Jon M. Sands
Federal Public Defender
District of Arizona
Emma L. Smith (IL No. 6317192)
Alison Y. Rose (CA No. 268937)
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
emma_smith@fd.org
alison_rose@fd.org
602.382.2816 Telephone
602.889.3960 Facsimile

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Cory Deonn Morris,<br><br>                    Petitioner,<br><br>  vs.<br><br>Charles L. Ryan, et al,<br><br>                    Respondents. | No. CV-17-00926-PHX-DGC<br><br><br>DEATH-PENALTY CASE |

# PETITION FOR WRIT OF HABEAS CORPUS
## 28 U.S.C. § 2254

**Table of Contents**

INTRODUCTION ................................................................................ 1

I. FACTS AND PROCEDURAL HISTORY. ...................................... 1

   A. Personal history. ................................................................... 1

   B. The crimes. ........................................................................ 18

   C. Procedural history. ............................................................ 23

      1. Pretrial proceedings. ................................................. 23

      2. Trial: guilt phase. ..................................................... 25

      3. Trial: aggravation phase. .......................................... 35

      4. Trial: penalty phase. ................................................. 38

      5. Direct Appeal. .......................................................... 42

      6. Post-conviction proceedings. ................................... 43

      7. Current proceedings. ................................................ 52

II. STATE COURT PRESUMPTION OF CORRECTNESS. .......... 53

III. EXHAUSTION. ......................................................................... 53

IV. THE AEDPA IS UNCONSTITUTIONAL. .............................. 54

   A. AEDPA suspends the writ of habeas corpus. ................... 55

   B. AEDPA violates the separation of powers doctrine. ........ 55

   C. Conclusion. ........................................................................ 57

V. FEDERAL CONSTITUTIONAL CLAIMS. ............................... 57

   CLAIM ONE ........................................................................... 57

   The trial prosecutor engaged in repeated and pervasive misconduct, violating Morris's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. ........................................................................... 57

      A. The prosecutor's pattern of misconduct. ...................... 59

      B. Morris's conviction and death sentence were obtained in violation of his constitutional rights due to pervasive prosecutorial misconduct. ............................................................................ 66

         1. Misstatement of facts. ............................................... 66

         2. Inappropriate focus on irrelevant and salacious information. ... 77

         3. Appeal to passions and fear. .................................... 83

         4. Uncharged aggravator. ............................................. 86

C. The state court ruled contrary to, and unreasonably applied, clearly established federal law in failing to find persistent and pervasive misconduct by the prosecutor that was prejudicial and made Morris's trial fundamentally unfair............................................. 87

D. Trial counsel was ineffective in failing to object to the prosecutor's pervasive misconduct.................................................... 93

CLAIM TWO.................................................................................. 95

Morris received ineffective assistance when his trial counsel failed to investigate and present evidence rebutting the prosecution's unsupported theory that Morris engaged in necrophilia. ........................... 95

A. Factual background.......................................................... 99

1. Pretrial preparation. .................................................. 99

2. The trial...................................................................... 101

3. Post-conviction proceedings.................................... 105

B. Morris's trial counsel failed to investigate, develop, and present evidence to rebut the necrophilia theory at the guilt phase. ............ 109

1. Counsel's performance was deficient..................... 109

2. Morris was prejudiced as a result of counsel's performance. . 112

3. The state court's rejection of this claim involved an unreasonable application of clearly established federal law and was based on an unreasonable determination of the facts............ 114

C. Morris's trial counsel failed to investigate, develop, and present evidence to rebut the necrophilia theory at the aggravation phase.. 118

1. Counsel's performance was deficient..................... 118

2. Morris was prejudiced as a result of counsel's performance. . 120

3. The state court's rejection of this claim involved an unreasonable application of clearly established federal law and was based on an unreasonable determination of the facts.......... 120

D. Morris's trial counsel failed to investigate, develop, and present evidence that Morris was not a necrophile and had not engaged in necrophilia at the penalty phase......................................... 122

1. Counsel's performance was deficient..................... 122

2. Morris was prejudiced as a result of counsel's performance .. 123

3. The state court's rejection of this claim involved an

unreasonable application of clearly established federal law and was based on an unreasonable determination of the facts. .......... 124

E. Conclusion ................................................................. 128

CLAIM THREE .......................................................... 129

Morris received ineffective assistance of counsel during the penalty phase of his capital trial proceedings in violation of his Sixth, Eighth, and Fourteenth Amendment rights. .......................................... 129

A. Trial counsel were ineffective for failing to investigate and present available, comprehensive mitigation evidence. .................. 130

1. Factual background. ................................................... 131

2. The state court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law. It was further based on unreasonable factual determinations based on the record before it. ............................. 143

3. Counsel performed deficiently. ................................. 153

4. Morris was prejudiced by counsel's deficient performance. .... 162

B. Trial counsel's failure to object to several instructional errors at the penalty phase of Morris's trial constituted ineffective assistance. ................................................................. 164

1. Trial counsel failed to object to an instruction that incorrectly informed the jury that Morris could be sentenced to life with the possibility of parole. ............................................ 165

2. Trial counsel failed to request that the jury be instructed that the cumulative effect of mitigation can be considered as a separate mitigating circumstance. ................................. 169

3. Trial counsel failed to request that the jury be instructed that mercy can be an independent mitigating circumstance. .............. 170

4. Trial counsel failed to request special verdict forms. .............. 171

C. Trial counsel was ineffective for failing to object to improper victim-impact testimony. ................................................ 171

D. Trial counsel were ineffective for failing to investigate and challenge juror misconduct in a motion for a new trial. .................. 174

CLAIM FOUR .......................................................... 175

Morris received ineffective assistance of counsel during the pretrial

stages of his trial, violating his rights under the Sixth and Fourteenth Amendments. ................................................................................... 175

    A. Trial counsel were ineffective for not filing a motion in limine to exclude evidence that purportedly showed that Morris engaged in necrophilia. .................................................................................. 177

    B. Trial counsel were ineffective in neglecting to properly investigate and present evidence to challenge Morris's statements to police. ................................................................................................ 182

        1. Factual background. ................................................................. 182

        2. Trial counsel failed to properly move to suppress Morris's involuntary statements to police. ................................................ 185

        3. Trial counsel neglected to properly investigate and present a defense to challenge Morris's statements at trial. ....................... 189

    C. Trial counsel were ineffective for failing to seek a severance of the multiple counts of first-degree murder. ..................................... 194

    D. Trial counsel were ineffective for failing to make appropriate objections during voir dire. ............................................................. 199

CLAIM FIVE ............................................................................................ 202

Morris received ineffective assistance of counsel during the guilt-phase of his trial, violating his rights under the Sixth and Fourteenth Amendments. ........................................................................................... 202

    A. Trial counsel were ineffective for failing to hire a pathologist to rebut at the guilt phase the cause of death for three victims. ...... 203

    B. Trial counsel were ineffective for failing to object to the Confrontation Clause violations that occurred when the medical examiners testified about the toxicology findings. ........................... 206

    C. Trial counsel we ineffective in failing to make a motion for acquittal on the ground that the State failed to present sufficient evidence to establish the corpus delicti of Codman and Davis. ...... 208

    D. Trial counsel failed to object to the standard of proof instruction at both the guilt and aggravation phases, rendering ineffective assistance. ..................................................................... 210

CLAIM SIX ............................................................................................... 212

Morris received ineffective assistance of counsel during the aggravation phase of his capital trial proceedings, in violation of his

Sixth and Fourteenth Amendment rights. ................................................. 212

    A. Counsel were ineffective for failing to challenge the (F)(6) aggravating factor with expert testimony. ........................................ 213

    B. Counsel were ineffective for failing to challenge the constitutionality of the aggravating factors. ..................................... 218

        1. Counsel failed to challenge the (F)(2) aggravating factor as a violation of Morris's rights under the Double Jeopardy Clause. 218

        2. Counsel failed to challenge jury instructions on the (F)(6) aggravating factor. ....................................................................... 219

CLAIM SEVEN ........................................................................................ 221

The trial court's denial of Morris's motions to dismiss and for judgment of acquittal, despite insufficient evidence, violated his constitutional rights. .................................................................................................... 221

    A. The admission of Morris's statements regarding the deaths of Codman and Davis without sufficient independent proof of corpus delicti rendered his trial fundamentally unfair in violation of his rights under the Fourteenth Amendment. ........................................ 221

    B. The trial court erroneously denied Morris's motion for judgment of acquittal in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments despite insufficient evidence that Morris murdered Codman and Davis. .......................................................... 224

CLAIM EIGHT ........................................................................................ 227

The introduction of unreliable scientific evidence rendered Morris's trial fundamentally unfair in violation of his rights under the Fourteenth Amendment. ............................................................................................ 227

CLAIM NINE .......................................................................................... 232

The introduction of extensive, poorly supported, and highly prejudicial evidence of necrophilia violated Morris's Fifth, Sixth, Eighth and Fourteenth Amendment rights. ................................................................ 232

CLAIM TEN ............................................................................................ 235

The trial court's failure to sever the counts against Morris resulted in a trial that was fundamentally unfair in violation of the Fourteenth Amendment and violated his Sixth Amendment right to an impartial jury. ...................................................................................................... 235

CLAIM ELEVEN ..................................................................................... 238

The trial court's admission of excessively gruesome photographs during the guilt and aggravation phases of Morris's trial resulted in the denial of a fair trial as guaranteed by the Sixth and Fourteenth Amendments, violated due process under the Fifth and Fourteenth Amendments, and rendered Morris's death sentences unreliable under the Eighth Amendment. ....................................................................... 238

CLAIM TWELVE ....................................................................... 243

The State failed to present sufficient evidence supporting the finding of the (F)(6) aggravating factor, an error the Arizona Supreme Court compounded on direct appeal, in violation of Morris's rights under the Fifth, Eighth, and Fourteenth Amendments. ............................................ 243

A. There was insufficient evidence to find the murders were cruel. ................................................................................................ 244

B. There was insufficient evidence to support a finding that the murders were heinous or depraved. .................................................. 248

CLAIM THIRTEEN ...................................................................... 251

Morris's due process and Eighth Amendment rights were violated when the jury was incorrectly instructed that if given a life sentence he could be eligible for parole. ....................................................................... 251

CLAIM FOURTEEN ..................................................................... 256

The jury-selection process deprived Morris of his rights under the Sixth and Fourteenth Amendments to be present at all critical stages of his trial and to a jury drawn from a representative cross-section of the community. ................................................................................... 256

A. Morris's absence during portions of the jury-selection process deprived him of due process. .......................................................... 259

B. The jury-selection process violated Morris's right to a jury drawn from a representative cross-section of the community. ........ 262

CLAIM FIFTEEN ........................................................................ 263

The trial court violated Morris's Sixth and Fourteenth Amendment rights when it admitted hearsay testimony in violation of the Confrontation Clause. ............................................................................. 263

A. The testimony of Dr. Keen about Noah's autopsy results violated the Confrontation Clause. .................................................. 265

B. The testimony of the medical examiners on the toxicology

findings violated the Confrontation Clause. ..................................... 267

CLAIM SIXTEEN ........................................................................ 268

Alternate jurors improperly participated in deliberations during Morris's trial, in violation of his Sixth and Fourteenth Amendment rights.......................................................................................... 268

CLAIM SEVENTEEN................................................................... 270

The prosecutor's discriminatory exercise of a peremptory challenge to strike a disabled prospective juror violated Morris's rights under the Fifth, Sixth, and Fourteenth Amendments............................................ 270

CLAIM EIGHTEEN ..................................................................... 273

The trial court violated Morris's Sixth, Eighth, and Fourteenth Amendment rights by erroneously denying his challenges for cause and forcing him to expend peremptory challenges.......................................... 273

CLAIM NINETEEN ...................................................................... 275

The Arizona courts violated Morris's Fifth, Sixth, and Fourteenth Amendment rights by admitting statements obtained from him in violation of the Constitution's voluntariness principles. ......................... 275

CLAIM TWENTY ......................................................................... 283

The reasonable-doubt instruction given at both the guilt and aggravation phases impermissibly lowered the State's standard of proof and shifted the burden to Morris, in violation of the Sixth and Fourteenth Amendments. ......................................................... 283

CLAIM TWENTY-ONE .................................................................. 285

Arizona's capital sentencing scheme is unconstitutional because it does not require that the jury find that the aggravating factors outweighed mitigating circumstances beyond a reasonable doubt, and the trial court's similarly flawed instruction violated Morris's Fifth, Sixth, Eighth, and Fourteenth Amendment rights................................................ 285

A. Under clearly established Supreme Court precedent at the time of Morris's appeal, he was entitled to relief based on the instructional error regarding the burden of proof at the penalty phase and Arizona's unconstitutional statute. .................................. 286

B. If *Hurst v. Florida* instead announced a new rule of constitutional law, it is retroactive to cases on collateral review. ... 288

C. Conclusion.................................................................... 290

CLAIM TWENTY-TWO .................................................................. 290

Morris's Sixth Amendment right to the effective assistance of counsel was violated by his direct appeal counsel's failure to raise meritorious claims on direct appeal.............................................................. 290

    A. Appellate counsel was ineffective for failing to challenge the sufficiency of the evidence supporting the (F)(6) aggravating factor or raise any argument that the jury abused its discretion in sentencing Morris to death................................................. 292

    B. Appellate counsel rendered ineffective assistance by failing to challenge the Confrontation Clause violations at the guilt phase of Morris's trial. .................................................................. 294

    C. Appellate counsel failed to challenge the introduction of unreliable scientific testimony from the medical examiners. .......... 296

    D. Appellate counsel failed to challenge the trial court's instruction that incorrectly informed the jury that Morris could be sentenced to life with the possibility of parole. ............................... 298

    E. Appellate counsel failed to challenge errors in the jury selection process..................................................................... 299

    F. Appellate counsel failed to challenge the trial court's failure to sever the multiple murder counts..................................................... 299

    G. Appellate counsel failed to challenge evidentiary errors............ 300

    H. Appellate counsel failed to challenge instructional errors at every phase of Morris's trial............................................................ 300

    I. Appellate counsel failed to challenge the application of the (F)(2) aggravating factor as a violation of Morris's rights under the Double Jeopardy Clause. ................................................... 301

    J. Appellate counsel failed to make several challenges to the constitutionality of the imposition of the death penalty in Morris's case. ............................................................................ 301

CLAIM TWENTY-THREE ........................................................ 302

Refusing to instruct the jury or permit the introduction of evidence and argument regarding residual doubt violated Morris's rights under the Sixth, Eighth, and Fourteenth Amendments.......................................... 302

CLAIM TWENTY-FOUR........................................................... 304

Arizona's death penalty sentencing scheme is constitutionally infirm

because it fails to require cumulative consideration of multiple mitigating factors by the jury..................................................................... 304

CLAIM TWENTY-FIVE ........................................................................ 306

Arizona's death-penalty scheme failed to require special verdict forms for the jury to indicate its specific findings on Morris's proffered mitigating circumstances, and this statute and the trial court's failure to use special verdict forms violated Morris's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. ..................................................... 306

CLAIM TWENTY-SIX ......................................................................... 308

The abuse of discretion standard of review mandated by Arizona Revised Statute § 13-703.05(A) is unconstitutional. ............................... 308

CLAIM TWENTY-SEVEN ..................................................................... 312

The state court violated Morris's rights under the Double Jeopardy Clause by convicting him of five counts of murder and considering the same conduct in sentencing him to death. ............................................... 312

CLAIM TWENTY-EIGHT ..................................................................... 313

Arizona's capital-sentencing scheme limits the jury's full consideration of mitigation evidence by requiring that mitigating circumstances be proved by a preponderance of the evidence, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.............. 313

CLAIM TWENTY-NINE........................................................................ 315

Because Morris was not indicted for a capital crime, and the aggravating circumstances were not included in the indictment, Morris was not provided sufficient notice of the alleged aggravating circumstances, nor was there a finding of probable cause as required by the Fifth, Sixth, Eighth, and Fourteenth Amendments. ........................... 315

CLAIM THIRTY ..................................................................................... 317

The especially cruel, heinous, or depraved aggravating factor, as well as the jury instructions given here on the factor, are unconstitutionally vague and violate the Eighth and Fourteenth Amendments to the United States Constitution. ................................................................................. 317

CLAIM THIRTY-ONE ............................................................................ 322

The admission of inflammatory and irrelevant victim-impact evidence resulted in a fundamental violation of Morris's Eighth and Fourteenth Amendment rights, and to the extent that Arizona Revised Statutes

§§ 13-752(R) and 13-4426(A) authorized such statements, they are unconstitutional. ........................................................................ 322

CLAIM THIRTY-TWO .............................................................. 326

Morris's jury was not instructed to consider mercy or sympathy as a mitigating circumstance in violation of his Sixth, Eighth, and Fourteenth Amendment rights. ......................................... 326

CLAIM THIRTY-THREE.............................................................. 328

Capital punishment is categorically cruel and unusual, in violation of the Eighth and Fourteenth Amendments. ................................ 328

CLAIM THIRTY-FOUR ............................................................ 331

The death penalty violates Morris's rights under the Eighth and Fourteenth Amendments to the United States Constitution because it is irrationally and arbitrarily imposed; the death penalty serves no penological purpose that is not adequately addressed by life imprisonment. ...................................................................... 331

CLAIM THIRTY-FIVE................................................................ 333

Arizona's capital-sentencing scheme violates the Eighth and Fourteenth Amendments because it affords the prosecutor unbridled discretion to seek the death penalty. ......................................... 333

CAIM THIRTY-SIX.................................................................... 334

Arizona's capital-sentencing scheme discriminates against indigent young male defendants, in violation of the Eighth and Fourteenth Amendments to the United States Constitution....................................... 334

CLAIM THIRTY-SEVEN............................................................ 336

Arizona's capital sentencing scheme violates the Fifth, Eighth, and Fourteenth Amendments because it denies capital defendants the benefit of proportionality review of their sentences. .............................. 336

CLAIM THIRTY-EIGHT............................................................ 337

Arizona's death penalty scheme is unconstitutional because it does not sufficiently channel the sentencing jury's discretion to impose death because it includes so many aggravating circumstances that virtually every defendant convicted of first-degree murder is eligible for death and because it does not set forth objective standards to guide the jury in weighing the aggravating circumstances against the mitigating circumstances, in violation of the Eighth and Fourteenth Amendments.

.............................................................................................. 337

CLAIM THIRTY-NINE ................................................................... 341

Execution by lethal injection is cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.. 341

    A.   Arizona   has   a   troublesome   history   of   carrying   out lethal-injection executions. ............................................................. 341

       1. Illegal importation. ................................................................ 342

       2. Protocol violations. ............................................................... 343

       3. Human experimentation.......................................................... 346

    B. Lethal injection as carried out by Arizona is cruel and unusual. ........................................................................................................ 348

CLAIM FORTY........................................................................... 349

Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments because it requires a death sentence whenever one aggravating circumstance and no mitigating circumstances are found with respect to an eligible defendant. ...................................................... 349

CLAIM FORTY-ONE ..................................................................... 350

Due Process requires that this Court re-evaluate Morris's death sentence in light of the significant changes to Morris's person and circumstances in the twelve and a half years since he was sentenced..... 350

CLAIM FORTY-TWO ..................................................................... 353

The imposition of the death penalty on persons under the age of twenty-five at the time of the offense serves no penological purpose and therefore constitutes cruel and unusual punishment. ........................ 353

CLAIM FORTY-THREE ................................................................... 359

The death penalty violates human rights and international law and thereby violates Morris's Eighth Amendment rights.............................. 359

CLAIM FORTY-FOUR ................................................................... 361

Morris will be denied a fair clemency process in violation of the Eighth and Fourteenth Amendments. ....................................................... 361

CLAIM FORTY-FIVE ..................................................................... 362

It would violate Morris's right to be free from cruel and unusual punishment for the State of Arizona to execute him after he has spent over twelve years on its death row.......................................................... 362

CLAIM FORTY-SIX ................................................................... 366

    The imposition of the death penalty on a person with organic brain damage violates the Eighth and Fourteenth Amendments. ..................... 366

        A. Infliction of capital punishment upon individuals who suffer from organic brain impairment at the time of the offense makes no measurable contribution to the acceptable goals of punishment. ..... 367

            1. Retribution is not served by executing those who have brain impairment at the time of the offense. ......................................... 368

            2. Deterrence is not served by executing those who have organic brain damage at the time of the offense. .......................... 369

        B. Like intellectual disability, aspects of organic brain impairment undermine the strength of the procedural protections that our nation's capital jurisprudence steadfastly guards. ........................... 369

CLAIM FORTY-SEVEN .......................................................... 371

    Death qualifying Morris's jury deprived him of an impartial jury and a fair and reliable trial in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. ................... 371

CLAIM FORTY-EIGHT ........................................................... 373

    Pursuant to the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, Morris was entitled to the constitutionally effective assistance of counsel during his state post-conviction proceedings. However, his counsel performed deficiently and Morris was prejudiced as a result. ...................................................... 373

        A. Deficient performance. ............................................... 380

        B. Prejudice. .................................................................. 382

CLAIM FORTY-NINE ............................................................. 383

    Morris's conviction and sentence must be vacated due to the cumulative prejudicial effect of the errors in this case. ........................... 383

PRAYER FOR RELIEF ............................................................ 385

xii

1
2

**INTRODUCTION**

Pursuant to 28 U.S.C. § 2254, Cory Deonn Morris respectfully petitions this
Court for a writ of habeas corpus freeing him from the custody of Respondents,
pursuant to the judgments and sentences of an Arizona state court, on the grounds
that those judgments and sentences were obtained and affirmed in violation of his
rights under the United States Constitution. Morris is in the custody of the Arizona
Department of Corrections ("ADC") because he was sentenced to death following
his convictions in 2005 for first-degree murder.

**I.     FACTS AND PROCEDURAL HISTORY.**

**A.     Personal history.**

Cory Deonn Morris ("Cory")[1] was born in Oklahoma City, Oklahoma on
May 10, 1978, to Wilma Eileen Morris ("Wilma"). Wilma discovered she was
pregnant with Cory at the age of seventeen, but did not give her parents the news
right away. (PCR Pet. Ex. M(D)(11) at 2 ¶ 8.)[2] Growing up as the middle child of
eleven children, Wilma was not close to her mother, Ernestine Morris ("Ernestine"),
and did not receive much attention from her parents. (PCR Hr'g Ex. 1 at Ex. D-7 at
12.) She referenced her place in the household as "just another kid." (PCR Hr'g Ex.
1 at Ex. D-7 at 12.) Wilma also learned at an early age that she was the product of

---

[1] To avoid confusion between family members with the same last names, throughout
this section Morris will be referred to by his first name only.

[2] When counsel is referring to the state court record, reporter's transcripts are
designated "Tr." followed by the relevant date and page number. Indexed
documents from the record on appeal are designated "IOR" followed by the docket
number, and exhibits from the trial and sentencing proceedings are designated "Trial
Ex." followed by the exhibit number. Direct appeal documents from the Arizona
Supreme Court record are designated "DA" followed by the docket number.
Documents from the state post-conviction proceedings are also designated "IOR,"
followed by the docket number. Exhibits to the post-conviction petition are labeled
"PCR Pet. Ex.," while exhibits from the post-conviction evidentiary hearing are
labeled "PCR Hr'g Ex." Documents from the petition for review proceedings are
designated "PFR," followed by the docket number. Counsel is using the docket that
the Maricopa County Superior Court prepared for the petition for review
proceedings that includes both the trial and PCR documents and is numbered 1–505.

an extra-marital affair—the man she had always known as her father, Quincy Morris ("Quincy"), was not her biological father. However, Ernestine warned Wilma never to discuss it because Quincy would kill them both if he ever found out Earnestine had cheated on him. (PCR Pet. Ex. M(D)(11) at 1 ¶ 5.)

Wilma waited until she started showing to tell Earnestine about the pregnancy. After that, Wilma was removed from her high school and sent to a special school for pregnant girls. (PCR Hr'g Ex. 1 at Ex. D-7 at 12.) After Cory's birth, she returned to her regular school to finish her senior year. (PCR Hr'g Ex. 1 at Ex. D-7 at 12.)

Wilma had briefly dated Cory's father, Arthur Johnson Jr., aka Dontalevar, ("Arthur"), who, at the time, was married and on leave from the Army. At twenty-one years of age, Arthur was older than Wilma. After only a few months of dating, Wilma became pregnant, and the relationship was over soon after. Arthur's name is not on Cory's birth certificate, and he was in jail when Cory was born. (PCR Pet. Ex. M(D)(11) at 2 ¶ 8.) Arthur remained absent for nearly all of Cory's formative years, seeing Cory only two or three times before his junior year of high school. (PCR Pet. Ex. T at 2.) Arthur had a history of mental health issues. On one occasion, he drank a combination of bleach, battery acid, and gas after a girlfriend attended a school dance with someone else. He cut himself multiple times due to his mental state surrounding his breakup with Wilma. He also received mental health treatment while in the military, with noted concerns about his psychiatric stability, history of drug use, suicide attempts, and therefore his ability to continue service.

Mental illness also was pervasive in Wilma's family. Her sister Sandra, and later Sandra's daughter, suffered from schizophrenia and bipolar disorder, and Wilma and her sister Melva struggled with depression. In addition, Wilma and several siblings had learning disabilities. (PCR Pet. Ex. M(D)(11) at 1 ¶¶ 3–4, PCR Pet. Ex. M(A) at 1–2 ¶ 3.)

Wilma does not remember much of Cory's childhood or that period of her life, and likewise, possesses little memory of her own childhood. (PCR Hr'g Ex. 1 at Ex. D-7 at 11.) Wilma suspects that she may have been molested by one of her brothers when she was a girl. (PCR Pet. Ex. M(D)(11) at 2 ¶ 7.) She recalls an uncomfortable experience waking up and seeing him by the door watching her; she remembers habitually sleeping fully clothed and wonders if she did so in order to shield herself from further abuse.

Wilma also suspects that Cory may have been a victim of sexual abuse. (PCR Pet. Ex. M(D)(11) at 2 ¶ 16.) When Cory was two, Wilma took him to the hospital multiple times for suspected symptoms of rectal bleeding and diarrhea; she told hospital staff that she suspected he had been molested. (PCR Pet. Ex. M(A) at 5 ¶ 19.) She remembers that Cory became hysterical when it came time for him to get on the bus to go to daycare and always wondered if something may have happened to him there.[3] (PCR Pet. Ex. M(A) at 5 ¶ 19.)

Wilma became pregnant with her second child, Candace Morris Evans Verbal ("Candace"), just two years after Cory's birth, and again with another son, Brandon Morris ("Brandon"), about a year and a half after that. (PCR Hr'g Ex. 1 at Ex. D-7 at 12.) None of Wilma's three children had the same father. Nor were any of the fathers involved long-term with the children or had any meaningful relationships with them. (PCR Pet. Ex. M(D)(11) at 2 ¶ 11.) In fact, each had his own problems with the law, drug-dependence, or both. (PCR Pet. Ex. M(A) at 3 ¶ 13.)

As a twenty-two years old single mother responsible for three young children, Wilma was struggling. (PCR Hr'g Ex. 1 at Ex. D-7 at 12–13.) Her parents provided some help, for example helping with child care and taking Wilma's family

---

[3] Cory's friend, Terri Jones, said later that Cory told her that he had been molested, it was a devastating experience, and he told his mother about it. (PCR Pet. Ex. T at 9; PCR Pet. Ex. M(A) at 5 ¶ 20.)

in for a short period when Cory was a baby. Eventually, Wilma got her own apartment. (PCR Hr'g Ex. 1 at Ex. D-7 at 12.) However, the young family struggled to find stability living in economically deprived areas. (Trial (mitigation phase) Ex. 19.)[4]

When Cory was an infant, Wilma moved with him to Phoenix, Arizona, but returned to Oklahoma City after about three months. (PCR Hr'g Ex. 1 at Ex. D-7 at 12–13.) After her other two children were born, the family moved residences five or six times just during the time Cory was in elementary school. (PCR Hr'g Ex. 1 at Ex. D-7 at 13.) He had to repeat the sixth grade because of one of their moves. (PCR Hr'g Ex. 1 at Ex. D-7 at 5.) Wilma received assistance from the government during those difficult times, but only did so temporarily. She decided, when her children were young, that she would not remain on welfare and did not want to support her family that way.

Wilma went to work for an office cleaning business when Cory was about six years old; she came to be known by the business owner as a committed and valuable employee. (Trial (mitigation phase) Ex. 19.) About a year later, Wilma took on a second job while continuing the cleaning work at night. (Tr. July 18, 2005 at 57–58.) When Cory was in the first and second grades, Wilma left the house early for work while Cory remained home and made his way to the school bus on his own. (PCR Hr'g Ex. 1 at Ex. D-7 at 11.)

At the age of seven, Cory had already become burdened with responsibilities related to his own care, home life, and the care of his younger sister and brother. (PCR Pet. Ex. T at 2.) He was responsible for their safety, such as making sure the doors were locked, as well as cooking and making sure they were fed. (Tr. July 18,

---

[4] Amy Nguyen of Capital Maps, LLC, concluded during post-conviction proceedings that "Mr. Morris's childhood was marked by patterns of poverty, lack of male role models and under education in his home communities." Nguyen's analysis was based on Oklahoma County census data and information from the Office of Juvenile Justice and Delinquency. (PCR Pet. Ex. CC.)

2005 at 58–59.) Cory remained in his role as designated caretaker throughout his middle and high school years, with only a brief reprieve when he moved away from home for the first time. (PCR Pet. Ex. T at 2.)

Cory recalls that, when he was about seven or eight years old, he began to distrust his mother, a feeling that strained their relationship over time and resulted in physical and emotional distance between mother and son. Wilma sent Cory to live with his aunt, Melva, at the young age of eight, approximately 1,000 miles away, in Phoenix, Arizona, while Candace and Brandon remained in Wilma's care. (PCR Pet. Ex. M(D)(11) at 2 ¶ 9; Tr. June 13, 2005 at 99.) Melva was single and had no children, but was a mother figure for Cory. Although Wilma reported Cory having had some difficulties with reading and school (PCR Hr'g Ex. 1 at Ex. D-7 at 12), Cory completed third grade in Phoenix, and his only problem there was not turning in homework. And Melva met with Cory's teacher, worked out a system, and the problem resolved.

At the end of the school year, Cory reunited with his mother and siblings; in doing so, he resumed his role as their caretaker and man of the house. (PCR Pet. Ex. M(D)(11) at 1 ¶ 4) Wilma consistently worked hard to provide for her family and was firm with Cory about rules he needed to follow in her absence. (PCR Pet. Ex. T at 2.) She was strict, which was attributed to her being a single mother. (PCR Pet. Ex. T at 2.) Cory received the brunt of his mother's harshness. Cory's best friend did not see him and his mother "interact as mother and son." Another of Cory's friends described Wilma as unemotional and mean. As a teen, Cory was afraid of his mother and nervous at the thought of her returning home to find him not strictly complying with her rules by, for example, allowing his siblings to play outside. Their relationship was such that people who know Cory relate his current incarceration and mental health issues or dysfunction directly to the relationship, or lack thereof, between him and his mother.

Wilma used the same harsh disciplinary tactics on Cory and his siblings that

she experienced at the hands of her parents, Quincy and Ernestine. (PCR Pet. Ex. M(D)(11) at 2 ¶ 6.) Ernestine whipped her children with any object within reach, including hangers, belts, tree branches, and cords. (PCR Pet. Ex. M(D)(11) at 2 ¶ 6.) Ernestine also disciplined her grandchildren, including Cory, in the same manner, sometimes with "severe whippings." (PCR Pet. Ex. M(D)(16) at 1 ¶ 4.)

Cory also was exposed at a young age to drugs. His uncle, James Jackson ("James"), used street drugs—cocaine and marijuana—and sold them as well. (PCR Pet. Ex. M(D)(27) at 1 ¶ 6.) James spent a lot of time around Cory, and lived with Wilma and the children. (PCR Pet. Ex. M(D)(27) at 1 ¶¶ 2, 5.) Cory witnessed his uncle using drugs. (PCR Pet. Ex. M(D)(27) at 1 ¶ 6.) Wilma's brothers, Charles and Cary Morris, and sister, Gwendolyn Morris, also used drugs. (PCR Pet. Ex. M(D)(11) at 1 ¶ 3.)

Cory did not make friends easily and really had only one good friend at Douglass High School, where he attended from 1994 to 1996. (Tr. July 14, 2005 at 63.) This friend, Tony Hollars ("Tony"), tried to integrate Cory into his group of friends, but they did not want Cory to be included. They made fun of him, as did other students who teased and talked about him behind his back by, for example, calling him "Stinky." (Tr. July 14, 2005 at 48, 82.) Throughout his years at Douglass High, Cory was known as the fat, ugly, and smelly kid. (Tr. July 14, 2005 at 47). His bad acne, described as blackheads with pus coming out, was noticeable and said to be revolting. (Tr. July 14, 2005 at 47.) He had constant body odor and weight problems, both of which followed him into adulthood. (PCR Pet. Ex. T at 2.)

In a devastating incident, a popular and attractive girl, Crystal Hoover ("Crystal"), agreed to attend the annual Military Ball with Cory his freshman year. (Tr. July 14, 2005 at 55–59.) Cory was ecstatic. (Tr. July 14, 2005 at 56.) He paid for their dance tickets, Crystal's dress, and her corsage, and proudly told people about his plans. (Tr. July 14, 2005 at 57.) But it turned out to be a cruel joke by

Crystal. She attended the ball with Cory, but ditched him soon after they arrived, leaving with another boy. (Tr. July 14, 2005 at 56.) Cory had an emotional breakdown over the incident as peers ogled at school, and he had to be consoled by a teacher. (Tr. July 14, 2005 at 58.)

Cory attended church regularly with his family (Tr. July 14, 2005 at 91– 92), and found refuge in the Army JROTC at Douglass High; it was his life (Tr. July 14, 2005 at 46). Cory knew from the time he saw a color guard assembly in middle school that he wanted to someday join ROTC. A high school peer remembers ROTC as the "only time I really seen him smile." (Tr. July 14, 2005 at 73.) His instructor found Cory dependable and enthused about the program and his duties. (Tr. July 14, 2005 at 81.) Cory excelled, successfully completing three years of training, and was recommended for promotion. (PCR Pet. Ex. M(C) at 40.) ROTC added structure to Cory's life. His ability to succeed in ROTC despite the challenges he faced both at home and in school was remarkable. But this balance proved untenable as Cory grew older.

Cory was an average student, at minimum, until he reached high school. Records reflect a gradual decline in academic performance beginning in his freshman year. By junior year, Cory was failing the main subjects. He was faced with constant taunting related to his acne, weight, and persistent body odor. (Tr. July 14, 2005 at 47, 82.) And his weight problem surfaced as a threat to his dream of joining the military. His ROTC instructors warned him that he needed to lose weight if he still hoped to join the service; Cory was losing focus. (Tr. July 14, 2005 at 79–80.) He reported that chronic sleep disturbance, which he still experiences in adulthood, began while a teenager in high school. (PCR Pet. Ex. L at 1.) As early as age thirteen or fourteen, he just "stopped sleeping." (PCR Pet. Ex. T at 5.)

In March 1996, Cory collapsed in a school hallway, hitting his head. He experienced chest pains and physical weakness. He was transported to the

emergency room where he presented as anxious; he was crying and curled up on his side. Earlier that morning, he had told his mother he had a headache and chest pain and wanted to stay home, but she insisted that he go to school.

And Cory suffered other head injuries. He fell head-first off of his scooter onto the cement porch at his aunt's home. Separately, he had a bike accident, wherein he fell down hitting his head and losing consciousness for a significant period of time. Candace noticed that Cory had been gone from the house for an inordinately long time, and when he returned, he appeared out of sorts and reported what had happened. (PCR Pet. Ex. M(D)(31) at 1 ¶ 4.)

Cory's home life was increasingly stressful and unbearable in high school, especially the relationship between him and his mother. Cory felt like he was constantly and unjustly in trouble with Wilma and that she was impossible to please. Indeed, he was in trouble even when he had done nothing wrong. (PCR Pet. Ex. T at 9.) If Brandon or Candace misbehaved, Cory was blamed and punished because he was supposed to be in charge. And, although Cory was tasked as the caretaker, he and Brandon fought and constantly butted heads. (Tr. July 18, 2005 at 62.) Brandon was stubborn and did not listen to Cory.

Cory was not the only one of his sibling to experience hardships while growing up. Candace was a victim of multiple sexual assault attempts, one by a school peer and another by a neighborhood playmate's father, resulting in his arrest. (PCR Pet. Ex. T at 14, PCR Pet. Ex. M(D)(11) at 3 ¶ 17.) Brandon was regularly involved in fights at school and experimented with drugs in his youth. (PCR Pet. Ex. M(A) at 4 ¶¶ 16, 18.) Even so, Candace and Brandon had more opportunities for normalcy in their childhoods and were able to do more without the adult responsibilities heaped on Cory. Indeed, his siblings were more outgoing and socially accepted, and participated in a myriad of school activities, sports, and social functions.

The family's neighbors noticed that Cory took care of himself and his

siblings; he was the head of the house when Wilma was away working. Regardless of his housekeeping efforts, looking after his siblings, and contributing money from his job, Wilma was never happy with Cory. He had grown more distrustful of her over the years and resented her; those feelings culminated and surfaced in a major disagreement. (PCR Pet. Ex. M(D)(14).) Wilma had purchased a truck for Cory; the title remained in her name, but Cory paid for insurance and gas. (PCR Pet. Ex. T at 2.) The truck needed repairs, but they were going to be costly, so Wilma sold the truck on the advice of her boss. Cory was upset and felt betrayed, not just that she sold the vehicle, but that she had refused to sell the truck to him despite his offer to buy it. The incident resulted in a fight in which Cory raised his voice to his mother (something he had never done), and in which his normally unemotional mother was so upset that she sobbed; this was the first time Candace had ever seen her mother cry.

Cory contacted his father, Arthur, in Austin, Texas, and requested to go live with him. Cory abruptly left Oklahoma City in early May 1996 with only a few weeks remaining of his junior year at Douglass High. He enrolled in the Austin Independent School District, completing his junior year at a new school where he knew no one. He found himself in an unfamiliar living situation with two people, his father and step-mother, whom he barely knew. Cory's father has been married numerous times and been described as physically and emotionally abusive. (PCR Pet. Ex. M(A) at 6 ¶ 22.) Arthur locked an ex-wife in a room, tied her to a bed, and forced her to have intercourse. (PCR Pet. Ex. M(A) at 6 ¶ 22.) He also violated her with a broom handle. (PCR Pet. Ex. M(A) at 6 ¶ 22.) As a child, he set a field on fire, resulting in the fire department intervening, and he stole things from his mother and others. Arthur also dropped mice into hot grease growing up and would ask his siblings if they could hear the mice scream.

Cory discovered that the high school in Austin did not have JROTC. He decided to enlist in the U.S. Army Reserves at Camp Mabry, which he did in July

1996, and he participated in Initial Active Duty with the Reserves during the school year from 1996 through 1997. (PCR Pet. Ex. M(C) at 8.) He committed, upon graduation, to report for active duty no later than June 5, 1997, approximately one year after his initial sign-up. (PCR Pet. Ex. M(C) at 12.) A military career was Cory's ultimate goal and the one and the only avenue for success he envisioned for himself. That plan, however, crumbled in the months to follow as Cory's mountain of tasks grew. He had to finish high school, fulfill his monthly Reserves duties, work in order to earn money, assist his father with his car repair business, attempt to get his weight (flagged at enlistment) under control, and navigate his relationships with his father and stepmother as well as their relationship with each other, which was at times volatile. (PCR Pet. Ex. T at 3.)

Cory was able to participate in a school program that allowed him to focus on classes necessary for graduation, as opposed to additional electives. He had little to no support at school, hardly talking to counselors, teachers, or peers. The program also required that he work, and he obtained a job at Sonic, the fast food restaurant. He completed all coursework the first semester he was enrolled in the program, all the while working half-days. He increased his work hours his second semester.

Cory's stepmother, Indalita "Lisa" Johnson ("Lisa"), began to notice that Cory was always tired. She observed that her husband, Cory's father, was mean to Cory and especially hard on him, particularly about his weight and poor eating habits. While Arthur admitted to whipping Cory with a belt, he claimed that Lisa was the one who was mean to Cory. She hit him, slapped him, and "cut him down" by yelling and screaming at him. According to Arthur, Lisa had mood swings and, when not being unkind, treated Cory like a son.

Cory was required to save a portion of his earnings from his job at Sonic, and Lisa helped him to open a savings account. He was also required to set aside a portion of his earnings to contribute to paying the bills, and he could keep the

remaining portion. However, there was little to show for the money Cory put toward paying the bills, as Arthur's and Lisa's home was frequently without water and electricity. And Cory later discovered that the money he had been giving them over the course of several months to deposit in his savings account was nonexistent—they had stolen thousands of dollars from him. Lisa claimed that Arthur made her withdraw the money and give it to him.

Arthur had promised Cory a car, but Cory never had the money needed for the repairs, and the car remained titled in Arthur's name. Because Cory did not have the time or the money to work on the car, he spent a considerable amount of time helping Arthur repair other people's vehicles for his business. In fact, Cory worked harder at the business than Arthur did, but he hardly compensated Cory.

Cory's image of his father was further tarnished upon learning that Arthur—clergy in the church they attended—was engaging in sexual relationships with women other than his wife, Lisa. (PCR Hr'g Ex. 1 at Ex. D-7 at 4, PCR Pet. Ex. M(A) at 5 ¶ 21.) While Lisa was working at night, Arthur would disappear from the house. (PCR Pet. Ex. M(A) at 5 ¶ 21.) Cory believed that his father was providing financial support to his mistresses, especially considering that the family's utilities and necessities were not being paid for, despite the money Cory had contributed.

Thus, it was no surprise that Cory continued to struggle with his weight in Austin, and, in fact, gained almost forty pounds. At the time of enlistment in May 1996, Cory weighed in at 219 pounds, and had been cautioned repeatedly by the Reserves personnel that he needed to lose weight. They had also offered him weight loss and control assistance, but Cory did not have the wherewithal to take them up on the offer. By the following May, he weighed in at 255 pounds, with his body fat at thirty percent. (PCR Pet. Ex. M(C) at 8.) His father's constant harping on Cory about his weight and eating habits likely had the opposite of its intended effect; Arthur acknowledged that Cory dealt with stress by eating. Cory's dreams of military service were slipping away.

11

By the end of his senior year, Cory had grown tired of Arthur's and Lisa's mistreatment of him and disheartened by his circumstances in Austin. It had been perhaps the most miserable year of Cory's life. A return to Oklahoma City was not necessarily what he wanted, especially not long-term, but he knew he could not remain in Austin and had nowhere else to go. Cory left Austin immediately following his high school graduation in May 1997. Wilma and Candace drove from Oklahoma City to attend the ceremony, and a tense transition followed. Lisa was upset with Cory for allowing his sister inside their home after Candace accompanied him there to change clothes after the ceremony. Wilma called law enforcement to the house to supervise as Cory gathered his belongings. Cory left the car that was supposedly his; it was still inoperable and in his father's name.

Arthur contacted the Army and told them that Cory left for Oklahoma following a disagreement with his stepmother and had no intention of reporting for active duty. (PCR Pet. Ex. M(C) at 8.) In Oklahoma City, Cory approached his former ROTC instructor about next steps. But Cory did not have with him in Oklahoma his paperwork from the Army Reserves, and he was uncertain about how to proceed.

Cory was unhappy, depressed, and unsettled back in Oklahoma. He got a job and spent time, when he was not working, driving his sister and her friend to school-related functions and church activities. He returned to spending time with his best friend, Tony, and Tony's girlfriend, Terri Jones ("Terri"), who was also a close friend of Cory's. He, Tony, and Terri visited the Army recruiter together. Cory was at a loss when he was not accepted into the Army; Terri was in the same situation. Tony and Cory had considered themselves "all army" since ROTC and purposefully did not apply to colleges because they knew they were going to enlist. Yet, Tony was the only one to be accepted. Although he was happy for his friend, Cory was crushed.

Terri had a young child; Tony and Cory were like surrogate fathers to the

little boy. The child had idiopathic epilepsy and died within hours of slipping and hitting his head. Terri and Cory were the last to see him and carried significant guilt over the child's death. (PCR Pet. Ex. T at 3.)

Tony and Terri then married in early January 1998. Cory drove Terri to Augusta, Georgia, where she and Tony would live; Tony had already been stationed there. (PCR Pet. Ex. T at 3.) Cory remained there with his friends for about five months. (PCR Pet. Ex. T at 3.) Being near Tony—regularly dropping him off and picking him up from the base—did something for Cory mentally; he desperately wanted to keep any connection to the military. (Trial (mitigation phase) Ex. 19.)

When Cory and Terri returned to Oklahoma City, he was again unsettled and without a plan. Candace had a steady boyfriend, whom she would eventually marry. She was working to complete high school and beginning to have children. Brandon was still in school and dealing with the trials of his teen years. He had already had his first child.

In late 1999, Cory's aunt Melva visited Oklahoma City along with her husband, Ronald Willis ("Ronald"), whom Cory had never met. He was not aware that they had married over ten years prior. Melva and Ronald agreed to let Cory live with them, and in the months that followed he made his way back to Phoenix. The move was an opportunity to get his life back on track in a city of which he had happy memories. But there, he ultimately found even less support, which contributed to a gradual emotional and mental decline.

The year Cory spent in Phoenix with Melva as a third grader had been among the happiest times of his life. However, Cory was unwittingly thrust into the middle of another unstable and unhealthy household upon his return to Phoenix. Unbeknownst to Cory, Melva had been long struggling in her marriage, mostly stemming from Ronald's abuse of her and his addiction to crack cocaine. Ronald had received inpatient substance abuse treatment as part of his probation "after numerous relapses of drug abuse" following a drug charge and plea. And Ronald

and Melva lost a foster care license and custodial child placement due to his crack habit. He had taken items from their home and sold them for drugs, and had abandoned Melva, leaving her in inhumane conditions. (PCR Pet. Ex. M(D)(18) at 1 ¶ 11.) Melva was depressed and suffered a breakdown. (PCR Pet. Ex. M(D)(18) at 1 ¶ 11.)

Melva's friend, Annette Petite, thought Cory moving to Phoenix would be good for Melva, a blessing; but, he ended up being impacted by her dysfunction with Ronald and then ostracized by them. Ronald disappeared for days, weeks, and sometimes months at a time on drug binges, and, when he did, Cory accompanied Melva to search for him. (PCR Pet. Ex. M(D)(18) at 1 ¶ 10.) Cory gave her money to help with the bills. (PCR Pet. Ex. M(D)(18) at 1 ¶ 10.) Yet, Cory was forced to sleep on the porch or some other place outside of the house after Ronald would return home. (PCR Pet. Ex. M(D)(18) at 1 ¶ 10.)

Cory had been in the Willises' home for about a year and a half when they kicked him out. (PCR Hr'g Ex. 1 at Ex. D-7 at 1.) He had been having mixed success with employment, going for periods without any, and Ronald and Melva grew frustrated. After leaving their home, Cory bounced around between living with friends and homelessness.

Cory worked a series of temporary, low-wage, or odd jobs to make money, such as selling perfume on the street, telemarketing, and selling food at the ballpark. (PCR Hr'g Ex. 1 at Ex. D-7 at 5–6.) He had not given up completely on his military dreams and visited a Navy recruiter—not the Army this time—in Phoenix, still to no avail. The rejection again left him "with neither a dream nor a plan."

In August 2001, Cory befriended Elizabeth Chavira ("Elizabeth"), who was almost twice his age and thrice married. (PCR Pet. Ex. T at 11, PCR Pet. Ex. Y at 11.) They struck up a relationship, and he moved in with her and her children—two of her four children lived with her. (PCR Pet. Ex. T at 11.) His body odor had persisted over the years and was still an issue; Elizabeth made him shower twice

14

daily. She found Cory to be immature, describing him as "like a 9 year-old in a 24 year old body." She was an alcoholic and self-proclaimed "bitch," and their tenuous relationship resulted in multiple breakups. (PCR Pet. Ex. T at 11.) Elizabeth became possessive and jealous, and cheated on Cory.

Cory shared an apartment for a time with some people he met through a friend he made while spending time in a local park. Cory sought help at Tumbleweed, a non-profit for homeless youth, but was told he was too old to qualify for services.

Cory returned to the Willises' home in 2002. (Tr. June 13, 2005 at 78–79.) This occurred after Wilma traveled to Phoenix to visit and discovered, while there, that Cory was homeless. She convinced her sister and brother-in-law to let him move back in with them. They allowed him to return, but only to sleep in the RV in their backyard. The RV was given to them by Cory's grandparents, so Cory would have a place to stay. (Tr. June 13, 2005 at 78–79; PCR Pet. Ex. M(D)(18) at 1 ¶ 10.) Ronald and Melva had taken in Cory's younger cousin, Evette Morris Rambo ("Evette"), from Oklahoma City, and she was using the room previously occupied by Cory. (Tr. June 13, 2005 at 77–78.) Cory was allowed access to the house for necessities like eating and using the restroom. The RV did not have running water.

Ronald continued to abuse illegal narcotics, hired prostitutes, and now physically and sexually abused Evette. (PCR Pet. Ex. M(D)(5) at 1 ¶ 4, PCR Pet. Ex. M(D)(7) at 1 ¶ 4.) By the age of sixteen, when she was sent to live with the Willises, Evette had already suffered extensive physical abuse by her mentally ill mother at the age of two, the physical removal from her mother's care by the State of Oklahoma, the death of her grandfather and mental and physical decline of her grandmother (her legal custodians), and the separation from her four siblings who remained in Oklahoma. (PCR Pet. Ex. M(D)(5) at 1 ¶ 4.) Ronald preyed on his vulnerable niece. He raped her, first when she was seventeen, and continuously violated her until she was twenty and she retreated back to Oklahoma. (PCR Pet. Ex. M(D)(5) at 1 ¶ 4.)

Ronald and Melva denied Evette mental health treatment while she was in their care. She told them that she needed to see a counselor; she was depressed and would stay in her room and eat. She had received mental health treatment previously in Oklahoma City. The Willises refused her requests for professional help in Phoenix.

Cory was not aware that Evette was being molested, but was well aware of the general mistreatment of her because it was similar to what he experienced. He knew that she was miserable in the Willises' home and did not want to be there, feelings he shared. Sometimes he went into the residence just to check on Evette. Ronald talked down to them both and made them feel inferior. Melva, after agreeing to help her nephew and then her niece, not only failed to protect them from her abusive husband, but actively participated in his mistreatment of them.

Ronald and Melva abused Cory mentally and treated him like he was nothing. They talked about him "like a dog" whether or not he was present. It was clear they did not want him around and said things to him such as, "You need to get your stuff; we're trying to move this camper," and, "You stink; you need to go somewhere."

Cory found solace in a group of misfits, homeless sorts who had banded together. One friend, Hassan Akbar ("Hassan"), had an apartment, and Cory stayed off and on with him. (PCR Pet. Ex. M(D)(5) at 1 ¶ 5.) His friends knew Cory hated his uncle and hated to go home. When he was sleeping in the RV, Cory on occasion went inside the house to eat. As a result, his aunt and uncle took away his keys. Cory shared with Hassan that his aunt and uncle did not want him to eat the food in the house, so he bought food that he took to Hassan's to cook.

Like his attempt to be a part of a family with Elizabeth, Cory befriended Susan Luchenta ("Susan"), a mother of three sons. She was separated from her husband when she and Cory were introduced. Cory babysat and spent time with her children. He expressed his desire to be with Susan regardless of her plan to reunite with her husband. He went so far as to steal $600 from his job at Goodwill to help

her after she had expressed financial difficulty.[5] (PCR Pet. Ex. T at 7.) He was in no position to help anyone financially. He was regularly donating plasma for money. He also resorted to selling drugs as a means of making money. Cory smoked marijuana sporadically but was not known to use other drugs or drink heavily. (PCR Hr'g Ex. 1 at Ex. D-7 at 16.)

Prior to Elizabeth and Susan, Cory engaged in a friendship and sexual relationship with prostitute and drug addict, Denae Jackson ("Denae"), aka Gloria Lewis, who he first met as a "trick." (PCR Pet. Ex. Y at 11.) He pursued Denae and expressed his desire for her to be his wife, after which she ended the relationship. (PCR Pet. Ex. Y at 11.) Denae was not the only woman Cory had paid for sex. (PCR Pet. Ex. Y at 14.)

On one occasion, Cory, while out walking in Phoenix, fell to the ground and, in the several weeks that followed, he experienced numbness on the side of his face. (PCR Pet. Ex. T at 4.) He did not seek medical treatment, but others noticed a difference in his appearance as well slurring in his speech. (PCR Pet. Ex. T at 4.)

People that spent time around Cory thought he seemed like two people, that he had multiple personalities, and that he lived in a fantasy world. None of the observations were made with the implication that he was malicious or intentionally deceitful. For example, Cory shared with others the loss of a girlfriend who was pregnant with his child. (PCR Hr'g Ex. 1 at Ex. D-7 at 13.) No one—neither friends nor family—had knowingly met the girlfriend; in fact, most doubted she existed. When sharing the experience, Cory consistently showed genuine emotion and a sense of loss. Also consistent has been that the woman and child died tragically. Dr. Richard Lanyon examined Cory in 2003 and said that Cory engaged in "massive fantasy" and opined that Cory could have 'difficulty telling the difference between some of the fantasy and reality; possibly he believes some of the fantasy[.]" Judith

---

[5] *State of Arizona v. Cory Deonn Morris*, CR2002-020163.

V. Becker, Ph.D. agreed that Cory's fantasies were not meant to deceive "but to create a life, both in the eyes of others and in his own mind, that is much richer and more important than the dreary life he has actually lived." (PCR Pet. Ex. T at 19, PCR Hr'g Ex. 1 at Ex. D-7 at 22.)

Cory's life had been unraveling over time, and some of the people around him in Phoenix noticed subtle signs. The friends Cory clung to in Phoenix, in an attempt at seeking some normalcy and a place to belong, observed times when Cory was unusually quiet, depressed, and crying. He had resorted to activities that were totally out of character and unlike the responsible, happy-go-lucky church boy who friends and family in Oklahoma City had known. (PCR Hr'g Ex. 1 at Ex. D-7 at 11.)

**B.    The crimes.**

On September 11, 2002, the nude, partially decomposed body of forty-six-year-old Barbara Lucille Codman was discovered in an alley in central Phoenix after a resident alerted Phoenix police at 5:47 a.m. (Tr. June 28, 2005 at 86–87.) The surface streets bounding the crime scene were North Seventh Street and North Ninth Street, East Pierce Street and East McKinley Street.

Dr. John Hu of the Maricopa County Medical Examiner's Office listed the cause of death as "[c]ombined toxicity of morphine and cocaine" and listed the manner of death as "[u]ndetermined." Hu noted "[n]o evidence of significant trauma." (IOR 68 at 000894–96.) Nor did he find "obvious trauma to the neck muscles, bone or cartilage." (IOR 68 at 000900.) He later testified that Codman's blood showed the presence of morphine—a metabolite of heroin—and cocaine, and she had used both shortly before her death. Alcohol was also detected. (Tr. June 28, 2005, at 34–37.)

After police provided investigative details, Hu altered the cause of death to "most likely asphyxia due to ligature strangulation." (Tr. June 28, 2005 at 39.) Hu testified that he "just changed [his] opinion" about the cause of death on December

17, 2002, after reviewing a tape of Morris's statement to police, though he had not signed or issued a written opinion at the time of his testimony. Hu testified that "my opinion would be stated consistent with strangulation, but official cause of death in my report will be undetermined, because there's no medical evidence." (Tr. June 28, 2005 at 55–58.) Hu further testified as to whether there were signs of strangulation, saying, "Nothing physical. But I have good circumstantial evidence[.]" (Tr. June 28, 2005 at 60.)

The nude, decomposing body of thirty-two-year-old Shanteria Yvette Davis was discovered on the morning of October 10, 2002, in the same alley where Codman's body had been found. (Tr. June 16 at 20–23.) A police officer questioned Morris on the day Davis' body was discovered. Morris reported that he did not hear or see anything unusual. (Tr. June 28, 2005 at 104–07.)

Dr. Kevin D. Horn of the Medical Examiner's Office listed Davis's cause of death as "[d]rug (cocaine) intoxication" and manner of death as "[u]ndetermined." (IOR 68 at 000904, 000906.) The autopsy report cited "spleen tissue with significant concentrations of cocaine and cocaine metabolites" and a "[h]istory of reported cocaine use." (IOR 68 at 000906.) Examination of her neck showed that "[t]he hyoid bone and thyroid cartilage are intact. There are no hemorrhages in the strip muscles or the soft tissues of the neck." (IOR 68 at 000910.) However, after reading a transcript of Morris's statement to police, Horn testified that Davis's death "was consistent with someone who had been strangled." (Tr. June 29, 2005 at 41.) At the time of his testimony, Horn had not amended his official autopsy report. He testified that "cocaine is still a potentially fatal intoxication that may or may not have contributed to this death. The manner would still remain undetermined, because homicide is still a possibility." (Tr. June 29, 2005 at 45.) He added, "I simply cannot rule out other potential manners of death: accident, homicide, so forth." (Tr. June 29, 2005 at 49.)

The body of thirty-four-year-old Jade Lee Velasquez was discovered on

North Ninth Street on February 27, 2003. Police were notified at 6:14 a.m. (Tr. June 27, 2005 at 133–36.) An autopsy report completed by Dr. Vladimir Shvarts noted alcohol and cocaine metabolites in the victim's system. It also listed "[a]brasions and pressure marks on the neck." Cause of death was listed as "[f]indings consistent with strangulation," while "[c]ombined drug intoxication" was listed under "Other" and the manner of death was determined to be homicide. (PCR Hr'g Ex. 11 at 000916.)

On March 29, 2003, the nude, decomposing body of Sherry Elizabeth Noah was discovered at 6:20 a.m. on the west side of North Ninth Street. (Tr. June 20, 2005 at 24–25.) An autopsy report authored by Dr. Alex Zhang listed the cause of death as "Asphyxia due to ligature strangulation." (PCR Hr'g Ex. 10 at 000926.)

On April 12, 2003, at 11:35 a.m., Phoenix police were alerted that a decomposing body had been discovered in an RV parked inside a fenced yard behind 768 East Pierce Street, the residence of Ronald and Melva Willis. The deceased later was identified as Julie Ann Castillo. (Tr. June 14, 2005 at 11–12; Tr. June 16, 2005 at 26.) The Willises' nephew, Cory Morris, had been staying in the RV. (Tr. June 13, 2005 at 78–79, 97.)

Morris, then age twenty-four, was contacted by police that afternoon at his place of employment, a bar called Fatcats. He was cooperative and agreed to go to police headquarters. (Tr. June 15, 2005 at 67–69.) Morris had a backpack with him, which police seized. (Tr. June 15, 2005 at 69.)

At 5:22 p.m., Detective Randy Hutson read Morris his rights and asked if he understood them. Morris said he did. Hutson did not specifically ask if Morris agreed to speak with him or if he wanted an attorney. (PCR Pet. Ex. O at 7.) The ensuing interview lasted approximately four hours. (Tr. June 15, 2005 at 51.)

Morris gave varying explanations of his involvement with the victims. Morris initially denied knowing about a body in the RV. (PCR Pet. Ex. O at 24–25.) He later stated that he had left Castillo in the RV and when he returned, she was

1  unresponsive and had apparently overdosed. He panicked and had no idea what to

2  do. He denied they had sex. (PCR Pet. Ex. O at 36–37.)

3  Morris also denied that any of the other victims were in the RV. (PCR Pet.

4  Ex. O at 41.) Hutson said of victim Sherry Noah, "She overdosed, something

5  happened to her." Hutson said Noah "was there. A similar thing happened. You

6  panicked, you didn't know what to do. I don't know what the hell these women are

7  doing. What kinda drugs they're using these days?" (PCR Pet. Ex. O at 43–44.)

8  Morris then admitted that he and Noah had sex (PCR Pet. Ex. O at 49), he left the

9  RV for more than three hours (PCR Pet. Ex. O at 52), and he returned to find her

10  unresponsive, next to a crack pipe (PCR Pet. Ex. O at 49). Morris said he placed

11  Noah on a sleeping bag and dragged her out of the yard. (PCR Pet. Ex. O at 51.) He

12  said that he placed the belt he was wearing around Noah's neck so he could move

13  her body. (PCR Pet. Ex. O at 57.) He said Noah's shoes were still in the RV, and

14  he thought he could give them to somebody who needed them. (PCR Pet. Ex. O at

15  56.)

16  Morris said Velasquez was a "friend slash prostitute" who came to the RV

17  after they met in a park. (PCR Pet. Ex. O at 59.) He described her as "drunk . . . outta

18  her mind." Morris initially reported that Velasquez passed out on his bed before

19  they could have sex and that he fell asleep and found her unresponsive and "stiff"

20  when he awakened. (PCR Pet. Ex. O at 61–63.) He moved the body out of the yard.

21  (PCR Pet. Ex. O at 64.)

22  Morris said he met Codman while she sought clients for sex near Polk and

23  Ninth Streets. She agreed to come to the RV, where he was to pay her twenty dollars

24  for sex. (PCR Pet. Ex. O at 66–68.) Morris said he stepped out of the RV and

25  returned to find Codman smoking crack. He told her to finish and leave, and he

26  waited outside. But she did not emerge, and when he reentered he noticed she had

27  "shortness of breath." He reported spending two nights at a friend's house before

28  removing Codman's body from the RV. (PCR Pet. Ex. O at 69–70.) Morris said he

believed some of Codman's clothing and some identification were still in the RV. (PCR Pet. Ex. O at 71–72.)

Morris said he encountered Davis near Fatcats; she offered sex for five dollars. (PCR Pet. Ex. O at 74.) He reported that they walked to the RV, where she produced a crack pipe. He stepped outside so she could smoke. He reentered and the two had sex. Morris said he went for a walk and returned an hour later to find Davis passed out. He left again and when he returned at 5:30 a.m., he realized she had died. He dragged her into the alley. (PCR Pet. Ex. O at 77–81.)

After approximately two hours of interrogation, Hutson asked Morris if he wanted "water or anything." Morris responded that he needed water but said, "I'll eat when I get back over to the bar." (PCR Pet. Ex. O at 84–85.)

Hutson told Morris, "These, these girls didn't die from smoking rock." (PCR Pet. Ex. O at 92.) He gave Morris two options of what actually happened: (1) Morris had promised the victims drugs in exchange for sex, or (2) they had smoked their own crack cocaine and wanted Morris to restrict their airways to enhance their pleasure. (PCR Pet. Ex. O at 97.) Hutson then introduced his theory that the victims were choked for sexual pleasure: "[S]ome guys actually like to choke themselves somehow with a rope or something? . . . They like to choke themselves when they masturbate, cause somehow they seem to think it makes it better. Is that something that's going on with . . . these girls wanting you to do something really weird?" (PCR Pet. Ex. O at 97.)

Morris proceeded to apply Hutson's choking theory to all of the victims. He stated that while they were having sex, Castillo asked him to put a necktie around her neck "like your [sic] riding a horse." (PCR Pet. Ex. O at 99.) Morris said that Castillo lost consciousness and never recovered. (PCR Pet. Ex. O at 100.) Prompted, he said the account he gave about Castillo passing out due to drug overuse was not true. (PCR Pet. Ex. O at 102.)

Morris said Noah "wanted to be choked. . . . She was one of the ones that was

talking about choking her." (PCR Pet. Ex. O at 106.) He said Noah asked him to use a strap from a gym bag. And "[s]he's the one that wrapped it around her. I just hold it." (PCR Pet. Ex. O at 107.) He said Noah insisted he keep applying pressure to the strap. He did what she asked, and "after that she just didn't say no more. Her eyes were closed," and he could not revive her. (PCR Pet. Ex. O at 110–11.)

Morris said Velasquez asked him to choke her during sex, and he used his hands. "[B]y the time [he] finished she was" unconscious. (PCR Pet. Ex. O at 112.) He said that Codman died during sex after she asked him to use a necktie to choke her. (PCR Pet. Ex. O at 114–16.) Finally, he said that Davis asked him to use her hair weave to choke her during sex, but "when we finally finish, she is not breathing." (PCR Pet. Ex. O at 119.)

In response to Hutson's questioning, Morris had said that while he was asleep in his bed, he had a wet dream involving an ex-girlfriend, and Castillo's body was on the floor at that time. (PCR Pet. Ex. O at 38–39.) Morris denied masturbating while any of the victims' bodies were in the RV. (PCR Pet. Ex. O at 134.) When prompted by Hutson, Morris had said that he always uses a condom when he has sex. (PCR Pet. Ex. O at 62.) At the conclusion of the interview, Morris was arrested on suspicion of murder for each victim. (PCR Pet. Ex. O at 154.)

### C.   Procedural history.

#### 1.   Pretrial proceedings.

On April 22, 2003, a Maricopa County grand jury indicted Morris on five counts of first-degree murder. (IOR 7.) The State did not allege any aggravating factors in the indictment. The Maricopa County Public Defender's Office was appointed initially but had to withdraw because of their prior representation of one of the victims. (IOR 2.) James Logan of the Maricopa County Office of the Legal Advocate was then appointed (IOR 4), and Maria Schaffer became his second chair

1   counsel and was primarily in charge of the penalty phase[6] (Tr. Mar. 24, 2015 at 78–
2   79). On July 1, 2003, the State filed its notice of intent to seek death and alleged
3   three aggravating factors: (1) the defendant has been convicted of another offense
4   for which a sentence of life imprisonment or death was imposable; (2) the defendant
5   has been or was previously convicted of a serious offense; and (3) that the murder
6   was committed in an especially heinous, cruel, or depraved manner. (IOR 19.)

7          Early on, the defense hired Richard Lanyon, Ph.D., "in order to gain a better
8   understanding of factors related to Mr. Morris' personality, psychopathology,
9   childhood and upbringing, and any other psychological aspects of his life that may
10   be relevant to the offenses with which he is charged." (PCR Hr'g Ex. 1 at Ex. D-7
11   at 1.) Lanyon recommended a neurological exam and an MRI "to investigate
12   directly the possibility of brain abnormality." (PCR Pet. Ex. J at 1.) Logan sought
13   to hire neurologist Stephen Flitman, M.D., but the head of the Office of the Legal
14   Advocate told him to "find someone more reasonably priced" and recommended
15   Harry Tamm, M.D., because another attorney was "able to save the $1,800 initial
16   exam fee." (PCR Pet. Ex. J at 3.) Logan explained that the other case was not a
17   capital case and that Lanyon "strongly" suggested both a neurological exam and
18   MRI. (PCR Pet. Ex. J at 4.) Lanyon, who was "puzzled" by Morris's behaviors, also
19   recommended the defense hire someone with more specialization like Judith
20   Becker, Ph.D.; Park Dietz, M.D. Ph.D.; or Reed Malloy, Ph.D. (PCR Hr'g Ex. 5 at
21   000037, 000048–49.) The defense eventually hired Tamm and Jack Potts, M.D.,
22   who wrote prescriptions for an EEG and an MRI, respectively, less than a month
23   before trial. The defense did not pursue the procedures. (PCR Pet. Exs. H, I, J at 7–
24   8; PCR Hr'g Ex. 5 at 000076.) Schaffer had left the Legal Advocate's Office in
25   December 2004, and Randall Craig had been assigned as the new second chair
26   counsel to handle the aggravation and mitigation phases. (Tr. Mar. 17, 2015 at 154,

27   _____

28   [6] Linda Thomas was the assigned mitigation specialist. (PCR Pet. Ex. D.)

24

1   156; Tr. Mar. 24, 2015 at 105–06; *see also* IOR 72.)

2       Logan filed several standard pretrial motions (IOR 52, 53, 54, 55), and an

3   objection to the voir dire process (IOR 86). He also filed a motion to preclude

4   Morris's statements to police as to Counts 1 and 2 based on the corpus delicti rule.

5   (IOR 65), as well as a motion to preclude the State from introducing Morris's

6   statements to police regarding a prior theft conviction and the allegation that Morris

7   was responsible for the death of another woman (IOR 88).

8                       **2.       Trial: guilt phase.**

9       Trial began with jury selection on June 1, 2005. Before trial, Logan had filed

10  an objection to the jury prescreening process. (IOR 86.) He again objected to this

11  process on the first day of trial. (Tr. June 1, 2005 at 4–6.) The court explained that

12  prospective jurors were prescreened for time, and that after reviewing the excuses,

13  the parties agreed that approximately twenty had "questionable excuses." (Tr. June

14  1, 2005 at 2.) The judge and attorneys went to the jury commissioner's office to

15  inquire about these jurors but were told they had been sent to other panels. (Tr. June

16  1, 2005 at 2–3.) The judge then brought into court Jury Commissioner Bob James

17  to discuss the issue. James admitted "it was a mistake" to send those twenty jurors

18  to other courts (Tr. June 1, 2005 at 13–14), but that there had been "confusion" in

19  the jury assembly room due to the "unusual procedure" of having the attorneys

20  present (Tr. June 1, 2005 at 14–15). Logan told the court he was concerned that he

21  did not get to question those jurors (Tr. June 1, 2005 at 16–17), but the judge ruled

22  they would proceed with those they had thus far (Tr. June 1, 2005 at 20). Jury

23  selection then continued and lasted seven days.

24      Before testimony began on June 13, the prosecutor, Juan Martinez, told the

25  court he planned to use Morris's statement to police. (Tr. June 13, 2005 at 37–38.)

26  Logan did not object but wanted to put a "minor issue" on the record. (Tr. June 13,

27  2005 at 38.) He said police asked Morris if he wanted something to eat during the

28  interrogation, but Morris said he would wait until he left and returned to the bar

where he worked. Logan explained that the police knew Morris would not be leaving, and that "could be considered a promise." (Tr. June 13, 2005 at 38.) The court found that Morris's statement was voluntary. (Tr. June 13, 2005 at 38.)

Martinez made his opening statement on June 13, and within his first sentence started to lay out his theory of the case. Martinez told the jury that Morris "killed for his own sexual gratification" and then kept the bodies "even after the skin would start to slide off. . . . [and] bloat up a little[]" and "satisfied himself at least on one occasion sexually while the rotting body was lying next to him, and he ejaculated." (Tr. June 13, 2005 at 39; *see also* Tr. June 13, 2005 at 49, 55.) He said that each victim was strangled and that "the actual time from beginning to end, from the life to death, is probably from about five to eight minutes." (Tr. June 13, 2005 at 40–41, 45.) He mentioned four times that one of the victims was "mentally retarded." (Tr. June 13, 2005 at 41, 42, 72, 75.) He also described Morris as a "bottom feeder" for selecting a prostitute whose "underwear had holes in the crotch." (Tr. June 13, 2005 at 68.) The defense reserved their opening. (Tr. June 13, 2005 at 76.)

The State's case commenced on June 13.  Morris's aunt and uncle, Melva and Ronald Willis, testified about the day Ronald found Castillo's body in their RV in the backyard. (*See generally* Tr. June 13, 2005 at 77–125.) Martinez asked Ronald to describe the smell several times (Tr. June 13, 2005 at 106–07, 120), and they both discussed Morris's body odor (Tr. June 13, 2005 at 98, 101–02, 109–110). The following day, James Seagraves, Morris's employer, also testified about Morris's "odor issue." (Tr. June 14, 2005 at 5–7.) Several officers testified about the scene at the RV and Morris's arrest. (*See generally* Tr. June 14, 2005 at 11–26, 41–164.) Martinez questioned Officer Thomas Kulesa about a jacket found in the RV that possibly belonged to Castillo. (Tr. June 15, 2005 at 20–23; Trial Ex. 166 (photo of jacket).) Martinez insisted "for this one, . . . I do want you to take [the jacket] out so we can take a look at it" and "hold it up so we can see the colors on

1    the lapels." (Tr. June 15, 2005 at 21, 23.) Immediately, Martinez told Kulesa to put
2    the jacket back in the bag, and the court asked if the jurors needed a break and then
3    took a recess. (Tr. June 15, 2005 at 23–24, 30.) After the recess, the court
4    apologized and told the jurors they would not have to "experience something like
5    that for the rest of the trial." (Tr. June 15, 2005 at 30.)

6        Next, Detective Sallie Dillian testified. She wrote the search warrant,
7    processed the scene, and attended Castillo's autopsy. (Tr. June 15, 2005 at 46, 54.)
8    She described the tie found around Castillo's neck and said it was looped[7] and tight.
9    (Tr. June 15, 2005 at 53–54.) Kevin Horn, M.D., a medical examiner, described the
10   advanced decomposition he found during Castillo's autopsy. (Tr. June 15, 2005 at
11   77–81.) He also described the tie around her neck but said it was not a true knot and
12   that it was loose. (Tr. June 15, 2005 at 81–83, 97.) He noted there were "defects in
13   the anus" but could not conclude whether they were attributable to maggot activity
14   or trauma.[8] (Tr. June 15, 2005 at 87–88, 96–97, 102.) He said that prior to her death,
15   Castillo had both alcohol and cocaine in her body, though he could not say how
16   long it had been there. (Tr. June 15, 2005 at 94–95.)

17       Several latent print examiners testified. (*See* Tr. June 15, 2005 at 125–26.)
18   Todd Whittard, the latent print supervisor at the Department of Public Safety,
19   compared Morris's and all of the victims' inked prints to the latent prints found in
20   the RV and found some were Morris's and that none were any of the victims'.
21   (Tr. June 15, 205 at 132–38.)

22       Case Agent Randy Hutson testified about his interview with Morris on April
23   12, 2003. (Tr. June 16, 2005 at 27.) He said that Morris was not handcuffed, was

24

25

26   [7] Martinez continuously referred to it as a knot, and acknowledged that it is "what I'm calling the knot." (Tr. June 15, 2005 at 55, 56, 57, 63, 64, 65, 82, 83.)

27   [8] Martinez also continuously referred to these defects as "injuries" or "trauma" that
28   are "consistent with sexual activity." (Tr. June 15, 2005 at 88, 95, 102; Tr. July 5, 2005 at 53–54; Tr. July 12, 2005 at 37–38, 109, 133, 135.)

1    read his *Miranda* rights, was not threatened or promised anything, never was in
2    distress, and did not ask to stop the interview. (Tr. June 16, 2005 at 28–33.)
3    Throughout Hutson's testimony, Martinez played short sections of the interrogation
4    tape, out of order, to the jury. (Tr. June 16, 2005 at 31, 34, 39, 40, 41, 43, 44, 46,
5    47, 53; Tr. June 20, 2005 at 8, 10, 12, 14.)

6         Detective Dillian was recalled on June 20. She also processed the Noah and
7    Velasquez scenes. (Tr. June 20, 2005 at 26–28.) She described Noah as "moderately
8    to even past moderately decomposed," but not to the extent that Castillo was.
9    (Tr. June 20, 2005 at 45–46.) She said that skin slippage was caused when the body
10   was touched or disturbed. (Tr. June 20, 2005 at 51.) Noah's sister, Sarah Shobe,
11   testified next. She said that Noah, who was "mentally retarded" and had a mental
12   age of ten to eleven years old, lived with her but "had a habit of taking off every
13   two or three months . . . for a couple of days." (Tr. June 20, 2005 at 58–59, 63.) She
14   acknowledged that Noah used alcohol and cocaine. (Tr. June 20, 2005 at 64.)

15        After the jury was excused, the judge held a hearing about the photographs
16   he thought should not be admitted into evidence. (Tr. June 20, 2005 at 78.) Martinez
17   told the court that "our theory is that the defendant killed these women so
18   that . . . once they were dead, he could have sex with them." (Tr. June 20, 2005 at
19   78.) He explained that Morris said he used a condom when he had sex with Noah,
20   but because a vaginal smear contained his semen and because of the skin slippage
21   pattern, "then the only conclusion that is left is that he had sex with the body
22   afterwards." (Tr. June 20, 2005 at 78–79.) Martinez said the same was true for
23   Castillo, but admitted "she was so decomposed, we're not able to tell by any skin
24   slippage analysis there had been any contact afterwards, but we can tell by the
25   position of the body" and because Horn indicated there were lacerations around her
26   anus, which "points to the fact . . . he had sex with her anally after she was dead."
27   (Tr. June 20, 2005 at 79–80.) Regarding Velasquez, Martinez said "[t]here is no
28   skin slippage on her to apply analysis, but we do have some swabs from her vagina,

and we know that his sperm is inside, so that leads to only one conclusion. If, as he says, he's using a condom[.]" (Tr. June 20, 2005 at 80.) As for Codman, he agreed the photograph offered was "grotesque" but suggested they could cut out the portion that showed the protruding tongue and bugged-out eyes, which Martinez said was an "indication of someone being strangled."[9] (Tr. June 20, 2005 at 81, 83.) He said the photographs showed Morris "was killing these people so he could have sex with them afterwards." (Tr. June 20, 2005 at 84.) Logan said the State's argument was "convoluted" and "specious" but that "if the medical examiners are going to testify that that is evidence of some sort of sexual activity post-mortem, well, then, my argument has to change."[10] (Tr. June 20, 2005 at 84–86.) Logan felt that the evidence so far showed that skin slippage was caused by touch or movement, which could have come from when the bodies were moved. (Tr. June 20, 2005 at 86.) The judge did not change his ruling but allowed the State to question the medical examiners, stating that "it's going to take some expert opinion to maybe tie this all together." (Tr. June 20, 2005 at 86.)

After a weeklong break, testimony resumed with DNA analyst Colleen Proffitt. She testified that Morris's sperm was found in vaginal swabs taken from victims Velasquez and Noah (Tr. June 27, 2005 at 15–16, 19–22, 24–25), but that other tests involving the other victims or items of evidence were inconclusive (Tr. June 27, 2005 at 27–63). Over Logan's objection, Philip Keen, M.D., testified for medical examiner Alex Zhang, M.D., who had moved out of state, regarding Noah's autopsy. (Tr. June 27, 2005 at 84–85; *see also* Tr. June 27, 2005 at 91–98.)

---

[9] Martinez also said that her head being darker than the rest of her body also meant she had been strangled. He said "they call [it] NOS, not otherwise specific, but it's an indication that this person was strangled or there was a ligature placed around the neck." (Tr. June 20, 2005 at 81.)

[10] Logan admitted that he did not know what the medical examiners were going to testify to, but that he would "find out when they get on the stand." (Tr. June 20, 2005 at 86.)

1    Keen testified that Noah was in the early to moderate decomposition stage with a
2    ligature mark around her neck and skin slippage in various areas. (Tr. June 27, 2005
3    at 98–101.) He described skin slippage by saying that "in any friction, the outer
4    layer of the skin will slide away." (Tr. June 27, 2005 at 85–86.)

5        Martinez then asked to admit a photograph that the court previously said
6    would not come in under Arizona Rule of Evidence 403. (Tr. June 27, 2005 at 104.)
7    He stated the pattern mark in the photograph showed that Noah put her hand
8    underneath the ligature and struggled. (Tr. June 27, 2005 at 104.) The court agreed
9    to admit the photo if Keen agreed with Martinez's assessment. (Tr. June 27, 2005
10   at 105.) Although Martinez insisted it was Noah's hand or fingers, Keen stated that
11   the mark could have been made by "any object." (Tr. June 27, 2005 at 106–07.) The
12   court admitted the photograph over Logan's objection. (Tr. June 27, 2005 at 106.)
13   Keen testified that the toxicology results showed Noah had used cocaine shortly
14   before her death but that it was not the cause of her death.[11] (Tr. June 27, 2005 at
15   114–15.) He opined that she died of strangulation, although he could not say how
16   long it took her to become unconscious. (Tr. June 27, 2005 at 117–18, 120–21.)

17       Detective Dillian was recalled to review the Velasquez scene. She described
18   the ligature marks and reddening on Velasquez's neck and a bruise under her left
19   eye. (Tr. June 27, 2005 at 150, 158.) Medical examiner John Hu, M.D., testified
20   next regarding Codman's autopsy. (Tr. June 28, 2007 at 11–12.) He described her
21   skin slippage as "extensive" during autopsy but "limited" several hours earlier
22   based on the scene photos. (Tr. June 28, 2005 at 13–16, 19–27.) The state of
23   decomposition prevented him from examining her neck fully to determine the cause
24   of death. (Tr. June 28, 2005 at 29.) He said the scene photos showed that the
25   decompensation in her head and neck was more advanced, which he agreed was

26   _____

27   [11] He stated the results were also positive for several prescription drugs and Gamma
28   Hydroxybutyrate ("GHB"). He explained that GHB, "known as the date rape drug,"
     could be produced by the body as well. (Tr. June 27, 2005 at 115.)

30

1    "consistent with strangulation," and that her tongue was "protruding" and her eyes
2    were "popping out," which he attributed to postmortem changes and gas formation.
3    (Tr. June 28, 2005 at 29–30, 33–34, 50.) Her toxicology results showed low levels
4    of alcohol ("consistent with postmortem levels"), morphine (potentially from
5    heroin), and cocaine and cocaine metabolites showing cocaine use as recent as thirty
6    minutes prior to her death. (Tr. June 28, 2005 at 34–37.) Initially, Hu's opinion was
7    that Codman died from combined morphine and cocaine toxicity, and that her
8    manner of death was undetermined. (Tr. June 28, 2005 at 41.) After the defense
9    interviewed Hu before trial, however, Martinez provided him with Morris's police
10   interview tape of Morris talking about Codman. (Tr. June 28, 2005 at 38.) As a
11   result of this tape, Hu changed his opinion and found Codman's cause of death was
12   "most likely asphyxia due to ligature strangulation." (Tr. June 28, 2005 at 38–39.)
13   On cross-examination, he said that he had changed his opinion just "days before"
14   and thought he could simply explain the change during his testimony. (Tr. June 28,
15   2005 at 55.) He admitted that he did internal and external examinations during the
16   autopsy to look for evidence of strangulation but found none. (Tr. June 28, 2005 at
17   51–52, 60.) Hu agreed with Logan's characterization of skin slippage as "the
18   movement of skin as a result of some sort of friction." (Tr. June 28, 2005 at 48.)

19       Detective Michael Meislish then testified about victim Davis. He described
20   the drag marks, skin slippage, and lack of maggot activity. (*See generally* Tr. June
21   28, 2005 at 93–103.) While at the scene, he went to Morris's RV and said Morris
22   was nice and answered questions. (Tr. June 28, 2005 at 106–07.) He said there were
23   no drag marks in the backyard by the RV and that the gate was rusted shut. (Tr. June
24   28, 2005 at 109, 112.)

25       Dr. Horn, who performed Davis's autopsy, testified the following day. He
26   described that she was in a state of moderate decompensation with multiple areas
27   of skin slippage. (Tr. June 29, 2005 at 35.) He said that her tongue, lips, and eyes
28   were protruding, "which is a feature of decomposition," but did not recall that her

1    head was a different color than her body. (Tr. June 29, 2005 at 35.) Davis's
2    toxicology screen indicated the use of cocaine at some point prior to her death, and
3    Horn certified her cause of death as drug intoxication, and manner of death as
4    undetermined. (Tr. June 29, 2005 at 37–38, 40.) As with Hu, Martinez gave to Horn
5    a copy of Morris's statement to police regarding Davis just prior to his testimony,
6    and he changed his opinion and concluded her manner of death was consistent with
7    strangulation. (Tr. June 29, 2005 at 40–41.) During cross-examination, however, he
8    agreed that cocaine may have contributed to her death. (Tr. June 29, 2005 at 45–46,
9    48.)

10           Vladimir Shvarts, M.D., testified about Jade Velasquez's autopsy. She was
11   dressed, not decomposing, and had no insect activity. (Tr. June 29, 2005 at 8.) He
12   stated there was a contusion to her left eye that was consistent with what Martinez
13   described could be from "a punch to the eye" or if someone fell and hit themselves
14   after falling unconscious. (Tr. June 29, 2005 at 9.) On cross-examination, Shvarts
15   said the eye bruise could have happened twenty-four hours or longer prior to her
16   death. (Tr. June 29, 2005 at 23–24, 31.) He also described petechial hemorrhages
17   in Velasquez's right eye which, again, Martinez tried to say could be "by a punch
18   to the eye or falling on it," but that Shvarts said was consistent with strangulation.
19   (Tr. June 29, 2005 at 11–12.) Shvarts also discussed the abrasions found on
20   Velasquez's neck, stating that they were consistent with fingernail and ligature
21   marks. (Tr. June 29, 2005 at 16–17.) The toxicology results showed an alcohol level
22   of .27–.34—which he felt would have been lower at the time of her death—cocaine
23   metabolites; and three types of prescription drugs that he thought even in
24   combination was not enough to kill her. (Tr. June 29, 2005 at 19–22, 33.) He opined
25   that her cause of death was strangulation, but admitted during cross-examination
26   that the drug intoxication was a contributing factor. (Tr. June 29, 2005 at 22, 28.)

27           Detective Hutson's testimony continued from June 20. Both Logan and
28   Martinez reviewed portions of the statements Morris made to him.

(*See generally* Tr. June 29, 2005 at 62–110.) Martinez then rested. (Tr. June 29, 2005 at 111.) Logan made a motion for a directed verdict without argument, which was denied. (Tr. June 29, 2005 at 112–13.) Morris then advised the court he did not want to testify (Tr. June 29, 2005 at 113), and Logan said, "[t]hen we rest also" (Tr. June 29, 2005 at 14).

Martinez began his closing argument on July 5. His theory was that Morris kept the victims "for one reason, and that was for sexual gratification . . . once their body was rotted out." (Tr. July 5, 2005 at 14.) Morris was what Martinez considered to be "bottom-feeding." (Tr. July 5, 2005 at 27.) He spent a lot of his closing discussing how each victim had fallen on "hard times." (*See, e.g.*, Tr. July 5, 2004 at 18, 26, 32–33, 34, 40, 57, 79, 85, 119, 131.) For Example, Martinez called Noah "one of the more pathetic ones" because she was "mentally retarded," and compared her to an eleven or twelve-year-old "child."[12] (Tr. July 5, 2005 at 24–25, 48–49.)

Martinez also argued his version of the facts. He said Morris choked Codman for four to eight minutes after she lost consciousness (Tr. July 5, 2005 at 37), but later "postulate[d]" that after she lost consciousness, she "c[a]me back . . . two or three times" and he strangled her again (Tr. July 5, 2005 at 60–62). Martinez explained "the reason I keep saying that is because [Morris] emphasized . . . she was different than the rest." (Tr. July 5, 2005 at 62.) He also said Morris kept the body there to have sex with it—which was indicated by "the skin fall[ing] off from those places"[13]—and "rocked himself between her legs . . . and cradled himself to an ejaculation." (Tr. July 5, 2005 at 34–39.) Regarding Davis, Martinez felt Morris kept her longer than Codman because she was bloated and there was "skin slippage

---

[12] Although Martinez noted Noah "looked like a woman," he mentioned eight times in his closing that she was "mentally retarded" and mentally "about 11 or 12 years old." (Tr. July 5, 2005 at 24–25, 31, 32, 48–49, 86.)

[13] He later said she had skin slippage in her vaginal area only. (Tr. July 5, 2005 at 123–24.)

33

everywhere" and so he could "inhale the rotting smell of the corpse." (Tr. July 5, 2005 at 44.) He said Velasquez's eye bruise showed that Morris punched her before he "throttle[d]" her with his hands, and that "we know that he had . . . full-fledged sexual intercourse with her after she was dead" because he said he wore a condom and the police found sperm in her. (Tr. July 5, 2005 at 45–47, 68.) Martinez said Morris had a "field day" with Noah's body, which was indicated by the skin slippage between her legs. (Tr. July 5, 2005 at 50, 124.) He said that Castillo's face and eyes were gone, that she had urinated on herself because she was in horrific pain, and that the smell was putrid. (Tr. July 5, 2005 at 51, 52.) Martinez then reminded the jurors that they were "expose[d] to it when the jacket was opened up for your . . . smelling pleasure." (Tr. July 5, 2005 at 51.) In describing how Morris strangled her with his tie, Martinez urged the jurors to "get the feel of it." (Tr. July 5, 2005 at 51–52.) He also said Morris left her face down with her buttocks propped up by trash so that whenever he got the urge, he could have anal sex with her. Martinez said this was corroborated by Morris when he admitted there was sexual activity and that he ejaculated. (Tr. July 5, 2005 at 52–54.)

Martinez stated that the police did not catch Morris earlier because they were "hampered by the Constitution and the rules and the law." (Tr. July 5, 2005 at 47–48.) He also questioned why the defense only talked about certain excerpts from Morris's police interview and suggested to the jurors that since the Hutson read every exchange to them that "[they] know what the State is telling [them] is true." (Tr. July 5, 2005 at 81–82.) He told the jurors that their duty was "not to be a defense attorney" but "to determine the facts." (Tr. July 5, 2005 at 133, 134.)

In the defense's closing, Logan told the jurors not to take terms like "probably" and "consistent with" as fact. (Tr. July 5, 2005 at 112–13.) He reminded them that there was no evidence of postmortem sex and that skin slippage was caused by any friction. (Tr. July 5, 2005 at 92–97, 110.) He also stated that all of the victims had been using cocaine and other drugs, which were toxic at any level

34

and could have caused death (Tr. July 5, 2005 at 101–09), and that Velasquez's eye bruise could have been a day or two old (Tr. July 5, 2005 at 105).

The jury returned guilty verdicts on all counts on July 11, 2005. (Tr. July 11, 2005 at 2–3; ROA 135–139.) The aggravation phase began the following day.

### 3.    Trial: aggravation phase.

Martinez's opening statement at the aggravation phase was similar to his arguments at the guilt phase. After briefly going over the definition for prior convictions (Tr. July 12, 2005 at 19–21), he moved on to the cruel, heinous, or depraved aggravating factor. Regarding Codman, he said that Morris grabbed her from behind by the neck and asked the jurors to "imagine what she felt like," stating that feeling of pain and mental anguish is "what cruelty talks about." (Tr. July 12, 2005 at 23–25.) He explained that heinous or depraved refers to Morris's thinking, and that he was relishing that he was going to keep and mutilate her.[14] (Tr. July 12, 2005 at 25–27.) Martinez said that Davis was looking at Morris and was in pain knowing she was going to die while he was compressing her chest and strangling her with her hair extensions, and that he was relishing that he was going to ejaculate on her chest. (Tr. July 12, 2005 at 28–31.) He stated that Velasquez tried to get away, but Morris hit her in the eye and began to strangle her, which lead to pain and knowledge that she was dying. (Tr. July 12, 2005 at 31–32.) Meanwhile, Morris relished that "he had another carcass" to mutilate. (Tr. July 12, 2005 at 31–33.) Martinez reminded the jury several times that Noah was mentally challenged and likened her to a twelve-year-old. (Tr. July 12, 2005 at 33, 34–35.) He said that she pulled her nails off while she fought for her life, and she knew she was dying. (Tr. July 12, 2005 at 34–35.) He also said Morris relished keeping her and had vaginal and anal intercourse with her after she began rotting. (Tr. July 12, 2005 at 35–36.) Martinez stated that Morris used his tie to choke Castillo, who felt such

---

[14] Martinez argued that "you can't call it sexual intercourse, because . . . she's already dead." (Tr. July 12, 2005 at 26–27.)

1   fear and anguish that she urinated on herself. (Tr. July 12, 2005 at 36–37.) After she
2   died, Martinez said Morris relished it because he positioned her so he could mutilate
3   her body, which was confirmed by the anal lacerations and bruises caused by
4   trauma. (Tr. July 12, 2005 at 37–38.)

5         Randall Craig made the opening statement for the defense. He told the jurors
6   that the State could not prove that these offenses were heinous, cruel, or depraved
7   because how the women felt was speculative. (Tr. July 12, 2005 at 40.) He said that
8   three of the victims had "absolutely no trauma at all" and that "the same really can
9   be said" about the other two, but that they all "had toxic[] levels of cocaine and
10  other drugs in their system." (Tr. July 12, 2005 at 40–41.) He also concluded that
11  the State could not prove that Morris relished these crimes. (Tr. July 12, 2005 at
12  41.) As for Martinez's argument regarding mutilation, Craig said "[w]e got some
13  decomposed corpses. That's what we got." (Tr. July 12, 2005 at 41–42.)

14        Dr. Keen was recalled as the State's sole witness. He discussed strangulation
15  in general. (Tr. July 12, 2005 at 43–50.) While it depended on a variety of factors,
16  he said it took approximately two minutes, although it could be less than a minute,
17  before an individual passes out from lack of oxygen, and that one can perceive what
18  is happening while conscious. (Tr. July 12, 2005 at 43–48, 57–58, 61.) He explained
19  that burking, a compression asphyxia, plus strangulation will accelerate death.
20  (Tr. July 12, 2005 at 51–54.) He also discussed skin slippage, stating that "[i]t takes
21  friction to cause that skin to slip." (Tr. July 12, 2005 at 58–59.) He said that while
22  "lots of things can cause you to urinate," it is not uncommon when one loses
23  consciousness (Tr. July 12, 2005 at 62), and "is usually not the consequence of fear"
24  (Tr. July 12, 2005 at 72).

25        On cross-examination, Keen explained that while he cannot give an exact
26  time that it takes to lapse into unconsciousness from strangulation, one thing that
27  could affect it is something being introduced into the victim's system. (Tr. July 12,
28  2005 at 66–67, 72.) He declined to acknowledge that something like cocaine or

36

1  morphine would make someone more susceptible to dying quicker (Tr. July 12,

2  2005 at 67–68), but he admitted that certain drug combinations may have more of

3  an impact (Tr. July 12, 2005 at 70).

4         Following Keen's testimony, both the State and defense rested. (Tr. July 12,

5  2005 at 76.) Once again, Martinez's closing argument mirrored his prior arguments

6  to the jury. He focused on the effect of strangulation to argue the crimes were cruel.

7  (*See, e.g.*, Tr. July 12, 2005 at 91–94.) For heinous or depraved, he argued that

8  Morris committed necrophilia. For example, about Codman he said that when

9  Morris strangled her he had his penis inside her and this was beyond the act of

10  killing because "people get killed all the time, but they don't have a penis stuck

11  inside them." (Tr. July 12, 2005 at 94–95.) Once again when he referred to Noah,

12  Martinez repeatedly compared her to a twelve-year-old girl. (Tr. July 12, 2005 at

13  103–06.) He then defined how Morris had previously been convicted of serious and

14  separate offenses, and asked the jury to return verdicts that the State had proven the

15  aggravating factors as to each victim. (Tr. July 12, 2005 at 110–14.)

16         Craig gave the closing for the defense. He told the jurors there was no

17  evidence that Morris relished the crimes or kept the bodies to have sex with them.

18  (Tr. July 12, 2005 at 117, 122.) He said that it was not known how long

19  consciousness lasted other than that it could be up to two minutes, and they did not

20  know what pain or suffering the victims endured because they all had toxic levels

21  of drugs and alcohol in their system. (Tr. July 12, 2005 at 118–19, 121.) He said

22  that there was no trauma associated with Codman, Davis, and Castillo, only a small

23  abrasion on Velasquez, and a ligature mark on Noah. (Tr. July 12, 2005 at 119–20,

24  125.) Craig asked the jurors to "consider just the evidence" and not base their

25  decision on what Morris or the victims were thinking. (Tr. July 12, 2005 at 126.)

26         In rebuttal, Martinez repeatedly called the defense's statements "absurd."

27  (Tr. July 12, 2005 at 128, 132, 136.) For example, he felt the statement the defense

28  made about Noah's vaginal trauma was absurd, and asked "what [wa]s he doing

sticking a finger inside her" as he was dragging her out of the gate. (Tr. July 12, 2005 at 128.) He said the defense "thr[e]w common sense out the window" when they suggested none of the victims suffered. (Tr. July 12, 2005 at 130.) Martinez then proceeded to ask the female jurors which of them wanted to "volunteer to come sit here and have the defendant sit himself on your chest" and "to have your hair pulled out[.]" (Tr. July 12, 2005 at 130, 133.) He then singled out specific jurors and asked a juror with long hair if she wanted Morris to "grab her hair while he's sitting on her chest . . . and pull it around her neck," and to the others, "Hey, Juror Number 1 or Juror Number 14, . . . what if we put [a] Winnie the Pooh tie around your neck? Are you going to enjoy that?" (Tr. July 12, 2005 at 130.) He suggested the defense was telling them that they would "really like it . . . especially with cocaine onboard." (Tr. July 12, 2005 at 132.) He reiterated that Morris had sex with at least four of the victims after they died, that they all felt pain and anguish (Tr. July 12, 2005 at 134–37), and that Morris would have gotten rid of them sooner if he did not want to play with them, which showed what he was thinking (Tr. July 12, 2005 at 138).

After deliberations, the jurors found for each victim that Morris had previously been convicted of a serious offense, and that the offense was committed in an especially cruel, heinous, or depraved manner. (Tr. July 13, 2005 at 9–14; IOR 157–161; IOR 170 at 3–5.) The penalty phase began the following day.

### 4.    Trial: penalty phase.

In opening statements, Craig told the jurors that Morris had dreams that were not fulfilled due to circumstances beyond his control. (Tr. July 14, 2005 at 12.) Counsel explained that Morris had a body odor problem and was born into poverty. (Tr. July 14, 2005 at 13–14.) He said Morris was caring and respectful but was in despair that led to loneliness and behavioral issues. (Tr. July 14, 2005 at 14.) He explained that in school Morris was daily "termed the big, fat, ugly, smelly kid," and that this "took a heavy toll" and shaped his personality. (Tr. July 14, 2005 at

16–19.) He asked the jurors to "consider . . . another form of punishment that is more appropriate." (Tr. July 14, 2005 at 20.)

Martinez countered that Morris just refused to bathe, was using the "poor me . . . [i]t's not my fault" excuse, and that his "despair [was] of his own doing. (Tr. July 14, 2005 at 20–23, 26, 27–28, 29.) Martinez suggested to Morris that if he had a dream of having a girlfriend, then he should not kill women. (Tr. July 14, 2005 at 24.) He said there were no mitigating factors, "just excuses." (Tr. July 14, 2005 at 29–30.)

Next, several of the victims' family members spoke about their loved ones, showed photographs, and described the impact the deaths had on their families. (*See generally* Tr. July 14, 2005 at 30–42.) The defense then started their mitigation case. Morris's friend, ROTC instructor, and pastor testified first. Much of their testimony was about Morris being teased because he was the "fat, ugly, smelly kid." (Tr. July 14, 2005 at 46–47, 50, 53, 54, 82, 93–94.) Manssa Muhammad, who did not want to be associated with Morris in high school because of Morris's image, testified that the cruelest joke played on Morris was when a girl went to the ROTC ball with him but "ditched" him for another boy when they arrived. (Tr. July 14, 2005 at 55–57, 74–75.) Muhammad said "everyone talked about it" and that Morris had a "break down" over it. (Tr. July 14, 2005 at 57–58.) During cross-examination, Muhammad said that people made fun of Morris behind his back but "[w]ere nice to him . . . in his face." (Tr. July 14, 2005 at 69–71.) Martinez also asked Muhammad if he ever broke up with a girl and if it made him want to "strangle her to death[.]" (Tr. July 14, 2007 at 66–67.) Will Cummins, Morris's ROTC instructor, testified that Morris was an excellent student. (Tr. July 14, 2005 at 78, 80–81.) Morris had gained considerable weight by his junior year and appeared to lose focus and desire regarding his future because of this. (Tr. July 14, 2005 at 79–80.) Pastor Donald Boone testified next. He met Morris when Morris was a pre-teen and talked to him about "spiritual things." (Tr. July 14, 2005 at 92.) On cross-examination, he

1 said Morris came from a good family. (Tr. July 14, 2005 at 99–102.)

2      The penalty phase continued several days later with Morris's family

3 testifying. They, too, recalled Morris's body odor and that he was teased because

4 "he smell[ed] like fish, . . . trash and waste." (Tr. July 18, 2005 at 7–10, 40–42, 60–

5 62, 65, 79.) His brother, Brandon, testified that he and Morris fought a lot (Tr. July

6 18, 2005 at 11–12), but that Morris was respectful and helpful (Tr. July 18, 2005 at

7 16). His sister, Candace, testified next. She said Morris took care of her and

8 Brandon while they were growing up. (Tr. July 18, 2005 at 36–40.) On

9 cross-examination, Martinez tried to make it look like Morris did not really do much

10 when it came to taking care of his siblings. (Tr. July 18, 2005 at 45–54.) Lastly,

11 Morris's mother, Wilma, testified. She depended on Morris from a young age to

12 watch Brandon and Candace. (Tr. July 18, 2005 at 58–60.) Other than fighting with

13 Brandon "like any other kids," Morris was respectful and a hard worker. (Tr. July

14 18, 2005 at 62–64.) Again, on cross-examination, Martinez focused on whether

15 Morris was really much help around the house. (Tr. July 18, 2005 at 68–72, 76.)

16      After the testimony was completed, and outside the jury's presence, Morris

17 informed the court he did want to make a statement to the jury. (Tr. July 18, 2005

18 at 81–82.) The defense then played four unsworn video statements from witnesses

19 who could not make the trip from out of state to testify. Fred Tanguma was Morris's

20 manager at Sonic in Austin, Texas from 1996 to 1997. He said Morris was a good

21 young man and a trusted employee who also became a good friend. (Trial Ex. 6.)

22 Next, Laila Pribble stated that she grew up with Morris, and he was a good student

23 and respectful friend who was the underdog. He had a lot of responsibility and took

24 care of his siblings. Donald McGlory was one of Morris's and Wilma's employers.

25 He explained that the Morrises were an economically deprived but happy family

26 and that Morris was a good kid. He hired Morris to pick up trash and sweep at a

27 local hospital. He said Morris's only problem was his body odor, which he

28 discussed with Morris. (Trial Ex. 19.) Lastly, Clareece Masters's video was played.

She was Morris's high school vocational business teacher for two-and-a-half years, although she first met him at a daycare where she worked. She considered Morris to be sensitive and insecure, but also well-mannered and a hard worker. She said he was teased because of his appearance and odor. She also recalled that Morris took a girl to the ROTC ball but that it was a joke, and how tearful Morris was when he told her about it. (Trial Ex. 20.) The defense then rested. (Tr. July 18, 2005 at 85.)

In rebuttal, the State called Detective Meislish to testify about Morris's 2002 felony conviction stemming from his stealing $600 from his employer, Goodwill. (Tr. July 18, 2005 at 87.) The State then rested as well.

Craig did the closing argument. He said that Morris grew up in an impoverished yet "loving, stable environment," but that "stress permeated the air" because he had to assume a lot of responsibility at a young age. (Tr. July 18, 2005 at 99–100, 106.) He added that Morris's hygiene problem, weight gain, and being the butt of cruel jokes caused Morris to fall into despair, which bred loneliness. (Tr. July 18, 2005 at 101–04, 106–08.)

In Martinez's closing, he stated that there were no witnesses who testified that Morris was lonely and in despair, and that it was simply something defense counsel argued. (Tr. July 18, 2005 at 112–13.) In fact, he said, the defense "never told [the jurors] specifically what it was that they thought was a mitigating factor." (Tr. July 18, 2005 at 116.) He blamed Morris's odor problem on his lack of bathing and on "living with a cadaver that was rotting." (Tr. July 18, 2005 at 119–22.) Martinez suggested that Morris did not realize he was the butt of jokes in high school because the testimony was that he was called Teddy and was everyone's friend. (Tr. July 18, 2005 at 122.) He told the jurors there were no mitigating circumstances and that the only appropriate verdict was death. (Tr. July 18, 2005 at 128–30.)

The defense rebutted the State's arguments by saying that Morris "was heavy, and he had a problem" that was "tragic" because it "skewed the way that

41

1    [he] viewed himself and viewed the world around him" and "led him to a dumpy

2    little trailer . . . with no running water." (Tr. July 18, 2005 at 131–32.) He said

3    Morris became depressed and lonely while living in "that trailer of darkness."

4    (Tr. July 18, 2008 at 132–33.) Counsel suggested there were two things that kept

5    Morris grounded—his responsibilities and sense of purpose at home and the

6    ROTC—and that when these things were gone, his foundation crumbled and his

7    behavior became erratic and strange. (Tr. July 18, 2005 at 136–37, 139, 141.) He

8    told the jurors that sentencing Morris to death would not erase the crimes (Tr. July

9    18, 2005 at 138–39) and to "[i]mpose life, because [they] heard the good in this

10   man" (Tr. July 18, 2005 at 141). The following day, the jury returned death verdicts

11   for each count. (Tr. July 19, 2005 at 2–3; IOR 178.)

12                   **5.      Direct Appeal.**

13        An automatic notice of appeal was filed in the Arizona Supreme Court on

14   July 21, 2005 (DA 1), and Deputy Legal Advocate Consuelo Ohanesian was

15   assigned to represent Morris (DA 21). The opening brief was filed on November

16   13, 2006. (DA 29.) Appellate counsel raised only four case-specific claims: (1) the

17   trial court abused its discretion by denying Morris's motion to dismiss the counts

18   involving Codman and Davis and there was insufficient evidence to prove they were

19   murdered; (2) the trial court abused its discretion and erred by violating Morris's

20   right to be present at all critical stages when it allowed the jury commissioner to

21   prescreen prospective jurors outside his and his counsel's presence, which also

22   resulted in the jury not representing a fair cross-section of the community; (3) there

23   was persistent and pervasive prosecutorial misconduct, and the cumulative effect

24   shows it was intentional with specific intent to prejudice Morris; and (4) the trial

25   court abused its discretion by allowing the State to introduce excessively gruesome

26   pictures throughout trial. She also raised fourteen claims called "issues raised to

27   avoid preclusion." (*See* DA 29.)

28        On June 18, 2007, the Arizona Supreme Court denied relief on all claims and

                                      42

1    affirmed Morris's convictions and sentences. *State v. Morris*, 160 P.3d 203 (Ariz.

2    2007). The United States Supreme Court denied Morris's petition for certiorari

3    review on January 7, 2008. *Morris v. Arizona*, 552 U.S. 1106 (2008). On January

4    28, the Arizona Supreme Court issued its mandate in Morris's direct appeal. (DA

5    50.) The same day, the court directed the Maricopa County Clerk of Court to file a

6    Notice of Post-Conviction Relief pursuant to Rule 32 of the Arizona Rules of

7    Criminal Procedure on Morris's behalf. (DA 51.)

8              **6.    Post-conviction proceedings.**

9              On January 31, 2008, Morris's Notice for Post-Conviction Relief was

10   automatically filed in the Maricopa County Superior Court. (IOR 207.) More than

11   two years later, on March 9, 2010, the Arizona Supreme Court appointed Nicole

12   Farnum to represent Morris in the state proceedings. (DA 52.) In 2011, she moved

13   to withdraw based on problems with her and Morris's communication (IOR 246),

14   but later withdrew the request with Morris's agreement (Tr. Feb. 10, 2011). After

15   eight continuances (IOR 212, 216, 226, 260, 276, 280, 292, 298), Farnum filed a

16   petition for post-conviction relief on June 6, 2012 (IOR 307). She raised a variety

17   of ineffective assistance of trial and appellate counsel claims, a "new

18   evidence/actual innocence" claim, a "new law" claim, and eleven claims that were

19   identical to those appellate counsel raised on direct appeal to avoid preclusion.

20   (*Compare* IOR 307 at 65–67, *with* DA 29 at 59–66; *see also* IOR 354 at 3 (PCR

21   court noting that "[i]t is unclear why [Morris is] re-raising them in this Rule 32

22   proceeding").) The State filed their response on September 21, 2012 (IOR 349), and

23   Farnum filed a seven-page reply on October 8 (IOR 352). On November 13, the

24   court dismissed several claims and granted an evidentiary hearing on the issue that

25   "additional experts should have been retained to present expert testimony in the

26   penalty phase to disprove the State's necrophilia theory." (IOR 354.)

27             Farnum asked the court to reconsider its November 13 ruling and to expand

28   the hearing to include the claim that trial counsel ineffectively defended against the

43

especially cruel aggravating factor in the aggravation phase of the trial. (IOR 386.) The court denied the motion, stating that Farnum presented no new evidence or law and simply repeated the same arguments she raised in her petition. (IOR 402, 404.)

On March 7, Morris filed a pro per motion for new counsel based on a conflict of interest between Farnum and his trial counsel James Logan. (IOR 382.) At the hearing on this issue, Farnum insisted there was a conflict if Logan saw her billing statements,[15] but she did not feel she had a conflict in representing Morris. (Tr. Apr. 9, 2013 at 7, 15.) The court did not see a conflict either and denied Morris's motion (Tr. Apr. 9, 2013 at 16), but later reversed the ruling and appointed the Public Defender's Office to advise Morris on the issue (IOR 388). At the following hearing, Morris refused to waive the conflict, and Farnum moved to withdraw. (Tr. July 9, 2013 at 3–4; IOR 419.) This motion was granted. (IOR 420.) Five months later, the Arizona Supreme Court appointed Harley Kurlander to take over Morris's post-conviction proceedings. (DA 57; IOR 422.)

Kurlander filed motions asking the court to both reconsider its denial of Farnum's motion to reconsider and to amend the petition to include new claims regarding trial counsel's failure to defend the necrophilia theory during the guilt and aggravation phases of the trial. (IOR 430, 434.) The court denied the motion for reconsideration as untimely. (IOR 432.) The court granted the request to amend but denied the new claims on the merits. (IOR 437, 438.)

On June 12, 2014, the case was transferred to Judge Rosa Mroz. (IOR 442.) Kurlander asked the new court to reconsider Judge Rayes's denial of his amended petition (IOR 456), which was denied (IOR 466). The evidentiary hearing began on March 16, 2015, and lasted six days. Morris waived his presence. (Tr. Mar. 16, 2015

---

[15] After leaving the Legal Advocate's Office, Logan became the director of Public Defense Services for Maricopa County where he was administratively and directly supervising the court's contract system at the time of Morris's post-conviction proceedings. (Tr. Mar. 19, 2015 at 5.)

at 4–5.)

David Posey, M.D., was the first witness called by the defense. He was asked to estimate the time of suffering of the victims, whether drugs were involved in the deaths, if there was evidence of sexual assault, and if there was evidence of body mutilation. (Tr. Mar. 16, 2015 at 24.) He said that he found no evidence of mutilation and no evidence of postmortem sex. (Tr. Mar. 16, 2015 at 26–27.) Prior to the hearing, he was asked specifically to focus on skin slippage and insect activity. (Tr. Mar. 16, 2015 at 27.) He reviewed for the court the general stages of decomposition. (Tr. Mar. 16, 2015 at 29–40.) He then focused on Noah. He saw "typical skin slippage" that was not consistent with rubbing or friction, but was "due to the natural decomposition process." (Tr. Mar. 16, 2015 at 54, 56, 60, 61.) He said that what he reviewed was not consistent with what the prosecutor argued at trial (Tr. Mar. 16, 2015 at 60), and that trial counsel did not question Keen about it (Tr. Mar. 16, 2015 at 62). Next, Posey discussed the skin slippage on Codman, describing it as typical postmortem skin slippage that was not caused by "rough handling." (Tr. Mar. 16, 2015 at 64, 74.) He said Hu's trial testimony that skin slippage is consistent with rubbing after death was not correct because he would expect to see more damage and loss of skin (Tr. Mar. 16, 2015 at 67–69, 71–72), and that there was no testimony that having sex was consistent with what Hu observed (Tr. Mar. 16, 2015 at 76–77). Lastly, he discussed Horn's testimony regarding the defects in the skin around victim Castillo's anus and how Horn said they could be tears from trauma. (Tr. Mar. 16, 2015 at 85–87.) Posey testified that the defects were "all caused by maggot activity," and that they did not have "irregular, torn borders" that he would expect to see if there had been trauma or sexual activity. (Tr. Mar. 16, 2015 at 88–94.)

On cross-examination, Posey opined that Noah did not suffer because she was intoxicated on cocaine and GHB, and that her attempt to loosen the ligature around her neck would have been an automatic reflex. (Tr. Mar. 16, 2015 at 130–

31.) He also discussed Hu's testimony that Codman's head decomposition was consistent with strangulation, which Posey felt was "disingenuous" because it had "nothing to do with strangulation." (Tr. Mar. 16, 2015 at 145–46.)

Next, Dr. Lanyon testified. In April 2003, he was asked by the trial team to do a general evaluation of Morris (Tr. Mar. 16, 2015 at 164; Tr. Mar. 23, 2015 at 6), but he did not come up with any "confident explanation" for Morris's behavior, any brain-related issues, or evidence of sexual deviance (Tr. Mar. 16, 2015 at 173–74). Because he felt Morris's case was "out of [his] league," he suggested the trial team look into a serial killer expert and a neurologist, and he recommended several psychologists who specialized in abnormal psychology. (Tr. Mar. 16, 2015 at 176–77; Tr. Mar. 23, 2015 at 11, 15, 17–19, 21–23, 61–62.) His involvement with Morris's case ended in October 2004. (Tr. Mar. 23, 2015 at 24.) On cross-examination, Lanyon explained that his report was just his notes typed up and was not an official report. (*See generally* Tr. Mar. 23, 2015 at 26–35.)

On the second day of the hearing, the defense called standard of care expert Richard Bock to discuss *Strickland v. Washington*, 466 U.S. 668, 688 (1984), and the American Bar Association Guidelines for the Appointment and Performance of Counsel In Death Penalty Cases (1989). (Tr. Mar. 17, 2015 at 3, 7–9.) He testified that "the first standard [he] felt that was not met was to get a forensic pathologist. [He thought] that would have been very significant to rebut physical evidence that was testified to and argued by the State." (Tr. Mar. 17, 2015 at 11–15.) He would have selected an expert forensic pathologist regarding the skin slippage and a mental health expert regarding the alleged sexual deviancy. (Tr. Mar. 17, 2015 at 15.) Bock said the State's focus on Morris being a necrophile, which he called the "highest degree of depravity," could have been rebutted. (Tr. Mar. 17, 2015 at 16–17, 142–43.) He noted that while the medical examiners testified that skin slippage was caused by friction and rubbing, they never gave the opinion that there was sex after death. (Tr. Mar. 17, 2015 at 21–22.) He said Logan just accepted that skin

slippage was caused by friction, which would have mislead the jury, and that a forensic pathologist expert like Posey could have testified that this was not the source. (Tr. Mar. 17, 2015 at 22–23.) He also explained that the ABA Guidelines compel an attorney to rebut aggravators through competent expert testimony and that trial counsel should have rebutted the State's argument that postmortem sex showed relishment and gratuitous violence. (Tr. Mar. 17, 2015 at 23–25.) He noted that someone like Potts, who the defense hired and who Bock thought was a Rule 11 doctor, would not have been helpful in this case. (Tr. Mar. 17, 2015 at 38–39.)

On cross examination, Bock explained why trial counsel's strategy for the penalty phase was insufficient and why they were ineffective. (Tr. Mar. 17, 2015, 42–43, 50–52.) In this case, he said, "the [ABA] standards . . . compel the testimony of experts to dispel this necrophilia." (Tr. Mar. 17, 2015 at 93.) He stated that arguing or emphasizing the weaknesses of the State's case can be strategic, but in this case necrophilia needed to be explained. (Tr. Mar. 17, 2015 at 94, 104.)

During redirect, Bock summarized that trial counsel were "ineffective not to get that specialized testimony from that expert" (Tr. Mar. 17, 2015 at 136), and stated that they had a duty to pursue, consult with, and present an expert at the penalty phase[16] regarding the physical evidence as well as a mental health expert as to whether Morris met the criteria for necrophilia (Tr. Mar. 17, 2015 at 138).

Randall Craig testified next. In December 2004, he replaced Maria Schaffer as second chair counsel on Morris's case. (Tr. Mar. 17, 2015 at 154; *see also* IOR 72.) He believed his role was to handle the aggravation and penalty phases (Tr. Mar. 17, 2015 at 156), but did not recall many details of the case (Tr. Mar. 17, 2015 at 150–51). He was sure he knew that the State's theory would be that Morris had sex with the victims' dead bodies (Tr. Mar. 17, 2015 at 156–57, 163–64), and said he

---

[16]He noted that the State argued at the penalty phase that the defense did not call an expert. (Tr. Mar. 17, 2015 at 139.)

thought he studied up on the subject at the law library (Tr. Mar. 17, 2015 at 161–62). He said Logan told him that they had Morris "examined by a variety of experts and he seem[ed] fine" and that "what we have is what we have" when it came to experts.[17] (Tr. Mar. 17, 2015 at 158–59.) He recalled that Logan argued their theory that the victims died of overdoses and that there was no evidence of what caused the skin slippage. (Tr. Mar. 17, 2015 at 165.) He recalled they felt that putting on an expert may have opened the door to the State's attack on rebuttal and feared they might lose some credibility with the jurors. (Tr. Mar. 17, 2015 at 164–66.) He said they attacked the sufficiency of the evidence since there was no real proof of necrophilia, it was just the State's argument, and none of the experts agreed regarding skin slippage or postmortem sex. (Tr. Mar. 17, 2015 at 168–73, 181–82.)

The following day, Craig was cross-examined. He explained that "everybody was puzzled," and they knew they needed a strong mitigation case (Tr. Mar. 18, 2015 at 38–42), but they did not want to put on experts who would say "we're baffled" (Tr. Mar. 18, 2015 at 42). On redirect, Craig said that presenting an expert in necrophilia and pathology could be mitigation as long as gruesome photographs did not come in. (Tr. Mar. 18, 2015 at 61–62.) He admitted it does not hurt to consult with experts, and said that Lanyon was hired as a consulting expert. (Tr. Mar. 18, 2015 at 71–73.)

Judith Becker, Ph.D., testified next. She said that post-conviction counsel Farnum contacted her to do a broad evaluation of Morris to try to explain his behaviors. (Tr. Mar. 18, 2015 at 93.) She saw Morris five times. He said that he did not want to discuss the crimes, so she looked at the collateral material, police reports, and evidence presented at trial. (Tr. Mar. 18, 2015 at 102–03.) She said that Morris answered her questions but exaggerated some things and portrayed himself

---

[17] Craig knew that Lanyon was just a consulting expert (Tr. Mar. 17, 2015 at 160), and did not recall any discussions about obtaining an MRI or EEG (Tr. Mar. 18, 2015 at 20).

as "exceptionally free of his shortcomings." (Tr. Mar. 18, 2015 at 107, 109.) Her testing did not render any psychological or psychiatric diagnosis, including necrophilia or erotophonophilia; and she, in fact, determined that Morris was not a necrophile. (Tr. Mar. 18, 2015 at 108, 115–16, 117–19.) She considered that Morris was aroused by lust murder based on what he told the police but did not so diagnose him. (Tr. Mar. 18, 2015 at 123–24.) She suggested his possible motivation was based on a "history of perceived disappointment and betrayals by women" and "issues with people lying to him." (Tr. Mar. 18, 2015 at 124–25; PCR Pet. Ex. T at 19.)

Under cross-examination, Becker said that Morris "just did not seem to fit" necrophilia and called him "an anomaly." (Tr. Mar. 18, 2015 at 138–39, 153–56.) She felt that he was not a necrophile because he "desperately wanted a relationship [and] enjoyed the company of live bodies" (Tr. Mar. 18, 2015 at 152), and that he did not like having a dead body in his RV but just had not moved it (Tr. Mar. 18, 2015 at 153).

On day four of the hearing, trial counsel James Logan testified. He explained that he has difficulty remembering specifics of any of his death-penalty cases, and once they are done he does not dwell on them. (Tr. Mar. 19, 2015 at 14; *see, e.g.*, Tr. Mar. 19, 2015 at 22–23, 25–26, 27, 29–30, 36, 37, 42, 44, 45–46, 51, 58–59, 71, 92, 94, 103, 112, 116, 119, 130, 131, 136 (noting he "did not recall").) He said the State's "sex after death" theory came in through the medical examiners' testimony, but that it was something they investigated and knew was going to be a potential issue. (Tr. Mar. 19, 2015 at 16–18, 29, 41–42.) He probably would have used an expert to say that Morris was not a necrophile (Tr. Mar. 19, 2015 at 43, 74–75), but felt that necrophilia was supported by the skin slippage and so attempted to deal with it through the medical examiners' testimony (Tr. Mar. 19, 2015 at 43–44). He also might not have used this type of expert because the evidence of necrophilia was "slight," would only have had "entertaining value," and would have

49

made necrophilia a bigger issue than it was. (Tr. Mar. 19, 2015 at 45, 48; PCR Hr'g Ex. 5 at 000049.) However, he admitted there was nothing to lose by the time they got to the penalty phase. (Tr. Mar. 19, 2015 at 45–46.) Regarding a pathologist, Logan felt that hiring someone to say that skin slippage was from natural decomposition and not friction may or may not have added something unless it was the only thing to support the heinous and depraved aggravator. (Tr. Mar. 19, 2015 at 49–51, 57–59.) He said their defense was that the deaths were accidental (Tr. Mar. 19, 2015 at 23), and that the case was more of a mitigation case—which Schaffer would have been in charge of—than a guilty/not guilty case (Tr. Mar. 19, 2015 at 26, 61). He stated that Lanyon was just who they asked to look at the case first (Tr. Mar. 19, 2015 at 21), and that he did not know Potts's qualifications other than he was someone used in Rule 11 examinations who he considered a "generalist" (Tr. Mar. 19, 2015 at 69–70).

On cross-examination, Logan said they focused on the victims' drug and alcohol use and that Keen did not perform the autopsies. (Tr. Mar. 19, 2015 at 95.) They "wracked [their] brains for strategy" and agreed it was a mitigation case and that they would argue insufficiency of the evidence. (Tr. Mar. 19, 2015 at 95–103.) Logan said it was "sometimes a whole lot better" to let the State's witnesses "cut their own throat." (Tr. Mar. 19, 2015 at 104.) Because Lanyon reported that there was no likelihood of impairment and functioning due to brain damage, and Tamm stated there was a high likelihood that CT and MRI scans would be normal, Logan made the decision not to do further testing. (Tr. Mar. 19, 2015 at 109–13, 125–26.) He said Potts was also "baffled" by Morris. (Tr. Mar. 19, 2015 at 131.) For mitigation, he brought in people to show that Morris's life was sad. (Tr. Mar. 19, 2015 at 128.) On redirect, he admitted that it might have been better if they had consulted with a pathologist. (Tr. Mar. 19, 2015 at 148–51.)

On the last day of the hearing, trial mitigation specialist Linda Thomas testified. She had been in the Office of the Legal Advocate since October 2002, and

was assigned Morris's case in April 2003. (Tr. Mar. 24, 2015 at 5, 13.) She discussed that because the head of their office liked to use local experts, they started with Lanyon for direction. (Tr. Mar. 24, 2015 at 13–14.) He came to a point where he felt they needed different experts because this case was beyond his expertise. (Tr. Mar. 24, 2015 at 16, 20–22.) Thomas looked for other experts, but ended up hiring Tamm because of budget issues. (Tr. Mar. 24, 2015 at 23–25; *see also* Tr. Mar. 24, 2015 at 35–44.) Tamm, who Thomas said had not worked with "this population" and took Morris as he presented, told them there was no need for further testing. (Tr. Mar. 24, 2015 at 26, 28.) She was frustrated because they had not found anyone who could help explain Morris. (Tr. Mar. 24, 2015 at 28.)

On cross-examination, Thomas said that Lanyon did not find anything in the initial tests that indicated brain damage but suggested further testing like an MRI or an EEG. (Tr. Mar. 24, 2015 at 54–55.) She believed that more testing and brain scans "absolutely" should have been done because something was wrong with Morris. (Tr. Mar. 24, 2015 at 57–58.) She wanted to hire Becker, who was an expert in paraphilias. (Tr. Mar. 24, 2015 at 58–59.) Thomas described Morris as a "very pathetic soul" and said it was their mission to paint Morris as a sad person. (Tr. Mar. 24, 2015 at 68–69.)

The last person to testify was Maria Schaffer. Schaffer worked for the Office of the Legal Advocate and was assigned as second chair after Morris's arrest; she was tasked with preparing for the penalty phase. (Tr. Mar. 24, 2015 at 78–79.) She recalled hiring Lanyon to do a neuropsychological evaluation on Morris and that he was "challenged" with Morris and referred the team to other, more qualified experts. (Tr. Mar. 24, 2015 at 83–84.) As of October 2004, only Lanyon had been hired, and they were "frantically" searching for other experts and potential diagnoses. (Tr. Mar. 24, 2015 at 88, 90.) As a team, they discussed that the State would allege that Morris had sex with the victims after they died. (Tr. Mar. 24, 2015 at 89, 91, 93.) She recalled the skin slippage and the anal defects were an issue, and

1    she felt they should consult with a forensic pathologist. (Tr. Mar. 24, 2015 at 91–

2    99.) Schaffer left the Legal Advocate's Office in December of 2004, and was no

3    longer on Morris's case. (Tr. Mar. 24, 2015 at 105–06.)

4         During cross-examination, Schaffer said that Becker might have been helpful

5    to explain to a jury how Morris got to that point in his life because the facts and

6    photographs of this case were so "horrific." (Tr. Mar. 24, 2015 at 116.) When she

7    left the office, they still had not come up with a mitigation theme, and she was

8    surprised they went to trial so quickly after she left because "there was so much

9    more that still needed to be done." (Tr. Mar. 24, 2015 at 118.)

10        The parties argued the issues immediately following the testimony.

11    (*See* Tr. Mar. 24, 2015 at 123–80.) A month later, the court dismissed the

12    post-conviction petition, finding there was no deficient performance or prejudice in

13    trial counsel's failure to secure expert testimony about either decomposition or "not

14    necrophilia." (IOR 491.)

15        Kurlander filed a petition for review in the Arizona Supreme Court on April

16    22, 2016. (PFR 7.) On March 14, 2017, the Arizona Supreme Court denied Morris's

17    petition for review without comment. (PFR 27.)

18              **7.    Current proceedings.**

19        On March 28, 2017, Morris filed with this Court an application to proceed in

20    forma pauperis and a motion for appointment of counsel. (ECF Nos. 2, 3.) On

21    March 29, this Court entered an order granting the application to proceed in forma

22    pauperis and appointing the Federal Public Defender for the District of Arizona in

23    these proceedings. (ECF No. 5.) On April 6, undersigned counsel Emma Smith

24    entered her appearance as lead counsel, and on September 8, Alison Rose entered

25    her appearance as co-counsel. (ECF Nos. 7, 14.) This Petition is timely filed in

26    accordance with this Court's order of June 22, 2017. (ECF No. 11; *see also* ECF

27    No. 18.)

28    / / /

## II.     STATE COURT PRESUMPTION OF CORRECTNESS.

Morris hereby provides notice of his intention to challenge the presumption of correctness of specific findings of fact made by the state court in his case. Certain factual findings of the state court in Morris's case, if any are found to exist, are not entitled to the presumption of correctness under 28 U.S.C. § 2254(e)(1). These include, but are not limited to, factual findings made by the trial court in Morris's trial and sentencing and the opinion by the Arizona Supreme Court on direct appeal. Pursuant to 28 U.S.C. § 2254(e)(1), Morris asserts that certain findings of fact by the state court at trial, resentencing, or on direct appeal, if any are found to exist, are not fairly supported by the record. Morris also intends to assert other exceptions to the presumption of correctness, including but not limited to: that the procedures employed by the state courts in making findings of facts were not adequate to afford him a full and fair hearing of his claims; that material facts were not adequately developed in state court proceedings; that Morris did not receive a full, fair, and adequate hearing of his claims in the state-court proceedings; and that Morris was otherwise denied due process of law in the state-court proceedings.

In addition, Morris asserts that certain findings of fact by the state court in regard to his state post-conviction proceedings, if any are found to exist, are not entitled to the presumption of correctness under 28 U.S.C. § 2254(e)(1). These include but are not limited to: any and all factual findings made by the trial court in regard to Morris's state post-conviction proceeding, as well as the decision of the Arizona Supreme Court on petition for review. Pursuant to 28 U.S.C. § 2254(e)(1), Morris intends to assert that certain findings of fact by the state court concerning his state post-conviction proceedings, if any are found to exist, also are not fairly supported by the record.

## III.     EXHAUSTION.

Most of the federal constitutional claims alleged herein have been exhausted in proceedings before the Arizona courts. Some claims, however, were not fully

presented to the state court, were not ripe for review, or could only be raised in this forum.

Morris expressly reserves his right to amend this petition. In *McCleskey v. Zant*, 499 U.S. 467, 498 (1991), the Supreme Court reaffirmed the "principle that [a] petitioner must conduct a reasonable and diligent investigation aimed at including all relevant claims and grounds for relief in the first federal habeas petition." Referring to Rule 6 of the Rules Governing Section 2254 Cases (discovery), Rule 7 (expansion of the record), and Rule 8 (evidentiary hearing), the Supreme Court held that a habeas petitioner has to have reasonable means and the ability to investigate to form a sufficient basis to allege a claim in the first petition. *Id*. Morris believes additional claims may be identified following a thorough review of the record, through investigation, after discovery is conducted and completed, or after an evidentiary hearing is held. At the appropriate time during these proceedings, Morris will present any additional claims through amendments to the petition.

## IV.     THE AEDPA IS UNCONSTITUTIONAL.

Morris's case is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). 28 U.S.C. § 2254. However, AEDPA is unconstitutional, and its strictures should not apply here. Central to fundamental fairness and the integrity of the United States' justice system is that every prisoner must have all of his constitutional claims heard by a court. *See Bounds v. Smith*, 430 U.S. 817, 822–23 (1977). One method of ensuring that a prisoner's constitutional claims are heard is through the writ of habeas corpus. However, the passage of AEDPA substantially changed the law that governs habeas petitions. *See Felker v. Turpin*, 518 U.S. 651, 654 (1996). AEDPA's restrictions suspend the writ of habeas corpus and violate the separation of powers, which results in prisoners remaining in prison without review of alleged constitutional defects of their convictions and sentences.

/ / /

1

## A.    AEDPA suspends the writ of habeas corpus.

2      Congress cannot define prisoners' habeas rights so narrowly that Congress,
3  in effect, suspends the writ. The writ of habeas corpus is guaranteed by the United
4  States Constitution in the Suspension Clause, which provides that "[t]he Privilege
5  of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of
6  Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9, cl.
7  2. The Suspension Clause is a structural limitation on the power of Congress. Like
8  bills of attainder and ex post facto laws, which are also prohibited in Article I,
9  section 9, the suspension of habeas (except in cases of rebellion or invasion) belongs
10  to a "category of Congressional actions which the Constitution barred." *United*
11  *States v. Lovett*, 328 U.S. 303, 315 (1946). The writ "can be preserved in practice
12  no other way than through the medium of the courts of justice; whose duty it must
13  be to declare all acts contrary to the manifest tenor of the Constitution void." *Id.* at
14  314 (quoting The Federalist No. 78 (Alexander Hamilton)).

15      Because AEDPA prevents federal courts in certain circumstances from
16  granting relief when it is undisputed that the conviction or sentence was
17  unconstitutional, it suspends the writ of habeas corpus. *See* 28 U.S.C. § 2254. Under
18  the tenets of AEDPA, the federal court must determine whether a federal
19  constitutional violation, in a capital case, was a "reasonable" or "unreasonable"
20  constitutional violation.

21

## B.    AEDPA violates the separation of powers doctrine.

22      Congress cannot impinge on the courts' duty to say what the law is, but
23  Congress does so when it requires Article III courts to ignore any part of the
24  Constitution and to instead give effect to a contrary law. *See Marbury v. Madison*,
25  5 U.S. (1 Cranch) 137, 178 (1803).

26      Congress has the power to constrain courts' authority. *See Keene Corp. v.*
27  *United States*, 508 U.S. 200, 207 (1993). "The judicial Power of the United States
28  shall be vested in one supreme Court, and in such inferior Courts as the Congress

may from time to time ordain and establish." U.S. Const. art. III, § 1. However, Congress must not manipulate the "test for determining the scope of [habeas corpus]" because the writ "is designed to restrain" Congress and because the writ is "an indispensable mechanism for monitoring the separation of powers." *Boumediene v. Bush*, 553 U.S. 723, 765–66 (2008).

The separation of powers doctrine found in Article III "serves both to protect the role of the independent judiciary within the constitutional scheme of tripartite government . . . and to safeguard litigants' right to have claims decided before judges who are free from potential domination by other branches of government." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848 (1986) (internal citations and quotation marks omitted). When it was confronted with an unconstitutional provision, the Supreme Court in *Marbury* asked whether courts are bound by "an act of the legislature" that is "repugnant to the constitution;" the Court answered that "[i]t is emphatically the province and duty of the judicial department to say what the law is." 5 U.S. at 177.

"[I]f Congress does provide for habeas in the federal courts, Congress cannot . . . instruct the federal courts, whether acting in a federal or in a state case, how to think, how to ascertain law, how to judge." *Irons v. Carey*, 505 F.3d 846, 855 (9th Cir. 2007) (Noonan, J., concurring), *overruled on other grounds by Hayward v. Marshall*, 603 F.3d 546 (9th Cir. 2010). Because AEDPA requires courts to ignore unlawful detentions if the prisoner does not meet certain provisions, it unconstitutionally violates the separation of powers doctrine. The question before the federal court should simply be whether Morris's constitutional rights were violated in such a way that he is entitled to habeas relief. Adding the gloss of "unreasonable" versus "reasonable" constitutional violations robs the courts of their ability to remedy constitutional wrongs.

/ / /

/ / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

C.     Conclusion.

AEDPA suspends the writ of habeas corpus and violates the separation-of-powers doctrine because it dictates that courts must not "grant relief to citizens who are being held in prison in violation of their constitutional rights unless the constitutional error that led to their unlawful conviction or sentence is one that could not have been made by a reasonable jurist." *Irons*, 505 F.3d at 859 (Reinhardt, J., concurring). Also, AEDPA does not allow an appellate judge to correct an unlawful detention if a lower court's "error is understandable," which is inconsistent with a judge's duty "to enforce the laws and protect the rights of our citizens against arbitrary state action." *Id.* Therefore, AEDPA is unconstitutional, and this Court should review Morris's claims de novo.

V.     FEDERAL CONSTITUTIONAL CLAIMS.

Morris petitions this Court pursuant to 28 U.S.C. § 2254 for a writ of habeas corpus freeing him from the custody of Respondents pursuant to the judgments and sentences of the state courts of Arizona, on the grounds that the judgments and sentences were obtained and affirmed in violation of his rights under the Constitution of the United States. In support of this request, Morris offers the following:

**CLAIM ONE**

**The trial prosecutor engaged in repeated and pervasive misconduct, violating Morris's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.**

Morris raised this claim on direct appeal. (DA 29 at 16, 47–54.) The Arizona Supreme Court denied the claim on the merits. *State v. Morris*, 160 P.3d 203, 214–18 (Ariz. 2007). The state court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an unreasonable determination of the facts in light of the evidence presented. *See id.* § 2254(d)(2). Morris incorporates by specific reference all facts, allegations, and

1    arguments made elsewhere in this Petition.

2         Prosecutors occupy a unique position in the Bar and are likewise subject to

3    uniquely rigorous standards. Although a prosecutor "may strike hard blows, he is

4    not at liberty to strike foul ones. It is as much his duty to refrain from improper

5    methods calculated to produce a wrongful conviction as it is to use every legitimate

6    means to bring about a just one." *Berger v. United States*, 295 U.S. 78, 88 (1935).

7    Thus, his interest in a criminal prosecution is not to win a case, but "that justice

8    shall be done." *Id*. at 88; *see also United States v. Kojayan*, 8 F.3d 1315, 1323 (9th

9    Cir. 1993) (explaining that "prosecutor's job isn't just to win, but to win fairly,

10   staying well within the rules"). As the Supreme Court has acknowledged, "the

11   average jury, in a greater or less degree, has confidence that these obligations . . .

12   will be faithfully observed. Consequently, improper suggestions, insinuations, and,

13   especially, assertions of personal knowledge are apt to carry much weight against

14   the accused when they should properly carry none." *Berger*, 295 U.S. at 88.

15        A prosecutor oversteps "the bounds of that propriety and fairness which

16   should characterize the conduct of such an officer" when he, among other things,

17   misstates facts in his cross-examination of witnesses; "put[s] into the mouths of

18   such witnesses things which they had not said"; "suggest[s] by his questions that

19   statements had been made to him personally out of court, in respect of which no

20   proof was offered"; pretends to understand that a witness said something he did not

21   say and persistently cross-examines him on that basis; assumes prejudicial facts not

22   in evidence; bullies and argues with witnesses; and generally conducts himself in a

23   "thoroughly indecorous and improper manner." *Id.* at 84. A prosecutor further

24   oversteps these bounds when his arguments are "undignified and intemperate" or

25   contain "improper insinuations and assertions calculated to mislead the jury." *Id.* at

26   85.

27        To prevail on a prosecutorial misconduct claim, a petitioner must meet one

28   of two standards. He must demonstrate that the prosecutor's conduct either (1)

58

prejudiced a substantive right, *see Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) (citing *Griffin v. California*, 380 U.S. 609, 623 (1965)), or (2) rendered the trial fundamentally unfair, *see id.* 78. When evaluating various instances of prosecutorial misconduct, the reviewing court must consider the cumulative effect of the harm. *See Berger*, 295 U.S. at 89 (awarding a new trial because of "probable cumulative effect" of instances of prosecutorial misconduct).

### A. The prosecutor's pattern of misconduct.

Here, the conduct of the prosecutor, Juan Martinez, both prejudiced Morris's substantive rights and rendered his trial fundamentally unfair. His misconduct was not confined to a single instance but was persistent. Morris already faced an uphill battle, given that his counsel failed to challenge the admissibility of his statement to police or properly investigate his social history and elected to not put on a defense. *See* Claims Three (A) and Four (B) *infra*. Being pitted against Martinez, a prosecutor with a history of misconduct and ethical complaints against him, proved to be an insurmountable obstacle. Indeed, Martinez's repeated instances of misconduct eviscerated Morris's right to a fair trial.

In determining whether misconduct rises to the level of a due process violation, both federal and Arizona courts have considered whether the misconduct was isolated or part of an ongoing pattern. *See Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987); *State v. Minnitt*, 55 P.3d 774, 782 (Ariz. 2002) (explaining that prosecutor's "misdeeds were not isolated events but became a consistent pattern of prosecutorial misconduct that began in 1993 and continued through retrial in 1997"); *State v. Jorgenson*, 10 P.3d 1177, 1180 (Ariz. 2000) ("This is perhaps the third or fourth time that the conduct of this same prosecutor has raised the same type of problem. It is unfortunate that he was permitted to try so serious a case and, without proper supervision, permitted to try it in such an improper manner.").

A prosecutor's level of experience is also relevant to the consideration of whether the prosecutor committed misconduct. *See Le v. Mullin*, 311 F.3d 1002,

1029 (10th Cir. 2002) (Henry, J., concurring) ("An experienced prosecutor should know better—especially considering the frequent criticism of his tactics by both state and federal courts—and should be willing to follow the law he has sworn to uphold."); *United States v. Scott*, 603 F. App'x 573, 575 (9th Cir. 2015) (explaining that "experienced prosecutor's misconduct" in arguing during closing that defendant was guilty based on exact propensity reasoning foreclosed by evidence rule was "inexplicable"); *Minnitt*, 55 P.3d 774, 782 (reversing conviction based on prosecutorial misconduct and noting that prosecutor was "not an inexperienced prosecutor, but rather a veteran homicide prosecutor"). Likewise, in disciplinary cases, a prosecutor's considerable experience renders his misconduct more egregious. *See In re Peasley*, 90 P.3d 764, 774 (Ariz. 2004) ("[W]hen a lawyer's substantial experience places that lawyer in a position that would be unavailable to a less experienced lawyer, and that lawyer's experience also affords, or should afford, a greater appreciation of the advantages of eliciting false testimony, substantial experience may be considered a relevant aggravating factor."); *In re Zawada*, 92 P.3d 862, 869 (Ariz. 2004) (because prosecutor's "extensive experience" helped him understand how jury would react to unfavorable evidence, "he suborned perjured testimony to destroy the negative inference the jury would otherwise have drawn").

Martinez has both a wealth of experience and a well-documented history of crossing ethical lines. Since 1998, Martinez has sent seven people to Arizona's death row. Prosecutorial misconduct claims have been raised by defense counsel in all but one of those cases. Michael Kiefer, *Objections Raised to Juan Martinez's Conduct in Jodi Arias Trial*, Ariz. Rep. (Feb. 28, 2014), *available at* http://archive.azcentral.com/news/articles/20131028jodi-arias-juan-martinez-conduct-day3.html (last visited Feb. 13, 2018) (hereinafter, "Kiefer, *Objections Raised*"). This should not be written off as a claim commonly raised on appeal by default; indeed, Martinez's conduct has not gone unnoticed by both the Arizona

1   Supreme Court and the State Bar of Arizona.

2       Most notably, during oral argument in *State v. Gallardo*, 242 P.3d 159 (Ariz.

3   2010), then-Justice Andrew Hurwitz asked the state's attorney:

> Can I ask you a question about something that nobody's discussed so far? The conduct of the trial prosecutor. It seems to me that at least on several occasions, and by and large the objections were sustained, that the trial prosecutor either ignored rulings by the trial judge or asked questions that the trial judges once ruled improper and then rephrased the question in another improper way. . . . Short of reversing a conviction, how is it that we can . . . stop inappropriate conduct?

10  Kiefer, *Objections Raised*; *see also* Oral Argument, *State v. Gallardo*, No. CR-09-

11  0171-AP, *available at* http://supremestateaz.granicus.com/MediaPlayer.php?view_

12  id=2&clip_id=1216 (last visited Feb. 13, 2018). Justice Michael Ryan, who had

13  recently retired and was sitting by designation, also indicated his awareness of the

14  ongoing issues with Martinez's conduct:

> Well, this prosecutor I recollect from several cases. This same prosecutor has been accused of fairly serious misconduct, but ultimately we decided it did not rise to the level of requiring a reversal. There's something about this prosecutor, Mr. Martinez.

19  *Id.*

20      Justice Ryan's recollection was accurate—Martinez's conduct had been

21  before the Arizona Supreme Court on several occasions, including in Morris's case.

22  *See Morris*, 160 P.3d at 214–18; *State v. Andriano*, 161 P.3d 540, 546 (Ariz. 2007);

23  *State v. Lynch* ("*Lynch I*"), 234 P.3d 595, 606–07 (Ariz. 2010). A review of these

24  cases reveals, as Justices Hurwitz and Ryan recognized, that Martinez has a

25  particular history of stepping over the line. For example, numerous appellants,

26  including Morris, have complained that Martinez misstated the nature of evidence.

27  *See Morris*, 160 P.3d at 215 (alleging that Martinez argued without any factual basis

28  that Morris murdered victims to have sexual intercourse with their corpses);

*Andriano*, 161 P.3d at 546 (alleging that Martinez "took every opportunity to infuse the trial with marginally relevant information about Andriano's partying and man-chasing"); *Lynch*, 234 P.3d at 607 (alleging several misstatements); *Gallardo*, 242 P.3d at 168 (alleging that Martinez mischaracterized testimony about expert witness's fees and potential bias as an inconsistent statement and persisted with line of argument after trial court sustained further objections). The Arizona Supreme Court agreed that Martinez had committed misconduct in *Gallardo*, although it relied on the jury instructions to deny relief. *See Gallardo*, 242 P.3d at 168.

Martinez has most recently been subject to further allegations of misconduct relating to the Jodi Arias trial. In one example, the court paused the penalty phase to hold a hearing after Arias's attorneys filed a motion to dismiss all charges, alleging prosecutorial misconduct stemming from the deletion from the victim's computer of thousands of files containing pornography. *See* Michael Kiefer, *Jodi Arias Defense: Porn Evidence Destroyed on Travis Alexander Computer*, Ariz. Rep. (Nov. 11, 2014), *available at* https://www.azcentral.com/story/news/local/mesa/2014/11/10/jodi-arias-sentencing-trial-defense-says-evidence-destroyed-travis-alexander-computer-abrk/18828589/ (last visited Feb. 13, 2018).

On December 22, 2015, Arizona Attorneys for Criminal Justice ("AACJ"),[18] the Arizona state affiliate of the National Association of Criminal Defense Lawyers, filed a bar complaint against Martinez, alleging that he had "engaged in a long and continuing pattern of unethical and unprofessional conduct. Martinez's misconduct has gone unpunished and uncorrected, despite its being recognized numerous times

---

[18] Founded in 1986, AACJ "is a statewide not-for-profit membership organization of Criminal Defense Lawyers, law students and associated professionals dedicated to protecting the rights of the accused in the courts and in the legislature, promoting excellence in the practice of criminal law through education, training and mutual assistance, and fostering public awareness of citizens' rights, the criminal justice system and the role of the defense lawyer." AACJ, *About*, *available at* http://www.aacj.org/about (last visited Feb. 13, 2018).

by Arizona courts[.]" AACJ Complaint at 1.[19] In the complaint, AACJ noted the large number of capital cases, including Morris's, in which the Arizona Supreme Court had reviewed alleged misconduct by Martinez but failed to take action against him. AACJ Complaint at 3–6 (citing *Morris*, 160 P.3d 203; *Andriano*, 161 P.3d 540; *Gallardo*, 242 P.3d 159; *Lynch I*, 234 P.3d 595; *State v. Lynch* ("*Lynch II*"), 357 P.3d 119 (Ariz. 2015), *rev'd on other grounds by Lynch v. Arizona*, 136 S. Ct. 1818 (2016)).[20] The complaint also detailed Martinez's conduct in several high-profile non-capital cases. AACJ Complaint at 6–16 (citing *State v. Beemon*, No. CR2002-0099001 (Maricopa Cty. Super Ct.); *State v. Hulsey*, No. CR2007-111635 (Maricopa Cty. Super. Ct.); *State v. Grant*, No. CR2005-032986 (Maricopa Cty. Super. Ct.); *State v. Chrisman*, No. CR2010-153913 (Maricopa Cty. Super. Ct.); *State v. Irizzarry*, No. CR2010-106178 (Maricopa Cty. Super. Ct.); *State v. Arias*, No. CR 2008-031021-001 (Maricopa Cty. Super. Ct.).) The conduct from these cases fits into several categories, including arguing during opening statements, appealing to the jury's passions and fear, misstating the evidence, misstating the law, attacking expert witnesses, impugning the integrity or honesty of opposing counsel, and presenting false testimony. Many of these types of misconduct are present in Morris's case.

In September 2016, the Attorney Discipline Probable Cause Committee of the Supreme Court of Arizona ("Committee") ordered, based on AACJ's complaint,

---

[19] A pdf version of the complaint is included in an Arizona Republic article, and is hereinafter referred to as the "AACJ Complaint." *See* Michael Kiefer, *State Bar Admonishes Jodi Arias Prosecutor Juan Martinez, Places Him on Probation*, Ariz. Rep. (Sept. 30, 2016), *available at* https://www.azcentral.com/story/news/local/phoenix/2016/09/30/jodi-arias-prosecutor-juan-martinez-admonished-state-bar-arizona/91332898/ (last visited Feb. 13, 2018) (hereinafter, "Kiefer, *State Bar Admonishes*").

[20] Martinez also prosecuted death-row prisoner Clarence Dixon, *see State v. Dixon*, 250 P.3d 1174 (Ariz. 2011), and numerous claims of misconduct are alleged against Martinez in that case as well, *see Dixon v. Ryan*, No. CV-14-258-PHX-DJW, Pet. for Writ of Habeas Corpus at 158–89 (D. Ariz. Dec. 19, 2014).

that Martinez be placed on probation for one year. Order of Admonition at 2.[21] The order states that the Committee found probable cause that Martinez engaged in unprofessional conduct; used means that had no substantial purpose other than to embarrass, delay, or burden any other person, or used methods of obtaining evidence that violated the legal rights of such a person, by among other things, improperly attacking the defendant; and engaged in misconduct by engaging in conduct that is prejudicial to the administration of justice. Order of Admonition at 1 (citing Ariz. R. Sup. Ct. 41(g); Ariz. R. Sup. Ct. 42 (Ethical Rules 4.4 and 8.4(d))). The Arizona Republic reported that the State Bar issued a statement that the order was issued "for inappropriate statements made by Mr. Martinez during various trials or other legal proceedings. In some instances, these statements were found to be unprofessional or otherwise improper by the Arizona Supreme Court but did not require a reversal of the underlying criminal cases." *See* Kiefer, *State Bar Admonishes*. Martinez appealed, and after a single-day hearing before the presiding disciplinary judge, the AACJ's complaint was dismissed. *See* Michael Kiefer, *Juan Martinez, Prosecutor in Jodi Arias Case, Cleared in State Bar Ethics Case*, Ariz. Rep. (Sept. 12, 2017), *available at* https://www.azcentral.com/story/news/local/phoenix/2017/09/12/juan-martinez-prosecutor-jodi-arias-case-cleared-state-bar-ethics-case/655024001/ (last visited Feb. 13, 2018). The State Bar has filed an appeal with the Arizona Supreme Court to overturn the dismissal of the complaint. *See* Michael Kiefer, *Arizona Bar Appeals Ethics Order Exonerating Jodi Arias Prosecutor*, Ariz. Rep. (Dec. 20, 2017), *available at* https://www.azcentral.com/story/news/local/phoenix/2017/12/20/arizona-bar-appeals-ethics-order-exonerating-jodi-arias-prosecutor-juan-martinez/970046001/ (last visited

---

[21] A pdf version of the Order of Admonition, Probation, (CLE), and Costs is included in the Arizona Republic article as is the AACJ's complaint and is hereinafter referred to as the "Order of Admonition." *See* Kiefer, *State Bar Admonishes*.

Feb. 13, 2018). The information contained in the AACJ complaint is nevertheless important to consider because—aside from the fact that an ethics inquiry in response to a general bar complaint is not the same undertaking as a constitutional challenge in a specific case—it illustrates a pattern of misconduct by Martinez, and this history is relevant to evaluating Martinez's conduct in this case.

Recently, Arias's attorneys asked the State Bar to reinstate a bar complaint against Martinez on the ground that there was "overwhelming evidence" that he violated ethical rules during Arias's trial.[22] *See* Michael Kiefer, *Jodi Arias prosecutor manipulated women to get juror info, complaint alleges*, Ariz. Rep. (Feb. 13, 2018), *available at* https://www.azcentral.com/story/news/local/phoenix/ 2018/02/13/arizona-state-bar-complaint-jodi-arias-prosecutor-juan-martinez/ 332195002/ (last visited Feb. 18, 2018). According to the article, the complaint alleges that Martinez "engaged or attempted engage women with who he had flirtatious or outright sexual relationships to get information about jurors or leak confidential case information over social media." *Id.* A social media-blogger with whom he was alleged to have been in a relationship bragged to at least two others that she helped Martinez dig up negative information about the sole juror who refused to vote for a death sentence and whose identity was revealed minutes after a mistrial was declared. *Id.* The complaint further alleges that during Arias's second trial, Martinez carried on an inappropriate telephone and test-message relationship with a juror who had been dismissed from the case and asked her for information about the other jurors' thoughts. *Id.* Although Martinez claimed that he quickly ended the correspondence, the woman disputes this. *Id.* As discussed more fully below, Martinez's tendency to flout ethical rules, of which this is just one example, occurred in his prosecution of Morris as well.

---

[22] Counsel are seeking the documentation filed with the State Bar that supports this reporting.

**B.**   **Morris's conviction and death sentence were obtained in violation of his constitutional rights due to pervasive prosecutorial misconduct.**

From voir dire to the penalty phase, Martinez engaged in continuous prejudicial misconduct in Morris's case. Considered either singly, or in combination with one another and the other errors that occurred in this case, reversal is required.

### 1.   Misstatement of facts.

A prosecutor may not make inaccurate statements about the record that may mislead or confuse the jury. *See King v. United States*, 372 F.2d 383, 395 (D.C. Cir. 1966); *United States v. Robledo-Vela*, 45 F. App'x 567, 568 (9th Cir. 2002) (finding "significant prosecutorial misconduct in the form of misstating evidence, and that this error was not harmless"). And an intentional misstatement is "a serious breach of the prosecutor's duty." *State v. Cannon*, 713 P.2d 273, 278 (Ariz. 1985). When a prosecutor makes statements regarding information not in evidence, he essentially becomes an unsworn witness in the case that is not subject to cross-examination. A prosecutor's comments create prejudicial error if they constitute personal and institutional guarantees of trustworthiness of the government and its case. *See United States v. Smith*, 962 F.2d 923, 933 (9th Cir. 1992). In this case, Martinez engaged in a pervasive pattern and practice of intentionally misstating the evidence. The most egregious examples are discussed here.

The most glaring and shocking example of Martinez distorting the evidence is his argument that Morris engaged in necrophilia. In support, Martinez relied on evidence of anal defects found on Castillo, skin slippage on Codman and Noah, and semen detected in Velasquez and Noah. As discussed below, none of this evidence actually supported Martinez's necrophilia theory. But he misstated and twisted the medical examiners' testimony about this evidence to mislead the jury into believing that Morris had engaged in postmortem sex with the victims. This was misconduct.

First, Martinez made numerous false statements and misrepresentations

about the perianal defects found on Castillo. Dr. Kevin Horn testified that there were "defects in the skin" around Castillo's anus, but he could not conclude whether they were from trauma or from insect activity during decomposition. (Tr. June 15, 2005 at 87–88, 96–97.) Martinez pressed him if the defects were consistent with trauma, to which Horn responded, "[c]ould be consistent, yes." (Tr. June 15, 2005 at 88.) Horn also testified that if there was trauma, he could not say whether it occurred before, during, or after death. (Tr. June 15, 2005 at 88, 102.) Further, even if the defects were the result of sexual activity, there was no way to tell from the forensic evidence whether that activity was consensual. (Tr. June 15, 2005 at 96–97.) Horn stated, in response to Martinez's questioning, that the defects seen around Castillo's anus could be from trauma, could be consistent with sexual activity, and could have occurred after death. (Tr. June 15, 2005 at 102.) Essentially, Horn had no idea when the defects to Castillo's anus occurred or what caused them. (Tr. June 15, 2005 at 88 (stating he "felt [he] couldn't opine one way or the other whether that was real trauma before death or just due to the decompositional process").)

Despite this testimony, Martinez, during his examination of Horn, repeatedly referred to these defects as "injuries" or "trauma" that were "consistent with sexual activity" (*see, e.g.*, Tr. June 15, 2005 at 88, 95, 102), and continued to do so throughout the proceedings (*see, e.g.*, Tr. July 5, 2005 at 53–54; Tr. July 12, 2005 at 37–38, 109, 133, 135). These statements were contrary to the evidence and highly prejudicial to Morris, as they transformed the defects from a natural phenomenon to evidence of assault.

Even more egregiously, Martinez then made false statements about Horn's testimony to support his theory that Morris engaged in postmortem sex with Castillo. For example, at the aggravation phase, Martinez argued, "But we also know there was more than that going on, because the medical examiner, Kevin Horn, told you so. He indicated in the anal area, if you're looking at it as if the face of a clock, that all the way around her anus were lacerations or bruising through

trauma." (Tr. July 12, 2005 at 37.) Then, he continued his argument about Horn's testimony:

> And you also know that the medical examiner, the medical examiner, Kevin Horn, told you that in her anus all around the face of the clock, one of the things you see are lacerations or contusions or abrasions, however you want to call it. So that this was, if you will, the defendant, whenever he felt like servicing himself, he would climb on top of her. That's what he would do. . . . There was trauma to Castillo. There was trauma to her anus.

(Tr. July 12, 2005 at 109.) He later repeated, "There was trauma to Castillo. There was trauma to her anus." (Tr. July 12, 2005 at 133.) As set forth above, Horn testified that he did not know whether the perianal defects were caused by trauma or by insect activity. Thus, in arguing that the anal defects found on Castillo showed necrophilia, Martinez falsely recounted Horn's testimony as if it were definitive on that point, when it was not.

And, in so doing, Martinez not only misrepresented the record but also vouched for his own witness. The Ninth Circuit has rebuked prosecutors' use of "we know" statements in closing arguments because doing so "readily blurs the line between improper vouching and legitimate summary." *United States v. Younger*, 398 F.3d 1179, 1191 (9th Cir. 2005). Indeed, "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *United States v. Young*, 470 U.S. 1, 18–19 (1985); *Berger v. United States*, 295 U.S. 78, 88 (1935) (explaining that because average juror has confidence in prosecutor as a public servant seeking justice, "improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none"). The Ninth Circuit explained that "[t]he question for the jury is not what a prosecutor believes to be true or what 'we know,' rather, the jury must decide what may be inferred from the evidence." *Younger*, 398 F.3d at 1191. This concern is highlighted in a case like Morris's where Martinez

used "we know" and "you know" on statements that were far from clear or proven.

Martinez also made false and misleading statements about the import of the skin slippage seen on the bodies of Codman and Noah in order to bolster his theory that necrophilia occurred in this case. Dr. Hu testified that there was skin slippage on Codman's thigh, right arm, maybe right hand, and left breast. (Tr. June 28, 2005 at 23–27.) Dr. Keen then testified that there was skin slippage on Noah's thighs, above the pubic area, on the right foot, and on the neck. (Tr. June 27, 2005 at 86–89.) Doctors Horn, Keen, and Hu all agreed that skin slippage occurs as a natural part of the decomposition process when the outer layer of skin begins to separate from the skin and tissue below. (Tr. June 15, 2005 at 81; Tr. June 27, 2005 at 85–86; Tr. June 28, 2005 at 22.) While Keen and Hu agreed with Martinez's suggestion that slippage could be caused by friction, neither of them opined that "rubbing" or postmortem sexual activity was the cause of it in this case. (Tr. June 27, 2005 at 86; Tr. June 29, 2005 at 22–26.) In fact, Wu testified that the slippage apparent on Codman's body was consistent with the victim being dragged on a sleeping bag. (Tr. June 28, 2005 at 63.)

Based on this testimony, Martinez committed misconduct when he falsely argued that the skin slippage found on Codman and Noah supported his argument that Morris committed necrophilia. For example, as to Codman he argued:

> [R]ight a little above her pelvis[23] and even above her left

---

[23] This is an instance of Martinez misstating facts. The medical examiner did not testify that there was skin slippage on Codman's pelvis:

> Q. Finally, we can see some greenish, bluish, and then some reddish area here, which is right above the public area. Is there any that you can see, any skin slippage there?
> . . .
>
> A. There's no skin slippage in that area.
>
> Q. And the area that we're talking about is just right before the pubic area, right?

69

1
2
3
4

> breast, you can see a little bit of skin slippage, and the rest of the body there isn't anything. That indicates that he went in there when she was dead. That indicates that he rocked himself, moved however you want to describe it, that's what he did to her body.

5

(Tr. July 5, 2005 at 38; *see also* Tr. July 5, 2005 at 123–24.) As to Noah, he argued:

6
7
8
9

> We see skin slippage between the legs we don't see anywhere else. We see upper right thigh, upper left thigh on the inside and, you know, also a little bit above the pubic area. And you know that what was going on is he was having a field day with her body.

10 (Tr. July 5, 2005 at 50; *see also* Tr. July 5, 2005 at 124.) Martinez continued these

11 false and intentionally misleading arguments at the aggravation phase, arguing, for

12 example, "We also know that at some point while he was doing this—or perhaps

13 on a different occasion, but it's still the same mutilation—with regard to Barbara

14 Codman, he placed his hand on her right[24] breast, because we see skin slippage

15 there." (Tr. July 12, 2005 at 27.)

16       The evidence of skin slippage did not support a reasonable inference that

17 Morris had committed necrophilia. No expert testified that skin slippage in general

18 or in the pattern present here indicated that Morris engaged in postmortem sex with

19 the victims. The link between the skin slippage and necrophilia was entirely

20

21

22

> A. That's correct. Lower abdomen, pubic area.

23
24

> Q. And just as a last point, three seems to be something here in the middle that goes from near the public area to down by the knee. Is that the skin slippage we're talking about?

25
26

> A. Yeah, looks like concentrate on the front inner aspect of the thigh.

27 (Tr. June 28, 2005 at 26–27.)

28 [24] The skin slippage was actually on the left breast. (Tr. June 28, 2005 at 26.)

Martinez's conjecture. The trial court had previously observed, in the context of a discussion about whether gruesome photographs should be admitted, that the argument about skin slippage as proof of necrophilia "really takes some expert to tell us, if there is a slippage in the inner thighs, what that means. And the photographs, . . . I don't think it's really supported by the evidence till we hear from the experts." (Tr. June 20, 2005 at 87.) That expert testimony never came, but Martinez nevertheless proceeded to argue as if it had.

Martinez's final support for his argument about necrophilia was the fact that Morris's semen was found in Velasquez's and Noah's vaginas. He argued at both the guilt and aggravation phases that this showed postmortem sex because Morris had told the police that he used a condom. (Tr. July 5, 2005 at 46, 50; Tr. July 12, 2005 at 32–33, 35.) This was preposterous. Martinez continually discounted parts of Morris's statement to the police—most fundamentally that the deaths had been accidental—but asserted that this one detail, which was suggested by the detective as discussed in Claim Four (B) and Nineteen *supra*, was truthful. As Logan explained, "That is simply specious argument. Those are conclusions that can be drawn only if one is trying to get to a certain spot and has no way to get to that spot." (Tr. June 20, 2005 at 84.)

Martinez's repeated argument that Morris had committed necrophilia was not supported by the evidence, and Martinez intentionally misled the jury both as to what the evidence was and as to what it showed. This was misconduct. *See Zapata v. Vasquez*, 788 F.3d 1106, 1114–15 (9th Cir. 2015).

During post-conviction proceedings, the extent to which Martinez had misrepresented and warped the evidence became even more apparent. Dr. David Posey, a pathologist, first explained that "[p]ostmortem sexual assault cannot be determined by the autopsy. In the absence of vital reaction (microscopically documented by bleeding with or without infiltrates of inflammatory cells), injuries to the genitalia and anus found at autopsy are almost always due to decomposition."

71

(PCR Pet. Ex. Q at 16.) Further, forensic evidence cannot determine the time at which sexual activity occurred, and DNA of course cannot show whether that activity was consensual. (PCR Pet. Ex. Q at 16.) He also opined that the skin slippage in this case definitively did not support Martinez's argument that necrophilia had occurred. Posey explained that despite Martinez's argument that skin slippage on Codman and Noah showed postmortem sex, in fact the slippage "is what would be expected based on the state of decomposition when found." (PCR Hr'g Ex. 6 at 6.) The location of the slippage—on the lower body—was "textbook." (PCR Hr'g Ex. 6 at 7.) If postmortem sex had occurred, more extensive skin damage would have been seen. (PCR Hr'g Ex. 6 at 10.) He concluded that "[s]kin slippage does not prove there was postmortem sex. Skin slippage is an expected, natural process of decomposition." (PCR Hr'g Ex. 6 at 9.)

Posey also opined that "with a high degree of medical certainty, the perianal defects [on Castillo] are a result of decomposition and aggressive maggot activity causing the skin defects and tissue loss." (PCR Hr'g Ex. 6 at 7.) A maggot was even still in one of the perianal defects at the time the autopsy photographs were taken. (PCR Hr'g Ex. 6 at 7.) If postmortem sex had occurred, the pattern of the skin defects would have been different and there would have been injuries to the rectum or sigmoid colon. (PCR Hr'g Ex. 6 at 7–8.)

Posey therefore concluded that "[t]here is no evidence of postmortem body-to-body contact on any of the victims." (PCR Hr'g Ex. 6 at 10.) This evidence further supports that Martinez was out of line in arguing that the forensic evidence supported an inference of necrophilia. This misconduct pervaded all phases of Morris's trial and rendered it fundamentally unfair.

Martinez's misrepresentation of the evidence in the record did not stop with his arguments about necrophilia. For example, Martinez also made several misleading statements about the circumstances surrounding Davis's death. He said that Horn's testimony about Davis was that, "All I had was a body that had been

dumped in an alley. That was suspicious to me, because, you know, a body just doesn't appear in alleys, especially when they're nude, and bodies don't appear in this condition where they're bloated, where the skin is slipping off of the body, without raising suspicion." (Tr. July 5, 2005 at 74–75.) However, Horn's actual testimony was, "The fact that she is nude in an alleyway means that she may be a quote, unquote, drug dump, meaning that somebody may have become intoxicated in someone's house and simply dumped in an alleyway, which does happen." (Tr. June 29, 2005 at 40.) Martinez's statements were not true.

Martinez also mischaracterized DNA evidence in order to argue that Davis attempted to fight off Morris, and thus did not die of a drug overdose. He asserted that Morris's DNA profile matched DNA found underneath Davis's fingernails on both hands. (Tr. June 13, 2005 at 69.) However, this was contradicted by the testimony of Colleen Proffitt, who said that, as concerned the DNA profile from the fingernail scrapings from Davis's right hand, Morris could not be excluded as a possible contributor to the mixed DNA profile.[25] (Tr. June 27, 2005 at 54, 79–81.) Nevertheless, in yet another example of inappropriate vouching, Martinez argued during closing at the guilt phase, "And the reason we know she's facing him because of the DNA that was found underneath both her left hand and right hand."

_____

[25] Proffitt testified that the DNA profiles from the fingernail scrapings from Davis's left and right hands were mixtures consistent with Davis's DNA profile and that of another unidentified source. Proffitt also testified that the male DNA profile from the left fingernail scrapings "matched" Morris's profile at eleven loci and amelogenin. (Tr. June 27, 2005 at 47–49.) Regarding the right fingernail scrapings, Proffitt testified that there had to be at least two individual contributors, and her opinion was that Morris "cannot be excluded" as a possible contributor. (Tr. June 27, 2005 at 51–54.) Proffitt specifically differentiated between the terms "match" and "cannot be excluded" because they mean different things and tell the DNA analyst how strong of a conclusion she can make based on the data available to her. Indeed, Proffitt testified that her opinion as to the right fingernails scrapings was "a little less strong." (Tr. June 27, 2005 at 54.) Thus, Martinez stripped away these careful, important distinctions to leave the jury with mistaken impression that the DNA evidence was conclusive and Morris was a match.

(Tr. July 5, 2005 at 41.)[26] He therefore misled the jury as to the strength of the DNA evidence related to Davis.

Martinez next made damaging misstatements regarding Codman beyond those related to skin slippage as outlined above. During his opening statement at the guilt phase, Martinez said that when the police found Codman's body, they noticed that her "tongue was coming out, the eyes were popping out, and the head was darker or blacker than the rest of the body," which he said was "an indication of strangulation." (Tr. June 13, 2005 at 64.) Based on this observation, Martinez informed the jury that the police found a body that "appeared to have been strangled[,] [b]ut the problem was that the fact of decomposition eradicates the cause." (Tr. June 13, 2005 at 64.) However, Hu testified that in his opinion, Codman's protruding tongue and bulging eyes were the result of postmortem decomposition from gas formation. (Tr. June 28, 2005 at 33, 50.) He also testified that the fact that Codman's head was more decomposed than the rest of her body was consistent with, but not a definitive indication of, strangulation. (Tr. June 28, 2005 at 33–34.) Horn similarly testified that a protruding tongue, lips, and eyes are "a feature of decomposition." (Tr. June 29, 2005 at 35.) This was yet another example of Martinez mischaracterizing the medical evidence.

Martinez also falsely stated that Morris referred to Codman as "the pretty one." (*See, e.g.*, June 13, 2005 at 57; Tr. July 5, 2005 at 33.) For example, during closing argument at the aggravation phase Martinez argued, "One of the things that we know is that he was relishing in this, and we're talking about the killing of Barbara Codman. He was relishing, because according to him, she was the pretty one. He had his penis inside of her, and he was getting what he wanted, which is that she die." (Tr. July 12, 2005 at 25.) However, it was Detective Hutson, and not

---

[26] Martinez also made several confusing statements where it was unclear whether he was arguing that DNA in the fingernail scrapings from both of Davis's hands matched or did not exclude Morris. (*See, e.g.*, Tr. July 5, 2005 at 43, 66–67.)

Morris, who referred to her as such. (PCR Pet. Ex. O at 000599.) Codman's sister then repeated this misinformation Martinez had introduced when, in her victim impact statement during the penalty phase, she told the jury, "And Cory Morris, he's the one who said my sister was the pretty one. Well, what you did to my sister was not pretty, but I brought you pictures of my sister so you could see the real Barbara." (Tr. July 14, 2005 at 42.) Martinez's misstatements were patently improper here and caused additional prejudice when they were repeated during the victim impact statement.

As related to both Codman and Davis, Martinez waited to provide the medical examiners who conducted their autopsies with Morris's statement to the police until after Logan had interviewed them, right before trial. (Tr. June 28, 2005 at 38; Tr. June 29, 2005 at 40–43.) Tellingly, each medical examiner then for the first time in trial said that the deaths were not drug overdoses, but were consistent with strangulation. (Tr. June 28, 2005 at 41, 55–58, 71; Tr. June 29, 2005 at 40–41, 47; PCR Hr'g Ex. 8 at 000894; PCR Hr'g Ex. 9 at 000904.)

Finally, Martinez falsely implied that Morris knew Noah was intellectually disabled even though the evidence pointed to the contrary: "And it just is so unseemly to take a woman who is mentally retarded and bring her over to a camper, knowing full well that you're going to kill her[.]" (Tr. July 5, 2005 at 48.) Noah's sister, Sarah Shobe, testified that Noah's mental age was about ten to eleven years old. (Tr. June 20, 2005 at 59.) Shobe said that Noah lived with her, but "had a habit of taking off every two or three months. She would take off for a couple of days. She would run away." (Tr. June 20, 2005 at 63.) Shobe also testified that she knew Noah to use alcohol and drugs, particularly cocaine. (Tr. June 20, 2005 at 64.) And, as Martinez acknowledged, Noah was an adult woman. (*See* Tr. July 5, 2005 at 24 ("although she had the body of a woman" and "[e]ven though she looked like a woman").) This evidence does not indicate that Morris knew or should have known that Noah was intellectually disabled.

Nevertheless, Martinez made several factually incorrect statements about Noah to the jury. He said that Noah "was chronologically speaking, mentally speaking, about 11 or 12 years old. . . . So he's clearly much more mentally sophisticated." (Tr. July 5, 2005 at 24–25.) Martinez continued, Morris "brings this child, if you will, this 12-year-old woman, over to his camper." (Tr. July 5, 2005 at 48–49.) Similarly, during the aggravation phase, Martinez said of Noah, "even though she is a 12-year-old." (Tr. July 12, 2005 at 104.) He then argued that Morris relished killing Noah because "[h]e mutilated what was, in essence, I guess, somebody who was chronologically the age of 12." (Tr. July 12, 2005 at 106.) Noah was actually thirty-seven years old at the time of the crime (*see* PCR Hr'g Ex. 10 at 000927), but Martinez repeatedly made false statements that she was "chronologically" a twelve-year-old child. And, he emphasized that Noah did not function at her age level despite his failure to present any evidence that Morris knew this.

Martinez's misleading and inflammatory arguments, which were not based on the evidence, were improper. *See Darden v. Wainwright*, 477 U.S. 168, 180–81 (1986) (explaining that a prosecutor commits misconduct during argument when he manipulates or misstates the evidence at trial); *Zapata v. Vasquez*, 788 F.3d 1106, 1113–14 & n.6 (9th Cir. 2015) (explaining that prosecutor committed "serious misconduct" by offering account of defendant's use of racial slurs as victim died that was "fictional" but offered "as though it was fact"). In situations like Morris's, the inherent danger that comments like Martinez's pose is so great that the trial judge had a duty to sua sponte take curative action, even in the absence of an objection by trial counsel. *See Young*, 470 U.S. at 12–13; *United States v. Roberts*, 618 F.2d 530, 534 (9th Cir. 1980) (explaining that judges are not referees and have responsibility to take prompt corrective action because "[v]ouching . . . in closing argument has often been held to be plain error, reviewable even though no objection was raised"). The trial judge took no action in this case. The fairness of Morris's

1   trial was undermined by these actions alone and in combination with those outlined

2   below, and so was constitutionally infirm.

3       **2.    Inappropriate    focus    on    irrelevant    and    salacious**
4       **information.**

5       Another type of misconduct that occurred here and appears frequently in

6   Martinez's cases is his inappropriate and improper focus on irrelevant sexual

7   aspects of a case. In *Andriano*, for example, even though the crime was not sexual

8   in nature, Martinez focused extensively on irrelevant details of Andriano's sexual

9   relationships, including the loss of her virginity, locations where she had had sexual

10  intercourse, and her use of lubricant; he also asked her mother if bruises on

11  Andriano could have been from sex. *See Andriano*, 161 P.3d 540, 546; *Andriano v.*

12  *Ryan*, No. CV-16-1159-SRB, Pet. for Writ of Habeas Corpus at 44–54 (D. Ariz.

13  Mar. 6, 2017). During trial in another case, Martinez asked witnesses whether they

14  wore thong underwear, had performed oral sex in cars, or engaged in "threesomes"

15  with the defendant, despite presenting no evidence that any of these things occurred

16  or were relevant. *See State v. Grant*, No. CR2005-032986 (Maricopa Cty. Super

17  Ct.). In a third case, Martinez asked a witness about being in a same-sex

18  relationship, asked witnesses if they went to parties where those in attendance

19  disrobed, and alleged that the defendant had engaged in "wifeswapping," again

20  without any evidence that these allegations were relevant or true. *See State v.*

21  *Chrisman*, No. CR2010-153913 (Maricopa Cty. Super Ct.). Martinez engaged in

22  this same behavior most prominently in the Arias case. *See, e.g.*, Kiefer, *Objections*

23  *Raised* (noting that Martinez "painted Arias as a sexual predator"); Colleen Curry,

24  *Jodi Arias Trial's Focus is Graphic Sex, Not Killing*, ABC News (Mar. 5, 2013),

25  *available    at*    http://abcnews.go.com/US/jodi-arias-trial-graphic-sex-details-

26  precedence-murder/story?id=18658243 (last visited Feb. 13, 2018) (noting that

27  "Martinez spent three days going through all of the details of the sex, details that

28  had already been pored over on direct testimony").

In Morris's case, this type of misconduct reached astonishing levels, and only the most egregious examples are cited here. As outlined above, Martinez argued that Morris had committed necrophilia despite the fact that there was no evidence to support his theory. In pushing an unfounded narrative, Martinez made this trial overtly sexualized and salacious in a way guaranteed to disgust the jury. His intention to sexualize the trial was apparent from the very beginning of trial. Martinez began his opening statement at the guilt phase by arguing that Morris:

> killed for his own sexual gratification, and after each kill he wouldn't get rid of the body. What he would do, he would just leave it there. He would keep the body even after the skin would start to slide off. He would keep the body when it would start to bloat up a little because of the bacterial decomposition, and he would keep the body because of the smell of rot, smell of decomposition.

(Tr. June 13, 2005 at 38–39.) Martinez ended his opening statement by reiterating that all of the victims "share one thing in common. They were brought over to this camper for the defendant's sexual gratification." (Tr. June 13, 2005 at 74.) Martinez therefore focused on deviant sexuality from the very beginning of trial, despite his inability to provide any evidence in support of these statements.

Martinez then focused on the graphic details of the victims' decomposition while questioning witnesses. As described above, he dwelt on evidence of skin slippage and anal defects. And, for example, he asked Horn, "With regard to the injuries or the potential trauma to the anus, where was it? If we picture the clock, where would it be? Where would the damage be?" (Tr. June 15, 2005 at 95–96.) Martinez followed up by asking, "Can you tell us how many or just around the anus, all the way around the anus?" (Tr. June 15, 2005 at 96.)

Martinez's dubious necrophilia theory was made explicit during closing argument at the guilt phase when he extensively and graphically argued that:

> once [the victims] were dead, [Morris] kept their body, and he kept their body for one reason, and that was for sexual gratification. He wanted to use them once their body was

rotted out so that he could fulfill whatever sexual desires he had. There was no other reason why he would keep the body.

(Tr. July 5, 2005 at 14.) Martinez continued that Morris was "intent on killing them so that they could remain with him in his camper to satisfy his needs." (Tr. July 5, 2005 at 15.) Martinez next described in detail the alleged acts of necrophilia with the individual victims.[27] He said that after Morris killed Codman, "[h]e decided to keep the body there, and the reason that he decided to keep the body there is because he wanted to have sex with the body." (Tr. July 5, 2015 at 37.) Martinez continued to argue that Morris "cradled himself, rocked himself between [Codman's] legs, in-between her legs, and cradled himself to ejaculation," and that skin slippage showed that Morris "went in there when she was dead. That indicates that he rocked himself . . . that's what he did to her body. And so now it begins to make sense in a sort of weird way. It explains why it is that the rest of her body does not have any skin slipping off[.]" (Tr. July 5, 2005 at 38–39.) However, there was no semen found in Codman, and Martinez's own witness had testified that the slippage apparent on her body was consistent with being dragged on a sleeping bag. (Tr. June 28, 2005 at 63.)

Regarding Velasquez, Martinez argued, "what that means, after she was dead, he placed himself inside her, even though she wasn't rotted out, but she was at least dead, and he ejaculated inside her." (Tr. July 5, 2005 at 46–47.) He stated that Morris looked down at her, and "he continues to look down, and his thought is die, because he wants to take advantage of her body." (Tr. July 5, 2005 at 68.) About Noah, Martinez argued that Morris "kept the body beyond the killing. He kept the body because he wanted to enjoy the body. He didn't want to enjoy the soul. He wanted just to enjoy the body. . . . [A]nd you know that what was going on is he

---

[27] Martinez acknowledged that he could not argue that there was postmortem sexual activity with Davis. (Tr. July 12, 2005 at 30.)

1   was having a field day with her body." (Tr. July 5, 2005 at 49–50.)

2        Finally, as to Castillo, Martinez said that Morris "must have liked her a lot.

3   He kept her even though she started smelling very bad." (Tr. July 5, 2005 at 54.)

4   He argued that "whenever the need arose, [Morris] would get on top of her, and he

5   would have anal sex with her. That's what accounts for the, if you will, the damage

6   that is done all the way around her anus." (Tr. July 5, 2005 at 52–54.) Martinez

7   stated that Morris's "penis went inside her anus when she was dead." (Tr. July 5,

8   2005 at 54.) As previously discussed, the medical examiner testified that the

9   perianal defects could have been due to insect activity, and even if the defects were

10   caused by sexual activity, it could have been before she died. But Martinez ignored

11   this testimony and proceeded to describe Castillo's body as "a trophy that [Morris]

12   didn't want to let go. He had something that he could enjoy, and that smell is what

13   always brought it back to him." (Tr. July 5, 2005 at 55.) Defense counsel made no

14   objections during the prosecutor's closing argument.

15        Martinez's baseless necrophilia theory was also a focus of the aggravation

16   phase of Morris's trial. Martinez argued, in graphic detail, that Morris relished the

17   murders and mutilated the victims' bodies, and that the crimes were therefore

18   heinous or depraved: "[N]ot only did [Morris] relish the killing because he knew he

19   was going to keep it, but he also mutilated the corpse . . . And he kept it around, if

20   you will, to play with it." (Tr. July 12, 2005 at 26.) Martinez argued that Morris

21   kept the bodies of the victims "until the skin started to bubble up. And what he did

22   then is that he opened her legs up, and he mutilated the body." (Tr. July 12, 2005 at

23   26–27.) With respect to Noah, Martinez commented, "So not only did [Morris] go

24   inside her vagina, but he also went a little bit lower, and that goes, again, to the

25   mutilation of the corpse." (Tr. July 12, 2005 at 35.) Martinez conceded that the

26   defects around Castillo's anus could have occurred before, during, or after death,

27   but continued to argue that Morris "still went to this body and engaged himself with

28   that in a carnal fashion, and that is the mutilation of the corpse." (Tr. July 12, 2005

1   at 38.)

2       During his closing, Martinez again argued that Morris had committed
3   necrophilia, asserting this as a basis to find the crimes "debased." (Tr. July 12, 2005
4   at 95.) In addition to falsely characterizing the medical evidence, Martinez
5   continued to make repulsive comments containing irrelevant details, including that
6   Morris "cradles himself while he has an erection, while he's rubbing her inner
7   thighs, while his pelvic area is rubbing her pelvic area. Actually, it's not hers
8   anymore. She's just dead. She's just a piece of meat." (Tr. July 12, 2005 at 96–97.)
9   Finally, during his closing at the penalty phase, Martinez referred back to these
10  arguments when advocating for a death sentence. (*See* Tr. July 18, 2005 at 128.)

11      The purpose of argument by counsel "is to explain to the jury what it has to
12  decide and what evidence is relevant to its decision." *Sandoval v. Calderon*, 241
13  F.3d 765, 776 (9th Cir. 2000). While attorneys are given wide latitude during
14  arguments, counsel may not make arguments "designed to appeal to the passions,
15  fears and vulnerabilities of the jury." *United States v. Weatherspoon*, 410 F.3d
16  1142, 1149 (9th Cir. 2005). When "jurors have been left the option of relying upon
17  a legally inadequate theory, there is no reason to think that their own intelligence
18  and expertise will save them from that error." *Griffin v. United States*, 502 U.S. 46,
19  59 (1991). But Martinez directly targeted the jurors' fears and passions. The concept
20  of necrophilia is socially repugnant such that any jury would harbor a strong,
21  adverse sensitivity to it. Yet, Martinez emphasized necrophilia and talked about the
22  act in graphic detail despite the lack of actual evidence to support his theory, as
23  outlined above in Section B.1. These arguments were inflammatory and calculated
24  to appeal to the jury's passions and prejudices. *See Sandoval*, 241 F.3d at 776. Thus,
25  the effect of Martinez's improper and salacious arguments regarding the State's
26  factually inadequate necrophilia theory infected the trial with unfairness so as to
27  make the resulting convictions a denial of due process.

28      But necrophilia was not the only example of Martinez injecting an unfounded

1    sexual narrative into the proceedings in Morris's case. Even before trial, Martinez

2    improperly introduced an unfounded element of sexual deviancy into the

3    proceedings when, during voir dire, he implied to several prospective jurors that

4    Morris sexually assaulted the victims. He said to Panelist 12, for example, that "the

5    case that we're doing may involve unwanted sexual advances." (Tr. June 7, 2005 at

6    61.) He told Panelist 65 that "there may be some elements of rape or unwanted

7    sexual activity or sexual activity, at least, in conjunction with those murders."

8    (Tr. June 8, 2005 at 124.) He told Panelist 23 that "[o]ne of the allegations in this

9    case may be that the murders occurred during something like" an attempted rape.

10   (Tr. June 9, 2005 a.m. at 4.) And Martinez said to Panelist 73, "Well let's see what

11   you might consider sex offender. This case may have some elements of sexual

12   assault to it, as well as murder." (Tr. June 9, 2005 p.m. at 12.)

13       Morris said he engaged in consensual sex with the victims, and he was not

14   charged with sexual assault. Nevertheless, throughout the trial Martinez focused on

15   evidence that could have been misinterpreted as being relevant to sexual assault.

16   For example, Keen testified that some Gamma Hydroxybutyrate, or GHB, was

17   found in Noah's system. He explained that it "is a product that can be produced by

18   the body itself" and is also "the same drug which is known as the date rape drug."

19   (Tr. June 27, 2005 at 115.) Martinez then asked Keen, "Did she die from that date

20   rape drug that you also mentioned?" (Tr. June 27, 2005 at 116.) Martinez also made

21   several references throughout trial to rape or sexual assault kits, though this is a

22   generic term and does not mean that there was an assault. (*See* Tr. June 20, 2005 at

23   18–19, 42–43; Tr. June 29, 2005 at 15–16.)

24       The constitutional guarantee of due process is violated by the admission of

25   evidence that is not relevant to an element of a crime charged and is so inflammatory

26   as to prevent a fair trial. *See, e.g.*, *Duncan v. Henry*, 513 U.S. 364, 366 (1995) (per

27   curiam); *Romano v. Oklahoma*, 512 U.S. 1, 12–13 (1994) (holding that admission

28   of irrelevant evidence violates due process if it so infected proceedings as to render

82

1  the jury's determination a violation of due process); *Estelle v. McGuire*, 502 U.S.

2  62, 70 (1991). Martinez's actions in falsely painting Morris as a predatory sexual

3  deviant rise to that level. Morris's trial was rendered fundamentally unfair.

### 3.   Appeal to passions and fear.

5  Martinez also employed a number of other tactics "designed to appeal to the

6  passions, fears and vulnerabilities of the jury." *See United States v. Weatherspoon*,

7  410 F.3d 1142, 1149 (9th Cir. 2005). Early in the guilt phase, Martinez showed

8  Detective Kulesa a booking photograph of Castillo in which she was wearing a

9  particular jacket. (Tr. June 15, 2005 at 22–23.) After Martinez then asked him to

10  hold up Castillo's jacket and take it out of the packaging, the court abruptly

11  recessed. (Tr. June 15, 2005 at 23–24.) A foul order permeated out from the jacket

12  in waves, which was evident because people had physical reactions to the smell as

13  it reached them. The smell was so horrible that large fans were brought in to air out

14  the courtroom. When the jury was brought back in, the trial judge apologized and

15  said, "I'm informed that's the only time we have to experience something like that

16  for the rest of the trial." (Tr. June 15, 2005 at 29–30.)[28]

17  Martinez had Kulesa take the jacket out of the packaging to inflame the jury.

18  He offered only a weak attempt to justify the stunt. During his examination of

19  Kulesa, Martinez commented that Kulesa was "asked to put it away somewhat

20  quickly," and asked him to describe the position of the arms. (Tr. June 15, 2005 at

21  30.) Kulesa responded, "The sleeves of that jacket are pulled . . . inside out, the

22  sleeve part only." (Tr. June 15, 2005 at 30.) During closing argument at the guilt

23  phase, Martinez suggested that the jacket was shown to the jury to demonstrate that

---

25  [28] The trial court also erred by failing to sua sponte grant a mistrial here. The jacket
26  was removed to portray Morris as a horrific monster who delighted in the smell of
    rotting bodies and was so prejudicial that it undoubtedly biased the jury against him
27  and infected the entire proceedings with unfairness. *See James v. Bowersox*, 187
    F.3d 866, 869 (8th Cir. 1999) (recognizing that trial court can sua sponte declare a
28  mistrial if prosecutor's actions are "inflammatory" and "outrageous" and that failure
    to do so can result in due process violation).

Castillo had not willingly removed it because the sleeves were inside out. (Tr. July 5, 2005 at 51.) This argument is nonsensical. Martinez's intent in unsealing the jacket was clear when he described the smell as "absolutely one of the worst things that you will ever probably experience. And you got a minimal exposure to it when the jacket was opened up for your, if you will, smelling pleasure, for lack of a better word." (Tr. July 5, 2005 at 51.) Martinez further falsely implied that the original smell was preserved because the jacket was dried out and then refrigerated like other biological items. (Tr. July 5, 2005 at 126–27.) As Logan pointed out, the reason the jacket smelled so badly was because it had been sitting for years. (Tr. July 5, 2005 at 93.)

On the same day that Castillo's jacket was unsealed, Martinez had at least one of the excluded pictures showing a maggot infestation on top of a pile of papers on his table, open for display to the jury. (Tr. June 15, 2005 at 58.) Logan objected to this during a sidebar conference, and the trial court ordered Martinez to remove the photograph. (Tr. June 15, 2005 at 58.) This appears to have been an attempt to get in front of the jury something the trial court had already ruled was too inflammatory and prejudicial for them see.

Finally, Martinez improperly inflamed the jury's passions and fears in violation of due process when, during closing argument at the aggravation phase, he singled out particular female jurors and asked:

> which one of you wants to volunteer? I want a show of hands on this one. Which one of you ladies – and we don't need guys on this one, because he didn't take guys. He only took women. Which one of you want to volunteer to come sit here and have the defendant sit himself on your chest and say, Oh, that didn't hurt? Because the defense attorney is saying throw common sense out of [the] window. Which one? I challenge anybody to say, That is something I want to do. And anyway, and on top of that, while he's sitting on my chest, which one of you, since the one [on the] lower left-hand side has the longer hair of the jurors, maybe she wants to have him grab her hair while he's sitting on her chest Burking her, to grab it and pull it around her neck.

> You think that's not going to hurt? You think one of you guys is going to volunteer for that? You can't leave your common sense aside. [Defense counsel] wants you to because he makes these arguments and says, well, we don't know what is in their head. We don't know what is in Juror Number 1's head. Can you tell me you don't think it's not going to hurt when he sits on you? Hey, Juror Number 1 or Juror Number 14, whatever it is, what if we put Winnie the Pooh tie around your neck? Are you going to enjoy that? Are you going to like it? Going to feel real good when you can't breathe?

(Tr. July 12, 2005 at 130.) Martinez later again asked the jurors to imagine themselves in the place of the victims:

> Which one of you could look at yourself in the mirror and say, You know what? Defendant is right. I wouldn't feel anything when that tie came around my neck. I wouldn't feel anything. And if he had his penis in me, that wouldn't anguish at all. That wouldn't be anything bad at all, especially if I have cocaine onboard, because, after all, cocaine is a stimulant. It won't make me feel things more, it will make me more awake. It will make me less prone to going, oh, no, all of a sudden, because physiological aspects or effects are enhanced, I'm going to like it more. In fact, I'm going to enjoy it.

(Tr. July 12, 2005 at 132.) Martinez continued, "Again, which one of you wants to volunteer to have your hair pulled out? Which one of you wants to volunteer?" (Tr. July 12, 2005 at 133.) Martinez, in asking the jurors to place themselves in the place of a victim, committed clear misconduct.[29] *See Drayden v. White*, 232 F.3d 704, 712–13 (9th Cir. 2000) (finding misconduct when the prosecutor argued as the victim because in so doing "the prosecutor seriously risked manipulating and misstating the evidence by creating a fictitious character based on the dead victim").

---

[29] The trial court erred in failing to sua sponte grant a mistrial in this instance. *See James*, 187 F.3d at 869 ("Federal habeas relief should only be granted if the prosecutor's closing argument was so inflammatory and so outrageous that any reasonable trial judge would have sua sponte declared a mistrial."); *Copeland v. Washington*, 232 F.3d 969, 974 & n.2 (8th Cir. 2000) (explaining that when examining prosecutor's arguments, "it would seem that there should be a more searching review of the penalty phase as the Eighth Amendment is implicated.").

1    These "irrelevant and improper" statements were "clearly designed to

2  encourage the jury to enter a verdict on the basis of emotion rather than fact."

3  *Weatherspoon*, 410 F.3d at 1150; *see also Zapata*, 788 F.3d at 1113 (discussing

4  misconduct from argument that was "both inflammatory and wholly extraneous to

5  any issue properly before the jury"). Martinez's actions undermined the fairness of

6  Morris's trial.

7                    **4.    Uncharged aggravator.**

8      Compounding his other misconduct, Martinez improperly invoked the

9  unproven and uncharged aggravator of pecuniary gain. *See* Ariz. Rev. Stat. §

10  13-703(F)(5) (renumbered § 13-751(F)(5)). He suggested that Morris intended to

11  rob both Codman and Noah after he murdered them. Of Codman, Martinez argued,

12  "So what happened is this individual here, with a lack of conscience, not only went

13  out and preyed upon her, but once he had her down, like some sort of vulture

14  looking for carrion he scavenged from what she had was the wallet. That's all she

15  had." (Tr. July 5, 2005 at 20.) Martinez proceeded to argue that there was no money

16  in the wallet, because after Morris "was through, he went and got that. He went and

17  took $20.00." (Tr. July 5, 2005 at 20.) Martinez later emphasized that Morris had

18  said he gave Codman $20.00, but it is not there because he "used that money for his

19  own ends after what happened." (Tr. July 5, 2005 at 33–34.) Martinez continued to

20  argue that the money Morris paid Codman and Davis for sex was "evanescent."

21  (Tr. July 5, 2005 at 21.) Martinez said of the money paid to Davis, "In other words,

22  it was ephemeral because those $5.00, where were they in the trailer? No money

23  was ever found. . . . Even that he took away from her." (Tr. July 5, 2005 at 21–22.)

24  These remarks injected improper considerations into the sentencing calculus, and

25  violated Morris's Eighth Amendment right to a reliable, individualized, and non-

26  arbitrary sentencing determination. *See Sumner v. Shuman*, 483 U.S. 66, 85 (1987);

27  *Caldwell v. Mississippi*, 472 U.S. 320, 329 (1985). And, when considered singly

28  and collectively with the above instances of misconduct, Martinez's comments

1    rendered Morris's trial fundamentally unfair in violation of due process.

2         Martinez injected improper considerations into every phase of Morris' trial

3    and encouraged the jurors to make a decision based on emotion rather than reason.

4    *See Weatherspoon*, 410 F.3d at 1149. All of these instances of misconduct,

5    considered singly and collectively, involved improper and deceptive methods of

6    persuasion, which rendered Morris's trial fundamentally unfair and in violation of

7    due process. *See Wood v. Ryan*, 693 F.3d 1104, 1116 (9th Cir. 2012) (explaining

8    that "[e]ven when separately alleged incidents of prosecutorial misconduct do not

9    independently rise to the level of reversible error, '[t]he cumulative effect of

10   multiple errors can violate due process.'" (quoting *United States v. Nobari*, 574

11   F.3d 1065, 1082 (9th Cir. 2009))). All of the misconduct identified here was aimed

12   at dehumanizing Morris so the jury would see him as Martinez described, as "death

13   personified" and "the black angel of death . . . in the streets of Phoenix." (Tr. July

14   5, 2005 at 28–29). In making this appeal to the jury's passions, fears, and emotions,

15   Martinez made it easier for them to convict Morris and sentence him to death. The

16   misconduct also violated Morris's Sixth Amendment confrontation rights as well

17   his right to reliability under the Eighth Amendment. *See Lawson v. Borg*, 60 F.3d

18   608, 612 (9th Cir. 1995) (recognizing that "[j]ury exposure to facts not in evidence

19   deprives a defendant of the rights to confrontation, cross-examination and

20   assistance of counsel embodied in the Sixth Amendment"); *Greer v. Miller*, 483

21   U.S. 756, 765 (1987) (citing *Donnelly*, 416 U.S. at 643); *see also Darden v.

22   Wainwright*, 477 U.S. 168, 178–79 (1986).

23        **C.    The state court ruled contrary to, and unreasonably applied,**

24            **clearly established federal law in failing to find persistent and**
             **pervasive misconduct by the prosecutor that was prejudicial and**

25            **made Morris's trial fundamentally unfair.**

26        On direct appeal, Morris argued that the cumulative effect of the prosecutor's

27   misconduct so infected his trial with unfairness as to make his convictions and death

28   sentences a denial of due process. (*See* DA 29 at 47–49.) He provided five examples

1    to demonstrate that Martinez's conduct was part of a persistent and pervasive

2    pattern that permeated the entire atmosphere of the trial: (1) improperly influencing

3    the medical examiners' testimony regarding the causes of Codman's and Davis's

4    deaths; (2) arguing a necrophilia theory without evidentiary support; (3) singling

5    out specific jurors and inviting them to put themselves in the place of the victims;

6    (4) unsealing Castillo's jacket; and (5) leaving an excluded photograph on the

7    prosecutor's table. (*See* DA 29 at 49–52.) Rather than looking at the cumulative

8    effect of Martinez's conduct, the Arizona Supreme Court individually analyzed

9    each of the five examples in a vacuum, determined that only one qualified as

10   misconduct, and held that "[b]ecause Morris has described only one incident of

11   misconduct, we cannot conclude that the prosecutor engaged in 'persistent and

12   pervasive' misconduct." *See Morris*, 160 P.3d at 218. In splitting the claim up in

13   this way and addressing examples of misconduct in isolation, the state court

14   unreasonably applied clearly established Supreme Court precedent holding that

15   prosecutorial misconduct is not evaluated from isolated instances alone; rather, the

16   reviewing court must consider the cumulative effect of the harm. *See Berger*, 295

17   U.S. at 89.

18        In any event, the state court's rulings on the individual pieces of the claim

19   were also contrary to, or based on an unreasonable application of, clearly

20   established Supreme Court precedent, 28 U.S.C. § 2254(d)(1), as well as based on

21   unreasonable determinations of the facts, 28 U.S.C. § 2254(d)(2). This Court can

22   therefore review Morris's claim de novo under the analysis above.[30] *See Frantz v.*

23   *Hazey*, 533 F.3d 724, 736 (9th Cir. 2008).

24        First, the Arizona Supreme Court found that Martinez's singling out and

25

---

26   [30] The de novo review of this claim conducted above in Sections A and B relies on
27   evidence outside of the appellate record. Here, Morris shows that the appellate
     court's denial of this claim was unreasonable under § 2254(d) based on the record
28   on direct appeal and thus before the Arizona Supreme Court at the time of this
     particular ruling.

personally addressing particular jurors constituted misconduct because it "play[ed] on their sympathy for the victims and fears of the defendant." *See Morris*, 160 P.3d at 216. However, because counsel had not objected—which was ineffective as argued below in Section D—the court reviewed the claim for fundamental error and then unreasonably determined that the error did not deprive Morris of a fair trial. *Id.* at 216–17. But the court ignored the fact that Martinez's argument was aimed at inflaming the passions in a supremely private context. He asked the jurors to imagine themselves being attacked and sexually assaulted by Morris. This argument pushed the jury toward a verdict on an aggravating factor based on the emotions of fear and disgust. The court further found that Morris could not show prejudice because the argument went to the cruelty prong of the (F)(6) aggravating factor, the evidence of which the court called "overwhelming." *Id.* at 217. As explained *infra* in Claim Twelve, there was insufficient evidence to support the finding of cruelty.

Next, the court ruled that there was no misconduct in Martinez arguing that Morris had committed necrophilia. As an initial matter, the court incorrectly constrained this argument to the aggravation phase of Morris's trial, not recognizing the pervasive argument about necrophilia at the guilt phase and that the argument from the aggravation phase was re-urged at the penalty phase. *See id.* at 215. The court therefore ignored an aspect of Morris's claim. But the court's findings as related to the aggravation phase are further not entitled to deference under § 2254(d).

As previously discussed, to support the State's necrophilia theory, Martinez relied on skin slippage on Codman's and Noah's bodies, perianal defects on Castillo, and Morris's semen found in Velasquez's and Noah's vaginas. The state court acknowledged that "the evidence in this case does not compel the conclusion that Morris engaged in intercourse with the corpses of the victims," but nevertheless inexplicably and unreasonably concluded that "the record includes sufficient evidence to permit the prosecutor to make such an argument." *See Morris*, 160 P.3d

at 215. In making this finding, the state court ignored the numerous misstatements Martinez made about the alleged evidence of necrophilia in an attempt to make it appear to be a reasonable theory. As discussed above in Section B.1, Martinez made numerous false and misleading statements about the perianal defects on Castillo, saying they were caused by postmortem sex instead of the decomposition process. Martinez also falsely implied that the only reason there would be skin slippage on the victims in certain areas of their bodies would be if Morris engaged in postmortem sex with them. But no medical examiner testified to this effect. In fact, Hu testified about Codman that there was no pattern to the skin slippage that suggested what had caused it. (Tr. June 28, 2005 at 49.) And the medical examiners testified that skin slippage is a natural part of the decomposition process. (*See, e.g.*, Tr. June 15, 2005 at 81; Tr. June 28, 2005 at 22.) Finally, Martinez's attempt to link the semen detected in Velasquez and Noah to postmortem sex was ridiculous. Martinez's reliance on Morris's statement to the police that he used a condom is an example of Martinez cherry-picking the evidence. Throughout the trial, he accepted as true from Morris's police interrogation statements that supported his theories, and deemed everything else lies.

That Martinez had to twist and misstate the only evidence he could point to in order to support his necrophilia theory demonstrates that the proposition that Morris had sex with the victims' corpses is not, as the state court found, a "reasonable inference" to be drawn from this evidence. *See Morris*, 160 P.3d at 215. Instead the argument, when compared to the actual forensic evidence, strains credulity. Therefore, the state court's finding that Martinez did not act improperly in making pervasive argument that Morris engaged in necrophilia was both an unreasonable determination of clearly established federal law and of the facts of this case.

The Arizona Supreme Court made an alternative finding that even if Martinez's comments about necrophilia were improper, the jury instruction that the

lawyers' arguments are not evidence "negated their effect." *See Morris*, 160 P.3d at 216. This too was an unreasonable application of clearly established federal law and based on an unreasonable factual determination because the arguments were "too clearly prejudicial for . . . a curative instruction to mitigate their effect." *See Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001) (alteration in original) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 644 (1974)). Also unreasonable was the state court's finding that the prosecutor's arguments about necrophilia constituted harmless error because they were directed only towards establishing the "heinous or depraved" prong of the (F)(6) aggravator. *See Morris*, 160 P.3d at 216. First, as discussed *infra* in Claim Twelve, the evidence supporting the cruelty prong of the (F)(6) aggravating factor was insufficient. And the fact that the necrophilia argument went to only the heinous or depraved prong of the aggravating factor does not mean it could not have impacted Morris's trial. At the penalty phase, the weight of the aggravating circumstance would have been different if it was based on a finding of cruelty only as opposed to the additional finding of heinousness or depravity based on necrophilia. *See Brown v. Sanders*, 546 U.S. 212, 220 (2006); *see also Van Hook*, 558 U.S. at 13 (explaining that in looking at prejudice the focus should not be on "the *number* of aggravating factors instead of their *weight*" (emphasis in original)). Further, as the record reflects, Martinez argued during the guilt phase that necrophilia was Morris's motive for the crimes. Martinez's unfounded necrophilia theory permeated every phase of the trial, which the state court ignored.

Next, the Arizona Supreme Court's finding that Martinez did not commit misconduct by unpacking Castillo's jacket was contrary to and an unreasonable application of clearly established law, as well as an unreasonable determination of the factual circumstances of the case. *See Morris*, 160 P.3d at 217. The state court ignored the magnitude of unsealing the jacket—the courtroom had to be cleared. The trial judge even apologized to the jury and said, "I'm informed that's the only

1    time we have to experience something like that for the rest of the trial." (Tr. June

2    15, 2005 at 29–30.) Instead, the Arizona Supreme Court focused on Martinez's

3    "smelling pleasure" argument, which it characterized as a singular "offhand"

4    comment that was at worst inappropriate. *See Morris*, 160 P.3d at 217. In that same

5    closing argument, however, Martinez said that Morris wanted Davis's "body to be

6    inside. He wanted to smell, if you will. He wanted to inhale the rotting smell of the

7    corpse. That's what he wanted to do, and that's why he kept them, so he could

8    enjoy, if you will, once they were dead." (Tr. July 5, 2005 at 44.) His focus on the

9    smell of decomposing bodies was not limited to the comment in reference to the

10   jacket. Indeed, painting Morris as a monster who enjoyed the smell of rotting

11   corpses was both a focus of Martinez's questioning of witnesses and of his closing

12   arguments. By introducing the jacket early in the guilt phase, Martinez provided the

13   jurors with a repugnant point of reference for each time he asked a witness about or

14   made statements concerning the smell of Morris's RV. The issue was not, as the

15   state court framed it, that Martinez introduced the jacket into evidence, but that he

16   took the evidence out of its protective packaging in order to inflame the jury with

17   the smell. Also unreasonable was the state court's finding that Morris cannot

18   establish prejudice because "overwhelming evidence established that the strong

19   odor associated with the jacket resulted from its close proximity to Castillo's badly

20   decomposed body." *Morris*, 160 P.3d at 217. This was an unreasonable factual

21   determination because, as Logan pointed out and the state court acknowledged, the

22   jacket had been sealed for years, causing the odor to increase. *Id.* at 217.

23        Next, in finding that Martinez's keeping on his table, in view of the jury, an

24   excluded photograph depicting a maggot infestation was not misconduct, the court

25   relied on the reasoning that there was no evidence that this action was intentional

26   as it was not repeated. *See id.* at 217–18. This ignores the fact that this incident

27   occurred on the same day that Castillo's jacket was unsealed. Therefore, the stunt

28   with the photograph occurred close in time to another act meant to inflame the jury

and was part of Martinez's pattern of doing so. Similarly, the state court did not consider the timing of events in finding that Martinez did not improperly influence the medical examiners. *See id.* at 214–15. This was another feature of his win-at-all-costs mentality. As set forth in Claim Seven, the timeline of Hu and Horn changing their opinions regarding the cause of Codman's and Davis's deaths was, at minimum, suspect. Indeed, Martinez did not provide the medical examiners with the police interview tape of Morris talking about Codman until after they were interviewed by Logan. (Tr. June 28, 2005 at 38; Tr. June 29, 2005 at 40–41.) The state court ignored these facts in making its ruling. Finding no misconduct was therefore unreasonable and based on an unreasonable factual determination.

The state court's denial of the claim thus was contrary to, and based on an unreasonable application of, clearly established Supreme Court precedent, 28 U.S.C. § 2254(d)(1), and an unreasonable determination of the facts, 28 U.S.C. § 2254(d)(2). Martinez is an experienced prosecutor. Based upon Martinez's history and experience, he knew he should not make improper and unsupported arguments or misstate the evidence. Martinez's misconduct can only be seen as intentional conduct aimed to secure another death verdict, and the cumulative effect was undeniably prejudicial to Morris, ultimately denying him of his right to a fair trial. Accordingly, he is entitled to relief.

### D. Trial counsel was ineffective in failing to object to the prosecutor's pervasive misconduct.

This claim was not raised in state court. Morris alleges he can overcome any default of this claim by showing cause and prejudice, including because of the ineffective assistance of state post-conviction counsel. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Murray v. Carrier*, 477 U.S. 478, 488–89 (1986); *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). Morris will demonstrate at an evidentiary hearing that post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced him.

1    Alternatively, he alleges that any procedural bar is not adequate or independent or
2    that imposing default would be a miscarriage of justice. Because this claim has not
3    been adjudicated by the Arizona state courts, the limitations on relief imposed by
4    28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider
5    the merits of the claim de novo. Morris incorporates by specific reference all facts,
6    allegations, and arguments made elsewhere in this Petition.

7        This claim is subject to the two-prong standard established in *Strickland*:
8    counsel's performance must be deficient, and such deficient performance must have
9    prejudiced the defense. *Strickland*, 466 U.S. at 686–87. First, the inquiry under the
10   deficiency prong is "whether counsel's assistance was reasonable considering all
11   the circumstances." *Id.* at 688. Performance is deficient when the attorney renders
12   objectively unreasonable assistance. *Id*. at 687–88. When assessing the second
13   prong, a court must decide whether "counsel's errors were so serious as to deprive
14   the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. And "despite
15   the strong presumption of reliability," the question to be asked is whether "the result
16   of the particular proceeding is unreliable because of a breakdown in the adversarial
17   process that our system counts on to produce just results." *Id*. at 696.

18       Here, trial counsel was plainly deficient for failing to object to, or ask for a
19   mistrial on the basis of, the pervasive and prejudicial prosecutorial misconduct that
20   Martinez committed throughout all phases of trial. As detailed above, Morris's trial
21   counsel failed to object to almost every instance of misconduct committed by
22   Martinez. And the misconduct began early and continued through all phases of trial.
23   Logan objected to Martinez leaving an excluded photograph on his table in view of
24   the jury (Tr. June 15, 2005 at 58), but failed to object to, for example, continued
25   inflammatory argument or misstatements of the evidence. Logan made little attempt
26   to rein in Martinez's conduct at trial. The misconduct was obvious and widespread,
27   but counsel did nothing to shield Morris from it. This was deficient performance.
28   *See Zapata*, 788 F.3d at 1115–16 (finding ineffective assistance when counsel did

1  not object to "egregious misstatements" by the prosecutor in argument that were

2  "fabricated from whole cloth [and] designed to inflame the passions of the jury").

3        These failures deprived Morris of a fair trial and undermine confidence in the

4  outcome. *See id.* at 1123–24. It is reasonably likely that, had trial counsel objected,

5  the prosecutor's arguments would have been curtailed, and with proper

6  admonitions, the jury would have understood properly its role in determining

7  Morris's guilt as well as the need to "consider and give effect to [mitigating]

8  evidence in imposing sentence," so that "'the sentence imposed . . . reflect[s] a

9  reasoned moral response to the defendant's background, character, and crime.'"

10 *See Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (quoting *California v. Brown*, 479

11 U.S. 538, 545 (1987) (O'Connor, J., concurring)). Further, the effect of counsel's

12 failures is seen on appeal, as the Arizona Supreme Court largely reviewed

13 prosecutorial misconduct for fundamental error because it was not preserved.

14 *See Morris*, 160 P.3d at 214–18. This is most prejudicial in the context of the

15 question of whether Martinez committed misconduct by singling out jurors and

16 asking them to imagine themselves in the place of a victim. The appellate court

17 found that this action was misconduct, but that it was not fundamental error. *See id.*

18 at 216–17. Counsel's failures prejudiced Morris at every phase of his trial as well

19 as on appeal. Thus, there is a reasonable probability that but for counsel's failings,

20 the results would have been more favorable. *See Strickland*, 466 U.S. at 687–96.

21 Morris is entitled to relief.

22 **CLAIM TWO**

23 **Morris received ineffective assistance when his trial counsel failed
   to investigate and present evidence rebutting the prosecution's**

24 **unsupported theory that Morris engaged in necrophilia.**

25       Morris raised these claims in his post-conviction proceedings. (IOR 307 at

26 33–43; IOR 434.) The post-conviction court denied the claims on the merits after

27 granting an evidentiary hearing on the penalty-phase issue only. (IOR 354 at 5–7;

28 IOR 438.) The state court's rejection of these claims was contrary to, or involved

1    an unreasonable application of, clearly established federal law, as determined by
2    the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an
3    unreasonable determination of the facts in light of the evidence presented. *See id.*
4    § 2254(d)(2). Morris incorporates by specific reference all facts, allegations, and
5    arguments made elsewhere in this Petition.

6         Morris has the constitutional right to effective counsel at all stages of his
7    capital trial. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (holding that a
8    criminal defense attorney has a constitutional duty to investigate both relevant
9    aggravating and mitigating circumstances); *Correll v. Ryan*, 539 F.3d 938, 947–48
10   (9th Cir. 2008) (finding deficient performance when, among other things, counsel
11   failed to challenge three of five alleged aggravating factors). In *Strickland v.*
12   *Washington*, 466 U.S. 668, 686–87 (1984), the Supreme Court outlined the standard
13   for determining when counsel has provided ineffective assistance. As described by
14   the Court, "the benchmark for judging any claim of ineffectiveness must be whether
15   counsel's conduct so undermined the proper functioning of the adversarial process
16   that the trial cannot be relied on as having produced a just result." *Id.* at 686. Under
17   *Strickland*, counsel is ineffective if: (1) "representation fell below an objective
18   standard of reasonableness," *id.* at 688; and (2) "there is a reasonable probability
19   that, but for counsel's unprofessional errors, the result of the proceeding would have
20   been different," *id.* at 694.

21        An attorney's representation is deficient when the attorney fails to render the
22   performance of a reasonably competent attorney. *See Strickland*, 466 U.S. at 687.
23   Although defense counsel has broad discretion when making strategic decisions,
24   those decisions must be reasonable and informed. *See id.* at 691; *Correll*, 539 F.3d
25   at 949 (holding that an "uninformed strategy" is "no strategy at all"). The
26   reasonableness of counsel's decisions is measured by the reasonableness of the
27   investigation done in making such a decision. *See Wiggins v. Smith*, 539 U.S. 510,
28   523 (2003) (focusing on "whether the investigation supporting counsel's decision

not to introduce evidence of Wiggins' background was itself reasonable"). "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91. In other words, any strategic decision made by counsel must be "reasonable and informed." *Jennings v. Woodford*, 290 F.3d 1006, 1014 (9th Cir. 2002).

In assessing counsel's performance, this Court should look to guides, such as the American Bar Association ("ABA") standards at the time of trial, *see Bobby v. Van Hook*, 558 U.S. 4, 7 (2009), as well as the standards of practice in the defense community in Arizona, *see Cullen v. Pinholster*, 563 U.S. 170, 196 (2011). The ABA standards provide that a capital investigation "should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *See* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases § 11.4.1(C) (1989); *see also* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases § 10.7 (rev. ed. 2003), *reprinted in* 31 Hofstra L. Rev. 813, 1022 (2003) (hereinafter "2003 ABA Guidelines"). "[C]ounsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." *Strickland*, 466 U.S. at 690. Moreover, "[t]rial lawyers have a 'duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process.'" *Connick v. Thompson*, 563 U.S. 51, 65 (2011) (quoting *Strickland*, 466 U.S. at 688).

Next, in determining prejudice, a court must decide whether "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. A petitioner does not have to demonstrate by a preponderance of the evidence that "the result in his case would have been different but for counsel's errors," but only that there was a reasonable probability that the errors undermined confidence in the outcome of his trial. *See Brown v.*

97

*Myers*, 137 F.3d 1154, 1157 (9th Cir. 1998) (citing *Strickland*, 466 U.S. at 694); *Lord v. Wood*, 184 F.3d 1083, 1085 (9th Cir. 1999). And "despite the strong presumption of reliability," the question to be asked is whether "the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Strickland*, 466 U.S. at 696. Moreover, "deficient performance and prejudice questions may be closely related." *Correll*, 539 F.3d at 951. Indeed, counsel's performance in and of itself could undermine a court's confidence in the outcome of the trial. *See id.*

"In making this [prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695; *see also Williams (Terry) v. Taylor*, 529 U.S. 362, 397–98 (2000); *Alcala v. Woodford*, 334 F.3d 862, 882–83 (9th Cir. 2003) (granting relief on basis of cumulative impact of multiple errors by counsel); *Harris by and through Ramseyer v. Wood*, 64 F.3d 1432, 1439 (9th Cir. 1995) (holding that the cumulative impact of numerous deficiencies in defense counsel's performance was prejudicial to the defense, rendering the proceedings improper and warranting habeas relief). Even if this Court finds that no single error amounts to prejudice, it, nonetheless, should apply cumulative error principles to grant relief. *See Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005) (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978) (en banc)). A critical aspect in assessing prejudice under *Strickland* thus is to consider whether the combined errors by trial counsel impacted the trial in a manner that violated the Sixth Amendment. The Supreme Court did not instruct that each individual error should be reviewed for prejudice, but rather that the totality of the errors by counsel should be reviewed collectively for prejudice. Accordingly, "[s]eparate errors by counsel at trial and at sentencing should be analyzed together to see whether their cumulative effect deprived the defendant of his right to effective assistance." *Sanders v. Ryder*, 342 F.3d 991, 1001 (9th Cir. 2003) (citation omitted). "They are, in other words, not separate claims,

1   but rather different aspects of a single claim of ineffective assistance of trial

2   counsel." *Id.* Even if prejudice does not result from an individual error, it may

3   nevertheless result from cumulative errors. *See Boyde*, 404 F.3d at 1176.

4          James Logan and Randall Craig's performance in Morris's case and their

5   failure to investigate and rebut the prosecution's necrophilia theory fell below the

6   applicable standard of care, prejudicing Morris. They therefore provided ineffective

7   assistance of counsel, and Morris is entitled to relief.

8          **A.     Factual background.**

9                **1.     Pretrial preparation.**

10          Morris's defense team knew before trial that necrophilia could be an issue at

11   trial. James Logan was appointed to represent Morris on April 18, 2003 (IOR 4),

12   and on September 19, 2003, Linda Thomas, the mitigation specialist, wrote to

13   Logan informing him that their consulting expert, Richard Lanyon, had asked if it

14   was known if Morris engaged in sexual conduct with the victims before or after

15   their deaths because "[t]his info will help determine a DSM-IV classification."

16   (PCR Hr'g Ex. 5 at 000010.) Logan responded that this determination may not be

17   possible due to the decomposed state of the bodies. (PCR Hr'g Ex. 5 at 000010.)

18   Lanyon spoke to second chair Maria Schaffer and recommended "an expert in serial

19   killerology perhaps Dr. Dietz or Reid Malloy in San Diego." (PCR Hr'g Ex. 5 at

20   000116.) Several months later, Lanyon expressed that he "remain[ed] puzzled" by

21   the case. He recommended a neurological examination and an MRI (PCR Pet. Ex.

22   J at 1), as well as a "true expert with 'paraphilias'"or experience with those accused

23   of being a serial killer. (PCR Hr'g Ex. 5 at 000048.) He specifically recommended

24   Doctors Judith Becker, Park Dietz, and Reid Malloy. (PCR Pet. Ex. R at 1; PCR

25   Hr'g Ex. 5 at 000048.) Lanyon also wrote his thoughts on the case after conducting

26   a literature review that included articles by Becker and Dietz and said that

27   "[c]omparing the literature on serial sexual murder with the sparse literature on

28   necrophilia, it would appear Mr. Morris fits the former category rather than the

1   later." (PCR Hr'g Ex. 5 at 000029, 000033.)

2       Thomas wrote to Logan that she and Lanyon did not think a "serial killer
3   expert or a necrophilia expert (and we have no concrete evidence to support
4   necrophilia, right?)" would be productive. (PCR Pet. Ex. R at 1.) Nevertheless,
5   Thomas reported that she would reach out to Becker. (PCR Pet. Ex. R at 1.) Becker
6   is a specialist in abnormal psychology. (PCR Pet. Ex. S.) Thomas then reported that
7   Becker was "very interested" in Morris's case and, although busy, could be ready
8   by the trial date, which was at that point set for February. (PCR Pet. Ex. R at 2.)
9   Becker sent Thomas her fee schedule (PCR Hr'g Ex. 5 at 000055), but the team did
10  not retain her.

11      Instead of hiring a specialist such as Becker, in December 2004, Logan wrote
12  to the director of the office that "[i]n a last ditch desperate effort to find something
13  to use in mitigation with Mr. Morris, I would like to give Dr. Potts a shot at the
14  mind of Mr. Morris." (PCR Pet. Ex. E at 3.) Thomas then emailed Becker, though
15  she sent it to the wrong email address, informing her that "[d]ue to our limited time
16  left on this case before the scheduled trial date of February 14th, 2005, we have
17  retained a local psychiatrist to assist us." (PCR Hr. Ex. 5 at 000059.)

18      The second chair on the case, Maria Schaffer, was then replaced by Randall
19  Craig, as reflected in a Minute Entry from December 16, 2004, two days after
20  Thomas emailed Becker saying that a local psychiatrist had been retained. (IOR
21  72.) On January 21, 2005, the trial was continued to June. (IOR 73.) The local
22  psychiatrist, Dr. Jack Potts, was also "somewhat baffled with" Morris. (PCR Pet.
23  Ex. F at 1; *see also* PCR Pet. Ex. G at 1.) No further experts were retained after
24  Potts.[31] The defense called no experts at any stage of the trial.

25

26

---

27  [31] Potts suggested an MRI and an EEG. Counsel had also retained Dr. Harry Tamm,
28  who prescribed an EEG while Potts prescribed an MRI. (PCR Pet. Ex. H; PCR Pet.
    Ex. I.) Neither test was completed, as discussed *infra* in Claim Three (A).

1    **2.    The trial.**

2    At trial, the prosecutor argued extensively that Morris had engaged in

3    necrophilia as discussed *supra* in Claim One. In his opening statement at the guilt

4    phase, he argued, for example, that Morris:

5    > killed for his own sexual gratification, and after each kill
        he wouldn't get rid of the body. What he would do, he
6    > would just leave it there. He would keep the body even after
        the skin would start to slide off. He would keep the body
7    > when it would start to bloat up a little because of the
        bacterial decomposition, and he would keep the body
8    > because of the smell of rot, smell of decomposition.
9

10   (Tr. June 13, 2005 at 39.) The defense did not object and did not make an opening

11   statement. (Tr. June 13, 2005 at 76.)

12   On the second day of the guilt phase, outside the presence of the jury, the

13   prosecutor made explicit his theory. In arguing that a picture was admissible, he

14   said that Morris:

15   > likes the smell of decaying flesh, and the reason he killed
        these women was for the sex, but it was also for the sex
16   > afterwards; that it's the smell that is what drives him. That's
        the motivation to kill. In other words, the premeditative
17   > aspect of this case as to him killing these people or these
        women was that not only did he want them dead, he wanted
18   > them dead so that they could smell[.]
19

20   (Tr. June 14, 2005 at 32.) Several times during the trial, the prosecutor informed

21   the judge and defense counsel that his theory was that Morris killed the victims in

22   order to commit necrophilia. (*See, e.g.*, Tr. June 20, 2005 at 78–80, 84.[32])

23   The prosecutor then questioned the medical examiners who testified about

24   _____

25   [32]  The prosecutor also asserted that the presence of Morris's semen showed
     postmortem sex for two of the victims because Morris told police that he always
26   used a condom. (*See, e.g.*, Tr. June 20, 2005 at 78.) This argument was preposterous,
     as even the State's expert recognized during post-conviction proceedings. (PCR
27   Hr'g Ex. 1 at 56 n.38.) The vast majority of the prosecutor's argument related to
     necrophilia relied on skin slippage and anal defects. Morris addresses that evidence
28   here.

101

1   the victims' autopsies in order to seek support for his theory that Morris had

2   engaged in necrophilia. For example, Dr. Kevin Horn testified that there were

3   "defects in the skin" around Castillo's anus that "could be tears" and "could be

4   consistent" with trauma. After pressing by the prosecutor, he testified it could have

5   occurred "before, during, or after death." (Tr. June 15, 2005 at 88.) He testified that

6   the damage could be due to sexual activity or insect activity. (Tr. June 15, 2005 at

7   96.) On redirect, the prosecutor put a finer point on it, asking if the damage "could

8   be consistent with sexual activity" and "could be after death." (Tr. June 15, 2005 at

9   102.) Dr. Philip Keen then testified that there was skin slippage on the inner thighs

10  and pubic area of Noah's body. (Tr. June 27, 2005 at 87.) He described skin slippage

11  by saying that "in any friction, the outer layer of the skin will slide away." (Tr. June

12  27, 2005 at 85–86.) And Dr. John Hu testified that there was skin slippage on

13  Codman's left breast, consistent, as the prosecutor put it, "with if somebody were

14  to rub their hands over" it. (Tr. June 28, 2005 at 26.) He further agreed with Logan's

15  characterization of skin slippage as "the movement of skin as a result of some sort

16  of friction." (Tr. June 28, 2005 at 48.)

17      In closing, the prosecutor argued extensively and graphically about

18  necrophilia. He asserted that Morris kept the victims' bodies "for one reason, and

19  that was for sexual gratification. He wanted to use them once their body was rotted

20  out so that he could fulfill whatever sexual desires he had. There was no other

21  reason why he would keep the body." (Tr. July 5, 2005 at 14.) He continued that

22  Morris was "intent on killing them so that they could remain with him in his camper

23  to satisfy his needs." (Tr. July 5, 2005 at 15.) Of Codman, he argued that Morris

24  "cradled himself, rocked himself between her legs, in-between her legs, and cradled

25  himself to ejaculation," and that skin slippage on her pelvis[33] and left breast showed

26  _____

27  [33] The medical examiner did not testify that there was skin slippage on Codman's
    pelvis. (Tr. June 28, 2005 at 26–27.) This is just one instance of the prosecutor
28  misstating the facts in evidence, as discussed *supra* in Claim One.

that Morris "went in there when she was dead. That indicates that he rocked himself . . . that's what he did to her body. And so now it begins to make sense in a sort of weird way. It explains why it is that the rest of her body does not have skin slipping off[.]" (Tr. July 5, 2005 at 38–39.) He then argued that Morris wanted the "rotting smell of the corpse" of Davis (Tr. July 5, 2005 at 44), and had "full-fledged sexual intercourse" with Velasquez after she died because DNA from sperm found in her vagina matched Morris even though he told police he always used a condom (Tr. July 5, 2005 at 46–47). He made the same argument about skin slippage and Morris's semen showing sexual contact after the death of Noah. (Tr. July 5, 2005 at 50.) Finally, he argued that the fact that Castillo's buttocks were "propped up by some trash" next to the area where Morris slept, in combination with the defects on her anus, meant that "whenever the need arose, [Morris] would get on top of her, and he would have anal sex with her. That's what accounts for the, if you will, the damage that is done all the way around her anus." (Tr. July 5, 2005 at 52–54.) He asserted that Morris's "penis went inside of her anus when she was dead." (Tr. July 5, 2005 at 54.) Defense counsel made no objections during the prosecutor's closing argument.

Logan in closing argued that no one testified about postmortem sex, so it was "conjecture that you are asked to leap to. That's the guesswork you are asked to engage in by the State." (Tr. July 5, 2005 at 92; *see id.* at 110.) He further argued there was no evidence Morris was excited by the smell of decomposing bodies (Tr. July 5, 2005 at 93), that Morris masturbated while victims' bodies were in the RV (Tr. July 5, 2005 at 94–95), or that skin slippage proves postmortem sex as opposed to "any sort of friction" (Tr. July 5, 2005 at 96–97). His closing argument focused on the victims' deaths being more consistent with drug overdoses than premeditated murder. (Tr. July 5, 2005 at 99–113.)

Next, at the aggravation phase of Morris's trial, the prosecutor argued that Morris relished the murders and mutilated the victims' bodies, and that the crimes

were therefore heinous or depraved: "[N]ot only did [Morris] relish the killing because he knew he was going to keep it, but he also mutilated the corpse . . . And he kept it around, if you will, to play with it." (Tr. July 12, 2005 at 26.) The prosecutor argued that Morris kept the bodies of the victims "until the skin started to bubble up. And what he did then is that he opened her legs up, and he mutilated the body." (Tr. July 12, 2005 at 26–27.) He continued that Morris relished killing because he had "another carcass." (Tr. July 12, 2005 at 32–33.) He reargued that the skin slippage and defects on Castillo's anus showed postmortem sex.[34] (Tr. July 12, 2005 at 36–38.) Randall Craig in his opening argued on the topic simply that "[t]here was absolutely no evidence presented that he did any kind of relishment or that he enjoyed any kind of sex after death. Again, these are conclusory statements presented by the State." (Tr. July 12, 2005 at 41.)

The prosecutor asked the sole aggravation-phase witness, Dr. Keen, about skin slippage and whether it could be caused by friction. (Tr. July 12, 2005 at 59.) In closing, the prosecutor again argued that Morris had committed necrophilia, asserting this as a basis for finding the crimes "debased." (Tr. July 12, 2005 at 95.) He argued, for example, that Morris "cradles himself while he has an erection, while he's rubbing her inner thighs, while his pelvic area is rubbing her pelvic area. Actually, it's not hers anymore. She's just dead. She's just a piece of meat." (Tr. July 12, 2005 at 96.) Craig again argued briefly that there was no evidence Morris enjoyed having the bodies of the victims near him, there was no evidence of postmortem sex, and it was unknown when the skin slippage occurred or if it was from the bodies being dragged. (Tr. July 12, 2005 at 117, 122, 124.) He argued nonsensically that "[i]f you buy Mr. Martinez's argument that there is mutilation of sexual activity, then you got to buy the proposition that the intent was to have sex,

---

[34] The prosecutor acknowledged that he could not argue that there was postmortem sexual activity with Davis. (Tr. July 12, 2005 at 30.)

1   not to mutilate the body." (Tr. July 12, 2005 at 126.)

2       Finally, at the penalty phase, the defense called six witnesses and played four

3   taped statements. (*See* Tr. July 14, 2005; Tr. July 18, 2005.) The witnesses testified

4   that Morris was made fun of growing up because of his appearance and body odor

5   (Tr. July 14, 2005 at 46–47, 82; Tr. July 18, 2005 at 7–10, 40, 62); that he was

6   embarrassingly and traumatically left at a school dance by his date for another boy

7   (Tr. July 14, 2005 at 56–58; Tr. July 18, 2005 at 13–15); that he was in ROTC in

8   high school and hoped to join the army but could not due to his weight (Tr. July 14,

9   2005 at 73, 78–79, 95); and that, in addition to getting jobs to help support the

10  family, he took care of his younger siblings and the household while his mother

11  worked (Tr. July 18, 2005 at 4–5, 38, 49, 57–59, 63). The defense put on no expert

12  testimony. The prosecutor in closing referred back to his aggravation-phase

13  arguments related to necrophilia, saying, "You never forget about aggravating

14  circumstances. You never forget mutilation of the body. You don't forget relishing.

15  You don't forget any of that[.]" (Tr. July 18, 2005 at 128.) He also commented on

16  the fact that no expert had testified at the penalty phase. (Tr. July 18, 2005 at 113.)

17      The prosecution's theory that Morris engaged in necrophilia therefore

18  infected the entire trial. Defense counsel presented no evidence to rebut the theory

19  at any stage.

20          **3.    Post-conviction proceedings.**

21      Morris's post-conviction counsel retained Drs. Becker and Dietz to opine on

22  whether Morris met the criteria for a diagnosis of necrophilia as well as Dr. David

23  Posey, a pathologist, to examine the physical evidence presented at Morris's trial.

24  Becker concluded that Morris "does not meet diagnostic criteria for necrophilia[.]"

25  (PCR Pet. Ex. T at 18.) Dietz explained that a DSM-IV diagnosis of necrophilia

26  requires evidence of "recurrent intense sexually arousing fantasies, sexual urges, or

27  behaviors" involving corpses over at least a six-month period. He concluded that

28  Morris did not meet the criteria. (PCR Pet. Ex. Y at 15–16.) Posey explained that

for four of the victims, "there were varying degrees of skin slippage due to postmortem decomposition and this included skin slippage in and around the genital and anal regions[.]" (PCR Pet. Ex. Q at 7.) He further wrote that there was no evidence of injury to the anus or rectum of any of the victims, which would be expected after anal intercourse (PCR Pet. Ex. Q at 8), and that "[t]here is no question" that the defects described on Castillo's anus "are all due to postmortem decomposition" (PCR Pet. Ex. Q at 12). He concluded that there "is no forensic evidence to suggest Mr. Morris had antemortem or postmortem anal sex with any of the decedents." (PCR Pet. Ex. Q at 16.)

Morris also submitted twenty-nine declarations from friends and family attesting that he had never expressed any interest in the dead. (*See* PCR Pet. Exs. M(D)(02)–(08), M(D)(10)–(13), M(D)(15)–(32).) Thomas also submitted an affidavit stating that at the time of Morris's case, the office's director encouraged them to act frugally, which sometimes resulted in them not hiring the "most appropriate experts[.]" (PCR Pet. Ex D ¶¶ 5–6.) Schaffer made clear during post-conviction proceedings that Morris's case was "predominately a mitigation case" and that she had wanted to use experts. (PCR Pet. Ex. A at 17–18.)

The post-conviction court granted an evidentiary hearing on the claim that trial counsel rendered ineffective assistance by failing to investigate and present experts to rebut the State's necrophilia theory at the penalty stage of Morris's trial. (IOR 354 at 5.) The court denied similar claims, contained in an amended post-conviction petition, related to the guilt and aggravation phases. (IOR 438.)

In anticipation of the evidentiary hearing, Posey wrote a supplemental report. He explained that skin slippage is "part of decomposition and the normal process of putrefaction" and that the "skin slippage on all of the victims is what would be expected based on the state of decomposition when found." (PCR Hr'g Ex. 6 at 6.) The slippage on Codman and Noah was "textbook" in appearance for their stages of decomposition and was located where it would be anticipated with the onset of

slippage, namely the lower abdomen and inner thighs. (PCR Hr'g Ex. 6 at 7.) He noted that at Morris's trial, both the medical examiners and Logan had made it unclear what the cause of skin slippage was and had not been precise that it is the natural effect of decomposition and not the result of "friction." (PCR Hr'g Ex. 6 at 6.) He concluded that:

> it is highly unlikely the degree of slippage observed in either crime scene or autopsy photographs of [Codman and Noah] was caused by Mr. Morris. . . . [I]f he would have had postmortem sex with either victim it would have taken several seconds if not minutes to have completed the act, and this would have resulted in visible damage. Such damage is not present.

(PCR Hr'g Ex. 6 at 7.) As for Castillo, Posey explained that the perianal defects observed were from decomposition and maggot activity, not postmortem sex. (PCR Hr'g Ex. 6 at 7–8.)

The State also had Morris evaluated by Dr. Steven Pitt in preparation for the hearing. He agreed with Dietz and Becker that Morris is not a homicidal necrophile. (PCR Hr'g Ex. 1, Report Re: Forensic Psychiatric Evaluation at 50.)

At the hearing, Posey and Becker testified about their opinions. (Tr. Mar. 16, 2015 at 12–153; Tr. Mar. 18, 2015 at 82–170.) Lanyon also testified. He said that he is not an expert in "more unusual forms of sexual deviance" and recommended that Morris's trial team "get a real expert in this area" such as Becker or Dietz, who were more qualified than he was. (Tr. Mar. 16, 2015 at 175–76.) He testified that he was "way out of my depth at that time, out of my league. I did not know the literature or had no experience seeing people like that," which he had communicated to the defense team. (Tr. Mar. 23, 2015 at 11.)

Logan testified that he recalled the team researching necrophilia before trial but did not remember discussing hiring an expert in necrophilia or why they did not hire a forensic pathologist. (Tr. Mar. 19, 2015 at 18, 23, 59.) He said that if an expert makes a specific recommendation, then he tries to follow it, and recognized that

1   Potts was a "generalist." (Tr. Mar. 19, 2015 at 21, 70.) He further testified that his
2   approach was to try to use the State's witnesses to undermine the prosecutor's
3   theories as much as possible. (Tr. Mar. 19, 2015 at 103–04.) Craig testified that he
4   remembered doing some research on necrophilia but never looked for an expert to
5   assist him. (Tr. Mar. 17, 2015 at 161–62, 172–73.) He did not recall why the team
6   did not hire Becker. (Tr. Mar. 18, 2015 at 39.) He testified that when he joined the
7   case, Logan informed him that Morris had already been evaluated and that "what
8   we have is what he have." (Tr. Mar. 17, 2015 at 159.)

9        Schaffer testified that before she left the case, the defense team knew that the
10   prosecutor was going to argue about necrophilia and anticipated that he would argue
11   that skin slippage on the inner thighs of the victims was an indication of postmortem
12   sex. (Tr. Mar. 24, 2015 at 89, 93.) She wanted to hire a forensic pathologist as well
13   as a mental health expert to examine Morris's sexual behavior and the suggestion
14   of necrophilia. (Tr. Mar. 24, 2015 at 92, 94–95.) She also testified that if an expert
15   suggested a particular course of action or a particular type of expert, it is understood
16   that a lawyer should follow that advice. (Tr. Mar. 24, 2015 at 89.)

17        Thomas testified that because the office was budget-conscious, they would
18   often start by hiring Lanyon to do a preliminary examination of a client, as they did
19   in Morris's case. (Tr. Mar. 24, 2015 at 13.) She further testified that Lanyon
20   recognized that the case was beyond his expertise and that another expert was
21   needed. And Thomas recognized that Potts did not specialize in aberrant behavior,
22   but she believed Logan chose to use him instead of Becker. (Tr. Mar. 24, 2015 at
23   16, 39–40.) After consulting with Potts, the team did nothing else to seek an expert
24   on paraphilias. (Tr. Mar. 24, 2015 at 46.) Finally, Richard Bock, a standard of care
25   expert, opined that it was deficient to fail to consult with and hire a forensic
26   pathologist to rebut physical evidence and explain skin slippage and to not consult
27   with a mental health expert in sexual deviance to testify that Morris does not meet
28   the criteria for a necrophile. (Tr. Mar. 17, 2015 at 11, 15, 17–18.) The

post-conviction court denied relief on the claim. (IOR 491.)

**B.      Morris's trial counsel failed to investigate, develop, and present evidence to rebut the necrophilia theory at the guilt phase.**

**1.      Counsel's performance was deficient.**

Trial counsel knew that allegations of necrophilia may arise during Morris's trial and so had a duty to investigate and rebut such a salacious theory. *Cf. Rompilla*, 545 U.S. at 389 (finding counsel deficient for failing to investigate information they knew prosecutor would rely on). Their failure has two dimensions—the failure to consult with and present a mental health expert to testify that Morris was not a necrophile as well the failure to consult with and present a pathologist to rebut the physical bases of the prosecutor's argument.

Counsel was explicitly informed before trial that they needed a specialist instead of a generalist to do a mental health evaluation in Morris's case. The defense's first consulting expert, Lanyon, alerted the team that this case was out of his depth and required more particularized specialization; he accordingly referred the team to other, more appropriate experts. (PCR Pet. Ex. J at 1; PCR Hr'g Ex. 5 at 000048.) The mitigation specialist and original second chair, who were in charge of preparing for the penalty phase, recognized the importance of retaining specialists. (*See* PCR Pet. Ex. A at 17–18; PCR Pet Ex. R at 1–2.) Thomas went so far as to reach out to Becker, who was recommended by Lanyon and available for trial. (PCR Pet. Ex. R at 2.) There is no notation in the file revealing why Becker was not retained, but she sent her fee schedule in October 2004 and the team had decided against hiring her in favor of hiring a local generalist by December 2004. (PCR Pet. Ex. E at 3; PCR Pet. Ex. R at 1–2; PCR Hr'g Ex. 5 at 000050.) In this time period, Schaffer left the case. (IOR 72.) Instead of following the recommendation of their expert, the defense team retained Potts, who was also puzzled by the case. (PCR Pet. Ex. F at 1; PCR Hr'g Ex. 5 at 000059.) After the local generalists, Lanyon and Potts, could not assist, there were no further efforts to retain an appropriate specialist.

1      This failure by counsel to hire an appropriate expert on the topic of
2  necrophilia was deficient because they knew—and were explicitly told by their
3  experts—that specialists were necessary. *See Hinton v. Alabama*, 134 S. Ct. 1081,
4  1088 (2014) (per curiam) (finding counsel's performance deficient for failing to
5  "request additional funding in order to replace an expert he knew to be
6  inadequate"); *Bemore v. Chappell*, 788 F.3d 1151, 1167–68 (9th Cir. 2015) ("The
7  principle that counsel need not doggedly seek out a favorable expert report in the
8  face of a conclusively unfavorable one does not negate counsel's duty to follow up
9  on a concededly preliminary report that both contained some potentially promising
10 information and recommended further inquiry."); *Summerlin v. Schriro*, 427 F.3d
11 623, 642–43 (9th Cir. 2005) (en banc) (acknowledging that different types of
12 experts are needed to present different types of mitigating evidence, especially with
13 respect to mental impairments); *Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir.
14 1999) (finding counsel performed deficiently for not consulting a toxicologist or
15 neurologist even though four other experts were hired). Counsel halted their
16 investigation after being told that their experts were out of their league; thus they
17 accepted that they would present no expert testimony despite having been referred
18 to more qualified experts and recognizing the importance of such an expert. Counsel
19 has the "duty to make reasonable investigations or to make a reasonable decision
20 that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.
21 Here, there was no strategic reason for failing to at least consult with an appropriate
22 expert. The only reasoning supported by the record is that counsel eschewed Becker
23 in favor of the cheaper assistance of Potts. As discussed more fully *infra* in Claim
24 Three (A), limiting an investigation based on funding is not a reasonable strategic
25 choice. *See Hinton*, 134 S. Ct. at 1088. A likely explanation is that, since Logan
26 was never in charge of the mitigation presentation, after Schaffer left the case—and
27 was replaced by Craig, who took a passive role and was unprepared as discussed
28 *infra* in Claim Three (A)—the mitigation investigation was not completed and leads

were dropped.

It was also deficient for counsel to fail to call, or at least consult with, a pathologist. Instead of calling any experts at the guilt phase, Logan chose to cross-examine the State's witnesses in an attempt to undermine their testimony. (Tr. Mar 19, 2015 at 103–04.) However, because he had not consulted with a pathologist, he was unable to effectively cross-examine the medical examiners and in fact compounded the misimpression the prosecutor sought to convey. For example, on cross-examination he asked Hu if "slippage is simply the movement of skin as a result of some sort of friction . . . And that friction can be from basically any source," including from the body being dragged. (Tr. June 28, 2005 at 48.) Logan did not ask, however, if skin slippage happens naturally and is not necessarily indicative of "friction." If he had consulted with a pathologist, he would have been able to effectively undermine the connection between both the skin slippage and the defects on Castillo's anus and necrophilia; all of the misinformation presented through the medical examiners could have been clarified with appropriate questioning. (*See* Tr. Mar. 16, 2015 at 152–53.)

And if counsel had hired a pathologist, they could have put on evidence that, as Posey testified, the skin slippage on Noah was "typical skin slippage" that was not consistent with rubbing or friction, but was "due to the natural decomposition process." (Tr. Mar. 16, 2015 at 54, 56, 60, 61.) Keen's characterization of skin slippage as being consistent with friction was misleading. (Tr. Mar. 16, 2015 at 149.) As to Codman, as Posey testified at the post-conviction hearing, the skin slippage was typical postmortem skin slippage that was not caused by "rough handling." (Tr. Mar. 16, 2015 at 64, 74.) Further, an expert could have testified that Hu's trial testimony that skin slippage is consistent with rubbing after death was not correct because more damage and loss of skin would be expected. (Tr. Mar. 16, 2015 at 67–69, 71–72.) Lastly, Horn's testimony that defects around Castillo's anus could be tears from trauma was incorrect, which a pathologist could have corrected.

1   (*See* Tr. Mar. 16, 2015 at 85–87.) Posey described how the defects were "all caused

2   by maggot activity," and they did not have the "irregular, torn borders" that he

3   would expect to see if there had been trauma or sexual activity. (Tr. Mar. 16, 2015

4   at 88–94.) A pathologist therefore could have directly rebutted the evidence the

5   prosecutor relied on to argue necrophilia.

6       It was therefore deficient for counsel to fail to investigate the forensic

7   underpinnings of a theory they knew the prosecutor would argue, especially a

8   theory as prejudicial and inflammatory as necrophilia. As a result, counsel both

9   failed to correctly and effectively cross-examine the medical examiners and to

10  present an expert who could have proven there was no physical evidence to support

11  necrophilia. *See Duncan v. Ornoski*, 528 F.3d 1222, 1235 (9th Cir. 2008) ("It is

12  especially important for counsel to seek the advice of an expert when he has no

13  knowledge or expertise about the field."); *Draughon v. Dretke*, 427 F.3d 286, 296

14  (5th Cir. 2005) (finding counsel ineffective for failing to investigate forensic

15  evidence that "deprived [the petitioner] of a substantial argument, and set up an

16  unchallenged factual predicate for the State's main argument"); *Dugas v. Coplan*,

17  428 F.3d 317, 329–31 (1st Cir. 2005) (finding deficient performance when counsel

18  did not hire expert on forensic issue central to State's case despite not knowing

19  about the issue himself); *Driscoll v. Delo*, 71 F.3d 701, 709 (8th Cir. 1995) ("[A]

20  reasonable defense lawyer would take some measures to understand the laboratory

21  tests performed and the inferences that one could logically draw from the results.");

22  *Dees v. Caspiri*, 904 F.2d 452, 454–55 (8th Cir. 1990) ("[C]ounsel had a duty to

23  make a diligent investigation of the forensic evidence and its potential weaknesses"

24  and "to garner the expertise necessary to cross examine [the State's expert].").

25      **2.      Morris was prejudiced as a result of counsel's performance.**

26      Necrophilia is an incredibly inflammatory charge, one that will uniformly

27  disgust jurors and unavoidably taint their perception of a defendant. As outlined

28  above, the prosecutor extensively and graphically argued that Morris was guilty of

engaging in postmortem sexual activity with the victims. Defense counsel left this theory unrebutted by failing to put on evidence that Morris does not meet the criteria of a necrophile as well as evidence that would have undermined the import of the evidence the prosecutor relied on—skin slippage on Codman and Noah and the anal defects on Castillo. Instead, the jury was left with the salacious impression, likely to provoke a visceral reaction, that necrophilia was a supportable possibility. Morris was therefore prejudiced by counsel's failure to rebut the theory of necrophilia. *Cf. Stevens v. McBride*, 489 F.3d 883, 898 (7th Cir. 2007) (finding state court's determination of no prejudice was an unreasonable application of *Strickland* in part because defense expert testified at penalty phase that petitioner "engaged in necrophilia after the murder"); *United States v. Hitt*, 981 F.2d 422, 424 (9th Cir. 1992) (recognizing that some topics "have a visceral impact," the introduction of which can prejudice a defendant).

In addition to being prejudicial because of its inflammatory nature, necrophilia was the prosecution's theory of premeditation. (*See, e.g.*, Tr. June 14, 2005 at 32.) The prosecutor argued that the reason for the victims' deaths was so that Morris could have access to their bodies after their death. Failure to rebut pivotal evidence that was central to the prosecution's theory was prejudicial. *See Draughon*, 427 F.3d at 297 (finding prejudice from counsel's failure to investigate forensic evidence to rebut important aspect of State's case); *Driscoll*, 71 F.3d at 709 (same). If this theory had been undermined by the evidence presented during Morris's post-conviction proceedings, there is a reasonable probability that one juror would not have voted for first-degree murder, and confidence in the outcome of the guilt phase accordingly is undermined. *See Hinton*, 134 S. Ct. at 1089 (recognizing that defendant can be prejudiced by failure to hire expert "who would have instilled in the jury a reasonable doubt as to [the defendant's] guilt"); *Strickland*, 466 U.S. at 694.

The prejudice from counsel's failures at the guilt phase was not contained to

that phase but instead infected the rest of the trial. *See Bemore,* 788 F.3d at 1175–76 (finding that deficient performance at the guilt phase "could well have contributed to the outcome of the penalty phase" and that the prejudice inquiry must be viewed cumulatively). As discussed more fully below, the basis of the heinous or depraved prong of the (F)(6) aggravating factor was the argument of necrophilia. (*See, e.g.*, Tr. July 12, 2005 at 26–27, 32–38, 95–96.) While the evidence the prosecutor relied on was primarily introduced during the guilt phase, it was re-urged at the aggravation phase. Counsel's failure to defend against this evidence at the guilt phase therefore prejudiced Morris at the aggravation phase as well. Similarly, the failure to refute necrophilia at the beginning of trial prejudiced Morris at the penalty phase, where the jurors were asked to weigh the aggravating and mitigating evidence. They went into that weighing determination with the impression that Morris engaged in necrophilia, a misconception that was so inflammatory it likely weighed heavily against Morris's mitigation. *Cf. Stevens*, 489 F.3d at 898. Counsel's failures at the guilt phase therefore had repercussions at every phase of the trial and prejudiced Morris throughout.

      **3.**    **The state court's rejection of this claim involved an unreasonable application of clearly established federal law and was based on an unreasonable determination of the facts.**

      **a. Performance**

    In denying Morris's claim, the state court both unreasonably applied the law and made unreasonable determinations of fact.[35] The court found that counsel had

---

[35] The de novo review of this claim conducted above in Sections B 1 and 2 relies on evidence presented in conjunction with the evidentiary hearing. Because this claim was denied before that hearing, however, Morris shows that the post-conviction court's denial of this claim was unreasonable under § 2254(d) based on the evidence presented with the post-conviction petition and thus before the court at the time of this particular ruling. The fact that evidence presented at the evidentiary hearing undermines the court's reasoning, however, also supports the argument that because the court made evidentiary findings without affording Morris a hearing, those findings are unreasonable factual determinations under § 2254(d)(2). *See, e.g.*, *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012); *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004), *abrogated on other grounds by*

not performed deficiently on the ground that it was a reasonable strategy to counter the necrophilia theory with argument instead of evidence because "[c]alling an expert had the potential to highlight, and perhaps legitimize the necrophilia claim and would have opened the door to potentially-damaging cross-examination, such as whether defendant's behaviors were 'consistent with' necrophilia, giving the necrophilia claim additional credibility." (IOR 438 at 3.) This finding was unreasonable under § 2254(d) in several respects.

First, Morris's claim was that his counsel's investigation and resultant failure to put on witnesses was deficient. Despite the court's reasoning, it was impossible for counsel to have decided not to call witnesses because they might be detrimental without first knowing what the witnesses would say. Counsel cannot halt investigation in the service of an already decided upon strategy when the record showed the need to investigate further, and it was an unreasonable application of clearly established federal law for the state court to find otherwise. *See Wiggins*, 539 U.S. at 521–22; *Strickland*, 466 U.S. at 691; *Weeden v. Johnson*, 854 F.3d 1063, 1070 (9th Cir. 2017) ("Counsel cannot justify a failure to investigate simply by invoking strategy. . . . Under *Strickland*, counsel's investigation must determine trial strategy, not the other way around. Weeden's counsel could not have reasonably concluded that obtaining a psychological examination would conflict with his trial strategy without first knowing what such an examination would reveal." (internal citations omitted)).

Next, the necrophilia theory was pervasive and graphic, and the court's determination that calling an expert would have brought more attention to it can be overcome under both § 2254(d)(1) and (d)(2). Necrophilia was the basis of the State's argument that the murders were premeditated. (*See, e.g.*, Tr. June 14, 2005 at 32.) Necrophilia was not a peripheral issue that could have been downplayed or

---

*Murray v. Schriro*, 745 F.3d 984 (9th Cir. 2014).

ignored, and finding otherwise misapprehended facts in the record on a material issue. *See Taylor*, 366 F.3d at 1001. Further, the prosecution establishing necrophilia in the guilt phase inevitably had repercussions at the aggravation and penalty phases. Counsel had a duty to formulate a strategy that would be effective at all stages of the trial. *See* 2003 ABA Guidelines § 10.10.1. It therefore was also an unreasonable application of clearly established federal law for the post-conviction court to determine that relying on mere argument in closing statements to rebut such a pervasive and important issue would have been a reasonable trial strategy. *See Strickland*, 466 U.S. at 685, 688 (explaining that the right to effective counsel is based in counsel's "crucial role in the adversarial system" and that "[c]ounsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process").

In finding a reasonable trial strategy, the state court also relied on facts that were not in the record, rendering the factual determinations unreasonable under § 2254(d)(2). *See Wiggins*, 539 U.S. at 528–29; *Hibbler*, 693 F.3d at1146; *Taylor*, 366 F.3d at 1001. The post-conviction court assumed without any basis that presenting experts to disprove necrophilia would open Morris up to damaging cross-examination and that those experts would testify that Morris's conduct was "'consistent' with necrophilia." (IOR 438 at 3.) The reports of Dietz, Becker, and Posey submitted with Morris's post-conviction petition unequivocally determined that he was not a necrophile and that the physical evidence did not support necrophilia.[36] Nowhere in the record before the state court was there any indication that defense experts could be cross-examined so that they would testify that Morris's conduct was consistent with necrophilia.

The state court's misstatement of the facts was compounded by the denial of

---

[36] Although the report of the State's expert, Dr. Pitt, was not yet before the state court when it made this ruling, he also found that Morris did not meet the criteria for necrophilia. (PCR Hr'g Ex. 1, Report Re: Forensic Psychiatric Evaluation at 50.)

Morris's request to expand the scope of the evidentiary hearing to include this claim. In so ruling, the court found that, accepting Morris's allegations as true, he had not raised a colorable claim for relief. *See State v. Watton*, 793 P.2d 80, 85 (Ariz. 1990) ("A defendant is entitled to an evidentiary hearing when he presents a colorable claim, that is a claim which, if defendant's allegations are true, might have changed the outcome."). But the trial court did not accept Morris's allegations as true and assumed facts not in evidence. Because the court therefore made "evidentiary findings without holding a hearing and giving petitioner an opportunity to present evidence, such findings clearly result in an 'unreasonable determination' of the facts." *Taylor*, 366 F.3d at 1001; *see also Hurles v. Ryan*, 752 F.3d 768, 790 (9th Cir. 2014); *Hibbler*, 693 F.3d at 1146; *Nunes v. Mueller*, 350 F.3d 1045, 1056 (9th Cir. 2003) ("[T]he state court's decision was objectively unreasonable because that court made factual findings (that is, it drew inferences against Nunes where equally valid inferences could have been made in his favor, and it made credibility determinations) when it rather claimed to be determining prima facie sufficiency.").

The post-conviction court's determination that counsel did not perform deficiently was therefore based on an unreasonable application of clearly established federal law as well as unreasonable determinations of the facts.

### b. Prejudice

The post-conviction court also found that Morris could not show prejudice from counsel's deficient performance because the Arizona Supreme Court found on direct appeal that evidence of guilt was "overwhelming." (IOR 438 at 3.) But in determining prejudice, the court:

> must consider the totality of the evidence before the judge or jury. . . . Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing

1
2
  that the decision reached would reasonably likely have
  been different absent the errors.

3  *Strickland*, 466 U.S. at 695–96. It was contrary to, or an unreasonable application
4  of, this precedent to defer to a determination that was made on direct appeal without
5  the benefit of the evidence counsel failed to introduce. The post-conviction court's
6  analysis did not look at the evidence presented at trial in combination with the
7  evidence presented at post-conviction that rebutted necrophilia. This was contrary
8  to, or an unreasonable application of, *Strickland*.

9      The post-conviction court's prejudice inquiry also failed to acknowledge that
10  deficient performance at the guilt phase can result in prejudice at another phase of
11  trial. As explained above, counsel's failure at the guilt phase infected both the
12  aggravation and the penalty phases. The state court's failure to recognize this was
13  also an unreasonable application of clearly established federal law. *See Bemore*,
14  788 F.3d at 1175–76 (citing *Chambers v. Mississippi*, 410 U.S. 284, 290 n.3
15  (1973)).

16      Because the state court's denial of Morris's claim that his counsel rendered
17  ineffective assistance for failing to investigate and present evidence at the guilt
18  phase to rebut the prosecution's necrophilia theory was based on an unreasonable
19  application of clearly established federal law and unreasonable factual
20  determinations, this Court can engage in the de novo review outlined above in
21  Sections B1 and 2. Morris is accordingly entitled to relief.

22  **C.   Morris's trial counsel failed to investigate, develop, and present**
23         **evidence to rebut the necrophilia theory at the aggravation phase.**

24      **1.   Counsel's performance was deficient.**

25      At the aggravation phase of Morris's trial, the prosecution charged that the
26  murders were especially heinous, cruel, or depraved. (*See* IOR 19.) *See* Ariz. Rev.
27  Stat. § 13-703(F)(6) (renumbered to § 13-751(F)(6)). The prosecutor's basis for the
28  argument that the crimes were heinous or depraved was that Morris had engaged in

necrophilia and thus relished the murder, inflicted gratuitous violence, and needlessly mutilated the victims' bodies. *See State v. Gunches*, 234 P.3d 590, 593 (Ariz. 2010). The Arizona Supreme Court had already, years prior, determined that necrophilia supports a finding that a defendant inflicted gratuitous violence. *See State v. Brewer*, 826 P.2d 783, 799 (Ariz. 1992). Counsel was therefore on notice that if they did not rebut the necrophilia theory, the State would be able to easily establish the (F)(6) aggravating factor. *See Hinton*, 134 S. Ct. at 1089 ("An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*.").

Nevertheless, defense counsel failed to follow the recommendations of Lanyon to hire a specialist and failed to hire a pathologist to show that the physical evidence does not support necrophilia, as discussed above. For the same reasons explained in Section B.1, this failure to investigate was deficient. *See generally Strickland*, 466 U.S. at 691. After this deficient investigation, counsel put on no evidence at the aggravation phase to show that Morris had not engaged in necrophilia and that the murders were therefore not heinous or depraved. In argument, Craig made a few comments that there was no evidence of postmortem sex. (Tr. July 12, 2005 at 117, 122.) But he failed to undermine any of the prosecution's bases for asserting necrophilia and reinforced the misperception that the skin slippage was the result of friction. (Tr. July 12, 2005 at 124.) Because the defense had not put on any evidence to rebut the import the prosecutor placed on the physical evidence, the prosecutor was free to re-assert, unchallenged, his arguments about the physical evidence. (*See* Tr. July 12, 2005 at 6, 27, 37, 128, 138.) In light of the importance of the theory of necrophilia to the prosecution's argument in support of the (F)(6) aggravating factor, it was deficient performance for counsel to fail to put on any evidence to rebut the theory. *See Rompilla*, 545 U.S. at 383–90 (finding deficient performance, and the state court's finding to the

1   contrary unreasonable under § 2254(d)(1), when counsel failed to investigate

2   evidence prosecutor used in support of aggravator).

3          **2.     Morris was prejudiced as a result of counsel's performance.**

4          Because the prosecution's necrophilia theory went largely uncontested, it

5   was a foregone conclusion that the jury would find the (F)(6) aggravating factor. If

6   counsel had put on the available testimony that would have undermined the

7   prosecution's argument, then there would have been no basis for the jury to find

8   that the crimes were heinous or depraved. As the evidence to support the cruelty

9   prong of this aggravating factor was insufficient, as discussed *infra* in Claim

10  Twelve, there is a reasonable probability that at least one juror would have voted

11  against finding the aggravating factor. *See Duncan*, 528 F.3d at 1246 (finding

12  prejudice at special circumstance stage of California capital trial when counsel

13  failed to investigate and hire expert).

14         Moreover, Morris was prejudiced even if the jury found that cruelty was

15  proven and so the (F)(6) factor was still found. At the penalty phase, the weight of

16  the aggravating circumstance would have been different if it was based on a finding

17  of cruelty only as opposed to the additional finding of heinousness or depravity

18  based on necrophilia. *See Van Hook*, 558 U.S. at 13 (explaining that in looking at

19  prejudice the focus should not be on "the *number* of aggravating factors instead of

20  their *weight*" (emphasis in original)). There is therefore a reasonable probability of

21  a different outcome at the penalty phase had counsel not performed deficiently at

22  the aggravation phase.

23         **3.     The state court's rejection of this claim involved an
                    unreasonable application of clearly established federal law
24                  and was based on an unreasonable determination of the
                    facts.**
25

26         The post-conviction court denied Morris's claim that counsel was ineffective

27  at the aggravation phase for many of the same reasons as discussed above in relation

28

to the guilt phase.[37] (IOR 438 at 3.) The court made the same ruling on the performance prong for both claims, and that determination was based on an unreasonable application of clearly established federal law and an unreasonable determination of the facts for the same reasons discussed above in Section B.3.a.

In addition, this analysis—that it was reasonable strategy for counsel to decide to not investigate and put on expert evidence to rebut necrophilia in order to not draw attention to the theory—is further unsupported at the aggravation phase. Necrophilia cannot be dismissed as a peripheral issue because it was the prosecutor's basis for, and alone sufficient to establish, that the crimes were heinous or depraved under the (F)(6) aggravating factor. *See Brewer*, 826 P.2d at 799. It therefore could not have been a reasonable strategy to fail to rebut this evidence, particularly when counsel had been directed to the appropriate experts. *See Rompilla*, 545 U.S. at 383–90.

The state court further found that Morris was not prejudiced by counsel's failures at the aggravation phase because a finding of cruelty is sufficient to establish the (F)(6) aggravating factor, and the necrophilia theory did not go to the cruelty prong of that factor. (IOR 438 at 3.) But this reasoning did not recognize that deficient performance at the aggravation phase resulted in prejudice at the penalty phase. As explained above, Morris was prejudiced even accepting that cruelty was established. The state court's failure to recognize this was an unreasonable application of clearly established federal law. *See Bemore*, 788 F.3d at 1175–76.

Because the state court's denial of Morris's claim that his counsel rendered ineffective assistance for failing to investigate and present evidence at the aggravation phase to rebut the prosecution's necrophilia theory was based on an unreasonable application of clearly established federal law and an unreasonable

---

[37] The arguments made above in footnote 35 apply equally to this analysis.

determination of the facts, this Court can engage in the de novo review outlined above in Sections C1 and 2. Morris is accordingly entitled to relief.

### D.     Morris's trial counsel failed to investigate, develop, and present evidence that Morris was not a necrophile and had not engaged in necrophilia at the penalty phase.

#### 1.     Counsel's performance was deficient.

By the time of the penalty phase, it was inescapable that the prosecution's theory was that Morris engaged in necrophilia. The defense was therefore up against an incendiary portrait of Morris, and a mitigation presentation could not be complete without refuting and correcting that image. Therefore, even if there were strategic reasons for not investigating and putting on evidence at the guilt and aggravation phases that Morris did not commit necrophilia, no such strategy existed at the penalty phase after the prosecution had already used necrophilia to support both premeditation and an aggravating factor. *See generally Wiggins*, 539 U.S. at 527 ("In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."). Craig admitted at the post-conviction hearing that evidence to rebut necrophilia could be mitigating, that there would have been no downside to consulting with experts, and that the defense knew that they needed an expert at the penalty phase, but said he did not look for an expert on necrophilia. (Tr. Mar. 17, 2015 at 162; Tr. Mar. 18, 2015 at 39, 62–63, 72.) Logan also testified that there would have been no harm in consulting with an expert who could have evaluated whether Morris was a necrophile and that after the jury had found the aggravating factors, there would have been little to lose by considering evidence to rebut necrophilia in the penalty stage. (Tr. Mar. 19, 2015 at 44, 46, 59.) He further testified that if he had Becker's opinion that Morris does not meet the criteria for necrophilia, "[i]t would certainly have been used in the mitigation portion of the trial." (Tr. Mar. 19, 2015 at 75.) But because counsel had failed in their trial

1   preparation as discussed above in Section B1 in relation to the guilt phase, they put

2   on no expert evidence at the penalty phase.

3        The defense knew that Morris's case would likely hinge on the penalty phase

4   and their mitigation presentation. (*See, e.g.*, Tr. Mar. 19, 2015 at 61.) The defense's

5   mitigation theory was that growing up in Oklahoma, Morris was given too much

6   responsibility and was bullied, but that he was reliable and kind. They argued that

7   there was a disconnect between the Morris everyone knew and the crimes for which

8   he was convicted. (*See, e.g.*, Tr. July 18, 2005 at 100–01.) But because the defense

9   had failed to address the allegations of necrophilia—and because no reason was

10  given for the disconnect counsel identified, as discussed *infra* in Claim Three (A)—

11  any portrait of Morris as having a good character or being sympathetic would be

12  unsuccessful and an incomplete mitigation presentation. *See Bemore*, 788 F.3d at

13  1172. The specter of necrophilia was too great. It was therefore deficient

14  performance for counsel to fail to combat the theory at the penalty phase. *See* 2003

15  ABA Guidelines § 10.11(A) (explaining that counsel has a "duty to investigate

16  issues bearing upon penalty and to seek information that supports mitigation or

17  rebuts the prosecution's case in aggravation"); *id.* § 10.11(F)(2) (explaining that

18  counsel should consider calling experts "to rebut or explain evidence presented by

19  the prosecutor").

20        **2.    Morris was prejudiced as a result of counsel's performance.**

21        Morris was prejudiced at the penalty phase by his counsel's failure to rebut

22  the prosecution's necrophilia theory. The defense's mitigation theme was that

23  Morris was "sad," had wasted potential, and was generally well liked by friends and

24  family though made fun of by others. This was undermined by the inference that he

25  was a necrophile. Such a characterization is incredibly prejudicial and made the

26  mitigating circumstances put forth by the defense less believable. The jury was

27  instructed that the defense had the burden of proving mitigating circumstances (IOR

28  169 at 4), but the defense did nothing to address the contradictory portraits the jury

was given of Morris as kind and reliable but engaging in deviant sexual activity. The jury therefore went into its weighing determination with the impression that Morris engaged in necrophilia, a misconception that was so inflammatory it likely weighed heavily against Morris's mitigation. If Morris's counsel had instead presented available expert testimony to undercut the necrophilia theory, there is a reasonable probability that at least one juror would have weighed the aggravating and mitigating circumstances differently. *See Stevens*, 489 F.3d at 898.

> ### 3. The state court's rejection of this claim involved an unreasonable application of clearly established federal law and was based on an unreasonable determination of the facts.

The post-conviction court's denial of Morris's claim after the evidentiary hearing is riddled with inaccuracies and is difficult to follow.[38] What is clear, however, is that the denial is based on an unreasonable application of clearly established law and an unreasonable determination of the facts and so is not accorded deference under § 2254(d)(1). The court made two rulings as to performance—that it was a reasonable strategy both to not consult with experts and to not call experts at the penalty phase—and then ruled that Morris could not show prejudice.

### a. Performance

Concerning deficient performance, the court reasoned that "counsel made a reasonable, strategic decision not to consult with additional experts" because mitigating evidence would have been "counterbalanced by unfavorable considerations" and the case would have become a "battle of the experts." (IOR 491 at 14.) As an initial matter, any decision not to consult with experts cannot reasonably be based on perceived detrimental language in an expert's report

---

[38] For example, the court incorrectly stated that all of the victims were discovered nude and that Morris at trial claimed both that the victims had died of drug overdoses and that the victims asked to be choked during sex. (IOR 491 at 4, 17, 20 n.38.)

1    because that information was not available to counsel at the time the investigation

2    was curtailed. "[A] decision not to present . . . particular mitigating evidence is

3    unreasonable unless counsel has explored the issue sufficiently to discover the facts

4    that might be relevant to his making an informed decision." *Lambright v. Schriro*,

5    490 F.3d 1103, 1116 (9th Cir. 2007) (per curiam) (citing *Wiggins*, 539 U.S. at 522–

6    23). Counsel could not have known what Becker, Posey, and Dietz would say before

7    consulting with them. The court's decision to the contrary was an unreasonable

8    application of clearly established federal law and an unreasonable factual

9    determination.

10        Furthermore, the court's determination that the experts' opinions contained

11   "unfavorable considerations" is not supported by the record and is a further

12   unreasonable factual determination. As the court elsewhere recognized, all experts,

13   including the State's expert, agreed that Morris did not meet the criteria for

14   necrophilia. (*See* IOR 491 at 6.) This is despite the fact that, as the court put it,

15   Morris refused to cooperate with the evaluations, did not answer all questions

16   related to sex, and tried to present himself in a positive light. (IOR 491 at 14.) The

17   three experts who conducted evaluations were still able to render opinions despite

18   what the court viewed as "unfavorable considerations." These factors therefore in

19   no way diminished the findings of the mental health experts that Morris was not a

20   necrophile. The court also pointed to the fact that Morris denied that he committed

21   the crimes to the experts and that there was a "duality" between Morris as a kind

22   person who was called "Teddy Bear" and the circumstances of the crimes. Even

23   accepting that this information was "unfavorable," it was already before the jury

24   and would not have been introduced for the first time by experts. *See Correll*, 539

25   F.3d at 955. Moreover, that potentially "adverse evidence" is uncovered with

26   mitigating evidence does not mean counsel did not perform deficiently. *See Sears

27   v. Upton*, 561 U.S. 945, 951 (2010); *cf. Porter v. McCollum*, 558 U.S. 30, 43 (2009)

28   ("It is also unreasonable to conclude that Porter's military service would have been

1    reduced to 'inconsequential proportions,' simply because the jury would have also
2    learned that Porter went AWOL on more than one occasion."). Finally, the court's
3    assertion that the case would have become a battle of the experts is not supported
4    because, again, the State's expert agreed with the defense experts that Morris did
5    not meet the criteria for necrophilia.

6          The post-conviction court next ruled that it was a reasonable strategic choice
7    not to call experts at the penalty phase. The court reasoned that the defense was
8    unable to find an appropriate expert despite a nationwide search and the counter-
9    theory suggested by Lanyon was itself detrimental. (IOR 491 at 17–18.) Both of
10   these reasons are based on egregious misstatements of the record. First, it is
11   undisputed, and the court recognized, that the defense team was referred to and
12   made contact with Becker before trial. (IOR 491 at 5.) Becker conveyed that she
13   was available and interested in the case, but the defense team failed to retain her.
14   (PCR Pet. Ex. R at 2.) The precise reason for their doing so is not contained in the
15   record, but any decision to hire Potts instead of Becker would not have been a
16   reasonable strategic choice, as the defense had been informed by Lanyon that a
17   specialist, not a generalist, was needed; any decision to the contrary also was an
18   unreasonable application of clearly established federal law. *See Bemore*, 788 F.3d
19   at 1167–68.

20         Next, the finding that Lanyon's opinion made the failure to call experts a
21   reasonable strategic choice is based on an unreasonable factual finding. Lanyon told
22   the defense team and the post-conviction court that he was out of his depth on this
23   case and that specialists were needed instead of him. (PCR Pet. Ex. J at 1; PCR Hr'g
24   Ex. 5 at 000048; Tr. Mar. 16, 2015 at 175–76; Tr. Mar. 23, 2015 at 11.) Counsel
25   were deficient for failing to follow this advice to hire another expert, not for failing
26   to call Lanyon at trial. The fact that Lanyon had an arguably unfavorable opinion is
27   therefore of no moment because it has no relationship to the fact that counsel had a
28   duty to hire experts other than Lanyon, on Lanyon's own suggestion.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### b. Prejudice

The post-conviction court also found that Morris was not prejudiced by his counsel's performance. The bases for this decision are belied by the record. First, the court reasoned, relying on Lanyon's preliminary opinion, that a defense expert would have testified that Morris is a serial, sexual murderer. (IOR 491 at 19.) But Lanyon was not an expert in this field, as he and the defense team recognized, so his preliminary thoughts—which were not a diagnosis—would not have been presented if an appropriate expert instead had been retained and called. (*See* Tr. Mar. 18, 2015 at 74.) Additionally, the fact that there were five victims opened Morris up to the inference of serial murder without an expert testifying to such. Therefore, even if Lanyon's thoughts did come in, they would not have added anything that was not before the jury, and certainly not anything so detrimental to counterbalance the benefit of having an expert testify that Morris did not engage in necrophilia. *Cf. Correll*, 539 F.3d at 955.

Next, the court speculated that "[h]ad the defendant secured an expert to dispute a necrophilia argument, it is probable that the expert would have reached a similar conclusion about the serial murder aspect." (IOR 491 at 19.) But Morris did secure experts during post-conviction, and they did not find that Morris met the criteria for any paraphilia and did not opine that he was a serial murderer. The court therefore assumed facts that were not in evidence and were in fact directly contradicted by the record. This was an unreasonable determination of the facts under § 2254(d)(2). *See Hibbler*, 693 F.3d at 1146; *Taylor*, 366 F.3d at 1001.

The court also based its prejudice decision on an assumption that if Morris had called an expert on necrophilia, then the State would have "secured its own expert either to refute the defense expert or to opine on the defendant as a serial, sexual deviant." (IOR 491 at 19.) But the State did hire an expert for the post-conviction hearing, over Morris's objection, on the premise that if the defense

1    had called experts at trial, then the State would have called an expert in rebuttal.

2    (Tr. Jan. 24, 2013 at 4.) And the State's expert agreed with Becker and Dietz that

3    Morris "is not a homicidal necrophile." (PCR Hr'g Ex. 1, Report Re: Forensic

4    Psychiatric Evaluation at 50.) The post-conviction court's assertion that a State

5    witness would have rebutted a defense expert who testified that Morris is not a

6    necrophile is therefore directly contradicted by the record.

7        The post-conviction court therefore based its prejudice finding on

8    unreasonable factual determinations and ignored the pervasive, inflammatory

9    nature of the charge of necrophilia. It was also an unreasonable application of

10   clearly established federal law for the court to find that if this evidence had been

11   effectively rebutted, the sentencing profile before the jury would not have been

12   fundamentally altered such that confidence in the outcome of the penalty phase is

13   undermined. *See Porter*, 558 U.S. at 41.

14       Because the state court's denial of Morris's claim that his counsel rendered

15   ineffective assistance for failing to investigate and present evidence at the penalty

16   phase to rebut the prosecution's necrophilia theory was based on an unreasonable

17   application of clearly established federal law and an unreasonable determination of

18   the facts, this Court can engage in the de novo review outlined above in Sections

19   D1 and 2. Morris is accordingly entitled to relief.

20       **E.    Conclusion.**

21       Despite being aware that necrophilia would be an issue at trial and being

22   referred to experts who could have assisted in the defense, counsel failed to

23   investigate and present evidence to rebut or counteract the assertion that Morris

24   engaged in necrophilia. This failure occurred at and impacted every stage of

25   Morris's trial. The state court's findings to the contrary are not entitled to deference

26   under § 2254(d). Morris has shown that he was denied the effective assistance of

27   counsel in violation of his Sixth Amendment rights. He is therefore entitled to relief.

28   / / /

**CLAIM THREE**

**Morris received ineffective assistance of counsel during the penalty phase of his capital trial proceedings in violation of his Sixth, Eighth, and Fourteenth Amendment rights.**

A defendant in a capital case has a constitutional right to present mitigating evidence during the penalty phase of the trial. *See generally Penry v. Lynaugh*, 492 U.S. 302, 319 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002); *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982). Therefore, the Sixth Amendment imposes on a capital defense attorney "a duty to investigate, develop, and present mitigation evidence during penalty phase proceedings." *Summerlin v. Schriro*, 427 F.3d 623, 630 (9th Cir. 2005). "[A] decision not to present . . . particular mitigating evidence is unreasonable unless counsel has explored the issue sufficiently to discover the facts that might be relevant to his making an informed decision." *Lambright v. Schriro*, 490 F.3d 1103, 1116 (9th Cir. 2007) (citing *Wiggins v. Smith*, 539 U.S. 510, 522–23 (2003); *Stankewitz v. Woodford*, 365 F.3d 706, 719 (9th Cir. 2004)). A mitigation strategy must be decided after a full investigation; investigation cannot follow an already decided upon mitigation strategy. *See Wiggins*, 539 U.S. at 521–22; *Strickland v. Washington*, 466 U.S. 668, 691 (1984); *cf. Weeden v. Johnson*, 854 F.3d 1063, 1070 (9th Cir. 2017) (discussing ineffective assistance at guilt phase).

When assessing prejudice, the question becomes whether "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. A petitioner does not have to demonstrate by a preponderance of the evidence that "the result in his case would have been different but for counsel's errors," but only that there was a reasonable probability that the errors undermined confidence in the outcome of his trial. *Brown v. Myers*, 137 F.3d 1154, 1157 (9th Cir. 1998) (citing *Strickland*, 466 U.S. at 694); *see also Jennings v. Woodford*, 290 F.3d 1006, 1016 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 694 (rejecting explicitly the preponderance standard)); *Lord*

1  *v. Wood*, 184 F.3d 1083, 1085 (9th Cir. 1999).

2       "In making this [prejudice] determination, a court hearing an ineffectiveness

3  claim must consider the totality of the evidence before the judge or jury."

4  *Strickland*, 466 U.S. at 695; *see also Williams (Terry) v. Taylor*, 529 U.S. 362, 397–

5  98 (2000); *Alcala v. Woodford*, 334 F.3d 862, 882–83 (9th Cir. 2003) (granting

6  relief on basis of cumulative impact of multiple errors by counsel); *Harris by and*

7  *through Ramseyer v. Wood*, 64 F.3d 1432, 1439 (1995) (holding that the cumulative

8  impact of numerous deficiencies in defense counsel's performance was prejudicial

9  to the defense, rendering the proceedings improper and warranting habeas relief).

10  Even if this Court finds that no single error amounts to prejudice, it, nonetheless,

11  should apply cumulative error principles to grant relief. *See Boyde v. Brown*, 404

12  F.3d 1159, 1176 (9th Cir. 2005) (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333

13  (9th Cir.1978) (en banc)).

14       **A.    Trial counsel were ineffective for failing to investigate and present**
15           **available, comprehensive mitigation evidence.**

16       Morris raised this claim in his post-conviction proceedings. (IOR 307 at 2–

17  6, 33–47.) The post-conviction court treated it as several separate claims instead of

18  one comprehensive claim about the ineffective assistance of counsel in the

19  preparation and presentation of mitigating evidence. The post-conviction court did

20  not address both prongs of the *Strickland* inquiry for each separate claim. (IOR 354

21  at 3–8.) In those instances, this Court can review the unaddressed prongs de novo.

22  *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *Wiggins*, 539 U.S. at

23  534; *Weeden*, 854 F.3d at 1071. Also, the rulings the state court did make were

24  contrary to, or involved an unreasonable application of, clearly established federal

25  law, as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition,

26  the court made unreasonable determinations of fact in light of the evidence

27  presented. *See id.* § 2254(d)(2). This Court can therefore ultimately review the

28  entire claim de novo. Morris incorporates by specific reference all facts, allegations,

1    and arguments made elsewhere in this Petition.

2    **1.    Factual background.**

3    **a.    Pretrial preparation.**

4    Logan was appointed to Morris's case on April 18, 2003. (IOR 4.) Maria

5    Schaffer was second chair, and she was tasked with preparing the penalty phase of

6    the trial. (*See, e.g.*, Tr. Mar. 24, 2015 at 79.)[39] Schaffer said she "was the one that

7    was more reaching out to the client and stuff like that. And by the time we did Cory

8    Morris, I knew that's what I needed to do. He, not so much . . . Logan would rely

9    on me a lot for the relationship." (PCR Pet. Ex. A at 15–16.) With Linda Thomas—

10   the mitigation specialist who was new to the office (Tr. Mar. 19, 2015 at 85)—

11   Schaffer sought to investigate Morris's life and mental health. Both expressed

12   frustration about the culture in the office that discouraged spending sufficient funds

13   on experts. (*See* PCR Pet. Ex. A; PCR Pet. Ex. D.) According to Thomas, they were

14   also encouraged to retain local experts. (PCR Pet. Ex. D ¶ 4.) And concern over

15   funding was one reason Schaffer ultimately left the office before Morris's case went

16   to trial. (Tr. Mar. 24, 2015 at 87.)

17   As early as July 2003, three months after counsel was appointed to Morris's

18   case, Thomas noted the possibility of an "organic component" to Morris's case. A

19   month later, she put a finer point on it, telling Logan that she believed Morris may

20   have organic brain damage and that testing such as a quantitative

21   electroencephalography ("QEEG") should be conducted in conjunction with

22   neuropsychological testing. To support her suggestion, she noted that Morris had a

23   bicycle accident when he was thirteen. (PCR Pet. Ex. J at 2.) After a visit with

24   Morris a month later, Thomas noted that Morris told her of an incident in eleventh

25   grade where he had a headache and chest pain and collapsed in the hall on the way

26   _____

27   [39] Morris here relies on evidence that was not before the post-conviction court when
     it rejected this claim, but does so under de novo review. In Section 2 below, Morris

28   relies only on the evidence in front of the court at the time of its decision to show
     that he can overcome the strictures of § 2254(d).

to the school nurse's office. He was taken to Presbyterian Hospital. He also told her of a time when he lost feeling in half of his face. In later interviews, Morris's brother, friends, and a teacher confirmed to Thomas that Morris collapsed in high school; some saw him hit his head on the cement floor. Morris's sister told Thomas that Morris also was in a bike accident and "was out cold and finally came home on the bike and told [her] about it. He didn't know how long he was out. He was missing a long time that day." (*See also* PCR Pet. Ex. M(D)(31) at 1.) Morris's mother also told Thomas that Morris was hit by a car while riding his bike as a teenager. He fell, hit his head, and lost consciousness. (PCR Pet. Ex. M(A) ¶ 19; PCR Pet. Ex. M(D)(11) ¶¶ 13, 23.) And, Morris's family members told Thomas of another incident when Morris fell head first off a scooter onto cement. Thomas therefore gathered information that Morris had head injuries on at least three different occasions as a teenager, experienced migraines, and at one point lost feeling in half of his face. The defense team hired Dr. Richard Lanyon, a neuropsychologist who was the preferred expert of the director of the Office of the Legal Advocate and was functionally on retainer for that office during this time period. (Tr. Mar. 16, 2015 at 162; Tr. Mar. 23, 2015 at 13; Tr. Mar. 24, 2015 at 83–84.) According to Schaffer, Lanyon was not qualified to be on death-penalty cases but was preferred by the head of her office because he was deemed cost effective. Lanyon was retained on Morris's case in April 2003 for $2,500 initially, and later was paid an additional $1,200. (PCR Pet. Ex. C at 5–6; PCR Pet. Ex. E at 1.) He conducted a neuropsychological evaluation but informed the team that he was not qualified to work on the case and recommended other courses of action, including retaining another mental health expert with specialization in paraphilias or abnormal psychology, specifically mentioning Drs. Becker, Dietz, and Malloy. (PCR Hr'g Ex. 5 at 000048, 000116; Tr. Mar. 23, 2015 at 11.)

The defense team and Lanyon had been told that Morris had a history of recounting events in his life in ways that his friends and family did not think was

accurate. For example, he told Susan Luchenta that his family had died in a car crash. Others had heard from Morris that he had a girlfriend or fiancée who died in a car crash while pregnant with Morris's child. Morris also told his legal team about this girlfriend. Thomas noted, "[t]here is some question as to whether there was a girlfriend, an accident or even a pregnancy." Morris's uncle told Thomas that Morris also "told people that he was a paratrooper, a secret agent, and that he had accomplished various other fictitious feats." And his cousin said that Morris had told his employer "he was quitting because he was a sharp shooter in the army and he was going after Bin Laden." Morris's aunt believed that Morris "must have a fantasy land going on somewhere." Others expressed similar sentiments. Morris's good friend from high school, Terri Jones, thought Morris showed signs of having multiple personalities. Thomas herself observed that sometimes Morris seemed to be "in a make-believe place with maybe a sprinkling of reality here and there." (*See also* Tr. Mar. 24, 2015 at 29 ("[F]antasy was a huge part of his existence[.]").) And Lanyon told Thomas that Morris "could be in and out of fantasy stuff." He further said Morris has a "rich fantasy world which [Lanyon] thinks has its origin many years ago." (PCR Pet. Ex. R at 1.)

Lanyon wrote to Logan that he "remain[ed] puzzled by some of [Morris's] behavior and thought processes" and so wrote to convey his "strong recommendation that the next step would be to investigate directly the possibility of brain abnormality, through a neurological examination plus an MRI." (PCR Pet. Ex. J at 1.) According to Thomas's notes, this recommendation was discussed with both Logan and Schaffer. By March 2004, there were several emails among team members discussing the costs of neurologists and seeking affordable and local options. (PCR Pet. Ex. J at 3.) Counsel wanted to retain Dr. Stephen Flitman for $2,500 ($1,250 for a neurological examination and $500 per hour of record review), but were told by the director of the office that they needed to find someone cheaper. (PCR Pet. Ex. J at 3.) Logan emailed the director of the office informing her that

Lanyon "'strongly suggests' both the neurological exam and the subsequent MRI . . . [Another] case is not a capital case and we can be a bit more frugal in that one . . . Morris on the other hand is a death case and based on his exam, Lanyon wants the full neurological exam." (PCR Pet. Ex. J at 4.)

The defense eventually hired Dr. Harry Tamm, a neurologist who billed a total of $1,900 on the case. (PCR Pet. Ex. C at 4; PCR Pet. Ex. J at 4.) Thomas informed him that Morris:

> suffered three different incidences of head trauma while growing up. The incidences occurred as follows:
>
> 1. He fell from a skateboard/scooter head first onto his aunt's cement porch between the ages of 8 and 12. It is unclear whether he was rendered unconscious in this incident. Recollections vary. Most persons interviewed recalled that he was unconscious for a period of time.
> 2. As a teenager, age 16 or 17, he fell while riding a bicycle, head first onto the curb and was unconscious for a significant length of time.
> 3. At age 16 or 17, while in high school class he became very ill and it was noticed by his instructor that he had developed a high temperature. As he walked to the nurse's office, he passed out falling head-first onto the cement hallway. He endured a seizure at that time and he was transported by paramedics to a hospital.

(PCR Hr'g Ex. 5 at 000043.) Tamm wrote Thomas that "[t]he high likelihood is that CT and MRI scans would be normal." (PCR Hr'g Ex. 5 at 000045–46.) In making this assessment, however, he recounted Morris's history of head injuries but incorrectly recited some of the facts of the accidents—for example that Morris did not lose consciousness with any of his injuries—and also failed to take into account the fact that Morris was an adolescent at the time of the accidents whose brain was therefore still developing. *See, e.g.*, Jay N. Giedd, *Structural Magnetic Resonance Imaging of the Adolescent Brain*, Ann. N.Y. Acad. Sci., 77–85 (2004), *available at* http://thesciencenetwork.org/docs/BrainsRUs/ANYAS_2004_Giedd.pdf.

1    Thomas then contacted Becker in October 2004 at Lanyon's suggestion;

2    Becker was available and interested in the case. Becker sent Thomas her fee

3    schedule, but the team did not retain her. (PCR Pet. Ex. R at 1–2; PCR Hr'g Ex. 5

4    at 000050.) Instead, the team hired local psychiatrist Dr. Jack Potts, "in a last ditch

5    desperate effort to find something to use in mitigation," receiving funding for

6    $2,500. (PCR Pet. Ex. E at 3.)

7    Schaffer then left the case and was replaced by a different attorney in that

8    office named Randall Craig. (IOR 72.) Schaffer did not think the team had yet

9    developed a mitigation strategy at the time of her departure. (PCR Pet. Ex. A at 15–

10   16; Tr. Mar. 24, 2015 at 118.) This was Craig's first capital trial, but Logan still

11   assigned him to put on the mitigation presentation. (Tr. Mar. 17, 2015 at 147;

12   Tr. Mar. 19, 2015 at 88.) Schaffer thought that this was a difficult case to have as a

13   first capital trial. (PCR Pet. Ex. A at 35.) The defense secured only a three-and-a-

14   half-month continuance, which Schaffer thought was insufficient. (IOR 73;

15   Tr. Mar. 24, 2015 at 118.)

16   Potts told Thomas that he was "somewhat baffled" by Morris. (PCR Pet. Ex.

17   F at 1.) He then met with Thomas and Craig. He:

18          clarified that his area of expertise is evaluating 'crazy
             people'. This client does not appear to suffer from insanity,
19          though he thinks that there is definitely something very
             wrong with Cory. . . . He suggested that *though Dr. Tamm*
20          *did not find a clinical basis for ordering an M.R.I., that*
             *there are profound forensic reasons for ordering the same.*
21          Dr. Potts is willing to write a prescription for an M.R.I. A
             court order will be necessary to accomplish this. Dr. Potts
22          also suggested that as a 'rule out,' with so much at stake in
             this case, that for forensic purposes an E.E.G. should be
23          conducted.

24

25   (PCR Pet. Ex. G at 1 (emphasis added).) Potts further suggested "an extensive blood

26   work-up including an evaluation of testosterone levels." (PCR Pet. Ex. G at 2.)

27   Thomas and Craig discussed that following Potts's suggestions might require them

28   to ask for a further continuance. (PCR Pet. Ex. G at 1–2.) The defense team

subsequently secured a prescription for an EEG from Tamm (PCR Pet. Ex. I), and a prescription for a MRI from Potts (PCR Pet. Ex. H). Thomas thereafter investigated the costs for these tests—$2,006 to $2,161 for an MRI and $720 to $800 for an EEG—and informed counsel of her findings. (PCR Pet. Ex. J at 6.) But in May 2005, Thomas wrote a memorandum explaining that although they had prescriptions for an EEG and an MRI, Logan "made a decision to not go forward with the examinations." She did not specify Logan's reason for failing to complete these tests. (PCR Hr'g Ex. 5 at 000076.)

Craig did not recall being involved in the "hiring or turning down of expert witnesses," but said "it would have been my responsibility since I was in charge of those two areas." (Tr. Mar. 17, 2015 at 158.) Craig had not previously either called or cross-examined expert witnesses about mental health diagnoses. (Tr. Mar. 17, 2015 at 162–63.) Counsel knew that an expert was needed and that they had to present a strong mitigation case, as both Craig and Logan believed that this case would likely hinge on the penalty phase. (Tr. Mar. 18, 2015 at 39; Tr. Mar. 19, 2015 at 61.) Craig conceded that it "doesn't hurt to consult" with experts (Tr. Mar. 18, 2015 at 72), as did Logan (Tr. Mar. 19, 2015 at 59). Craig had another murder trial in the months leading up to Morris's trial, and perceived that he was joining the case late. (Tr. Mar. 18, 2015 at 16; PCR Hr'g Ex. 13; PFR 13 Ex. 2 at 19.) When Craig was put on the case, he was told that Morris had been evaluated by experts already, and Logan said "what we have is what we have." (PFR 13 Ex. 2 at 20.) Craig thought, "we had everything that we had at that time and we were just gonna go with it. . . . I just remember us feeling like, okay, this is what we got. We've exhausted all areas, and let's rol[l]." (PFR 13 Ex. 2 at 47; *see also* Tr. Mar. 17, 2015 at 159.) Craig did not explain why he believed all areas had been exhausted when the team had not followed through on obtaining the MRI and EEG examinations.

Communication between Morris and his counsel deteriorated in the lead-up to trial. At one point, Morris had declined further legal visits because Logan did not

"seem to care about anything [he] had to say." (PCR Pet. Ex. L at 2.) According to Morris, he and Logan "were barely on speaking terms" by trial. (PCR Pet. Ex. L at 2.) Logan visited Morris twice in 2005 after Schaffer left and before the start of jury selection on June 1, 2005. (*See* PCR Pet. Ex. DD at 11.) Craig visited Morris only once in jail and "didn't really have too much involvement with him," despite his role in the mitigation presentation. (PCR Pet. Ex. DD at 8; PFR 13 Ex. 2 at 22.)

The defense noticed nineteen mitigation witnesses on July 20, 2004. (IOR 63.) Thomas worked on a list of mitigation witnesses, and emailed Logan and Craig on April 5, 2005, that she was "putting together a scaled-down list of the most helpful witnesses to call." (PCR Pet. Ex. F at 1.) As a result of scaling down the list, the defense failed to call several witnesses who could have offered helpful mitigating evidence. The defense ultimately called six witnesses and played recorded statements from four additional people. None were expert witnesses.

### b. Penalty-phase presentation.

The defense's intention at the penalty phase was to present Morris as a sad person who deserved pity. (Tr. Mar. 18, 2015 at 56–57; Tr. Mar. 19, 2015 at 128.) In opening statements, the defense told the jurors that Morris had dreams that were not fulfilled due to circumstances beyond his control. (Tr. July 14, 2005 at 12.) Counsel explained that Morris had a body odor problem and was born into poverty. (Tr. July 14, 2005 at 13–14.) He said Morris was a "respectful, loving, caring individual, but an individual of despair. You see, this is really a case about despair. Despair that has bred loneliness, loneliness that has bred behavior." (Tr. July 14, 2005 at 14.) He explained that in school Morris was daily "termed the big, fat, ugly, smelly kid," and that this "took a heavy toll" and shaped his personality. (Tr. July 14, 2005 at 16–19.) The prosecutor countered that any weight gain, poverty, body odor, and despair were Morris's own fault. (Tr. July 14, 2005 at 21–23.) As the Arizona Supreme Court put it on direct appeal, the defense then put on mitigation witnesses to testify as to "responsibilities placed on [Morris] at a young age; his

1   problems with his appearance and hygiene, particularly his problems with body
2   odor; his desire to improve himself; and his good work record." *State v. Morris*, 160
3   P.3d 203, 211 (Ariz. 2007). For example, his sister, Candace, testified that Morris
4   took care of her and Brandon while they were growing up. (Tr. July 18, 2005 at 36–
5   40.) And Morris's mother, Wilma, testified that she depended on Morris from a
6   young age to watch Brandon and Candace. (Tr. July 18, 2005 at 58–60.) In rebuttal,
7   the State called Detective Meislish to testify about Morris's 2002 felony conviction
8   stemming from his stealing $600.00 from his employer, Goodwill. (Tr. July 18,
9   2005 at 87.)

10   Morris told Logan that he wished to make a statement to the jury at the
11   penalty phase to tell them in part that he did not engage in postmortem sex with any
12   of the victims. (PCR Pet. Ex. L at 1.) According to Morris, "Jim Logan told me not
13   to testify at trial because the jury would not believe me." (PCR Pet. Ex. L at 2.)
14   Logan had Schaffer talk to Morris and convince him not to talk to the jury even
15   though she was no longer on the case. (PCR Pet. Ex. A at 11–15.) Morris declared
16   that "Maria Schaffer told me that Jim Logan had sent her to tell me not to make a
17   statement to the jury because anything I said was not believable and would make
18   him look bad." (PCR Pet. Ex. L at 2.) According to jail visitation logs, after the
19   guilt-phase verdicts, counsel did not meet with Morris in jail even once. (*See* PCR
20   Pet. Ex. DD.) Morris did not ultimately give a statement to the jury.

21   In closing, Craig argued that Morris grew up in an impoverished yet "loving,
22   stable environment," but that "stress permeated the air" because he had to assume
23   a lot of responsibility at a young age. (Tr. July 18, 2005 at 99–100, 106.) He added
24   that Morris's hygiene problem, weight gain, and experience as the butt of cruel
25   jokes caused him to fall into despair, which bred loneliness. (Tr. July 18, 2005 at
26   101–04, 106–08.) He argued:

27   But a person that came from a loving, stable environment
     such as Cory, who demonstrated so many wonderful
28

138

1
2
3
4
5
6
7

> factors, like responsibility, caring for his brothers and sisters, taking on a job inside and outside of the home, trying to assimilate in school, joining the ROTC, having hopes and dreams of becoming an Army personnel some day. A person such as that who had these hopes and dreams but somehow internalized things that happened to him. That's really the ultimate question to him, isn't it? What happened to Cory Morris? . . . [T]hese are things we want you to consider in assessing how this person got to this point.

8

(Tr. July 18, 2005 at 100–01.)

9   In the prosecutor's closing, he said that nobody really testified that Morris

10  was lonely and in despair, and this was just argument by the defense counsel that

11  was not supported by expert or lay testimony. (Tr. July 18, 2005 at 112–13.) He

12  blamed Morris's odor problem on his lack of bathing and on "living with a cadaver

13  that was rotting." (Tr. July 18, 2005 at 119–22.) The prosecutor suggested that

14  Morris did not realize he was the butt of jokes in high school because the testimony

15  was that he was called Teddy and was everyone's friend. (Tr. July 18, 2005 at 122.)

16  He told the jurors there were no mitigating circumstances and that the only

17  appropriate verdict was death. (Tr. July 18, 2005 at 128–30.)

18
19

### c. Mitigation evidence produced during post-conviction proceedings.

20  During post-conviction proceedings, Morris presented the court with much

21  more mitigation evidence that trial counsel should have discovered and presented.

22  First, post-conviction counsel completed testing trial counsel had abandoned.

23  Dr. Joseph Wu conducted a PET scan and DTI scan on Morris. (PCR Pet. Ex. M(J);

24  PCR Pet. Ex. N at 16.) The PET scan showed "a pattern of hypofrontality with

25  decreases in frontal cortex relative to lateral occipital cortex. There are

26  asymmetrical decreases in left temporal cortex relative to the right." (PCR Pet. Ex.

27  M(J).) The DTI scan showed a "significant decrease" in Morris's anterior corpus

28  callosum. (PCR Pet. Ex. N at 17.) Wu opined that the pattern he detected and

Morris's history—including his head injuries—were "consistent with a dual diagnosis of brain injury from head traumas and/or schizoaffective disorder." (PCR Pet. Ex. N at 2.) Wu further opined that the result of a difference in the right and left temporal cortexes was consistent with neuropsychological testing that showed differences in processing speed compared to verbal comprehension as well as differences in perceptual reasoning as compared to verbal comprehension. These neuropsychological findings were "consistent with cognitive slowing secondary to traumatic brain injury" and "the PET scan finding which shows an asymmetrical decrease in the left temporal cortex relative to the right," respectively. (PCR Pet. Ex. N at 2.) Finally, Wu explained that the frontal and temporal lobes regulate aggression:

> Inability to control aggressive impulses is much more likely if a patient has abnormally functioning frontal and/or temporal lobes. Frontal lobe injury is characterized by symptoms such as over-reactivity and disproportionate responses. Brain damage of that nature reduces the ability of an individual to control impulsive violent urges. A history of being abused with this type of brain damage produces a negative synergistic effect so that a person has a higher likelihood of acting on these aggressive impulses. A history of being abused or emotionally neglected can adversely interact with brain dysfunction to create a negatively synergistic situation with a greater likelihood of violent behavior.

(PCR Pet. Ex. N at 4–5.) These results provide key context for Morris's actions, and would have been compelling to a jury that was given essentially no explanation for why Morris committed these crimes.

Morris also presented declarations from friends and family members. (PCR Pet. Exs. M(D)(2)–M(D)(32).) His post-conviction mitigation specialist, Maria De La Rosa, submitted an affidavit outlining the mitigation investigation she had completed. (PCR Pet. Ex. M(A).) These materials revealed, for example,[40] that

---

[40] The details of Morris's life are more fully outlined *supra* in Section I.A. To avoid repetition, Morris incorporates that section into this claim.

Morris had a familial history of mental illness and substance abuse and that Morris was exposed to drug use at a young age. (PCR Pet. Ex. M(D)(2) at 1; PCR Pet. Ex. M(D)(5) at 1; PCR Pet. Ex. M(D)(11) at 1; PCR Pet. Ex. M(D)(27) at 1; PCR Pet. Ex. M(D)(30) at 1.) Morris's grandmother "whipped" her children and at least some of her grandchildren with "anything she could find," including "belts, hangers, electrical cords, and tree branches," and Morris's mother, Wilma, did the same with her children. (PCR Pet. Ex. M(D)(3) at 1; PCR Pet. Ex. M(D)(8) at 1; PCR Pet. Ex. M(D)(11) at 1–2; PCR Pet. Ex. M(D)(16) at 1; PCR Pet. Ex. M(D)(30) at 1; PCR Pet. Ex. M(D)(31) at 1; *see also* PCR Pet. Ex. T at 9.) Growing up, Morris was raised in a poor community where there was gang and other criminal activity. (PCR Pet. Ex. M(D)(19) at 1; PCR Pet. Ex. M(D)(28) at 1; PCR Pet. Ex. M(D)(31) at 1.) Then, he moved to live with his father in Austin, Texas, during his junior year of high school. His father's home, shared with Morris's stepmother, was volatile. Morris's father took the money Morris had earned at his job at Sonic, misleadingly telling Morris that it was being put in a bank account. (PCR Pet. Ex. M(D)(31) at 2; *see also* PCR Pet. Ex. T at 3, 14.) Morris was enrolled in the Army Reserves while he lived in Austin, Texas, but could not proceed to basic training because of his struggles with his weight, resulting in his enrollment agreement being terminated. (PCR Pet. Ex. M(C); *see also* PCR Pet. Ex. T at 7.) When Morris subsequently moved to Phoenix, he lived with his aunt and uncle, but his uncle was abusive and addicted to crack cocaine. (PCR Pet. Ex. M(D)(7) at 1; PCR Pet. Ex. M(D)(11) at 2; PCR Pet. Ex. M(D)(18) at 1; PCR Pet. Ex. M(D)(27) at 1.) His uncle sexually abused over several years Evette Morris, Morris's cousin who lived with the Willises. (PCR Pet. Ex. M(D)(5) at 1.) Morris was homeless for a time while he lived in Phoenix when his aunt and uncle kicked him out of their house. (PCR Pet. Ex. M(D)(18) at 1; *see also* PCR Pet. Ex. T at 3.) He later moved into the RV in his aunt and uncle's yard, where there was no toilet or running water. (PCR Pet. Ex. T. at 4.) De La Rosa concluded that several unpresented mitigating circumstances were

1   supported by her investigation. (PCR Pet. Ex. M(A) at 8–9.)

2   Amy Nguyen, a Geographic Information Systems Analyst, mapped Morris's

3   childhood neighborhoods using census, community, and demographic data. (PCR

4   Pet. Ex. CC at 1.) As a young child, Morris lived with his family in an almost

5   exclusively African American neighborhood where families with single mothers

6   comprised 76.81% of the community, the poverty rate was 41.56% compared to the

7   county's average of 11.81%, and 27.52% of the adults had less than a ninth grade

8   education. (PCR Pet. Ex. CC at 2.) In 1987, Morris and his family moved to a

9   neighborhood that was only 5.25% African American, compared to the 95.05% of

10  their previous neighborhood. This percentage would rise to 15.28% by 1990. In this

11  new neighborhood, "the average number of single mothers" was 20.59%, almost

12  twice the county's average. (PCR Pet. Ex. CC at 2.) The poverty rate was more than

13  three times the county's average, and 39.51% of adults over twenty-five had less

14  than a ninth grade education. The percentage of families with single mothers and

15  the poverty rate increased by 1990. In the neighborhood, 81.57% of African

16  Americans were in poverty. (PCR Pet. Ex. CC at 2.) Nguyen concluded that

17  "Mr. Morris's childhood was marked by patterns of poverty, lack of male role

18  models and under education in his home communities." (PCR Pet. Ex. CC at 2.)

19  Dr. Becker further explained that Morris shouldered a great deal of

20  responsibility in the home growing up, and that "[t]his is a lot of responsibility for

21  a young person and in many ways having that responsibility deprives a child of the

22  opportunity to engage in social interactional behaviors with their peer group." (PCR

23  Pet. Ex. T at 18.) She further explained that Morris's "lack of appropriate

24  developmental social experiences," body odor, and struggles with weight "placed

25  Mr. Morris as an adolescent at a risk, both physically and psychologically for

26  teasing, bullying and other negative interactions." (PCR Pet. Ex. T at 18–19.) She

27  determined that "[i]n many ways Mr. Morris' life can be seen as bleak and

28  desolate[.]" (PCR Pet. Ex. T at 19.) Finally, she noted that Morris "is generally

nonviolent, [and] the nickname people had for him was 'Teddy Bear' because he was seen as being gentle and helpful to people, even if it was to his own disadvantage. . . . [I]f Mr. Morris continues to be incarcerated he will not pose a risk for misconduct[.]" (PCR Pet. Ex. T at 20.) This final conclusion mirrored that of another expert retained during post-conviction proceedings, Dr. James Sullivan, who opined that "[d]efendants with similar profiles to Mr. Morris report relatively few antisocial traits and behaviors. Defendants with such profiles have been shown to have low rates of institutional misconduct when compared with other institutionalized individuals." (PCR Pet. Ex. V at 2.) All of this evidence could have been presented at Morris's trial.

> **2.     The state court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law. It was further based on unreasonable factual determinations based on the record before it.**

As an initial matter, the post-conviction court treated Morris's claim of ineffective assistance of counsel at the penalty stage as multiple, distinct claims and did not examine the cumulative effect of the various instances of counsel's deficient performance. (*See* ROA 354 at 4–8.) But "[i]n making this [prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695; *see also Williams (Terry)*, 529 U.S. at 397–98; *Martin v. Grosshans*, 424 F.3d 588, 590–92 (7th Cir. 2005) ("[E]ven if [trial counsel's] errors, in isolation, were not sufficiently prejudicial, their cumulative effect prejudiced Martin's defense."); *Alcala*, 334 F.3d at 882–83 (granting relief on basis of cumulative impact of multiple errors by counsel); *Lindstadt v. Keane*, 239 F.3d 191, 194, 205 (2d Cir. 2001) (granting relief where petitioner was prejudiced by cumulative effect of errors committed by trial counsel); *Harris by and through Ramseyer*, 64 F.3d at 1439 (holding that the cumulative impact of numerous deficiencies in defense counsel's performance was prejudicial to the defense, rendering the proceedings

improper and warranting habeas relief). The Supreme Court did not instruct that each individual error should be reviewed for prejudice, but rather that the totality of the errors by counsel should be reviewed collectively for prejudice. In fact, *Strickland* established that assessing prejudice resulting from a claim of ineffective assistance of counsel is identical to assessing materiality for a suppression-of-evidence claim under *United States v. Agurs*, 427 U.S. 97, 104, 112–13 (1976). *Strickland*, 466 U.S. at 694. And the Supreme Court has continually explained that when assessing materiality, the suppressed evidence must be "considered collectively, not item by item." *Kyles v. Whitley*, 514 U.S. 419, 436 (1995). Accordingly, "[s]eparate errors by counsel at trial and at sentencing should be analyzed together to see whether their cumulative effect deprived the defendant of his right to effective assistance." *Sanders v. Ryder*, 342 F.3d 991, 1001 (9th Cir. 2003). "They are, in other words, not separate claims, but rather different aspects of a single claim of ineffective assistance of trial counsel." *Id.* Even if prejudice does not result from an individual error, it may nevertheless result from cumulative errors. *See Boyde*, 404 F.3d at 1176.

The state court's prejudice analysis was therefore contrary to, or involved an unreasonable application of, the Supreme Court's dictates as to how the prejudice inquiry must be undertaken because the court broke this claim apart and looked at pieces in isolation. Even if the state court's approach to this claim were appropriate, the court's rejection of the individual parts of the claim is not entitled to deference under § 2254(d), as outlined below.

> ### a. Counsel failed to investigate and present broad mitigation evidence as well as experts to explain the mitigation presentation.

Morris argued that his counsel were ineffective for failing to discover and present significant mitigating evidence from lay witnesses as well as failing to retain an expert to explain the mitigation presentation and the impact the events of

1    Morris's life had on him and his development. (IOR 307 at 34–47.) The court first

2    looked at counsel's failure to call experts at the penalty phase. The court reasoned

3    that counsel tried to call an expert as evidenced by the fact that they had Morris

4    evaluated by three experts, but they were "unable to locate anyone with the

5    appropriate expertise." (IOR 354 at 5, 7.) This finding was an unreasonable factual

6    determination because it is directly contradicted by the record. *See Taylor v.*

7    *Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004), *abrogated on other grounds by*

8    *Murray v. Schriro*, 745 F.3d 984 (9th Cir. 2014). Lanyon referred the team to

9    Becker, who Morris argued in his post-conviction petition his trial counsel should

10   have hired. (IOR 307 at 34–35, 45; PCR Pet. Ex. R at 1.) Becker told the team that

11   she was available and interested in the case, but the defense team failed to retain

12   her. (PCR Pet. Ex. R at 2.) It is therefore untrue that counsel could not locate an

13   appropriate expert. They simply failed to use the one available to them.

14       The state court next mischaracterized Morris's argument in order to deny it.

15   The court reasoned that Morris would not have wanted to call Lanyon or Potts as

16   experts on erotophonophilia, or "lust murder," because their testimony would not

17   be mitigating. (IOR 354 at 6.) But Morris argued that the defense should have

18   investigated further, followed the leads provided by the consulting experts and lay

19   witnesses, and put on evidence such as that conveyed by Becker, Sullivan, and

20   Nguyen during the post-conviction proceedings. (IOR 307 at 35–36, 45.) The issue

21   is not that counsel should have put on experts to testify that he suffered from

22   erotophonophilia.[41] The post-conviction court completely ignored the opinions

23   

----

24   [41] Further, no expert in fact made this diagnosis. Lanyon speculated that Morris "was motivated by the thrill from the women's extreme sexual arousal while choking

25   them" but also acknowledged that this was not his area of expertise. (PCR Pet. Ex. R at 1; PCR Pet. Ex. BB at 1.) Becker noted that "[i]t should be considered that

26   Mr. Morris is sexually aroused by the act of strangling/choking, or what is termed erotophonophilia/lust murder or causing physical suffering to the victims." But she

27   then explained why that diagnosis could not be made, as there was no evidence of prior, similar acts. (PCR Pet. Ex. T at 18.) And the consideration that Morris may

28   have felt pleasure from strangulation would not have been new information

offered by Sullivan and Nguyen, which were exhibits to his petition. (PCR Pet. Ex. V; PCR Pet. Ex. CC.) Doing so was an unreasonable determination of the facts because the court did not "consider key aspects of the record." *Taylor*, 366 F.3d at 1008.

The court did acknowledge Becker's opinion, but in discounting it both made unreasonable factual determinations and unreasonably applied clearly established federal law. The court pointed to perceived negative information in Becker's report as a reason counsel was not deficient in failing to retain her. (IOR 354 at 6–7.) But any pieces of information the court pulled out from Becker's report as a reason that her opinion may not have been fully mitigating cannot be an answer to the failure to investigate. Counsel did not know what Becker would say when they failed to consult with her. And any determination that it would have been a reasonable strategy to not consult with a specialist is an unreasonable application of clearly established federal law because counsel cannot halt investigation in the service of an already decided upon strategy when the record showed the need to investigate further. *See Wiggins*, 539 U.S. at 521–22; *Strickland*, 466 U.S. at 691; *Weeden*, 854 F.3d at 1070. Moreover, that potentially "adverse evidence" is uncovered with mitigating evidence does not mean counsel did not perform deficiently in failing to investigate and present expert testimony that was overwhelmingly beneficial. *See Sears v. Upton*, 561 U.S. 945, 951 (2010) (per curiam); *Williams (Terry)*, 529 U.S. at 396; *cf. Porter v. McCollum*, 558 U.S. 30, 43 (2009) ("It is also unreasonable to conclude that Porter's military service would be reduced to 'inconsequential proportions,' simply because the jury would also have learned that Porter went AWOL on more than one occasion." (internal citation omitted)). It was an unreasonable application of this precedent to discount the mitigating aspects of

---

introduced to the jurors by experts, as at this point in the trial they had already convicted him on the prosecution's theory that Morris strangled the victims during sex. *See Correll v. Ryan*, 539 F.3d 938, 955 (9th Cir. 2008).

1   Becker's opinion, and the context to the other mitigation she could have provided,

2   simply because she offered a few stray comments that the post-conviction court

3   thought were not fully mitigating.

4        Finally, the court reasoned that because the experts did not give a mitigating

5   explanation for the murders, counsel did not perform deficiently in failing to present

6   them. (IOR 354 at 7.) But testimony does not have to have a causal nexus to the

7   crime in order to be mitigating. *See Eddings*, 455 U.S. at 114; *McKinney v. Ryan*,

8   813 F.3d 798, 804 (9th Cir. 2015) (en banc). Finding otherwise was contrary to, or

9   an unreasonable application of, clearly established Supreme Court precedent.

10       The post-conviction court next addressed the aspect of Morris's claim that

11  concerned the failure to call lay witnesses and to put on all areas of potential

12  mitigation. The court found that counsel had not performed deficiently in this aspect

13  of the claim either because "counsel need not 'scour the globe on the off-chance

14  something will turn up; reasonably diligent counsel may draw a line when they have

15  good reason to think further investigation would be a waste." (IOR 354 at 7 (citing

16  *Rompilla*, 545 U.S. at 383).) But in the same paragraph, the court acknowledged

17  that the trial team had interviewed thirty-seven people, and the majority of these

18  witnesses were the very same who possessed the mitigating evidence Morris

19  presented during post-conviction. It therefore was not the case that counsel would

20  have had to "scour the globe" to find this information, but that counsel failed to

21  utilize the resources available to them and effectively prepare for the penalty phase

22  of trial. The post-conviction court's finding to the contrary was an unreasonable

23  application of clearly established federal law and based on an unreasonable

24  determination of the facts.

25       The state court next reasoned that "[m]uch of the evidence defendant now

26  proffers is cumulative of the mitigation he presented." (IOR 354 at 7.) The court

27  cited the Arizona Supreme Court's description of counsel's mitigation presentation

28  at trial, that it related "to long-standing problems with his appearance and hygiene,

1  the responsibilities placed on him at a young age, his desire to improve himself, and
2  his good work record." (IOR 354 at 7 (citing *Morris*, 160 P.3d. at 220).) But Morris
3  presented far more areas of mitigation during post-conviction, as outlined above.
4  No evidence was put on at trial of, for example, Morris's familial history of mental
5  illness and substance abuse, the physical abuse he experienced as a child, or the
6  volatility of Morris's life in Austin and Phoenix. The court ignored this evidence,
7  and failure to consider evidence in the record is an unreasonable determination of
8  the facts under § 2254(d)(2). *See Taylor*, 366 F.3d at 1008 (citing *Miller-El v.*
9  *Cockrell*, 537 U.S. 322, 346 (2003)).

10      Further, even though some mitigating evidence offered during
11  post-conviction touches on the same general categories of mitigation as presented
12  at trial, the breadth and depth of the new mitigation as compared to that presented
13  at trial cannot be ignored. Counsel's duty is not "discharged merely by conducting
14  a limited investigation of these issues or by providing the sentencing court with a
15  cursory or 'abbreviated' presentation of potentially mitigating factors." *Lambright*,
16  490 F.3d at 1120; *see also Wiggins*, 539 U.S. at 524 (finding deficient performance
17  where "counsel abandoned their investigation of petitioner's background after
18  having acquired only rudimentary knowledge of his history from a narrow set of
19  sources"); *Douglas v. Woodford*, 316 F.3d 1079, 1090 (9th Cir. 2003) (finding
20  ineffective assistance where trial counsel "introduced some of [the defendant's]
21  social history, [but] did so in a cursory manner that was not particularly useful or
22  compelling"). Therefore it was an unreasonable application of clearly established
23  federal law to find that counsel did not perform deficiently because they put on
24  some mitigation evidence, even if superficial.

25      The court finally discounted Morris's argument that counsel should have put
26  on accurate evidence of his military record specifically based on the unreasonable
27  factual finding that there "was no record to support" military service beyond
28  Morris's participation in ROTC, which was presented at trial. (IOR 354 at 7.) But

1    Morris enlisted in the Army Reserves while in Austin, and those records were
2    before the court. (PCR Pet. Ex. M(C).) This finding therefore ignored evidence in
3    the record.

4        The post-conviction court made several unreasonable factual determinations
5    and unreasonably applied clearly established federal law in denying this aspect of
6    Morris's broader claim.

7               **b. Counsel failed to investigate and present evidence of**
8                    **brain damage specifically.**

9        In addressing Morris's contention that trial counsel was ineffective
10   specifically for failing to investigate and present evidence of brain damage, the
11   post-conviction court assumed without deciding that trial counsel's performance
12   was deficient but then found that Morris had not shown prejudice. (IOR 354 at 4.)
13   This determination was an unreasonable application of clearly established law and
14   an unreasonable determination of the facts. The post-conviction court first reasoned
15   that because Morris said that the strangulation was a consensual sexual act and the
16   victims' deaths were accidental and because "[t]here was no evidence that he had
17   been violent or unable to control his aggressive impulses in the past," the
18   neurological evidence "would have conflicted with the mitigation presented."
19   (IOR 354 at 4.) This was unreasonable for several reasons.

20       As an initial matter, the court's finding was based on an unreasonable
21   determination of the facts because it relied on Morris's second statement to the
22   police. But Morris did not testify at any stage of the trial, and the defense's theory
23   rested on Morris's first story to police—that the victims died of drug overdoses.
24   (*See* Tr. July 5, 2005 at 101–04.) Morris did not argue at trial that the deaths were
25   the result of consensual strangulation. Moreover, the jury had necessarily rejected
26   both of Morris's statements to the police in finding him guilty of premeditated,
27   first-degree murder. In convicting Morris, the jury had already found that he acted
28   aggressively. The determination that Morris was not prejudiced by failing to find

and present available evidence that would have explained aggression at the penalty phase because his aggression was not at issue was therefore based on an unreasonable determination of the facts.

More fundamentally, the post-conviction court could not reason away prejudice by relying on the mitigation theory presented after it assumed deficient performance. Morris's claim was that his counsel failed to investigate and present evidence of brain damage. The fact that this evidence would have conflicted with a mitigation story put on after a less than complete mitigation investigation is no answer. As the Supreme Court has explained, "that a theory might be reasonable, in the abstract, does not obviate the need to analyze whether counsel's failure to conduct an adequate mitigation investigation before arriving at this particular theory prejudiced" the petitioner. *Sears*, 561 U.S. at 953. In *Sears*, the state court had found that counsel performed deficiently but that there was no prejudice. In finding that the state court had misapplied *Strickland*, the Court explained that "any finding with respect to the reasonableness of the mitigation theory counsel utilized . . . is in tension with the trial court's unambiguous finding that counsel's investigation was itself so unreasonable as to be facially unconstitutional." *Id.* at 953–54. Although the court here did not find that counsel was deficient, instead assuming so, the analytical problem is the same. Finding that there was no prejudice from what was assumed to be a deficient investigation because the unpresented evidence conflicted with the presented evidence is the reasoning explicitly rejected by the Supreme Court in *Sears* and therefore was contrary to *Strickland*.

Finally, the basic premise of the post-conviction court's finding is based on an unreasonable determination of the facts because the neurological evidence did not conflict with the mitigation theory the defense put on. *See Bemore v. Chappell*, 788 F.3d 1151, 1173 (9th Cir. 2015) ("[W]hile it may have been strategically defensible upon a reasonably thorough investigation to rely on good character evidence in addition to mental health evidence, the two sentencing strategies are

not necessarily mutually exclusive." (internal quotation marks and emphasis omitted) (citing *Wiggins*, 539 U.S. at 535)). The mitigation witnesses testified to Morris's behaviors and disposition as a child and teenager when he lived in Oklahoma. None of the witnesses were with Morris when he lived in Phoenix, and the crimes occurred years after the mitigation witnesses had frequent contact with Morris. The defense's mitigation theme was that Morris was a responsible and caring child who was made fun of because of his body odor and appearance and was forced to raise his siblings because of his absent mother. (*See, e.g.*, Tr. July 14, 2005 at 46–47; Tr. July 18, 2005 at 4–5, 38, 49, 57–59, 63.) The defense then argued that there was a disconnect between this image of Morris and what he was convicted of: "That's really the ultimate question to him, isn't it? What happened to Cory Morris? . . . [T]hese are things we want you to consider in assessing how this person got to this point." (Tr. July 18, 2005 at 100–01.) Wu could have provided that missing link. He explained that Morris's "deterioration in function with his ending up homeless is consistent with persistent cognitive and emotional sequela due to prior head injury." (PCR Pet. Ex. N at 2.) Wu further explained that a "history of being abused or emotionally neglected can adversely interact with brain dysfunction to create a negatively synergistic situation" and that Morris "has had a history of having a mother who did not provide a stable and nurturing home." (PCR Pet. Ex. N at 5.) The evidence of brain damage that counsel failed to present therefore would have explained that missing link counsel argued was crucial to understanding Morris.

The post-conviction court next reasoned that because of the "nature and strength of the aggravating factors," Morris could not show prejudice. (IOR 354 at 4.) But "heinous crimes [do not] make mitigating evidence irrelevant." *Smith*, 189 F.3d at 1013; *see Mayfield v. Woodford*, 270 F.3d 915, 929 (9th Cir. 2001) (reversing death sentence because of ineffective assistance despite strong aggravating evidence). And the post-conviction court failed to recognize that the

1   defense put on no expert testimony at the penalty phase—or any phase, for that
2   matter—and that a mitigation presentation that included an expert testifying about
3   Morris's brain damage would have been significantly stronger than the lay
4   testimony that was presented. *See Caro v. Woodford*, 280 F.3d 1247, 1257 (9th Cir.
5   2002). The Supreme Court has repeatedly recognized the importance and uniquely
6   compelling nature of evidence of brain damage in finding prejudice. *See Sears*, 561
7   U.S. at 949, 956; *Porter*, 558 U.S. at 36, 41; *Rompilla*, 545 U.S. at 392–93. It was
8   an unreasonable application of this precedent for the post-conviction court to find
9   that there was no reasonable probability that one juror, after being provided with
10  evidence of Morris's brain damage and its effect on his functioning, would have
11  weighed the aggravation and mitigation differently.

12                    **c. Counsel failed to communicate with Morris.**

13       Morris argued that trial counsel failed to effectively communicate with him,
14  resulting in him not addressing the jury during the penalty phase and directly
15  denying the inflammatory charge of necrophilia. (IOR 307 at 45–47.) The
16  post-conviction court in denying this claim reasoned that because members of the
17  defense team visited Morris in jail before trial, they had adequate communication
18  and that Morris could have consulted further with counsel in the courtroom during
19  trial. (IOR 354 at 8.) The court's performance finding was based on an unreasonable
20  determination of the facts. After Schaffer left the case, Logan and Craig rarely
21  visited Morris in jail. (*See* PCR Pet. Ex. DD.) This is especially egregious on the
22  part of Craig, as he was tasked with the penalty-phase preparation and had not
23  previously had an opportunity to develop a relationship with Morris. "Adequate
24  consultation between attorney and client is an essential element of competent
25  representation of a criminal defendant." *United States v. Tucker*, 716 F.2d 576, 581
26  (9th Cir. 1983); *see also Summerlin*, 427 F.3d at 630–31; *Turner v. Duncan*, 158
27  F.3d 449, 457 (9th Cir. 1998); 2003 ABA Guidelines § 10.5. And any real
28  conversation about the right to allocution, what it entails, and what should be said

1  could not have occurred in the courtroom. The court further found that Morris could

2  not show prejudice but in so doing failed to recognize the pervasive and unrebutted

3  discussion of necrophilia, as discussed *supra* in Claim Two, a theory Morris would

4  have denied.

5            **d.  Counsel made investigative decisions based on cost.**

6            In his post-conviction petition, Morris argued that counsel was ineffective

7  for making decisions about what experts to pursue based on cost considerations.

8  (IOR 307 at 2–3.) The post-conviction court simply quibbled with the amount of

9  money that had been spent on Morris's defense. (IOR 354 at 4.) This finding did

10 not address the importance of the questions about funding—whatever the ultimate

11 amount—and that counsel can be ineffective for failing to retain necessary experts

12 based on funding concerns. *See Hinton v. Alabama*, 134 S. Ct 1081, 1088 (2014);

13 *Harrington v. Richter*, 562 U.S. 86, 106 (2011) ("Criminal cases will arise where

14 the only reasonable and available defense strategy requires consultation with

15 experts or introduction of expert evidence."). It was therefore an unreasonable

16 application of clearly established federal law. Here, counsel did not retain necessary

17 experts, and their failure to do so based on funding was ineffective.

18           **e.  Morris is entitled to de novo review of his entire claim.**

19           Morris has therefore satisfied the strictures of § 2254(d) on the basis of the

20 state court record, and this Court must review the merits of his claim de novo.

21 *See Frantz v. Hazey*, 533 F.3d 724, 736 (9th Cir. 2008) (en banc) (stating that once

22 § 2254(d)'s limitation on relief has been satisfied, a federal court conducts a de

23 novo review of the underlying constitutional violation). Morris demonstrates below

24 that he is entitled to relief on the merits.

25           **3.       Counsel performed deficiently.**

26           Counsel failed to sufficiently prepare for the penalty phase of Morris's trial

27 and therefore failed to put on a complete or compelling mitigation presentation.

28 Morris's counsel had an obligation to conduct a thorough investigation of his

background and any mental deficits in preparation for sentencing. In fact, in *Porter v. McCollum*, the Supreme Court described this obligation as "unquestioned" as of the time of Porter's 1988 sentencing. 558 U.S. at 38–39. Further, counsel's duty is not "discharged merely by conducting a limited investigation of these issues or by providing the sentencing court with a cursory or 'abbreviated' presentation of potentially mitigating factors." *Lambright*, 490 F.3d at 1120; *see also Wiggins*, 539 U.S. at 524 (finding deficient performance where "counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources"); *Douglas*, 316 F.3d at 1090 (finding ineffective assistance where trial counsel "introduced some of [the defendant's] social history, [but] did so in a cursory manner that was not particularly useful or compelling"). As the Ninth Circuit has observed, "Only after a thorough investigation can a less than complete presentation of mitigating evidence ever be deemed reasonable, and only to the extent that a reasonable strategy supports such a presentation." *Lambright*, 490 F.3d at 1120. That court has also made clear that "[a]n uninformed strategy is not a reasoned strategy. It is, in fact, no strategy at all." *Correll*, 539 F.3d at 949. Counsel's failures here cannot be excused as the product of a reasoned decision made after a thorough investigation.

Counsel acknowledged that in Morris's case, the mitigation presentation was essential. (*See, e.g.*, Tr. Mar. 19, 2015 at 61.) In their investigation and preparation, however, there are many instances of them failing to follow up on important leads. Perhaps most egregious is the failure to fully investigate evidence of Morris's brain damage. From early in the case, the defense team had reason to suspect Morris suffered from brain damage. If "counsel is on notice that his client may be mentally impaired, counsel's failure to investigate his client's mental condition as a mitigating factor in a penalty phase hearing, without a supporting strategic reason, constitutes deficient performance." *Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995); *see also Lambright*, 490 F.3d at 1117; *Stankewitz*, 365 F.3d at 719–20;

*Douglas v. Woodford*, 316 F.3d at 1088–89. Here there were more than "tantalizing indications in the record . . . that would lead a reasonable attorney to investigate further." *Stankewitz*, 365 F.3d at 719–20 (internal quotation marks and citation omitted). Not only did counsel have knowledge that Morris suffered multiple adolescent head injuries, they were explicitly told that by their experts that they could not determine the source of Morris's perceived deficits and that further testing was required.

At the post-conviction hearing, Logan testified that he would consider getting an MRI done on a client when an expert suggests one because he does not "know enough medicine to know when an MRI is a good thing, a bad thing or a waste of money." (Tr. Mar. 19, 2015 at 106–07.) He did not recall why he did not get the testing done in Morris's case, but was "sure" that his decision was based on Lanyon's and Tamm's findings because "[t]hese are medical tests that medical doctors needed to prescribe, number one, and were expensive and both of the experts that we had that had examined Mr. Morris said essentially they're not going to show you anything and they expected them to be perfectly normal." (Tr. Mar. 19, 2015 at 112–13.) Thomas, on the other hand, testified that Lanyon had told the team that an MRI and EEG to examine Morris's brain were necessary; Lanyon did not say that Morris did not suffer from brain damage but that more testing was needed. (Tr. Mar. 24, 2015 at 55.) As to Tamm, Thomas testified that "he took to heart [Morris's] self report. . . . [M]y sense of Dr. Tamm was that he had not worked with this population very much. . . . Mr. Morris was so concerned about presenting in a normal fashion, and he even minimized three traumatic events, two which rendered him unconscious." (Tr. Mar. 24, 2015 at 56.) She concluded that she thought that further testing was "[a]bsolutely" needed based on the recommendations and recognized limitations of Lanyon and Potts. (Tr. Mar. 24, 2015 at 57–58.) Lanyon and Potts both recommended an MRI, and ignoring the recommendations of these experts because of Tamm would have been unreasonable. Potts evaluated Morris

1    after Tamm. (*See* PCR Hr'g Ex. 5 at 000066.) He recommended an MRI and EEG

2    despite Tamm's suggestion that they might not reveal any deficits, saying there

3    were "profound forensic reasons" to do so. (PCR Hr'g Ex. 5 at 000066.) Lanyon

4    had also strongly suggested such testing.

5           At the time of Morris's trial, the importance of evidence of brain damage and

6    the duty to investigate were both well established. *See, e.g.*, *Bean v. Calderon*, 163

7    F.3d 1073, 1080 (9th Cir. 1998) (explaining that duty to investigate, perform

8    recommended testing by experts, and provide experts with necessary information

9    "were not alien concepts in 1981, but were an integral thread in the fabric of

10   constitutionally effective representation" and that the court had "previously

11   recognized an attorney's duty to investigate and present mitigating evidence of

12   mental impairment in the context of a 1979 capital sentencing hearing"). And the

13   ABA Guidelines advised that counsel has a "duty to investigate issues bearing upon

14   penalty and to seek information that supports mitigation[.]" 2003 ABA Guidelines

15   § 10.11(A). The defense team knew that this case would hinge on the mitigation

16   presentation, and it therefore was deficient to fail to follow the leads provided to

17   counsel about Morris's head injuries as well as the express recommendations of two

18   defense experts and to cease an investigation into brain damage. *See Smith v.

19   Stewart*, 189 F.3d 1004, 1012 (9th Cir. 1999) (explaining that petitioner was

20   convicted of two murders and "the presence of the other murder, Smith's prior rape

21   convictions, and heinous nature of the crimes established aggravating

22   circumstances. It was therefore 'critical' under this scheme and in Smith's particular

23   circumstances that counsel attempt to investigate and present the strongest possible

24   case for mitigation").

25          Beyond failing to follow the recommendation of their experts to secure brain

26   imaging, trial counsel failed to retain and present any experts. Upon information

27   and belief, counsel failed to investigate and present evidence that Morris suffered

28   from a mental illness, such as psychosis or delusions; a physical illness such as a

genetic disorder, thyroid disorder, or hormonal imbalance; or the effects of trauma. Such evidence would have impacted, for example, Morris's judgment, ability to form relationships, ability to regulate his behavior, disinhibition, and thought process at the time of the crimes. Evidence of delusions also would have combatted the oft-repeated charge that Morris lied frequently. This type of evidence is essential in giving context to Morris's life experiences and actions and thus in humanizing him. As Thomas put it at the post-conviction hearing, "the Mr. Morris who took women back to his trailer is going to be well represented by the prosecution. And my job is to offset that with real, true, facts, [] to explain how he got to that point." (Tr. Mar. 24, 2015 at 70.) Counsel had a duty to investigate, develop, and present this "classic" mitigating evidence. *See, e.g.*, *Wiggins*, 539 U.S. at 534–35.

Further, counsel did not develop or present expert evidence to explain the mitigation profile that they had developed. An expert was needed to explain the risk factors Morris was exposed to growing up as well as protective factors in his life and the effect the combination would have had on Morris. In other words, an expert was needed to explain the effect on Morris of evidence introduced through lay witnesses and why it should be weighed in mitigation. *See, e.g.*, Scott E. Sundby, *The Jury as Critic: An Empirical Look at how Capital Juries Perceive Expert and Lay Testimony*, 83 Va. L. Rev. 1109, 1163 (1997) ("Because each category of testimony [lay and expert] has its intrinsic strengths and weaknesses, the most successful defense cases tended to use a combination of different types of testimony to create a coherent defense theme."). For example, Becker ultimately was able to give context to Morris's experiences and explain how they shaped him. Although Lanyon specifically recommended Becker, and Thomas reached out to her and discovered she was available and willing to assist, counsel did not hire her. (PCR Pet. Ex. R at 2.) Becker explained in post-conviction that the amount of responsibility that was placed on Morris from a very young age by his mother— including caring for his siblings, cooking, and cleaning—deprived him of "the

opportunity to engage in social interactional behaviors" with his peers. (PCR Pet. Ex. T at 18.) He was effectively deprived of a childhood. Further, his struggles with weight, appearance, and body odor put him at risk for "bullying and other negative peer interactions." (PCR Pet. Ex. T at 18.) Similarly, Nguyen could have explained, based on data, the environment Morris grew up in and the features of his neighborhood. (PCR Pet. Ex. CC.) This would have supported the argument that Morris grew up in poverty, and that this was not a personal failing as the prosecutor argued (Tr. July 14, 2005 at 21–22), but instead a feature of his broader community. This also would have given further context to the series of stressors Morris was exposed to in his formative years, as he was effectively raising his siblings in a poor and at times dangerous neighborhood, all the while fearing the repercussions and abuse from his mother if he took any misstep in his duties. Counsel put on evidence of Morris's childhood responsibilities, poverty, struggles with appearance and odor, and mistreatment by peers, but an expert was needed to explain why these events were formative and important. *See Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999) (finding prejudice even when extensive mitigating evidence presented because its importance was not adequately explained). Without expert testimony, the prosecutor was able to dismiss Morris's life experiences as run of the mill and non-mitigating.

There is no notation in the record offering why counsel stopped looking for mitigating expert evidence. Counsel has a duty to investigate mitigating evidence, including that available through experts, and cessation of investigation must be based on "a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691; 2003 ABA Guidelines § 10.11(A), (F). To the extent counsel failed to retain experts based on funding concerns, as is suggested by the record, that would constitute ineffective assistance. *See Hinton*, 134 S. Ct. at 1088; *Harrington*, 562 U.S. at 106 ("Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of

expert evidence."). At the post-conviction hearing, Logan testified that Becker's rates were reasonable and that her fee would not have been a reason not to hire her. (Tr. Mar. 19, 2015 at 66.) While Logan denied that the team faced funding restrictions, Schaffer and Thomas both testified as to their frustrations and difficulties; Schaffer also testified that Dietz's cost would have been a reason they did not consult with him, and Thomas testified the same as to Malloy. (Tr. Mar. 19, 2015 at 106; Tr. Mar. 24, 2015 at 13, 23, 43, 86–87.) Members of the defense team were under the impression that they could not hire the experts they desired based on funding constraints. The team failed to retain necessary experts, and declining to do so because of cost would not have been a reasonable strategy.

Counsel's failure to secure an expert is made worse by the fact that the lay witness testimony they put on was superficial and unfocused. Instead of the evidence and integrated story presented *supra* in Section I.A., counsel attempted to paint a portrait of Morris as responsible and helpful but burdened by this tremendous responsibility, as well-liked but also bullied, as kind and non-violent but also filled with despair. This disjointed presentation failed to tell the story of Morris's life and decline. Counsel put on no witnesses to testify about, for example, the volatility of Morris's life in Austin and Phoenix, and did not connect the image of who Morris was growing up with who he was as an adult. Counsel asked the jurors to consider what had happened in the interim between his childhood and the time of the crimes, but gave them no answer. (*See, e.g.*, Tr. July 18, 2005 at 100–01.) *Cf. Yarborough v. Gentry*, 540 U.S. 1, 5–6 (2003) ("The right to effective assistance extends to closing arguments. . . . Closing arguments should 'sharpen and clarify the issues for resolution by the trier of fact[.]'" (quoting *Herring v. New York*, 422 U.S. 853, 862 (1975)); *Strickland*, 466 U.S. at 669; 2003 ABA Guideline § 10.10.1, cmt. (requiring counsel to advance integrated defense theory at closing argument).

The presentation counsel put on was further flawed in several more respects.

159

First, the witnesses were not prepped appropriately, and Craig was not prepared to question them. As Thomas explained it, Craig joined the case late and, she testified at the post-conviction hearing that she "remember[ed] just putting in front of him, this is what you can get from Witness A, B, C, D, E. This is what you need . . . he wasn't there much." (Tr. Mar. 24, 2015 at 61.) This lack of preparation and involvement showed in Craig's examinations of the witnesses. For example, Pastor Boone, who had met Morris when he was a pre-teen, testified about a time when Morris and his brother, Brandon, got into a fight and Morris then read a poem in front of the church that moved the congregation to tears and prompted the brothers to make up. (Tr. July 14, 2005 at 92, 97–98.) Brandon, however, testified that Morris "wrote a poem saying that he didn't have a brother, that he hated me because of that incident. And after that, we were just—we talked to the pastor and kind of resolved it." (Tr. July 18, 2005 at 12–13.) Craig did not clarify what appeared to be a discrepancy. Instead, Brandon had misspoken. Morris's comment about not having a brother was said in the heat of the argument, and the poem was about "his brotherly love for Brandon."

As a result of the witnesses' lack of preparation, their words were also easily twisted by the prosecutor. For example, Brandon testified that Morris began taking care of him and Candace when Morris was fifteen, before which their grandmother cared for them. (Tr. July 18, 2005 at 23.) Morris's mother, Wilma, testified that she first began to rely on Morris to care for the home and his siblings when he was nine or ten. (Tr. July 18, 2005 at 58.) During cross-examination, the prosecutor asked a series of questions aimed at undermining the assertion that Morris cared for his siblings at the age of nine, instead suggesting that their grandmother "helped, also." (Tr. July 18, 2005 at 67–72.) Then in closing, the prosecutor argued:

> Nine-year-o1d, he's going to kindergarten to pick up his five-year-old brother—he doesn't have a driver's license—and able to get him home and take care of him. Maybe it was the grandmother that was there to take care of him.

1
2
3
4

> These were things not only that at nine years old, he's cooking on a stove, doing homework for other kids. But wait a minute. It could be when he was in high school they forgot ROTC. They forgot he was in that all these days during the week, so he couldn't have been doing what they said.

5   (Tr. July 18, 2005 at 126.) Defense counsel had failed to clarify his own witnesses'

6   testimony in order to give an accurate account of, in this instance, the extent of

7   Morris's responsibilities growing up.

8   Next, because defense counsel argued that Morris had an exemplary work

9   history (*see, e.g.*, Tr. July 14, 2005 at 16), the prosecution was able to put on rebuttal

10   evidence that Morris had been convicted of stealing from a former employer

11   (Tr. July 18, 2005 at 86–87). Then in closing, the prosecutor argued that Goodwill

12   Industries:

13
14
15
16
17
18

> are the people that serve the poor. These are the people that are out there to help the community. And one of the things that they did, they employed this individual as an assistant store manager. But did they tell you what he did when he was employed in November of 2002 as a store manager? Of course not. They didn't tell you that, because they wanted you to see the whole individual as only they want to present it. They don't want you to see the whole individual as he really is. And in this case this individual does not have an exemplary work history.

19   (Tr. July 18, 2005 at 114.) Defense counsel opened the door to this argument despite

20   filing a pretrial motion to exclude Morris's statement to the police on the subject.

21   (ROA 88.)

22   Finally, leading up to trial, communication between Morris and Logan

23   deteriorated, and Craig visited Morris only once. (PCR Pet. Ex. L at 2; PCR Pet.

24   Ex. DD at 8.) As a result of this poor communication, when Morris told counsel

25   that he wished to allocute during the penalty phase, they sent Schaffer to talk him

26   out of it. (*See* PCR Pet. Ex. A at 11–15.) In Arizona, "[a] criminal defendant has a

27   right to make a statement to the jury before imposition of a death sentence." *State*

28   *v. Anderson*, 111 P.3d 369, 392 (Ariz. 2005); *see also* Ariz. R. Crim. P. 19.1(d)(7).

1    Allocution is a critical part of the sentencing process because it is an opportunity to
2    humanize the defendant and for the defendant to convey to the sentencer the reasons
3    for mercy. *See State v. Hopson*, 543 P.2d 1126, 1128 (Ariz. 1975) (describing
4    allocution as a "constitutional right"); *State v. Fettis*, 664 P.2d 208, 209 (Ariz. 1983)
5    (describing that a "defendant exercising his right of allocution" is one of the
6    "minimum requirements" of sentencing (citing ABA's Standards for Criminal
7    Justice, Standard 18-6.4 (1980))). Moreover, allocution is protected by the Eighth
8    Amendment, which prohibits a State from placing impermissible restrictions on the
9    types of mitigating evidence presented by the defense. *See Lockett v. Ohio*, 438 U.S.
10   586, 604 (1978) ("[T]he Eighth and Fourteenth Amendments require that the
11   sentencer, in all but the rarest kind of capital case, not be precluded from
12   considering, as a mitigating factor, any aspect of a defendant's character or record
13   and any of the circumstances of the offense that the defendant proffers as a basis
14   for a sentence less than death."). Morris's counsel failed to effectively communicate
15   with him and adequately explain allocution and his right to speak to the jury. As a
16   result, Morris did not tell the jury the mitigating fact that he did not have
17   postmortem sex with the victims. As discussed *supra* in Claim Two, the evidence
18   of necrophilia went unrebutted.

19        Counsel's performance in the preparation and presentation of mitigating
20   evidence was woefully deficient. The failure to follow leads and explicit
21   recommendations, to secure any expert testimony, and to put on a complete and
22   coherent mitigation story fell below "an objective standard of reasonableness."
23   *Strickland*, 466 U.S. at 688.

24        **4.    Morris was prejudiced by counsel's deficient performance.**

25        Prejudice is not determined by a court on habeas review through a mere
26   numerical weighing of the aggravation evidence adduced at trial against the
27   mitigation evidence adduced at trial and in post-conviction; the inquiry must
28   include a consideration of the appropriateness of the penalty as applied to an

individual defendant in light of his record and character. The Supreme Court articulated this standard plainly, holding that although the newly-presented mitigation evidence, when combined with that presented to the sentencer at the time of trial, "may not have overcome [the aggravating circumstance], the graphic description of Williams' childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability." *Williams (Terry)*, 529 U.S. at 398 (citing *Boyde v. California*, 494 U.S. 370, 387 (1990)).

This Court must analyze how the mitigation evidence bears on the "development of the person who committed the crime," *Ainsworth v. Woodford*, 268 F.3d 868, 878 (9th Cir. 2001), how it affects "the individualized sentence required by the Constitution," *id.*, and how it "might well have influenced the [sentencer's] appraisal of . . . moral culpability," *Williams*, 529 U.S. at 398. The Court must determine whether there is a reasonable probability that the mitigation evidence now proffered might have made a difference to at least one juror. *See Stankewitz*, 365 F.3d at 718 n.6; *Douglas*, 316 F.3d at 1090.

Here, Morris's counsel failed to investigate, develop, and present robust and available evidence regarding mitigating factors that influenced Morris's development and functioning. This evidence was the type that, if properly presented and argued, could have affected the outcome at sentencing, and had counsel presented the mitigating story here presented in Section I.A., there is a reasonable probability of a different result in the penalty phase. Courts have repeatedly found prejudicial ineffective assistance of counsel where, as here, counsel neglected investigation of a capital defendant's background and mental health. *See, e.g.*, *Stankewitz v. Wong*, 698 F.3d 1163 (9th Cir. 2012); *Robinson v. Schriro*, 595 F.3d 1086 (9th Cir. 2010); *Hamilton v. Ayers*, 583 F.3d 1100 (9th Cir. 2009); *Libberton v. Ryan*, 583 F.3d 1147 (9th Cir. 2009); *Correll v. Ryan*, 539 F.3d 938 (9th Cir. 2008); *Lambright v. Schriro*, 490 F.3d 1103 (9th Cir. 2007); *Frierson v.*

1   *Woodford*, 463 F.3d 982 (9th Cir. 2006); *Daniels v. Woodford*, 428 F.3d 1181 (9th

2   Cir. 2005); *Summerlin v. Schriro*, 427 F.3d 623 (9th Cir. 2005) (en banc); *Boyde v.*

3   *Brown*, 404 F.3d 1159 (9th Cir. 2005); *Jennings v. Woodford*, 290 F.3d 1006 (9th

4   Cir. 2002); *Karis v. Calderon*, 283 F.3d 1117 (9th Cir. 2002); *Caro v. Woodford*,

5   280 F.3d 1247 (9th Cir. 2002); *Ainsworth v. Woodford*, 268 F.3d 868 (9th Cir.

6   2001); *Smith v. Stewart*, 189 F.3d 1004 (9th Cir. 1999); *Seidel v. Merkle*, 146 F.3d

7   750 (9th Cir. 1998). And the Supreme Court has repeatedly recognized the

8   importance and uniquely compelling nature of evidence of brain damage in

9   particular in finding prejudice. *See Sears*, 561 U.S. at 949, 956; *Porter*, 558 U.S. at

10  36, 41; *Rompilla*, 545 U.S. at 392–93. These cases control the analysis in Morris's

11  case as well, especially under a de novo standard of review where the strictures of

12  § 2254(d) do not apply.

13      Morris's Sixth Amendment right to the effective assistance of counsel was

14  violated, and he is entitled to relief.

15  **B.    Trial counsel's failure to object to several instructional errors at**

16  **the penalty phase of Morris's trial constituted ineffective**
    **assistance.**

17      This claim was not raised in state court. Morris alleges he can overcome any

18  default of this claim by showing cause and prejudice, including because of the

19  ineffective assistance of state post-conviction counsel. *See Martinez v. Ryan*, 566

20  U.S. 1, 9 (2012); *Murray v. Carrier*, 477 U.S. 478, 488–89 (1986); *Strickland v.*

21  *Washington*, 466 U.S. 668, 687–88 (1984). Morris will demonstrate at an

22  evidentiary hearing that post-conviction counsel fell below the standards of

23  minimally competent capital attorneys and that those failures prejudiced him.

24  Alternatively, he alleges that any procedural bar is not adequate or independent or

25  that imposing default would be a miscarriage of justice. Because this claim has not

26  been adjudicated by the Arizona state courts, the limitations on relief imposed by

27  28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider

28  the merits of the claim de novo. Morris incorporates by specific reference all facts,

1   allegations, and arguments made elsewhere in this Petition.

2          **1.     Trial counsel failed to object to an instruction that**
3          **incorrectly informed the jury that Morris could be**
           **sentenced to life with the possibility of parole.**

4          The Arizona Legislature abolished parole for those convicted of the most

5   serious felonies in 1994. *See* Ariz. Rev. Stat. § 41-1604.09(I) (1994) (applying

6   parole-eligibility statutes only to one "who commit[s a] felony offense[] before

7   January 1, 1994"). As a result, those convicted of capital murder after 1993 could

8   be sentenced only to life imprisonment without the possibility of parole or to death.

9   The Supreme Court in *Simmons v. South Carolina*, 512 U.S. 154, 162 (1994), held

10  that a defendant's due process rights were violated when the jury was not provided

11  with "accurate information regarding petitioner's parole ineligibility."

12  *See also Lynch v. Arizona*, 136 S. Ct. 1818 (2016) (applying *Simmons* to Arizona

13  case).

14         Morris was convicted of crimes that occurred in 2002 and 2003, and was thus

15  categorically ineligible for parole. (*See* IOR 7.) *See id.* at 1819. Since a decade

16  before Morris's trial, the law therefore was clear that Morris was not eligible for

17  parole and failure to inform the jury of that fact would violate his due process rights.

18  And the Supreme Court had reaffirmed this holding in the years before Morris's

19  trial. *See Kelly v. South Carolina*, 534 U.S. 246 (2002); *Shafer v. South Carolina*,

20  532 U.S. 36 (2001).

21         Nevertheless, the trial court instructed the jury at the penalty phase of trial

22  that:

23                 If your verdict is that the Defendant should be sentenced to
                   life, the Defendant will not be sentenced to death, and the
24                 Court will sentence the Defendant to either life without the
                   possibility of release until 25 calendar years in prison are
25                 served, or "natural life," which means the defendant would
                   never be released from prison.
26

27  / / /
28  / / /

1   (IOR 163 at 9; IOR 169 at 7; Tr. July 14, 2005 at 10; Tr. July 18, 2005 at 96.)[42]

2   Defense counsel failed to object to this instruction. (*See* Tr. July 13, 2005 at 3–4.)

3   In fact, the prosecutor had filed a motion seeking to preclude "evidence or argument

4   claiming there is no possibility of parole under Arizona law." (IOR 76 at 1.) Defense

5   counsel filed no opposition. Instead, defense counsel requested that the jury

6   questionnaires inform prospective jurors that if the jury finds that life is the

7   appropriate sentence, it will then be up to the judge whether the sentence is life with

8   or without the possibility for parole. (IOR 86 at 12.) Although the defense's

9   requested question was not included, the questionnaires still provided incorrect

10  information about possible sentencing outcomes, and counsel informed prospective

11  jurors, including one who was later seated, of these sentencing alternatives and

12  failed to object to the prosecutor similarly providing incorrect information.

13  (Tr. June 6, 2005 at 37, 83, 88; Tr. June 8, 2005 at 15–16, 20–21, 58.) Defense

14  counsel failed to draw the court's attention to the fact that Morris was parole

15  ineligible and failed to object to the erroneous jury instruction informing the jury

16  otherwise.

17      Counsel's failure to object to the court's incorrect jury instruction constituted

18  deficient performance. In *Carpenter v. Vaughn*, 296 F.3d 138, 156–59 (3d Cir.

19  2002), the court held that counsel performed deficiently by failing to object to the

20  trial court's response to a jury question that misleadingly suggested that the

21  defendant may be eligible for parole. The situation here is even more extreme, as

22  the jury instruction was not just susceptible to the interpretation that Morris could

23  be sentenced to life with the possibility of parole; it was explicit on that point.

24  Further, the trial in *Carpenter* occurred before *Simmons* was decided, showing that

25  even before *Simmons*, counsel was deficient for failing to object to the trial court's

26

27  _____

28  [42] A similar, incorrect instruction was also given at the aggravation phase. (IOR 153
    at 5; Tr. July 12, 2005 at 18.)

1    misleading suggestion that the defendant may be eligible for parole. *See id.* at 144.

2    Here, *Simmons* was decided a decade before Morris's trial, and after that decision,

3    counsel's failure to correct a court when misinforming the jury about a defendant's

4    parole eligibility was even more extreme that in *Carpenter* because the Supreme

5    Court had spoken explicitly on the issue.

6        The prosecutor put Morris's future dangerousness at issue throughout the

7    guilt and aggravation phases of the trial. *See* Claim Thirteen *infra*. Counsel should

8    have been on notice that the jury had to be instructed on Morris's parole ineligibility

9    and had a duty to investigate the potential sentences he faced. *See Hinton v.*

10   *Alabama*, 134 S. Ct. 1081, 1089 (2014) ("An attorney's ignorance of a point of law

11   that is fundamental to his case combined with his failure to perform basic research

12   on that point is a quintessential example of unreasonable performance under

13   *Strickland*."); *Risher v. United States*, 992 F.2d 982 (9th Cir. 1993) (finding

14   deficient performance when counsel failed to inform defendant he could be

15   sentenced under Sentencing Reform Act, which the Ninth Circuit had ruled

16   unconstitutional but the status of which was in "disarray"); 2003 ABA Guidelines

17   § 10.9.1 (explaining that counsel have a duty to "know and fully explain to the client

18   the maximum penalty that may be imposed for the charged offense(s) and any

19   possible lesser included or alternative offenses"); American Bar Association,

20   *Criminal Justice Standards for the Defense Function* 4-8.1 (3d ed. 1993) ("Defense

21   counsel should, at the earliest possible time, be or become familiar with all of the

22   sentencing alternatives available to the court[.]"). Failure to do so was deficient.

23       Counsel's deficient performance also prejudiced Morris. The argument about

24   Morris's dangerousness was pervasive throughout his trial, and "there may be no

25   greater assurance of a defendant's future nondangerousness to the public than the

26   fact that he never will be released on parole." *Simmons*, 512 U.S. at 163–64. Further,

27   due to Morris's young age at the time of sentencing, the jury could have thought

28   that if sentenced to life with the possibility of parole, his release was a realistic

possibility. *Cf. State v. Escalante-Orozco*, 386 P.3d 798, 830 (Ariz. 2017) (discussing jurors' consideration of the fact that defendant was in his forties and possibility he will "live to see release" in conducting harmless-error inquiry).

Research into jury decision making reveals that if jurors are not informed about alternatives to death sentences, they drastically underestimate the length of time a defendant will serve, which increases the likelihood that they will sentence a defendant to death. The Capital Jury Project (CJP) conducted 1,198 in-depth juror interviews dating back to 1991. The jurors participated in 353 capital trials over fourteen states. *See* University at Albany School of Criminal Justice, *What is the Capital Jury Project*, http://albany.edu/scj/13189.php (last visited Jan. 29, 2018). CJP's research "shows that capital jurors believe murderers are back on the streets 'far too soon'." William J. Bowers & Benjamin D. Steiner, *Death by Default: An Empirical Demonstration of False and Forced Choices in Capital Sentencing*, 77 Tex. L. Rev. 605, 645–46 (1999). And jurors' mistaken beliefs about parole eligibility make them more likely to impose a death sentence. *Id.* at 660 ("[M]istaken estimates of early release appear to be decisive in the decision-making of jurors who have not made up their minds before deliberations begin or by the time of the jury's first vote on punishment."); *see also* J. Mark Lane, *"Is there Life Without Parole?": A Capital Defendant's Right to a Meaningful Alternative Sentence*, 26 Loy. L.A. L. Rev. 327, 334 (1993) ("Juries frequently choose death, not because they think it is the appropriate sentence, but because they do not believe that the life-sentence alternative will adequately ensure the defendant's incarceration.").

Jurors' misunderstanding about the prospect of a defendant's release is critical during deliberations. Up to thirty-two percent of jurors surveyed by CJP reported that penalty-phase deliberations "focused 'a great deal' on a variety of topics related to worries about the defendant's future dangerousness," and up to sixty percent "reported that the jury's discussions focused at least a 'fair amount'

on topics related to the defendant's future dangerousness." John H. Blume, Stephen P. Garvy, and Sheri Lynn Johnson, *Future Dangerousness in Capital Cases: Always "At Issue"*, 86 Cornell L. Rev. 397, 406–07 (2001). Ultimately, it is clear that when making a determination between life and death, the availability of parole carries significant weight with jurors. "The available sociological evidence suggests that juries are less likely to impose the death penalty when life without parole is available as a sentence." *Baze v. Rees*, 553 U.S. 35, 78–79 (2008) (Stevens, J., concurring). If the jurors had been informed of the fact that Morris could not pose a future danger to the public even if sentenced to life instead of death, there is a reasonable probability that at least one juror would have voted against a death sentence.

Counsel therefore performed deficiently, to Morris's prejudice.

### 2.   Trial counsel failed to request that the jury be instructed that the cumulative effect of mitigation can be considered as a separate mitigating circumstance.

As discussed in Claim Twenty-Four, Arizona's capital sentencing scheme is constitutionally infirm because it does not require the jury to consider the combined effects of the individual mitigating factors presented by a defendant at sentencing. Because Arizona law does not require that the trial court automatically instruct the jury to consider the cumulative effect of mitigating evidence, it was incumbent on Morris's counsel to request that his jury be so instructed. However, Morris's counsel failed to do so, and consequently his jury was only instructed to consider "the totality of the aggravating circumstance with the totality of the mitigating circumstances." (Tr. July 18, 2005 at 94; IOR 169 at 6.)

Counsel's ineffective assistance in failing to request a jury instruction on the cumulative effect of Morris's mitigation prejudiced him by increasing the risk that his jury would return a death sentence. *Cf. Taylor v. Kentucky*, 436 U.S. 478, 488–89 (1978) (holding that the "arguments of counsel cannot substitute for instructions by the court"). Even if the individual mitigating circumstances Morris presented to

1   the jury did not individually call for a sentence less than death, had the jury been
2   instructed to consider the aggregate impact of Morris's mitigating factors, it likely
3   would have shown leniency and sentenced Morris to life imprisonment instead.
4   *See Smith v. McCormick*, 914 F.2d 1153, 1168 (9th Cir. 1990). It was essential that
5   the jury consider the combined effect of the mitigation that was presented.
6   *Cf. Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (holding that sentencer must be
7   allowed to consider "any aspect of a defendant's character or record and any of the
8   circumstances of the offense that the defendant proffers as a basis for a sentence
9   less than death"). Trial counsel's failure to request that the court instruct the jury to
10  consider the cumulative effect of Morris's mitigating evidence constituted deficient
11  performance that left the jury with the impression it was to consider the gravity of
12  each mitigating factor separately. Thus, counsel's constitutionally ineffective
13  assistance prejudiced Morris and rendered his sentencing unreliable.

14  **3.     Trial counsel failed to request that the jury be instructed
15              that mercy can be an independent mitigating circumstance.**

16      The prosecutor filed a motion requesting a jury instruction "informing jurors
17  that they 'must not be swayed by mere sentiment, conjecture, sympathy, passion,
18  prejudice, public opinion or public feeling'[.]" (IOR 80 at 3.) The defense did not
19  file a response. Nor did the defense ask that the jury be instructed that mercy can
20  itself be considered a mitigating circumstance even though pleading for mercy has
21  been approved as a constitutionally sufficient mitigation strategy. *See Darden v.
22  Wainwright*, 477 U.S. 168, 185–87 (1986). As a result, the jury was prevented from
23  considering all evidence relevant to the determination of whether Morris should be
24  sentenced to death.

25      Here, the jury was instructed that it must confine its inquiry to whether
26  mitigation has been proven and its relative weight. (Tr. July 18, 2005 at 91
27  (instructing the jury that "[t]he burden of proving the existence of mitigation is on
28  the defendant" and the defendant "must persuade you by the evidence that the claim

or a fact is more probably true than not"). Because trial counsel did not request that mercy be included as a mitigating circumstance, the jury was unconstitutionally precluded from determining whether the case warranted the exercise of mercy as an independent consideration. As a result, the jury was unable to consider all of the mitigating evidence, and Morris was accordingly prejudiced by counsel's failure.

### 4. Trial counsel failed to request special verdict forms.

Trial counsel did not ask that the court use special verdict forms at the penalty phase that would have clarified what mitigating circumstances the jury found proven. As a result, when the Arizona Supreme Court reviewed whether the jury abused its discretion by imposing the death penalty in Morris's case, it had no findings of fact or reasoning from the jury to review.   *See* Ariz. Rev. Stat. § 13-703.05(A) (renumbered §13-756(A)). As discussed in Claim Twenty-Six, "it is important that the record on appeal disclose to the reviewing court the considerations which motivated the death sentence in every case in which it is imposed." *Gardner v. Florida*, 430 U.S. 349, 361 (1977) (plurality opinion). Because counsel failed to request special verdict forms, the record left little for review on direct appeal, which completely undermined the meaningful review of death sentences mandated by the Supreme Court. *See Gregg v. Georgia*, 428 U.S. 153, 197–98 (1976). Morris was thus prejudiced on appeal by trial counsel's deficient performance.

### C. Trial counsel was ineffective for failing to object to improper victim-impact testimony.

This claim was not raised in state court. Morris alleges he can overcome any default of this claim by showing cause and prejudice, including because of the ineffective assistance of state post-conviction counsel. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Murray v. Carrier*, 477 U.S. 478, 488–89 (1986); *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). Morris will demonstrate at an evidentiary hearing that post-conviction counsel fell below the standards of

minimally competent capital attorneys and that those failures prejudiced him. Alternatively, he alleges that any procedural bar is not adequate or independent or that imposing default would be a miscarriage of justice. Because this claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the merits of the claim de novo. Morris incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

As discussed more fully in Claim Thirty-One, in Arizona, victims are allowed to tell the jury "information about the murdered person and the impact of the murder on the victim and other family members[.]" Ariz. Rev. Stat. § 13-752(R). Although the United States Supreme Court has not fully banned victim-impact evidence, it has recognized its minimal relevance in a capital sentencing proceeding and has limited the admissible categories of information. Such evidence is merely relevant to show that the victim is an individual whose death represents a unique loss to society and in particular to her family. *See Payne v. Tennessee*, 501 U.S. 808, 825 (1991). But any relevance victim-impact evidence has in this regard pales in comparison to the prejudicial effect it has on a jury. Such evidence is highly emotional and serves no relevant purpose—it is simply intended to appeal to the jury's sympathies.

Here, defense counsel failed to object and ask for a mistrial on the basis of the improper victim-impact testimony. For example, Patina Noah said, "I can't bear to hear all the grisly details about *how he made Sherr[y] suffer*. She didn't deserve this. Sherr[y] did not deserve this." (Tr. July 14, 2005 at 31 (emphasis added).) Jan Velasquez then commented on how strong she thought Morris's mitigating evidence was:

> I'm the oldest of three children, and I do know what Mr. Morris went through, but I haven't taken that life that he took. I took care of my little sister, and I took care of my little brother, too, and I'm also getting a bachelor's of science in nursing and bachelor's of science in social work.

> Even though we grew up poor, we didn't choose the life that Mr. Morris chose. My little sister had three associate's degrees, and she was also a member of the armed forces. She didn't let anything stop her. She ran every morning so that she could get in shape to join the Army. . . . We grew up without a father, too, but that didn't stop us from achieving our goals.

(Tr. July 14, 2005 at 35–36.) Finally, G.G. Codman said:

> And now I know the gory details, *the disgusting details* . . . Just no human being, no sister, no child needs to ever hear what I've heard in this courtroom or seen what Cory Morris has done to my sister and *what he did to her after death. It's just horrifying*, and nobody should ever have to see that. . . . I have heard what Cory Morris has done to my sister, *how he preyed upon her weakness and her vulnerabilities* and performed some *unimaginable acts and vile acts* upon her. . . . And Cory Morris, he's the one who said my sister was the pretty one. Well, what you did to my sister was not pretty[.][43]

(Tr. July 14, 2005 at 40–42 (emphasis added).) These statements did not simply address the victims' lives or the impact on their families. Rather, they conveyed to the jury what value the victims' family members placed on the aggravating evidence—the level of suffering of the victims, that postmortem sex occurred, that Morris preyed on the victims and committed vile acts—as well as the mitigating evidence.

These statements were unduly prejudicial and were effectively sentencing recommendations. But counsel did nothing in response. *See Payne*, 501 U.S. at 830 n.2 (explaining that "the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment"); *Booth v. Maryland*, 482 U.S. 496, 508–09 (1987). There is a reasonable probability that without the inflammatory statements and recommendations as to sentencing at least one juror would have weighed the

---

[43] As discussed *supra* in Claim One, Morris did not say that Codman was "the pretty one." The prosecutor incorrectly attributed this statement to him.

173

aggravating and mitigating evidence differently. Counsel therefore was ineffective.

**D.   Trial counsel were ineffective for failing to investigate and challenge juror misconduct in a motion for a new trial.**

This claim was not raised in state court. Morris alleges he can overcome any default of this claim by showing cause and prejudice, including because of the ineffective assistance of state post-conviction counsel. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Murray v. Carrier*, 477 U.S. 478, 488–89 (1986); *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). Morris will demonstrate at an evidentiary hearing that post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced him. Alternatively, he alleges that any procedural bar is not adequate or independent or that imposing default would be a miscarriage of justice. Because this claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the merits of the claim de novo. Morris incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

The Sixth and Fourteenth Amendments protect a criminal defendant's right to a fair trial based on the evidence presented and the right to an impartial jury. *See Parker v. Gladden*, 385 U.S. 363, 364 (1966) (per curiam); *Turner v. Louisiana*, 379 U.S. 466, 471–72 (1965). This includes the right to a jury free from misconduct or "any private communication, contact, or tampering." *Remmer v. United States*, 347 U.S. 227, 229 (1954); *see United States v. Bagnariol*, 665 F.2d 877, 884 (9th Cir. 1981) (per curiam). Morris's trial counsel was ineffective for not, after the completion of his trial, investigating juror misconduct in order to support a motion for a new trial under Arizona Rule of Criminal Procedure 24.1(c)(3). *See* 2003 ABA Guidelines § 10.7(A) ("Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty."). If they had done so, they would have discovered that the alternate jurors

1   participated in deliberations despite the court's express direction that they not do

2   so, as discussed *infra* in Claim Sixteen. (*See* Tr. July 5, 2005 at 144; Tr. July 12,

3   2005 at 149; Tr. July 18, 2005 at 147.)

4         Had counsel filed a motion for a new trial as a result of this misconduct, the

5   trial court would have had to hold an evidentiary hearing to determine the impact

6   of the alternate jurors' improper participation. *See State v. Miller*, 875 P.2d 788,

7   790 (Ariz. 1994) (finding trial court abused its discretion by not holding an

8   evidentiary hearing after alternate juror left note on juror's car saying "He's guilty"

9   or "My vote is guilty"); *State v. Hooper*, 703 P.2d 482, 492 (Ariz. 1985) (finding

10   no abuse of discretion in denial of motion for new trial based on alternate juror's

11   discussion with seated jurors because they had discussions "prior to the beginning

12   of actual deliberations" that "did not discuss the merits of the case"). As the

13   misconduct went to the issues directly before the jury, there is a reasonable

14   probability that such a motion would have been granted. *Cf. Remmer*, 347 U.S. at

15   229 ("[P]rivate communication, contact, or tampering directly or indirectly, with a

16   juror during a trial about the matter pending before the jury is, for obvious reasons,

17   deemed presumptively prejudicial[.]"). Morris was thus prejudiced by his counsel's

18   deficient performance.

19         When reviewing this claim, even if this Court finds that no single error by

20   counsel at the penalty phase amounts to prejudice, it, nonetheless, should apply

21   cumulative error principles to grant relief. *See Boyde v. Brown*, 404 F.3d 1159, 1176

22   (9th Cir. 2005). Morris's counsel was ineffective, and he is entitled to relief.

23   ### CLAIM FOUR

24   **Morris received ineffective assistance of counsel during the pretrial stages of his trial, violating his rights under the Sixth and Fourteenth Amendments.**

25   

26         Morris's trial counsel committed errors during the pretrial phases of his

27   capital trial, and as such, the result of those proceedings is unreliable. This claim is

28   subject to the two-prong standard established in *Strickland*: counsel's performance

must be deficient, and such deficient performance must have prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *cf. Padilla v. Kentucky*, 559 U.S. 356, 369–73 (2010) (applying *Strickland* to claim that counsel was ineffective in plea proceedings). First, the inquiry under the deficiency prong is "whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688. Performance is deficient when the attorney renders objectively unreasonable assistance. *Id*. at 687–88. Although defense counsel has broad discretion when making strategic decisions, those decisions must be reasonable and informed. *Id*. at 691; *see also Correll v. Ryan*, 539 F.3d 938, 949 (9th Cir. 2008) (holding that an "uninformed strategy" is "no strategy at all"). In assessing counsel's performance, this Court should look to guides, such as the American Bar Association (ABA) standards at the time of trial, *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (per curiam), as well as the standards of practice in the defense community in Arizona, *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011). "[C]ounsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." *Strickland*, 466 U.S. at 690. Moreover, "[t]rial lawyers have a 'duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process.'" *Connick v. Thompson*, 563 U.S. 51, 65 (2011) (quoting *Strickland*, 466 U.S. at 688).

The reasonableness of counsel's decisions is measured by the reasonableness of the investigation done in making such a decision. *Cf. Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (focusing on "whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background was itself reasonable"). "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91. In other words, any strategic decision made by counsel must be "reasonable and informed." *Jennings v. Woodford*, 290 F.3d 1006, 1014 (9th Cir. 2002).

1    When assessing the second prong, a court must decide whether "counsel's
2    errors were so serious as to deprive the defendant of a fair trial, a trial whose result
3    is reliable." *Strickland*, 466 U.S. at 687. A petitioner does not have to demonstrate
4    by a preponderance of the evidence that "the result in his case would have been
5    different but for counsel's errors," but only that there was a reasonable probability
6    that the errors undermined confidence in the outcome of his trial. *Brown v. Myers*,
7    137 F.3d 1154, 1157 (9th Cir. 1998) (citing *Strickland*, 466 U.S. at 694);
8    *see also Jennings*, 290 F. 3d at 1016 (quoting *Strickland*, 466 U.S. at 694 (rejecting
9    explicitly the preponderance standard)); *Lord v. Wood*, 184 F.3d 1083, 1085
10   (9th Cir. 1999). "In making this [prejudice] determination, a court hearing an
11   ineffectiveness claim must consider the totality of the evidence before the judge or
12   jury." *Strickland*, 466 U.S. at 695; *see also Williams (Terry) v. Taylor*, 529 U.S.
13   362, 397–98 (2000); *Alcala v. Woodford*, 334 F.3d 862, 882–83 (9th Cir. 2003)
14   (granting relief on basis of cumulative impact of multiple errors by counsel); *Harris*
15   *by and through Ramseyer v. Wood*, 64 F.3d 1432, 1439 (1995) (holding that the
16   cumulative impact of numerous deficiencies in defense counsel's performance was
17   prejudicial to the defense, rendering the proceedings improper and warranting
18   habeas relief). Even if this Court finds that no single error amounts to prejudice, it,
19   nonetheless, should apply cumulative error principles to grant relief. *See Boyde v.*
20   *Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005) (quoting *Cooper v. Fitzharris*, 586
21   F.2d 1325, 1333 (9th Cir.1978) (en banc)).

22   The following subparts of this claim detail the ways in which Morris's trial
23   counsel failed to render reasonably effective assistance of counsel throughout his
24   pretrial proceedings. These errors "were so serious as to deprive [Morris] of a fair
25   trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687.

26   **A.    Trial counsel were ineffective for not filing a motion in limine to**
27   **exclude evidence that purportedly showed that Morris engaged in**
     **necrophilia.**

28   This claim was not raised in state court. Morris alleges he can overcome any

1   default of this claim by showing cause and prejudice, including because of the

2   ineffective assistance of state post-conviction counsel. *See Martinez v. Ryan*, 566

3   U.S. 1, 9 (2012); *Murray v. Carrier*, 477 U.S. 478, 488–89 (1986); *Strickland v.*

4   *Washington*, 466 U.S. 668, 687–88 (1984). Morris will demonstrate at an

5   evidentiary hearing that post-conviction counsel fell below the standards of

6   minimally competent capital attorneys and that those failures prejudiced him.

7   Alternatively, he alleges that any procedural bar is not adequate or independent or

8   that imposing default would be a miscarriage of justice. Because this claim has not

9   been adjudicated by the Arizona state courts, the limitations on relief imposed by

10   28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider

11   the merits of the claim de novo. Morris incorporates by specific reference all facts,

12   allegations, and arguments made elsewhere in this Petition.

13       Defense counsel was aware before trial that the prosecution would argue that

14   Morris engaged in necrophilia. (*See, e.g.*, Tr. Mar. 24, 2015 at 89.) The defense

15   team had discussions about necrophilia both amongst themselves and with their

16   consulting expert. (*See, e.g.*, PCR Hr'g Ex. 5 at 000010, 000033.) And, as evidenced

17   by an email from Thomas to Logan, they knew that there was no evidence of

18   necrophilia but that testimony on the topic at trial could be harmful to Morris.

19   (PCR Pet. Ex. R at 1.) Counsel failed, however, to make any attempt to preclude

20   the prosecution from introducing evidence to advance a necrophilia theory. Counsel

21   should have filed a motion in limine arguing that the evidence should be excluded

22   under Arizona Rules of Evidence 404(b) and 403. *See* 2003 ABA Guidelines § 10.8

23   (explaining that counsel has a duty to investigate and consider "all legal claims

24   potentially available" at every stage of a case).

25       Under Rule 404(b), a defendant's prior bad acts cannot be introduced "to

26   show action in conformity therewith," but can be admissible to show "motive,

27   opportunity, intent, preparation, plan, knowledge, identity, or absence of  mistake

28   or accident." Ariz. R. Evid. 404(b). "[B]efore admitting evidence of prior bad acts,

1    trial judges must find that there is clear and convincing proof both as to the
2    commission of the other bad act and that the defendant committed the act." *State v.*
3    *Terrazas*, 944 P.2d 1194, 1198 (Ariz. 1997). Here, there was not clear and
4    convincing proof that Morris engaged in necrophilia. The prosecution relied on skin
5    slippage on two of the victims, semen detected in two of the victims, and anal
6    defects found on one of the victims to support his theory that Morris had committed
7    necrophilia. All of this evidence's connection to necrophilia was attenuated at best.

8         First, the understanding of trial counsel was that skin slippage occurs as the
9    result of decomposing skin being subjected to any friction. (*See* Tr. June 28, 2005
10   at 48.) As the defense argued at trial, the fact that there was skin slippage therefore
11   simply showed that the bodies were moved after they had begun to decompose.
12   Four of the victims—including those with skin slippage—were not found where
13   they were killed, so the skin slippage was not indicative of anything beyond the fact
14   that they were moved. (*See* Tr. June 28, 2005 at 63; Tr. July 5, 2005 at 97.) If
15   counsel had hired a pathologist as discussed *supra* in Claim Three (A), counsel
16   would have been further aware that skin slippage is a natural part of the
17   decomposition process and that the pattern and amount of slippage observed was
18   not consistent with postmortem sex. (PCR Hr'g Ex. 6 at 6–7.) Even absent this
19   additional information from an expert, counsel knew enough to argue that skin
20   slippage was not clear and convincing evidence of necrophilia.

21        Nor was the presence of Morris's semen. The purported link between the
22   semen and necrophilia was preposterous. According to the prosecution, because
23   Morris told the police that he used a condom with the victims, the fact that his semen
24   was detected showed he had sex with them after death since he used a condom
25   before death. (Tr. June 20, 2005 at 78–80; Tr. July 5, 2005 at 46, 50.) Even the
26   State's expert at post-conviction ultimately recognized that reliance on Morris's
27   statement was not supportable. (*See* PCR Hr'g Ex. 1, Report Re: Forensic
28   Psychiatric Evaluation at 56 n.38.) Morris's semen simply showed that he had

1    sexual intercourse with two of the victims, a fact he readily admitted. The
2    prosecutor's attempts to pick and choose which parts of Morris's statements to
3    believe, as well as the purported link between the detected semen and necrophilia,
4    were not sustainable.

5         Finally, the anal defects found on one of the victims could not be linked to
6    postmortem sex. Castillo's body was severely decomposed, and there was
7    "extensive insect activity in and around the vagina and the anus." (PCR Hr'g Ex. 7
8    at 001256, 001260.) The medical examiner noted that there were "possible mucosal
9    tears" that were possibly "artefacts of postmortem insect activity." (PCR Hr'g Ex.
10   7 at 001256.) The medical examiner could not determine whether the detected
11   defects were due to trauma or the decompositional process or whether they occurred
12   before or after death. (Tr. June 15, 2005 at 88, 96.) Again, if counsel had retained a
13   pathologist, they would further have been able to argue that the defects were
14   conclusively the result of insect activity and not indicative of postmortem sex. (PCR
15   Pet. Ex. Q at 12; PCR Hr'g Ex. 6 at 7–8.) Further, if postmortem anal intercourse
16   had occurred, there would have been internal injuries that were not present in any
17   of the victims. (PCR Pet. Ex. Q at 12.)

18        Counsel therefore could have argued that there was not clear and convincing
19   evidence that necrophilia had occurred and that the evidence to support the theory
20   therefore could not be admitted under Rule 404(b). *See State v. Anthony*, 189 P.3d
21   366, 371–72 (Ariz. 2008) (finding trial court abused its discretion in denying motion
22   in limine to preclude argument that defendant had molested victim because
23   evidence "fell far short of proving" the molestation had occurred).

24        Even if evidence is admissible under Rule 404(b), it is still subject to Rule
25   403, which requires the exclusion of evidence "if its probative value is substantially
26   outweighed by the danger of unfair prejudice." *State v. Fernane*, 914 P.2d 1314,
27   1318 (Ariz. Ct. App. 1995) (internal quotation marks omitted). "Unfair prejudice
28   means an undue tendency to suggest decision on an improper basis such as emotion,

sympathy or horror." *State v. Schurz*, 859 P.2d 156, 162 (Ariz. 1993) (internal quotation marks and citation omitted). Counsel therefore also could have sought the exclusion of the evidence of necrophilia on the basis that it was unfairly prejudicial. The evidence supporting necrophilia was slight but highly inflammatory. *Cf. United States v. Hitt*, 981 F.2d 422, 424 (9th Cir. 1992) (recognizing that some topics "have a visceral impact," the introduction of which can prejudice a defendant); *Stevens v. McBride*, 489 F.3d 883, 898 (7th Cir. 2007) (finding state court's determination of no prejudice was an unreasonable application of *Strickland* in part because defense expert testified at penalty phase that petitioner "engaged in necrophilia after the murder"). The charge of necrophilia painted Morris as sexually deviant and repulsive. The probative value of the evidence of necrophilia was minimal but had the power to overshadow everything else, and counsel accordingly should have sought its exclusion under Rule 403.

Counsel performed deficiently by failing to move to preclude evidence to support necrophilia. Particularly because counsel made no opening statement and did not call any witnesses at trial, it was particularly important to seek to keep this evidence out of the trial. Counsel failed to pursue available avenues to do so.

Morris was prejudiced by counsel's deficient performance because the prosecutor's theory of necrophilia pervaded every phase of trial. At the guilt phase, for example, the prosecutor argued that Morris kept the victims' bodies "for one reason, and that was for sexual gratification. He wanted to use them once their body was rotted out so that he could fulfill whatever sexual desires he had. There was no other reason why he would keep the body." (Tr. July 5, 2005 at 14.) At the aggravation phase, necrophilia was used to support the (F)(6) aggravating factor that the murders were heinous or depraved. The prosecutor argued that necrophilia showed that Morris relished the murders and mutilated the victims' bodies. (Tr. July 12, 2005 at 26–27.) Finally, at the penalty phase, the prosecutor argued that death was the appropriate sentence because "[y]ou never forget about aggravating

1   circumstances. You never forget mutilation of the body. You don't forget relishing.

2   You don't forget any of that[.]" (Tr. July 18, 2005 at 128.) The argument of

3   necrophilia, and the use of skin slippage to support it, also was the basis for allowing

4   the prosecutor to admit several gruesome photographs, as discussed *infra* in Claim

5   Eleven. If counsel had not performed deficiently and had gotten this evidence

6   excluded before trial, then the prosecutor's graphic and inflammatory argument

7   would not have tainted the entire trial. Confidence in the outcome of Morris's trial

8   is undermined, and he is entitled to relief.

9       **B.    Trial counsel were ineffective in neglecting to properly investigate
10      and present evidence to challenge Morris's statements to police.**

11      This claim was not raised in state court. Morris alleges he can overcome any

12   default of this claim by showing cause and prejudice, including because of the

13   ineffective assistance of state post-conviction counsel. *See Martinez v. Ryan*, 566

14   U.S. 1, 9 (2012); *Murray v. Carrier*, 477 U.S. 478, 488–89 (1986); *Strickland v.*

15   *Washington*, 466 U.S. 668, 687–88 (1984). Morris will demonstrate at an

16   evidentiary hearing that post-conviction counsel fell below the standards of

17   minimally competent capital attorneys and that those failures prejudiced him.

18   Alternatively, he alleges that any procedural bar is not adequate or independent or

19   that imposing default would be a miscarriage of justice. Because this claim has not

20   been adjudicated by the Arizona state courts, the limitations on relief imposed by

21   28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider

22   the merits of the claim de novo. Morris incorporates by specific reference all facts,

23   allegations, and arguments made elsewhere in this Petition.

24          **1.    Factual background.**

25      On April 12, 2003, at around 5:00 p.m., Detectives Barnes and Hutson came

26   to Morris's place of work. (Tr. June 15, 2005 at 66.) Morris was cooperative and

27   agreed to talk to them. (Tr. June 15, 2005 at 67–69.) Hutson then stated that he

28   wanted to drive Morris to Hutson's "office" so they "could speak without being

1   disturbed." Morris again agreed, and he was transported by a patrol officer to the
2   police station. At 5:22 p.m., Hutson reconnected with Morris and accompanied him
3   to a homicide detail interview room. (Tr. June 16, 2005 at 27.) The subsequent
4   interrogation was audio and videotaped. (Tr. June 16, 2005 at 28–29.)

5       Earlier in the day, Morris had donated plasma. (PCR Hr'g Ex. O at 000474.)
6   He had hardly slept the night before and felt light headed and dizzy while walking
7   around downtown Phoenix in the afternoon heat. Before reporting to work, Morris
8   had started to get a migraine and took several tablets of Aleve.

9       During the interrogation, Morris described each of his encounters with the
10  victims, stating that they all died of apparent drug overdoses. (PCR Pet. Ex. O at
11  000489–545.) Hutson said that he did not believe Morris and pressed him hard to
12  tell a different story. (PCR Pet. Ex. O at 000555–59.) Hutson then gave Morris two
13  options of what actually happened—either he had promised the victims drugs in
14  exchange for sex, or they had smoked their own crack cocaine and wanted Morris
15  to choke them to enhance their pleasure. (PCR Pet. Ex. O at 000560.) Morris then
16  told a second version of the encounters, this time stating that each of the victims
17  asked him to choke her, and they accidentally died as a result. (PCR Pet. Ex. O at
18  000561–86.) Morris maintained throughout the interview that he never intended to
19  kill any of them. (PCR Pet. Ex. O at 000561–86, 000599–603.) He was arrested at
20  the end of the interrogation. (PCR Pet. Ex. O at 000617.)

21      On January 21, 2005, at a case management conference, the prosecutor
22  informed the trial court that the State was going to ask for a voluntariness hearing
23  as to Morris's statement. (Tr. Jan. 21, 2005 at 8.) The prosecutor said that he wanted
24  to stipulate to give the trial court a copy of the interrogation videotape. (Tr. Jan. 21,
25  2005 at 8.) The trial judge agreed and clarified, "[A]ll I'm going to rule on is the
26  voluntariness of it." (Tr. Jan. 21, 2005 at 8–9.) He explained, "So what we'll do
27  then, you'll submit to me your motion along with a videotape, and if you both
28  stipulate that I can rule on the motion based on the videotape, put that in writing so

1    I can—I can put that on the record too." (Tr. Jan. 21, 2005 at 9.) Defense counsel

2    stated that he was fine with that and asked for a voluntariness hearing as well.

3    (Tr. Jan. 21, 2005 at 9.)

4          On May 27, 2005, at a status conference, the prosecutor told the trial court

5    that there was a voluntariness hearing issue, but it would "go quick" and the parties

6    "can even submit it on the transcript." (Tr. May 20, 2005 at 4.) Logan agreed and

7    said, "We won't need an evidentiary hearing on that, I don't believe, Judge."

8    (Tr. May 20, 2005 at 4.)

9          After the jurors were sworn in and read the preliminary instructions, the

10   prosecutor informed the trial court, during a bench conference, that he was "going

11   to attempt to use the defendant's statement" and did not "believe there's any reason

12   to believe that it was anything less than voluntary." (Tr. June 13, 2005 at 37–38.)

13   The trial court responded, "I've reviewed the statement. I don't see any issues."

14   (Tr. June 13, 2005 at 38.) Logan said that there was "one minor issue" he wanted

15   to put on the record to reflect the "only inducement of a promise that—or anything

16   that could be considered a promise." (Tr. June 13, 2005 at 38.) Morris had said

17   during his police interview that he would wait to eat until he got back to the bar he

18   worked at, and the police "fully know he's not going back to the bar. They say,

19   Okay. That's fine. They promise he's going to be leaving." (Tr. June 13, 2005 at

20   38.) The trial judge indicated that he had reviewed the statement and did not see

21   any voluntariness issues. (Tr. June 13, 2005 at 38.) He ruled, "I'm going to find it

22   was given voluntarily, and there's no basis to suppress it at this point." (Tr. June

23   13, 2005 at 38.)

24         In his opening statement, the prosecutor told the jury about the day that

25   Morris was brought to the police station for questioning. (Tr. June 13, 2005 at 51.)

26   He said that "basically one of the first things that the police officer told him . . . was

27   he admonished or told him of his Miranda rights," and the officer asked, "Do you

28

1  agree to speak to me?" (Tr. June 13, 2005 at 51.)[44] The prosecutor proceeded to tell

2  the jury about several damaging statements Morris had made during the

3  interrogation. (*See* Tr. June 13, 2005 at 51–75.) Those statements ultimately

4  composed a large portion of the evidence against Morris at trial.

5  The defense's theory of the case was essentially the first version of events

6  Morris recounted to Hutson—that the victims had died from drug overdoses.

7  (*See, e.g.*, Tr. July 5, 2005 at 99–113.) Thus, in order to make this a viable theory

8  at trial, the defense needed to show that Morris's second version of events was

9  unreliable. However, defense counsel failed to investigate or develop a strategy to

10  suppress Morris's statements, and if that failed, to convince the jury of the

11  statement's unreliability.

12  ## 2.   Trial counsel failed to properly move to suppress Morris's involuntary statements to police.

13

14  As set forth in Claim Nineteen, there were numerous indicators that Morris's

15  statement to Hutson was involuntary based on the way Hutson questioned Morris.

16  In addition, Logan wrote that, during a jail visit in December 2003, Morris had said

17  that on the day of his interview with Hutson, he had donated plasma, gotten light

18  headed and dizzy, and taken several tablets of Aleve for a migraine headache.

19  Indeed, it was apparent that during the police interview Morris was experiencing

20  side effects of donating plasma, including dehydration. Morris requested water

21  three times, but never asked to use the restroom. (*See* PCR Pet. Ex. O at 000547,

22  000609, 000615.) Right before Hutson ended the interview, Morris asked him,

23  "Could you feel my head and see if I'm hot." (PCR Pet. Ex. O at 000615.) Hutson

24  said that Morris felt about right and asked if he felt sick. (PCR Pet. Ex. O at 000615.)

25  _____

26  [44]This is yet another example of the prosecutor misstating the evidence as discussed
27  *supra* in Claim One. Morris was asked only if he understood his rights under
*Miranda v. Arizona*, 384 U.S. 436 (1966), and not if he was willing to waive them
28  as the prosecutor implied. (*See* PCR Pet. Ex. O at 000470.)

1   Morris responded that he did. (PCR Pet. Ex. O at 000615.) Hutson said, "Okay,

2   well drink that water. That might help you. Might of got a little dehydrated or

3   something. Okay?" (PCR Pet. Ex. O at 000615.)

4   The interview and police reports reveal that Morris was also suffering from

5   sleep deprivation. Morris told Hutson that, on the day of the interview, he had

6   returned home from work just before 6:00 a.m. and "sat on the porch." (PCR Pet.

7   Ex. O at 000475–76, 000479.) Earlier that day, Morris's cousin Evette Morris told

8   Hutson that, at around 7:30 a.m., she found Morris sleeping on the front porch, and

9   at about 7:50 a.m., he came into the house, sat at the dining room table, and fell

10  asleep. Ronald and Melva Willis told Hutson that they saw Morris between 9:00

11  a.m. and 11:00 a.m. when he came into their house to do laundry. Morris said that

12  he left the house at about 11:15 a.m., and he was not at the residence when Hutson

13  arrived there at around noon. (PCR Pet. Ex. O at 000481.) During the interrogation,

14  Morris told Hutson that he had not spent the past three nights at home. (PCR Pet.

15  Ex. O at 000476–77, 000482.) When Hutson stepped out of the room at the end of

16  the interview, Morris started to fall asleep. (PCR Pet. Ex. O at 000615–16.)

17  It was also evident from the circumstances of the interview that Morris did

18  not understand the quick recitation of his *Miranda* rights, or that he was

19  relinquishing those rights. And, as discussed more fully in Claim Nineteen, Hutson

20  put extreme pressure on Morris to adopt certain responses, used suggestive

21  questioning and subtle coercion, and made implied promises to Morris. These

22  questionable tactics led to Morris telling the second version of events, which was

23  extremely damaging to his case.

24  In April 2003, the defense team hired Dr. Richard Lanyon, a

25  neuropsychologist, to evaluate Morris. (PCR Pet. Ex. C at 5–6; PCR Pet. Ex. E at

26  1.) Notes dated May 5, 2003, from the trial mitigation specialist, Linda Thomas,

27  indicate that she had discussed Morris's statement with Lanyon, and he wondered

28  if Morris thought that he was helping the police. Lanyon, however, was "puzzled

1    by some of [Morris's] behavior and thought processes"; thus, he wrote to Logan in

2    March 2004 to convey his "strong recommendation that the next step would be to

3    investigate directly the possibility of brain abnormality, through a neurological

4    examination plus an MRI." (PCR Pet. Ex. J at 1.) Like Lanyon, Dr. Jack Potts, the

5    psychiatrist hired by the defense team, was "somewhat baffled" by Morris (PCR

6    Pet. Ex. F at 1), and suggested that an MRI, EEG, and "extensive blood work-up"

7    be conducted, (PCR Pet. Ex. G at 1–2). As discussed more fully *supra* in Claim

8    Three (A), the trial team failed to complete the recommended tests and to hire

9    appropriate mental health experts. (*See, e.g.*, PCR Hr'g Ex. 5 at 000076.) Had they

10   done so, they would have discovered that Morris was suffering from brain damage,

11   including asymmetrical decreases in his left temporal cortex relative to the right,

12   which causes differences in processing speed compared to verbal comprehension

13   as well as differences in perceptual reasoning as compared to verbal

14   comprehension. (*See* PCR Pet. Ex. N at 2.)

15         And, although Thomas emailed Logan in November 2004 an article entitled,

16   "Telling Police What They Want to Hear, Even if It's False," the defense team did

17   not consult with or retain an expert in the psychology of police interrogations and

18   confessions. Nor did they consult with any experts to determine how Morris's

19   physical condition on the day of the interview impacted his suggestibility.

20         Logan performed deficiently by reaching an agreement with the prosecutor

21   to allow the trial court to determine, on the basis of the interview transcript alone

22   and without an evidentiary hearing, whether Morris's statements were involuntary.

23   (*See* Tr. Jan. 21, 2005 at 9; Tr. May 20, 2005 at 4.) Logan was aware that there was

24   a question as to the cause of death for Codman and Davis, as he filed a motion to

25   dismiss the charges related to them on the grounds that the prosecutor could not

26   establish the corpus delicti of either alleged crime. (IOR 65.) Counsel knew that for

27   these two victims in particular, nothing but Morris's statement supported a finding

28   that homicides had occurred. This, combined with the import of Morris's statements

1  to the prosecution's case in general, made it particularly important to seek to keep

2  Morris's statements from the jury.

3         Inexplicably, Logan never unambiguously objected to the statements'

4  admission nor argued for their suppression. Had defense counsel developed and

5  presented evidence and expert testimony regarding the effects Morris's mental and

6  physical condition had on his suggestibility, it was reasonably likely that Morris's

7  statements would have been suppressed. *Cf. Hinton v. Alabama*, 134 S. Ct. 1081,

8  1088 (2014) (per curiam) ("[C]ounsel has a duty to make reasonable investigations

9  or to make a reasonable decision that makes particular investigations

10 unnecessary."); *Bemore v. Chappell*, 788 F.3d 1151, 1165 (9th Cir. 2015) ("The

11 'deference owed [to] strategic judgments' to pursue one trial strategy and not an

12 alternative is 'defined . . . in terms of the adequacy of the investigations supporting

13 those judgments." (quoting *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)). And,

14 because involuntary statements are not permitted to be used at trial for any purpose,

15 no reasonable strategy can be said to excuse trial counsel's failure to file a

16 suppression motion. *See Mincey v. Arizona*, 437 U.S. 385, 398 (1978) (explaining

17 that the use of involuntary statements at trial are always a denial of due process).

18 Logan further could have moved to suppress the statement based on its unreliability.

19 *See State v. Tucker*, 759 P.2d 579, 591–92 (Ariz. 1988) (recognizing that although

20 statement may be "voluntary" for due process purposes, "the condition of a

21 defendant may render his statements so unreliable that they must be excluded under

22 the evidentiary laws of the forum," and considering whether defendant's

23 intoxication rendered his statements so unreliable that they should have been

24 excluded from evidence).

25        Logan's deficient performance here prejudiced Morris because, had Logan

26 successfully moved to suppress Morris's statement, Logan could have filed a

27 meritorious pretrial motion to dismiss the counts involving Codman and Davis.

28 Indeed, medical examiners Hu and Horn both originally determined that Codman

1   and Davis died of drug overdoses. (*See* IOR 68 at 000894, 000896, 0009-4, 0009-6.)

2   Thus, without Morris's statement, there was insufficient evidence that Codman and

3   Davis had been murdered.

4       And, although Morris never confessed to intentionally murdering the victims,

5   the prosecutor equated Morris's statements with a confession. (*See, e.g.*, Tr. July 5,

6   2005 at 16 ("The defendant, for whatever reason, decided to change his mind and

7   now tell the truth or at least indicate what method he used to end the lives of each

8   and every one of these women.").) As set forth *supra* in Claim One, Morris's

9   statements were used to show both that he had committed the murders and engaged

10  in necrophilia. Suppression of his statements would have deprived the state of the

11  key piece of evidence used to secure his convictions and death sentences. Thus,

12  confidence in the outcome in Morris's trial is undermined.

13      Logan's constitutionally deficient response to the prosecutor's request to

14  admit Morris's statements to the police and failure to adequately seek to suppress

15  them denied Morris his constitutionally guaranteed rights under the Fourth, Sixth,

16  and Fourteenth Amendments.

17  ### 3.   Trial counsel neglected to properly investigate and present

18  a defense to challenge Morris's statements at trial.

19      Logan was further ineffective for, short of getting Morris's statements

20  suppressed, failing to explain them and give them context at trial. The defense's

21  theory at trial was that Morris's first statement to the police was true, and the women

22  had died of drug overdoses. (*See* Tr. July 5, 2005 at 101–04.) Crucial to this defense

23  strategy was undermining the reliability of Morris's second statement to the police.

24  Counsel failed to do so.

25      Logan did not make an opening statement. (Tr. June 13, 2005 at 76.)

26  Consequently, the prosecutor's assertions that Morris had been properly

27  *Mirandized* (Tr. June 13, 2005 at 51), and essentially confessed to strangling each

28  of the victims (Tr. June 13, 2005 at 52–73), went unchallenged at the

189

1   commencement of the guilt phase.

2        Then, during the direct examination of Hutson, the prosecutor sought to

3   admit only discrete sections of the videotape of the interrogation. (Tr. June 16, 2005

4   at 34–35.) Logan objected to the practice:

5              Judge, when we started this, I didn't know we were going
              to have sections, which I don't object to as long as they
6              include everything . . . If we're going to skip around and do
              bits and pieces, I don't know, I object. I want the tape
7              played with the exception of those two sections we agreed.
8              If we're going to leave things out, then I object to it.

9   (Tr. June 16, 2005 at 34–35.) The trial court explained that it was not going to make

10  the prosecutor play the entire tape, but that defense counsel should be given an

11  opportunity to determine for each section whether anything else should be played

12  for completeness. (See Tr. June 16, 2005 at 35–37.) Logan appeared to acquiesce

13  to that process and said, "As long as it follows, and everything is together, that's

14  fine." (Tr. June 16, 2005 at 37.) He also told the trial court that he had been having

15  back spasms all day, was "in some distress," and may ask to break a little early.

16  (Tr. June 16, 2005 at 37.) Subsequently, Logan did not object, but reserved his

17  earlier comments, as to the admission of several sections of the videotape.

18  (See Tr. June 16, 2005 at 39–42.) During a recess, Logan told the trial court that he

19  was having some difficulty tracking the videotape, "but I'll get it through

20  cross-examination and if I have to play the whole tape in one sequence." (Tr. June

21  16, 2005 at 42.)

22       After the recess, the prosecutor moved to admit a section of the videotape

23  containing Morris's second version of events regarding Castillo, and Logan

24  objected "unless there's some foundation as to how much later in the conversation

25  this is. This is not just a short time later." (Tr. June 16, 2005 at 42–43.) The trial

26  court overruled the objection. (Tr. June 16, 2005 at 43.) Rather than playing the

27  sections in chronological order, the prosecutor proceeded to play back to back the

28

1   first and second versions of Morris's story related to each victim. (*See* Tr. June 16,

2   2005 at 44–55; Tr. June 20, 2005 at 7–12.) The prosecutor also played for the jury

3   a section "toward the end of the conversation," which he characterized as Hutson

4   and Morris "sort of summariz[ing] some of the activities involving him and these

5   women[.]" (Tr. June 20, 2005 at 13–14.)

6         When Logan cross-examined Hutson over a week later, Logan asked:

7             Now, when you had your discussion with him, you didn't

8             have it in the same order as the videotapes that were played, did you? In other words, he didn't talk about one of the

9             incidents, both where he said that the person had died of an overdose and then immediately afterwards said, "No, she

10            died because of being strangled."

11  (Tr. June 29, 2005 at 72.) Hutson agreed that this was correct. (Tr. June 29, 2005 at

12  72.) While continuing to cross-examine Hutson, Logan characterized the interview

13  as consisting of three portions—one in which Morris said that each victim had died

14  of a drug overdose, a middle portion in which Hutson tells Morris that is not what

15  happened, and a third portion in which Morris talks about strangling the victims.

16  (*See* Tr. June 29, 2005 at 73–76, 78–86.) Logan read aloud from sections of the

17  "middle portion" in which Hutson gave Morris two options of what actually

18  happened: (1) Morris had promised the victims drugs in exchange for sex, or (2)

19  they had smoked their own crack cocaine and wanted Morris to choke them to

20  enhance their pleasure. (*See* Tr. June 29, 2005 at 78–86.) Logan tried to elicit from

21  Hutson that Morris did not talk about strangling until after Hutson had suggested

22  that some people enjoyed being choked. (*See* Tr. June 29, 2005 at 73–76, 78–86.)

23        In his closing argument, Logan told the jury that Morris's first version was

24  not accepted by Hutson, "so they have Cory give them another statement consistent

25  with what he had been told, and what he had been told, there was damage to the

26  neck. They were choked." (Tr. July 5, 2005 at 111–12.) However, the only reason

27  Logan gave the jury for why Morris told the second story was that he was "naive."

28

1  (*See* Tr. July 5, 2005 at 100–01 ("Cory is, as you can tell from the tapes and the
2  video, rather naive.").)

3       Logan thus failed to effectively explain to the jurors why they should
4  discount Morris's second story to the police. Although he pointed out that Morris
5  talked about strangulation only after being prompted by Hutson, he gave no
6  explanation as to why Morris would have agreed with this scenario if it was not
7  true. As the defense's theory was that Morris's first story—that the women had died
8  of drug overdoses—was true, this was particularly unreasonable. *See Crane v.*
9  *Kentucky*, 476 U.S. 683, 689 (1986) (explaining that "regardless of whether the
10  defendant marshaled the same evidence earlier in support of an unsuccessful motion
11  to suppress, and entirely independent of any question of voluntariness, a
12  defendant's case may stand or fall on his ability to convince the jury that the manner
13  in which the confession was obtained casts doubt on its credibility"). Because he
14  did not make an opening statement, the jury was left with the damaging and
15  mistaken impression that Morris originally told one story, and then voluntarily
16  confessed to strangling each of the victims, an impression which Logan did little to
17  dispel. (*See* Tr. June 13, 2005 at 52–73.) An opening statement was a missed
18  opportunity to educate the jury about how the pressures of custodial police
19  interrogation can induce suspects into making unreliable, inculpatory statements.
20  Additionally, Logan should have told the jury what to be mindful of when viewing
21  the videotape of Morris's statement.

22       Moreover, Logan appears to have been blindsided when the prosecutor
23  sought to admit and play for the jury only discrete sections of the videotape of
24  Morris's statement out of order. Logan separately objected based on completeness
25  and lack of foundation, but did not object that the statements were unreliable and
26  that showing sections of videotape out of order was unduly prejudicial. Logan's
27  inexcusable lack of preparedness was evident when he failed to explain to the trial
28  court that the whole statement needed to be shown so that the jury could see the

effect of Hutson's tactics on Morris and how they led him into telling the second version of events. Thus, Logan should have played for the jury the whole tape so they could see how Morris's statements were taken out of context by the prosecutor and what influence techniques preceded those statements. Indeed, the prosecutor commented on Logan's failure to do so in his closing argument. (Tr. July 5, 2005 at 81–82 (arguing that defense alluded to statements from second version of events being involuntary but, "[if] that was the claim, why didn't they show" the jury the whole tape)

Finally, counsel should have developed and presented testimony from an expert in the psychology of police interrogations and confessions to support the defense's theory of the case—that Morris was particularly suggestible, and, as a result of Hutson's deceptive tactics, the second version of events was inherently unreliable. As noted in the article Thomas sent Logan, "Jurors simply can't get over their reluctance to believe that anybody would confess to a crime they didn't commit, especially murder[.]" Thus, an expert was necessary to explain to laypersons how, in a custodial setting, people do in fact make unreliable inculpatory statements, that certain interrogation techniques increase the risk of unreliable inculpatory statements, and that certain people are more susceptible to making such statements. Such an expert could have explained that Morris's original version of events was mostly reliable, but that the techniques used by Hutson, and Morris's susceptibility to them, led Morris into telling the second version of events. Thus, it was objectively unreasonable for Logan to challenge the reliability of Morris's statements merely through cross-examination and closing argument and without the assistance of expert testimony. *See Hinton*, 134 S. Ct. at 1088 ("Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence." (quoting *Harrington v. Richter*, 562 U.S. 86, 106 (2011)).

Importantly, the statements were not innocuous—they were used to show

both that Morris had committed the murders and had engaged in necrophilia. As previously discussed, Logan was aware that Morris's second version of events was the key piece of evidence against him. (*See, e.g.*, Tr. July 5, 2005 at 111 ("All of the information that you folks have about the actual killings comes from the statement by Cory to Detective Hutson.").) If Logan had explained this key evidence and undermined its reliability, there is a reasonable likelihood that the outcome of every stage of Morris's trial would have been different.

There were several bases upon which to challenge both the admissibility and reliability of Morris's statement to police. However, Logan failed to investigate and explore these bases, even though he knew that either excluding or undermining the reliability of the statement was crucial to the defense. This failure to develop and present an appropriate challenge to the admissibility and reliability of Morris's statements was objectively unreasonable and undermines confidence in the outcomes of every stage of Morris's trial.

## C. Trial counsel were ineffective for failing to seek a severance of the multiple counts of first-degree murder.

Morris raised this claim in his post-conviction proceedings. (IOR 307 at 47–54.) The post-conviction court denied the claim on the merits. (IOR 354 at 8.) The state court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an unreasonable determination of the facts in light of the evidence presented. *See id.* § 2254(d)(2). Morris incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Morris was charged with five counts of first-degree murder based on crimes that occurred at different times. (*See* IOR 7.) The counts were joined for trial, and defense counsel failed to move to sever them. "The rules for joinder and severance must be read together." *State v. Lee*, 708 P.2d 102, 108 (Ariz. Ct. App. 1985).

1    Arizona Rule of Criminal Procedure 13.3(a)(1) allows joinder of offenses if they

2    "[a]re of the same or similar character." Ariz. R. Crim. P. 13.3(a)(1).[45] Arizona Rule

3    of Criminal Procedure 13.4 governs the severance of offenses. Subsection (a)

4    provides that "[w]henever 2 or more offenses . . . have been joined for trial, and

5    severance of any or all offenses . . . is necessary to promote a fair determination of

6    the guilt or innocence of any defendant of any offense, the court may on its own

7    initiative, and shall on motion of a party, order such severance." Ariz. R. Crim. P.

8    13.4(a). Under subjection (b), a "defendant shall be entitled as of right to sever

9    offenses joined only by virtue of Rule 13.3(a)(1), unless evidence of the other

10   offense or offenses would be admissible under the applicable rules of evidence if

11   the offenses were tried separately." Ariz. R. Crim. P. 13.4(b).

12       Counsel should have moved under these rules to sever the multiple charges

13   against Morris. Counsel was aware of the dissimilarities between the counts as

14   evidenced by his filing a motion related to a lack of evidence of corpus delicti for

15   two of the victims (IOR 65), as discussed in Claim Seven. Due to these differences

16   in proof as to each victim, it was clear before trial that there was a risk that the

17   evidence as to each victim would not be clearly delineated.

18       Because of counsel's failure to seek a severance, the prosecutor was able to

19   use evidence supporting the individual counts to advocate for verdicts on the others.

20   For example, the prosecutor argued at trial that decomposition erased the signs of

21   strangulation on Codman and Davis and essentially urged the jury to consider

22   evidence that the other victims were strangled. (*See, e.g.*, Tr. June 13, 2005 at 64–

23   65 (arguing that Codman's body appeared to have been strangled even though "the

24   fact of decomposition eradicates the cause . . . [and] if a body is too decomposed,

25   the reason that the person died is not available to the medical examiner's office

26

27   _____

28   [45] All citations to Rules 13.3 and 13.4 of the Arizona Rules of Criminal Procedure
     are to the versions effective until January 1, 2018.

1    anymore").) Moreover, joinder allowed the prosecutor to blur the lines between the

2    evidence supporting the charge of necrophilia as to each victim. As set forth in

3    Claim Two, the prosecutor's theory of the case was that Morris had killed the

4    victims in order to engage in postmortem sex with their corpses. (*See, e.g.*, Tr. June

5    20, 2005 at 78–80, 84.) The evidence the prosecutor relied on was primarily

6    introduced during the guilt phase and re-urged at the aggravation phase. This

7    consisted of skin slippage on Codman and Noah, semen detected in Velasquez and

8    Noah, and anal defects found on Castillo. The jury was invited to infer that, based

9    on the cumulative evidence, Morris had engaged in postmortem sex with all of the

10   victims. Indeed, the prosecutor urged the jury to find that Morris relished Davis's

11   murder, inflicted gratuitous violence on Davis, and needlessly mutilated her body,

12   even though he acknowledged that he could not point to any physical evidence of

13   postmortem sexual activity with her. (Tr. July 12, 2005 at 30.) Specifically, the

14   prosecutor argued that Morris:

15              knows, even if we can't prove that, there's this sexual
               interaction with her. He knows he's going to keep the body
16             around. He knows he's going to have that in his trailer, and
               he knows it's at his disposal. He has this trophy that he is
17             doing with what he will, whatever that may be.

18

19   (Tr. July 12, 2005 at 100.)

20         Counsel's failure to seek a severance thus impacted the guilt and aggravation

21   phases of Morris's trial. If counsel had not performed deficiently and had filed a

22   motion to sever, there is a reasonable probability that the motion would have been

23   granted and the prejudicial impact of having the counts tried together would have

24   been mitigated.

25         The post-conviction court found that counsel was not ineffective first because

26   the offenses were properly joined under Rule 13.3(a)(1). The court reasoned that

27   they all "involved a female prostitute or transient who was strangled while having

28   sex with [the] defendant, and whose body was found in the vicinity of defendant's

yard over a period of a few months." (IOR 354 at 8.) In making this finding, the post-conviction court painted the offenses in broad strokes and overlooked and ignored evidence of the offenses' dissimilarity to one another. Velasquez, for example, was found clothed. (Tr. June 27, 2005 at 134.) By contrast, the other victims were found nude, and there appeared to be drag marks near the bodies of Codman and Davis. (IOR 67 at 2–4.) The autopsy reports for Codman and Davis, respectively, originally listed their causes of death as drug overdoses. (IOR 68 at 000894, 000896, 000904, 000906.) Moreover, two other persons had previously been suspected of Codman's murder. (PCR Pet. Ex. FF.) And semen was found in the bodies of Velasquez and Noah only. (Tr. June 27, 2005 at 24–25, 78, 125–30.) Accordingly, the post-conviction court's finding that the crimes were of similar character and thus properly joined under Rule 13.3(a)(1) was an unreasonable determination of the facts based on the record before it. *See Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004) (explaining that state-court fact-finding process is fatally undermined, rendering resulting finding unreasonable, where state court has before it, yet apparently ignores, highly probative evidence central to petitioner's claim), *abrogated on other grounds by Murray v. Schriro*, 745 F.3d 984 (9th Cir. 2014); *cf. Miller-El v. Cockrell*, 537 U.S. 322, 346 (2003) ("Our concerns are amplified by the fact that the state court also had before it, and apparently ignored, testimony demonstrating that the Dallas County District Attorney's Office had, by its own admission, used this process to manipulate the racial composition of the jury in the past.").

Next, the post-conviction court found that counsel was not ineffective for failing to seek a severance because evidence of the other offenses still would have been admissible at separate trials on the ground that Morris "claimed in his statements to police that the deaths were either a mistake or accidental." (IOR 354 at 8.) Arizona Rule of Evidence 404(b) provides that a defendant's prior bad acts cannot be introduced "to show action in conformity therewith," but can be

admissible to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ariz. R. Evid. 404(b). Morris's statement to police had two versions of events: (1) all of the victims died of apparent drug overdoses (PCR Pet. Ex. O at 000489–545); and (2) each of the victims asked Morris to choke her and accidentally died as a result (PCR Pet. Ex. O at 000561–586). It was unreasonable for the state court to conclude that Morris would claim the second version of events to be true at trial with no basis for that position. Indeed, the first version was ultimately the defense's theory of the case. (*See, e.g.*, Tr. July 5, 2005 at 99–113.) As such, the evidence of the other offenses would not have been admitted because the defense did not argue mistake or accident at trial. *See, e.g.*, *State v. Ives*, 927 P.2d 762, 770–71 (Ariz. 1996) (finding that, where defendant denied any wrongdoing, it was reversible error to admit evidence of other instances of molestation to show defendant's "intent," or whether he had "accidentally" or "mistakenly" touched victims). Thus, the post-conviction court's conclusion that evidence of the other offenses would have been cross-admissible at separate trials, and severance as of right under Rule 13.4(b) was therefore unavailable, was an unreasonable determination of the facts.

Additionally, the post-conviction court did not address Morris's argument that defense counsel should have moved for severance under Rule 13.4(a), which provides for severance when it is "necessary to promote a fair determination of the guilt or innocence of any defendant of any offense." (*See* IOR 307 at 48.) Arizona's "rules on joinder and severance are intended to further not only liberal joinder but also *liberal severance*. Where there is any doubt, it must be resolved in favor of the defendant." *State v. Roper*, 682 P.2d 464, 467 (Ariz. Ct. App. 1984) (emphasis in original) (internal citations omitted). In this case, there was a great risk that the jury would use evidence of the other offenses to infer that Morris had murdered Codman and Davis, despite the dearth of evidence that their deaths were caused by criminal conduct. The same is true of the aggravation phase, where the evidence to support

1   finding that one crime was cruel, heinous, or depraved could be used to bolster the

2   argument as to the other crimes, particularly in the case of Davis, as discussed

3   above.

4          Associating the five separate offenses risked portraying Morris in a

5   manifestly unfair manner because it would give rise to the impression that he was

6   generally disposed to deviant sexual behavior, and thus killed and then engaged in

7   necrophilia with all of the victims, regardless of the individual merits of each

8   charge. As set forth in Claim Ten, joinder of all five counts did render Morris's trial

9   fundamentally unfair in violation of the Fourteenth Amendment and violated his

10  Sixth Amendment right to an impartial jury. The state court ignored this facet of

11  Morris's claim of ineffective assistance of counsel and did not address the fact that

12  counsel was deficient for failing to protect Morris from these violations by seeking

13  severance under the principle that it is required to ensure the fairness of trial. The

14  state court's rejection of Morris's claim was therefore based on unreasonable

15  factual determinations and was an unreasonable application of clearly established

16  federal law.

17         Had defense counsel filed a motion to sever the counts against Morris, there

18  is a reasonable probability that Arizona's policy of liberal severance would have

19  required resolution in his favor, preventing the fundamentally unfair joinder of the

20  separate offenses. Counsel was thus ineffective, and Morris is entitled to relief.

21         **D.     Trial counsel were ineffective for failing to make appropriate**
22  **objections during voir dire.**

23         This claim was not raised in state court. Morris alleges he can overcome any

24  default of this claim by showing cause and prejudice, including because of the

25  ineffective assistance of state post-conviction counsel. *See Martinez v. Ryan*, 566

26  U.S. 1, 9 (2012); *Murray v. Carrier*, 477 U.S. 478, 488–89 (1986); *Strickland v.*

27  *Washington*, 466 U.S. 668, 687–88 (1984). Morris will demonstrate at an

28  evidentiary hearing that post-conviction counsel fell below the standards of

1    minimally competent capital attorneys and that those failures prejudiced him.
2    Alternatively, he alleges that any procedural bar is not adequate or independent or
3    that imposing default would be a miscarriage of justice. Because this claim has not
4    been adjudicated by the Arizona state courts, the limitations on relief imposed by
5    28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider
6    the merits of the claim de novo. Morris incorporates by specific reference all facts,
7    allegations, and arguments made elsewhere in this Petition.

8          Morris has a constitutional right to be tried by an impartial jury that was not
9    "uncommonly willing" to return a death verdict. *Witherspoon v. Illinois*, 391 U.S.
10   510, 521 (1968). Additionally, in *Morgan v. Illinois*, 504 U.S. 719 (1992), the
11   Supreme Court held that any juror who would automatically impose the death
12   penalty upon conviction of the capital offense charged must be disqualified for
13   cause, and that capital defendants are constitutionally entitled to examine
14   prospective jurors on voir dire with enough specificity to identify and challenge any
15   juror holding such views. Morris's counsel had a duty to protect these rights during
16   voir dire. *See, e.g.*, 2003 ABA Guidelines § 10.10.2(B) ("Counsel should be
17   familiar with precedents relating to questioning and challenging of potential jurors,
18   including the procedures surrounding 'death qualification' concerning any potential
19   juror's beliefs about the death penalty."). Instead, counsel failed to move that
20   several jurors should be struck for cause based on their bias toward the imposition
21   of the death penalty.

22         For example, Panelist 27 said that he had seen news coverage of the case that
23   made it seem like Morris was guilty and that he was "leaning one way." (Tr. June
24   7, 2005 at 28.) When asked if he could put aside what he had previously heard about
25   the case, he responded "I think I could do that. The only trouble I have is that, like
26   I said from the beginning, I'm almost swayed a little bit. . . . Just that this person
27   was accused of this and appeared that he was guilty." (Tr. June 7, 2005 at 30.) He
28   further stated that he believed when the death penalty was imposed, it should be

carried out within a year because "they languish too long." (Tr. June 7, 2005 at 31–32.) Defense counsel then followed-up about what Panelist 27 had heard in the media and if he was already swayed toward a conviction. (Tr. June 7, 2005 at 34–37.) Counsel also asked about a statement on the prospective juror's questionnaire that said "after that one-year time allotment, hook them up." (Tr. June 7, 2005 at 37.) Panelist 27 agreed that this was his view regardless "of any appeal or anything like that[.]" (Tr. June 7, 2005 at 37.) After all of this, defense counsel failed to move that he be stricken for cause. (Tr. June 7, 2005 at 38.) The trial judge asked twice if there was no objection from the defense; there was none. (Tr. June 7, 2005 at 38.) Counsel then had to use a peremptory challenge to strike Panelist 27. (IOR 102 (sealed).)

Similarly, two prospective jurors who ended up being seated, K.N. and C.J., said that they did not agree with the law that what can be considered aggravating is limited. (Tr. June 6, 2005 at 147; Tr. June 8, 2005 at 16–17.) Another seated juror, A.L., said that the death penalty is imposed too seldom and that he knew Dr. Keen on a professional basis. (Tr. June 7, 2005 at 138, 140.) And juror A.M. heard about the case on the news. He also worked as a mechanic at a Phoenix Police Department precinct and knew the names of two of the officers involved in the case and acknowledged that there were more people on the list that he may know, just not by name. (Tr. June 6, 2005 at 127, 133–34.) Counsel did not move to strike any of them for cause. (Tr. June 6, 2005 at 134, 148; Tr. June 7, 2005 at 141; Tr. June 8, 2005 at 18.) Counsel further failed to object to the *Batson* violation outlined in Claim Seventeen, *infra*.

As a result of counsel's failure to challenge biased jurors, Morris was subjected to a jury that was "'organized to convict'" him and impose the death penalty. *Witherspoon*, 391 U.S. at 521. The prejudice from this deficient performance was paramount, as the jury began trial already inclined to side with the prosecution. This was due to counsel's constitutionally ineffective assistance.

When reviewing this claim, even if this Court finds that no single error by counsel amounts to prejudice, it, nonetheless, should apply cumulative error principles to grant relief. *See Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005). Morris's counsel was ineffective, and he is entitled to relief.

## CLAIM FIVE

**Morris received ineffective assistance of counsel during the guilt-phase of his trial, violating his rights under the Sixth and Fourteenth Amendments.**

Morris's trial counsel committed errors during the guilt-phase proceedings of his capital trial, and as a result, the result of those proceedings is unreliable. This claim is subject to the two-prong standard established in *Strickland*: counsel's performance must be deficient, and such deficient performance must have prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). First, the inquiry under the deficiency prong is "whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688. The reasonableness of counsel's decisions is measured by the reasonableness of the investigation done in making such a decision. *Cf. Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (focusing on "whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background was itself reasonable."). "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91. In other words, any strategic decision made by counsel must be "reasonable and informed." *Jennings v. Woodford*, 290 F.3d 1006, 1014 (9th Cir. 2002).

When assessing the second prong, a court must decide whether "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. "In making this [prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695; *see also Williams (Terry) v.*

202

1   *Taylor*, 529 U.S. 362, 397–98 (2000); *Alcala v. Woodford*, 334 F.3d 862, 882–83

2   (9th Cir. 2003) (granting relief on basis of cumulative impact of multiple errors by

3   counsel); *Harris by and through Ramseyer v. Wood*, 64 F.3d 1432, 1439 (1995)

4   (holding that the cumulative impact of numerous deficiencies in defense counsel's

5   performance was prejudicial to the defense, rendering the proceedings improper and

6   warranting habeas relief). Even if this Court finds that no single error amounts to

7   prejudice, it, nonetheless, should apply cumulative error principles to grant relief.

8   *See Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005) (quoting *Cooper v.*

9   *Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978) (en banc)).

10       The following subparts of this claim detail the ways in which Morris's trial

11   counsel failed to render reasonably effective assistance of counsel throughout the

12   guilt phase of his trial. These errors "were so serious as to deprive [Morris] of a fair

13   trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687.

14       **A.   Trial counsel were ineffective for failing to hire a pathologist to**
15       **rebut at the guilt phase the cause of death for three victims.**

16       Morris raised this claim in his post-conviction proceedings. (IOR 307 at 25–

17   33.) The post-conviction court did not rule on this claim. (*See* IOR 354.) Morris can

18   rebut the presumption that the state court nevertheless adjudicated the claim on the

19   merits. *See Johnson v. Williams*, 568 U.S. 289, 293 (2013). Review in this Court is

20   therefore de novo. Morris incorporates by specific reference all facts, allegations,

21   and arguments made elsewhere in this Petition.

22       The deaths of two of the victims, Codman and Davis, were originally ruled

23   drug overdoses. Dr. Hu performed the autopsy of Codman and listed the cause of

24   death as combined toxicity of morphine and cocaine. (PCR Hr'g Ex. 8 at 000894.)

25   Dr. Horn performed Davis's autopsy and listed the cause of death as cocaine

26   intoxication. (PCR Hr'g Ex. 9 at 000904.) Counsel accordingly filed a motion to

27   preclude Morris's statements as to these two victims because there was "no corpus

28   of the crime charged without the statement of the defendant[.]" (IOR 65 at 1.) The

1    court denied this motion, as discussed *infra* in Claim Seven. (IOR 70.)

2        At trial, the defense's theory was that the victims had died from drug

3    overdoses, as Morris originally told the police. (*See, e.g.*, Tr. July 5, 2005 at 99–

4    113.) Counsel did not, however, call an expert to support this theory. Hu and Horn

5    both testified that their opinions as to the cause of death for Codman and Davis,

6    respectively, had changed after performing the autopsies because they heard

7    Morris's statement to police. (Tr. June 28, 2005 at 55–58, 71; Tr. June 29, 2005 at

8    40–41, 47.) But an expert for the defense could have opined that "with a high degree

9    of medical certainty," Codman and Davis died from drug overdoses. There was no

10   evidence of asphyxia. (PCR Pet. Ex. Q at 13.) Further, as to Velasquez, the cause

11   of death was listed as "[f]indings consistent with strangulation. Other [contributory

12   causes:] Combined drug intoxication." (PCR Hr'g Ex. 11 at 000916.) A defense

13   expert could have testified that the cause of death should have been "undetermined"

14   because the injuries to her neck "could have been agonal or around the time of death

15   in a setting where the decedent was dying from multidrug intoxication." (PCR Pet.

16   Ex. Q at 10.) Without consideration of the fact that there were other victims, the

17   medical examiner could not have determined whether she died from asphyxia or

18   drug intoxication. (PCR Pet. Ex. Q at 15.)

19       Schaffer wanted to hire a forensic pathologist in this case, (Tr. Mar. 24, 2015

20   at 92, 94–96), and Logan did not remember why one was not hired (Tr. Mar. 19,

21   2015 at 18, 23, 59). Counsel was undeniably aware of the issues concerning cause

22   of death, and failure to consult with and call an expert to rebut the testimony of the

23   medical examiners on this issue was deficient. *See, e.g.*, *Dugas v. Coplan*, 428 F.3d

24   317, 331 (1st Cir. 2005) (finding deficient performance when counsel did not hire

25   expert on forensic issue central to State's case despite not knowing about the issue

26   himself). Because the expert testimony would have undermined whether three of

27   the victims were in fact murdered, confidence in Morris's trial is undermined as a

28   result of counsel's performance.

In his post-conviction petition, Morris argued that his trial counsel was ineffective for failing to "investigate and develop a defense regarding the victims' deaths." (IOR 307 at 25.) He further argued that "[u]pon review of Dr. Posey's report, it is clear that the defense could have refuted critical aspects of the State's case during both the guilt phase, and the penalty phase, which would have affected the verdict." (IOR 307 at 26.) He then outlined the testimony Posey could have provided, including the challenges to the cause of death for Codman, Davis, and Velasquez. (IOR 307 at 27–30.) The State understood Morris to be making an argument about counsel's failure to call a pathologist to testify at the guilt phase about the cause of death of the victims, saying "Dr. Posey's opinions would not have affected the verdicts because there was sufficient evidence that Morris strangled each victim, including his admissions." (IOR 349 at 21.) The State then defended the evidence that Codman, Davis, and Velasquez died from strangulation. (IOR 349 at 21–23.)

The state court, however, did not discuss this claim in its order dismissing the majority of Morris's post-conviction claims. (*See* IOR 354.) The court addressed counsel's failure to hire a pathologist at the aggravation phase only. (IOR 354 at 4–5.) The presumption that the court nevertheless adjudicated the claim on the merits is here rebutted. This is not an instance where the state court ruled on a state-law ground that is co-extensive with federal law. Further, there was more than a "fleeting reference to a provision of the Federal Constitution," as it was clear the claim was based on the Sixth Amendment right to effective counsel. Finally, the claim was not "too insubstantial to merit discussion." *Johnson*, 568 U.S. at 298–99. Instead, the claim was ignored completely despite its importance, as it went to the confidence in the guilt-phase verdict on three counts. "If a federal claim is rejected as a result of sheer inadvertence, it has not been evaluated based on the intrinsic right and wrong of the matter." *Id.* at 302–03. That is what occurred here. Review in this Court is therefore de novo.

1       Even if the presumption that the claim was adjudicated on the merits cannot
2  be rebutted, Morris still prevails. The question becomes "what arguments or
3  theories . . . could have supported [] the state court's decision; and then . . . whether
4  it is possible fairminded jurists could disagree that those arguments or theories are
5  inconsistent with the holding in a prior decision" of the Supreme Court. *Harrington*
6  *v. Richter*, 562 U.S. 86, 102 (2011). Any determination that counsel did not perform
7  deficiently by failing to retain a pathologist to challenge the cause of death for three
8  of the victims would have been an unreasonable application of clearly established
9  federal law. The defense's theory was that the victims died from drug overdoses,
10 but they put on no evidence to support that theory. "Criminal cases will arise where
11 the only reasonable and available defense strategy requires consultation with
12 experts or introduction of expert evidence[.]" *Id.* at 106; *see also Hinton v.*
13 *Alabama*, 134 S. Ct. 1081, 1088 (2014) (finding that expert was required in case
14 because "[a]s Hinton's trial attorney recognized, the core of the prosecution's case
15 was the state experts' conclusion that the six bullets had been fired from the Hinton
16 revolver, and effectively rebutting that case required a competent expert on the
17 defense side"). This was indisputably a case where an expert was needed. Counsel
18 recognized that this case turned on medical expertise, and there was no reasonable
19 strategy that would have supported the decision not to hire a pathologist. Further,
20 the state court could not have reasonably found that Morris was not prejudiced by
21 this failure, as the issue to which a pathology expert was central was whether a
22 murder had occurred at all. "[C]ounsel's errors were so serious as to deprive
23 [Morris] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687.

24       **B.    Trial counsel were ineffective for failing to object to the**
25            **Confrontation Clause violations that occurred when the medical**
            **examiners testified about the toxicology findings.**

26       This claim was not raised in state court. Morris alleges he can overcome any
27 default of this claim by showing cause and prejudice, including because of the
28 ineffective assistance of state post-conviction counsel. *See Martinez v. Ryan*, 566

1   U.S. 1, 9 (2012); *Murray v. Carrier*, 477 U.S. 478, 488–89 (1986); S*trickland v.*
2   *Washington*, 466 U.S. 668, 687–88 (1984). Morris will demonstrate at an
3   evidentiary hearing that post-conviction counsel fell below the standards of
4   minimally competent capital attorneys and that those failures prejudiced him.
5   Alternatively, he alleges that any procedural bar is not adequate or independent or
6   that imposing default would be a miscarriage of justice. Because this claim has not
7   been adjudicated by the Arizona state courts, the limitations on relief imposed by
8   28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider
9   the merits of the claim de novo. Morris incorporates by specific reference all facts,
10  allegations, and arguments made elsewhere in this Petition.

11      As discussed *infra* in Claim Fifteen, the medical examiners testified as to the
12  drugs and alcohol found in the victims' systems despite not having conducted the
13  toxicology testing themselves. (Tr. June 15, 2005 at 93–95 (Castillo); Tr. June 27,
14  2005 at 114–16 (Noah); Tr. June 28, 2005 at 34–36 (Codman); Tr. June 29, 2005 at
15  19–22 (Velasquez); Tr. June 29, 2005 at 37–38 (Davis); PCR Hr'g Exs. 7–11.)
16  Counsel did not object to this testimony either as impermissible hearsay or as
17  violations of the Confrontation Clause. This is despite the fact that counsel objected
18  to the testimony of Dr. Keen because he had not conducted the autopsy of Noah but
19  testified to its results. (Tr. June 27, 2005 at 84, 91–98.) Counsel therefore clearly
20  was aware that the Confrontation Clause prohibited testimonial hearsay statements
21  introduced by a witness other than the declarant when the declarant is available.
22  *See Crawford v. Washington*, 541 U.S. 36, 68 (2004).

23      The testimony concerning the toxicology reports was of particular
24  importance to the defense's case. At the guilt phase, the defense's theory was that
25  the victims had died of accidental drug overdoses. (*See* Tr. July 5, 2005 at 101–04.)
26  And at the aggravation phase, counsel argued that the victims were not conscious
27  and could not feel pain because of their levels of intoxication. (Tr. July 12, 2005 at
28  41, 119–23.) Because counsel did not object to the Confrontation Clause violations,

207

they were not able to cross-examine the toxicologist, Norman Wade, on the methods used to determine the drug levels found in each victims' system or his credentials and credibility, including the fact that he had been fired from a previous job for crimes related to his workplace and subsequently convicted of stealing a gun from a property room, facts going to his credibility. Counsel therefore performed ineffectively and Morris is entitled to relief.

**C.     Trial counsel we ineffective in failing to make a motion for acquittal on the ground that the State failed to present sufficient evidence to establish the corpus delicti of Codman and Davis.**

This claim was not raised in state court. Morris alleges he can overcome any default of this claim by showing cause and prejudice, including because of the ineffective assistance of state post-conviction counsel. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Murray v. Carrier*, 477 U.S. 478, 488–89 (1986); *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). Morris will demonstrate at an evidentiary hearing that post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced him. Alternatively, he alleges that any procedural bar is not adequate or independent or that imposing default would be a miscarriage of justice. Because this claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the merits of the claim de novo. Morris incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

As set forth *infra* in Claim Seven (A), Morris filed a pretrial motion to preclude the introduction of his statement to police as to Counts 1 and 2 involving Codman and Davis, respectively, on the ground that the State could not establish the corpus delicti of either alleged crime. (IOR 65.) Because counsel for both parties asked the court to rule on the motion based on their written submissions, the court assumed that the facts stated in the motion and response thereto were true. (IOR 70 at 1.) The trial court denied the motion on the ground that evidence independent of

1   Morris's statements raised reasonable inferences that Codman's and Davis's deaths

2   were caused by criminal conduct. (IOR 70 at 1–2.)

3       After the close of the State's evidence, Logan made a motion pursuant to

4   Arizona Rule of Criminal Procedure 20 for a judgment of acquittal. He said, "I

5   won't argue the facts. You've heard all the facts. And I'll leave it to you." (Tr. June

6   29, 2005 at 112.) The trial court indicated that there was "sufficient evidence to go

7   to the jury in this case," and asked whether Logan was making a Rule 20 motion as

8   to all five counts. (Tr. June 29, 2005 at 113.) Logan said that he was, and the trial

9   court denied the motion as to all five counts. (Tr. June 29, 2005 at 113.)

10      A defendant may raise the issue of corpus delicti in a motion for judgment of

11  acquittal, made pursuant to Rule 20, at the close of the State's case. *See State v.*

12  *Morgan*, 61 P.3d 460, 464 (Ariz. Ct. App. 2002). Here, defense counsel was

13  deficient in failing to argue, in the Rule 20 motion, that the State had not presented

14  sufficient evidence to establish the corpus delicti of Codman and Davis.

15      Medical examiners Hu and Horn testified that Codman and Davis,

16  respectively, had toxic doses of drugs in their systems. (Tr. June 28, 2005 at 53;

17  Tr. June 29, 2005 at 40.) As set forth *infra* in Claim Seven (B), Hu and Horn also

18  conceded that the only evidence that led them to opine that Codman's and Davis's

19  deaths were caused by criminal conduct was Morris's statement to Hutson, despite

20  the existence of other evidence pointing to drug intoxication. (*See* Tr. June 28, 2005

21  at 55–60; Tr. June 29, 2005 at 43–49.) Indeed, without Morris's statements, no

22  evidence established that Codman and Davis died due to criminal conduct or that

23  Morris caused their deaths. The circumstances in which Codman's and Davis'

24  bodies were found nude and in an alley can, as Dr. Horn testified, be indicative of

25  a "drug dump." (Tr. June 29, 2005 at 40 ("The fact that she is nude in an alley way

26  means that she may be a quote, unquote, drug dump, meaning that somebody may

27  have become intoxicated in someone's house and simply dumped in an alleyway

28  which does happen.").) This is especially true given that both Codman and Davis

1    were reported to have extensive histories of drug abuse.

2         And, testimony that Codman's and Davis's personal items were found in

3    Morris's possession or in his trailer merely establishes what Morris initially told

4    Hutson—that Codman and Davis accompanied Morris to his trailer to engage in

5    prostitution and that each died of an apparent drug overdose while there. Therefore,

6    the State failed to present sufficient evidence to raise a reasonable inference that

7    Codman's and Davis's deaths resulted from criminal activity. *See State v. Gillies*,

8    662 P.2d 1007, 1013 (Ariz. 1983) (explaining that before accused's inculpatory

9    statements admissible as evidence of crime, "the state must establish the corpus

10   delicti by proving that a certain result has been produced and that someone is

11   criminally responsible for that result").

12        Had defense counsel raised and argued the corpus delicti issue with respect

13   to Codman and Davis as part of his Rule 20 motion, there is a reasonable probability

14   that Counts 1 and 2 would have been dismissed. Counsel therefore performed

15   ineffectively and Morris is entitled to relief.

16        **D.    Trial counsel failed to object to the standard of proof instruction
17             at both the guilt and aggravation phases, rendering ineffective
             assistance.**

18        This claim was not raised in state court. Morris alleges he can overcome any

19   default of this claim by showing cause and prejudice, including because of the

20   ineffective assistance of state post-conviction counsel. *See Martinez v. Ryan*, 566

21   U.S. 1, 9 (2012); *Murray v. Carrier*, 477 U.S. 478, 488–89 (1986); *Strickland v.*

22   *Washington*, 466 U.S. 668, 687–88 (1984). Morris will demonstrate at an

23   evidentiary hearing that post-conviction counsel fell below the standards of

24   minimally competent capital attorneys and that those failures prejudiced him.

25   Alternatively, he alleges that any procedural bar is not adequate or independent or

26   that imposing default would be a miscarriage of justice. Because this claim has not

27   been adjudicated by the Arizona state courts, the limitations on relief imposed by

28   28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider

1    the merits of the claim de novo. Morris incorporates by specific reference all facts,

2    allegations, and arguments made elsewhere in this Petition.

3         As discussed in Claim 20, at both the guilt and aggravation phases of

4    Morris's trial, the court defined the reasonable-doubt standard using the Arizona

5    Supreme Court's articulation in *State v. Portillo*, 898 P.2d 970, 974 (Ariz. 1995).

6    These instructions reduced the State's standard of proof to something less than

7    reasonable doubt. Counsel did not object to these instructions at either the guilt or

8    aggravation phase. In fact, Morris's counsel included the same standard-of-proof

9    instruction in his proposed instructions for the guilt phase. (IOR 124 at 7.) The

10   reasonable-doubt  standard  "is  indispensable  to  command  the  respect  and

11   confidence of the community in applications of the criminal law." *In re Winship*,

12   397 U.S. 358, 364 (1970). "It is critical that the moral force of the criminal law not

13   be diluted by a standard of proof that leaves people in doubt whether innocent men

14   are being condemned." *Id.* A lesser standard of proof violates a defendant's rights

15   to due process. *See id.* As the Supreme Court has explained, "'[a]ttempts to explain

16   the term 'reasonable doubt' do not usually result in making it any clearer to the

17   minds of the jury.'" *Holland v. United States*, 348 U.S. 121, 140 (1954) (quoting

18   *Miles v. United States*, 103 U.S. 304, 312 (1880)). As a result of counsel's failure

19   to object to these unconstitutional instructions, the State was not held to its proper

20   standard of proof. If the jury had been correctly instructed, there is a reasonable

21   probability that at least one juror would have reached a different verdict at the guilt

22   and aggravation phases. Counsel was therefore ineffective, and Morris is entitled to

23   relief.

24         When reviewing this claim, even if this Court finds that no single error by

25   counsel in the guilt phase amounts to prejudice, it, nonetheless, should apply

26   cumulative error principles to grant relief. *See Boyde v. Brown*, 404 F.3d 1159, 1176

27   (9th Cir. 2005). Morris's counsel was ineffective at the guilt phase of his capital

28   trial, and he is entitled to relief.

# CLAIM SIX

**Morris received ineffective assistance of counsel during the aggravation phase of his capital trial proceedings, in violation of his Sixth and Fourteenth Amendment rights.**

Morris's counsel performed deficiently during the aggravation phase of his trial, and he was prejudiced as a result. The inquiry under the deficiency prong is "whether counsel's assistance was reasonable considering all the circumstances." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Performance is deficient when the attorney fails to render the performance of a reasonably competent attorney. *Id.* at 687. Although defense counsel has broad discretion when making strategic decisions, those decisions must be reasonable and informed. *Id.* at 691; *see also Correll v. Ryan*, 539 F.3d 938, 949 (9th Cir. 2008) (holding that an "uninformed strategy" is "no strategy at all"). In assessing counsel's performance, the United States Supreme Court has determined that the ABA Guidelines are "guides to determining what is reasonable." *Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003).

Capital defense counsel are charged with the duty to contest aggravating factors alleged by the State against their client. *See, e.g.*, *Correll*, 539 F.3d at 947–48 (finding deficient performance when, among other things, counsel failed to challenge three of five alleged aggravating factors). In fact, the Supreme Court addressed this topic when ruling on a related issue in *Rompilla*, 545 U.S. at 387, and held that a criminal defense attorney has a constitutional duty to investigate relevant aggravating and mitigating circumstances. S*ee also Wiggins*, 539 U.S. at 524 (discussing counsel's express duty to investigate evidence in rebuttal of aggravation). Here, Morris's counsel failed to perform according to prevailing professional norms with regard to several aspects of the aggravation phase, and Morris was prejudiced as a result.

/ / /

/ / /

**A.** **Counsel were ineffective for failing to challenge the (F)(6) aggravating factor with expert testimony.**

Morris raised this claim in his post-conviction proceedings. (IOR 307 at 6–33.) The post-conviction court denied the claim on the merits. (IOR 354 at 4–5.) The state court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an unreasonable determination of the facts in light of the evidence presented. *See id.* § 2254(d)(2). Morris incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

At the aggravation phase of Morris's trial, the prosecutor argued that the victims experienced pain and mental anguish while being strangled and that Morris then had postmortem sex with their bodies. (*See, e.g.*, Tr. July 12, 2005 at 22–39.) These arguments supported the argument that the crimes were cruel as well as heinous or depraved, respectively. *See* Ariz. Rev. Stat. § 13-703(F)(6) (renumbered to § 13-751(F)(6)). The prosecutor's bases for this aggravating factor would have been easily undermined by expert testimony. Instead, defense counsel called no witnesses to counter the prosecutor's theory in aggravation.

If the defense had called a pathologist, they first could have undermined the prosecutor's necrophilia theory and thus the support for the finding that the crimes were heinous or depraved. Posey was hired during Morris's post-conviction proceedings, and he explained that "[p]ostmortem sexual assault cannot be determined by the autopsy." (PCR Pet. Ex. Q at 16.) He also opined that the skin slippage in this case definitively did not support the prosecutor's argument that necrophilia had occurred. Posey clarified that despite the prosecutor's argument that skin slippage on Codman and Noah showed postmortem sex, in fact the slippage "is what would be expected based on the state of decomposition when found." (PCR Hr'g Ex. 6 at 6.) The location of the slippage—on the lower body—was "textbook."

213

(PCR Hr'g Ex. 6 at 7.) If postmortem sex had occurred, more extensive skin damage would have been seen. (PCR Hr'g Ex. 6 at 10.) He concluded that "[s]kin slippage does not prove there was postmortem sex. Skin slippage is an expected, natural process of decomposition." (PCR Hr'g Ex. 6 at 9.) Posey also opined that "with a high degree of medical certainty, the perianal defects [on Castillo] are a result of decomposition and aggressive maggot activity causing the skin defects and tissue loss." (PCR Hr'g Ex. 6 at 7.) Posey therefore concluded that "[t]here is no evidence of postmortem body-to-body contact on any of the victims." (PCR Hr'g Ex. 6 at 10.) Counsel performed deficiently by not presenting testimony such as this, which directly contradicted the prosecutor's argument that the murders were heinous or depraved.

Expert testimony also would have rebutted the prosecutor's cruelty argument. Posey opined that a victim of strangulation will lose consciousness in approximately ten seconds. (PCR Pet. Ex. Q at 15.) He concluded "[w]ith a very high degree of medical certainty, none of the decedents suffered more than 10 seconds if they suffered at all." (PCR Pet. Ex. Q at 17.) And experts also could have testified as to the effects on their awareness of the drugs and alcohol the victims had consumed, and thus whether they consciously experienced physical pain or mental anguish, as necessary for a finding of cruelty. *See State v. Trostle*, 951 P.2d 869, 883 (Ariz. 1997). Posey explained that Velasquez, Noah, and Castillo were intoxicated at the time of their deaths to the point that, as to each victim, "her level of awareness was markedly decreased as were her normal inhibitions. If she was not unconscious or dead, she more likely than not did not know she was being asphyxiated." (PCR Pet. Ex. Q at 9–13, 15.) He concluded that for:

> Ms. Noah and Ms. Castillo, there is a very high degree of medical certainty they were semiconscious or unconscious when they were strangled, and they were unaware of what was happening. The absence of injuries indicates they were not trying to defend themselves or they were not in a struggle or altercation at the time of their deaths.

1
2
3

> Ms. Velasquez was either semiconscious or unconscious,
> and in the event she was strangled, she too was not aware
> of what was happening to her.

4   (PCR Pet. Ex. Q at 16.) As for Codman and Davis, they both had lethal doses of

5   drugs in their systems. (PCR Pet. Ex. Q at 13.)

6       A toxicologist similarly could have testified about the drug quantities

7   detected in each of the victims. For example, the level of morphine in Codman's

8   blood "is high enough blood concentration that one would expect to have some

9   analgesia from the drug. Such an average person would have a lessened perception

10  of pain." (IOR 386 at Attachment at 9.) Further, the concentration of cocaine found

11  in Davis's blood "enough cocaine to cause euphoria and increase one's sense of

12  well-being[.]" (IOR 386 at Attachment at 9.) And the amount of alcohol Velasquez

13  had consumed "would affect and diminish one's ability to perceive pain." (IOR 386

14  at Attachment at 10.)

15      Expert testimony thus could have shown that the victims were most likely

16  conscious for mere seconds if at all, and that if they were conscious they were

17  feeling the effects of drugs such that they were not aware of what was occurring.

18  This testimony would have directly undermined the prosecutor's theory as to why

19  the crimes were cruel.

20      Defense counsel should have known going into the aggravation phase what

21  argument the prosecutor would make, as he had put in testimony to support his

22  aggravation theory during the guilt phase. And counsel knew before trial that all of

23  the victims had drugs or alcohol in their systems and that necrophilia would be an

24  issue in the case. *See* Claims Seven and Two. They simply failed to investigate how

25  this information could be presented to rebut the prosecutor's aggravation

26  arguments. "Although it may not be necessary in every instance to consult with or

27  present the testimony of an expert, when the prosecutor's expert witness testifies

28  about pivotal evidence . . . defense counsel's failure to present expert testimony on

215

that matter may constitute deficient performance." *Duncan v. Ornoski*, 528 F.3d 1222, 1235 (9th Cir. 2008) (citing cases). The evidence offered to support the (F)(6) aggravating factor came entirely from medical examiners, and the defense needed to put on expert testimony to rebut it. They performed deficiently in failing to do so.

Because the evidence to support the aggravating factor that the murders were cruel, heinous, or depraved was so weak, as discussed *infra* in Claim Twelve, an expert would have held particular sway with the jury and been able to point out to the jury that there was insufficient evidence to support this factor. There is a reasonable probability that at least one juror would have either voted against the factor or, when weighing the aggravation and mitigation at the penalty phase, given the factor less weight. Morris was therefore prejudiced by counsel's deficient performance.

The post-conviction court ruled that defense counsel was not ineffective for failing to hire a pathologist to testify at the aggravation phase because Posey's opinion "ignores evidence of strangulation and struggles by some of the victims."[46] (IOR 354 at 5.) The court therefore discounted his opinion. First, Posey had considered the evidence that purportedly supported finding that Noah, Davis, and Velasquez[47] had struggled. (*See* PCR Pet. Ex. Q at 10 ¶¶ 1.2, 2.324, 2.331, 2.335, 2.342, 2.343.) It was therefore an unreasonable factual determination for the court to find otherwise. Moreover, the post-conviction court made a credibility determination about the strength of Posey's opinion without the benefit of an

---

[46] Footnote 39 applies equally to this claim.

[47] These were the three victims the Arizona Supreme Court on direct review said had struggled. *State v. Morris*, 160 P.3d 203, 220 (Ariz. 2010). Although the post-conviction court did not specify which victims it was referring to, Morris assumes it was these same three.

1    evidentiary hearing.[48] Because the court therefore made "evidentiary findings

2    without holding a hearing and giving petitioner an opportunity to present evidence,

3    such findings clearly result in an 'unreasonable determination' of the facts." *Taylor*

4    *v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004), *abrogated on other grounds by*

5    *Murray v. Schriro*, 745 F.3d 984 (9th Cir. 2014); *see also Hurles v. Ryan*, 752 F.3d

6    768, 790 (9th Cir. 2014); *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012);

7    *Nunes v. Mueller*, 350 F.3d 1045, 1056 (9th Cir. 2003) ("[T]he state court's decision

8    was objectively unreasonable because that court made factual findings (that is, it

9    drew inferences against Nunes where equally valid inferences could have been

10   made in his favor, and it made credibility determinations) when it rather claimed to

11   be determining prima facie sufficiency."). Moreover, the state court rejected

12   Posey's opinion on this ground as it related to "some of the victims" only, not

13   addressing his opinion as to the others. (IOR 354 at 5.)

14        The post-conviction court also found that Morris could not show prejudice

15   because Posey said that the victims would have suffered no more than ten seconds,

16   but, according to the court, that is sufficient to support a finding of cruelty. (IOR

17   354 at 5.) This was an unreasonable application of clearly established federal law

18   because aggravating factors have to narrow the class of defendants who are eligible

19   for the death penalty, and accepting this definition of cruelty would not do so.

20   *See, e.g.*, *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988). *See* Claim Twelve.

21        The post-conviction court's ruling that counsel was not ineffective for failing

22   to challenge the cruelty prong of the (F)(6) aggravating factor was therefore an

23   unreasonable application of clearly established federal law and based on an

---

25   [48] At the evidentiary hearing, Posey further explained that he did not ignore what
26   the post-conviction court thought was evidence of a struggle, but instead did not
     afford it the same significance as the court. For example, Posey testified that the
27   marks on Noah's neck could be fingernail marks, but that does not prove that she
     was suffering. Trying to loosen a ligature is reflexive and does not show awareness,
28   particularly in light of the drugs she had consumed. (Tr. Mar. 16, 2015 at 131.)

1   unreasonable determination of facts. It is not entitled to deference under § 2254(d).

2   The state did not address Morris's argument that counsel was also ineffective for

3   failing to challenge the heinous or depraved prong of the aggravating factor.

4   (*See* IOR 307 at 8, 25–33.) This Court can therefore review Morris's entire claim

5   de novo. *See Rompilla*, 545 U.S. at 390; *Wiggins*, 539 U.S. at 534; *Weeden v.*

6   *Johnson*, 854 F.3d 1063, 1071 (9th Cir. 2017); *Frantz v. Hazey*, 533 F.3d 724, 736

7   (9th Cir. 2008) (en banc). Because Morris's Sixth Amendment rights were violated

8   by counsel's performance, he is entitled to relief.

9   **B.      Counsel were ineffective for failing to challenge the**

10  **constitutionality of the aggravating factors.**

11      This claim was not raised in state court. Morris alleges he can overcome any

12  default of this claim by showing cause and prejudice, including because of the

13  ineffective assistance of state post-conviction counsel. *See Martinez v. Ryan*, 566

14  U.S. 1, 9 (2012); *Murray v. Carrier*, 477 U.S. 478, 488–89 (1986); *Strickland*, 466

15  U.S. 6 at 687–88. Morris will demonstrate at an evidentiary hearing that

16  post-conviction counsel fell below the standards of minimally competent capital

17  attorneys and that those failures prejudiced him. Alternatively, he alleges that any

18  procedural bar is not adequate or independent or that imposing default would be a

19  miscarriage of justice. Because this claim has not been adjudicated by the Arizona

20  state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply

21  to this Court's review, and the Court may consider the merits of the claim de novo.

22  Morris incorporates by specific reference all facts, allegations, and arguments made

23  elsewhere in this Petition.

24  **1.      Counsel failed to challenge the (F)(2) aggravating factor as**

25  **a violation of Morris's rights under the Double Jeopardy**

26  **Clause.**

26      Defense counsel failed to challenge the use of the aggravating factor that

27  Morris "was previously convicted of a serious offense," which relied for each count

28  on the other four. *See* Ariz. Rev. Stat. § 13 751(F)(2). Counsel should have moved

to have this aggravator dismissed as a violation of the Double Jeopardy Clause, which ensures that no citizen shall be twice placed in jeopardy for the same offense. *See* U.S. Const. amend. V. As discussed *infra* in Claim Twenty-Seven, this protects a defendant against both successive punishments and successive prosecutions for the same criminal offense. *See United States v. Dixon*, 509 U.S. 688, 696 (1993) (citing *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989)). The Supreme Court has established a test to determine whether two crimes constitute the same offense in violation of the Fifth Amendment: "whether each provision requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932). Because the same facts are required to prove the elements of murder and the (F)(2) factor as presented here, Morris was exposed to multiple proceedings and punishments on the same offense. If counsel had gotten this factor dismissed, at sentencing the jury would have weighed only one aggravating factor against Morris's mitigation, and there is a reasonable probability that at least one juror would have voted for life. *See generally Stankewitz v. Woodford*, 365 F.3d 706, 718 n.6 (9th Cir. 2004)

> **2.    Counsel failed to challenge jury instructions on the (F)(6) aggravating factor.**

Counsel filed a motion seeking to strike the aggravating factor that the crimes were cruel, heinous, or depraved on the basis that it was unconstitutionally vague. (IOR 54.) After the trial court did not rule on this motion, counsel failed to object to the jury instructions that were similarly vague and failed to narrow the aggravating factor. The given instructions failed to provide jurors with a "meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not." *Godfrey v. Georgia*, 446 U.S. 420, 427 (1980) (internal quotation marks omitted) (alterations in original).

The trial court, to give substance to the terms "cruel," "heinous," and

"depraved," first instructed the jury that the murder had to be "especially heinous, cruel, or depraved." (IOR 152 at 6.) This phrase alone does not help define what crimes qualify. *See Maynard v. Cartwright*, 486 U.S. 356, 364 (1988). The trial court went on to define "especially heinous, cruel, or depraved" as "above the norm of other first degree murders." (IOR 152 at 6.) But the jury was not instructed as to what qualified as "the norm of other first degree murders" in order for a murder to be "especially heinous, cruel, or depraved" as opposed to just "heinous, cruel, or depraved." Without any point of reference or comparison as to what first-degree murders were "the norm," the jury could not differentiate the case before it.

The jurors here most likely had not previously participated in first-degree murder trials, so they also did not have the benefit of experience to help them discern if the case before them was not "the norm." *Cf. Gregg v. Georgia*, 428 U.S. 153, 192 (1976) ("Since the members of a jury will have had little, if any, previous experience in sentencing, they are unlikely to be skilled in dealing with the information they are given." (citations omitted)). Counsel failed to object to, or seek to clarify, these vague instructions and, as a result, the jury did not have proper guidance in how to find the aggravating factor. If counsel had sought to clarify the instructions and the jury had been properly instructed, there is a reasonable probability that at least one juror would not have found the aggravating factor proven. *See generally Stankewitz*, 365 F.3d at 718 n.6.

When reviewing this claim, even if this Court finds that no single error by counsel in the aggravation phase amounts to prejudice, it, nonetheless, should apply cumulative error principles to grant relief. *See Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005). Morris's counsel was ineffective at the aggravation phase of his capital trial, and he is entitled to relief.

/ / /

/ / /

/ / /

1

**CLAIM SEVEN**

2

3

**The trial court's denial of Morris's motions to dismiss and for judgment of acquittal, despite insufficient evidence, violated his constitutional rights.**

4

Morris raised these claims on direct appeal. (DA 29 at 16, 18–32.) The

5

Arizona Supreme Court denied the claims on the merits. *State v. Morris*, 160 P.3d

6

203, 212 (Ariz. 2007). The state court's rejection of these claims was contrary to,

7

or involved an unreasonable application of, clearly established federal law, as

8

determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it

9

constituted an unreasonable determination of the facts in light of the evidence

10

presented. *See id.* § 2254(d)(2). Morris incorporates by specific reference all facts,

11

allegations, and arguments made elsewhere in this Petition.

12

    A.    **The admission of Morris's statements regarding the deaths of Codman and Davis without sufficient independent proof of corpus delicti rendered his trial fundamentally unfair in violation of his rights under the Fourteenth Amendment.**

13

14

15

The crux of the State's case against Morris for the murders of Codman and

16

Davis was that the second version of events Morris recounted to Hutson—that each

17

woman asked him to choke her while they were having sex—was accurate. All of

18

the evidence independent of those statements was consistent with Morris's initial

19

statement that each of the victims died of apparent drug overdoses.

20

The corpus delicti doctrine is well-established. The Supreme Court has

21

explained that "[t]he general rule that an accused may not be convicted on his own

22

uncorroborated confession has previously been recognized by this Court, and has

23

been consistently applied in the lower federal courts and in the overwhelming

24

majority of state courts." *Smith v. United States*, 348 U.S. 147, 152–53 (1954)

25

(internal citations omitted). In Arizona, a defendant may not be convicted of a crime

26

based on his own uncorroborated confession "without independent proof of the

27

corpus delicti, or the 'body of the crime.'" *State v. Morgan*, 61 P.3d 460, 464 (Ariz.

28

Ct. App. 2002) (citations omitted). "To establish the corpus delicti in a homicide

221

1  case, the State must introduce, in its case-in-chief, evidence independent of the
2  defendant's inculpatory statements that raises a reasonable inference that the death
3  in question was caused by criminal conduct. If the State introduces such
4  independent proof, it may then also introduce the defendant's inculpatory
5  statements." *State v. Nieves*, 87 P.3d 851, 853 (Ariz. Ct. App. 2004). "A State
6  violates a criminal defendant's due process right to fundamental fairness if it
7  arbitrarily deprives the defendant of a state law entitlement." *Laboa v. Calderon*,
8  224 F.3d 972, 979 (9th Cir. 2000) (citing *Hicks v. Oklahoma*, 447 U.S. 343, 346
9  (1980)). Therefore, a state court's arbitrary denial of the protections of the corpus
10  delicti rule to a defendant renders his trial fundamentally unfair in violation of due
11  process.

12      Before trial, Morris filed a motion to preclude the introduction of his
13  statement to Hutson as to Counts 1 and 2, involving Codman and Davis
14  respectively, on the ground that the State could not establish the corpus delicti of
15  either alleged crime. (IOR 65.) Because counsel for both parties asked the court to
16  rule on the motion based on their written submissions, the court assumed that the
17  facts stated in the motion and response thereto were true. (IOR 70 at 1.) In denying
18  the motion, the trial court found that evidence independent of Morris's statements
19  raised reasonable inferences that Codman's and Davis's deaths were caused by
20  criminal conduct. (IOR 70 at 1–2.)

21      The Arizona Supreme Court rejected Morris's claim that the trial court's
22  admission of his statements concerning the deaths of Codman and Davis violated
23  his constitutional rights. *Morris*, 160 P.3d at 212. In doing so, it reasoned that
24  "sufficient evidence independent of Morris's incriminating statements establishes
25  corpus delicti for the deaths of both Codman and Davis." *Morris*, 160 P.3d at 212.
26  This was an unreasonable determination of the facts supporting this claim.

27      At the time Hu performed Codman's autopsy, he did not find any external or
28  internal signs of significant trauma, and he listed the cause and manner of death as

"pending." (IOR 68 at 4, 6–10.) After he received the results of the toxicology examination, Hu filed an amendment to the report of Codman's autopsy stating that he had determined the cause of death to be combined toxicity of morphine and cocaine. (IOR 68 at 3, 5.) Similarly, when Horn performed Davis's autopsy, he did not find any external or internal signs of significant trauma, and he listed the cause and manner of death as "pending." (IOR 68 at 14, 16–20.) After he received the results of the toxicology examination, Horn filed an amendment to the report of Davis's autopsy stating that he had determined the cause of death to be "drug (cocaine) intoxication," noting Davis's "[h]istory of reported cocaine abuse." (IOR 68 at 13, 15.)

Accordingly, without Morris's statements, no evidence before the trial court established that Codman and Davis died due to criminal conduct or that Morris caused their deaths. The Arizona courts concluded that the circumstances under which the bodies of Codman and Davis were found naked in an alley raised a reasonable inference that their deaths resulted from criminal conduct. *Morris*, 160 P.3d at 212. (*See* IOR 70 at 1–2.) However, these circumstances equally indicate that Morris panicked and dumped their bodies after they overdosed. This is especially true given that both Codman and Davis were reported to have extensive histories of drug abuse. (*See, e.g.*, IOR at 68 at 14 (noting Davis's reported past history of crack cocaine use).)

The prosecutor argued, and the state court pointed to, evidence that Codman's driver's license, social security card, and Bank of America card were found in Morris's possession; fingernail scrapings from Davis's left hand matched Morris's DNA profile; and clothing and hair extensions found in his trailer appeared to belong to Codman and Davis. *See Morris*, 160 P.3d at 212. (IOR 67). But this evidence merely establishes what Morris initially told Hutson—that Codman and Davis accompanied Morris to his trailer to engage in prostitution and that each died of an apparent drug overdose while there. Because this evidence was insufficient to

1    raise a reasonable inference that Codman's and Davis's deaths resulted from

2    criminal activity, the trial court's denial of Morris's motion to exclude his statement

3    with respect to Codman and Davis was arbitrary, and thus violated his due process

4    rights. The Arizona Supreme Court's finding to the contrary was both an

5    unreasonable application of the law and an unreasonable determination of the facts.

6        Had the trial court correctly granted Morris's motion, he could have

7    successfully moved to dismiss Counts 1 and 2 against him. Accordingly, the

8    admission of Morris's statements regarding Codman and Davis rendered his trial

9    fundamentally unfair in violation of his due process rights. *See Estelle v. McGuire*,

10   502 U.S. 62, 67–68 (1991); *cf. Laboa*, 224 F.3d at 979–80. He is entitled to a new

11   trial on this basis.

12        **B.    The trial court erroneously denied Morris's motion for judgment**
           **of acquittal in violation of the Fifth, Sixth, Eighth, and Fourteenth**
13         **Amendments despite insufficient evidence that Morris murdered**
           **Codman and Davis.**
14

15        "[T]he Due Process Clause protects the accused against conviction except

16   upon proof beyond a reasonable doubt of every fact necessary to constitute the

17   crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). If the

18   State fails to present substantial evidence on any one element of an offense

19   necessary for a conviction on a specific charge, the court must, consistent with due

20   process, enter a judgement of acquittal on that charge. *See State v. Guerra*, 778 P.2d

21   1185, 1189 (Ariz. 1989); *State v. Williams*, 698 P.2d 724, 730–31 (Ariz. 1985).

22   When reviewing the sufficiency of the evidence, the inquiry demanded by due

23   process is "whether, after viewing the evidence in the light most favorable to the

24   prosecution, any rational trier of fact could have found the essential elements of the

25   crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

26        At the conclusion of the guilt phase of the trial, defense counsel moved the

27   court, under Arizona Rule of Criminal Procedure 20, for a judgment of acquittal as

28   to all five counts against Morris. (Tr. June 29, 2005 at 112–13.) The trial court

1  denied the motion. (Tr. June 29, 2005 at 113.) In his direct appeal, Morris argued,
2  based on the evidence presented at trial, that the State had not established the corpus
3  delicti for Codman's and Davis's deaths. (IOR 29 at 16, 18–32.)

4      The state court's finding that "sufficient evidence independent of Morris's
5  incriminating statements establishes corpus delicti for the deaths of both Codman
6  and Davis," *Morris*, 160 P.3d at 212, was an unreasonable determination of the
7  factual circumstances of the case. As set forth above, Hu and Horn originally opined
8  that the cause of both Codman's and Davis's deaths, respectively, was drug
9  intoxication. After Hu was interviewed by Logan, the prosecutor provided Hu with
10 the police interview tape of Morris talking about Codman. (Tr. June 28, 2005 at 38.)
11 At trial, Hu testified that just "days before [his] testimony," he had changed his
12 opinion as a result of the tape and found that Codman's cause of death was "most
13 likely asphyxia due to ligature strangulation." (Tr. June 28, 2005 at 38–39, 55.) Hu
14 also testified that he had not prepared another amendment, but if he were to do so,
15 he would "amend to cause of death is undetermined." (Tr. June 28, 2005 at 55–59.)

16     Similarly, just prior to Horn's testimony, the prosecutor had given to Horn a
17 copy of the transcript of Morris's statement to police. (Tr. June 29, 2005 at 40–41.)
18 As a result, Horn changed his opinion to conclude that the manner of Davis's death
19 was consistent with strangulation (Tr. June 29, 2005 at 40–41), but that cocaine may
20 have contributed to her death (Tr. June 29, 2005 at 45–46, 48). Horn testified that
21 he still felt that "undetermined in this case is the most intellectually honest answer"
22 that he could give as to the cause of Davis's death. (Tr. June 29, 2005 at 48–49.)
23 He also testified that he had not prepared another amendment because he felt "that
24 that's a legal matter to be determined by the court." (Tr. June 29, 2005 at 43.)

25     Hu and Horn testified that Codman and Davis had toxic doses of drugs in
26 their systems. (Tr. June 28, 2005 at 53; Tr. June 29, 2005 at 40.) Importantly, Hu
27 and Horn both conceded that the only the evidence that led them to opine that
28 Codman's and Davis's deaths, respectively, were caused by criminal conduct was

1    Morris's statements, despite the existence of other evidence pointing to drug
2    intoxication. (*See* Tr. June 28, 2005 at 55–60; Tr. June 29, 2005 at 43–49.) Indeed,
3    without Morris's statements, no evidence establishes that Codman and Davis died
4    due to criminal conduct or that Morris caused their deaths.

5         Nevertheless, the state court concluded that the fact that Codman and Davis
6    were found naked in the same alley and there were drag marks near their bodies
7    raised a reasonable inference that their deaths resulted from criminal conduct.
8    *Morris*, 160 P.3d at 212. (IOR 70 at 1–2.) However, as Horn testified, these
9    circumstances are also indicative of a "drug dump." (Tr. June 29, 2005 at 40 ("The
10   fact that she is nude in an alley way means that she may be a quote, unquote, drug
11   dump, meaning that somebody may have become intoxicated in someone's house
12   and simply dumped in an alleyway which does happen.").) As set forth above,
13   Codman and Davis were reported to have extensive histories of drug abuse.
14   (*See, e.g.*, Tr. Jun 13, 2005 at 41–42 (noting that Codman had just been released
15   from prison and had a drug problem, and Davis was a prostitute with "a drug
16   problem"); IOR at 68 at 14.)

17        The state court also noted that Morris's DNA was found under Davis's
18   fingernails. *Morris*, 160 P.3d at 212. As set forth in Claim One, the prosecutor made
19   several statements suggesting that Morris's DNA was found in fingernail scrapings
20   from both Davis's left and right hands in order to bolster his argument that it was
21   attributable to her fighting Morris rather than from consensual sexual activity.
22   However, Colleen Proffitt did not testify that Morris's DNA profile matched the
23   mixed DNA profile from the fingernail scrapings from Davis's right hand, but that
24   he could not be excluded as a possible contributor to the mixed DNA profile.
25   (Tr. June 27, 2005 at 54, 79–81.) And, neither Hu nor Horn found any external or
26   internal signs of significant trauma to Codman's or Davis's bodies. (IOR 68 at 3,
27   6–10, 14, 16–20.)

28        The state court also pointed to testimony that Codman's and Davis's personal

1   items were found in Morris's possession or in his trailer. *Morris*, 160 P.3d at 212.

2   However, this evidence establishes only that Codman and Davis accompanied

3   Morris to his trailer to engage in sexual relations and died of drug overdoses while

4   there. The State therefore failed to present sufficient independent evidence that

5   Codman and Davis were actually murdered. *See United States v. Lopez-Alvarez*,

6   970 F.2d 583, 593–95 (9th Cir. 1992). Accordingly, the Arizona Supreme Court's

7   conclusion that sufficient evidence was presented at trial to raise a reasonable

8   inference that Codman's and Davis's deaths resulted from criminal activity was

9   both an unreasonable application of the law and unreasonable factual determination.

10   Furthermore, for the reasons set forth in Claim Nineteen, Morris's statement

11   to Hutson was both involuntary and unreliable. Thus, without Morris's statement,

12   no "rational trier of fact could have found . . . beyond a reasonable doubt," that

13   Codman's and Davis's deaths were due to criminal conduct, let alone that Morris

14   murdered them. *See Jackson*, 443 U.S. at 319. The trial court should have granted

15   Morris's motion for acquittal as to Counts 1 and 2, but instead unreasonably denied

16   his motion, and Morris was subsequently convicted of those charges. Consequently,

17   Morris's Fifth, Sixth, Eighth, and Fourteenth Amendment rights were violated, and

18   he is entitled to relief.

19   ## CLAIM EIGHT

20   **The introduction of unreliable scientific evidence rendered Morris's**
21   **trial fundamentally unfair in violation of his rights under the**
     **Fourteenth Amendment.**

22   This claim was not raised in state court. Morris alleges he can overcome any

23   default of this claim by showing cause and prejudice, including because of the

24   ineffective assistance of appellate and state post-conviction counsel. *See Martinez*

25   *v. Ryan*, 566 U.S. 1, 9 (2012); *Murray v. Carrier*, 477 U.S. 478, 488–89 (1986);

26   *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). Morris will demonstrate at

27   an evidentiary hearing that appellate and post-conviction counsel fell below the

28   standards of minimally competent capital attorneys and that those failures

1    prejudiced him. Alternatively, he alleges that any procedural bar is not adequate or

2    independent or that imposing default would be a miscarriage of justice. Because

3    this claim has not been adjudicated by the Arizona state courts, the limitations on

4    relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the

5    Court may consider the merits of the claim de novo. Morris incorporates by specific

6    reference all facts, allegations, and arguments made elsewhere in this Petition.

7        The Supreme Court "imposes a special obligation upon a trial judge to ensure

8    that any and all scientific testimony . . . is not only relevant, but reliable." *Kumho*

9    *Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (alteration in original)

10   (internal quotations omitted); *cf. United States v. Martinez*, 3 F.3d 1191, 1197–98

11   (8th Cir. 1993) ("In order to determine whether scientific testimony is reliable, the

12   court must conclude that the testimony was derived from the application of a

13   reliable methodology or principle in the particular case."). At Morris's trial, the

14   State presented evidence through the testimony of the medical examiners related to

15   skin slippage, anal defects, a vaginal bruise, and the cause of death for the victims.

16   Because this testimony was scientifically unreliable, it should have been excluded.

17   The admission of this evidence rendered Morris's trial fundamentally unfair, and

18   thus violated his due process rights. *See Estelle v. McGuire*, 502 U.S. 62, 67–68

19   (1991); *Gimenez v. Ochoa*, 821 F.3d 1136, 1143–45 (9th Cir. 2016) ("We join the

20   Third Circuit in recognizing that habeas petitioners can allege a constitutional

21   violation from the introduction of flawed expert testimony at trial if they show that

22   the introduction of this evidence 'undermined the fundamental fairness of the entire

23   trial.'" (citation omitted)); *Han Tak Lee v. Glunt*, 667 F.3d 397, 403–04 (3d Cir.

24   2012).

25       At Morris's trial, the medical examiners offered scientifically unfounded

26   testimony. First, as relates to skin slippage, Dr. Keen, when discussing Noah,

27   testified that:

28           Skin slippage is where, particularly in the postmortem

> phase, where you have first some blistering separating epidermis from underlying of the skin. In any friction, the outer layer of the skin will slide away and expose the underlying skins and after that will desiccate. . . . And if you then have any pressure and movement across the surface, it slides and detaches the outer surface from the underlying so it exposes layers.

(Tr. June 27, 2005 at 85–86.) Dr. Hu similarly testified that skin slippage is "consistent with rubbing after death." (Tr. June 28, 2005 at 22.) He further testified that skin slippage on Codman's left breast meant "some kind of force [was] applied to that area," meaning "rubbing, touching. Because of skin that's very loose it's— it's a little bit [of] force [that] can cause that, including rubbing." (Tr. June 28, 2005 at 26.)

This testimony was incorrect and misleading about the origins and causes of skin slippage. As explained by Dr. Posey:

> The distinct impression from the wording of questions and answers given by testimony of the medical examiners made it unclear as to the cause and location of skin slippage. . . . [S]kin slippage is a well-known process of putrefaction with loosening of the epidermis from the underlying integument or dermis, and it can be exacerbated by friction. As well documented in the crime scene photographs in this case, skin slippage most commonly first appears with blister formation on the lower body regions to include the abdomen, inner thighs and lower legs . . . The blisters often burst due to the intense pressure from the accumulation of gases and fluid and/or by maggot activity. The blisters can burst by either light touch or friction, and the more pressure applied from friction or rubbing the greater will be the skin slippage observed.

(PCR Hr'g Ex. 6 at 6.) He continued that the slippage observed on Codman and Noah "occur[ed] exactly where anticipated and predicted by forensic science[.]" (PCR Hr'g Ex. 6 at 7.) He concluded that "[s]kin slippage is not 'the movement of skin as a result of friction'" but that it is "an expected, natural process of decomposition." (PCR Hr'g Ex. 6 at 9.) The medical examiners' testimony and the

1   implication that friction or rubbing was necessary in order for skin slippage to be
2   observed therefore was scientifically unfounded.

3       Next, Dr. Horn testified that there were "defects in the skin" around Castillo's
4   anus that "could be tears" and "could be consistent" with trauma. (Tr. June 15, 2005
5   at 88.) He testified that the damage could be due to sexual activity or insect activity.
6   (Tr. June 15, 2005 at 96.) This was incorrect. As Posey explained, "[t]here is no
7   question" that the appearance of Castillo's anus was due to postmortem
8   decomposition. (PCR Pet. Ex. Q at 12; *see also* PCR Hr'g Ex. 6 at 7.) "If Mr. Morris
9   would have had postmortem anal sodomy with Ms. Castillo, there would have been
10  a different pattern of damage to her body." (PCR Hr'g Ex. 6 at 7.) The suggestion
11  that the appearance of Castillo's anus could have been caused by postmortem sex
12  was scientifically incorrect.

13      Keen also testified that there was a bruise or contusion found on the right
14  lateral wall of Noah's vagina (Tr. June 27, 2005 at 98), a fact that was then used by
15  the prosecutor to argue that the murder was cruel at the aggravation phase (Tr. July
16  12, 2005 at 60, 105). But this contusion was in fact "an autopsy artifact
17  misinterpreted as a contusion." (PCR Pet. Ex. Q at 11.) Posey opined that Zhang's
18  conclusion that it was a contusion, repeated at trial by Keen, was "disingenuous and
19  inappropriate." (PCR Pet. Ex. Q at 11.)

20      Finally, the medical examiners' testimony as to the cause of death for four of
21  the victims was not based in science. First, Dr. Hu originally determined that the
22  cause of Codman's death was combined toxicity of morphine and cocaine. (Tr. June
23  28, 2005 at 41; PCR Hr'g Ex. 8 at 000896.) He changed his opinion as to the cause
24  of death after hearing Morris's statement to police. (Tr. June 28, 2005 at 55–58,
25  71.) Similarly, Horn initially listed Davis's manner of death as undetermined and
26  cause of death as cocaine intoxication. (PCR Hr'g Ex. 9 at 000906.)  He changed
27  his opinion as to cause of death because, after hearing of Morris's statement, there
28  was nothing in the autopsy that was inconsistent with a conclusion that she was

1   strangled. (Tr. June 29, 2005 at 40–41, 47.) But Posey opined that "with a high

2   degree of medical certainty," Codman and Davis died from drug overdoses. There

3   was no evidence of asphyxia. (PCR Pet. Ex. Q at 13.)

4       As to Velasquez, Dr. Shvarts listed her cause of death as "[f]indings

5   consistent with strangulation due to combined drug intoxication." (PCR Hr'g Ex.

6   11 at 000914.) It was then amended to read "[f]indings consistent with

7   strangulation" with "combined drug intoxication" listed under "other." (PCR Hr'g

8   Ex. 11 at 000916.) But the cause of death should have been "undetermined" because

9   the injuries to her neck "could have been agonal or around the time of death in a

10  setting where the decedent was dying from multidrug intoxication." (PCR Pet. Ex.

11  Q at 10.) Without consideration of the fact that there were other victims, the medical

12  examiner could not have determined whether she died from asphyxia or drug

13  intoxication. (PCR Pet. Ex. Q at 15.)

14      Finally, Horn testified that his autopsy did not establish how Castillo had died

15  because there was no evidence of trauma. Looking at the body itself, he could not

16  tell cause of death and had to rely on extraneous information from detectives in

17  order to determine that she had died from asphyxia. (Tr. June 15, 2005 at 98, 101.)

18      Therefore, as to four of the victims, the medical examiners testified as to

19  causes of death that were not based in scientific evidence. Conveying this

20  information through a medical examiner, an expert in the scientifically based

21  circumstances surrounding a death, sends the message to the jury that the

22  determinations of cause of death were based in science, which they were not.

23  *See Hinton v. Alabama*, 134 S. Ct. 1081, 1090 (2014) (per curiam) ("[W]e have

24  recognized the threat to fair criminal trials posed by the potential for incompetent

25  or fraudulent prosecution forensics experts, noting that '[s]erious deficiencies have

26  been found in the forensic evidence used in criminal trials. . . . One study of cases

27  in which exonerating evidence resulted in the overturning of criminal convictions

28  concluded that invalid forensic testimony contributed to the convictions in 60% of

1  the cases.'" (citations omitted)); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
2  509 U.S. 579, 595 (1993) ("Expert evidence can be both powerful and quite
3  misleading because of the difficulty in evaluating it." (citation omitted)).

4      Morris's trial was thus filled with unreliable scientific testimony. Because
5  the medical examiners were allowed to testify as they did, the jury was led to believe
6  that all of the deaths were homicides, that Morris engaged in necrophilia, and that
7  the murders were cruel, heinous, and depraved, to Morris's prejudice. The
8  admission of this unreliable evidence violated Morris's due process rights, and he
9  is entitled to a new trial.

10  **CLAIM NINE**

11  **The introduction of extensive, poorly supported, and highly**
12  **prejudicial evidence of necrophilia violated Morris's Fifth, Sixth,**
   **Eighth and Fourteenth Amendment rights.**

13      This claim was not raised in state court. Morris alleges he can overcome any
14  default of this claim by showing cause and prejudice, including because of the
15  ineffective assistance of appellate and state post-conviction counsel. *See Martinez*
16  *v. Ryan*, 566 U.S. 1, 9 (2012); *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000);
17  *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *but see Davila v. Davis*,
18  137 S. Ct. 2058 (2017). Morris will demonstrate at an evidentiary hearing that
19  appellate and post-conviction counsel fell below the standards of minimally
20  competent capital attorneys and that those failures prejudiced him. Alternatively,
21  he alleges that any procedural bar is not adequate or independent or that imposing
22  default would be a miscarriage of justice. Because this claim has not been
23  adjudicated by the Arizona state courts, the limitations on relief imposed by
24  28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider
25  the merits of the claim de novo. Morris incorporates by specific reference all facts,
26  allegations, and arguments made elsewhere in this Petition.

27      The admission of evidence of Morris's alleged prior bad acts in the form of
28  necrophilia violated his rights to due process and a fair trial. *See* U.S. Const.

amends. V, VI, XIV. One of the fundamental principles of American law is that evidence of other bad acts is not admissible to show a defendant's bad character. *See McKinney v. Rees*, 993 F.2d 1378, 1380–81 (9th Cir. 1993); David P. Leonard, *In Defense of the Character Evidence Prohibition: Foundations of the Rule Against Trial by Character*, 73 Ind. L.J. 1161, 1162 (1998). This principle recognizes that character evidence would have a highly prejudicial effect on a defendant's case because the jury can use the character evidence to improperly conclude that the defendant is a bad person, and is thus more likely to have engaged in the charged offense. *See State v. McFarlin*, 517 P.2d 87, 90 (Ariz. 1973).

Accordingly, in Arizona "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," but it may be admissible to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of a mistake or accident." Ariz. R. Evid. 404(b). "[B]efore admitting evidence of prior bad acts, trial judges must find that there is clear and convincing proof both as to the commission of the other bad act and that the defendant committed the act." *State v. Terrazas*, 944 P.2d 1194, 1198 (Ariz. 1997). Even if evidence is admissible under Rule 404(b), it must still be relevant, and all evidence is subject to Rule 403, which requires the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." *State v. Fernane*, 914 P.2d 1314, 1318 (Ariz. Ct. App. 1995) (internal quotation marks omitted). "Unfair prejudice means an undue tendency to suggest decision on an improper basis such as emotion, sympathy or horror." *State v. Schurz*, 859 P.2d 156, 162 (Ariz. 1993) (internal quotation marks and citation omitted).

Although "federal habeas corpus relief does not lie for errors of state law," relief is available if the error deprived the petitioner of a fundamentally fair trial and therefore rose to the level of a violation of due process. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). The introduction of evidence violates due process "if

its potential for prejudice far outweighs what little relevance it might have." *United States v. LeMay*, 260 F.3d 1018, 1026–27 (9th Cir. 2001). Morris's due process rights were violated under this precedent.

Here, there was not clear and convincing proof that Morris engaged in necrophilia. The prosecution relied on skin slippage on two of the victims, semen detected in two of the victims, and anal defects found on one of the victims to support his theory that Morris had committed necrophilia. All of this evidence's connection to necrophilia was attenuated at best and scientifically incorrect at worst, as discussed *supra* in Claims One, Four (A), and Eight. The trial court therefore should not have allowed this evidence to be admitted in order to show prior bad acts of necrophilia because the prosecution did not show by clear and convincing evidence that necrophilia had occurred or that Morris had engaged in necrophilia. *See State v. Anthony*, 189 P.3d 366, 371–72 (Ariz. 2008) (finding trial court abused its discretion in denying motion in limine to preclude argument that defendant had molested victim because evidence "fell far short of proving" the molestation had occurred).

Even if the court did not err under Arizona Rule of Evidence 404(b), the evidence should have been excluded as unduly prejudicial under Rule 403. The charge of necrophilia painted Morris as sexually deviant and repulsive, inviting the jury to have a visceral response to him. *See United States v. Hitt*, 981 F.2d 422, 424 (9th Cir. 1992) (recognizing that some topics "have a visceral impact," the introduction of which can prejudice a defendant). In contrast, it had minimal probative value for the reason the prosecution offered it. The evidence of necrophilia infected every phase of Morris's trial and prejudiced him throughout, as discussed more fully *supra* in Claim Two. The evidence "served only to prey on the emotions of the jury," and Morris's constitutional rights were violated. *McKinney*, 993 F.2d at 1385.

Morris is accordingly entitled to a new trial.

234

## CLAIM TEN

**The trial court's failure to sever the counts against Morris resulted in a trial that was fundamentally unfair in violation of the Fourteenth Amendment and violated his Sixth Amendment right to an impartial jury.**

This claim was not raised in state court. Morris alleges he can overcome any default of this claim by showing cause and prejudice, including because of the ineffective assistance of appellate and state post-conviction counsel. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012) (2012); *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *but see Davila v. Davis*, 137 S. Ct. 2058 (2017). Morris will demonstrate at an evidentiary hearing that appellate and post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced him. Alternatively, he alleges that any procedural bar is not adequate or independent or that imposing default would be a miscarriage of justice. Because this claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the merits of the claim de novo. Morris incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Arizona Rule of Criminal Procedure 13.4(a) provides that "[w]henever 2 or more offenses . . . have been joined for trial, and severance of any or all offenses . . . is necessary to promote a fair determination of the guilt or innocence of any defendant of any offense, the court may on its own initiative, and shall on motion of a party, order such severance." Ariz. R. Crim. P. 13.4(a).[49] To prevail on a claim that the trial court erred by failing to sever counts against him, a habeas petitioner must demonstrate that the court's denial of severance rendered his trial fundamentally unfair. *See Grisby v. Blodgett*, 130 F.3d 365, 370 (9th Cir.

---

[49] All citations to Arizona Rule of Criminal Procedure 13.4 are to the version effective until January 1, 2018.

1   1997); *Featherstone v. Estelle*, 948 F.2d 1497, 1503 (9th Cir. 1991) ("The

2   simultaneous trial of more than one offense must actually render petitioner's state

3   trial fundamentally unfair and hence, violative of due process before relief pursuant

4   to 28 U.S.C. § 2254 would be appropriate." (quoting *Tribbitt v. Wainwright*, 540

5   F.2d 840, 841 (5th Cir. 1976))); *see also United States v. Lane*, 474 U.S. 438, 446

6   n.8 (1986) (explaining that misjoinder rises to level of constitutional violation

7   where "it results in prejudice so great as to deny a defendant his Fifth Amendment

8   right to a fair trial"). The requisite level of "prejudice is shown if the impermissible

9   joinder had a substantial and injurious effect or influence in determining the jury's

10  verdict." *Sandoval v. Calderon*, 241 F.3d 765, 772 (9th Cir. 2000). "[T]here is 'a

11  high risk of undue prejudice whenever . . . joinder of counts allows evidence of

12  other crimes to be introduced in a trial of charges with respect to which the evidence

13  would otherwise be inadmissible.'" *Bean v. Calderon*, 163 F.3d 1073, 1084

14  (9th Cir. 1998) (quoting *United States v. Lewis*, 787 F.2d 1318, 1321 (9th Cir.),

15  *amended by* 798 F.2d 1250 (9th Cir. 1986)). Thus, in evaluating prejudice, the

16  reviewing court "focuses particularly on cross-admissibility of evidence and the

17  danger of 'spillover' from one charge to another, especially where one charge or set

18  of charges is weaker than another." *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir.

19  2004).

20        As set forth *supra* in Claim Four (C), there was a great risk that the jury would

21  use evidence of the other offenses to infer that Morris had murdered Codman and

22  Davis, despite the dearth of evidence that their deaths were caused by criminal

23  conduct. Indeed, the prosecutor argued at trial that decomposition erased the signs

24  of strangulation on Codman and Davis and essentially urged the jury to consider

25  evidence that the other victims were strangled. (*See, e.g.*, Tr. June 13, 2005 at 64–

26  65 (arguing that Codman's body appeared to have been strangled even though "the

27  fact of decomposition eradicates the cause . . . [and] if a body is too decomposed,

28  the reason that the person died is not available to the medical examiner's office

1    anymore").)

2         Moreover, joinder allowed the prosecutor to blur the lines between the

3    evidence supporting the charge of necrophilia as to each victim. As set forth in

4    Claim One, the prosecutor's theory of the case was that Morris had killed the

5    victims in order to engage in postmortem sex with their corpses. (*See, e.g.*, Tr. June

6    20, 2005 at 78–80, 84.) The evidence the prosecutor relied on was primarily

7    introduced during the guilt phase and re-urged at the aggravation phase. This

8    consisted of skin slippage on Codman and Noah, semen detected in Velasquez and

9    Noah, and anal defects found on Castillo. Even if the jurors did not believe that one

10   of those bases supported the necrophilia theory, they nonetheless could infer that,

11   based on the cumulative evidence, Morris had postmortem sex with all of the

12   victims. Indeed, the jury found that Morris relished Davis's murder, inflicted

13   gratuitous violence on Davis, and needlessly mutilated her body (IOR 158), in spite

14   of the fact that the prosecutor acknowledged that he could not point to any evidence

15   of postmortem sexual activity with her (*see* Tr. July 12, 2005 at 30). This indicates

16   that the jury improperly considered evidence of necrophilia as to the other victims.

17        The charge of necrophilia painted Morris as sexually deviant and repulsive,

18   inviting the jury to have a visceral response to him. *Cf. United States v. Hitt*, 981

19   F.2d 422, 424 (9th Cir. 1992) (recognizing that some topics "have a visceral

20   impact," the introduction of which can prejudice a defendant). Joinder of the five

21   offenses resulted in an inflammatory portrayal of Morris because it gave rise to the

22   impression that he was generally disposed to deviant sexual behavior, and thus

23   killed and then engaged in necrophilia with all of the victims, regardless of the

24   individual merits of each charge. Therefore, the cross-contamination caused by the

25   prosecution's simultaneous presentation of evidence from all five counts rendered

26   Morris's trial and sentencing fundamentally unfair in violation of his due process

27   rights. *See Featherstone*, 948 F.2d at 1503.

28        In addition, the trial court's failure to sever the offenses violated Morris's

1   Sixth Amendment rights because it prejudiced the jury against him. The Sixth
2   Amendment guarantees criminal defendants "the right to a speedy and public trial,
3   by an *impartial jury* of the State and district wherein the crime shall have been
4   committed[.]" U.S. Const. amend. VI (emphasis added). The objectivity of the jury
5   in Morris's trial was compromised by the joinder of all five counts because the jury
6   was encouraged to consider evidence for the all victims when evaluating each
7   individually.

8       Although the trial court did give limiting instructions (Tr. July 5, 2005 at 9;
9   Tr. July 12, 2005 at 142), they were not sufficient to cure the errors here because
10  they did not sufficiently explain to the jury that the evidence as to each victim had
11  to be considered independently. *Cf. Lane*, 474 U.S. at 450 n.13 (concluding in case
12  regarding misjoinder of defendants that "carefully crafted limiting instructions"
13  may reduce potential prejudice "to the minimum").

14      The error here therefore had a substantial and injurious effect on the verdict.
15  *See Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993); *Sandoval*, 241 F.3d at
16  771–72. Morris's due process and Sixth Amendment rights were violated by the
17  trial court's failure to sever the multiple counts of first-degree murder. Morris is
18  entitled to relief.

19              **CLAIM ELEVEN**

20  **The trial court's admission of excessively gruesome photographs
    during the guilt and aggravation phases of Morris's trial resulted in
21  the denial of a fair trial as guaranteed by the Sixth and Fourteenth
    Amendments, violated due process under the Fifth and Fourteenth
22  Amendments, and rendered Morris's death sentences unreliable
23  under the Eighth Amendment.**

24      Morris raised this claim on direct appeal. (DA 29 at 54–58.) The Arizona
25  Supreme Court denied the claim on the merits. *State v. Morris*, 160 P.3d 203 218–
26  19 (Ariz. 2007). The state court's rejection of this claim was contrary to, or involved
27  an unreasonable application of, clearly established federal law, as determined by
28  the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an

1   unreasonable determination of the facts in light of the evidence presented. *See id.*

2   § 2254(d)(2). Morris incorporates by specific reference all facts, allegations, and

3   arguments made elsewhere in this Petition.

4   The introduction of gruesome photographs of victims in capital trials

5   continually raises issues of constitutional dimension. *See, e.g.*, *Mann v. Oklahoma*,

6   488 U.S. 877 (1988) (Marshall and Brennan, JJ., dissenting from denial of

7   certiorari); *Tucker v. Kemp*, 481 U.S. 1063 (1987) (Brennan and Marshall, JJ.,

8   dissenting from denial of certiorari). In *Zant v. Stephens*, the Supreme Court held

9   that the jury should not be allowed to consider evidence that is "totally irrelevant to

10  the sentencing process" and fails to focus on "the character of the [defendant] and

11  circumstances of the crime." 462 U.S. 862, 879, 885 (1983). In addition, the

12  erroneous admission of prejudicial and cumulative evidence violates a defendant's

13  Fourteenth Amendment due process rights if the admission results in the denial of

14  fundamental fairness. *See, e.g.*, *Duncan v. Henry*, 513 U.S. 364, 366 (1995) (per

15  curiam) (explaining that claim challenging violation of due process must allege that

16  admission of evidence so inflammatory as to prevent a fair trial); *Dudley v.*

17  *Duckworth*, 854 F.2d 967, 972 (7th Cir. 1988) (holding that admission of evidence

18  of threats deprived the defendant of fundamental fairness and violated his

19  Fourteenth Amendment rights). The admission of such evidence also undermines

20  the reliability required by the Eighth and Fourteenth Amendments in capital

21  sentencing. *See Beck v. Alabama*, 447 U.S. 625, 637–38 (1980) (noting that death

22  is a "different kind of punishment" and "[i]t is of vital importance . . . that any

23  decision to impose the death sentence be, and appear to be, based on reason rather

24  than caprice or emotion").

25  Here, the admission of excessively gruesome photographs undermined the

26  fundamental fairness of Morris's trial at the guilt and aggravation phases. The court

27  admitted over thirty photographs showing the bodies of the victims. For example,

28  Exhibit 46 showed Castillo's decomposed body on a tarp after the police had turned

1    it over. This was admitted over Logan's objection. (Tr. June 14, 2005 at 39–40.)

2    The prosecutor argued that it showed the location of the ligature, but, as Logan

3    pointed out, the fact that Castillo was found with a tie around her neck was not in

4    dispute. (Tr. June 14, 2005 at 29–30.) And because her body had been moved, the

5    ligature was not necessarily in the position it was at the time of her death. The court

6    recognized that another picture of Castillo's body, Exhibit 40, was "too prejudicial"

7    to be admitted because it looked like a "melting body." (Tr. June 14, 2005 at 31,

8    40.) The state of Castillo's body did not improve in Exhibit 46, and the tie is barely

9    visible. (*See* Trial Ex. 46.) This disturbing photograph should have been excluded

10   as unfairly prejudicial, particularly because it did not shed light on any fact that was

11   at issue.

12        Next, several photographs were introduced over Logan's objection to show

13   Noah's hands and feet as they were observed during the autopsy. (Tr. June 20, 2005

14   at 43.) These photographs showed that Noah's hands and foot had started to

15   mummify. (Tr. June 20, 2005 at 47–48; Trial Exs. 271–74.) But this was wholly

16   irrelevant to the case, and mummification is a natural process that occurs when

17   moisture leaves the body. (Tr. June 20, 2005 at 48.) The photographs showing this

18   process had no relevance but were highly prejudicial.

19        Several photographs were also introduced that all showed the ligature mark

20   around Noah's neck. (Tr. June 20, 2005 at 38–40; Tr. June 27, 2005 at 104; Trial

21   Exs. 264, 265, 268.) The trial court had originally excluded one photograph, Exhibit

22   268, under Arizona Rule of Evidence 403 but unreasonably reversed this ruling

23   because the prosecutor asserted that the photograph showed a different part of the

24   mark and was therefore relevant. (Tr. June 27, 2005 at 104–05.) The introduction

25   of multiple photographs showing the same marking was prejudicial. A photograph

26   showing Noah's inner thigh was also introduced at the guilt phase in order to show

27   skin slippage. (Tr. June 27, 2005 at 86–87.)  As the theory that this skin slippage

28   showed postmortem sex was wholly without factual support, as discussed *supra* in

1   Claim One, this photograph as well as the others showing skin slippage (*see, e.g.*,

2   Trial Exs. 264, 265, 274, 279, 281, 399.001) should have been excluded as

3   irrelevant and unfairly prejudicial.

4   Then, at the aggravation phase, the court admitted Exhibit 383 depicting

5   Noah's nude body at the crime scene, again to show skin slippage. (Tr. July 12,

6   2005 at 10–11; Trial Ex. 383.) The defense objected to the admission of the

7   photograph under Rule 403. (Tr. July 12, 2005 at 11.) The prosecutor showed the

8   photograph to Keen, who testified that there was skin slippage on Noah's thigh. (Tr.

9   July 12, 2005 at 58–59.) He had already testified to this effect at the guilt phase

10  based on Exhibit 254. (Tr. June 27, 2005 at 86–87.) The introduction of Exhibit 383

11  was therefore superfluous. In argument, the prosecutor made clear that the

12  photograph was gruesome and introduced for that reason. He showed the jury the

13  photograph again and said that Morris had postmortem sex with Noah's body "after

14  she began [to] rot." (Tr. July 12, 2005 at 35.) The photograph was thus, in addition

15  to being unnecessary, clearly prejudicial and should have been excluded.

16  The jurors were thus exposed to many emotionally disturbing, inflammatory

17  photographs of the victims that did not shed light on disputed issues. Any

18  informational value of the photographs was outweighed by their prejudicial effect

19  on Morris's trial. *See State v. Chapple*, 660 P.2d 1208, 1215 (Ariz. 1983) (stating

20  that when photographs "have no tendency to prove or disprove any question which

21  is actually contested, they have little use or purpose except to inflame and would

22  not usually be admissible"), *superseded by statute on other grounds as stated in*

23  *State v. Goudeau,* 372 P.3d 945, 983 (Ariz. 2016). The admission of these

24  photographs undermined the fairness of the trial and "so infected the sentencing

25  proceeding with unfairness as to render the jury's imposition of the death penalty a

26  denial of due process." *Romano v. Oklahoma*, 512 U.S. 1, 12 (1994);

27  *Bruton v. United States*, 391 U.S. 123, 131 n.6 (1968) ("An important element of a

28  fair trial is that a jury consider only relevant and competent evidence bearing on the

1    issue of guilt or innocence.").

2       A state court's evidentiary ruling is grounds for federal habeas relief if it

3 renders the state proceeding "so arbitrary and fundamentally unfair that it

4 constitutes a violation of federal due process." *Powell v. Spalding*, 679 F.2d 163,

5 166 (9th Cir. 1982). Here, the erroneously admitted evidence infected both the guilt

6 and aggravation phases of the trial by causing the jury to view the circumstances of

7 the offense through the lens of shock and emotion, as opposed to reason, and

8 rendered Morris's trial fundamentally unfair. The Arizona Supreme Court affirmed

9 the trial court's error in violation of Morris's Fourteenth Amendment rights.

10 *See Morris*, 160 P.3d at 218–19.

11       Additionally, the Arizona Supreme Court's conclusion that the photographs

12 were not unduly prejudicial was based on an unreasonable determination of the facts

13 in light of the evidence presented. The court found that the photographs showing

14 Noah's mummified hands and foot as well as the skin slippage on her inner thigh

15 "provide information about the time and manner of death or otherwise corroborate

16 the State's case." *Id.* at 218. But mummification played no role in the prosecution's

17 case, and, as mentioned above and in Claim One, the evidence regarding skin

18 slippage was irrelevant because it did not actually show postmortem sex. In light of

19 the at best minimally probative value of the photographs, it was unreasonable and

20 fundamentally unfair to find that any such probative value was not outweighed by

21 their prejudicial effect. *See id.* at 218–19.

22       The many gruesome photographs depicting decaying bodies were not

23 relevant to any disputed issue and were so unduly prejudicial as to render Morris's

24 trial and sentencing fundamentally unfair in violation of his rights to a fair and

25 impartial jury and due process. Consequently, he is entitled to relief.

26 / / /

27 / / /

28 / / /

# CLAIM TWELVE

**The State failed to present sufficient evidence supporting the finding of the (F)(6) aggravating factor, an error the Arizona Supreme Court compounded on direct appeal, in violation of Morris's rights under the Fifth, Eighth, and Fourteenth Amendments.**

This claim was not raised in state court. The state court, however, addressed the sufficiency of the evidence to support the aggravating factor while conducting its abuse of discretion review under Arizona Revised Statute § 13-703.05 (renumbered § 13-756). *See State v. Gunches*, 234 P.3d 590, 593 (Ariz. 2010) ("Gunches argues that the State failed to prove the (F)(6) aggravator beyond a reasonable doubt. Because Price's murder occurred after August 1, 2002, we do not independently review the jury's finding of this aggravator, but instead consider whether the jury abused its discretion."). It addressed the cruelty prong of the aggravator only, however. *See State v. Morris*, 160 P.3d 203, 220 (Ariz. 2007). Its finding on this prong was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an unreasonable determination of the facts in light of the evidence presented. *See id.* § 2254(d)(2). Because the state court explicitly did not address the heinous or depraved prong, this Court can review whether there was sufficient evidence to support it de novo. *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003); *Weeden v. Johnson*, 854 F.3d 1063, 1071 (9th Cir. 2017). In the alternative, if this Court finds the claim defaulted, Morris alleges he can overcome the default because of the ineffective assistance of appellate and post-conviction counsel. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012). Morris incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). In order

1    to establish an aggravating factor, the State bears the burden of proving the factor

2    beyond a reasonable doubt. *Summerlin v. Schriro*, 427 F.3d 623, 642 (9th Cir. 2005)

3    (en banc); *see also State v. Towery*, 920 P.2d 290, 309–10 (Ariz. 1996). When

4    reviewing a claim challenging the sufficiency of evidence, the inquiry demanded

5    by due process is "whether, after viewing the evidence in the light most favorable

6    to the prosecution, any rational trier of fact could have found the essential elements

7    of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319

8    (1979); *see also Lewis v. Jeffers*, 497 U.S. 764, 782 (1990) (extending the rule in

9    *Jackson* to reviewing the sufficiency of evidence in a state court's finding of

10   aggravating circumstances). Habeas relief is appropriate when the state court's

11   denial of a sufficiency of the evidence claim is objectively unreasonable.

12   *See Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam); *Boyer v. Belleque*, 659

13   F.3d 957, 964–65 (9th Cir. 2011).

14        In Arizona, it is considered an aggravating circumstance if the defendant

15   "committed the offense in an especially heinous, cruel or depraved manner." Ariz.

16   Rev. Stat. § 13-703(F)(6) (renumbered to § 13-751(F)(6)). Here, the jury found both

17   prongs of the aggravator despite insufficient evidence. (IOR 157–61.) On direct

18   appeal, the Arizona Supreme Court then reviewed the evidence supporting the

19   aggravating factors as well as the propriety of imposing death sentences for an

20   abuse of discretion. *Morris*, 160 P.3d at 219–20. In so doing, the court further

21   compounded the error.

22        **A.    There was insufficient evidence to find the murders were cruel.**

23        Arizona courts have defined cruelty to exist "if the victim consciously

24   experienced physical or mental pain prior to death, and the defendant knew or

25   should have known that suffering would occur. Mental anguish includes a victim's

26   uncertainty about her ultimate fate." *State v. Trostle*, 951 P.2d 869, 883 (Ariz. 1997)

27   (internal quotation marks and citations omitted). The Arizona Supreme Court here

28   found that there was sufficient evidence to support the finding of cruelty because

1   "strangulation victims remain conscious and experience pain for at least some
2   period of time," and there was evidence that Davis, Velasquez, and Noah struggled.
3   *See Morris*, 160 P.3d at 220.

4          First, the state court's determination that the victims consciously experienced
5   pain or mental anguish because they were strangled was based on an unreasonable
6   determination of the facts. The prosecution presented no evidence as to how long
7   any of the victims remained conscious. And the Arizona Supreme Court has
8   consistently held that "[i]f the evidence is inconclusive on consciousness, the factor
9   of cruelty cannot exist." *State v. Fulminante*, 778 P.2d 602, 619–20 (Ariz.
10  1988); *see, e.g.*, *State v. Amaya-Ruiz*, 800 P.2d 1260, 1285 (Ariz. 1990). The state
11  court here did not acknowledge that the evidence of consciousness presented was
12  inconclusive.

13         Testimony about strangulation began at the guilt phase. First, Horn testified
14  that most people will lose consciousness while being strangled "within 30 seconds
15  to a minute of consistent pressure[.]" (Tr. June 15, 2005 at 85.) Next, Keen testified
16  that how long it will take someone to lose consciousness from a ligature
17  strangulation "[d]epends on several factors" including whether "they had anything
18  that causes them to be rendered other than alert to begin with" and whether the
19  ligature is applied continuously. (Tr. June 27, 2005 at 109.) When pressure is
20  applied over the carotid artery, a person can lose consciousness within seconds and
21  "[m]ost people are going to be blacked out before a couple minutes. Very rarely
22  will anybody go beyond a couple of minutes before they lose consciousness[.]"
23  (Tr. June 27, 2005 at 109–10.) And, Keen testified, the more a person struggles, the
24  faster they will lose consciousness. (Tr. June 27, 2005 at 110.) He testified that he
25  could not tell in this case how quickly Noah lost consciousness. (Tr. June 27, 2005
26  at 117.) Next, Hu testified that if both sides of the carotid artery are closed, it
27  "doesn't take too long to kill a person." (Tr. June 28, 2005 at 66.)

28         At the aggravation phase, Keen was the only witness. He testified that when

a person is strangled, either manually or with a ligature, she will have the sensation of a shortness of breath until she loses consciousness. (Tr. July 12, 2005 at 43.) He again testified that if the person struggles, then the amount of time until unconsciousness will decrease. (Tr. July 12, 2005 at 44.) He testified that there was no way to know how long it took for any of the victims in this case to lose consciousness. (Tr. July 12, 2005 at 66, 72.) The length of time would be "variable" and depend on things such as the hold on the ligature and the state of consciousness of the victim. (Tr. July 12, 2005 at 57–58, 66.)

Furthermore, all of the victims had drugs or alcohol in their system. (Tr. June 15, 2005 at 93–95, 100; Tr. June 27, 2005 at 114–18; Tr. June 28, 2005 at 34–37; Tr. June 29, 2005 at 19–21, 37–38.) And the levels of drugs for Codman and Davis were toxic. (Tr. June 28, 2005 at 53; Tr. June 29, 2005 at 40.) The finding that the victims were conscious at all at the time of their deaths therefore is even more speculative. There was no evidence as to how long the victims here would have been conscious in order to experience either pain or mental anguish, and it was an unreasonable factual determination for the court to find otherwise.

Next, the state court's finding that evidence of any amount of pain for any amount of time is sufficient to satisfy the aggravating factor would mean that any murder would qualify. *See State v. Soto-Fong*, 928 P.2d 610, 628 (Ariz. 1996) ("We do not mean to suggest a bright-line, arbitrary temporal rule must be met before a finding of cruelty can be sustained. However, the assumption underlying the trial court's alternative findings in this case and the state's arguments on appeal would lead to findings of physical cruelty in all but the most exact, most precise, and most uncommon of murders. This approach would run counter to the constitutional narrowing function of (F)(6).") This would be contrary to, or an unreasonable application of clearly established federal law that the aggravating factors have to narrow the class of defendants who are eligible for the death penalty. *See, e.g.*, *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988). The state court's

definition would provide "no meaningful basis for distinguishing the few cases in which [death] is imposed from the many cases in which it is not." *Furman v. Georgia*, 408 U.S. 238, 313(1972) (White, J., concurring) (per curiam); *see, e.g.*, *Maynard v. Cartwright*, 486 U.S. 356, 362 (1988); *Godfrey v. Georgia*, 446 U.S. 420, 427–28 (1980) (plurality opinion). The physical pain from a few moments of the sensation of not being able to breathe properly is not comparable to the pain experienced in other cases involving strangulation where cruelty has been found. *See, e.g.*, *State v. Brewer*, 826 P.2d 783, 788–89 (Ariz. 1992) (noting it took defendant multiple attempts to strangle the victim, who was his girlfriend, and noting injuries testified to by medical examiner); *State v. Cook*, 821 P.2d 731, 736–37 (Ariz. 1991) (noting victim suffered sexual assault and torture before strangulation). Accepting this level of pain as sufficient to make a murder one of "the few cases in which [the death penalty] is imposed" would fail to narrow the class of offenders eligible for the penalty. *Godfrey*, 446 U.S. at 427 (internal quotations and citation omitted; alteration in original).

The state court also based its cruelty finding as to three victims—Davis, Velasquez, and Noah—on the assertion that they struggled. *Morris*, 160 P.3d at 220. There was, however, no more than speculation that this was true. The support for this assumption about Davis was the fact that Morris's DNA was found under her fingernails on one hand. *Id.* at 209. But it is a leap to assume that this DNA got there in the course of a struggle as opposed to during a sexual act. Next, the court pointed to a bruise on Velasquez's face. *Id.* at 210. But the medical examiner, Shvarts, could not give a definitive time range of when the bruise had appeared, estimating that it could have been within a day, or longer. (Tr. June 29, 2005 at 23, 31.) He made clear that he was just giving a "general range." (Tr. June 29, 2005 at 31.) There was no evidence that Morris inflicted the bruise. And even if the bruise had occurred during the commission of the crime, Shvarts testified it could have been from her falling forward after being unconscious. (Tr. June 29, 2005 at 9.) It

1   therefore could not support a finding that she consciously experienced pain. Finally,

2   the court noted that Noah had broken fingernails, *id.*, but no evidence was put on as

3   to when this occurred. Even if the evidence supported a finding that these three

4   victims felt pain or mental anguish because there was evidence of a struggle, for the

5   other two victims there was absolutely no evidence beyond the fact that they were

6   strangled while intoxicated. *See State v. Snelling*, 236 P.3d 409, 415–16 (Ariz.

7   2010) (noting lack of defensive injuries and single ligature mark when examining

8   mental anguish and finding that strangulation is not "per se physically cruel").

9       The state court's finding that sufficient evidence supported the cruelty prong

10  of the (F)(6) aggravating factor was therefore an unreasonable application of clearly

11  established federal law and based on unreasonable determinations of the facts.

12  ### B.    There was insufficient evidence to support a finding that the murders were heinous or depraved.

13

14      The Arizona Supreme Court reasoned that because it found that cruelty was

15  supported, it "need not address whether the jury abused its discretion in finding that

16  the murders were also heinous or depraved." *Morris*, 160 P.3d at 220. The court

17  therefore did not rule on this prong of the claim, and this Court can review it de

18  novo. *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005). The prosecutor argued that

19  the crimes here were heinous or depraved because Morris kept the victims' bodies

20  in order to engage in necrophilia.[50] (*See, e.g.*, Tr. July 12, 2005 at 26–27, 32–33,

21  36–39.) As discussed *supra* in Claim One, the necrophilia theory was not supported

22  by the evidence but was instead wild speculation on the part of the prosecutor. There

23  therefore was not sufficient evidence to establish this prong of the aggravating

24  factor.

25  _____

26  [50] The prosecutor admitted that he could not prove postmortem sex with regard to

27  Davis but still argued the murder was heinous or depraved because Morris kept her body after she had died. (Tr. July 12, 2005 at 30.) As to Davis, then, there is

28  absolutely no evidence that the murder was heinous or depraved, as the prosecutor's basis for this prong of the aggravating factor was admittedly not present in her case.

1    If this Court instead determines that the state court did adjudicate this prong

2    of the claim on the merits, then the state court's ruling had to be that even if there

3    was insufficient evidence to support that the crimes were heinous or depraved, any

4    error was harmless beyond a reasonable doubt. *See Gunches*, 234 P.3d at 594. This

5    was contrary to, or an unreasonable application of, clearly established federal law.

6    It ignores the fact that it is not simply the number of aggravating factors that is

7    important to the sentencing determination, but instead the weight of the aggravators.

8    *See Brown v. Sanders*, 546 U.S. 212, 220 (2006) ("An invalidated sentencing factor

9    (whether an eligibility factor or not) will render the sentence unconstitutional by

10   reason of its adding an improper element to the aggravation scale in the weighing

11   process unless one of the other sentencing factors enables the sentencer to give

12   aggravating weight to the same facts and circumstances." (emphasis omitted));

13   *see also Bobby v. Van Hook*, 558 U.S. 4, 13 (2009) (per curiam) (explaining that in

14   looking at prejudice the focus should not be on "the *number* of aggravating factors

15   instead of their *weight*" (emphasis in original)); *Gunches*, 234 P.3d at 593–94

16   (vacating death sentence when insufficient evidence for gratuitous violence aspect

17   of heinous or depraved prong of (F)(6) even though senselessness of crime and

18   helplessness of victim were also established as to that prong and (F)(2) aggravator

19   remained valid). And an aggravator that a murder was cruel because it involved

20   strangulation is much weaker than an aggravator with the additional considerations

21   that Morris relished the murders, inflicted gratuitous violence, and needlessly

22   mutilated the victims' bodies[51] by committing necrophilia.

23   The state court then compounded this error in evaluating whether the jury

24   had abused its discretion in imposing death sentences. When the court found that

25   "[g]iven the nature and strength of the aggravating factors for each murder, a

26

27   _____

28   [51] The jury did not find that Morris had needlessly mutilated Velasquez's body. (IOR 159.)

249

1    reasonable jury could have determined" that death was the appropriate sentence,
2    *Morris*, 160 P.3d at 220, it should not have considered the evidence of necrophilia.
3    If the evidence supporting heinousness or depravity was insufficient, as the court
4    necessarily assumed it was, then it would not have been appropriate for the jury to
5    consider the evidence supporting that aggravator when weighing the aggravating
6    and mitigating factors. *See, e.g.*, *Brown*, 546 U.S. at 220.

7          To satisfy the heightened standard of reliability necessary in the
8    death-penalty context, *see Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)
9    (joint opinion of Stewart, Powell, and Stevens, JJ.), the Supreme Court has
10   "emphasized repeatedly the crucial role of meaningful appellate review in ensuring
11   that the death penalty is not imposed arbitrarily or irrationally," *Parker v. Dugger*,
12   498 U.S. 308, 321 (1991); *see also Zant v. Stephens*, 462 U.S. 862, 890 (1983)
13   (footnote omitted) ("Our decision in this case depends in part on the existence of an
14   important procedural safeguard, the mandatory appellate review of each death
15   sentence by the Georgia Supreme Court to avoid arbitrariness and to assure
16   proportionality."). As the purpose of appellate review is to ensure the
17   constitutionality of a death sentence, the review must itself be constitutional.
18   *Cf. Clemons v. Mississippi*, 494 U.S. 738, 748–51 (1990) (evaluating
19   constitutionality of appellate review). The Arizona Supreme Court here
20   unconstitutionally reviewed Morris's sentence by making two errors. First, the
21   court did not recognize the difference to the sentencing determination between an
22   aggravator supported by a finding of cruelty only versus an aggravator supported
23   by findings of both cruelty and heinousness or depravity. Second, the court assumed
24   that there was insufficient evidence of the heinous or depraved prong of the
25   aggravating factor but then did not take this into account when reviewing the
26   propriety of Morris's death sentences.

27         There was insufficient evidence to support the (F)(6) aggravating factor at
28   trial, and the Arizona Supreme Court compounded this error on direct appeal in

1   violation of Morris's constitutional rights. He is therefore entitled to relief.

2   ### CLAIM THIRTEEN

3   **Morris's due process and Eighth Amendment rights were violated**
4   **when the jury was incorrectly instructed that if given a life sentence**
    **he could be eligible for parole.**

5        This claim was not raised in state court. Morris alleges he can overcome any

6   default of this claim by showing cause and prejudice, including because of the

7   ineffective assistance of appellate and state post-conviction counsel. *See Martinez*

8   *v. Ryan*, 566 U.S. 1, 9 (2012); *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000);

9   *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *but see Davila v. Davis*,

10  137 S. Ct. 2058 (2017). Morris will demonstrate at an evidentiary hearing that

11  appellate and post-conviction counsel fell below the standards of minimally

12  competent capital attorneys and that those failures prejudiced him. Alternatively,

13  he alleges that any procedural bar is not adequate or independent or that imposing

14  default would be a miscarriage of justice. Moreover, there was an absence of

15  available state corrective process or circumstances exist that rendered the process

16  ineffective, thereby excusing the failure to exhaust. *See* 28 U.S.C. § 2254(b)(1)(B).

17  Because this claim has not been adjudicated by the Arizona state courts, the

18  limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's

19  review, and the Court may consider the merits of the claim de novo. Morris

20  incorporates by specific reference all facts, allegations, and arguments made

21  elsewhere in this Petition.

22       The Due Process Clause of the Fourteenth Amendment requires that a jury

23  be fully and correctly instructed regarding the law related to its sentencing

24  discretion and powers in order to prevent an unconstitutional and arbitrary

25  deprivation of a defendant's liberty. *See Hicks v. Oklahoma*, 447 U.S. 343, 346–47

26  (1980). A jury cannot be "affirmatively misled regarding its role in the sentencing

27  process." *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994). Therefore, the United States

28  Supreme Court in *Simmons v. South Carolina* held that a defendant's due process

rights were violated when the jury was not provided with "accurate information regarding petitioner's parole ineligibility." 512 U.S. 154, 162 (1994); *see also Shafer v. South Carolina*, 532 U.S. 36, 39 (2001). The trial court in *Simmons* had not instructed the jury that if it returned a life verdict in a capital case, the petitioner was nevertheless parole ineligible. *Id.* at 159–60. The Court explained that "the jury reasonably may have believed that petitioner could be released on parole if he were not executed. To the extent this misunderstanding pervaded the jury's deliberations, it had the effect of creating a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration." *Id.* at 161.

In *Lynch v. Arizona*, 136 S. Ct. 1818 (2016), the United States Supreme Court reaffirmed these principles in the context of Arizona's sentencing scheme. The Court said that, "[u]nder *Simmons* and its progeny, where a capital defendant's future dangerousness is at issue, and the only sentencing alternative to death available to the jury is life imprisonment without possibility of parole, the Due Process Clause entitles the defendant to inform the jury of his parole ineligibility." 136 S. Ct. at 1818 (alteration, internal quotation marks, and internal citation omitted). The Court noted that Arizona felons whose crimes occurred after 1993 were statutorily ineligible for parole, that the defendant in that case was convicted of a crime that occurred in 2001, and that the state supreme court had acknowledged that the defendant could not be paroled. *Id.* at 1819. *Lynch* therefore confirms that, under *Simmons*, a defendant in Arizona is entitled to have the jury informed of his parole ineligibility if (1) he is in fact ineligible for parole and (2) his future dangerousness is at issue.

First, Morris was ineligible for parole. The Arizona Legislature abolished parole for those convicted of the most serious felonies in 1994. *See* Ariz. Rev. Stat. § 41-1604.09(I) (1994) (applying parole-eligibility statutes only to one "who commit[s] [a] felony offense[] before January 1, 1994"). As a result, those

252

1  convicted of capital murder after 1993 could be sentenced only to life imprisonment
2  without the possibility of parole or to death; they were categorically ineligible for
3  parole. *See Lynch*, 136 S. Ct. at 1819. Morris was convicted of crimes that occurred
4  in 2002 and 2003. (*See* IOR 7.)

5         Second, Morris's future dangerousness was put at issue throughout his trial.
6  In addition to the argument related to necrophilia that infected the entire trial, as
7  discussed *supra* in Claims 1 and 2, the prosecutor made pointed argument painting
8  Morris as a threat to society. This began during the guilt phase. For example, in
9  closing argument he said, "So what happened is this individual here, with a lack of
10 conscience, not only went out and preyed upon [the victim], but once he had her
11 down, like some sort of vulture looking for carrion he scavenged for what she
12 had[.]" (Tr. July 5, 2005 at 20.) He continued, "while he's out there walking in the
13 city . . . sometimes he gets that urge, sometimes he gets that tickle. And when he
14 gets that urge and he gets that tickle, it doesn't matter to him. He will bring home
15 whoever he can find to bring home," and said that Morris is "death personified. He
16 is the black angel of death while he walks out there in the city, in the streets of
17 Phoenix, in the Garfield District." (Tr. July 5, 2005 at 23, 28–29.) He depicted
18 Morris at the guilt phase as a man without a conscience who enjoyed killing and
19 who would have killed more if he had found more victims, or "prey," that he could
20 bring back to his "chamber of horrors." (Tr. July 5, 2005 at 19–20, 23–24, 31, 56,
21 69, 106.) By the end of the guilt phase, therefore, the prosecutor had depicted Morris
22 as a dangerous man who roved the streets of Phoenix looking for victims.
23 Furthermore, because of the nature and number of crimes Morris was convicted of,
24 future dangerousness was a "logical inference from the evidence." *Kelly v. South*
25 *Carolina*, 534 U.S. 246, 252 (2002) (citation omitted).

26        This portrayal of Morris continued at the aggravation phase, where the
27 prosecutor in argument emphasized Morris's size and said that he overpowered the
28 victims, again referencing his "prey." (Tr. July 12, 2005 at 22, 28, 33, 98.) The

253

prosecutor went so far as to address the female jurors and ask if they wanted to volunteer for Morris to sit on them, saying many of them would not be able to fight him off. (Tr. July 12, 2005 at 130–32.) He argued extensively that Morris had sexual intercourse with "rotting" bodies, saying for example that "he then put himself inside her and began to move back and forth with a body that was rotting." (Tr. July 12, 2005 at 27.) He described Morris's actions as "shockingly evil," "debased," and "perverse." (Tr. July 12, 2005 at 38.)

Finally, after emphasizing Morris's dangerousness at the previous two phases of the trial, at the penalty phase the prosecutor referred back to those arguments, saying, "You never forget about aggravating circumstances. You never forget mutilation of the body. You don't forget relishing. You don't forget that[.]" (Tr. July 18, 2005 at 128.) He argued that there were no mitigating circumstances presented and that "the only thing that is appropriate is death." (Tr. July 18, 2005 at 112, 130.)

Morris's future dangerousness was therefore explicitly at issue. *See Kelly*, 534 U.S. at 255 (finding that calling defendant a "'dangerous' 'bloody' 'butcher'" put future dangerousness at issue); *State v. Escalante-Orozco*, 386 P.3d 798, 829 (Ariz. 2017) ("The prosecutor did not have to explicitly argue future dangerousness for it to be at issue; instead, it is sufficient if future dangerousness is a logical inference from the evidence or is injected into the case through the State's closing argument." (internal quotation marks and citation omitted)), *cert. denied*, 138 S. Ct. 238 (2017). He thus was entitled to have the jury know that if it sentenced him to life in prison, he would never be eligible for parole. *See Lynch*, 136 S. Ct. at 1820.

But the jury was not so informed. The trial court gave an incorrect instruction first at the aggravation phase:[52]

_____

[52] This incorrect information about sentencing possibilities was also included in the juror questionnaires and repeated during voir dire. (*See, e.g.*, Tr. June 8, 2005 at 15–16.) By the penalty phase, the misinformation therefore had been reinforced several

> If you do not unanimously find the state has proved at least one aggravating factor, your jury service will end and the Court will sentence the defendant either to natural life imprisonment without the possibility of parole or life imprisonment without possibility of parole until at least 25 years have been served.

(IOR 153 at 5; Tr. July 12, 2005 at 18.) The trial court repeated the incorrect information about the possible sentences Morris faced in the penalty phase instructions:

> If your verdict is that the Defendant should be sentenced to life, the Defendant will not be sentenced to death, and the Court will sentence the Defendant to either life without the possibility of release until 25 calendar years in prison are served, or "natural life," which means the defendant would never be released from prison.

(IOR 163 at 9; IOR 169 at 7; Tr. July 14, 2005 at 10; Tr. July 18, 2005 at 96–97.) In addition to the evidence and argument put on throughout trial, these instructions themselves implicitly put Morris's future dangerousness at issue because when a jury is instructed that a capital defendant can be eligible for release if not sentenced to death, such an instruction "focuses the jury on the defendant's probable future dangerousness" and "invites the jury to predict . . . what the defendant himself might do if released into society." *California v. Ramos*, 463 U.S. 992, 1003, 1005 (1983).

The jury indisputably was misinformed of the possible outcome of returning a life sentence after being told that Morris posed a danger to society, violating Morris's due process rights as well as his rights under the Eighth Amendment. *See Boyde v. California*, 494 U.S. 370, 380 (1990) (explaining that the Eighth Amendment is violated when there is a "reasonable likelihood that the jury has

---

times. *See State v. Hulsey*, 408 P.3d 408, 437 (Ariz. 2018) ("The impression that Hulsey could be released on parole if he were not executed was created by the court in the aggravation phase and was never rectified. Because this misperception was never cured or contradicted, its impact carried over to the penalty phase." (internal citation omitted)).

applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence"). The error in jury instructions was structural because it invited jurors to set aside the evidence before them and instead focus on their mistaken beliefs and fears related to whether Morris could be released from prison. *See generally Arizona v. Fulminante*, 499 U.S. 279, 309–10 (1991) (explaining that structural defects "defy analysis by 'harmless-error' standards" because "[w]ithout these basic protections, a criminal trial cannot reliably serve its function . . . and no criminal punishment may be regarded as fundamentally fair" (citation omitted)); *see also Mollett v. Mullin*, 348 F.3d 902, 928 n.6 (10th Cir. 2003) (questioning whether harmless-error review applies to *Simmons* error because it was not employed by Supreme Court in cases applying *Simmons*); *Escalante-Orozco*, 386 P.3d at 830 (same).

Morris's due process rights under the Fourteenth Amendment, as well as his Eighth Amendment rights, were violated at the penalty phase of his trial, entitling him to a new penalty hearing.

## CLAIM FOURTEEN

**The jury-selection process deprived Morris of his rights under the Sixth and Fourteenth Amendments to be present at all critical stages of his trial and to a jury drawn from a representative cross-section of the community.**

Morris raised these claims on direct appeal. (DA 29 at 16, 32–47.) The Arizona Supreme Court denied the claims on the merits. *State v. Morris*, 160 P.3d 203, 212–14 (Ariz. 2007). The state court's rejection of these claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an unreasonable determination of the facts in light of the evidence presented. *See id.* § 2254(d)(2). Morris incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

On May 25, 2005, Morris filed several written objections to the voir dire

process, one of which was in opposition to "the jury commissioner pre-screening the potential jurors for time excuses outside the presence of the court and counsel." (IOR 86 at 1.) At a hearing held on May 27, 2005, the trial court addressed Morris's objections. (IOR 95.) The trial court explained that it still intended to have the jury commissioner prescreen prospective jurors, but those who self-identified as being unable to serve would have to write down their excuses. (Tr. May 27, 2005 at 4.) Logan would be given the opportunity to review the excuse sheets, and the trial court would question any prospective jurors that Logan believed did not answer honestly. (Tr. May 27, 2005 at 4–5.) Logan continued to object because neither he nor the trial court would "be able to see or hear them say the answer and be able to evaluate whether or not they are honest or not." (Tr. May 27, 2005 at 5.)

Jury selection for Morris's trial began on the morning of June 1, 2005. (IOR 96.) Between 330 and 350 prospective jurors were brought in to address the approximately eight jury trials that were scheduled to start that day, including Morris's. (Tr. June 1, 2005 at 10–11.) The Director Jury Commissioner, Bob James, prescreened the prospective jurors for time using a set script. (Tr. June 1, 2005 at 11–12.) The prospective jurors were told that when their names were called, they should answer "yes" if they were able to serve on a trial expected to last eight weeks and "no" if, due to health reasons or other unavoidable circumstances, they were unable to serve on a trial of that length. (Tr. June 1, 2005 at 12; Jury Selection Ex. 2; Jury Selection Ex. 4.) They were also informed that those who answered "no" would be required to fill out a form indicating the reasons why they were unable to serve on the trial. (Tr. June 1, 2005 at 12; Jury Selection Ex. 2; Jury Selection Ex. 4.)

Eighty-seven of the prospective jurors indicated that they would be able to serve on an eight-week trial. (Tr. June 1, 2005 at 4.) Those who remained were given a one-page sheet asking them to list the reasons why they could not serve for that length of time. (Tr. June 1, 2005 at 4; *see, e.g.*, Jury Selection Ex. 3.) Martinez and Logan reviewed the answer sheets and found approximately 150 to be

"suspect." (Tr. June 1, 2005 at 4.) Those answer sheets were brought to the trial court, which indicated that it wanted to follow-up on around twenty of them. (Tr. June 1, 2005 at 2, 4–5.) However, James did not wait for the trial court's decision and assigned to other panels almost all of the prospective jurors whose answer sheets had been under review. (Tr. June 1, 2005 at 2–3, 5, 7, 12–14.)

At a hearing held that afternoon, Logan explained:

> When we gave the first stack of hundred people that we thought had legitimate excuses to the Bailiff, we were told by some person, and maybe this Bob James person, in no uncertain nor polite terms that he hadn't waited. He didn't care. He already sent jurors out from all of the "no" people, not just the no's that everyone agreed should be a no, and he wasn't going to make jurors wait, and that was his answer to us, and he didn't care what we had to say.

(Tr. June 1, 2005 at 5.) Logan added that only four of the twenty prospective jurors the trial court identified as having questionable excuses were available to be interviewed. (Tr. June 1, 2005 at 5.) He objected to the panel and "the way it was selected" because "we are left with nothing but volunteers." (Tr. June 1, 2005 at 6–7.)

James was called to testify about the prescreening process and said that assigning to other panels the prospective jurors who filled out answer sheets "was a mistake." (Tr. June 1, 2005 at 10, 14.) He testified further that there was no effort by anyone in his office to intentionally prevent those jurors from being available for questioning. (Tr. June 1, 2005 at 14.)

After James testified, the trial court explained that it did not "see any reason why we don't have a representative cross section of the community of those 86 or 87 jurors who answered the questions saying they were available." (Tr. June 1, 2005 at 16.) The trial court also found that "there certainly wasn't any intent or any effort or any means of doing any type of screening that would cause an identifiable group to be underrepresented in the jury panel." (Tr. June 1, 2005 at 16.)

Logan requested that all of the one-page answer sheets be marked and entered

1   into evidence. (Tr. June 1, 2005 at 17–18.) The trial court noted that the answer

2   sheets from all but four of the prospective jurors that it had determined gave

3   questionable excuses had gone missing. (Tr. June 1, 2005 at 18.) James promised

4   to have another search performed for the answer sheets (Tr. June 1, 2005 at 18), but

5   they were never found (Tr. June 2, 2005 at 2–3).

6          The trial court and counsel proceeded to question the four remaining

7   prospective jurors regarding the excuses they had given. (Tr. June 1, 2005 at 21–

8   29.) After conferring with counsel, the trial court excused two of the four

9   prospective jurors. (Tr. June 1, 2005 at 29–31.)

10
11   **A.     Morris's absence during portions of the jury-selection process deprived him of due process.**

12          It is a well-settled principle of constitutional law that a criminal defendant

13   has the "right to be present at all stages of the trial where his absence might frustrate

14   the fairness of the proceedings." *Faretta v. California*, 422 U.S. 806, 819 n.15

15   (1975); *accord Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). Although this right

16   is rooted to a large extent in the Sixth Amendment's Confrontation Clause, the

17   Supreme Court has recognized that the right to presence "is protected by the Due

18   Process Clause in some situations where the defendant is not actually confronting

19   witnesses or evidence against him." *United States v. Gagnon*, 470 U.S. 522, 526

20   (1985) (per curiam). A defendant's presence contributes to the fairness of the

21   proceedings when, in light of the nature of the situation, his presence "would have

22   been useful in ensuring a more reliable determination." *See Stincer*, 482 U.S. at 747.

23   In other words, "[s]o far as the Fourteenth Amendment is concerned, the presence

24   of a defendant is a condition of due process to the extent that a fair and just hearing

25   would be thwarted by his absence, and to that extent only." *Snyder v.*

26   *Massachusetts*, 291 U.S. 97, 107–08 (1934), *overruled in part on other grounds by*

27   *Malloy v. Hogan*, 378 U.S. 1 (1964). Due process does not, however, require the

28   defendant's presence "when presence would be useless, or the benefit but a

259

1    shadow." *Snyder*, 291 U.S. at 106–07.

2         The Supreme Court has also made clear that voir dire is a critical stage of a

3    criminal trial "during which the defendant has a constitutional right to be present."

4    *Gomez v. United States*, 490 U.S. 858, 873 (1989). While some courts have found

5    that "routine administrative procedures relating to jury selection are not part of the

6    true jury impanelment process in which parties and counsel have a right to

7    participate," *United States v. Greer*, 285 F.3d 158, 167 (2d Cir. 2002), others have

8    taken a less hardline approach and have looked at the circumstances of the

9    proceeding in question. For example, in *Cohen v. Senkowski*, the Second Circuit

10   held that the defendant's right to be present during the material stages of trial was

11   violated when jurors were prescreened, out of his presence, about their exposure to

12   pretrial publicity of the case. 290 F.3d 485, 489–90 (2d Cir. 2002). Similarly, in

13   *United States v. Bordallo*, the Ninth Circuit held that either the defendant or his

14   counsel should have been present when the district court excused some of the

15   prospective jurors because they "knew which specific case they would hear, and

16   some were excused due to factors related to [the defendant's] particular cause." 857

17   F.2d 519, 523 (9th Cir. 1988), *opinion amended on reh'g*, 872 F.2d 334 (9th Cir.

18   1989). As in *Bordallo*, "[t]his case falls somewhere between the ministerial stage

19   of drawing the prospective juror pool and the formal pretrial narrowing of the pool

20   through voir dire for a particular trial." 857 F.2d at 523.

21        The trial court recognized the importance of Morris's presence when it

22   fashioned a prescreening procedure that allowed him to participate through counsel

23   in reviewing the prospective jurors' excuses given during the prescreening process

24   and questioning the jurors about the validity of those excuses. However, the jury

25   commissioner did not comply with this process and instead allowed a sizeable

26   majority of the venire to voluntarily opt out of serving on Morris's trial. This error

27   deprived Morris of his due process rights. All of the prospective jurors should have

28   undergone the same prescreening process, including being made available for

1    questioning, in Morris's presence, about the validity of their hardship excuses.

2         The Arizona Supreme Court assumed that Morris could show error but then
3    found that Morris could not show that this error was harmless. *Morris*, 160 P.3d at
4    214. But a criminal defendant's "right to be present during all critical stages of the
5    proceedings . . . , as with most constitutional rights, [is] subject to harmless error
6    analysis, unless the deprivation, by its very nature, cannot be harmless." *Rushen v.*
7    *Spain*, 464 U.S. 114, 117 n.2 (1983) (per curiam) (internal citations omitted). The
8    error here fits that bill. Morris's absence from portions of the jury-selection process
9    was structural error and therefore per se prejudicial. *See generally United States v.*
10   *Gonzalez-Lopez*, 548 U.S. 140, 148–49 (2006) (explaining that structural errors
11   "defy analysis by harmless-error standards because they affec[t] the framework
12   within which the trial proceeds, and are not simply an error in the trial process itself"
13   (internal quotation marks omitted)). It was therefore contrary to, or an unreasonable
14   application of, clearly established federal law for the state court to apply
15   harmless-error review.

16        Even if harmless-error review applied, the state court unreasonably applied
17   clearly established law in determining that the denial of Morris's rights was
18   harmless in this case. *See Morris*, 160 P.3d at 214. It cannot be said that Morris's
19   presence during the jury commissioner's prescreening of prospective jurors would
20   have "been useless, or the benefit but a shadow." As set forth above, only four of
21   the prospective jurors who self-identified as being unable to serve on Morris's trial
22   were made available to be questioned about their excuses in the presence of
23   Morris's counsel. The trial court ultimately found that the excuses given by two out
24   of the four prospective jurors were invalid. Had Morris been present for the entirety
25   of the prescreening process, either he or his counsel would have been able to
26   identify other invalid excuses that went undetected by the jury commissioner. Thus,
27   the fairness of the proceedings was thwarted by Morris's absence, and the state
28   court's finding to the contrary was unreasonable. Morris is entitled to a new trial.

**B.    The jury-selection process violated Morris's right to a jury drawn from a representative cross-section of the community.**

The Supreme Court has held that a defendant in a capital case has a constitutional right to a jury that represents a fair cross-section of the community, and a jury unlikely to reflect such community views violates the Sixth Amendment. *See Taylor v. Louisiana*, 419 U.S. 522, 537 (1975). To make a prima facie showing that a jury does not represent a fair cross-section of the community, a defendant must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979).

Here, the jury commissioner's willingness to excuse jurors who might suffer hardship because of the length of the trial without inquiring into the reasons for the alleged hardship resulted in a jury comprised essentially of "volunteers." Because the jurors were allowed to opt out of participation in a lengthy trial, this process likely disproportionately excluded low-income persons from Morris's jury because those who would not opt out would be those with the financial means to be absent from work for two months.

The Arizona Supreme Court found that Morris had not identified a distinctive group that was excluded from his jury panel. *See Morris*, 160 P.3d at 213. This was an unreasonable determination of the facts supporting this claim given that the jury commissioner lost the forms that disclosed the identities of the prospective jurors who opted out of serving on a lengthy trial. Even the prosecutor conceded that he was perhaps "a little concerned" with the prescreening process because "we don't know where these people that could or may or may not have been available for [Logan] to choose from where they would have fallen. We just don't know."

1   (Tr. June 1, 2005 at 7–8.) Thus, the prescreening procedures followed in Morris's
2   case resulted in a constitutionally deficient jury pool. The absence of an appropriate
3   cross-section of jurors denied Morris a right afforded by the Sixth and Fourteenth
4   Amendments, and the state court's decision to the contrary was an unreasonable
5   application of clearly established federal law. Morris is therefore entitled to relief.

6   ### CLAIM FIFTEEN

7   **The trial court violated Morris's Sixth and Fourteenth Amendment
8   rights when it admitted hearsay testimony in violation of the
    Confrontation Clause.**

9   These claims were not raised in state court. Morris alleges he can overcome
10  any default by showing cause and prejudice, including because of the ineffective
11  assistance of appellate and state post-conviction counsel. *See Martinez v. Ryan*, 566
12  U.S. 1, 9 (2012). Morris will demonstrate at an evidentiary hearing that appellate
13  and post-conviction counsel fell below the standards of minimally competent
14  capital attorneys and that those failures prejudiced him. Alternatively, he alleges
15  that any procedural bar is not adequate or independent or that imposing default
16  would be a miscarriage of justice. Because these claims have not been adjudicated
17  by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d)
18  do not apply to this Court's review, and the Court may consider the merits of the
19  claims de novo. Morris incorporates by specific reference all facts, allegations, and
20  arguments made elsewhere in this Petition.

21  The Sixth and Fourteenth Amendments guarantee a criminal defendant the
22  "right to be confronted with the witnesses against him." *Pointer v. Texas*, 380 U.S.
23  400, 405 (1965). Under the Confrontation Clause, "testimonial" hearsay statements
24  against a criminal defendant are inadmissible unless the declarant is "unavailab[le]
25  and the defendant has had "a prior opportunity for cross-examination." *Crawford v.
26  Washington*, 541 U.S. 36, 68 (2004). The "core class" of testimonial statements
27  include "*ex parte* in-court testimony or its functional equivalent—that is, material
28  such as affidavits . . . or similar pretrial statements that declarants would reasonably

expect to be used prosecutorially." *Crawford*, 541 U.S. at 51 (internal quotation marks omitted). Written findings in autopsy reports are included in this core class. *See Bullcoming v. New Mexico*, 564 U.S. 647, 661–63 (2011) (holding that a forensic report analyzing the defendant's blood-alcohol concentration could not be introduced through a "surrogate" witness, a lab worker who had not performed or observed the blood test or certified its results); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 308–11 (2009) (concluding that certificates of analysis identifying a substance seized as cocaine were testimonial hearsay because they had a clear evidentiary purpose and therefore could not be introduced except through the analyst who had authored them); *Crawford*, 541 U.S. at 47 n.2 (explaining "several early American authorities flatly rejected any special status for coroner statements"). Several Arizona statutes demonstrate that autopsy reports are meant for trial, so an objectively reasonable medical examiner should believe that an autopsy report he or she prepared could be used prosecutorially, making them testimonial. *See* Ariz. Rev. Stat. § 11-593(C) (requiring law enforcement to notify the medical examiner and promptly investigate and report "the facts and circumstances surrounding the death and report the results to the medical examiner"); Ariz. Rev. Stat. § 11-594(A)(7) (directing that the medical examiner "[n]otify the county attorney or other law enforcement authority when death is found to be from nonnatural causes"); Ariz. Rev. Stat. § 11-597(C) ("If the county attorney or a superior court judge of the county where the death occurred requests an autopsy, the county medical examiner shall perform the autopsy"); Ariz. Rev. Stat. § 11-597(E) ("If the person performing the autopsy determines that the report should be forwarded to the county where the death occurred or the county in which any injury contributing to or causing the death was sustained, the report shall be forwarded to the county attorney.").

/ / /

/ / /

### A.    The testimony of Dr. Keen about Noah's autopsy results violated the Confrontation Clause.

At trial, Dr. Phillip Keen, the Chief Medical Examiner of Maricopa County at the time, testified about Noah's autopsy and its results. (Tr. June 27, 2005 at 83.) But Keen had neither conducted nor witnessed the autopsy. Instead, Dr. Alex Zhang conducted Noah's autopsy and wrote the autopsy report. (Tr. June 27, 2005 at 84.) The prosecutor made no argument that Zhang was unavailable, just that he no longer worked in the medical examiner's office. (Tr. June 27, 2005 at 84.) Morris's trial counsel objected to Keen's testimony as hearsay and a violation of the Confrontation Clause. (Tr. June 27, 2005 at 84, 91–98.) The trial court overruled the objection and allowed Keen to testify based on the incorrect assumption that if the autopsy report was admissible under the business records exception to the hearsay rules then the Confrontation Clause could not be violated. (Tr. June 27, 2005 at 97.) *See Crawford*, 541 U.S. at 50–51 ("[W]e . . . reject the view that the Confrontation Clause applies of its own force only to in-court testimony, and that its application to out-of-court statements introduced at trial depends upon 'the law of Evidence for the time being.' Leaving the regulation of out-of-court statements to the law of evidence would render the Confrontation Clause powerless to prevent even the most flagrant inquisitorial practices." (citations omitted)); *United States v. Ignasiak*, 667 F.3d 1217, 1229 n.14 (11th Cir. 2012) ("The autopsy reports appear to have been admitted into evidence under the hearsay exception for documents kept in the regular course of business under Fed. R. Evid. 803(6). Under that rule, the availability of the declarant is immaterial. Of course, admissibility under the rules of evidence does not vitiate Confrontation Clause requirements.").

Keen then served as a conduit for Zhang's autopsy findings. The prosecutor admitted that "[e]verything will be based on this other doctor's report" and that he was calling Keen to "give[] the opinions of the person who gave the actual examination." (Tr. June 27, 2005 at 85, 92.) For example, Keen testified that at the

1    autopsy—which he did not attend—a "visual viewing of the body" showed
2    decomposition, a ligature abrasion around the neck, skin slippage on the thighs, and
3    a contusion of the vagina. (Tr. June 27, 2005 at 98, 100–01.) He also testified that
4    Noah did not die of a drug overdose. (Tr. June 27, 2005 at 114–16.) This testimony
5    mirrored Zhang's findings. (*See* PCR Hr'g Ex. 10.) Even though the autopsy report
6    itself was not admitted into evidence, its contents were admitted through Keen's
7    summary and reliance on it. Keen gave surrogate testimony and thus presented
8    testimonial hearsay. *See Ignasiak*, 667 F.3d at 1234 ("That Dr. Minyard may have
9    briefly expressed her own independent agreement with the non-testifying medical
10   examiner's conclusions regarding cause of death only compounded the
11   Confrontation Clause error that occurred. Because Dr. Minyard had neither
12   performed nor been present during the autopsies in question, she was not in a
13   position to testify on cross-examination as to the facts surrounding how the
14   autopsies were actually conducted or whether any errors, omissions, or mistakes
15   were made."). The State was therefore obligated under the Sixth Amendment to
16   have Zhang testify so that the defense could cross-examine him on his findings. The
17   State did not do so, instead presenting Keen only. Keen's testimony therefore failed
18   to satisfy the Confrontation Clause.
19          This violation was not harmless. Keen's testimony was used to support the
20   prosecution's theory that Morris engaged in necrophilia, which pervaded the trial
21   as discussed *supra* in Claims One and Two. Further, the results of Noah's autopsy
22   report—the vaginal bruising in particular—were also used to support the cruelty
23   finding at the aggravation phase. (Tr. July 12, 2005 at 60, 105.) The confrontation
24   violation therefore had a substantial and injurious effect on the verdicts at both the
25   guilt and aggravation phases, and Morris is entitled to relief. *See Ocampo v. Vail*,
26   649 F.3d 1098, 1114 (9th Cir. 2011) (quoting *Brecht v. Abrahamson*, 507 U.S. 619,
27   623 (1993)).
28   / / /

1

2

### B.    The testimony of the medical examiners on the toxicology findings violated the Confrontation Clause.

3    At Morris's trial, all of the medical examiners testified as to drugs and

4   alcohol found in the victims' systems. (Tr. June 15, 2005 at 93–95 (Castillo);

5   Tr. June 27, 2005 at 114–16 (Noah); Tr. June 28, 2005 at 34–36 (Codman); Tr. June

6   29, 2005 at 19–22 (Velasquez); Tr. June 29, 2005 at 37–38 (Davis).) The medical

7   examiners, however, did not conduct the toxicology testing; the toxicology reports

8   were signed by Norman Wade. (*See* PCR Hr'g Exs. 7–11.) Each medical examiner

9   therefore served as a surrogate for Wade, and such surrogate testimony violates the

10  Confrontation Clause. *See Bullcoming*, 564 U.S. at 661–63.

11    The defense's theory of the case was that the victims had died of accidental

12  drug overdoses. (*See* Tr. July 5, 2005 at 101–04.) As such, the amount of drugs

13  found in the victims' systems was crucial to whether the crimes were homicides.

14  Indeed, two of the deaths—of Codman and Davis—were originally found to be drug

15  overdoses. (PCR Hr'g Ex. 8 at 1; PCR Hr'g Ex. 9 at 1; Tr. June 28, 2005 at 41–42,

16  54–60; Tr. June 29, 2005 at 40, 45–48.) For a third victim, Velasquez, the cause of

17  death was strangulation with "combined drug intoxication" as a "contributing

18  factor." (PCR Hr'g Ex. at 11; Tr. June 29, 2005 at 22, 28, 32–33.) And Keen

19  testified that there was cocaine, prescription drugs, and Gamma Hydroxybutyrate

20  ("GHB") in Noah's system, but that she did not die of a drug overdose. (Tr. June

21  27, 2005 at 114–16.) Finally, Horn testified that the toxicology results showed that

22  Castillo had ingested alcohol and cocaine. (Tr. June 15, 2005 at 94.) The importance

23  of the toxicology findings was furthered at the aggravation phase, when the level of

24  intoxication was relevant to the victims' consciousness and thus the cruelty finding

25  for the (F)(6) aggravating factor. (Tr. July 12, 2005 at 31–32, 36, 41, 67–68, 73,

26  119–20, 123.)

27    Morris could not cross-examine the medical examiners on the methods used

28  to determine the drug levels found in each victims' system, as they did not conduct

1   the testing. He further could not question Wade about his credentials, which is
2   particularly problematic because he had been fired from a previous job for crimes
3   related to his workplace and subsequently convicted of stealing a gun from a
4   property room, facts going to his credibility. The confrontation violations therefore
5   had a substantial and injurious effect on the verdicts at both the guilt and
6   aggravation phases. *See Ocampo*, 649 F.3d at 1114. Morris is accordingly entitled
7   to relief.

## CLAIM SIXTEEN

**Alternate jurors improperly participated in deliberations during Morris's trial, in violation of his Sixth and Fourteenth Amendment rights.**

11   This claim was not raised in state court. Morris alleges he can overcome any
12   default of this claim by showing cause and prejudice, including because of the
13   ineffective assistance of state post-conviction counsel. *See Martinez v. Ryan*, 566
14   U.S. 1, 9 (2012); *Murray v. Carrier*, 477 U.S. 478, 488–89 (1986); *Strickland v.*
15   *Washington*, 466 U.S. 668, 687–88 (1984). Morris will demonstrate at an
16   evidentiary hearing that post-conviction counsel fell below the standards of
17   minimally competent capital attorneys and that those failures prejudiced him.
18   Alternatively, he alleges that any procedural bar is not adequate or independent or
19   that imposing default would be a miscarriage of justice. Because this claim has not
20   been adjudicated by the Arizona state courts, the limitations on relief imposed by
21   28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider
22   the merits of the claim de novo. Morris incorporates by specific reference all facts,
23   allegations, and arguments made elsewhere in this Petition.

24   The Sixth and Fourteenth Amendments protect a criminal defendant's right
25   to a fair trial based on the evidence presented and the right to an impartial jury.
26   *See Parker v. Gladden*, 385 U.S. 363, 364 (1966) (per curiam); *Turner v. Louisiana*,
27   379 U.S. 466, 471–72 (1965). This includes the right to a jury free from misconduct
28   or "any private communication, contact, or tampering." *Remmer v. United States*,

268

347 U.S. 227, 229 (1954); *see United States v. Bagnariol*, 665 F.2d 877, 884 (9th Cir. 1981) (per curiam) ("The introduction of outside influences into the deliberative process of the jury is inimical to our system of justice. The jury should reach its decisions only upon the evidence produced at trial, unaffected by extrinsic facts." (internal citations omitted)). "The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." *Turner*, 379 U.S. at 472.

At Morris's trial, the alternate jurors participated in deliberations. This is despite the fact that the trial court told them not to do so. (Tr. July 5, 2005 at 144; Tr. July 12, 2005 at 149; Tr. July 18, 2005 at 147.) The alternate jurors sat in on deliberations, participated in discussion, and left only when votes were being taken.[53] The participation by the alternate jurors qualifies as a private communication with the jury, resulting in the introduction of extraneous influences during deliberations. As the Arizona Supreme Court has explained:

> Defendants have an undisputed right to a unanimous verdict by a properly constituted jury, unaided by outside influences such as alternate jurors who have been excused by the court. Thus, if alternate jurors aid the jury that is

---

[53] Because this qualifies as an extraneous influence on the jury, it falls under this Court's ruling that "Petitioner may question jurors concerning any extraneous influences on, or racial animus of, the jury." (ECF No. 11 at 2.) Although generally a verdict may not be impeached based on the jury's internal deliberations, juror testimony on extraneous influences on a verdict is permissible. *See Tanner v. United States*, 483 U.S. 107, 117 (1987). But because of Morris's compliance with this Court's ruling that he "may not question jurors on the course of their deliberations or other matters that are not admissible in evidence absent further authorization of the Court" (ECF No. 11 at 2), it is unknown what effect the alternate jurors' participation had on the seated jurors' deliberations. Several jurors said that there was a holdout juror at the penalty phase, but more detail is not known. Morris maintains that the error here is presumptively prejudicial, as argued below, but in the event he has to show prejudice, he will ask for a court order permitting him to further investigate the juror misconduct or will ask for depositions of jurors in his Motion for Evidentiary Development.

269

1
2

finally picked in its deliberations, prejudice necessarily results and a new trial is warranted.

3

*State v. Hooper*, 703 P.2d 482, 492 (Ariz. 1985) (internal citation omitted).

4 There is a presumption of prejudice when jurors consider extraneous
5 information about a case or are subject to extraneous influences. *See Tarango v.*
6 *McDaniel*, 837 F.3d 936, 945–46 (9th Cir. 2016) ("Clearly established federal law
7 provides that any unauthorized 'private communication, contact, or tampering
8 directly or indirectly, with a juror during a trial *about the matter pending before the*
9 *jury* is, for obvious reasons, deemed presumptively prejudicial.'" (emphasis in
10 original) (quoting *Remmer*, 347 U.S. at 229)); *Tong Xiong v. Felker*, 681 F.3d 1067,
11 1076–78 (9th Cir. 2012); *Caliendo v. Warden of Cal. Men's Colony*, 365 F.3d 691,
12 695–99 (9th Cir. 2004). Further, even if a showing of prejudice is required, only
13 one juror need have been influenced by extrinsic considerations "because a
14 defendant is 'entitled to be tried by 12 . . . impartial and unprejudiced jurors.'"
15 *Tarango*, 837 F.3d at 946 (quoting *Parker*, 385 U.S. at 366). And here, there was a
16 holdout juror during deliberations. There is thus "a reasonable possibility that the
17 material could have affected the verdict." *Sea Hawk Seafoods, Inc. v. Alyeska*
18 *Pipeline Serv. Co.*, 206 F.3d 900, 906 (9th Cir. 2000).

19 The alternate jurors' participation in deliberations and introduction of
20 improper considerations into the deliberation process violated Morris's Sixth and
21 Fourteenth Amendment rights. He is entitled to relief.

22

**CLAIM SEVENTEEN**

23
24

**The prosecutor's discriminatory exercise of a peremptory challenge to strike a disabled prospective juror violated Morris's rights under the Fifth, Sixth, and Fourteenth Amendments.**

25 This claim was not raised in state court. Morris alleges he can overcome any
26 default of this claim by showing cause and prejudice, including because of the
27 ineffective assistance of appellate and state post-conviction counsel. *See Martinez*
28 *v. Ryan*, 566 U.S. 1, 9 (2012); *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000);

*Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *but see Davila v. Davis*, 137 S. Ct. 2058 (2017). Morris will demonstrate at an evidentiary hearing that appellate and post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced him. Alternatively, he alleges that any procedural bar is not adequate or independent or that imposing default would be a miscarriage of justice. Because this claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the merits of the claim de novo. Morris incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

The prosecutor impermissibly exercised a peremptory challenge to exclude the only blind prospective juror from Morris's jury on the basis of her disability. In *Batson v. Kentucky*, 476 U.S. 79, 96–98 (1986), the Supreme Court held that the discriminatory use of peremptory challenges based on a prospective juror's race violates the Equal Protection Clause of the Fourteenth Amendment. In *J.E.B. v. Alabama ex. rel. T.B.*, 511 U.S. 127, 131 (1994), the Court extended its holding to strikes based on gender. Although the Supreme Court has not explicitly extended its holding in *Batson* to claims that jurors were excluded on the basis of disability, the Court has held that "classifications based on disability violate" the Fourteenth Amendment if "they lack a rational relationship to a legitimate governmental purpose." *Tennessee v. Lane*, 541 U.S. 509, 522–23 (2004). The Seventh Circuit has accordingly entertained a challenge to a prosecutor's use of a peremptory challenge against a disabled juror, reviewing the challenge under rational basis review. *United States v. Harris*, 197 F.3d 870, 876 (7th Cir. 1999).

Here, there was no rational basis for the prosecutor's peremptory challenge against Panelist 12; the only reason she was stricken was because she was blind. The prosecutor first tried to have Panelist 12 stricken for cause. He argued that she would not, for example, be able to see someone cry on the stand. (Tr. June 7, 2005

at 68–69.) Defense counsel pointed out that "we certainly can't discriminate against her handicap. . . . [W]e shouldn't discriminate against her." (Tr. June 7, 2005 at 71.) The court rejected the prosecutor's argument that blindness in any way interfered with the prospective juror's ability to serve. (Tr. June 7, 2005 at 71–72.) The prosecutor re-raised the issue of striking Panelist 12 for cause the next day. (Tr. June 8, 2005 at 48.) He protested that "she's not being released because she's blind. She's being asked to be released because she cannot look at the items that are being presented and cannot fairly consider them." (Tr. June 8, 2005 at 51.) The court again rejected this argument saying, "What I did find is that there are some cases where there are handicapped jurors who are left on juries, and it seems in this case that the Juror 12 handicap of being blind shouldn't impact the case at all. Identification in this case is not an issue." (Tr. June 9, 2005 p.m. at 64.) The prosecutor thereafter used a peremptory challenge to strike Panelist 12 from the jury. (IOR 102 (sealed).)

The prosecutor's reason for striking Panelist 12 was based on the fact that she was blind. Accepting the reasoning that she would not be able to see demeanor or evidence would effectively mean that blind jurors can be stricken from every jury. But the Supreme Court has found that the disabled, including the blind, have a fundamental right to access to courts. *See Lane*, 541 U.S. at 533–34. The trial court rejected the argument that sight was needed in this case, and the prosecutor's use of the strike therefore fails rational basis review:

> Even under conventional tiered scrutiny, equal protection would still prohibit disability-based strikes. It is often irrational to exclude a juror based solely on disability since such a challenge must, by its very nature, be status-based. In other words, once a juror with a disability has shown that she can perform the essential functions of a juror, there is no legitimate rationale for elimination based on her status as a disabled person. Rather, it is based on a false assumption about the juror's incompetence or partiality. Moreover, the state's interest in the peremptory challenge has been viewed by *Batson* and its progeny as so weak as to make such discrimination appear even more irrational.

Mary A. Lynch, *The Application of Equal Protection to Prospective Jurors with Disabilities: Will Batson Cover Disability-Based Strikes?*, 57 Alb. L. Rev. 289, 362 (1993).

"[T]he Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Snyder v. Louisiana*, 552 U.S. 472 478 (2008) (quoting *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994).) A *Batson* violation is a structural error, requiring a grant of relief without any showing of prejudice. *Gray v. Mississippi*, 481 U.S. 648, 668 (1987). A defendant's conviction must be vacated if even one of the prosecutor's strikes was motivated by a discriminatory intent. *Id.* (noting that courts cannot treat the erroneous exclusion of one juror as an "isolated incident"); *see also United States v. Battle*, 836 F.2d 1084, 1086 (8th Cir. 1987). Panelist 12 was here struck for a discriminatory purpose. Morris is therefore entitled to relief.

## CLAIM EIGHTEEN

**The trial court violated Morris's Sixth, Eighth, and Fourteenth Amendment rights by erroneously denying his challenges for cause and forcing him to expend peremptory challenges.**

This claim was not raised in state court. Morris alleges he can overcome any default of this claim by showing cause and prejudice, including because of the ineffective assistance of appellate and state post-conviction counsel. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *but see Davila v. Davis*, 137 S. Ct. 2058 (2017). Morris will demonstrate at an evidentiary hearing that appellate and post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced him. Alternatively, he alleges that any procedural bar is not adequate or independent or that imposing default would be a miscarriage of justice. Because this claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider

1  the merits of the claim de novo. Morris incorporates by specific reference all facts,

2  allegations, and arguments made elsewhere in this Petition.

3       Morris has a constitutional right to be tried by an impartial jury that was not

4  "uncommonly willing" to return a death verdict. *Witherspoon v. Illinois*, 391 U.S.

5  510, 521 (1968). He also has a right to an unbiased and impartial jury. *Morgan v.*

6  *Illinois*, 504 U.S. 719, 727 (1992); *see also Groppi v. Wisconsin*, 400 U.S. 505, 509

7  (1971). The "presence of a biased juror cannot be harmless; the error requires a new

8  trial without a showing of actual prejudice." *United States v. Gonzalez*, 214 F.3d

9  1109, 1111 (9th Cir. 2000) (citations omitted); *see also Hughes v. United States*,

10  258 F.3d 453, 463 (6th Cir. 2001).

11       The trial court here, in denying the defense's motions to strike for cause

12  jurors who were biased, deprived Morris of the peremptory challenges guaranteed

13  by state law and therefore of his rights under the Sixth, Eighth, and Fourteenth

14  Amendments. *See Ross v. Oklahoma* 487 U.S. 81, 89 (1988) ("[T]he right to

15  peremptory challenges is denied or impaired only if the defendant does not receive

16  that which state law provides." (internal quotation marks omitted)). Because the

17  trial court erroneously denied defense counsel's for-cause challenges to several of

18  the prospective jurors, the defense had to use peremptory challenges to cure the trial

19  court's errors. For example, the defense moved to strike for cause Panelist 15, who

20  knew the sister of one of the victims. The court denied to strike for cause. (Tr. June

21  6, 2005 at 96.) The court also denied the defense's motion to strike Panelist 50,

22  whose aunt was murdered by Ted Bundy. (Tr. June 8, 2005 at 27.) The prosecutor

23  did not have to similarly expend his peremptory challenges. As a result, the rulings

24  of the trial court in this case effectively granted to the prosecution more challenges

25  than to the defense. Therefore, Morris is entitled to relief. *See Ross*, 487 U.S. at 89;

26  *see also United States v. Harbin*, 250 F.3d 532, 541 (2001).

27  / / /

28  / / /

# CLAIM NINETEEN

**The Arizona courts violated Morris's Fifth, Sixth, and Fourteenth Amendment rights by admitting statements obtained from him in violation of the Constitution's voluntariness principles.**

This claim was not raised in state court. Morris alleges he can overcome any default of this claim by showing cause and prejudice, including because of the ineffective assistance of appellate and state post-conviction counsel. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *but see Davila v. Davis*, 137 S. Ct. 2058 (2017). Morris will demonstrate at an evidentiary hearing that appellate and post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced him. Alternatively, he alleges that any procedural bar is not adequate or independent or that imposing default would be a miscarriage of justice. Because this claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the merits of the claim de novo. Morris incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

On April 12, 2003, police officers came to Morris's place of work and took him to the police station where he was questioned by Hutson for approximately four hours. (Tr. June 16, 2005 at 31–32; Tr. June 20, 2005 at 12.) The interrogation was audio and videotaped. (Tr. June 16, 2005 at 28–29.) During the interrogation, Morris described each of his encounters with the victims, stating that they all died of apparent drug overdoses. (PCR Pet. Ex. O at 000489–545.) Hutson said that he did not believe Morris and pressed him to tell a different story. (PCR Pet. Ex. O at 000555–59.) Hutson then gave Morris two options of what actually happened— either he had promised the victims drugs in exchange for sex, or they had smoked their own crack cocaine and wanted Morris to choke them to enhance their pleasure. (PCR Pet. Ex. O at 000560.) Morris then told a second version of the encounters,

275

1    this time stating that each of the victims asked him to choke her, and they
2    accidentally died as a result. (PCR Pet. Ex. O at 000561–86.) Morris maintained
3    throughout that he never intended to kill any of them. (PCR Pet. Ex. O at 000561–
4    86, 000599–603.) He was arrested at the end of the interrogation. (PCR Pet. Ex. O
5    at 000617.)

6        As set forth in Claim Four (B), defense counsel reached an agreement with
7    the State to let the trial court determine on the basis of the transcript, and without a
8    hearing, whether or not Morris's statements to Hutson were voluntary. (Tr. May 20,
9    2005 at 4.) Just before the prosecutor made his opening statement, the trial judge
10   indicated during a bench conference that he had reviewed the statement and did not
11   see any voluntariness issues. (Tr. June 13, 2005 at 38.) He ruled, "I'm going to find
12   it was given voluntarily, and there's no basis to suppress it at this point." (Tr. June
13   13, 2005 at 38.)

14       The Fifth and Fourteenth Amendments "secure[] against state invasion
15   the . . . right of a person to remain silent unless he chooses to speak in the unfettered
16   exercise of his own will, and to suffer no penalty . . . for such silence." *Malloy v.*
17   *Hogan*, 378 U.S. 1, 8 (1964). Thus, for a statement to be admissible, it "must be
18   free and voluntary; that is, must not be extracted by any sort of threats or violence,
19   nor obtained by any direct or implied promises, however slight, nor by the exertion
20   of any improper influence." *Bram v. United States*, 168 U.S. 532, 542–43 (1897)
21   (citation omitted); *accord Malloy*, 378 U.S. at 7. In addition, the State bears the
22   burden of proving by a preponderance of the evidence that a defendant's waiver
23   was voluntary. *See Colorado v. Connelly*, 479 U.S. 157, 168–69 (1986).

24       Hutson began his interview of Morris at approximately 5:24 p.m. by asking
25   him basic identifying information. (PCR Pet. Ex. O at 000467; 1 Tr. June 16, 2005
26   at 31–32.) Hutson next asked about places Morris had lived and about his family.
27   (PCR Pet. Ex. O at 000467–70.) After inquiring about television shows Morris liked
28   to watch, Hutson asked if Morris ever watched any "cop shows." (PCR Pet. Ex. O

1   at 000470.) When Morris responded that he did, Hutson said, "(Inaudible) police
2   shows. Well this is just like on TV, okay?" (PCR Pet. Ex. O at 000470.) He
3   proceeded to slip in the *Miranda* rights by reading them off of a card. (PCR Pet. Ex.
4   O at 000470; Tr. June 16, 2005 at 29–30.) He then asked if Morris understood the
5   rights, to which he responded, "Yes sir." (PCR Pet. Ex. O at 000470.) Hutson never
6   asked whether Morris would waive those rights, and instead quickly returned to
7   questioning Morris about his personal background. (PCR Pet. Ex. O at 000470;
8   Tr. June 16, 2005 at 32.) Thus, the *Miranda* rights were given to Morris in a way
9   that trivialized them.

10      Shortly thereafter, Morris told Hutson that he had donated plasma that
11   afternoon. (PCR Pet. Ex. O at 000474, 000481.) Morris also said that he had
12   returned home from work just before 6:00 a.m. and "sat on the porch." (PCR Pet.
13   Ex. O at 000475–76, 000479.) Morris said that he left the house at about 11:15 a.m.,
14   and he was not at the residence when Hutson arrived there at around noon. (PCR
15   Pet. Ex. O at 000481.) Moreover, Hutson acknowledged Morris's statements that
16   he had not spent the past three nights at home. (PCR Pet. Ex. O at 000476–77,
17   000482.) Thus, Hutson must have known that Morris was severely sleep deprived.
18   Indeed, when Hutson stepped out of the room at the end of the interview, Morris
19   started to fall asleep. (PCR Pet. Ex. O at 000615–16.)

20      It was also apparent that, during the interview, Morris was experiencing side
21   effects of donating plasma, including dehydration. Morris requested water three
22   times, but never asked to use the restroom. (*See* PCR Pet. Ex. O at 000547, 000609,
23   000615.) And right before Hutson ended the interview, Morris asked him, "Could
24   you feel my head and see if I'm hot." Hutson said that Morris felt about right and
25   asked if he felt sick. Morris responded that he did. Hutson said, "Okay, well drink
26   that water. That might help you. Might of got a little dehydrated or something.
27   Okay?" (PCR Pet. Ex. O at 000615.)

28      Given Morris's fragile physical condition at the time of the interview, Morris

1   could not understand the quick recitation of his *Miranda* rights, or that he was
2   relinquishing those rights. *Cf. Dickerson v. United States*, 530 U.S. 428, 434 (2000)
3   (explaining due process requires taking into account all circumstances of an
4   interrogation in determining voluntariness); *Doody v. Ryan*, 649 F.3d 986, 991–92
5   (9th Cir. 2011) (en banc) (finding confession involuntary). Therefore, Morris's
6   uncounseled statements, obtained without an acknowledgement that he was
7   waiving his *Miranda* rights, were involuntary and obtained in violation of the Fifth,
8   Sixth, and Fourteenth Amendments.

9       In addition, "[t]he line between proper and permissible police conduct and
10   techniques and methods offensive to due process is, at best, a difficult one to draw,
11   particularly in cases such as this where it is necessary to make fine judgments as to
12   the effect of psychologically coercive pressures and inducements on the mind and
13   will of an accused." *Haynes v. Washington*, 373 U.S. 503, 515 (1963). Evidence of
14   "pressure placed on [a defendant] to adopt certain responses" and "suggestive
15   questioning that provided details of the alleged crime" can inform the voluntariness
16   analysis as a factor. *See United States v. Preston*, 751 F.3d 1008, 1027–28 (9th Cir.
17   2014) (en banc).

18       Here, Hutson put extreme pressure on Morris to adopt certain responses, used
19   suggestive questioning and subtle coercion, and made implied promises to Morris.
20   Throughout the interview, it became apparent that Morris was susceptible to
21   suggestive questioning. For example, after Morris stated that he had sex with Noah,
22   Hutson asked if Morris used a condom. (PCR Pet. Ex. O at 000517.) He responded,
23   "Yes." (PCR Pet. Ex. O at 000517.) Later on, while discussing Velasquez, Hutson
24   said, "Now let me, wait, wait, wait, wait, wait. Let me back up. Do you always use
25   a condom?" (PCR Pet. Ex. O at 000525.) Morris again responded, "Yes." The next
26   time Hutson asked if Morris used a condom, Morris said, "Yes," and followed up
27   with, "Always." (PCR Pet. Ex. O at 000542.) After they returned to discussing
28   Noah, Hutson said, "You have a condom on." (PCR Pet. Ex. O at 000572.) Morris

responded, "Yes. Always." (PCR Pet. Ex. O at 000572.) Hutson repeated, "Always." (PCR Pet. Ex. O at 000572.) This, of course, proved to be untrue, as Morris's semen was found in Noah and Velasquez. (Tr. June 27, 2005 at 19–22, 78–79); Morris had merely parroted back what Hutson wanted him to say.

And, as Logan put on the record, when Hutson asked if Morris was hungry, he said that he was, but he would eat when he got back to the bar. Hutson then indicated that there were some problems with Morris's original version of events and said, "We need to just get it all, I don't want to leave no loose ends hanging out there so that I gotta come back to the bar and ask you to come down here and talk to me again." (PCR Pet. Ex. O at 000549.) Thus, Hutson made an implied promise to let Morris go back to the bar, but he would first have to tell Hutson what he wanted to hear.

After this, Hutson continued to pressure Morris, asking him if he could have "accidentally" put a rope around Noah's neck and accidentally choked her. (PCR Pet. Ex. O at 000551.) Morris responded, "Oh no. Choking? No. No, no, no. No, no." (PCR Pet. Ex. O at 000552.) Hutson tried again. He said, "These, these girls didn't die from smoking rock." (PCR Pet. Ex. O at 000555.) Hutson continued, "But do you understand that these girls are not, these five dollar prostitutes, do not have enough dope to overdose." (PCR Pet. Ex. O at 000560.) He proceeded to give Morris two options:

> You can take door number one . . . Door number one is a . . . you gave 'em some dope, and that's how you got 'em to go with you in the first place. But you don't like dope. Bear with me. Door number two is . . . they smoked their own dope and you're having sex with 'em and for whatever reason, maybe they liked being, when they get high they like to hold their breath and have you put their hand on their mouth, I don't know. But something like happened. *You cover up their face with a pillow,* I don't know. Because they like it when they're high, cause of the shortness of breath and stuff. Something they're wanting. That's door number two. It's something they're wanting you to do to them uhm . . . that in conjunction with their dope causes

1
2

> this. *That's what I think happened. Because you don't like dope. And you wouldn't give anybody dope*[.]

3    (PCR Pet. Ex. O at 000560 (emphasis added).)

4          By constraining Morris to two alternatives, Hutson knew that Morris would

5    be less likely to reject both of them. Moreover, Hutson essentially closed door

6    number one by referencing their earlier discussions about Morris's contempt for

7    drug use. (*See, e.g.*, PCR Pet. Ex. O at 000555–56.) Thus, all Morris was left with

8    was door number two—that the victims wanted Morris to restrict their airways to

9    enhance their sexual pleasure. And Hutson suggested to Morris how this could have

10   occurred:

11
12
13
14
15

> Have you ever heard of, you prob, I don't know if you've ever heard of this or not, but some guys actually like to choke themselves somehow with a rope or something? Don't make a face, it's true. *They like to choke themselves* when they masturbate, cause somehow they seem to think it makes it better. Is that something that's going on with th[e], *these girls wanting you do something really weird*? You need to explain this to me[.]

16   (PCR Pet. Ex. O at 000560 (emphasis added).) Thereafter, Morris parroted back

17   precisely what he had been fed. He said, "That's easy. The girls wanted to do

18   something strange." (PCR Pet. Ex. O at 000561.) Hutson said that he wanted to talk

19   about Castillo, and Morris said that she[54] asked him to put a blanket over her head,

20   and after he refused, to wrap a tie around her neck. (PCR Pet. Ex. O at 000561–62.)

21   He said that he agreed, and she passed out while they were having sex and never

22   regained consciousness, but it was an accident. (PCR Pet. Ex. O at 000562–68.)

23         Thereafter, Morris completed recounting this second version of events in

24   which each of the victims accidentally died after they asked Morris to choke them.

25   (PCR Pet. Ex. O at 000568–603.) Throughout the remainder of the interview,

26   Hutson continued to feed information to Morris in an attempt to make him accept

27
28

---

[54] It is not entirely clear that Morris is referring to Castillo here, but based on the context that is the most reasonable inference.

responsibility for the victims' deaths. For example, Hutson fed Morris what to say about Castillo's death, at one point finishing his sentence:

> Hutson: And you did that. And during the sex you think you squeezed too hard?
> Morris: I had to have squeezed too hard.
> Hutson: You had to have squeezed too hard. And you think that was wrong?
> Morris: Yes.
> Hutson: And is that why you took her out without saying anything or calling anybody? Cause you knew it was wrong and knew you could get in trouble?
> Morris: Yes. Cause I just, it's like, there's no way to explain it. Beside, besides telling exactly what happened there's still no way to explain it.
> Hutson: Sure.
> Morris: Because . . . only thought in my head is  . . . I'm, I'm just in deep trouble because I just . . .
> Hutson: Killed her.
> Morris: And that's basically what's thought in my head is . . . I killed her. And it's, it's, (inaudible) I know I had to.
> Hutson: You had to what.
> Morris: That's what, that's my thought, it's like I know I had to have killed her. I know I (inaudible)
> Hutson: You had to have killed her? Because of what you were doing . . .
> Morris: Because of what I'm, what I was doing. I mean, yes, yes . . . And now I've decided to go ahead and say okay, cause you asked, but even then I still didn't have to and . . .
> Hutson: Well, is there any doubt in your mind  . . . Let's talk about Barbara. Any doubt in your mind that what you did . . . caused her to die? I mean, that's kind of a rough way of putting it, but that's pretty much the facts. I mean, you had that tie around her neck and if it wouldn't have been around her neck she wouldn't have died, right?
> Morris: More than likely, yes.

(PCR Pet. Ex. O at 000601–02.) Similarly, Hutson suggested to Morris that he was responsible for Noah's death and knew that his involvement was wrong:

> Hutson: You think you're responsible for her death?
> Morris: I'm thinking I'm responsible for all their deaths just because
> Hutson: And do you know that's

1
2
3
4
5
6

> Morris: Cause I ended up going through what they asked for and . . .
> Hutson: Right. And do you know that that was wrong?
> Morris: I already know it was wrong, just, just to go ahead and agree to it.
> Hutson: Okay. And then by hiding their
> Morris: And then hiding, hiding it made it even worse because . . . it's like, if you hide it then it make is seem like you got something to hide.

7

(PCR Pet. Ex. O at 000602–03.)

8   Therefore, the totality of the circumstances surrounding the interview,
9   including Morris's physical condition and susceptibility to suggestion coupled with
10  Hutson's use of deceptive tactics, establish that Morris's will was overborne such
11  that has statements were involuntarily made. *See Dickerson v. United States*, 530
12  U.S. 428, 434 (2000).

13  "Reversal is required if" an illegally obtained confession "'had substantial
14  and injurious effect or influence in determining the jury's verdict.'" *Sessoms v.*
15  *Grounds*, 776 F.3d 615, 629 (9th Cir. 2015) (en banc) (quoting *Brecht*, 509 U.S. at
16  637). Had the trial court suppressed Morris's statement, Morris could have filed a
17  meritorious pretrial motion to dismiss the counts involving Codman and Davis.
18  Indeed, medical examiners Hu and Horn both testified that the only evidence that
19  led them to opine that Codman's and Davis's deaths, respectively, were caused by
20  criminal conduct rather than drug overdoses was Morris's statements to police.
21  (*See* Tr. June 28, 2005 at 55–60; Tr. June 29, 2005 at 43–49.) Thus, without
22  Morris's statement, there was insufficient evidence that Codman and Davis had
23  been murdered.

24  Moreover, a "defendant's confession is probably the most probative and
25  damaging evidence that can be admitted against him." *Arizona v. Fulminante*, 499
26  U.S. 279, 296 (1991) (internal quotation marks and citation omitted). Although
27  Morris never confessed to intentionally murdering the victims, the prosecutor
28  equated Morris's statements with a confession. (*See, e.g.*, Tr. July 5, 2005 at 16

("The defendant, for whatever reason, decided to change his mind and now tell the truth or at least indicate what method he used to end the lives of each and every one of these women.").) As set forth *supra* in Claim One, Morris's statements were used to show both that he had committed the murders and engaged in necrophilia. Suppression of his statements would have deprived the state of the key piece of evidence used to secure his convictions and death sentences. Thus, the admission of the unconstitutionally obtained statements had a substantial and injurious effect on the jury's verdicts. *See Brecht*, 509 U.S. at 637. The trial court erred by admitting Morris's statement, and Morris is entitled to relief.

## CLAIM TWENTY

**The reasonable-doubt instruction given at both the guilt and aggravation phases impermissibly lowered the State's standard of proof and shifted the burden to Morris, in violation of the Sixth and Fourteenth Amendments.**

This claim was not raised in state court. Morris alleges he can overcome any default of this claim by showing cause and prejudice, including because of the ineffective assistance of appellate and state post-conviction counsel. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *but see Davila v. Davis*, 137 S. Ct. 2058 (2017). Morris will demonstrate at an evidentiary hearing that appellate and post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced him. Alternatively, he alleges that any procedural bar is not adequate or independent or that imposing default would be a miscarriage of justice. Because this claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the merits of the claim de novo. Morris incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

At both the guilt and aggravation stages of Morris's trial, the court defined

the reasonable-doubt standard using the Arizona Supreme Court's articulation in *State v. Portillo*, 898 P.2d 970, 974 (Ariz. 1995). The court instructed:

> The State has the burden of proving the defendant guilty beyond a reasonable doubt. In civil cases, it is only necessary to prove that a fact is more likely true than not or that its truth is highly probable. In criminal cases such as this, the State's proof must be more powerful than that. It must be beyond a reasonable doubt.
> Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every doubt. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty.

(IOR 130 at 3; *see also* IOR 152 at 3 (same instructions modified for aggravation phase).) The phrase "firmly convinced" reduced the State's standard of proof to something less than reasonable doubt. It is akin to "clear and convincing." *See, e.g.*, *State v. Perez*, 976 P.2d 427, 442 (Haw. Ct. App. 1998), *aff'd in part, rev'd in part on other grounds*, 976 P.2d 379 (Haw. 1999). The instructions further shifted the burden of proof, requiring Morris to prove that there is a "real possibility that he is not guilty." *See, e.g.*, *United States v. Walton*, 207 F.3d 694, 705 (4th Cir. 2000) (King, J., dissenting) (discussing criticism of such instructions and citing *United States v. Porter*, 821 F.2d 968, 973 (4th Cir. 1987), and Lawrence M. Solan, *Refocusing the Burden of Proof in Criminal Cases: Some Doubt About Reasonable Doubt*, 78 Tex. L. Rev. 105 (1999)).

The reasonable-doubt standard "is indispensable to command the respect and confidence of the community in applications of the criminal law." *In re Winship*, 397 U.S. 358, 364 (1970). "It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned." *Id.* A lesser standard of proof, such as "firmly convinced,"

violates a defendant's rights to due process. *See id.* As the Supreme Court has explained, "[a]ttempts to explain the term 'reasonable doubt' do not usually result in making it any clearer to the minds of the jury." *Holland v. United States*, 348 U.S. 121, 140 (1954) (quoting *Miles v. United States*, 103 U.S. 304, 312 (1880)). Here, the instructions were more than confusing.  They lowered the State's standard of proof and shifted the burden of proof to the defendant. As such, the instructions violated Morris's rights to a jury trial and due process. He is entitled to relief.

## CLAIM TWENTY-ONE

**Arizona's capital sentencing scheme is unconstitutional because it does not require that the jury find that the aggravating factors outweighed mitigating circumstances beyond a reasonable doubt, and the trial court's similarly flawed instruction violated Morris's Fifth, Sixth, Eighth, and Fourteenth Amendment rights.**

Morris raised this claim on direct appeal. (DA 29 at 64.) The Arizona Supreme Court did not address the claim on the merits, and instead summarily dismissed it at the end of its opinion. *See State v. Morris*, 160 P.3d 203, 222 (Ariz. 2007). Because this claim has not been adjudicated by the Arizona state courts on the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim. If this instead constituted a decision on the merits, the state court's rejection of the claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(2). Finally, if this Court determines that this claim is unexhausted, Morris reserves the right to seek to return to state court under the stay and abeyance procedure outlined in *Rhines v. Weber*, 544 U.S. 269 (2005).

/ / /

/ / /

/ / /

**A.      Under clearly established Supreme Court precedent at the time of Morris's appeal, he was entitled to relief based on the instructional error regarding the burden of proof at the penalty phase and Arizona's unconstitutional statute.**

Before the jury may impose a death sentence, Arizona's death-penalty statute requires the jury to find that aggravating circumstances outweigh mitigating circumstances. However, Arizona's capital sentencing scheme does not impose any particular burden of persuasion on either party with regard to the weighing of aggravating and mitigating circumstances. *See* Ariz. Rev. Stat. § 13-703(E) (renumbered at § 13-751(E)). The trial court in Morris's case accordingly instructed the jurors that "[n]either the State nor the Defendant has a burden of proving that the weight of the mitigation is or is not sufficiently substantial to call for leniency." (IOR 169 at 6.) Like the statute, the jury instructions therefore relieved the prosecutor of his burden of proving beyond a reasonable doubt that the mitigation was not sufficiently substantial to call for leniency, and relieved the jury of having to determine beyond a reasonable doubt that death was the appropriate punishment. This violated Morris's clearly established rights.

The United States Supreme Court has repeatedly held that "any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Jones v. United States*, 526 U.S. 227, 243 n.6 (1999); *see also Apprendi v. New Jersey*, 530 U.S. 466, 476 (2000) (applying this principle to states through the Fourteenth Amendment). The Court affirmed this principle in the context of a capital case in *Ring v. Arizona*, 536 U.S. 584, 602 (2002):

> If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt.

*See also id.* at 610 (Scalia, J., concurring) ("[T]he fundamental meaning of the jury-trial guarantee of the Sixth Amendment is that all facts essential to imposition

1  of the level of punishment that the defendant receives—whether the statute calls

2  them elements of the offense, sentencing factors, or Mary Jane—must be found by

3  the jury beyond a reasonable doubt."). Because aggravating circumstances must be

4  found to outweigh mitigating circumstances before a death sentence can be imposed

5  in Arizona, under *Ring* and its antecedents it is a fact that must be found by a jury

6  beyond a reasonable doubt. *See Murdaugh v. Ryan*, 724 F.3d 1104, 1115 (9th Cir.

7  2013) ("In [*Ring*], the Supreme Court described several determinations that had to

8  occur under Arizona law before a defendant became death-eligible, including the

9  judge's determination that 'there are no mitigating circumstances sufficiently

10  substantial to call for leniency.'").

11      The accuracy of Morris's position on appeal was made explicit when the

12  Supreme Court decided *Hurst v. Florida*, 136 S. Ct. 616, 621 (2016), in which the

13  Court held that the failure to require a jury to determine the relative weight of

14  aggravating and mitigating circumstances beyond a reasonable doubt violates the

15  Sixth Amendment right to a jury trial as well as the Fourteenth Amendment's Due

16  Process Clause. The Court reiterated the Sixth Amendment's basic requirement that

17  "any fact that 'expose[s] the defendant to a greater punishment than that authorized

18  by the jury's guilty verdict' is an 'element' that must be submitted to the jury." *Id.*

19  (quoting *Apprendi*, 530 U.S. at 494). The Court also emphasized that under *Ring*,

20  this principle applies with equal force to death penalty statutes: "The Sixth

21  Amendment requires a jury, not a judge, to find each fact necessary to impose a

22  sentence of death." *Id.* at 619. The Court recognized that under *Alleyne v. United*

23  *States*, 133 S. Ct. 2151, 2156 (2013), "each element of a crime [must] be proved to

24  a jury beyond a reasonable doubt." *Id.* at 621; *see also Apprendi*, 530 U.S. at 498

25  (Scalia, J., concurring) (stating that charges against the accused, and the

26  corresponding maximum exposure he faces, must be determined "beyond a

27  reasonable doubt by the unanimous vote of 12 of his fellow citizens").

28      In *Hurst*, the State of Florida argued that the weighing process fell outside

287

1    the ambit of *Ring* and *Apprendi*, as the defendant was death eligible after the jury

2    found at least one aggravating circumstance. *Hurst*, 136 S. Ct. at 622. The Court

3    rejected this contention, and *Hurst* therefore stated what prior Sixth Amendment

4    precedent had already established: It is not constitutionally sufficient that a jury find

5    the existence of at least one aggravating circumstance beyond a reasonable doubt

6    because a determination regarding the relative weight of aggravating and mitigating

7    circumstances is also a factual finding necessary to a defendant's eligibility for a

8    sentence of death. *Id.*; *see also Rauf v. State*, 145 A.3d 430 (Del. 2016) (per curiam)

9    (striking down Delaware's capital sentencing scheme on the basis of *Hurst* and

10   determining that the Sixth Amendment requires a jury to find, beyond a reasonable

11   doubt, each aggravating circumstance and that the aggravation outweighs

12   mitigation); *Hurst v. State*, 202 So.3d 40, 57 (Fla. 2016) (finding that Hurst

13   "mandates that all the findings necessary for the imposition of a death sentence are

14   'elements' that must be found by a jury" and holding that "before the trial judge

15   may consider imposing a sentence of death, the jury in a capital case

16   must . . . unanimously find that the aggravating factors outweigh the mitigating

17   circumstances").

18       *Hurst* built upon *Ring* and *Apprendi* but did not create new law. Morris is

19   therefore entitled to relief under either de novo review or § 2254(d)(1) because the

20   state court's failure to recognize the violation of his rights was an unreasonable

21   application of clearly established federal law.

22       **B.    If *Hurst v. Florida* instead announced a new rule of constitutional
            law, it is retroactive to cases on collateral review.**
23

24       In the alternative, if *Hurst* did not simply apply existing precedent and instead

25   created a new rule of constitutional law, that ruling applies retroactively on

26   collateral review. *But see Ybarra v. Filson*, 869 F.3d 1016, 1033 (9th Cir. 2017).

27   As an initial matter, in cases that pre-date *Teague v. Lane*, 489 U.S. 288 (1989), the

28   Supreme Court consistently held that decisions establishing a requirement of proof

beyond a reasonable doubt apply retroactively. *See Hankerson v. North Carolina*, 432 U.S. 233 (1977); *Ivan V. v. City of New York*, 407 U.S. 203, 205 (1972) (per curiam). Looking at these decisions under *Teague*'s framework, rules about the standard of proof fit into the first exception for substantive rules. *See Welch v. United States*, 136 S. Ct. 1257, 1264 (2016); *Schriro v. Summerlin*, 542 U.S. 348, 352 n.4 (2004) (explaining that substantive rules "are more accurately characterized as" not "subject to the bar" on retroactive application under *Teague*). Such rules are substantive because they lessen the "risk that a defendant . . . faces a punishment that the law cannot impose upon him." *Summerlin*, 542 U.S. at 351–52; *cf. In re Winship*, 397 U.S. 358, 363 (1970). *Hurst* categorically prohibits the State from imposing the death penalty for those made eligible for the penalty other than by a jury finding beyond a reasonable doubt that aggravation outweighs mitigation; it does not regulate "the manner of determining the defendant's culpability," which would be procedural. *Montgomery*, 136 S. Ct. at 729–30 (internal citations omitted and emphasis omitted). The Ninth Circuit articulated the distinction between substantive and procedural rules: "The failure to apply a procedural rule does not necessarily invalidate every result, whereas failure to apply a substantive rule leaves no possibility of a legitimate outcome." *Alfaro v. Johnson*, 862 F.3d 1176, 1185 n.5 (9th Cir. 2017). *Hurst*'s rule fits into the latter description.

Even if it is deemed procedural and not substantive, *Hurst*'s beyond-a-reasonable-doubt holding would constitute a "watershed" procedural rule under *Teague*. *See Powell v. State*, 153 A.3d 69, 74–75 (Del. 2016) (finding retroactive its prior decision in *Rauf*, which invalidated Delaware's death penalty statute under *Hurst*, because it fell "squarely within the second exception set forth in *Teague* requiring retroactive application of 'new rules' of criminal procedure"). This is because *Hurst* "implicate[s] the fundamental fairness and accuracy," of sentencing, *Welch*, 136 S. Ct. at 1264, by mandating the use of the beyond-a-reasonable-doubt standard, which "is a prime instrument for reducing the

1     risk of convictions resting on factual error," *Ivan V.*, 407 U.S. at 203. *Hurst*, if

2     deemed procedural, would therefore constitute a watershed new rule and would be

3     retroactive.

4        Therefore, if the Court finds that *Hurst* announced a new rule of

5     constitutional law, it is retroactive and Morris is entitled to relief.

6        **C.**     **Conclusion.**

7        The statutorily driven failure to instruct Morris's jury on the proper burden

8     of proof is structural error not susceptible to harmlessness review. *See Sullivan v.*

9     *Louisiana*, 508 U.S. 275, 281 (1993) (refusing to apply harmless error analysis

10    where trial court erred in describing burden of proof in a criminal case, reasoning

11    that "a misdescription of the burden of proof . . . vitiates all the jury's findings").

12    The jury instructions violated Morris's rights and Arizona's statute is

13    unconstitutional. Under any construction of the import of *Hurst*, he is entitled to

14    relief in the form of a new penalty phase hearing.

15                           **CLAIM TWENTY-TWO**

16        **Morris's Sixth Amendment right to the effective assistance of**

17        **counsel was violated by his direct appeal counsel's failure to raise meritorious claims on direct appeal.**

18        Morris raised parts (A)–(C) of this claim in his post-conviction proceedings.

19    (IOR 307 at 5–33; 57–59.) The state court dismissed these claims without holding

20    an evidentiary hearing. (IOR 354 at 5, 9–11.) The state court's denial of these claims

21    was contrary to, or involved an unreasonable application of, clearly established

22    federal law, as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In

23    addition, it constituted an unreasonable determination of the facts in light of the

24    evidence presented. *See id.* § 2254(d)(2).

25        Parts (D)–(J) of this ineffectiveness claim were not raised in state court.

26    Morris alleges he can overcome any default by showing cause and prejudice,

27    including because of the ineffective assistance of state post-conviction counsel.

28    *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Edwards v. Carpenter*, 529 U.S. 446,

453 (2000); *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *but see Davila v. Davis*, 137 S. Ct. 2058 (2017). Morris will demonstrate at an evidentiary hearing that post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced him. Alternatively, he alleges that any procedural bar is not adequate or independent or that imposing default would be a miscarriage of justice. Because these claims have not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the merits of the claim de novo.

Morris incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

The effective assistance of appellate counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. *See Evitts v. Lucey*, 469 U.S. 387, 396 (1985) ("A first appeal as of right . . . is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney."); *id.* at 395 ("Because the right to counsel is so fundamental to a fair trial, the Constitution cannot tolerate trials in which counsel, though present in name, is unable to assist the defendant to obtain a fair decision on the merits."). As such, "nominal representation" during an appeal "does not suffice to render the proceedings constitutionally adequate[.]" *Id.* at 396.

Ineffective assistance of appellate counsel claims are governed by the standard of review set forth in *Strickland*. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000). Accordingly, Morris must show that appellate counsel's representation "fell below an objective standard of reasonableness," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694. In addition, the ABA Guidelines are instructive in evaluating the reasonableness of counsel's conduct. *See Rompilla v. Beard*, 545 U.S. 374, 387 (2005). Regarding appellate counsel's

1    performance, the ABA Guidelines indicate that "counsel should seek to litigate all
2    issues . . . that are arguably meritorious[.]" 2003 ABA Guidelines § 10.15.1(C).
3    Therefore, when appellate counsel fails to raise meritorious issues and there is a
4    reasonable probability it would have resulted in the reversal of a conviction or
5    sentence, counsel has necessarily caused prejudice to the defendant.
6    *See*, *e.g*., *Strickland*, 466 U.S. at 694.

7         Individually and cumulatively, the deficiencies raised below constitute
8    ineffective assistance of appellate counsel. *See Rompilla*, 545 U.S. at 393
9    (evaluating prejudice based on the evidence "taken as a whole"); *Strickland*, 466
10   U.S. at 690 (allegations of ineffectiveness must be examined in light of all the
11   circumstances). Appellate counsel's deficient performance was prejudicial. Thus,
12   Morris is entitled to relief.

13   **A.**   **Appellate counsel was ineffective for failing to challenge the**
14           **sufficiency of the evidence supporting the (F)(6) aggravating**
15           **factor or raise any argument that the jury abused its discretion in**
             **sentencing Morris to death.**

16         For crimes committed after August 1, 2002, the Arizona Supreme Court
17   reviews all death sentences and findings in aggravation for an abuse of discretion
18   pursuant to Arizona Revised Statute § 13-703.05(A) (renumbered §13-756(A)).
19   Morris's was the first case in which the Arizona Supreme Court "consider[ed] [its]
20   role under section 13-703.05." *State v. Morris*, 160 P.3d 203, 219 (Ariz. 2007).
21   Although this was an opportunity for appellate counsel to shape how this review
22   would be conducted and to advocate for a life sentence for Morris, counsel raised
23   no challenge to the sufficiency of the evidence supporting the aggravating factors
24   or the propriety of the death sentence. The court noted that counsel had made "no
25   challenges to the aggravation or penalty phases" of Morris's trial other than the
26   claim of prosecutorial misconduct. *Id.* Further, the lack of argument prompted the
27   court to admonish that "[o]ur conclusion that section 13-703.05 requires us to
28   review the sentence regardless of Morris's failure to raise arguments against it

1   should not be understood to relieve death penalty counsel of the duty to raise all

2   meritorious arguments against a death sentence." *Id.* 219 n.14 (citing the ABA

3   Guidelines).

4       The Arizona Supreme Court, as well as the ABA Guidelines, emphasized that

5   capital counsel should take advantage of every opportunity to argue for life.

6   *See, e.g.*, Ariz. R. Crim. P. 6.8 (stating that counsel appointed in capital cases

7   should be familiar with and guided by the 2003 ABA Guidelines); *State v. Speer*,

8   212 P.3d 787, 801 (Ariz. 2009) ("We have reminded capital defense counsel on two

9   recent occasions of their professional obligation 'to take advantage of all

10  appropriate opportunities to argue why death is not a suitable punishment' for their

11  client, and not to 'simply rely on this Court's statutory duty to review the record.'"

12  (citing ABA Guidelines)); *Morris*, 160 P.3d at 219 n.10 (explaining that the court's

13  duty of independent review "should not be understood to relieve death penalty

14  counsel of the duty to raise meritorious arguments against a death sentence"

15  (citation omitted)); *see also Penson v. Ohio*, 488 U.S. 75, 82 (1988) (rejecting

16  argument that defendant suffered no prejudice from counsel's failure to submit a

17  merits brief on colorable claims because the appellate court examined the record

18  independently). Counsel performed deficiently by failing to both challenge the

19  constitutionality of the abuse of discretion review, *see* Claim Twenty-Six, and brief

20  a challenge to the evidence underlying Morris's death sentences, as that is

21  mandatorily reviewed. *See Delgado v. Lewis*, 223 F.3d 976, 980–81 (9th Cir. 2000);

22  2003 ABA Guideline 10.15.1(C) ("[C]ounsel should seek to litigate all issues . . .

23  that are arguably meritorious."). And counsel was at least aware of the insufficient

24  evidence to support the heinous or depraved prong of the (F)(6) aggravating factor

25  because she had argued that the prosecutor committed misconduct by arguing this

26  unfounded theory. (DA 29 at 51.) When appellate counsel fails to raise meritorious

27  issues that could have resulted in a reversal of a conviction or a sentence, counsel

28  has necessarily caused prejudice to the defendant. *See, e.g., Strickland*, 466 U.S. at

1  694.

2      The post-conviction court rejected this claim because it reasoned that the

3  challenge "would not have changed the outcome on appeal," relying on the fact that

4  the Arizona Supreme Court had found the evidence sufficient to support the cruelty

5  prong of the (F)(6) aggravating factor. (IOR 354 at 5.) But the decision on direct

6  appeal was itself an unreasonable determination of clearly established federal law

7  and based on an unreasonable determination of the facts, as discussed *supra* in

8  Claim Twelve. Deference to this determination was therefore unreasonable for all

9  of the reasons outlined in Claim Twelve.

10     Appellate counsel rendered ineffective assistance by failing to challenge the

11  sufficiency of the evidence supporting both the cruel and heinous or depraved

12  prongs of the (F)(6) aggravating factor as well as the fact that the jury abused its

13  discretion in imposing death sentences.

14  **B.  Appellate counsel rendered ineffective assistance by failing to challenge the Confrontation Clause violations at the guilt phase of Morris's trial.**

16     The Sixth and Fourteenth Amendments guarantee a criminal defendant the

17  "right to be confronted with the witnesses against him." *Pointer v. Texas*, 380 U.S.

18  400, 405 (1965). Under the Confrontation Clause, "testimonial" hearsay statements

19  against a criminal defendant are inadmissible unless the declarant is "unavailab[le]

20   and the defendant has had "a prior opportunity for cross-examination." *Crawford*

21  *v. Washington*, 541 U.S. 36, 68 (2004). The "core class" of testimonial statements

22  include "*ex parte* in-court testimony or its functional equivalent—that is, material

23  such as affidavits . . . or similar pretrial statements that declarants would reasonably

24  expect to be used prosecutorially." *Crawford*, 541 U.S. at 51 (internal quotation

25  marks omitted). Written findings in autopsy reports are included in this core class.

26  *See id.* at 47 n.2 (explaining "several early American authorities flatly rejected any

27

28

1    special status for coroner statements").[55]

2    As discussed *supra* in claim Fifteen, at trial Dr. Keen, the Chief Medical

3    Examiner of Maricopa County at the time, testified about Noah's autopsy and its

4    results. (Tr. June 27, 2005 at 83.) But Keen had neither conducted nor witnessed

5    the autopsy. Instead, Dr. Alex Zhang conducted Noah's autopsy and wrote the

6    autopsy report. (Tr. June 27, 2005 at 84.) The prosecutor made no argument that

7    Zhang was unavailable, just that he no longer worked in the medical examiner's

8    office. (Tr. June 27, 2005 at 84.) Morris's trial counsel objected to Keen's testimony

9    as hearsay and a violation of the Confrontation Clause. (Tr. June 27, 2005 at 84,

10   91–98.) The trial court overruled the objection and allowed Keen to testify.

11   (Tr. June 27, 2005 at 97.) Morris's appellate counsel failed to challenge this

12   Confrontation Clause violation on direct appeal despite the fact that it had been

13   preserved by trial counsel. This was constitutionally ineffective.

14   Further, at Morris's trial all of the medical examiners testified as to drugs and

15   alcohol found in the victims' systems even though they did not conduct the

16   toxicology testing. (Tr. June 15, 2005 at 93–95 (Castillo); Tr. June 27, 2005 at 114–

17   16 (Noah); Tr. June 28, 2005 at 34–36 (Codman); Tr. June 29, 2005 at 19–22

18   (Velasquez); Tr. June 29, 2005 at 37–38 (Davis); PCR Hr'g Exs. 7–11.) Each

19   medical examiner therefore recounted the findings of the toxicologist, and such

20   testimony violates the Confrontation Clause. *See Crawford*, 541 U.S. at 68.

21

22

23   [55] This holding was confirmed by two decisions post-dating Morris's appeal,
     *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), and *Bullcoming v. New
24   Mexico*, 564 U.S. 647 (2011). In *Melendez-Diaz*, the Court concluded that
     certificates of analysis identifying a substance seized as cocaine was testimonial
25   hearsay because they had a clear evidentiary purpose and therefore could not be
     introduced except through the analyst who had authored them. 557 U.S. at 308–11.
26   In *Bullcoming*, the Court held that a forensic report analyzing the defendant's
     blood-alcohol concentration could not be introduced through the "surrogate"
27   witness, a lab worker who had not performed or observed the blood test or certified
     its results. 564 U.S. at 661–63. In *Bullcoming*, as here, the report had been admitted
28   under the business-record exception to the hearsay rule. *Id.* at 655–56. (Tr. June 27,
     2005 at 97.)

Appellate counsel also failed to challenge these violations, which severely impacted both the guilt phase—as whether the victims died of drug overdoses was a central question—and the finding of cruelty at the aggravation phase. *See* Claim Fifteen *supra*. Appellate counsel was therefore constitutionally deficient, and Morris was prejudiced as a result.

The post-conviction court found that appellate counsel was not ineffective for failing to challenge the Confrontation Clause violation related to Keen's testimony because Keen testified as to his own opinions, meaning there was no Confrontation Clause violation. (IOR 354 at 10–11.) But Keen effectively summarized Zhang's autopsy report and conclusions. These were testimonial hearsay statements that triggered the protections of the Confrontation Clause:

> It was therefore clearly established Supreme Court law before *Crawford* that in-court descriptions of out-of-court statements, as well as verbatim accounts, are "statements" and can violate the Confrontation Clause, if the requisite requirements are otherwise met. . . . [I]t would be an unreasonable application of the core Confrontation Clause principle underlying *Crawford* to allow police officers to testify to the substance of an unavailable witness's testimonial statements as long as they do so descriptively rather than verbatim or in detail.

*Ocampo v. Vail*, 649 F.3d 1098, 1108–09 (9th Cir. 2011). In finding otherwise, the post-conviction court unreasonably applied clearly established federal law. *See id.* at 1111.

**C.    Appellate counsel failed to challenge the introduction of unreliable scientific testimony from the medical examiners.**

At Morris's trial, the medical examiners' testimony as to the cause of death for three of the victims was, based on their trial testimony, obviously not grounded in their scientific expertise, as discussed in Claim Eight. Hu and Horn initially found that Codman and Davis, respectively, died from drug overdoses and only changed their opinions at trial based on Morris's statement to the police. (Tr. June 28, 2005

at 41, 55–58, 71; Tr. June 29, 2005 at 40–41, 47; PCR Hr'g Ex. 8 at 000896; PCR Hr'g Ex. 9 at 000906.) And Horn testified that his autopsy did not establish how Castillo had died because there was no evidence of trauma. Looking at the body itself, he could not tell cause of death and had to rely on extraneous information from detectives in order to determine that she had died from asphyxia. (Tr. June 15, 2005 at 98, 101.) Despite this equivocal testimony, appellate counsel failed to challenge the admission of this evidence as scientific, expert evidence.

When rejecting this claim, the post-conviction court reasoned that a "medical examiner's opinion as to cause of death is clearly within his/her expertise and admissible." (IOR 354 at 10.) The court, however, recognized that the medical examiners had to rely on evidence that was not scientific, but recounted to them by lay witnesses. In ruling on this claim, the court ignored the fact that couching non-scientific evidence in the guise of scientific expertise is misleading to jurors. *See Hinton v. Alabama*, 134 S. Ct. 1081, 1090 (2014) (per curiam) ("[W]e have recognized the threat to fair criminal trials posed by the potential for incompetent or fraudulent prosecution forensics experts, noting that '[s]erious deficiencies have been found in the forensic evidence used in criminal trials. . . . One study of cases in which exonerating evidence resulted in the overturning of criminal convictions concluded that invalid forensic testimony contributed to the convictions in 60% of the cases.'" (citations omitted)); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993) ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." (citation omitted)). And even if it is "generally accepted practice in [the] field" to make cause of death determinations on non-scientific evidence, as the court found (IOR 354 at 10), allowing such testimony can still render a trial fundamentally unfair and violate due process. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *Gimenez v. Ochoa*, 821 F.3d 1136, 1143–45 (9th Cir. 2016) ("We join the Third Circuit in recognizing that habeas petitioners can allege a constitutional violation from the introduction of

1   flawed expert testimony at trial if they show that the introduction of this evidence
2   'undermined the fundamental fairness of the entire trial.'" (citation omitted)); *Han*
3   *Tak Lee v. Glunt*, 667 F.3d 397, 403–04 (3d Cir. 2012). The state court's finding
4   was thus based on an unreasonable factual determination and was an unreasonable
5   application of clearly established federal law.

6   **D.   Appellate counsel failed to challenge the trial court's instruction
      that incorrectly informed the jury that Morris could be sentenced
7      to life with the possibility of parole.**

8       As discussed in Claim Thirteen, *supra*, the trial court incorrectly instructed
9   the jury that Morris was eligible for parole. In *Simmons v. South Carolina*, the
10  Supreme Court held that a defendant's due process rights were violated when the
11  jury was not provided with "accurate information regarding petitioner's parole
12  eligibility." 512 U.S. 154, 162 (1994); *see Lynch v. Arizona*, 136 S. Ct. 1818 (2016)
13  (reaffirming these principles in the context of Arizona's sentencing scheme).

14      Under Arizona law, Morris was ineligible for parole. *See* Ariz. Rev. Stat.
15  § 41-1604.09(I) (1994) (applying parole-eligibility statutes only to one "who
16  commit[s] [a] felony offense[] before January 1, 1994"). And, his future
17  dangerousness was put at issue throughout his trial. (*See, e.g.*, Tr. July 5, 2005 at
18  19–31, 56, 69, 106; Tr. July 12, 2004 at 22, 27–28, 28, 33, 38, 98, 130–32; Tr. July
19  18, 2005 at 112, 128–30.) As a result of the trial court's legally incorrect
20  instructions, the jury was misinformed of the possible outcome of returning a life
21  sentence. Competent appellate counsel would have raised this meritorious claim.
22  Failure to do so constituted deficient performance, and there is a reasonable
23  probability that had this issue been placed before the Arizona Supreme Court, the
24  court would have determined that Morris was entitled to a new penalty phase
25  hearing. Consequently, he was prejudiced by counsel's failure to raise this claim on
26  direct appeal. *See Strickland*, 466 U.S. at 694.

27  / / /
28  / / /

1

2

  **E.**  **Appellate counsel failed to challenge errors in the jury selection process.**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

  As discussed in Claims Seventeen, Eighteen, and Forty-Seven, there were constitutional errors during the jury-selection process in Morris's case. First, the prosecutor used a peremptory challenge to exclude the only blind juror from Morris's jury on the basis of her disability. Appellate counsel should have challenged this discriminatory use of a peremptory challenge under *Batson v. Kentucky*, 476 U.S. 79 (1986), and *J.E.B. v. Alabama ex. rel. T.B.*, 511 U.S. 127 (1994). Next, the trial court denied defense counsel's motions to strike perspective jurors for cause, thus forcing the defense to use its peremptory challenges. Appellate counsel also failed to challenge this trial-court error. *See Ross v. Oklahoma*, 487 U.S. 81, 89 (1988) ("[T]he right to peremptory challenges is denied or impaired only if the defendant does not receive that which state law provides." (internal quotation marks omitted)). Finally, appellate counsel failed to challenge the practice of death-qualifying the jury as a violation of Morris's right to an unbiased and impartial jury. *See Morgan v. Illinois*, 504 U.S. 719, 726–27 (1992).

17

18

19

20

21

22

  Competent appellate counsel would have raised these meritorious claims. Failure to do so constituted deficient performance, and there is a reasonable probability that had these issues been placed before the Arizona Supreme Court, the court would have determined that Morris was entitled to a new trial. Consequently, he was prejudiced by counsel's failure to raise these claims on direct appeal. *See Strickland*, 466 U.S. at 694.

23

24

  **F.**  **Appellate counsel failed to challenge the trial court's failure to sever the multiple murder counts.**

25

26

27

28

  As discussed in Claim Ten, the trial court erred by not severing the multiple counts in this case. The counts were improperly joined, and, as a result, Morris's due process rights were violated. *See, e.g.*, *Bean v. Calderon*, 163 F.3d 1073, 1084 (9th Cir. 1998). Further, his right to an impartial jury, protected by the Sixth

Amendment, was violated. Appellate counsel failed to raise this meritorious claim on direct appeal, and consequently, Morris was prejudiced. *See Strickland*, 466 U.S. at 694.

### G.   Appellate counsel failed to challenge evidentiary errors.

As discussed in Claims Nine and Nineteen, the trial court made several errors in the handling of the evidence in Morris's case. The admission of evidence purportedly of necrophilia violated Morris's due process rights because it was irrelevant and inflammatory. *See Estelle*, 502 U.S. at 67–68. Further, the admission of Morris's involuntary statements to the police violated his Fifth, Sixth, and Fourteenth Amendment rights. See *Malloy v. Hogan*, 378 U.S. 1, 8 (1964); *Bram v. United States*, 168 U.S. 532, 542–43 (1897) (citation omitted). Appellate counsel failed to raise these meritorious claims on direct appeal, and consequently, Morris was prejudiced. *See Strickland*, 466 U.S. at 694.

### H.   Appellate counsel failed to challenge instructional errors at every phase of Morris's trial.

As discussed in Claims Twenty, Twenty-Three, Twenty-Four, and Twenty-Five, there were instructional errors at the guilt, aggravation, and penalty phases of Morris's trial. At the guilt and aggravation phases, the standard-of-proof instruction held the State to a lesser standard of proof than beyond a reasonable doubt. *See generally In re Winship*, 397 U.S. 358, 364 (1970). And at the penalty phase, the court failed to instruct the jury that residual doubt and the cumulative effect of the mitigating evidence are independent mitigating circumstances. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978). The court at the penalty phase further failed to use special verdict forms that would have delineated what mitigating circumstances the jury found proven, which impeded proper appellate review. *See Gardner v. Florida*, 430 U.S. 349, 361 (1977) (plurality opinion). Appellate counsel failed to raise these meritorious claims on direct appeal, and consequently, Morris was prejudiced. *See Strickland*, 466 U.S. at 694.

1    **I.    Appellate counsel failed to challenge the application of the (F)(2)**
2    **aggravating factor as a violation of Morris's rights under the**
     **Double Jeopardy Clause.**

3    As discussed in Claim Twenty-Seven, the State alleged as an aggravating

4    factor that Morris "was previously convicted of a serious offense," relying for each

5    murder count on the other four. *See* Ariz. Rev. Stat. § 13-751(F)(2). Because the

6    same facts are required to prove the elements of murder and the (F)(2) factor as

7    presented here, Morris was exposed to multiple proceedings and punishments on

8    the same offense, which violated the Double Jeopardy Clause. *See United States v.*

9    *Dixon*, 509 U.S. 688, 696 (1993); *Blockburger v. United States*, 284 U.S. 299, 304

10   (1932). Appellate counsel failed to raise these meritorious claims on direct appeal,

11   and consequently, Morris was prejudiced. *See Strickland*, 466 U.S. at 694.

12   **J.    Appellate counsel failed to make several challenges to the**
     **constitutionality of the imposition of the death penalty in Morris's**
13   **case.**

14   As discussed in Claims Forty-Two, Forty-Three, and Forty-Four, there were

15   several bases to challenge Morris's eligibility for the death penalty and the

16   imposition of the death penalty in this case. Because Morris was twenty-four at the

17   time of the offenses, appellate counsel should have argued that he was categorically

18   ineligible for the death penalty under *Roper v. Simmons*, 543 U.S. 551 (2005). And,

19   because Morris will face prolonged incarceration before his death sentence is

20   carried out, there is no penological justification for the death sentence, meaning it

21   is cruel and unusual under the Eighth Amendment. *See Lackey v. Texas*, 514 U.S.

22   1045, 1046 (1995) (Stevens, J., mem. respecting denial of certiorari). Finally,

23   appellate counsel should have challenged the death penalty under the Eighth

24   Amendment as a violation of human rights and international law. *See, e.g.*, *Foster*

25   *v. Florida*, 537 U.S. 990 (2002) (mem.) (Breyer, J., dissenting from denial of

26   certiorari). Appellate counsel failed to raise these meritorious claims on direct

27   appeal, and consequently, Morris was prejudiced. *See Strickland*, 466 U.S. at 694.

28   / / /

## CLAIM TWENTY-THREE

**Refusing to instruct the jury or permit the introduction of evidence and argument regarding residual doubt violated Morris's rights under the Sixth, Eighth, and Fourteenth Amendments.**

This claim was not raised in state court. Morris alleges he can overcome any default of this claim by showing cause and prejudice, including because of the ineffective assistance of appellate and state post-conviction counsel. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *but see Davila v. Davis*, 137 S. Ct. 2058 (2017). Morris will demonstrate at an evidentiary hearing that appellate and post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced him. Alternatively, he alleges that any procedural bar is not adequate or independent or that imposing default would be a miscarriage of justice. Because this claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the merits of the claim de novo. Morris incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

In a capital case, the sentencer cannot "be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *see also Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982). Upon meeting the low threshold for relevance, "the 'Eighth Amendment requires that the jury be able to consider and give effect to' a capital defendant's mitigating evidence." *Tennard v. Dretke*, 542 U.S. 274, 285 (2004) (quoting *Boyde v. California*, 494 U.S. 370, 377–78 (1990)).

At the penalty phase, residual doubt was not included in the jury instructions as mitigating circumstances the jury should consider. (*See* Tr. July 14, 2005; Tr. July 18, 2005.) Because residual doubt was not included in the trial court's

definition of mitigation, jurors were precluded from taking it into consideration even if, in that juror's view, residual doubt would have counseled against the imposition of the death penalty.

The trial court's failure to include residual doubt as a mitigating circumstance unconstitutionally limited the mitigation the jury was allowed to consider. The United States Supreme Court has clearly established that the jury cannot be precluded from considering "circumstances of the offense" in mitigation. *See Lockett*, 438 U.S. at 604. Residual doubt is an argument about the circumstances of the offense and can be understood as:

> (1) actual, reasonable doubt about guilt of any crime; (2) actual, reasonable doubt that defendant was guilty of a capital offense, as opposed to other offenses; (3) a small degree of doubt about (1) or (2), sufficient to cause the juror not to want to foreclose (by execution) the possibility that new evidence might appear in the future.

Christina S. Pignatelli, *Residual Doubt: It's a Life Saver*, 13 Cap. Def. J. 307, 308 (2001) (quotation marks omitted). The utilization of the "residual doubt" strategy therefore can be an effective form of mitigation. *See* Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rev. 1538, 1563 (1998). Arizona courts have accordingly allowed residual doubt to be a mitigating circumstance. *See, e.g.*, *State v. Dann*, 79 P.3d 58, 61 (Ariz. 2003) (noting that residual doubt was offered as a mitigating circumstance); *State v. Nordstrom*, 77 P.3d 40, 45 (Ariz. 2003) (same); *State v. Jones*, 72 P.3d 1264, 1270 (Ariz. 2003) (same). An instruction including residual doubt as a mitigating circumstance would not give jurors leeway to reconsider their verdict, but instead would allow them to determine that capital punishment is inappropriate when the defendant's guilt was proven beyond a reasonable doubt, but not beyond any doubt.

The trial court prevented the jury from considering residual doubt as mitigation. As a result, the jury was unable to meaningfully consider all of the mitigating evidence put before it in violation of the Sixth, Eighth, and Fourteenth

1    Amendments. Morris is therefore entitled to a new penalty phase.

2                            **CLAIM TWENTY-FOUR**

3        **Arizona's death penalty sentencing scheme is constitutionally**
         **infirm because it fails to require cumulative consideration of**
4        **multiple mitigating factors by the jury.**

5            This claim was not raised in state court. Morris alleges he can overcome any

6    default of this claim by showing cause and prejudice, including because of the

7    ineffective assistance of appellate and state post-conviction counsel. *See Martinez*

8    *v. Ryan*, 566 U.S. 1, 9 (2012); *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000);

9    *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *but see Davila v. Davis*,

10   137 S. Ct. 2059 (2017). Morris will demonstrate at an evidentiary hearing that

11   appellate and post-conviction counsel fell below the standards of minimally

12   competent capital attorneys and that those failures prejudiced him. Alternatively,

13   he alleges that any procedural bar is not adequate or independent or that imposing

14   default would be a miscarriage of justice. Because this claim has not been

15   adjudicated by the Arizona state courts, the limitations on relief imposed by

16   28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider

17   the merits of the claim de novo. Morris incorporates by specific reference all facts,

18   allegations, and arguments made elsewhere in this Petition.

19           The Eighth and Fourteenth Amendments of the United States Constitution

20   require that in capital cases the sentencer "not be precluded from considering, *as a*

21   *mitigating factor*, any aspect of a defendant's character or record and any of the

22   circumstances of the offense that the defendant proffers as a basis for a sentence

23   less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). "[I]t is not enough

24   simply to allow the defendant to present mitigating evidence to the sentencer. The

25   sentencer must also be able to consider and give effect to that evidence in imposing

26   [the] sentence." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989); *see also Boyde v.*

27   *California*, 494 U.S. 370, 377–78 (1990); *Eddings v. Oklahoma*, 455 U.S. 104, 110

28   (1982). As such, the law is clear that juries must be permitted to consider all relevant

1  mitigating evidence. *See Tennard v. Dretke*, 542 U.S. 274, 284–85 (2004).

2      Imposing a standard that limits the mitigating evidence considered by the
3  jury thus violates the Eighth Amendment's requirement that the sentencer be
4  allowed to consider any aspect of the defendant's character or record that counsels
5  in favor of a sentence other than death. *See Smith v. Texas*, 543 U.S. 37, 47 (2004)
6  (per curiam); *Tennard*, 542 U.S. at 285; *Lockett*, 438 U.S. at 604. As a result, due
7  process requires that a jury be fully and correctly instructed regarding the law
8  related to its sentencing discretion and powers in order to prevent an
9  unconstitutional and arbitrary deprivation of the defendant's liberty. *See Hicks v.
10  Oklahoma*, 447 U.S. 343, 346–47 (1980). The ultimate responsibility for such
11  instruction rests with the judge, not with counsel. *See Taylor v. Kentucky*, 436 U.S.
12  478, 488–89 (1978) (holding that the "arguments of counsel cannot substitute for
13  instructions by the court").

14      As Supreme Court precedent makes clear, the jury must be permitted to fully
15  consider any and all mitigation and, in order to ensure this, the judge must correctly
16  instruct the jury on how to do so. Here, the trial court only instructed the jury to
17  consider and compare "the totality of the aggravating circumstance with the totality
18  of the mitigating circumstances." (Tr. July 18, 2005 at 94; IOR 169 at 6.)

19      The combined effect of individual mitigating factors is appropriate for a
20  capital jury to consider. "[E]ven if [specific mitigating facts] are not in themselves
21  cause for a sentence less than death, they are still relevant to mitigation and must
22  be weighed in conjunction with other factors to determine if all of the circumstances
23  together warrant a lesser sentence." *Smith v. McCormick*, 914 F.2d 1153, 1168 (9th
24  Cir. 1990); *see also Boyde*, 494 U.S. at 377–78 (Eighth Amendment requires capital
25  sentencer to consider "all relevant mitigating evidence" offered by defendant).
26  There is a clear difference between weighing the totality of aggravation and the
27  totality of mitigation against each other, as the jury was instructed, and including
28  the totality of mitigation as a separate mitigator to be weighed in addition to each

other mitigator against the totality of aggravation. Because Morris's jury was not properly instructed to consider the cumulative effect of mitigating evidence, Morris's constitutional rights were violated and he is entitled to relief.

## CLAIM TWENTY-FIVE

**Arizona's death-penalty scheme failed to require special verdict forms for the jury to indicate its specific findings on Morris's proffered mitigating circumstances, and this statute and the trial court's failure to use special verdict forms violated Morris's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.**

This claim was not raised in state court. Morris alleges he can overcome any default of this claim by showing cause and prejudice, including because of the ineffective assistance of appellate and state post-conviction counsel. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *but see Davila v. Davis*, 137 S. Ct. 2058 (2017). Morris will demonstrate at an evidentiary hearing that appellate and post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced him. Alternatively, he alleges that any procedural bar is not adequate or independent or that imposing default would be a miscarriage of justice. Because this claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the merits of the claim de novo. Morris incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

The Eighth and Fourteenth Amendments require states to provide a mechanism for meaningful direct review of death sentences. *Gregg v. Georgia*, 428 U.S. 153, 197–98 (1976); *see State v. Brewer*, 826 P.2d 783, 790 (Ariz. 1992) ("Appellate review of sentencing is, of course, even more necessary in the context of a capital case. The penalty of death differs from all other forms of criminal punishment in terms of severity and irrevocability, and may not be exacted in the

1    absence of certain constitutional safeguards.") (citation omitted)). The Supreme

2    Court has frequently held that once a state establishes an appellate forum, it must

3    assure access to it upon terms and conditions equally applicable and available to all.

4    *See, e.g.*, *North Carolina v. Pearce*, 395 U.S. 711, 724 (1969), *overruled on other*

5    *grounds by Alabama v. Smith*, 490 U.S. 794 (1989); *Griffin v. Illinois*, 351 U.S. 12

6    (1956).

7         Under Arizona law, in a non-capital sentencing the judge is required to state

8    for the record the mitigating and aggravating factors it considers and applies when

9    imposing any sentence other than the presumptive term. Ariz. Rev. Stat.

10   § 13-701(C); *State v. Harrison*, 985 P.2d 486 (Ariz. 1999). However, Arizona does

11   not impose the same requirement upon capital juries. The decision to impose the

12   death penalty once the jury finds aggravating factors is a matter for each individual

13   juror. *See* Ariz. Rev. Stat. § 13-751(C) (stating that "[e]ach juror may consider any

14   mitigating circumstance found by that juror in determining the appropriate

15   penalty"). The statute does not require that the jurors identify which mitigating

16   circumstances they find established.

17        On appeal, however, the Arizona Supreme Court must consider whether the

18   jury abused its discretion when it imposed a sentence of death. *See* Ariz. Rev. Stat.

19   § 13-756(A); *id.* § 13-703(E) (renumbered at § 13-751) (requiring the trier of fact

20   to impose a death sentence if it finds at least one aggravating factor and determines

21   that the mitigating circumstances are not "sufficiently substantial to call for

22   leniency"). And the Arizona Supreme Court cannot conduct a meaningful

23   abuse-of-discretion review of aggravating and mitigating factors unless the jury

24   uses special verdict forms indicating which mitigating factors each juror found. "[I]t

25   is important that the record on appeal disclose to the reviewing court the

26   considerations which motivated the death sentence in every case in which it is

27   imposed." *Gardner v. Florida*, 430 U.S. 349, 361 (1977) (plurality opinion). Thus,

28   a jury may not sentence a defendant to death without offering any findings of fact

or reasons for imposing a death sentence. Such a record leaves little for review on direct appeal, and completely undermines *Gregg*'s mandated meaningful review of death sentences. *See Gregg*, 428 U.S. at 197–98.Without special findings, the Arizona Supreme Court is unable to know the considerations that motivated the jury to select death as the sentence and whether the jury's determination is deficient. The jury's determination can influence the court as the jury has the best ability to determine credibility of witnesses.

Here, the jury employed no such special verdict form and simply returned verdicts of death. (IOR 172–76.)  Because these verdicts lacked any indication which mitigating factors each juror found, the trial court's failure to require special verdict forms—and the fact that one is not statutorily required—violated Morris's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and deprived him of an adequate appellate review. Accordingly, Morris is entitled to relief.

## CLAIM TWENTY-SIX

**The abuse of discretion standard of review mandated by Arizona Revised Statute § 13-703.05(A) is unconstitutional.**

This claim was not raised in state court. Morris alleges he can overcome any default of this claim by showing cause and prejudice, including because of the ineffective assistance of appellate and state post-conviction counsel. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012). Morris will demonstrate at an evidentiary hearing that appellate and post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced him. Alternatively, he alleges that any procedural bar is not adequate or independent or that imposing default would be a miscarriage of justice. Because this claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the merits of the claim de novo. Morris incorporates by specific reference all facts,

allegations, and arguments made elsewhere in this Petition.

To help satisfy the heightened standard of reliability necessary in the death-penalty context, *see Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.), the Supreme Court has "emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally." *Parker v. Dugger*, 498 U.S. 308, 321 (1991) (citations omitted); *see also Zant v. Stephens*, 462 U.S. 862, 890 (1983) ("Our decision in this case depends in part on the existence of an important procedural safeguard, the mandatory appellate review of each death sentence by the Georgia Supreme Court to avoid arbitrariness and to assure proportionality."); *Jurek v. Texas*, 428 U.S. 262, 276 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) ("By providing prompt judicial review of the jury's decision in a court with statewide jurisdiction, Texas has provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under law."). The presence of such review supported the eventual approval of capital-sentencing statutes in numerous states. *See, e.g.*, *Gregg v. Georgia*, 428 U.S. 153, 195 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) ("Where the sentencing authority is required to specify the factors it relied upon in reaching its decision, the further safeguard of meaningful appellate review is available to ensure that death sentences are not imposed capriciously or in a freakish manner.").

As the purpose of this appellate review is to ensure the constitutionality of a death sentence, the review must itself be constitutional. *Cf. Clemons v. Mississippi*, 494 U.S. 738, 748–51 (1990) (evaluating constitutionality of appellate review). To that end, meaningful appellate review cannot lose sight of the fact that "[t]he primary concern in the Eighth Amendment context [is] that the sentencing decision be based on the facts and circumstances of the defendant, his background, and his crime." *Id.* at 748 (citations omitted); *cf. Smith v. Texas*, 543 U.S. 37, 44–45 (2004) (per curiam) (rejecting state court's reliance during appellate review of "causal

nexus" test that limited consideration of relevant mitigation). Moreover, the appellate review must not inject "arbitrar[iness] or irrational[ity]" into the sentencing process. *Parker*, 498 U.S. at 321. Finally, once a state has provided a mechanism for meaningful appellate review, it must follow its own laws regarding that mechanism; the failure to do so can result in the denial of a liberty interest protected by the Due Process Clause of the Fourteenth Amendment. *See Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) (recognizing that a state-law procedural right granted to a criminal defendant at sentencing can give rise to a constitutionally protected liberty interest).

For crimes committed after August 1, 2002, the Arizona Supreme Court reviews all death sentences and findings in aggravation for an abuse of discretion pursuant to Arizona Revised Statute § 13-703.05(A) (renumbered §13-756(A)).[56] In articulating this review in Morris's case, the Arizona Supreme Court determined that a jury did not abuse its discretion if there is "any reasonable evidence in the record to sustain it." *State v. Morris*, 160 P.3d 203, 219–20 (Ariz. 2007) (citation omitted). However, this standard is more deferential than the abuse of discretion standard ordinarily articulated and applied by the Arizona Supreme Court. The Court had previously held that:

> The term "abuse of discretion" is unfortunate. In ordinary language, "abuse" implies some form of corrupt practice, deceit or impropriety. Webster's Third New International Dictionary (1976). In this sense, the application of the word to the act of a trial judge who ruled in accordance with all the decided cases on the issue is inappropriate. However, in the legal context, the word "abuse" in the phrase "abuse of discretion" has been given a broader meaning. In the few

---

[56] For crimes committed prior to that date, the Arizona Supreme Court was required to conduct an independent review of the aggravating and mitigating circumstances and the propriety of the death sentence. Ariz. Rev. Stat. § 13-755(A). It is this type of review that was contemplated by *Gregg*, *Clemons*, and their progeny. The legislature changed the applicable standard of review in 2002. *See* Ariz. Sess. Laws 2002, 5th S.S., Ch. 1, § 5; *State v. Forde*, 315 P.3d 1200, 1232 (Ariz. 2014) (discussing the procedural propriety of the legislative change).

cases that have attempted an analysis, the ordinary meaning of the word has been considered inappropriate and *the phrase as a whole has been interpreted to apply where the reasons given by the court for its action are clearly untenable, legally incorrect, or amount to a denial of justice.* Similarly, a discretionary act which reaches an end or purpose not justified by, and clearly against, reason and evidence "is an abuse."

*State v. Chapple*, 660 P.2d 1208, 1224 n.18 (Ariz. 1983) (internal citations omitted), *superseded by statute on other grounds as stated in State v. Goudeau*, 372 P.3d 945, 983 (Ariz. 2016) (emphasis added).

The standard articulated in *Chapple* is legally correct and would yield a different result than the more deferential standard the Court set for the abuse-of-discretion review in Morris's case. The standard applied here undermines the meaningful review of death sentences mandated by the United States Supreme Court and the Constitution because it is nothing but a rubber stamp of the jury's conclusions and fails to shield capital defendants from arbitrary and capricious death sentences. *See Gregg*, 428 U.S. at 204 (requiring that the state supreme court review every death sentence and "determine whether [among other things] the evidence supports the findings of a statutory aggravating circumstance").

The Arizona Supreme Court, when it conducted its independent review in other cases, did not simply "defer to the findings or decision of the jury with respect to aggravation and mitigation when determining the propriety of the death sentence." *State v. Newell*, 132 P.3d 833, 849 (Ariz. 2006) (internal quotation marks omitted). Because § 13-756(A), on the other hand, does not encompass the constitutionally mandated standard for reviewing death sentences, it violates the Eighth and Fourteenth Amendments and renders Arizona's death sentencing statute unconstitutional. Consequently, Morris's death sentence cannot stand.

/ / /

/ / /

/ / /

**CLAIM TWENTY-SEVEN**

**The state court violated Morris's rights under the Double Jeopardy Clause by convicting him of five counts of murder and considering the same conduct in sentencing him to death.**

This claim was not raised in state court. Morris alleges he can overcome any default by showing cause and prejudice, including because of the ineffective assistance of appellate and state post-conviction counsel. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *but see Davila v. Davis*, 137 S. Ct. 2058 (2017). Morris will demonstrate at an evidentiary hearing that appellate and post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced him. Alternatively, he alleges that any procedural bar is not adequate or independent or that imposing default would be a miscarriage of justice. Because this claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the merits of the claim de novo. Morris incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Morris was charged with five counts of first-degree murder. (IOR 7.) He was found guilty on all counts. (IOR 164.) In the capital sentencing proceedings, the State alleged as an aggravating factor that Morris "was previously convicted of a serious offense," relying for each count on the other four. *See* Ariz. Rev. Stat. § 13-751(F)(2) ("The defendant has been or was previously convicted of a serious offense, whether preparatory or completed. Convictions for serious offenses committed on the same occasion as the homicide . . . . shall be treated as a serious offense under this paragraph."). (Tr. July 12, 2005 at 19–21.) The jury was instructed that first-degree murder qualifies as a serious offense and that "[c]onvictions for serious offenses that were not committed on the same occasion as the homicide, but were consolidated for trial with the homicide, shall be treated

as a serious offense for the purpose of this aggravating factor." (IOR 152 at 5.) Therefore, for each conviction, Morris was both found guilty and found death-eligible for the four other convictions.

The Fifth Amendment's Double Jeopardy Clause ensures that no citizen shall be twice placed in jeopardy for the same offense. U.S. Const. amend V. This protects a defendant against both successive punishments and successive prosecutions for the same criminal offense. *See United States v. Dixon*, 509 U.S. 688, 696 (1993) (citing *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989)). The Supreme Court has established a test to determine whether two crimes constitute the same offense in violation of the Fifth Amendment: "whether each provision requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932). Because the same facts are required to prove the elements of murder and the (F)(2) factor as presented here, Morris has been exposed to multiple proceedings and punishments on the same offense. Morris's Fifth and Fourteenth Amendment rights have been violated, and he is therefore entitled to relief.

## CLAIM TWENTY-EIGHT

**Arizona's capital-sentencing scheme limits the jury's full consideration of mitigation evidence by requiring that mitigating circumstances be proved by a preponderance of the evidence, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.**

Morris raised this claim on direct appeal. (DA 29 at 59.) The Arizona Supreme Court did not address the claim on the merits, and instead summarily dismissed it at the end of its opinion. *See State v. Morris*, 160 P.3d 203, 220–21 (Ariz. 2007). Because this claim has not been adjudicated by the Arizona state courts on the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim. If this instead constituted a decision

on the merits, then the state court's rejection of the claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(2).

At trial, the state court instructed the jury that "[t]he burden of proving the existence of mitigation is on the defendant" and "[t]he defendant must prove the existence of mitigation by a preponderance of the evidence." (Tr. July 14, 2015 at 6.) The court further instructed the jury that "[a] party having the burden of proof by a preponderance of the evidence must persuade you, by the evidence, that the claim or a fact is more probably true than not true. This means the evidence that favors that party outweighs the opposing evidence." (Tr. July 14, 2015 at 6–7.) The jury instruction, by requiring Morris to prove mitigating circumstances by a preponderance of evidence, limited the jury's ability to consider all of the mitigating evidence presented.

In *Lockett v. Ohio*, the United States Supreme Court concluded that "in all but the rarest kind of capital case," the sentencer must "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense . . . [offered] as a basis for a sentence less than death." 438 U.S. 586, 604–05 (1978) (emphasis omitted). "[I]t is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing [the] sentence." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002); *see also Boyde v. California*, 494 U.S. 370, 377–78 (1990); *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982). Upon meeting the low threshold for relevance, "the 'Eighth Amendment requires that the jury be able to consider and give effect to' a capital defendant's mitigating evidence." *Tennard v. Dretke*, 542 U.S. 274, 285

(2004) (quoting *Boyde*, 494 U.S. at 377–78). Imposing a standard that limits the mitigating evidence considered by the jury violates the Eighth Amendment's requirement that the sentencer be allowed to consider any aspect of the defendant's character or record that counsels in favor of a sentence other than death. *See Smith v. Texas*, 543 U.S. 37 (2004) (per curiam); *Tennard*, 542 U.S. at 285; *Lockett*, 438 U.S. at 604. *But see Walton v. Arizona*, 497 U.S. 639, 649–51 (1990) (plurality opinion), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

The jury instruction limiting the mitigation that the jury could consider therefore violated Morris's constitutional rights. This error violated Morris's constitutional rights and prejudiced him. He is entitled to evidentiary development and relief.

## CLAIM TWENTY-NINE

**Because Morris was not indicted for a capital crime, and the aggravating circumstances were not included in the indictment, Morris was not provided sufficient notice of the alleged aggravating circumstances, nor was there a finding of probable cause as required by the Fifth, Sixth, Eighth, and Fourteenth Amendments.**

Morris raised this claim on direct appeal. (DA 29 at 59–60.) The Arizona Supreme Court did not address the claim on the merits, and instead summarily dismissed it at the end of its opinion. *See State v. Morris*, 160 P.3d 203, 221 (Ariz. 2007). Because this claim has not been adjudicated by the Arizona state courts on the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim. If this instead constituted a decision on the merits, then the state court's rejection of the claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(2).

The State pursued charges against Morris through an indictment, but failed

1   to allege any aggravating circumstances in that indictment. (IOR 7.) The State did

2   not notify Morris of the alleged aggravating circumstances until over two months

3   after the indictment was filed. (IOR 19.) Further, because the aggravating

4   circumstances were added at the State's discretion after the indictment, the grand

5   jury never made a determination of whether probable cause existed to support the

6   aggravating circumstances.

7        The United States Supreme Court has clearly established that any fact serving

8   to increase the punishment for a crime must be treated as an element of the offense.

9   *See Apprendi v. New Jersey*, 530 U.S. 466, 477 (2000); *see also Ring v. Arizona*,

10  536 U.S. 584, 609 (2002). In *Apprendi*, the Court noted that "'any fact (other than

11  prior conviction) that increases the maximum penalty for a crime must be *charged*

12  *in an indictment*, submitted to a jury, and proven beyond a reasonable doubt.'" 530

13  U.S. at 476 (emphasis added) (quoting *Jones v. United States*, 526 U.S. 227, 243

14  n.6 (1999)). The necessity of alleging aggravating facts in an indictment arises from

15  the understanding that "[an] aggravating fact is an element of the aggravated

16  crime," and must, therefore, be included in the indictment and subject to a pretrial

17  probable cause finding. *Id.* at 501 (Thomas, J., concurring).

18       Section 13-1105 of the Arizona Revised Statutes defines first-degree murder

19  under Arizona law. The maximum sentence for first-degree murder is life

20  imprisonment unless a jury finds the presence of at least one aggravating factor and

21  determines that there are no mitigating circumstances sufficiently substantial to

22  warrant leniency. Ariz. Rev. Stat. § 13-752(C)–(D), (G). In Arizona, the

23  aggravating factors "operate as 'the functional equivalent of an element of a greater

24  offense.'" *Ring*, 536 U.S. at 609 (quoting *Apprendi*, 530 U.S. at 494 n.19). As

25  elements of the offense of capital murder, the Fifth, Sixth, and Fourteenth

26  Amendments require aggravating circumstances to be included in the charging

27  document. *See United States v. Cruikshank*, 92 U.S. 542, 558, 566–69 (1875)

28  (noting that the Sixth Amendment requires an indictment to include "every

1    ingredient of which the offence is composed" (internal quotation marks omitted));
2    *see also Apprendi*, 530 U.S. at 476. To be included in the charging document, each
3    and every element of the alleged offense must have been subjected to a probable
4    cause determination either by a grand jury, in the case of an indictment, or by a
5    judicial officer at a preliminary hearing. Here, there were no aggravating
6    circumstances alleged in the indictment; thus, Morris was not charged with a capital
7    crime.

8    Because the aggravating circumstances alleged in Morris's case were not
9    subject to a probable cause determination by a neutral arbiter, Morris's death
10   sentence violates the Fifth, Sixth, Eighth, and Fourteenth Amendments of the
11   Constitution. The violation of Morris's constitutional rights cannot be cured short
12   of remanding to the grand jury for further proceedings. Morris's sentence is
13   constitutionally infirm, and he is entitled to relief.

## CLAIM THIRTY

**The especially cruel, heinous, or depraved aggravating factor, as well as the jury instructions given here on the factor, are unconstitutionally vague and violate the Eighth and Fourteenth Amendments to the United States Constitution.**

18   Morris raised this claim on direct appeal. (DA 29 at 60–61.) The Arizona
19   Supreme Court did not address the claim on the merits, and instead summarily
20   dismissed it at the end of its opinion. *See State v. Morris*, 160 P.3d 203, 221 (Ariz.
21   2007). Because this claim has not been adjudicated by the Arizona state courts on
22   the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to
23   this Court's review of the claim. If this instead constituted a decision on the merits,
24   then the state court's rejection of the claim was contrary to, or involved an
25   unreasonable application of, clearly established federal law, as determined by the
26   United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted
27   an unreasonable determination of the facts in light of the evidence presented. *See* 28
28   U.S.C. § 2254(d)(2).

The Eighth Amendment requires that within a state's capital-sentencing scheme, the aggravating factors genuinely narrow the class of offenders that are eligible for the death penalty. *See, e.g.*, *Loving v. United States*, 517 U.S. 748, 755 (1996); *Zant v. Stephens*, 462 U.S. 862, 877 (1983). To comply with the Eighth Amendment, states must establish a threshold below which the death penalty cannot be imposed and "establish rational criteria that narrow the decisionmaker's judgment as to whether the circumstances of a particular defendant's case meet the threshold." *McCleskey*, 481 U.S. at 305; *see also Lowenfield v. Phelps*, 484 U.S. 231 (1988); *Stephens*, 462 U.S. at 877. Further, a state's sentencing procedure must suitably direct and limit the sentencing body's discretion "so as to minimize the risk of wholly arbitrary and capricious action." *Stephens*, 462 U.S. at 874 (quoting *Gregg v. Georgia*, 428 U.S. 153, 189 (1976)). Vague standards are unconstitutional because they fail to adequately "channel the sentencing decision patterns of juries." *Gregg*, 428 U.S. at 195 n.46.

Here, the State alleged that the crimes were especially cruel, heinous, or depraved. (Tr. July 12, 2005 at 18.) The Supreme Court has repeatedly held that, on their face, aggravating factors based on the heinousness, cruelty, or depravity of a murder fail to adequately narrow death-penalty eligibility because the language is too vague to adequately guide the discretion of the sentencer. *See Maynard v. Cartwright*, 486 U.S. 356, 363 (1988) ("There is nothing in these few words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence." (quoting *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980))); *see also Walton v. Arizona*, 497 U.S. 639, 654 (1990) (finding that Arizona's especially heinous, cruel, or depraved aggravating circumstance is facially vague), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002). The plain language of the heinous, cruel, or depraved aggravating circumstance applies to any intentional homicide and therefore fails to "suitably direct[] and limit[]" the sentencer's discretion in imposing the death penalty.

1    *See Gregg*, 428 U.S. at 189.

2        In *Walton*, the Supreme Court noted that "there is no serious argument that

3    Arizona's 'especially heinous, cruel or depraved' aggravating factor is not facially

4    vague." 497 U.S. at 654. The Court went on to conclude that while Arizona's

5    especially heinous, cruel, or depraved aggravating circumstance was facially vague,

6    it did not violate the Eighth and Fourteenth Amendments because sentencing was

7    the responsibility of the trial judge and it could be presumed that the judge would

8    follow the narrowed definition of the aggravating circumstance as construed by the

9    Arizona Supreme Court. *Id.* at 653–54. Walton does not apply in the context of jury

10   sentencing. *Id.* at 653 (distinguishing prior cases which struck down similar

11   aggravating circumstance under jury-sentencing schemes because the "logic of

12   those cases has no place in the context of sentencing by a trial judge").

13       After the shift to jury sentencing in Arizona, this aggravating circumstance

14   is unconstitutionally vague. When the jury is the factfinder, the vague statutory

15   definition of especially cruel will not suffice. How the jury will interpret this factor

16   can "only be the subject of sheer speculation." *Godfrey*, 446 U.S. at 429 (discussing

17   the aggravating circumstance of "outrageously or wantonly vile, horrible and

18   inhuman"). A standardless capital-punishment statute allows for the imposition of

19   the death penalty in an arbitrary and capricious manner, violating the Eighth

20   Amendment. *Maynard*, 486 U.S. at 361–62.

21       In addition, Arizona's judicial interpretations of the heinous, cruel, or

22   depraved aggravating circumstance, and any jury instructions based on such

23   interpretations, have failed to narrow the class of offenders eligible for the death

24   penalty. In Arizona, a murder in which the killer uses excessive force is considered

25   "cruel" for purposes of the death penalty. *State v. Summerlin*, 675 P.2d 686, 696

26   (Ariz. 1983). But using insufficient force to commit a murder is also "cruel."

27   *See State v. Chaney*, 686 P.2d 1265, 1282 (Ariz. 1984) (finding "cruelty" because

28   defendant used insufficient force causing the victim to suffer). With the arbitrary

imposition of this aggravating circumstance, this Court cannot be sure that Morris's death sentence was not imposed in a wanton and freakish manner. *Cf. Gregg*, 428 U.S. at 195.

Here, the given jury instructions did not provide jurors with a "meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not." *Godfrey*, 446 U.S. at 427 (internal quotation marks omitted) (alterationns in original). To give substance to the terms "cruel," "heinous," and "depraved" the trial court first instructed the jury that the murder had to be "especially heinous, cruel, or depraved." (IOR 152 at 6.) This phrase alone does not help define what crimes qualify for the circumstance:

> The State's contention that the addition of the word "especially" somehow guides the jury's discretion, even if the term "heinous" does not, is untenable. To say that something is "especially heinous" merely suggests that the individual jurors should determine that the murder is more than just "heinous," . . . and an ordinary person could honestly believe that every unjustified, intentional taking of human life is "especially heinous."

*Maynard*, 486 U.S. at 364 (citing *Godfrey*, 446 U.S. at 428–29).

The trial court went on to define "especially heinous, cruel, or depraved" as "above the norm of other first degree murders." (IOR 152 at 6.) But the jury was not instructed as to what qualified as "the norm of other first degree murders" in order for a murder to be "especially heinous, cruel, or depraved" as opposed to just "heinous, cruel, or depraved." Without any point of reference or comparison as to what first-degree murders were "the norm," the jury could not differentiate the case before it. The jurors here most likely had not previously participated in first-degree murder trials, so they also did not have the benefit of experience to help them discern if the case before them was not "the norm." *Cf. Gregg*, 428 U.S. at 192 ("Since the members of a jury will have had little, if any, previous experience in sentencing, they are unlikely to be skilled in dealing with the information they are given." (citations omitted)). The fact that the jurors were provided special

aggravating factors verdicts for each count does not constitutionally narrow this facially vague aggravating circumstance or cure the instructional error. (IOR 157, 158, 159, 160, 161.)

In any event, the special verdicts do not cure the unconstitutional vagueness. Jurors, unlike judges who see a range of first-degree murders, have no points of comparison as to whether a particular murder is especially heinous, cruel, or depraved. Jurors are quite likely to believe that every murder meets this standard. *See Cartwright*, 486 U.S. at 364 ("[A]n ordinary person could honestly believe that every unjustified, intentional taking of human life is 'especially heinous.'"). The jury instructions the court provided do not cure the vagueness and overbreadth. "Vague terms do not suddenly become clear when they are defined by reference to other vague terms." *Cartwright v. Maynard*, 822 F.2d 1477, 1489 (10th Cir. 1987), *aff'd,* 486 U.S. 356 (1988).

The significant change in Arizona law and the shift to jury sentencing alters the landscape and analysis under *Walton*. In addition, the failure of Arizona cases to narrow this facially vague aggravating circumstance results in a potential for the arbitrary imposition of the death penalty. Arizona's especially heinous, cruel, or depraved aggravating circumstance is vague and overbroad and fails to adequately narrow the class of offenders subject to the death penalty. The Arizona Supreme Court's contrary ruling represents an unreasonable application of clearly established federal law, 28 U.S.C. § 2254(d)(1), and turns on unreasonable factual determinations, *id.* § 2254(d)(2). It is therefore no limit on plenary merits review. Morris's sentence based on this aggravating circumstance violated his Eighth and Fourteenth Amendment rights, and taken individually and together with the other errors discussed throughout this Petition, he is entitled to relief.

/ / /

/ / /

/ / /

1

**CLAIM THIRTY-ONE**

2

3

4

5

**The admission of inflammatory and irrelevant victim-impact evidence resulted in a fundamental violation of Morris's Eighth and Fourteenth Amendment rights, and to the extent that Arizona Revised Statutes §§ 13-752(R) and 13-4426(A) authorized such statements, they are unconstitutional.**

6

7

8

9

10

11

12

13

14

15

16

17

Morris raised this claim on direct appeal. (DA 29 at 61.) The Arizona Supreme Court did not address the claim on the merits, and instead summarily dismissed it. *See State v. Morris*, 160 P.3d 203, 221 (Ariz. 2007). Because this claim has not been adjudicated by the Arizona state courts on the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim. If this instead constituted a decision on the merits, then the state court's rejection of the claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(2). Morris incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

18

19

20

21

22

23

24

25

26

27

28

Arizona Revised Statute § 13-752(R) gives victims the "right to be present and present information at the penalty phase." Further, it authorizes victims to "present information about the murdered person and the impact of the murder on the victim and other family members [and to] submit a victim impact statement in any format to the trier of fact." Ariz. Rev. Stat. § 13-752(R). Additionally, § 13-4426(A) provides that "the victim may present evidence, information and opinions that concern the criminal offense, the defendant, the sentence or the need for restitution at any aggravation, mitigation, presenting or sentencing proceeding," and subsection (B) gives victims the right to be present and address the court "[a]t any disposition proceeding." *See also* Ariz. Const. Art. 2 § 2.1(A)(3) (stating that victims have the right "[t]o be present at and, upon request, to be informed of all

criminal proceedings where the defendant has the right to be present"). These statutes broadly authorize victim-impact statements and impose minimal restriction on the content of such statements. Read literally, § 13-4426(A) authorizes victims to explicitly recommend to the jury that it impose a sentence of death. And "victim" in these statutes has been defined to include a murder victim's "spouse, parent, child, grandparent, sibling, and any other person related to the person by consanguinity or affinity to the second degree or any other lawful representative[.]" Ariz. Rev. Stat. §13-4401(19).[57]

By broadly authorizing victim-impact testimony, Arizona has violated the basic premise of the Eighth Amendment that requires that the jury listen, consider, and give effect to relevant mitigating evidence. *See Eddings v. Oklahoma*, 455 U.S. 104, 110–17 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604–06 (1978). Long-standing precedent establishes that there can be no modification of the sentencer's obligation to listen and give weight to mitigating evidence. *See Tennard v. Dretke*, 542 U.S. 274, 284 (2004); *Boyde v. California*, 494 U.S. 370, 377–78 (1990) ("The Eighth Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence offered by petitioner."). Permitting such a broad universe of

---

[57] The expansive authorization to victims under Ariz. Rev. Stat. § 13-4426(A) and § 13-752(R) is diametrically opposed to Arizona Rule of Criminal Procedure 19.1(d)(3) (renumbered 19.1(e)(3)), which permits the victim's survivors to "make a statement relating to the characteristics of the victim and the impact of the crime on the victim's family, [though they] may not offer any opinion regarding the appropriate sentence to be imposed." The Arizona Legislature, in enacting § 13-752(R) and § 13-4426(A), has infringed upon the judiciary's rule-making powers in violation of the Arizona Constitution. *See* Ariz. Const. Art. 6 § 5(5) ("The Supreme Court shall have [p]ower to make rules relative to all procedural matters in any court."); *San Carlos Apache Tribe v. Super. Ct. ex rel. Cty. of Maricopa*, 972 P.2d 179, 195 (Ariz. 1999) ("Article III is violated at the point where the legislative enactment unreasonably limits the judiciary's performance of its duties." (citation omitted)); *see also Readenour v. Marion Power Shovel, Inc.*, 719 P.2d 1058, 1061 (Ariz. 1986) ("The doctrine of separation of powers prevents the legislature from assuming judicial functions." (citation omitted)); *Seisinger v. Siebel*, 203 P.3d 483, 487 (Ariz. 2009) ("[T]he legislature and this Court both have rulemaking power, but [] in the event of irreconcilable conflict between a procedural statute and a rule, the rule prevails.").

1    victim-impact testimony, as Arizona does, injects irrelevant emotional sympathies

2    into the trial, thereby undermining the jury's ability to fairly listen to and consider

3    mitigation evidence.

4         When members of the victim's family offer characterizations and opinions

5    about the crime and the defendant, the defendant suffers a fundamental violation of

6    his due processs and Eighth Amendment rights. *See Payne v. Tennessee*, 501 U.S.

7    808, 830 n.2 (1991); *Booth v. Maryland*, 482 U.S. 496, 508–09 (1987). Courts have

8    long recognized that the imposition of a capital sentence must meet the dictates of

9    the Eighth Amendment. *See Payne*, 501 U.S. at 824 ("Where the State imposes the

10   death penalty for a particular crime, we have held that the Eighth Amendment

11   imposes special limitations upon that process."). In *Booth*, the Supreme Court

12   considered the constitutionality of the admission of two types of victim-impact

13   evidence: (1) information about the victim and the impact of the victim's death on

14   the victim's family; and (2) the victim's family members' opinions and

15   characterizations of the crimes and the defendant. 482 U.S. at 502–03. The Court

16   held that the introduction of both types of victim-impact evidence at a capital

17   sentencing proceeding violated the Eighth and Fourteenth Amendments. *Id.* at

18   503–09.

19        *Booth* was modified by *Payne*, which permitted evidence relating to the

20   victim and the impact of the victim's death on the surviving family. *Payne*, 501

21   U.S. at 827. *Payne*, however, did not overrule the conclusion in *Booth* that the

22   Eighth and Fourteenth Amendments prohibit "the admission of a victim's family

23   members' characterizations and opinions about the crime, the defendant, and the

24   appropriate sentence." *Id.* at 830 n.2. The *Payne* Court also continued to recognize

25   that any type of victim-impact evidence violates a defendant's federal due process

26   rights when it "is so unduly prejudicial that it renders the trial fundamentally

27   unfair." *Id.* at 825; *see also Gretzler v. Stewart*, 112 F.3d 992, 1009 (9th Cir. 1997)

28   (citing *Payne*, 501 U.S. at 825).

1    Emotional victim-impact evidence, likely to provoke arbitrary or capricious
2    action, violates the Fifth, Sixth, Eighth, and Fourteenth Amendments to the
3    Constitution. *See, e.g.*, *Gardner v. Florida*, 430 U.S. 349, 358 (1977) (plurality
4    opinion) ("It is of vital importance to the defendant and to the community that any
5    decision to impose the death sentence be, and appear to be, based on reason rather
6    than caprice or emotion."); *Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (joint
7    opinion of Stewart, Powell, and Stevens, JJ.) (noting that "where discretion is
8    afforded a sentencing body on a matter so grave as the determination of whether a
9    human life should be taken or spared, that discretion must be suitably directed and
10   limited so as to minimize the risk of wholly arbitrary and capricious action");
11   *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (joint opinion of Stewart,
12   Powell, and Stevens, JJ.) (recognizing "the need for reliability in the determination
13   that death is the appropriate punishment in a specific case").

14   Although the Supreme Court has not fully banned victim-impact evidence, it
15   has recognized its minimal relevance in a capital sentencing proceeding and has
16   limited the admissible categories of information. Such evidence is only relevant to
17   show that the victim is an individual whose death represents a unique loss to society
18   and in particular to his family. *See Payne*, 501 U.S. at 825. Any relevance victim-
19   impact evidence has in this regard pales in comparison to the prejudicial effect it
20   has on a jury. Such evidence is highly emotional; it is simply intended to appeal to
21   the jury's sympathies.

22   The Supreme Court has reaffirmed that no statute, rule, or judicial
23   interpretation may impair a jury's opportunity to give a reasoned moral response to
24   a defendant's mitigating evidence. *See Abdul-Kabir v. Quarterman*, 550 U.S. 233,
25   246–48 (2007). Permitting a victim to offer inflammatory testimony during a capital
26   penalty phase as permitted in this case violates the Eighth Amendment. Thus,
27   Arizona's statutes that authorize such testimony are constitutionally infirm

28   The consequences of Arizona's unconstitutionally broad statutes manifested

in Morris's case when victims were permitted to make inflammatory statements and comment on the strength of the aggravating and mitigating evidence, as discussed *supra* in Claim Three (C). For example, G.G. Codman said, "I have heard what Cory Morris has done to my sister, *how he preyed upon her weakness and her vulnerabilities* and performed some *unimaginable acts and vile acts* upon her." (Tr. July 14, 2005 at 41 (emphasis added).) These statements had no place in Morris's capital sentencing because they exceeded the permissible bounds of relevance, were unduly prejudicial, and violated Morris's rights to due process and a fair and reliable sentencing. The Arizona statutes that authorized such statements are unconstitutional. Morris was unduly prejudiced by their implementation in his case, and, thus, his death sentence cannot stand.

## CLAIM THIRTY-TWO

**Morris's jury was not instructed to consider mercy or sympathy as a mitigating circumstance in violation of his Sixth, Eighth, and Fourteenth Amendment rights.**

Morris raised this claim on direct appeal. (DA 29 at 61–62.) The Arizona Supreme Court did not address the claim on the merits, and instead summarily dismissed it at the end of its opinion. *See State v. Morris*, 160 P.3d 203, 221 (Ariz. 2007). Because this claim has not been adjudicated by the Arizona state courts on the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim. If this instead constituted a decision on the merits, then the state court's rejection of the claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(2).

In a capital case, the sentencer cannot "be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence

1   less than death." *Lockett*, 438 U.S. at 604; *see also Eddings*, 455 U.S. at 110. Upon

2   meeting the low threshold for relevance, "the 'Eighth Amendment requires that the

3   jury be able to consider and give effect to' a capital defendant's mitigating

4   evidence." *Tennard v. Dretke*, 542 U.S. 274, 285 (2004) (quoting *Boyde v.*

5   *California*, 494 U.S. 370, 377–78 (1990)).

6       Here, the trial court instructed the jury that mitigating circumstances are

7   "circumstances which do not justify or excuse the offense but which, in fairness, []

8   may extenuate or reduce the degree of blame or moral culpability" and include "any

9   evidence presented by either the defendant or the State that would lead you to apply

10  leniency in this case and find that death is not an appropriate sentence." (Tr. July

11  18, 2005 at 92.) Thus, Morris's jury was instructed that the various mitigating

12  factors should be considered in the jury's determination of whether to show mercy

13  to Morris and spare him a sentence of death. However, mercy itself was not included

14  in the jury instructions as a mitigating circumstance the jury should consider.

15  (*See* Tr. July 18, 2005 at 92–95.)  Morris's defense counsel did not submit to the

16  court mercy as a mitigating circumstance for the jury's consideration during the

17  penalty phase.

18      Because mercy was not included as a mitigating circumstance, the jury did

19  not consider all evidence relevant to the determination of whether Morris should be

20  sentenced to death. Mercy is undeniably relevant to the imposition of the death

21  penalty. In *Kansas v. Marsh*, 548 U.S. 163 (2006), the Supreme Court explained

22  that Kansas juries are instructed as follows:

23          The appropriateness of the exercise of mercy can itself be
            a mitigating factor you may consider in determining
24          whether the State has proved beyond a reasonable doubt
            that the death penalty is warranted.
25

26  *Id.* at 176. The Court noted that this instruction alone prevented a challenge to the

27  Kansas death-penalty scheme based on *Furman v. Georgia*, 408 U.S. 238 (1972)

28  (per curiam), that a "death sentence will be imposed in spite of facts calling for a

1   lesser penalty." *Marsh*, 548 U.S. at 176 n.3. Pleading for mercy also has been

2   approved of as a constitutionally sufficient mitigation strategy. *See Darden v.*

3   *Wainwright*, 477 U.S. 168, 185-86 (1986). And the Supreme Court in *Kansas v.*

4   *Carr*, 136 S. Ct. 633, 642 (2016), reaffirmed the proposition that mercy has a role

5   in capital sentencing: "And of course the ultimate question whether mitigating

6   circumstances outweigh aggravating circumstances is mostly a question of mercy."

7       Here, the jury was instructed that it must confine its inquiry to whether

8   mitigation has been proven and its relative weight. (Tr. July 18, 2005 at 91

9   (instructing the jury that "[t]he burden of proving the existence of mitigation is on

10  the defendant" and the defendant "must persuade you by the evidence that the claim

11  or a fact is more probably true than not"). Because mercy was not included as a

12  mitigating circumstance, the jury was unconstitutionally precluded from

13  determining whether the case warranted the exercise of mercy as an independent

14  consideration. As a result, the jury was unable to meaningfully consider all of the

15  mitigating evidence put before it in violation of the Sixth, Eighth, and Fourteenth

16  Amendments. Morris is therefore entitled to a new penalty phase.

17                          **CLAIM THIRTY-THREE**

18      **Capital punishment is categorically cruel and unusual, in violation**
        **of the Eighth and Fourteenth Amendments.**
19

20      Morris raised this claim on direct appeal. (DA 29 at 62.) The Arizona

21  Supreme Court did not address the claim on the merits, and instead summarily

22  dismissed it at the end of its opinion. *See State v. Morris*, 160 P.3d 203, 221 (Ariz.

23  2007). Because this claim has not been adjudicated by the Arizona state courts on

24  the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to

25  this Court's review of the claim. If this instead constituted a decision on the merits,

26  then the state court's rejection of the claim was contrary to, or involved an

27  unreasonable application of, clearly established federal law, as determined by the

28  United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted

1    an unreasonable determination of the facts in light of the evidence presented. *See* 28

2    U.S.C. § 2254(d)(2).

3        The Eighth Amendment precludes the imposition of punishments that are

4    "cruel and unusual," as assessed according to the "evolving standards of decency

5    that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 100, 101

6    (1958). The past forty years have demonstrated that capital punishment is cruel and

7    unusual and serves no penological purpose. Accordingly, it does not comport with

8    the dictates of the Eighth Amendment.

9        The death penalty is cruel for two distinct reasons: it is both unreliable and

10   arbitrarily imposed. First, in spite of the need for heightened reliability in a

11   proceeding when a sentence of death is at stake, *see Woodson v. North Carolina*,

12   428 U.S. 280, 305 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.),

13   capital punishment is unreliable because of the significant risk that an innocent

14   person will be sentenced to death or even executed. Between 1989 and 2012, there

15   were 115 exonerations from capital convictions; there were six more based on

16   actual innocence in 2014 alone. *Glossip v. Gross*, 135 S. Ct. 2726, 2757 (2015)

17   (Breyer, J., dissenting). Indeed, research suggests that 4.1% of the people on death

18   row are actually innocent. *See id.* at 2758 (citing Samuel R. Gross et al., *Rate of*

19   *False Conviction of Criminal Defendants Who Are Sentenced to Death*, 111 Proc.

20   of the Nat'l Acad. of Sci. 7230 (2014)). Moreover, there is compelling evidence

21   that innocent individuals have in fact been executed. *See, e.g.*, David Grann, *Trial*

22   *by Fire: Did Texas Execute an Innocent Man?*, The New Yorker (Sept. 7, 2009),

23   http://www.newyorker.com/magazine/2009/09/07/trial-by-fire    (describing    the

24   conviction and execution of Cameron Todd Willingham for the house fire that killed

25   his children, despite the invalidity of the scientific analysis deeming the fire

26   intentional).

27       In addition to being unreliable, the death penalty is wholly arbitrary. The

28   imposition of the death penalty should turn on the crime and the offender's

329

culpability; capital punishment in this country is to be reserved for "those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'" *Roper v. Simmons*, 543 U.S. 551, 568 (2005) (quoting *Atkins v. Virginia*, 536 U.S. 304, 319 (2002)). But research demonstrates that a number of irrelevant factors, including the race and gender of the victim or defendant and the geographic location of the crime, have an impermissible bearing on the probability of a death sentence. *See, e.g.*, Steven F. Shatz & Terry Dalton, *Challenging the Death Penalty with Statistics: Furman, McCleskey, and a Single County Case Study*, 34 Cardozo L. Rev. 1227, 1244–56 (2013) (citing studies finding gender, racial, and geographic disparities in the imposition of death sentences). That the death penalty is both unreliable and turns on constitutionally irrelevant factors renders it cruel. *Cf. Furman v. Georgia*, 408 U.S. 238, 309–10 (1972) (Stewart, J., concurring) (per curiam) (deeming "cruel and unusual" the "wanton[] and freakish[]" imposition of death sentences).

The death penalty has also become unusual. Both the number of death sentences and the number of executions nationally have plummeted over the last fifteen years. *See Glossip*, 135 S. Ct. at 2775 (Breyer, J., dissenting). Fewer and fewer states use the death penalty—thirty have abolished capital punishment or have not conducted an execution in many years—and the use of the death penalty is now concentrated in a handful of counties. *See Executions by State and Year*, The Death Penalty Information Center, https://www.deathpenaltyinfo.org/node/5741(last visited February 12, 2018); *States With and Without the Death Penalty*, The Death Penalty Information Center, http://www.deathpenaltyinfo.org/states-and-without-death-penalty (last visited February 12, 2018); Richard C. Dieter, *The 2% Death Penalty: How a Minority of Counties Produce Most Death Cases At Enormous Costs to All*, 1 (2013) ("Over half of the executions carried out since 1976 come from cases originating in 2% of U.S. counties."), The Death Penalty Information Center, https://deathpenaltyinfo.org/documents/TwoPercent

1  Report.pdf (last visited February 14, 2018). Perhaps most striking is the
2  "consistency of the direction of change." *Atkins*, 536 U.S. at 315. Seven states have
3  abolished the death penalty in the last twelve years, making capital punishment
4  singularly unusual. *See States With and Without the Death Penalty*, *supra*.

5      Because the death penalty is cruel and unusual, capital punishment is
6  unconstitutional. Accordingly, Morris's sentence is constitutionally infirm under
7  the Eighth and Fourteenth Amendments, and he is entitled to relief.

8
9                              **CLAIM THIRTY-FOUR**

10  **The death penalty violates Morris's rights under the Eighth and**
    **Fourteenth Amendments to the United States Constitution because**
11  **it is irrationally and arbitrarily imposed; the death penalty serves**
    **no penological purpose that is not adequately addressed by life**
12  **imprisonment.**

13      Morris raised this claim on direct appeal. (DA 29 at 62–63.) The Arizona
14  Supreme Court did not address the claim on the merits, and instead summarily
15  dismissed it at the end of its opinion. *See State v. Morris*, 160 P.3d 203, 221 (Ariz.
16  2007). Because this claim has not been adjudicated by the Arizona state courts on
17  the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to
18  this Court's review of the claim. If this instead constituted a decision on the merits,
19  then the state court's rejection of the claim was contrary to, or involved an
20  unreasonable application of, clearly established federal law, as determined by the
21  United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted
22  an unreasonable determination of the facts in light of the evidence presented. *See* 28
23  U.S.C. § 2254(d)(2).

24      In 1972, the Supreme Court struck down all existing death-penalty statutes
25  because the Court concluded that the death penalty was being imposed in an
26  arbitrary and irrational manner. *Furman v. Georgia*, 408 U.S. 238 (1972). The death
27  penalty continues to be imposed in an arbitrary and irrational fashion by Arizona
28  courts.

1  The arbitrary application of the death penalty in Morris's case amounts to

2 cruel and unusual punishment in violation of the Eighth Amendment and violates

3 his right to due process under the Fourteenth Amendment. *See Glossip v. Gross*,

4 135 S. Ct. 2726, 2755–56 (2015) (Breyer, J., dissenting) ("Today's administration

5 of the death penalty involves three fundamental constitutional defects: (1) serious

6 unreliability, (2) arbitrariness in application, and (3) unconscionably long delays

7 that undermine the death penalty's penological purpose."); *Callins v. Collins*, 510

8 U.S. 1141, 1144 (1994) (Blackmun, J., dissenting); *Jeffers v. Lewis*, 38 F.3d 411,

9 425 (9th Cir. 1994) (en banc) (Noonan, J., dissenting) ("[T]he administration of the

10 death penalty in Arizona is so arbitrary as to constitute cruel and unusual

11 punishment in violation of the Eighth Amendment[.]").

12  Finally, capital punishment serves no permissible penological purpose. In

13 1976, the Supreme Court emphasized that the death penalty was "said to serve two

14 principal social purposes: retribution and deterrence of capital crimes by

15 prospective offenders." *Gregg v. Georgia*, 428 U.S. 153, 183 (1976) (joint opinion

16 of Stewart, Powell, and Stevens, JJ.). However, the Court recognized that a

17 "sanction imposed cannot be . . . totally without penological justification." *Id.*;

18 *see also Enmund v. Florida*, 458 U.S. 782, 798 (1982) ("Unless the death penalty

19 when applied . . . measurably contributes to one or both of these goals [retribution

20 and deterrence], it 'is nothing more than the purposeless and needless imposition of

21 pain and suffering,' and hence an unconstitutional punishment." (quoting *Coker v.*

22 *Georgia*, 433 U.S. 584, 592 (1977) (plurality opinion))). Over time, empirical

23 evidence and philosophical critiques have emerged that have eroded these two

24 justifications for the death penalty, leaving the death penalty with no discernible

25 purpose at all. *See, e.g.*, John J. Donohue & Justin Wolfers, *Uses and Abuses of*

26 *Empirical Evidence in the Death Penalty Debate*, 58 Stan. L. Rev. 791, 794, 843

27 (2005); Carol S. Steiker, *No, Capital Punishment Is Not Morally Required:*

28 *Deterrence, Deontology, and the Death Penalty*, 58 Stan. L. Rev. 751 (2005).

1    Because Morris's death sentence was imposed arbitrarily when compared
2    with other cases involving either a sentence of death or a sentence of life
3    imprisonment, and because the death penalty serves no valid penological purpose,
4    Morris's death sentence is unconstitutional. There is no rational, constitutionally
5    permissible basis for distinguishing Morris's case, or the few cases in which the
6    death penalty has been imposed in Arizona and in the United States, from the many
7    cases in which it has not been imposed. Because Morris's sentence violates his
8    Eighth and Fourteenth Amendment rights, he is entitled to relief.

9                                    **CLAIM THIRTY-FIVE**

10   **Arizona's capital-sentencing scheme violates the Eighth and**
     **Fourteenth Amendments because it affords the prosecutor**
11   **unbridled discretion to seek the death penalty.**

12       Morris raised this claim on direct appeal. (DA 29 at 63.) The Arizona
13   Supreme Court did not address the claim on the merits, and instead summarily
14   dismissed it at the end of its opinion. *See State v. Morris*, 160 P.3d 203, 221-22
15   (Ariz. 2007). Because this claim has not been adjudicated by the Arizona state
16   courts on the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do
17   not apply to this Court's review of the claim. If this instead constituted a decision
18   on the merits, then the state court's rejection of the claim was contrary to, or
19   involved an unreasonable application of, clearly established federal law, as
20   determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In
21   addition, it constituted an unreasonable determination of the facts in light of the
22   evidence presented. *See* 28 U.S.C. § 2254(d)(2).

23       In Arizona, each prosecutor has the sole authority and complete discretion to
24   determine whether to seek the death penalty as a sentencing option, following her
25   unreviewable determination that one or more aggravating circumstances exist. This
26   discretion is limited only by the whims of each individual prosecutor as to which
27   cases are appropriate for the death penalty. *See State v. Harding*, 670 P.2d 383, 397
28   (Ariz. 1983). Arizona's scheme thus allows arbitrary and capricious charging

decisions and creates a substantial risk of variation between similar cases. Such "arbitrary and wanton" discretion in seeking a death sentence, *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.), leads to the "wanton[] and freakish[]" imposition of the death sentence. *Furman v. Georgia*, 408 U.S. 238, 310 (1972) (Stewart, J., concurring). *But see Gregg v. Georgia*, 428 U.S. 153, 199 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). The fact that Arizona prosecutors have unbridled discretion to seek the death penalty violates the Eighth and Fourteenth Amendments. Morris's death sentence must therefore be vacated.

## CAIM THIRTY-SIX

**Arizona's capital-sentencing scheme discriminates against indigent young male defendants, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.**

Morris raised this claim on direct appeal. (DA 29 at 63.) The Arizona Supreme Court did not address the claim on the merits, and instead summarily dismissed the claim.. *See State v. Morris*, 160 P.3d 203, 222 (Ariz. 2007). Because this claim has not been adjudicated by the Arizona state courts on the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim. If this instead constituted a decision on the merits, then the state court's rejection of the claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(2).

Morris was sentenced pursuant to a statutory scheme that is discriminatorily applied. The Fourteenth Amendment guarantees that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause protects criminal defendants from being sentenced based on purposeful discrimination. *McCleskey v. Kemp*, 481 U.S. 279,

292 (1987). Still, Arizona's death row is predominantly populated by indigent males who committed their crimes when young men. Although women commit nearly 12% of all murders and non-negligent manslaughters, only three of the 120 persons on Arizona's death row are women. *See* FBI, *Crime in the United States 2015*, *Table 42: Arrests by Sex*, *2015*, https://ucr.fbi.gov/crime-in-the-u.s/2015/crime-in-the-u.s.-2015/tables/table-42 (last visited Feb. 16, 2018); ADOC, *Death Row Demographics*, http://corrections.az.gov/node/431 (last visited Feb. 16, 2018). Indeed, research suggests that "women homicide defendants receive more favorable treatment at each stage of the criminal process," even in capital cases. Shatz & Dalton, *Challenging the Death Penalty with Statistics*, 34 Cardozo L. Rev. 1227, 1251–53 (2013) (citing studies finding gender disparities in the imposition of death sentences). Moreover, "numerous studies . . . have concluded that individuals accused of murdering white victims, as opposed to black or other minority victims, are more likely to receive the death penalty." *Glossip v. Gross*, 135 S. Ct. 2726, 2760-61 (2015) (Breyer, J., dissenting) (citing studies establishing the impact of victims' race on capital-murder charges and death sentences).

If a defendant similarly situated to Morris happened to have been a woman, there would likely have been no sentence of death imposed. Nothing regarding the nature of the crime, or the aggravating or mitigating circumstances, can explain this disproportionate pattern other than systemic discrimination on the basis of race, class, and sex. The discriminatory application of the death penalty in Arizona violates Morris's constitutional rights as guaranteed by the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution.

These errors violated Morris's constitutional rights and prejudiced him. They affected all phases of the trial against him. Morris is entitled to evidentiary development and relief.

/ / /

/ / /

## CLAIM THIRTY-SEVEN

**Arizona's capital sentencing scheme violates the Fifth, Eighth, and Fourteenth Amendments because it denies capital defendants the benefit of proportionality review of their sentences.**

Morris raised this claim on direct appeal. (DA 29 at 63–64.) The Arizona Supreme Court did not address the claim on the merits, and instead summarily dismissed it at the end of its opinion. *See State v. Morris*, 160 P.3d 203, 222 (Ariz. 2007). Because this claim has not been adjudicated by the Arizona state courts on the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim. If this instead constituted a decision on the merits, then the state court's rejection of the claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(2).

The Arizona Supreme Court failed to conduct a comparative proportionality review of Morris's death sentence, rendering the sentence unconstitutional. When the Supreme Court sanctioned the modern death penalty scheme, it did so based on the belief that state supreme courts would conduct careful and effective proportionality reviews in individual cases to guard against the arbitrary and capricious infliction of the death penalty. *See Gregg v. Georgia*, 428 U.S. 153, 203–06 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) (highlighting proportionality review on appeal as an important protection against caprice in sentencing); *Proffitt v. Florida*, 428 U.S. 242, 258 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) (same); *see also Glossip v. Gross*, 135 S. Ct. 2726, 2763 (2015) (Breyer, J., dissenting) (recognizing the importance of comparative proportionality review to avoid arbitrary imposition of the death penalty). *But see Pulley v. Harris*, 465 U.S. 37, 50–51 (1984). The Arizona Supreme Court, however, has abandoned this procedural safeguard. *See State v. Salazar*, 844 P.2d

566, 583–84 (Ariz. 1992). The discontinuation of proportionality review allows for the death penalty to be applied arbitrarily in Arizona and violates the Fifth, Eighth, and Fourteenth Amendments. Morris's sentence, affirmed without a comparative proportionality review, is constitutionally unsound, and Morris is entitled to relief.

### CLAIM THIRTY-EIGHT

**Arizona's death penalty scheme is unconstitutional because it does not sufficiently channel the sentencing jury's discretion to impose death because it includes so many aggravating circumstances that virtually every defendant convicted of first-degree murder is eligible for death and because it does not set forth objective standards to guide the jury in weighing the aggravating circumstances against the mitigating circumstances, in violation of the Eighth and Fourteenth Amendments.**

Morris raised this claim on direct appeal. (DA 29 at 64–65.) The Arizona Supreme Court did not address the claim on the merits, and instead summarily dismissed it at the end of its opinion. *See State v. Morris*, 160 P.3d 203, 222 (Ariz. 2007). Because this claim has not been adjudicated by the Arizona state courts on the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim. If this instead constituted a decision on the merits, then the state court's rejection of the claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(2).

Under the Supreme Court's decisions in *Gregg v. Georgia*, 428 U.S. 153 (1976), and *Furman v. Georgia*, 408 U.S. 238 (1972), a state's "capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988) (quoting *Zant v. Stephens*, 462 U.S. 862, 877 (1983)). "If a State has determined that death should be an available penalty for certain crimes,

then it must administer that penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not." *Spaziano v. Florida*, 468 U.S. 447, 460 (1984), *overruled on other grounds by Hurst v. Florida*, 136 S. Ct. 616 (2016). If a State's scheme offers "no principled way" of making that distinction, *Godfrey v. Georgia*, 446 U.S. 420, 433 (1980) (plurality opinion), the death penalty is "cruel and unusual in the same way that being struck by lightning is cruel and unusual," *Furman v. Georgia*, 408 U.S. 238, 309 (1972) (Stewart, J., concurring).

The narrowing process must, moreover, be established by statute. *See Gregg*, 428 U.S. at 207 (stating that the selection of the persons eligible to be prosecuted and ultimately sentenced to death "[must] always [be] circumscribed by . . . legislative guidelines"); *Lowenfield*, 484 U.S. at 246 (the "legislature" must provide a means of "narrow[ing] the class of death eligible murderers"). "Part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates 'standardless [sentencing] discretion.'" *Godfrey*, 446 U.S. at 428 (alteration in original) (quoting *Gregg*, 428 U.S. at 196).

Arizona's death penalty statute violates these mandates of the Supreme Court. Under Arizona law, a broad range of conduct constitutes first-degree murder, including intentional killings, premeditated killings, killings committed in the course of a number of other crimes, and the killings of law-enforcement officers in the line of duty. *See* Ariz. Rev. Stat. § 13-1105(A). This initial "pool" of individuals eligible for the death penalty is so broadly defined that it encompasses the vast majority of murders actually committed. This is seen both by a reading of the statute, which fails to meaningfully distinguish first-degree murder and second-degree murder, and through a review of the actual cases, which demonstrates that almost all murders in Arizona could in fact be categorized as first-degree murder.

The narrowing function, then, is ostensibly performed by the aggravating factors; a jury must find at least one to make a first-degree-murder defendant

death-eligible. However, the proliferation of aggravating factors under the Arizona scheme has made virtually every person convicted of first-degree murder in Arizona eligible for the death penalty. The aggravating factors sweep so expansively that they do not meaningfully separate out a group of offenders whose crimes are so egregious they should be eligible for the death penalty. *See id.* § 13-703(F); *compare, e.g.*, *State v. Wallace*, 728 P.2d 232, 238 (Ariz. 1986) (stating that a murder with no apparent motive is death-eligible), *and State v. Chaney*, 686 P.2d 1265, 1282 (Ariz. 1984) (finding that the defendant used insufficient force and is therefore death-eligible), *with State v. Smith*, 687 P.2d 1265, 1266–67 (Ariz. 1984) (discussing crime committed with specific motive of eliminating a witness), *and State v. Summerlin*, 675 P.2d 686, 696 (Ariz. 1983) (finding that the defendant used excessive force and so was death-eligible). Under Arizona law, the sentencer must impose a death sentence whenever it "finds one or more of the aggravating circumstances . . . and then determines that there are no mitigating circumstances sufficiently substantial to call for leniency." Ariz. Rev. Stat. § 13-703(E) (current version at Ariz. Rev. Stat. § 13-751(E) (2012)).

Because both Arizona's definition of first-degree murder and its aggravating factors sweep so broadly, the Arizona statute fails to perform the constitutionally required function of channeling the sentencer's discretion toward imposing a death sentence for only the most egregious of murders and therefore violates the Eighth and Fourteenth Amendments. *See Lowenfield*, 484 U.S. at 244. Because Morris was sentenced to death under Arizona's overbroad capital-sentencing scheme, his sentence is constitutionally infirm, and he is entitled to relief.

In addition, to avoid the arbitrary and inconsistent imposition of death on a "jury-by-jury" basis, clear instructions must be provided to ensure that juries faced with similar evidence will return similar verdicts. *See Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) ("[C]apital punishment [must] be imposed fairly, and with reasonable consistency, or not at all."). There was no guarantee that Morris's death

1  sentence was not arbitrarily imposed because the sentencing jury had no guidance
2  in determining whether the mitigating evidence presented was sufficiently
3  substantial to call for leniency. In the absence of such guidance, the risk that
4  Morris's death sentence was the result of unfettered discretion is intolerably high.

5      In light of the qualitative difference between a sentence of death and a
6  sentence to a term of imprisonment, the Eighth Amendment demands a higher
7  degree of "reliability in the determination that death is the appropriate punishment
8  in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (joint
9  opinion of Stewart, Powell, and Stevens, JJ.). In *Furman*, the United States Supreme
10  Court declared that a death-sentencing procedure is unconstitutional when it
11  provides "no meaningful basis for distinguishing the few cases in which [death] is
12  imposed from the many cases in which it is not."  408 U.S. at 313 (White, J.,
13  concurring) (per curiam); *see also, e.g.*, *Maynard v. Cartwright*, 486 U.S. 356, 362
14  (1988); *Godfrey v. Georgia*, 446 U.S. 420, 427–28 (1980) (plurality opinion).
15  "*Furman* mandates that where discretion is afforded a sentencing body on a matter
16  so grave as the determination of whether a human life should be taken or spared,
17  that discretion must be suitably directed and limited so as to minimize the risk of
18  wholly arbitrary and capricious action."  *Gregg*, 428 U.S. at 189.

19      Due process requires that a jury be fully and correctly instructed regarding
20  the law related to its sentencing discretion and powers in order to prevent an
21  unconstitutional and arbitrary deprivation of the defendant's liberty. *See Hicks v.*
22  *Oklahoma*, 447 U.S. 343, 346–47 (1980). Arizona's death penalty statute provides
23  no objective standards to guide the jury in weighing aggravating and mitigation
24  circumstances. *See* Ariz. Rev. Stat. § 13-703. However, the ultimate responsibility
25  for such instruction rests with the judge, not with counsel. *See Taylor v. Kentucky*,
26  436 U.S. 478, 488–89 (1978) (holding that the "arguments of counsel cannot
27  substitute for instructions by the court"). The death penalty is the ultimate
28  punishment and, as such, it is intended to be reserved for only those murders that

are "above the norm." This intended limitation on death sentences also serves as mitigating information because it informs the jury that not every homicide or even death penalty case warrants the death penalty and that this case may be one that does not. Therefore, the jury should have been instructed that only murders "above the norm" may qualify for the death penalty so that their deliberations and ultimate sentence reflected that fact. By not informing the jury of this fact, the trial court violated Morris's rights under the Sixth, Eighth, and Fourteenth Amendments.

Because neither the aggravating factors under Arizona's death penalty scheme nor the instructions given during the penalty phase adequately channeled the jury's discretion in imposing a sentence of death, Morris was sentenced in violation of the Eighth and Fourteenth Amendments and is entitled to relief.

### CLAIM THIRTY-NINE

**Execution by lethal injection is cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.**

Morris raised this claim on direct appeal. (DA 29 at 65.) The Arizona Supreme Court did not address the claim on the merits, and instead summarily dismissed it at the end of its opinion. *See State v. Morris*, 160 P.3d 203, 222 (Ariz. 2007). Because this claim has not been adjudicated by the Arizona state courts on the merits, then the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim. If this instead constituted a decision on the merits, the state court's rejection of the claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(2).

### A.   Arizona has a troublesome history of carrying out lethal-injection executions.

In July 2005, Morris was sentenced to death by lethal injection. (IOR 178.)

1    Arizona Revised Statutes § 13-757(A) provides that "[t]he penalty of death shall be

2    inflicted by an intravenous injection of a substance or substances in a lethal quantity

3    sufficient to cause death, under the supervision of the state department of

4    corrections." There is no additional statutory guidance provided to Arizona

5    Department of Corrections ("ADC") in carrying out the execution. The procedures

6    implemented and the drugs used during the last seven years demonstrate that

7    Arizona's lethal-injection process is cruel and unusual.

8         Since the time that Morris was sentenced to death, Arizona has carried out

9    15 executions—all via lethal injection using various combinations of drugs.

10   *See* ADC,   Executions   Prior   to   1992   &   Execution   Methods,

11   https://corrections.az.gov/public-resources/death-row/executions-prior-1992-

12   execution-methods (last visited Feb. 12, 2018). Based on ADC's actions in those

13   dozen-plus executions, there are three reasons that ADC cannot constitutionally

14   carry out executions via lethal injection. First, ADC has not complied with the law

15   in obtaining the substances to be used in executions. A state cannot violate the law

16   while carrying out the law. Second, ADC has been unable to follow its written

17   protocol time and time again. Third, ADC has selected drugs that result in human

18   experimentation. These factors both individually and combined make Arizona's use

19   of lethal injection inherently cruel and unusual and therefore a violation of the

20   Eighth Amendment.

21              **1.     Illegal importation.**

22        Arizona killed Jeff Landrigan on October 26, 2010, using the drug sodium

23   thiopental obtained from, at that time, an unknown foreign source. *See Landrigan*

24   *v. Brewer*, No. CV-10-02246-PHX-ROS, 2010 WL 4269559, at *4 (D. Ariz. Oct.

25   25, 2010), *stay of execution aff'd*, 625 F.3d 1144 (9th Cir. 2010), *stay vacated*, 562

26   U.S. 996 (2010) ("During argument, counsel for the State declined to reveal where

27   ADC obtained the sodium thiopental for Plaintiff's execution but acknowledged

28   that it was not obtained from or manufactured by Hospira, Inc., which Plaintiff

1    alleges is the only manufacturer of sodium thiopental approved by the Food and

2    Drug Administration."). Several months later, on May 4, 2011, eighteen hours

3    before its scheduled execution of Donald Beaty, ADC announced that it intended

4    to use a different drug because "the Department of Justice informed ADC that its

5    supply of sodium thiopental was imported without compliance with the Controlled

6    Substance Act." *See West v. Brewer*, No. CV-11-1409-PHX-NVW, 2011 WL

7    6724628, at *10 (D. Ariz. Dec. 21, 2011). As was later shown, the drug sodium

8    thiopental used in Landrigan's execution (and the one carried out after his) was

9    imported in violation of federal law. *See, e.g.*, *Cook v. FDA*, 733 F.3d 1, 11–12

10   (D.C. Cir. 2013).

11   Again, recently, ADC imported sodium thiopental that has been detained by

12   the Food and Drug Administration. *See* Defs.' Notice in Resp. to Ct. Order at 1–2,

13   *Wood v. Ryan*, No. 2:14-cv-01447-NVW (D. Ariz. filed Nov. 3, 2015), ECF No.

14   79. Given ADC's past and current actions, it is cruel and unusual to permit the

15   government to carry out the law by violating the law. Since that time, ADC has

16   revised Department Order 710 (D.O. 710), which sets out the procedures for

17   carrying out an execution, to remove the one limitation on the source of the lethal

18   chemicals to be used in an execution: that ADC obtain compounded execution drugs

19   only from a certified or licensed compounding pharmacist or pharmacy in good

20   standing with the appropriate licensing board. *See* ADC, Dep't Order: 710—

21   Execution    Procedures    (eff.    June    13,    2017),    Att.    D    § C.2,

22   https://corrections.az.gov/sites/default/files/policies/700/0710_062917.pdf

23   [hereinafter D.O. 710 (eff. June 13, 2017)]. Accordingly, nothing in D.O. 710 (eff.

24   June 13, 2017) requires that the lethal drugs be obtained from a legal, properly

25   licensed source. *See id.*

26   **2.    Protocol violations.**

27   In December 2011, the district court held a trial, issued an opinion, and found

28   that "[f]ive prisoners were executed by lethal injection between October 2010 and

343

July 2011. At the direction of those responsible for administering these executions, *ADC failed to follow certain components of its execution protocol*." *West v. Brewer*, No. CV-11-1409-PHX-NVW, 2011 WL 6724628, at \*7 (D. Ariz. Dec. 21, 2011) (emphasis added). In January 2012, ADC amended its protocol and removed many of the provisions it was found to have violated—including minimum qualifications for and training of the IV team members.

In February 2012, with execution dates pending, two prisoners, Robert Moormann and Robert Towery, challenged the change to the protocol. On appeal, the court noted, "[e]ven after the appeal was filed and hours before the argument, Arizona yet again changed course as to its plans for the executions." *Towery v. Brewer*, 672 F.3d 650, 652 (9th Cir. 2012) (per curiam). ADC changed the drug formula because it discovered at the last minute that one of the drugs had expired. *Id.* The court remarked: "How such a discovery escaped the State for the past six weeks is beyond us, and gives us pause as to the regularity and reliability of Arizona's protocols." *Id.* at 653. During that case, the court upheld the denial of a preliminary injunction but *only* based on the protocol "as amended by the State during oral argument," and it further noted that "the State's frequent changes to its protocol during litigation are not sustainable." *Id.*

After the Ninth Circuit allowed the executions to go forward, known problems occurred during the execution of Robert Towery. Those concerns were raised by another prisoner facing execution, Samuel Lopez. *See Lopez v. Brewer*, 680 F.3d 1068, 1073 (9th Cir. 2012) ("Towery's recent execution is the primary basis of Lopez's claim."). Those problems included concerns with setting the IV lines. *See id.* "Although [the court] uph[e]ld the district court's decision, [it] caution[ed], yet again, that Arizona's ad hoc approach risks going beyond *Baze*'s safe harbor." *Id.* at 1075. The court expressed grave concern with the State's method of changing its protocol hours before an execution, and the State essentially asked the court to "trust that it will exercise its discretion in a

1    constitutionally permissible manner." *Id.* at 1070.

2       Indeed, in response to the lawsuit related to Lopez's execution, several Ninth

3    Circuit judges noted, "In case after case, [the court has] been forced to rely on the

4    ad hoc representations of the state's counsel in conducting one of the gravest

5    responsibilities that [it is] asked to perform: approving the state's plan to take a

6    human life." *Lopez v. Brewer*, 680 F.3d 1084, 1095 (9th Cir. 2012) (mem.)

7    (Reinhardt, J., dissenting from denial of rehearing en banc). As explained, "[t]he

8    trouble that plagued Towery's execution highlights the practical problems this

9    obsessive secrecy creates for any meaningful litigation in the constricted time

10   periods permitted by Arizona's moving target approach to execution procedures."

11   *Lopez*, 680 F.3d at 1083 (Berzon, J., concurring in part and dissenting in part).

12       The "obsessive secrecy" taints the entire execution process. There are several

13   aspects of the execution that are never revealed to the prisoner or the public. Before

14   the execution takes place, D.O. 710 does not provide a mechanism for notifying the

15   prisoner of the qualifications and selection of the Special Operations and IV Team

16   members to administer the drugs selected for the execution, let alone within a

17   meaningful time-frame to allow for judicial review. Nothing in D.O. 710 requires

18   that any member of the IV Team possess certification or licensure that would at

19   least meet the minimal qualifications necessary for IV insertion recommended by

20   the Arizona State Board of Nursing.

21       Nor does D.O. 710 provide for disclosure of the chain of custody and storage

22   conditions of the drugs procured for and to be used in the execution, thus defeating

23   any ability of the prisoners to evaluate whether the drugs have been continuously

24   stored, for example within the temperature limits appropriate for that particular

25   drug.

26       In the years since Towery's execution, Arizona has intensified the secrecy

27   surrounding the execution process. For example, prisoners executed several years

28   ago were provided the source of the lethal-injection drugs. Reinterpreting already

existing statutes, ADC amended D.O. 710 in the last few years to now state,

> The anonymity of any person, as defined in A.R.S. § 1-215(28) and A.R.S. § 13-105(30), who participates in or performs any ancillary function(s) in the execution, *including the source of the execution chemicals*, and any information contained in records that would identify those persons are, as required by statute, to remain confidential and are not subject to disclosure. A.R.S. § 13-757(C).

D.O. 710 (eff. June 13, 2017) at 2 (emphasis added).

Arizona has made it impractical to determine the constitutionality of its protocol and procedures by keeping critical information secret and releasing it only after a court orders it to do so. *See Schad v. Brewer*, No. CV-13-2001-PHX-ROS, 2013 WL 5551668, at *10 (D. Ariz. Oct. 7, 2013) (requiring disclosure of information to plaintiff regarding lethal-injection drugs); *Wood v. Ryan*, 759 F.3d 1076, 1088 (9th Cir. 2014), *stay of execution vacated*, 135 S. Ct. 21 (2014) (mem.) (requiring ADC to disclose "(a) the name and provenance of the drugs to be used in the execution and (b) the qualifications of the medical personnel, subject to the restriction that the information provided will not give the means by which the specific individuals can be identified").

### 3. Human experimentation.

Arizona's most recent execution occurred on July 23, 2014. Arizona executed Joseph Wood using experimental drugs; it took nearly two hours for Wood to die. *See Glossip*, 135 S. Ct. at 2783 (Sotomayor, J., dissenting) ("Despite being administered 750 milligrams of midazolam, Wood had continued breathing and moving for nearly two hours[.]"). The concoction to be used—50 milligrams of hydromorphone and 50 milligrams of midazolam—had never been used by Arizona and the combination (albeit in different amounts) had been used *with problems* in January 2014 in Ohio. *See* Lawrence Hummer, *I Witnessed Ohio's Execution of Dennis McGuire. What I Saw Was Inhumane*, The Guardian, (Jan. 22, 2014), https://www.theguardian.com/commentisfree/2014/jan/22/ohio-mcguire-

execution-untested-lethal-injection-inhumane. Arizona had no scientific or medical basis for its formula.

Wood's execution began at 1:52 p.m. Wood lay on the gurney gasping for breath for over an hour. Around 3:00 p.m., one of his attorneys contacted the district court and filed an emergency motion; the court held a hearing while the execution was occurring. *See* Mot. for Emergency Stay of Execution, *Wood v. Ryan*, No. 2:14-cv-01447-NVW (D. Ariz. July 23, 2014), ECF No. 26; Minute Entry, *Wood*, No. 2:14-cv-01447-NVW (D. Ariz. July 23, 2014), ECF No. 33; Order, *Wood*, No. 2:14-cv-01447-NVW (D. Ariz. July 24, 2014) , ECF No. 34.

During the emergency hearing, at 3:25 p.m., the attorney for the State represented that Wood was given a "second dose of drugs." *Wood*, No. 2:14-cv-01447-NVW, Tr. July 23, 2014, at 7:22. Wood was still alive, but died during the hearing at 3:49 p.m. The State later revealed that Wood was given 15 doses of the drugs—and it had already administered 12 doses at the time the State's attorney told the court that two doses had been given. *See* Michael Kiefer, *Arizona inmate injected 15 times, records show*, The Arizona Republic (Aug. 1, 2014), http://www.azcentral.com/story/news/local/Arizona/2014/08/01/arizona-botched-execution-report-injections/13492511.[58]

The use of 15 doses of the drug formula was *not* in the written protocol, but the Director claimed that there was nothing wrong with the execution. In fact, in a press release, ADC indicated that the administration of 750 milligrams of drugs was "permitted" under the protocol. *See* ADC Press Release, Independent Review Process for Wood Execution Underway (Aug. 1, 2014), https://corrections.az.gov/article/independent-review-process-wood-execution-underway. Wood's execution resulted in human experimentation and failed to comply not only with ADC's written protocol but also with the Eighth Amendment.

---

[58] Documentation of Wood's execution is available here: http://archive.azcentral.com/ic/pdf/wood-execution-documentation.pdf.

1    ADC has since agreed not to use midazolam, or any other benzodiazepine, or

2    any paralytic in any execution. *See* Stipulated Settlement Agreement at 1, *Wood v.*

3    *Ryan*, No. 2:14-cv-01447-NVW, (D. Ariz. filed Dec. 19, 2016), ECF No. 152;

4    Stipulated Settlement Agreement at 4, *Wood v. Ryan*, No. 2:14-cv-01447-NVW,

5    (D. Ariz. filed June 21, 2017), ECF No. 186. But ADC does not promise to abide

6    by any other limitations of the types of drugs that it could designate for use in

7    executions in future versions of D.O. 710. And, as noted above, ADC has refused

8    any limitation on the sources of any execution drugs.

9    **B.    Lethal injection as carried out by Arizona is cruel and unusual.**

10    As demonstrated above, the State of Arizona cannot carry out lethal injection

11    in a manner that comports with the Constitution. As Circuit Judge Kozinski noted

12    regarding lethal injection, "Whatever the hopes and reasons for the switch to drugs

13    [from prior methods], they proved to be misguided. Subverting medicines meant to

14    heal the human body to the opposite purpose was an enterprise doomed to failure."

15    *Wood*, 759 F.3d at 1102 (Kozinski, J., dissenting from denial of rehearing en banc).

16    "The [lethal-injection] enterprise is flawed. Using drugs meant for individuals with

17    medical needs to carry out executions is a misguided effort to mask the brutality of

18    executions by making them look serene and peaceful—like something any one of

19    us might experience in our final moments." *Id.* at 1102–03. But, as Judge Kozinski

20    explained, executions are brutal, and "[i]f we as a society want to carry out

21    executions, we should be willing to face the fact that the state is committing a

22    horrendous brutality on our behalf." *Id.* at 1103.

23    In 2018, in Arizona, we have reached the point that lethal injection cannot be

24    carried out in a manner consistent with principles of dignity, that does not impose

25    a lingering death, and that avoids pain and suffering. For these reasons, lethal

26    injection is unconstitutional, and Morris's sentence of death should be vacated.

27    / / /

28    / / /

**CLAIM FORTY**

**Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments because it requires a death sentence whenever one aggravating circumstance and no mitigating circumstances are found with respect to an eligible defendant.**

Morris raised this claim on direct appeal. (DA 29 at 65–66.) The Arizona Supreme Court did not address the claim on the merits, and instead summarily dismissed it at the end of its opinion. *See State v. Morris*, 160 P.3d 203, 222 (Ariz. 2007). Because this claim has not been adjudicated by the Arizona state courts on the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim. If this instead constituted a decision on the merits, then the state court's rejection of the claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(2).

Because death is the ultimate penalty, unlike any other, the sentencer must provide an "individualized determination on the basis of the character of the individual and the circumstances of the crime." *Zant v. Stephens*, 462 U.S. 862, 879 (1983); *see also Woodson v. North Carolina*, 428 U.S. 280, 303 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) (acknowledging that death is a punishment different from all other sanctions). Under Arizona law, the trier of fact is required to impose a death sentence whenever it "finds one or more of the aggravating circumstances . . . and then determines that there are no mitigating circumstances sufficiently substantial to call for leniency." Ariz. Rev. Stat. § 13-703(E) (renumbered at § 13-751(E)). Arizona's statute effectively places a "'thumb [on] death's side of the scale,' thus 'creat[ing] the risk [of] treat[ing] the defendant as more deserving of the death penalty.'" *Sochor v. Florida*, 504 U.S. 527, 532 (1992) (citations omitted; alterations in original). In Arizona, a death

1    sentence is the default sentence once at least one aggravating circumstance has been
2    proven. Here, the court instructed the jury during the penalty phase that "[i]f no
3    jurors find that the defendant proved any mitigation by a preponderance of the
4    evidence *you must return a verdict of death*." (Tr. July 18, 2005 at 97) (emphasis
5    added).

6        What is more, mitigating evidence is not all considered because of the use of
7    a screening mechanism designed to prevent the sentencer from considering such
8    evidence. *See, e.g.*, *State v. Ramirez*, 871 P.2d 237, 252–53 (Ariz. 1994) (requiring
9    the defendant to prove mitigating evidence by a preponderance of the evidence
10   before the sentencer must "accept" the evidence as mitigating). In Morris's case,
11   the jury was instructed consistently with this screening mechanism that "the
12   defendant must prove the existence of mitigation by a preponderance of the
13   evidence." (Tr. July 18, 2005 at 91.) As a result, a sentencer is not free to consider
14   any circumstance for a sentence less than death if it was not proven by the defendant
15   by a preponderance of the evidence.

16       The use of such a screening mechanism, coupled with the statute where the
17   default sentence is death, deprives the jury of discretion to impose a sentence other
18   than death, in violation of the Eighth and Fourteenth Amendments. *See Woodson*,
19   428 U.S. at 302–03. Morris's sentence is therefore constitutionally infirm, and he
20   is entitled to relief.

### CLAIM FORTY-ONE

21   
22   **Due Process requires that this Court re-evaluate Morris's death**
     **sentence in light of the significant changes to Morris's person and**
23   **circumstances in the twelve and a half years since he was sentenced.**

24       This claim was not raised in state court. Morris alleges that this claim was
25   not ripe for review until now. *See Panetti v. Quarterman*, 551 U.S. 930, 947 (2007)
26   (holding claim raised for the first time in second habeas corpus application was not
27   barred when the claim was not ripe at the time the first application was filed).
28   Because Morris was sentenced to death over twelve years ago, premised in part on

a prediction of future dangerousness that has not come to fruition, due process requires that his death sentence be re-evaluated. Morris will demonstrate at an evidentiary hearing that his death sentence is unconstitutional because he is not the same person who was sentenced to death in 2005. Because this claim has not been adjudicated by Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not restrict review, and the Court may consider the claim de novo. *See Dickens v. Ryan*, 740 F.3d 1302, 1320–21 (9th Cir. 2014) (en banc).

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). A capital sentencing "must satisfy the requirements of the Due Process Clause," *Gardner v. Florida*, 430 U.S. 349, 358 (1977) (plurality opinion), and capital defendants retain a liberty interest in life even after conviction and sentence, *see Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 288 (1998) (O'Connor, J., concurring in part and concurring in the judgment, joined by Souter, J., Ginsburg, J., and Breyer, J.); *id.* at 290–91 (Stevens, J., dissenting). These principles demonstrate that if circumstances have substantially changed between the time when a death sentence is imposed and when it will be carried out, due process requires that the propriety of the sentence be re-evaluated in light of the current circumstances and characteristics of the defendant. *See Kelly v. Brewer*, 525 F.2d 394, 399–400 (8th Cir. 1975) (finding due process required meaningful periodic reviews of inmates in segregation to determine if segregation is still appropriate). Because the State's presentation at Morris's trial emphasized the danger he could pose if sentenced to life imprisonment, as discussed *supra* in Claim Thirteen, the Court should consider whether that conclusion is still accurate. Since Morris was sentenced in 2005, he has been successfully incarcerated and he has demonstrated a low risk of violence.

First, not only has Morris proven to be non-violent in prison, but he has been a model of good behavior. *See State v. Watson*, 628 P.2d 943, 945 (Ariz. 1981)

1  (setting aside death sentence in part because of defendant's good conduct while in

2  prison); *State v. Richmond*, 886 P.2d 1329, 1336–37 (Ariz. 1994) (reducing death

3  sentence to life imprisonment in part because of evidence of the defendant's

4  changed character). Contrary to the State's characterization of Morris at trial,

5  Dr. Sullivan wrote that "Defendants with similar profiles to Mr. Morris report

6  relatively few antisocial traits and behaviors. Defendants with such profiles have

7  been shown to have low rates of institutional misconduct when compared with other

8  institutionalized individuals." (PCR Pet. Ex. V at 2.) In fact, as observed by

9  Dr. Becker, "Mr. Morris appears to have been a model prisoner with no disciplinary

10  action reports that this evaluator is aware of. This evaluator is of the opinion that if

11  Mr. Morris continues to be incarcerated he will not pose a risk for misconduct, and

12  this opinion concurs with that of Dr. Sullivan." (PCR Pet. Ex. T at 20.) Thus, the

13  State's argument that Morris would continue to pose a danger if he was not executed

14  has proven untrue and is contradicted by expert opinions.

15       Furthermore, the State's concern regarding Mr. Morris is disputed not only

16  by the experts in this case, but is apparently no longer shared by the ADC. Since

17  Morris was placed on death row, Arizona has made significant changes to the

18  housing of death-row prisoners, which diminish the differences between the

19  incarceration conditions of those sentenced to life without the possibility of parole

20  and those sentenced to death. *See generally* Gabriella Robles, Condemned to

21  Death—And Solitary Confinement, The Marshall Project (July 23, 2017),

22  https://www.themarshallproject.org/2017/07/23/condemned-to-death-and-solitary-

23  confinement#.N9igqzex9 (explaining change in ADC rules which allow death row

24  prisoners with suitable disciplinary records to be housed in lower-security settings).

25  Under the old rules, death-row prisoners were automatically classified as maximum

26  security and kept in solitary confinement. New rules permit death-row prisoners

27  who do not pose a risk to be kept in lower-security settings with more out-of-cell

28  time, contact visits with family and legal counsel, outdoor group recreation, and the

1    opportunity to work or take education courses. Morris is no longer housed in a
2    maximum security unit and has been approved for close custody because he met the
3    prison's requirements for reclassification. In addition to showing that ADC does
4    not agree with the State's assessment of Morris's risk level, these changes mean
5    that Morris is not housed in the strictest manner merely because he is on death row.
6    Because these changes occurred after Morris's 2005 trial, the jury could not have
7    known that sentencing Morris to death could very well place him in the same
8    custodial setting as though he had been sentenced to life imprisonment. Morris has
9    not committed any violence in this setting and is unlikely to do so in the future.

10       Due process dictates that Morris has the right to have the appropriateness of
11   his death sentence re-evaluated in light of the changes that have occurred since he
12   was sentenced. At an evidentiary hearing, Morris will demonstrate that these
13   changes are significant, and this Court should re-weigh the mitigation in this case
14   to determine whether a death sentence remains valid.

## CLAIM FORTY-TWO

**The imposition of the death penalty on persons under the age of twenty-five at the time of the offense serves no penological purpose and therefore constitutes cruel and unusual punishment.**

18       This claim was not raised in state court. Morris alleges he can overcome any
19   default of this claim by showing cause and prejudice, including because of the
20   ineffective assistance of appellate and state post-conviction counsel. *See Martinez*
21   *v. Ryan*, 566 U.S. 1, 9 (2012); *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000);
22   *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *but see Davila v. Davis*,
23   137 S. Ct. 2058 (2017). Morris will demonstrate at an evidentiary hearing that
24   appellate and post-conviction counsel fell below the standards of minimally
25   competent capital attorneys and that those failures prejudiced him. Alternatively,
26   he alleges that any procedural bar is not adequate or independent or that imposing
27   default would be a miscarriage of justice. Because this claim has not been
28   adjudicated by the Arizona state courts, the limitations on relief imposed by

1   28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider
2   the merits of the claim de novo. Morris incorporates by specific reference all facts,
3   allegations, and arguments made elsewhere in this Petition.

4           In *Roper v. Simmons*, 543 U.S. 551 (2005), the United States Supreme Court
5   placed a categorical ban on the death penalty for persons under the age of eighteen
6   years old. As the Court noted in *Roper*, "[t]he prohibition against 'cruel and unusual
7   punishments,' like other expansive language in the Constitution, must be
8   interpreted according to its text, by considering history, tradition, and precedent,
9   and with due regard for its purpose and function in the constitutional design." *Id.* at
10  560. To implement this framework, the Court has repeatedly "established the
11  propriety and affirmed the necessity of referring to 'the evolving standards of
12  decency that mark the progress of a maturing society' to determine which
13  punishments are so disproportionate as to be cruel and unusual." *Id.* at 560–61
14  (quoting *Trop v. Dulles*, 356 U.S. 86, 100–01 (1958) (plurality opinion)).
15  Accordingly, since *Roper*, the Court has interpreted "the evolving standards of
16  decency" to expand the scope of crimes and/or sentences to which the categorical
17  ban for juveniles is applied. *See, e.g.*, *Graham v. Florida*, 560 U.S. 48, 74–75 (2010)
18  (prohibiting sentences of life imprisonment without parole for juvenile non-
19  homicide offenders); *Miller v. Alabama*, 567 U.S. 460, 487 (2012) (prohibiting
20  mandatory life sentences without parole for juvenile homicide offenders). And, in
21  *Atkins v. Virginia*, 536 U.S. 304, 321 (2002), the Court placed a ban on the
22  execution of those with intellectual disabilities.

23          The Supreme Court has directed that "[c]apital punishment must be limited
24  to those offenders who commit 'a narrow category of the most serious crimes' and
25  whose extreme culpability makes them 'the most deserving of execution.'" *Roper*,
26  543 U.S. at 568 (quoting *Atkins*, 536 U.S. at 319). Recent sociological and
27  neuroscientific research demonstrates that people under twenty-five years of age do
28  not have fully developed brains, are immature, and are vulnerable to peer pressure

and risk-taking behavior. Accordingly, youthful offenders under age twenty-five have the same vulnerabilities as juvenile offenders under age eighteen that the Court recognized in *Roper* are not the worst of the worst. Consequently, execution of individuals who committed offenses under the age of twenty-five does not achieve the constitutionally approved reasons for capital punishment and is unconstitutional.

In *Roper*, the Court observed that there are "[t]hree general differences between juveniles under 18 and adults [that] demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders." 543 U.S. at 569. First, "'[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young[,] . . . often result[ing] in impetuous and ill-considered actions and decisions.'" *Id.* (quoting *Johnson v. Texas*, 509 U.S. 350, 367 (1993)). Second, "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." *Id.* (citing *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982) ("[Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage.")). The third difference noted by the *Roper* court is "that the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed." *Id.* at 570.

The Court concluded that these differences "render suspect any conclusion that a juvenile falls among the worst offenders." *Id.*

> The susceptibility of juveniles to immature and irresponsible behavior means "their irresponsible conduct is not as morally reprehensible as that of an adult." *Thompson* [*v. Oklahoma*, 487 U.S 815, 835 (1988)] (plurality opinion). Their own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment. *See Stanford* [*v.*

1
2
3
4

*Kentucky*, 492 U.S. 361, 395 (1989)] (Brennan, J., dissenting). The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character.

5
6
7
8

*Id.* The Court concluded that "[o]nce the diminished culpability of juveniles is recognized, it is evident that the penological justifications for the death penalty," retribution and deterrence of capital crimes, "apply to them with lesser force than to adults." *Id.* at 571.

9
10
11
12
13
14
15
16

Under the retribution justification, punishment must be based on the moral culpability of the particular defendant. *See Hall v. Florida*, 134 S. Ct. 1986, 1993 (2014). "The diminished capacity of the intellectually disabled lessens moral culpability and hence the retributive value of the punishment." *Id.* And, as described above, juveniles are protected because their "lack of maturity" and "underdeveloped sense of responsibility" "often result in impetuous and ill-considered actions and decisions." *Roper*, 543 U.S. at 569 (internal citations omitted).

17
18
19
20
21
22
23
24
25
26
27
28

The deterrence role of capital punishment, while questionable at best under any circumstances, has even more limited effect on young adults like Morris. Deterrence assumes that the heightened severity of the punishment will discourage criminals from engaging in murder. *See Atkins*, 536 U.S. at 320. Because young adults like Morris are not fully capable of foreseeing consequences and planning for the future, the deterrent effect of capital punishment is consequently diminished. The limitations of young offenders make them less likely to engage in the "'cost-benefit analysis that attaches any weight to the possibility of execution.'" *Roper*, 543 U.S. at 561–62 (quoting *Thompson*, 487 U.S. at 837). There are no legitimate penological reasons for imposing a death sentence on an offender like Morris who possessed the same characteristic vulnerabilities and weaknesses as those offenders under eighteen in all respects relevant to the rationale for

1    categorically exempting such under-eighteen offenders from the death penalty.

2    In *Hall*, the Supreme Court acknowledged that arbitrary numerical cut-offs
3    for application of a categorical ban against capital punishment can themselves be
4    unconstitutional if they fail to include all persons who can fairly demonstrate, with
5    reliable scientific evidence, that they share the condition that is addressed with the
6    categorical ban. 134 S. Ct. at 1993–2001. In *Eddings*, the Supreme Court indicated
7    that courts reviewing a death sentence imposed on a young defendant should focus
8    on more than the defendant's chronological age. 455 U.S. at 115–16. In doing so,
9    the Court recognized that "just as the chronological age of a minor is itself a relevant
10   mitigating factor of great weight, so must the background and mental and emotional
11   development of a youthful defendant be duly considered in sentencing." *Id.* at 116.

12   The consensus of medical professionals is also relevant to Eighth
13   Amendment jurisprudence. *Hall*, 134 S. Ct. at 2000. Social science research shows
14   that the characteristics that make juveniles less culpable than adults do not dissipate
15   when a person turns eighteen but rather persist well into a person's twenties. Setting
16   eighteen years as the line for who is mature enough for the death penalty, regardless
17   of other factors affecting a person's neurodevelopment, makes little scientific sense.
18   "[T]here is little empirical evidence to support age 18, the current legal age of
19   majority, as an accurate marker of adult capacities." Sara B. Johnson, Robert W.
20   Blum & Jay N. Giedd, *Adolescent Maturity and the Brain: The Promise and Pitfalls*
21   *of Neuroscience Research in Adolescent Health Policy*, 45 J. Adolescent Health
22   216, 217 (2009), http://www.jahonline.org/article/S1054-139X(09)00251-
23   1/fulltext. Furthermore, reliable scientific evidence demonstrates that the human
24   brain does not stop maturing until the mid-twenties. *Id.* at 216.

25   Neuroscience research demonstrates that the more primitive regions of the
26   brain, like the amygdala, that are responsible for instinctual behavior, such as
27   aggression, anger pleasure and fear, develop first. Conversely, the region of the
28   brain called the prefrontal cortex, which "is linked to the ability to inhibit impulses,

1   weigh consequences of decisions, prioritize, and strategize," does not reach adult
2   levels until the mid-twenties. Jay N. Giedd, *Structural Magnetic Resonance*
3   *Imaging of the Adolescent Brian*, 1021 Annals N.Y. Acad. Sci. 77, 83 (2004),
4   http://thesciencenetwork.org/docs/BrainsRUs/ANYAS_2004_Giedd.pdf.

5          The same concerns that led to categorical exemptions from the death penalty
6   for the intellectually disabled and for juveniles apply to the group of defendants
7   who mentally and emotionally have not yet become fully functioning adults due to
8   their continually developing brains. Medical studies and social science research put
9   the cognitive capacity and concomitant moral culpability of these post-adolescents
10  in serious doubt. Ultimately, while the consequence of the decisions in *Atkins* and
11  *Roper* was to establish a categorical ban on executing certain classes of individuals,
12  the rationale driving these decisions was to bring the imposition of capital
13  punishment in line with a properly individualized assessment of moral culpability.

14         Deficits in reasoning, judgment, and impulse control—as recognized in both
15  *Atkins* and *Roper*—necessarily affect the degree to which defendants can be held
16  morally culpable for their actions. As we now know that the areas of the brain that
17  control these functions are not fully developed until the mid-twenties, "the evolving
18  standards of decency" dictate that individuals who were under the age of
19  twenty-five at the time of their offense should similarly be exempt from capital
20  punishment. To execute an individual whose chronological age is above the
21  eighteen-year cutoff required to prohibit his execution under *Roper*, but whose
22  incomplete brain development results in similar deficits to those who gain
23  protection under the Court's decision, is exactly the unscientific arbitrary
24  line-drawing that the Court forbid in *Hall*. Thus, the execution of individuals like
25  Morris—who not only suffered brain damage as discussed *supra* in Claim Three,
26  but was under twenty-five at the time of his offense—is categorically
27  unconstitutional, and Morris is entitled to relief.
28  / / /

1

## CLAIM FORTY-THREE

2

3

**The death penalty violates human rights and international law and thereby violates Morris's Eighth Amendment rights.**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

This claim was not raised in state court. Morris alleges he can overcome any default of this claim by showing cause and prejudice, including because of the ineffective assistance of appellate and state post-conviction counsel. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *but see Davila v. Davis*, 137 S. Ct. 2058 (2017). Morris will demonstrate at an evidentiary hearing that appellate and post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced him. Alternatively, he alleges that any procedural bar is not adequate or independent or that imposing default would be a miscarriage of justice. Because this claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the merits of the claim de novo. Morris incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

18

19

20

Prevailing international norms weigh in favor of finding that the death penalty constitutes an Eighth Amendment violation. According to the Supreme Court,

21

22

23

24

25

26

> The prohibition against "cruel and unusual punishments," like other expansive language in the Constitution, must be interpreted according to its text, by considering history, tradition, and precedent, and with due regard for its purpose and function in the constitutional design. To implement this framework we have established the propriety and affirmed the necessity of referring to "the evolving standards of decency that mark the progress of a maturing society" to determine which punishments are so disproportionate as to be cruel and unusual.

27

28

*Roper v. Simmons*, 543 U.S. 551, 560–61 (2005) (quoting *Trop v. Dulles*, 356 U.S. 86, 100–01 (1958) (plurality opinion)); *see also Miller v. Alabama*, 567 U.S. 460,

469–70 (2012); *Graham v. Florida*, 560 U.S. 48, 58 (2010); *Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008); *Atkins v. Virginia*, 536 U.S. 304, 311 (2002). Since its decision in *Trop*, the Supreme Court has "referred to the laws of other countries and to international authorities as instructive for its interpretation of the Eighth Amendment's prohibition of 'cruel and unusual punishments.'" *Roper*, 543 U.S. at 575 (collecting cases). The Court accordingly cited the international community's "overwhelming" disapproval of executing the intellectually disabled and juvenile offenders in concluding that such executions violated the Eighth Amendment. *Id.* ("Our determination that the death penalty is disproportionate punishment for offenders under 18 finds confirmation in the stark reality that the United States is the only country in the world that continues to give official sanction to the juvenile death penalty."); *see also Atkins*, 536 U.S. at 316 n.21.

Similarly, the United States also stands virtually alone among the nations of the world in confining individuals for periods of many years continuously under a death sentence. The international community is increasingly recognizing that prolonged confinement under these circumstances is cruel and degrading and in violation of international human rights law. *See Foster v. Florida*, 537 U.S. 990 (2002) (mem.) (Breyer, J., dissenting from denial of certiorari) ("Courts of other nations have found that delays of 15 years or less can render capital punishment degrading, shocking, or cruel."); *see also Knight v. Florida*, 120 S. Ct. 459, 463 (1999) (mem.) (Breyer, J., dissenting) (collecting cases). The Canadian Supreme Court cited such delays as "a relevant consideration" in its decision that extradition of a murder suspect to the United States without assurances that the death penalty would not be imposed "violates principles of 'fundamental justice.'" *Foster*, 537 U.S. at 990 (citing *United States v. Burns*, 1 S.C.R. 283, 353, ¶ 123 (2001)). This developing international consensus demonstrates that, in addition to being cruel, the death penalty in the United States is also "unusual" within the meaning of the Eighth Amendment, entitling Morris to relief. To the extent the death penalty cannot be

reliably administered without also subjecting prisoners to extraordinary delays, it violates Morris's rights under the due process clause of the Fourteenth Amendment.

International law has also clearly established a norm against the infliction of the death penalty as a regular form of punishment. This norm is codified in such international agreements as the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights ("ICCPR"), and the American Declaration of the Rights and Duties of Man. In particular, the ICCPR holds that "[e]very human being has the inherent right to life. . . . No one shall be arbitrarily deprived of his life." ICCPR Article 6, para. 1, June 8, 1992, 999 U.N.T.S. 171. As discussed throughout this Petition, Morris was sentenced to death pursuant to Arizona's arbitrary and capricious sentencing scheme. As a result, Morris's sentence was imposed in violation of international law. Because the Constitution specifies that states are bound by international treaties, U.S. Const. art. VI, cl. 2, Morris's sentence is unconstitutional and he is entitled to relief.

## CLAIM FORTY-FOUR

**Morris will be denied a fair clemency process in violation of the Eighth and Fourteenth Amendments.**

Morris has not yet presented this claim to the Arizona courts because his opportunity to seek executive clemency has not yet become ripe. Morris presents this claim now in order to avoid difficulties with raising this claim in future federal habeas proceedings. *See Stewart v. Martinez-Villareal*, 523 U.S. 637, 643–46 (1998). Under Arizona law, Morris has a right to seek executive clemency before execution. *See* Ariz. Const. art. V, § 5; Ariz. Rev. Stat. § 31-401 *et seq*. This should be part of the constitutional scheme that ensures the reliability of criminal convictions and the propriety of sentences. *See Herrera v. Collins*, 506 U.S. 390, 415 (1993). Accordingly, Morris has a due process liberty interest in the impartiality of the system by which clemency may be afforded to him. *See generally Mathews v. Eldridge*, 424 U.S. 319 (1976).

1   Morris's clemency proceedings will not be impartial. On information and
2   belief, Morris asserts that both the selection process for members of Arizona's
3   Board of Executive Clemency ("the Board") and the conflicting roles of the State
4   will work to deprive him of a fair clemency proceeding. Without judicial review of
5   the bias inherent in Arizona's clemency process, Morris will never have an
6   opportunity to vindicate his right to a fair and impartial clemency process.

7   The Board consists of five members appointed by the Governor with input
8   from the Director of the Department of Corrections, the Director of Public Safety,
9   and three other individuals of his choosing. *See* Ariz. Rev. Stat. § 31-401(A). The
10  Governor may remove members of the Board for cause. *See id.* § 31-401(E). On
11  information and belief, Morris asserts that the Attorney General's Office, the office
12  that advocated for his death in state appellate and post-conviction proceedings and
13  is currently advocating for his death before this Court, is responsible for training
14  the members of the Board regarding their duties. On information and belief, Morris
15  asserts that he will neither have notice of the time and place of the hearing, the
16  evidence the Governor will use when he decides whether to grant or deny clemency,
17  or an opportunity to present evidence to him in favor of granting clemency. For all
18  these reasons, Arizona's clemency procedures do not comport with the procedural
19  due process protections guaranteed to him by the Fourteenth Amendment. Morris
20  is entitled to habeas corpus relief.

21                                  **CLAIM FORTY-FIVE**

22  **It would violate Morris's right to be free from cruel and unusual
    punishment for the State of Arizona to execute him after he has
23  spent over twelve years on its death row.**

24  This claim was not raised in state court. Morris alleges he can overcome any
25  default of this claim by showing cause and prejudice, including because of the
26  ineffective assistance of appellate and state post-conviction counsel. *See Martinez*
27  *v. Ryan*, 566 U.S. 1, 9 (2012); *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000);
28  *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *but see Davila v. Davis*,

137 S. Ct. 2058 (2017). Morris will demonstrate at an evidentiary hearing that appellate and post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced him. Alternatively, there was an absence of available state corrective process or circumstances exist that rendered the process ineffective, thereby excusing the failure to exhaust, *see* 28 U.S.C. § 2254(b)(1)(B), or this claim was not previously available and so could not have been raised in state court, *cf. Panetti v. Quarterman*, 551 U.S. 930, 945 (2007). Therefore, the Court will be able to consider the merits of this claim. Moreover, because the claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the claim de novo. Morris incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

"By protecting even those convicted of heinous crimes, the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons." *Roper v. Simmons*, 543 U.S. 551, 560 (2005). It therefore forbids punishments that are excessive. *See id.* Morris entered death row in 2005. Executing Morris after he has served over twelve years under a death sentence would violate his Eighth and Fourteenth Amendment rights.

First, if Morris is executed, he will be punished "both by death and also by more than a generation spent in death row's twilight." *Foster v. Florida*, 537 U.S. 990, 993 (2002) (Breyer, J., dissenting from denial of certiorari). Morris's time on death row itself has been a severe punishment, making the additional punishment of execution excessive. *See Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (discussing years in solitary confinement as an "added punishment"); *Hutto v. Finney*, 437 U.S. 678, 685 (1978) ("Confinement in a prison or in an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment standards."); *Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549, 563–

64, 566–69 (3d Cir. 2017) (discussing the harsh conditions of death row, its deprivations compared to those of general population, and studies of the severe psychological consequences of solitary confinement), *cert. denied sub nom. Walker v. Farnan*, 138 S. Ct. 357 (2017), *and cert. denied sub nom. Williams v. Wetzel*, 138 S. Ct. 357 (2017). The United States Supreme Court in 1890 recognized time spent in solitary confinement awaiting execution as "an additional punishment of the most important and painful character," *In re Medley*, 134 U.S. 160, 171 (1890), and "research still confirms what [the] Court suggested over a century ago: Years on end of near-total isolation exact a terrible price." *Davis*, 135 S. Ct. at 2210 (Kennedy, J., concurring). Accordingly, the American Bar Association and the United Nations Special Rapporteur on Torture have recommended limitations on the use of solitary confinement. *See Glossip v. Gross*, 135 S. Ct. 2726, 2765 (2015) (Breyer, J., dissenting). Indeed, foreign courts have found that extended delay in the imposition of a death sentence "renders ultimate execution inhuman, degrading, or unusually cruel." *Knight v. Florida*, 528 U.S. 990, 995 (1999) (Breyer, J., dissenting from denial of certiorari); *see also Foster*, 537 U.S. at 992-93 (Breyer, J., dissenting from denial of certiorari).

The severity of the physical conditions of death row is not the only punishment Morris has faced, for "[t]he dehumanizing effect of solitary confinement is aggravated by uncertainty as to whether a death sentence will in fact be carried out." *Glossip*, 135 S. Ct. at 2765 (Breyer, J., dissenting). The United States Supreme Court has recognized the toll that waiting for execution can take on a prisoner, writing over a century ago—of a delay of just four weeks—that "when a prisoner sentenced by a court to death is confined in the penitentiary awaiting the execution of the sentence, one of the most horrible feelings to which he can be subjected during that time is the uncertainty during the whole of it." *Medley*, 134 U.S. at 172; *see also Valle v. Florida*, 564 U.S. 1067, 1067 (2011) (Breyer, J., dissenting from denial of stay); *Knight*, 528 U.S. at 994-95 (Breyer, J., dissenting

from denial of certiorari); *Furman v. Georgia*, 408 U.S. 238, 288–89 (1972) (Brennan, J., concurring). Morris has been severely punished through his imprisonment, and exacting the additional punishment of an execution would be excessive.

Executing Morris after his lengthy imprisonment also would be unconstitutional because no penological justification would support the punishment. The Supreme Court has recognized deterrence and retribution as the justifications for the death penalty. *See Enmund v. Florida*, 458 U.S. 782, 798 (1982); *Gregg v. Georgia*, 428 U.S. 153, 183 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). But when these aims can no longer be advanced, an execution "is nothing more than the purposeless and needless imposition of pain and suffering and hence an unconstitutional punishment." *Atkins v. Virginia*, 536 U.S. 304, 319 (2002) (internal quotation marks and citation omitted); *see also Furman*, 408 U.S. at 279–80 (Brennan, J., concurring). Executing Morris would provide little, if any, deterrent effect that is not achieved by a lifetime of imprisonment. *See, e.g.*, *Valle*, 564 U.S. at 1068 (Breyer, J., dissenting from denial of stay) ("It is difficult to imagine how an execution following so long a period of incarceration could add significantly to that punishment's deterrent value."); *Coleman v. Balkcom*, 451 U.S. 949, 952 (1981) (Stevens, J., concurring in denial of certiorari) ("[T]he deterrent value of incarceration during that period of uncertainty [confined under a death sentence] may well be comparable to the consequences of the ultimate step itself."); *Lackey v. Texas*, 514 U.S. 1045, 1046 (1995) (Stevens, J., mem. respecting denial of certiorari). Studies on the question of the death penalty's deterrent value are contradictory and inconclusive, and therefore insufficient to justify Morris's execution. *See Glossip*, 135 S. Ct. at 2767–68 (Breyer, J., dissenting) (comparing sources); *Baze v. Rees*, 553 U.S. 35, 79 (2008) (Stevens, J., concurring); *Ring v. Arizona*, 536 U.S. 584, 614–15 (2002) (Breyer, J., concurring). Nor would retribution be a sufficient justification for

1    Morris's execution. *See Glossip*, 135 S. Ct. at 2769 (Breyer, J., dissenting);

2    *Coleman*, 451 U.S. at 960 (Rehnquist, J., dissenting from denial of certiorari)

3    ("There can be little doubt that delay in the enforcement of capital punishment

4    frustrates the purpose of retribution."). Because neither penological justification for

5    the death penalty has much, if any, force after an excessive period of confinement

6    under a death sentence, such an execution would be gratuitous.

7        Execution under the circumstances of Morris's case would be cruel and

8    unusual in violation of the Eighth and Fourteenth Amendments. He is therefore

9    entitled to relief.

10                           **CLAIM FORTY-SIX**

11       **The imposition of the death penalty on a person with organic brain**
         **damage violates the Eighth and Fourteenth Amendments.**
12

13       This claim was not raised in state court. Morris alleges he can overcome any

14   default of this claim by showing cause and prejudice, including because of the

15   ineffective assistance of state post-conviction counsel. *See Martinez v. Ryan*, 566

16   U.S. 1, 9 (2012); *Murray v. Carrier*, 477 U.S. 478, 488–89 (1986); *Strickland v.*

17   *Washington*, 466 U.S. 668, 687–88 (1984). Morris will demonstrate at an

18   evidentiary hearing that post-conviction counsel fell below the standards of

19   minimally competent capital attorneys and that those failures prejudiced him.

20   Alternatively, he alleges that any procedural bar is not adequate or independent or

21   that imposing default would be a miscarriage of justice. Because this claim has not

22   been adjudicated by the Arizona state courts, the limitations on relief imposed by

23   28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider

24   the merits of the claim de novo. Morris incorporates by specific reference all facts,

25   allegations, and arguments made elsewhere in this Petition.

26       In *Atkins v. Virginia*, the United States Supreme Court held that the Eighth

27   Amendment's ban on excessive and cruel and unusual punishment prohibits the

28   execution of intellectually disabled persons. 536 U.S. 304, 321 (2002). The Court's

                                     366

1  rationale in *Atkins* applies with equal force to persons who have organic brain

2  damage like Morris, who suffers impairments in both his frontal and temporal lobes.

**A.    Infliction of capital punishment upon individuals who suffer from organic brain impairment at the time of the offense makes no measurable contribution to the acceptable goals of punishment.**

5  The United States Supreme Court has held that the death penalty violates the

6  Eighth Amendment when it "'makes no measurable contribution to acceptable

7  goals of punishment and hence is nothing more than the purposeless and needless

8  imposition of pain and suffering[.]'" *Penry v. Lynaugh*, 492 U.S. 302, 335 (1989)

9  (quoting *Coker v. Georgia*, 433 U.S. 584, 592 (1977) (plurality opinion)),

10  *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002). The Court

11  has identified "'two principal social purposes'" served by capital punishment:

12  "'retribution and deterrence of capital crimes[.]'" *Penry*, 492 U.S. at 335–36

13  (quoting *Gregg v. Georgia*, 428 U.S. 153, 183 (1976)). In *Enmund v. Florida*, 458

14  U.S. 782 (1982), the Court held that, "[u]nless the death penalty when applied to

15  those in [the defendant's] position measurably contributes to one or both of these

16  goals, it 'is nothing more than the purposeless and needless imposition of pain and

17  suffering,' and hence an unconstitutional punishment." *Enmund*, 458 U.S. at 798

18  (citation omitted). In *Atkins*, the Court held that the death penalty, when applied to

19  the intellectually disabled, advances neither of these goals. *Atkins*, 536 U.S. at 319–

20  20.

21  The Court's reasoning in *Atkins* dictates that capital punishment inflicted on

22  individuals who have frontal- or temporal-lobe brain impairment at the time of the

23  offense is nothing more than the purposeless and needless imposition of pain and

24  suffering. It makes no measurable contribution to the acceptable goals of

25  punishment and fails to serve any legitimate penal purpose more effectively than a

26  less severe penalty.

27  / / /

28  / / /

1

2

**1.** **Retribution is not served by executing those who have brain impairment at the time of the offense.**

3

4

5

6

7

8

9

10

The Supreme Court has recognized that "'evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.'" *Penry*, 492 U.S. at 319 (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)); *see also Eddings v. Oklahoma*, 455 U.S. 104, 113–15 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604–05 (1978).

11

12

13

14

15

16

17

18

19

The Court has also stated that "retribution as a justification for executing [offenders] . . . very much depends on the degree of [their] culpability[.]" *Enmund*, 458 U.S. at 800. Moreover, culpability is not based solely upon the magnitude of harm resulting from the offense. "For purposes of imposing the death penalty, . . . punishment must be tailored to [a defendant's] personal responsibility and moral guilt." *Id.* at 801. The rationale of the Court's acceptance in *Atkins* that intellectually disabled murderers are so lacking in moral blameworthiness as to be ineligible for the death penalty dictates that those with organic brain damage should likewise be ineligible:

20

21

22

23

24

> Because of their impairments, . . . [intellectually disabled persons] have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. . . . Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.

25

26

27

28

*Atkins*, 536 U.S. at 318. These characterizations apply with equal force to those who have frontal- or temporal-lobe brain impairment at the time of the offense. If intellectually disabled individuals warrant exemption from capital punishment due to their cognitive and behavioral limitations, so, too, do persons who suffer from

1    brain damage at the time of their offense. Because of their significantly reduced

2    moral culpability, the execution of those with organic brain impairment does not

3    advance the goal of retribution.

## 2. Deterrence is not served by executing those who have organic brain damage at the time of the offense.

6        In *Atkins*, the Court said that for intellectually disabled offenders, the "cold

7    calculus" of cost and benefit is "at the opposite end of the spectrum from

8    behavior[.]" *Atkins*, 536 U.S. at 319–20. As Justice Powell observed, "the death

9    penalty has little deterrent force against defendants who have reduced capacity for

10   considered choice." *Skipper v. South Carolina*, 476 U.S. 1, 13 (1986) (Powell, J.,

11   concurring). The same is true for those who have frontal- or temporal-lobe brain

12   impairment at the time of their offenses. As described above, organic brain

13   impairment prevents people from being able to exercise impulse control and to

14   make reasoned decisions. As such, these individuals, who often have little control

15   over their impulses, are not meaningfully deterred by the threat of capital

16   punishment.

17       The death penalty can serve no legitimate purpose when applied to

18   defendants who have organic brain impairment at the time of the offense. In such

19   circumstances, the death penalty amounts to the purposeless infliction of needless

20   pain and suffering because it fails to advance either retribution or deterrence.

## B. Like intellectual disability, aspects of organic brain impairment undermine the strength of the procedural protections that our nation's capital jurisprudence steadfastly guards.

23       In *Atkins*, the Court pointed to "the reduced capacity" of intellectually

24   disabled offenders as a justification for a categorical bar against their execution.

25   "The risk 'that the death penalty will be imposed in spite of factors which may call

26   for a less severe penalty' is enhanced," in part, "by the lesser ability of mentally

27   retarded defendants to make a persuasive showing of mitigation[.]" *Atkins*, 536 U.S.

28   at 320 (quoting *Lockett*, 438 U.S. at 605). "Mentally retarded defendants may be

less able to give meaningful assistance to their counsel and are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes." *Id.* at 320–21.

Moreover, intellectual disability as a mitigating factor can act as a "two-edged sword" by increasing the likelihood the defendant will be found a future danger by the jury. *Id.* at 321. This concern is equally applicable to those with organic brain impairment.

The Supreme Court has noted that a state may not attach the aggravating label "to conduct that actually should militate in favor of a lesser penalty, such as perhaps the defendant's mental illness." *Zant v. Stephens*, 462 U.S. 862, 885 (1983). The Court cited *Miller v. Florida*, 373 So.2d 882, 885–86 (Fla. 1979), which found a constitutional violation where it was "clear from the trial judge's sentencing order that he considered as an aggravating factor the defendant's allegedly incurable and dangerous mental illness." Because of the risk that a jury will treat evidence of frontal- or temporal-lobe brain impairment, which is similar to an "incurable and dangerous mental illness" as an aggravating factor based on a misunderstanding of future dangerousness, due process and the Eighth Amendment require that such decisions be removed from the purview of the jury.

Capital juries are likely to treat organic brain impairment as aggravating because they incorrectly assume that such impairment increases future dangerousness. Lay persons are ill-equipped to appreciate the role of frontal- or temporal-lobe brain impairment in behavior. Misuse of brain impairment evidence unbalances the process by which mitigating and aggravating factors are weighed and impermissibly increases the chances that a mentally ill offender will receive the death penalty. As with intellectually disabled persons, only a categorical ban on executing offenders with organic brain impairment at the time of the crime can adequately protect their constitutional rights. Indeed, these offenders require more such protection than other groups, precisely because of the stigma and

1   misunderstanding surrounding their impairments.

2       In short, it is not enough to allow jury consideration of organic brain
3   impairment as mitigation. Rather, as with intellectual disability, this Court must
4   recognize that the Eighth Amendment contains a categorical exemption for those
5   who have organic brain impairment at the time of their offense. Because Morris has
6   frontal- and temporal-lobe damage, he lacks culpability in the same way as those
7   who are intellectually disabled. Morris's death sentence violates the Eighth
8   Amendment and he is therefore entitled to relief.

**CLAIM FORTY-SEVEN**

9

10
11  **Death qualifying Morris's jury deprived him of an impartial jury
    and a fair and reliable trial in violation of the Fifth, Sixth, Eighth,
    and Fourteenth Amendments to the United States Constitution.**

12      This claim was not raised in state court. Morris alleges he can overcome any
13  default of this claim by showing cause and prejudice, including because of the
14  ineffective assistance of state post-conviction counsel. *See Martinez v. Ryan*, 566
15  U.S. 1, 9 (2012); *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Strickland v.*
16  *Washington*, 466 U.S. 668, 687–88 (1984). Morris will demonstrate at an
17  evidentiary hearing that appellate and post-conviction counsel fell below the
18  standards of minimally competent capital attorneys and that those failures
19  prejudiced him. Alternatively, he alleges that any procedural bar is not adequate or
20  independent or that imposing default would be a miscarriage of justice. Because
21  this claim has not been adjudicated by the Arizona state courts, the limitations on
22  relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the
23  Court may consider the merits of the claim de novo. Morris incorporates by specific
24  reference all facts, allegations, and arguments made elsewhere in this Petition.

25      The jury selection process utilized by the trial court violated Morris's rights
26  because it death-qualified the jury, a process in which the trial court excuses
27  venirepersons who cannot consider the death penalty as a possible punishment. The
28  use of this procedure in the jury selection process is constitutionally impermissible.

1   A defendant has the right to an unbiased and impartial jury. *See Morgan v.*
2   *Illinois*, 504 U.S. 719, 726–27 (1992) (identifying an impartial tribunal as a
3   fundamental requirement of due process); *see also Groppi v. Wisconsin*, 400 U.S.
4   505, 509 (1971). Empirical research demonstrates that the death-qualification
5   process facilitates the selection of jurors who are more likely to return a guilty
6   verdict, and then more likely to return a death verdict. *See* Susan D. Rozelle, *The*
7   *Principled Executioner: Capital Juries' Bias and the Benefits of True Bifurcation*,
8   38 Ariz. St. L.J. 769, 784–85 (2006) (reviewing data showing that "[t]he death
9   qualification process today still seats juries uncommonly willing to find guilt, and
10  uncommonly willing to mete out death"); William J. Bowers & Wanda D. Foglia,
11  *Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital*
12  *Sentencing*, 39 Crim. L. Bull. 51, 61–66 (2003) (reviewing studies demonstrating
13  that death-qualified jurors are more likely to convict and to return a death verdict).

14  Moreover, research has found that the death-qualification process itself
15  influences jurors to adopt pro-prosecution and pro-death attitudes. *See* Craig Haney,
16  *On the Selection of Capital Juries: The Biasing Effects of the Death-Qualification*
17  *Process*, 8 L. & Hum. Behav. 121, 128–29 (1984), available at
18  https://capitalpunishmentincontext.org/files/resources/deathqual/Haney1984.pdf
19  (demonstrating through empirical research that repeated discussion of the death
20  penalty during voir dire increases the likelihood that jurors will believe in the
21  defendant's guilt and to conclude that a death sentence is warranted). Because "the
22  *voir dire* phase of the trial represents the jurors' first introduction to the substantive
23  factual and legal issues in a case. The influence of the *voir dire* process may persist
24  through the whole course of the trial proceedings." *Powers v. Ohio*, 499 U.S. 400,
25  412 (1991) (citation and internal quotation marks omitted). It is an understatement
26  to say that the process of death qualification does not facilitate the selection of a
27  fair and impartial jury.

28  The process of death qualification thus deprives a criminal defendant of his

1   right to be tried by an "impartial jury drawn from a venire that has not been tilted

2   in favor of capital punishment by selective prosecutorial challenges for cause."

3   *Uttecht v. Brown*, 551 U.S. 1, 9 (2007). The death qualification process "stack[s]

4   the deck against the petitioner," *Witherspoon v. Illinois*, 391 U.S. 510, 523 (1968),

5   and "has the purpose and effect of obtaining a jury that is biased in favor of

6   conviction," *Baze v. Rees*, 553 U.S. 35, 84 (2008) (Stevens, J., concurring).

7   Death qualification impairs the impartiality of the venire of jurors and obtains

8   a jury biased toward conviction. *See Baze*, 553 U.S. at 84. The death-qualification

9   process deprived Morris of his right to be tried by an impartial jury and violated his

10  right to equal protection because only capital defendants like Morris are subject to

11  biased, death-qualified jurors. *See id.* The death qualification of prospective jurors

12  generally, and as applied in Morris's case, constitutes structural constitutional error

13  requiring relief. *See Gray v. Mississippi*, 481 U.S. 648, 660 (1987).

## CLAIM FORTY-EIGHT

**Pursuant to the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, Morris was entitled to the constitutionally effective assistance of counsel during his state post-conviction proceedings. However, his counsel performed deficiently and Morris was prejudiced as a result.**

19  This claim was not raised in state court because there is no available state

20  court corrective process. *See* 28 U.S.C. § 2254(b)(1)(B)(i). Accordingly, AEDPA's

21  limitations on relief do not apply and this Court's review is de novo. *See Dickens v.*

22  *Ryan*, 740 F.3d 1302, 1320–21 (9th Cir. 2014) (en banc).

23  Morris was entitled to the effective assistance of post-conviction counsel.

24  Arizona's post-conviction process was inadequate and ineffective to protect

25  Morris's constitutional right to counsel, and his post-conviction counsel performed

26  deficiently and prejudiced him. As explained in *Martinez v. Ryan*, 566 U.S. 1, 4

27  (2012), Arizona prisoners must raise claims regarding the ineffectiveness of trial

28  counsel in a petition for post-conviction relief, not on direct appeal: "The State of

Arizona does not permit a convicted person alleging ineffective assistance of trial counsel to raise that claim on direct review." *See also State v. Spreitz*, 39 P.3d 525, 527 (Ariz. 2002). The same is also true of any other claims that are supported by evidence outside the trial record, even if not raised as a counsel ineffectiveness claim. Morris's post-conviction proceedings were his only opportunity to pursue any claims that relied on extra-record evidence. Thus, those post-conviction proceedings were a "first appeal as of right" as to those claims, and he should have a constitutional right to the effective assistance of counsel in those proceedings. *See Evitts v. Lucey*, 469 U.S. 387, 396 (1985). While the Supreme Court initially entertained argument on this issue as part of the *Martinez* litigation, the Court eventually declined to decide this issue because the case could be resolved on equitable grounds instead. 566 U.S. at 9 ("This is not the case, however, to resolve whether that exception exists as a constitutional matter.").

For capital defendants in Arizona, post-conviction relief proceedings are not a "sword" used by the petitioner to upset a determination of guilt. Instead, they are a part of an established, mandatory appellate process, initiated not by the defendant, but by the Arizona Supreme Court. *See* Ariz. R. Crim. P. 32.4(a) (providing that upon issuance of mandate affirming conviction and death sentence on direct appeal, clerk of Arizona Supreme Court files automatic notice for post-conviction relief); *State v. Bolton*, 896 P.2d 830, 839 (Ariz. 1995) (holding that a Rule 32 proceeding is mandatory upon the affirmance of a death sentence). In Arizona, post-conviction review of ineffective assistance of counsel claims is an extension of a capital defendant's direct appeal. *See* Ariz. R. Crim. P. 32.3(a) (holding that post-conviction proceeding "is part of the original criminal action and not a separate action").

Because the initiation of post-conviction proceedings in Arizona is automatic upon the affirmance of a death sentence, and because those proceedings are a defendant's sole opportunity to present constitutional claims regarding ineffective

assistance of trial and appellate counsel, Rule 32 proceedings are appeals "as of right" for such claims. In first appeals as of right, due process requires that defendants have the effective assistance of an attorney. *Evitts*, 469 U.S. at 396 ("A first appeal as of right therefore is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney."); *see also Jackson v. State*, 732 So. 2d 187, 190 (Miss. 1999) ("The reality is that post-conviction efforts, though collateral, have become an appendage, or part, of the death penalty appeal process at the state level.").

In Arizona, a petitioner is statutorily entitled to the appointment of post-conviction counsel, and the state provides basic standards in an attempt to ensure counsel's competence. Accordingly, due process requires that counsel be effective. Implementation of this statutorily provided right must comport with due process: "when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution – and, in particular, in accord with the Due Process Clause." *Evitts*, 469 U.S. at 401; *see also Jackson v. Weber*, 637 N.W.2d 19, 24–25 (S.D. 2001) ("If the defense attorney was ineffective in the original criminal proceeding and habeas counsel was thereafter ineffective in ferreting out the invalidity of the conviction, we may never know if the convicted person had a fair trial or, God forbid, was actually innocent."). Due process demands that when a statutory right to counsel is established, the concomitant right to effective assistance of counsel must also be recognized; otherwise, the statutory right would be meaningless. *See Evitts*, 469 U.S. at 396 ("[A] party whose counsel is unable to provide effective representation is in no better position than one who has no counsel at all."); *see also* Eric M. Freedman, *Giarratano is a Scarecrow: The Right to Counsel in State Capital Postconviction Proceedings*, 91 Cornell L. Rev. 1079, 1095 (2006); Celestine Richards McConville, *The Right to Effective Assistance of Capital Postconviction Counsel: Constitutional Implications of Statutory Grants of Capital Counsel*, 2003

1  Wis. L. Rev. 31 (2003).

2      The appropriate starting point for this Court's analysis is
3  *Murray v. Giarratano*, 492 U.S. 1 (1989), in which the Supreme Court was asked
4  to decide whether its ruling in *Pennsylvania v. Finley*, 481 U.S. 551 (1987), finding
5  no general right to the effective assistance of counsel in state post-conviction
6  proceedings, applied with equal force in capital proceedings. Four justices
7  (Rehnquist, C.J., and White, O'Connor, and Scalia, JJ.) concluded that *Finley*
8  should apply in the capital context, while four other justices (Stevens, Brennan,
9  Marshall, and Blackmun, JJ.) concluded that due process dictated that indigent
10 capital defendants be afforded the effective assistance of state post-conviction
11 counsel. *See Giarratano*, 492 U.S. at 3–13 (opinion of Rehnquist, C.J.); *id.* at 15–
12 32 (opinion of Stevens, J.).

13     The controlling decision in *Giarratano*, however, was that of Justice
14 Kennedy. In his brief opinion concurring solely in the judgment of the Court, Justice
15 Kennedy stated, "It cannot be denied that collateral relief proceedings are a central
16 part of the review process for prisoners sentenced to death." 492 U.S. at 14. He
17 continued, "[t]he complexity of our jurisprudence in this area, moreover, makes it
18 unlikely that capital defendants will be able to file successful petitions for collateral
19 relief without the assistance of persons learned in the law." *Id.* Justice Kennedy,
20 however, was "not prepared to say" that the particular scheme for appointment of
21 post-conviction counsel in Virginia that was at issue before the Court in *Giarratano*
22 violated the Constitution. *Id.* at 14–15.

23     Under established Supreme Court precedent, Justice Kennedy's opinion in
24 *Giarratano* constitutes the holding of the Court in that case. *See Marks*
25 *v. United States*, 430 U.S. 188, 193 (1977) (holding that when the Court issues a
26 plurality decision, the opinion of the Justices concurring in the judgment on the
27 "narrowest grounds" should be regarded as the Court's holding) (quoting
28 *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, and

1   Stevens, JJ.)). Thus, *Giarratano* does not stand for the proposition that, under the

2   rationale of *Finley*, an indigent capital defendant will under no circumstances have

3   the right to the effective assistance of state post-conviction counsel.

4   The next relevant decision is *Coleman v. Thompson*, 501 U.S. 722 (1991). In

5   *Coleman*, Justice O'Connor, writing for the majority, described *Giarratano* as

6   holding that there is no constitutional right to an attorney in state capital

7   post-conviction proceedings. *Id.* at 752. In light of *Marks*, however, Justice

8   O'Connor's description of *Giarratano* is inaccurate. Nevertheless, *Coleman* left

9   open a possible "exception to the rule of *Finley* and *Giarratano* in those cases where

10  state collateral review is the first place a prisoner can present a challenge to his

11  conviction." *Id.* at 755. The Court was not required to address this possible

12  exception in *Coleman* because the issue in that case involved whether the

13  petitioner's attorney had been ineffective in perfecting the appeal of the denial of

14  his state post-conviction proceeding:

15  
16      Coleman has had his "one and only appeal," if that is what
        a state collateral proceeding may be considered; the
17      Buchanan County Circuit Court, after a 2-day evidentiary
        hearing, addressed Coleman's claims of trial error,
18      including his ineffective assistance of counsel claims. What
        Coleman requires here is a right to counsel on appeal from
19      *that* decision. Our case law will not support it.

20  *Id.* at 756 (emphasis in original).

21  The issue Morris raises in this case involves the "possible exception" to

22  *Finley* left unresolved in *Coleman*: the ineffectiveness of his appointed counsel in

23  filing his initial petition for state post-conviction relief. That issue has yet to be

24  definitively resolved by this Court or the United States Supreme Court, a fact that

25  is demonstrated by a careful review of Ninth Circuit precedent on the issue.

26  The right to effective assistance of counsel recognized in *Evitts*, and upon

27  which Morris relies, is guaranteed by the Due Process Clause of the Fourteenth

28  Amendment, not the Sixth Amendment. *See Evitts v. Lucy*, 469 U.S. 387, 396

(1985) ("A first appeal as of right therefore is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney.")

Moreover, for two reasons, 28 U.S.C. § 2254(i) does not preclude a federal court from recognizing a right to the effective assistance of post-conviction counsel under the facts presented here. Section 2254(i) provides only that "[t]he ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254." First, as Morris explained above, in Arizona capital cases, the presentation of claims of ineffective assistance of trial and direct appeal counsel are not "collateral" proceedings, but are in reality first appeals as of right as to those claims. Second, and more importantly, Morris is not asserting the ineffectiveness of his post-conviction counsel as "grounds for relief" from his convictions and sentences, which is all that § 2254(i) prohibits. If this Court recognizes Morris's due process right to the effective assistance of his post-conviction attorney, the remedy is to acknowledge post-conviction counsel's constitutional ineffectiveness as cause for Morris's failure to raise any claims during his state post-conviction proceedings that the Court may deem procedurally barred and not eligible under the narrower holding of *Martinez*. *See Martinez*, 566 U.S. at 17 ("Section 2254(i) provides that 'the ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief.' 'Cause,' however, is not synonymous with 'a ground for relief.' A finding of cause and prejudice does not entitle the prisoner to habeas relief. It merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted.").

Finally, even if this Court were to determine that Morris did not have a due process right to the effective assistance of his post-conviction attorney, because he is a capital defendant he has an Eighth Amendment right to that protection.

Specifically, because the Eighth Amendment requires meaningful appellate review in death penalty cases, Morris is entitled to competent counsel in the only proceeding that allows him to enforce his right to effective assistance of trial and appellate counsel and other constitutional claims relying on extra-record evidence. The Supreme Court has recognized that "meaningful appellate review" is necessary in capital cases because it "serves as a check against the random or arbitrary imposition of the death penalty." *Gregg v. Georgia*, 428 U.S. 153, 195, 206 (1976) (opinion of Stewart, Powell, and Stevens, JJ.).

A sentencing process that offends "the evolving standards of decency that mark the progress of a maturing society" violates the Eighth Amendment. *Roper v. Simmons*, 543 U.S. 551, 561 (2005) (quoting *Trop v. Dulles*, 356 U.S. 86, 100–01 (1958) (plurality opinion)); *Atkins v. Virginia*, 536 U.S. 304, 311–12 (2002) (same); *Gregg*, 428 U.S. at 173 (same). This doctrine applies both to the substance of who may be subject to the death penalty and to the procedural safeguards states provide to protect against unjust death sentences. *See Gardner v. Florida*, 430 U.S. 349, 357 (1977) ("[T]his Court has acknowledged its obligation to re-examine capital-sentencing procedures against evolving standards of procedural fairness in a civilized society."); *Beck v. Alabama*, 447 U.S. 625, 637 (1980).

Given that every active death penalty state, with the exception of Alabama, provides for the pre-filing appointment of counsel to assist indigent death row inmates in the preparation of post-conviction petitions challenging their convictions and sentences, an overwhelming national consensus has evolved concerning the need for the constitutionally effective assistance of post-conviction counsel in capital cases. As a consequence, when a state establishes a right to capital post-conviction proceedings, there is a corresponding Eighth Amendment right to the assistance of post-conviction counsel in those proceedings. Morris therefore had the right to the effective assistance of counsel in his post-conviction proceedings, and his state appointed counsel failed to meet this standard.

### A.    Deficient performance.

The Court promulgated a two-part test for determining ineffective assistance of counsel in *Strickland*. 466 U.S. at 687. First, the defendant must demonstrate that counsel's performance was "deficient," meaning that counsel's errors were "so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id*. While the Court found that specific requirements for counsel were not appropriate and that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms," *id. at 688*. (explaining that prevailing norms of practice as reflected in the American Bar Association standards and the like are guides to determining what is reasonable), the Court also explained that counsel has a duty to make reasonable investigations and that strategic choices made after less than complete investigation are only reasonable to the extent that professional judgment would support such limits to investigation, *id.* at 691.

Morris's post-conviction counsel Nicole Farnum did not meet these standards. This was Farnum's first capital post-conviction case. She was, at the time of her application for appointment to capital post-conviction cases, serving as second chair in one capital jury trial,[59] but had no prior capital experience. She did not, however, request the appointment of second counsel until after the post-conviction petition was filed. (IOR 370.) In a supplemental request, she wrote "undersigned counsel has *never* tried a capital case or defended anyone in a felony trial. . . . In comparison to undersigned counsel's lack of trial experience, proposed co-counsel . . . has the following trial experience[.]"" (IOR 391 at 3–4 (emphasis in original).)

Communication between Farnum and Morris was strained at best. For

---

[59] In 2015, the Capital Defense Review Committee recommended that Farnum not be approved to serve as second chair on capital trials in Maricopa County.

example, on November 1, 2010, Farnum wrote Morris accusing him of lying to her and saying, "You need to understand you are not a celebrity or a movie star. You are just another black man on death row waiting to be executed . . . It's up to you if you want to end your life living a lie or not. I could care less what [your mother] does because she is not my client; you are, and I have no desire to attend your execution—I wonder if she will." The mitigation specialist working with Farnum, Maria De La Rosa, noted that Farnum wanted to "be 'good cop, bad cop'[.]" She noted her disagreement with this strategy. During this period of tumultuous communication, Farnum sent Dr. Becker to evaluate Morris. He at one point refused to see her, and Morris voiced his displeasure with Farnum and said that he did not want her to represent him any more. Farnum accordingly filed a motion to withdraw. (IOR 246.) After Morris's consent, this was subsequently withdrawn and Farnum remained on the case for another two years until she withdrew based on a conflict of interest. (Tr. Feb. 10, 2011 at 4; ROA 419.)

In those two years Farnum filed Morris's post-conviction petition. (IOR 307.) The petition is disorganized with, for example, a claim about ineffective assistance for failing to defend against an aggravating factor under a heading for ineffective assistance at the penalty phase. (*See* IOR 307 at 3, 6.) And although she raised a claim of ineffective assistance for failing to defend against the prosecutor's necrophilia theory at the penalty phase, she did not clearly raise this claim as to the guilt and aggravation phases. (*See* IOR 307 at 33–43.) As a result, the court granted an evidentiary hearing as to the penalty phase only. (IOR 354 at 5.) When Harley Kurlander was appointed to replace Farnum, he had to file an amended petition about counsel's failings in this regard at the guilt and aggravation phase. (IOR 434.) Farnum also failed to raise several other meritorious claims, as outlined in this Petition. *See, e.g.*, Claims Three (B)–(D), Four (A)–(B), Four (D), Five (B)–(D), and Six (B).  For example, she did not challenge counsel's failure to object to a jury instruction that was in blatant violation of the Supreme Court's rule in *Simmons v.*

*South Carolina*, 512 U.S. 154 (1994), or appellate counsel's failure to challenge this instruction on appeal. *See* Claims Three (B)(i), Twenty-Two (D). And some claims she did raise, such as a challenge to counsel's failure to hire an expert to examine his statement to the police, were incompetently done. There, she hired a linguist who offered an opinion that was obvious from the face of the statement to police and was therefore easily rejected by the court as unhelpful. (PCR Pet. Ex. GG; IOR 354 at 8 ("Even assuming that Dr. Leonard qualified as a linguistics expert and was reliable, his testimony would not have been admissible because it would not have provided appreciable help to the jury.").) A linguist was an inappropriate expert for this undertaking as opposed to an expert in the psychology of police interrogations and coercive tactics, as discussed *supra* in Claim Four (B).

### B.    Prejudice.

Morris was prejudiced by post-conviction counsel's errors. In a capital sentencing proceeding, the inquiry is "whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Wiggins*, 539 U.S. at 534 (quoting *Strickland*, 466 U.S. at 694). When assessing counsel's conduct, and more particularly the impact of that conduct on the reliability of the proceedings, counsel's deficiencies must be considered cumulatively as opposed to item-by-item. *See, e.g.*, *Strickland*, 466 U.S. at 695 ("In making this [prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."); *Williams v. Taylor*, 529 U.S. 362, 397 (2000) (holding that when assessing prejudice, reviewing court must consider "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the [post-conviction] proceeding"); *Alcala v. Woodford*, 334 F.3d 862 (9th Cir. 2003) (granting relief on basis of cumulative impact of multiple errors by counsel); *Martin v. Grosshans*, 424

F.3d 588, 590–92 (7th Cir. 2005) ("[E]ven if [trial counsel's] errors, in isolation, were not sufficiently prejudicial, their cumulative effect prejudiced Martin's defense."); *Lindstadt v. Keane*, 239 F.3d 191, 194, 205 (2d Cir. 2001) (granting relief where petitioner was prejudiced by "cumulative effect of four errors" committed by trial counsel). Because Morris's post-conviction counsel was constitutionally ineffective for a number of reasons, a cumulative analysis of those errors reveals the prejudice to Morris and undermines confidence in the outcome of his trial and post-conviction proceedings.

Many of the claims that Farnum failed to raise are meritorious claims that, if she had raised them, may well have changed the outcome of Morris's post-conviction proceedings. If she had challenged trial counsel's conduct throughout trial—pretrial through the penalty phase—Morris would likely have received a new trial or sentencing. Additionally if she had raised all instances of ineffective assistance of appellate counsel, there is a reasonable probability that Morris would have received a new appeal. Farnum's performance undermines confidence in the outcome of the state-court proceedings. Her failures constituted deficient performance that prejudiced Morris.

## CLAIM FORTY-NINE

**Morris's conviction and sentence must be vacated due to the cumulative prejudicial effect of the errors in this case.**

Morris incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

The combination of errors in this case deprived Morris of his fundamental constitutional rights including his right to a fair trial, trial by jury, due process, effective assistance of counsel, presentation of a defense, a reliable determination of guilt and penalty, and fundamental fairness. *See Taylor v. Kentucky*, 436 U.S. 478, 487 n.15 (1978). As a result of the cumulative effect of the errors in the guilt and penalty phases of the trial against Morris, his convictions and sentence are

1  unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, Eighth,

2  and Fourteenth Amendments to the United States Constitution. When evaluating

3  cumulative error, while only guilt-phase errors are relevant to Morris's convictions,

4  "*all* errors are relevant to the sentence." *Darks v. Mullin*, 327 F.3d 1001, 1018 (10th

5  Cir. 2003) (emphasis added). As stated above, Morris incorporates by specific

6  reference all facts, allegations, and arguments made elsewhere in this document. In

7  addition, he re-urges all objections, arguments, and claims of error made at trial and

8  during direct appeal and post-conviction proceedings, and incorporates by reference

9  herein those prior objections, arguments, and claims of error.

10  Even in cases where no single trial error examined in isolation is sufficiently

11  prejudicial to warrant reversal, the Ninth Circuit Court of Appeals recognizes that

12  the cumulative effect of multiple errors may still prejudice a defendant. *See Parle*

13  *v. Runnels*, 505 F.3d 922, 934 (9th Cir. 2007) (finding habeas relief warranted when

14  combined effect of multiple trial errors resulted in injurious effect on jury's verdict);

15  *Alcala v. Woodford*, 334 F.3d 862, 894–95 (9th Cir. 2003) (affirming grant of

16  habeas relief where multiple errors by court and counsel deprived defendant of a

17  fundamentally fair trial); *Killian v. Poole*, 282 F.3d 1204, 1211 (9th Cir. 2002)

18  (stating that the cumulative effect of errors may be so prejudicial as to require

19  reversal); *Harris ex rel. Ramseyer v. Wood*, 64 F.3d 1432, 1438–39 (9th Cir. 1995)

20  (holding that the cumulative impact of numerous deficiencies in defense counsel's

21  performance was prejudicial to the defense, rendering the proceedings improper and

22  warranting habeas relief); *Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir. 1992) (per

23  curiam) (finding that counsel's deficiencies taken in combination with two other

24  errors constituted a denial of petitioner's due process rights).

25  As the preceding claims illustrate, multiple grievous errors were committed

26  during Morris's trial and sentencing proceedings. Even if the above errors are

27  deemed harmless when viewed individually, their cumulative effect substantially

28  prejudiced Morris, and when viewed cumulatively in the totality of the

1  circumstances, Morris did not receive a fair trial or sentencing. "[T]he cumulative
2  effect of two of more individually harmless errors has the potential to prejudice a
3  defendant to the same extent as a single reversible error." *Darks*, 327 F.3d at 1018
4  (quotation and internal citations omitted).

5      Here, the cumulative effect of the errors in this case resulted in an abridgment
6  of the fundamental fairness of the trial process during all phases. Each of these
7  errors deprived Morris of important constitutional rights including, but not limited
8  to, his right to due process, equal protection, effective counsel, to present a defense
9  and confront the witnesses against him, an impartial jury, and to be free of cruel
10  and unusual punishment.

11      The aggregate harm of these constitutional violations warrants the granting
12  of this Petition without any determination of whether these violations individually
13  substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, 507
14  U.S. 619, 638 n.9 (1993). Furthermore, these constitutional violations so infected
15  the integrity of the proceedings that the errors cannot be deemed harmless. In any
16  event, these violations of Morris's rights had a substantial and injurious effect or
17  influence on the penalty judgment, rendering it fundamentally unfair. Considering
18  all the errors above, this Court must conclude that Morris was denied a fair trial.

19                          **PRAYER FOR RELIEF**

20      WHEREFORE, Morris respectfully prays this Court to:

21  1.    Order that Morris be granted leave to conduct discovery pursuant to Rule 6
22  of the Rules Governing § 2254 Cases and permit Morris to utilize the processes of
23  discovery set forth in Federal Rules of Civil Procedure 26–37, to the extent
24  necessary to fully develop and identify the facts supporting his petition, and any
25  defenses thereto raised by Respondents' Answer;

26  2.    Order that upon completion of discovery, Morris be granted leave to amend
27  his Petition to include any additional claims or allegations not presently known to
28  him or his counsel, which are identified or uncovered in the course of discovery and

that Morris be granted leave to expand the record pursuant to Rule 7 of the Rules Governing § 2254 Cases to include additional materials related to the Petition;

3.      Grant an evidentiary hearing pursuant to Rule 8 of the Rules Governing § 2254 Cases at which proof may be offered concerning the allegations of this Petition;

4.      Issue a writ of habeas corpus to have Morris brought before this Court to the end that he may be discharged from his unconstitutional confinement and restraint;

5.      In the alternative to the relief requested in Paragraph 4, if this Court should deny the relief as requested in Paragraph 4, issue a writ of habeas corpus to have Morris brought before it to the end that he may be relieved of his unconstitutional sentences;

6.      Grant such other relief as may be appropriate and dispose of the matter as law and justice require.


        Respectfully submitted this 20th day of February, 2018

                                        Jon M. Sands
                                        Federal Public Defender
                                        District of Arizona

                                        Emma L. Smith
                                        Alison Y. Rose

                                        s/ Emma L. Smith
                                        Counsel for Petitioner

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Certificate of Service**

I hereby certify that on February 20, 2018, I electronically filed the foregoing Petition for Writ of Habeas Corpus with the Clerk's Office by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Jessica Ward
Assistant Paralegal
Capital Habeas Unit