1    **WO**

2

3

4

5

6              **IN THE UNITED STATES DISTRICT COURT**

7                   **FOR THE DISTRICT OF ARIZONA**

8

9    Cory Deonn Morris,                  No. CV-17-00926-PHX-DGC

10                    Petitioner,         <u>DEATH-PENALTY CASE</u>

11   v.                                   **ORDER**

12   Charles L. Ryan, et al.,

13                    Respondents.

14

15          Petitioner Cory Deonn Morris is an Arizona state prisoner sentenced to death for the

16   murders of five women.  Morris has filed a motion to amend his habeas petition to add five

17   claims related to his alleged incompetency during his state court and federal habeas

18   proceedings.  (Doc. 38.)  The motion is fully briefed.  (Docs. 41–42.)  Also before the Court

19   is Respondents' motion to strike the juror declarations filed with Morris's request for

20   evidentiary development and the notice of request for evidentiary development.  (Doc. 45.)

21   The motion is fully briefed.  (Docs. 52–53.)  For the reasons set forth below, the Court will

22   deny Morris's motion to amend and will grant, in part, Respondents' motion to strike.

23   I.     <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

24          In July 2005, a jury in Maricopa County Superior Court convicted Morris of five

25   counts of first-degree murder and determined he should be sentenced to death for each

26   count.  *See State v. Morris*, 215 Ariz. 324 (2007).  The following factual account is

27   summarized from the Arizona Supreme Court's opinion affirming Morris's convictions

28   and sentences.  *See id.*

Morris worked at a bar three nights a week and lived in a camper in the backyard of his aunt and uncle's house in Phoenix, Arizona. On April 12, 2003, Morris's uncle went to the camper to find Morris and discovered a decomposed body in the camper under a blanket. That same day, police officers questioned Morris about the body, as well as four other bodies that had been found nearby. The first had been discovered in an alley near Morris's camper on September 11, 2002. Morris admitted knowing each of the five victims and provided two different versions of each of their deaths to the police. In the first version, he claimed that each victim had died of a drug overdose while he was away from the camper. When the investigating detective informed Morris that he didn't believe him, Morris stated each victim asked him to choke her during sex and died accidentally as a result.

Morris presented no defense during the guilt phase of trial. The jury found two aggravating factors in the aggravation phase: conviction of prior serious offenses, based on the five convictions from the guilt phase of the trial, and commission of all five murders in both an "especially cruel" and "especially heinous or depraved" manner. At the penalty phase, Morris presented mitigation evidence focusing on the responsibilities placed on him at a young age, problems with his appearance and hygiene, his desire to improve himself, and his good work record. The jury determined that Morris's mitigation evidence was not sufficiently substantial to call for leniency and that death was the appropriate sentence for each of the five murders.

Morris raised four case-specific issues on appeal: (1) the State presented insufficient evidence to prove that two of the women were murdered, (2) the prescreening of prospective jurors violated his right to be present at all stages of the criminal proceeding, (3) the prosecutor engaged in misconduct, and (4) the trial court abused its discretion in admitting excessively gruesome photographs. *Morris,* 215 Ariz. at 332–34. Morris also raised 14 separate challenges to the constitutionality of Arizona's death penalty scheme. *Id.* at 341–43. The Arizona Supreme Court rejected these arguments and affirmed Morris's convictions and sentences. *Id.* at 343.

Morris filed a petition for post-conviction relief ("PCR") raising ineffective assistance of trial and appellate counsel claims, a "new law" claim, and eleven claims identical to claims raised on appeal. (EIR Doc. 307.)[1] The court dismissed several claims and granted an evidentiary hearing on the issue that "additional experts should have been retained to present expert testimony in the penalty phase to disprove the State's necrophilia theory." (EIR 354 at 5.) A six-day evidentiary hearing was held, after which the court dismissed the PCR petition, finding no deficient performance or prejudice in trial counsel's failure to secure expert testimony about either decomposition or necrophilia. (EIR 438.) Morris's petition for review in the Arizona Supreme Court was denied without comment on March 14, 2017.

On May 30, 2017, Morris filed a statement of intent to file a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On February 20, 2018, Morris filed a Petition for Writ of Habeas Corpus ("Petition") asserting 49 claims for relief, many of them containing several subclaims. (Doc. 21.) Respondents filed an Answer on May 22, 2018 (Doc. 27), and Morris filed a Reply on August 13, 2018 (Doc. 34).

II.    MOTION TO AMEND

Morris seeks to amend his Petition with claims that (1) appellate counsel was ineffective for failing to raise a claim challenging Morris's competence to stand trial (Doc. 38-1, redlined amended Claim Twenty-Two, Attachment A), (2) postconviction counsel was ineffective for failing to challenge Morris's competence to stand trial and to proceed in his postconviction proceedings (Doc. 38-2, redlined amended Claim Forty-Eight, Att. B), (3) trial counsel was ineffective for failing to investigate and request a competency hearing (Doc. 38-3, proposed new Claim Fifty, Att. C), (4) Morris was convicted and sentenced to death while incompetent (Doc. 38-4, proposed new Claim

[1] "EIR" refers to the document number in the Electronic Index of Record in Maricopa County Case #CR2003-11506. "RT" refers to the reporter's transcripts from Morris's state court proceedings. The transcripts and certified copies of the state trial and post-conviction records on appeal were provided electronically to this Court by the Arizona Supreme Court on July 11, 2018.

Fifty-One, Att. D), and (5) Morris is being denied his due process rights by having to litigate his federal habeas proceedings while incompetent (Doc. 38-5, proposed new Claim Fifty-Two, Att. E).

Respondents ask the Court to deny Morris's motion to amend because of (1) the futility of the proposed amendment, (2) undue delay, and (3) undue prejudice to Respondents and victims. (Doc. 41) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Caswell v. Calderon*, 363 F.3d 832, 837 (9th Cir. 2004)). Respondents assert that the proposed amendment should be denied as futile because the proposed amended claims (1) are untimely and do not relate back to Morris's timely filed habeas petition, (2) are procedurally defaulted or not cognizable, and (3) are tenuous. Morris does not dispute that the motion to amend was filed after the expiration of the statute of limitations, but asserts that his new claims are timely because they "relate back" to the pending habeas petition. Morris asserts that the core facts supporting each claim are contained "in interrelated claims in Morris's original petition that arise out of Morris's detachment from reality and his counsel's corresponding failure to conduct a thorough mental-health investigation." (Doc. 42 at 2.) After considering the applicable law and facts of this case, the Court does not agree.

A. Applicable Law

A petition for habeas corpus may be amended pursuant to the Federal Rules of Civil Procedure. 28 U.S.C. § 2242; *see also* Rule 12, Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (providing that the Federal Rules of Civil Procedure may be applied to habeas petitions to the extent not inconsistent with the habeas rules). A court looks to Rule 15 of the Federal Rules of Civil Procedure to address a party's motion to amend a pleading in a habeas corpus action. *See James v. Pliler*, 269 F.3d 1124, 1126 (9th Cir. 2001).

Leave to amend shall be freely given "when justice so requires." Fed. R. Civ. P. 15(a). Courts must review motions to amend in light of the strong policy permitting amendment. *Gabrielson v. Montgomery Ward & Co.*, 785 F.2d 762, 765 (9th Cir. 1986). Factors that may justify denying a motion to amend are undue delay, bad faith or dilatory

motive, futility of amendment, undue prejudice to the opposing party, and whether petitioner has previously amended. *Foman*, 371 U.S. at 182; *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995).

Leave to amend may be denied based upon futility alone. *See Bonin*, 59 F.3d at 845. To assess futility, a court necessarily evaluates whether relief may be available on the merits of the proposed claim. *See Caswell*, 363 F.3d at 837-39 (conducting a two-part futility analysis reviewing both exhaustion of state court remedies and the merits of the proposed claim). If the proposed claims are untimely, unexhausted, or otherwise fail as a matter of law, amendment should be denied as futile.

The Antiterrorism and Effective Death Penalty Act ("AEDPA") imposes a one-year statute of limitations for the filing of federal habeas corpus petitions. 28 U.S.C. § 2244(d); *see Pliler v. Ford*, 542 U.S. 225, 230 (2004). Under Federal Rule of Civil Procedure 15(c), Morris may add an otherwise untimely claim to his habeas petition if it relates back to a timely-filed claim. *See Alfaro v. Johnson*, 862 F.3d 1176, 1183 (9th Cir. 2017). In the habeas context, the original pleading to which Rule 15 refers is governed by the "more demanding" pleading standard of Habeas Corpus Rule 2(c), which provides that a petition must "specify all the grounds for relief available to the petitioner" and "state the facts supporting each ground." *Mayle v. Felix*, 545 U.S. 644, 655 (2005). The "relation back" provision is to be strictly construed in light of "Congress' decision to expedite collateral attacks by placing stringent time restrictions on [them]." *Id.* at 657; *see United States v. Ciampi*, 419 F.3d 20, 23 (1st Cir. 2005).

"*Mayle* requires a comparison of a petitioner's new claims to the properly exhausted claims left pending in federal court[.]" *King v. Ryan*, 564 F.3d 1133, 1142-43 (9th Cir. 2009). An untimely claim relates back if it "arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). "The requirement that the allegations in the [amended pleading] arise from the same conduct, transaction, or occurrence is meant to ensure that the original pleading provided adequate notice of the claims raised in the amended pleading." *Williams v.*

*Boeing Co.*, 517 F.3d 1120, 1133 n.9 (9th Cir. 2008) (citing *Martell v. Trilogy Ltd.*, 872 F.2d 322, 326 (9th Cir. 1989)). This Court is not to read the "conduct, transaction, or occurrence" requirement so broadly as to render meaningless the statute of limitations. *Mayle*, 545 U.S. at 662-64.

A late-filed claim in an amended federal habeas petition relates back if the timely claim and the late-filed claim "are tied to a common core of operative facts." *Id.* at 664; *see Hebner v. McGrath*, 543 F.3d 1133, 1134 (9th Cir. 2008) (explaining that "a new claim in an amended petition relates back to avoid a limitations bar . . . only when it arises from the same core of operative facts as a claim contained in the original petition"). Claims share a common core if the litigant "will rely on the same evidence to prove each claim." *Williams*, 517 F.3d at 1133. If a new claim clarifies or amplifies a claim or theory already in the original petition, the new claim may relate back to the date of the original petition and avoid a time bar. *Woodward v. Williams*, 263 F.3d 1135, 1142 (10th Cir. 2001). "An amended habeas petition . . . does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Mayle*, 545 U.S. at 650.

B.   Analysis

1.   Proposed Amended Petition

Claims Fifty through Fifty-Two are asserted by Morris for the first time in the proposed amended petition. In Claim Fifty, Morris asserts trial counsel were ineffective for failing to investigate Morris's incompetence and request a competency hearing. (Doc. 38-3, at 1.) In Claim Fifty-One Morris asserts he was convicted and sentenced to death while incompetent, and his incompetency continued throughout his state-court proceedings. (Doc. 38-4 at 1.) In Claim Fifty-Two, Morris argues he is being denied his due-process rights by having to litigate his federal habeas proceedings when he is currently incompetent. (Doc. 38-5 at 1.)

Morris states he suffers from delusional disorder and exhibits symptoms of detachment from reality, paranoia, denial, and mistrust. Morris alleges counsel failed to

properly investigate his mental health, specifically his incompetence, despite several red flags indicating he was unable to rationally assist in his defense or understand the proceedings. Morris argues that, due to his delusional disorder, he lacked a rational understanding of his trial proceedings and the ability to effectively communicate with his attorneys.

Morris alleges that the facts he now offers in support of his claims are "rooted in the same facts alleged by Morris in his petition." (Doc. 38 at 7-10.) Morris alleges the new claims in the amended petition—Claims Fifty through Fifty-Two—arise out of the same nucleus of facts contained in several claims found in his timely filed Petition: Claims Two, Three (A), Four (B), and Nineteen. (Doc. 38 at 8-9) (citing Doc. 21 at 99–100, 109, 130–64, 182–94, 275–83).

Morris also alleges that the proposed amendments to existing Claims Twenty-Two and Forty-Eight challenge appellate and post-conviction counsel's effectiveness respectively. Morris asserts that these revisions relate back to the facts concerning appellate and post-conviction counsel in the Petition in addition to the facts from the claims listed above. (Doc. 38 at 9) (citing Doc. 21 at 290-301, 373-83).

### 2. Original Petition

In his Petition, Morris describes a family history of mental health issues, neglect, abuse, harsh discipline, and poverty. (*See generally* Doc. 21, at 1–18.)[2] Morris was burdened with responsibilities for his own care as well as that of his younger siblings at a very young age. (*Id.* at 4.) Morris was also exposed at a young age to drugs. (*Id.* at 6.) In high school, he was successful in Army JROTC, but his academic performance began to decline. (*Id.* at 7.) Morris suffered from insomnia, head injuries, and weight gain that ultimately prevented him from fulfilling his goal of serving in the military. (*Id.* at 7-12.)

---

[2] Respondents suggest that the operative facts supporting a new claim must be found in a single claim from the original petition, not scattered throughout the petition. (Doc. 41 at 9.) Morris contends there is no such requirement. (Doc. 42 at 2.) This Court does not reach this issue because it finds that the claims in the proposed amended petition do not relate back to the operative facts in the original petition regardless of where the facts are found.

After high school, Morris moved to Phoenix and lived with his aunt Melva and her drug-abusing husband Ronald in a dysfunctional home. (*Id.* at 13-14.) Morris was later kicked out of their home and lived for a time with friends; at other times he was homeless. (*Id.*) Eventually, Morris was allowed to return to Melva and Ronald's home where he was permitted to sleep in an RV in their backyard but remained the subject of mistreatment and mental abuse. (*Id.* at 15--6.) While at times employed, Morris also donated plasma for money and sold drugs. (*Id.* at 17.) Morris sporadically smoked marijuana, but was not known for using other drugs or drinking heavily. (*Id.*)

People who knew Morris thought that he seemed like two people, had multiple personalities, or lived in a fantasy world. (*Id.*) Specifically, Morris recounted to multiple witnesses what he now describes as a "fixed," "nonbizarre" delusion: the tragic death of his pregnant girlfriend in a car crash. (*Id.*) Most of his friends and family doubted the girlfriend existed. (*Id.*) Dr. Richard Lanyon examined Morris in 2003 and said that Morris engaged in "massive fantasy" and opined that Morris could have difficulty telling the difference between his fantasy and reality. (*Id.*) During post-conviction proceedings, Judith Becker, Ph.D., opined that Morris's fantasies were not meant to deceive, but to create a richer and more important life in his own mind and in the eyes of others, (*id.* at 17-18), for "the purpose of bolstering his own poor self-image." (Doc. 34 at 74.)

On April 12, 2003, police officers came to Morris's place of work and took him to the police station where he was questioned for approximately four hours. (Doc. 21 at 275.) During the interrogation, Morris described each of his encounters with the victims, stating that they all died of apparent drug overdoses. (*Id.*) The interrogator said that he did not believe Morris and pressed him to tell a different story, giving him two options of what happened—either he had promised the victims drugs in exchange for sex, or they had smoked their own crack cocaine and wanted Morris to choke them to enhance their pleasure. (*Id.*) Morris then told a second version of events, stating that each victim asked him to choke her and accidentally died as a result. (*Id.* at 275–76.)

During trial, the prosecutor advanced the theory that Morris was a necrophile. In Claim Two (A) of the Petition, Morris argues his counsel were ineffective during the guilt phase for failing to consult with and hire a mental health expert to testify that Morris was not a necrophile, and a pathologist to rebut the physical bases of the prosecutor's argument. (Doc. 21 at 109.) Morris asserts that his defense team knew before trial that necrophilia could be an issue at trial. (*Id.* at 99.) Although counsel had retained experts prior to trial, they presented no expert witnesses during trial. Before trial, Dr. Lanyon expressed puzzlement by the case and recommended obtaining a neurological examination, an MRI, and a "true expert with paraphilias" or an expert in serial killing. (*Id.*) Counsel contacted Dr. Becker, a specialist in abnormal psychology, but did not retain her. (*Id.* at 100.) Counsel also retained a local psychiatrist, who was "somewhat baffled" with Morris. (*Id.*)

In Claim Three (A) of the Petition Morris argues that trial counsel failed sufficiently to prepare for the penalty phase of Morris's trial and therefore failed to put on a complete or compelling mitigation investigation. (Doc. 21. at 153.) Morris asserts that the most egregious error was counsel's failure to fully investigate Morris's brain damage by deciding not to follow up on Dr. Lanyon and Dr. Pott's recommendations to obtain an MRI and EEG. (*Id.* at 155.) Morris also asserts that in conducting a mitigation investigation counsel failed to retain and present any experts or investigate and present evidence that he suffered from a mental illness such as a psychosis or delusions that would have combatted the charge that he lied frequently. (*Id.* at 156-57.) Finally, Morris asserts that counsel failed to effectively communicate with him and adequately explain allocution and his right to speak to a jury and, as a result, Morris did not tell the jury the mitigating fact that he did not have postmortem sex with the victims. (*Id.* at 161-62.)

In Claim Four (B) of the Petition, Morris argues his trial counsel neglected to properly investigate and present evidence to challenge Morris's statements to police during the pretrial and guilt-phase stages of his trial. (Doc. 21 at 182.) During the police interview, Morris initially stated that all the victims died of drug overdoses. (*Id.* at 183.) Morris asserts that, after suggestive questioning, subtle coercion, and implied promises by

his interrogator, he adopted a second version of events, claiming that each victim asked him to choke her and accidentally died as a result. (*Id.* at 183, 186.) Morris argues that counsel failed to present any expert witnesses to demonstrate that he was particularly susceptible to suggestions because he suffers from brain damage and, on the day of the interrogation, he had donated plasma and was also suffering from dehydration, light-headedness, dizziness, a migraine headache, and sleep deprivation. (*Id.* at 185–87.) He also asserts that counsel should have presented testimony from an expert in the psychology of police interrogations and confessions to support the defense's theory that Morris was particularly suggestible. (*Id.* at 193.)

In Claim Nineteen, Morris alleges many of the same facts he alleged in Claim Four (B) to support his claim that his statements were made involuntarily, and the trial court erred by admitting the statements in light of the totality of the circumstances surrounding the interview, including Morris's physical condition and susceptibility to suggestion coupled with the police's use of deceptive tactics. (*Id.* at 275–82.) Claim Nineteen was not raised in state court.

In Claim Twenty-Two, Morris argues that appellate counsel failed to raise meritorious claims on direct appeal by failing to challenge (A) the sufficiency of the evidence supporting the (F)(6) aggravating factor; (B) the medical examiner's testimony under the Confrontation Clause; (C) the introduction of unreliable scientific testimony from the medical examiner; (D) the trial court's erroneous instruction that Morris could be sentenced to life with the possibility of parole; (E) errors in the jury selection process; (F) the trial court's failure to sever the multiple murder counts; (G) evidentiary and (H) instructional errors throughout the guilt, aggravation, and penalty phases of Morris's trial; (I) the application of the (F)(2) aggravating factor as a double jeopardy violation; and (J) the constitutionality of the imposition of the death penalty in Morris's case. (Doc. 21 at 290-301.) Parts (D)-(J) of this claim were not raised in state court.

In Claim Forty-Eight of the Petition, Morris argues he was entitled to the effective assistance of PCR counsel to raise ineffective assistance of trial counsel claims in the PCR

proceedings which he asserts are a "first appeal of right"[3] as to those claims. Specifically, he asserts PCR counsel was inexperienced and failed to raise numerous meritorious claims. He describes communication between PCR counsel and himself as "tumultuous" and "strained at best." Morris asked PCR counsel to withdraw, but subsequently consented to her representation. Morris did not raise Claim Forty-Eight in state court, noting "there is no available state court corrective process." (*Id.* at 373) (citing 28 U.S.C. § 2254(b)(1)(B)(i)).

### 3. Relation Back

Morris asserts his amended claims relate back to claims of ineffective assistance of counsel ("IAC") and trial error in the Petition. He argues that his new claims arise out of the same nucleus of facts contained in his Petition including several claims alleging counsel were ineffective for failing to (1) hire a mental health expert in the guilt phase to testify that Morris was not a necrophile, (2) investigate Morris's brain damage by obtaining an MRI and EEG, (3) effectively communicate with Morris and adequately explain his allocution and his right to speak to a jury, and (4) present expert testimony to support the defense's theory that Morris was particularly suggestible, and a trial error claim that centers on whether the trial court erred in admitting statements Morris made to investigating officers.

In Claim Fifty, Morris asserts that counsel failed to investigate the numerous indications that he was unable to reasonably consult with his lawyers and could not rationally and factually understand the proceedings against him. Nothing in the Petition, however, would have put Respondents on notice that the difficulty Morris's attorneys had in communicating with him rendered him incompetent or was caused by Morris's delusional disorder. In the Petition, Morris places the blame for the troubled attorney-client

---

[3] A PCR filed in Arizona courts by a defendant who pleads guilty is known as a "Rule 32 of-right" proceeding and is the functional equivalent of a direct appeal. *State v. Ward*, 211 Ariz. 158, 161 (App. 2005); *see* Ariz. R. Crim. P. 32.1.

communications on his counsel's failure to adequately communicate with Morris. (*See* Doc. 21 at 131, 136, 137, 152, 161-62, 394.)[4]

Morris also argues in the Petition that counsel failed to investigate evidence that he suffered from a mental illness such as psychosis and delusions and asserts that this type of mitigating evidence is "essential in giving context to Morris's life experiences and actions and thus in humanizing him." (*Id.* at 156-57.) He also contends this evidence would have been useful to combat accusations that Morris lied frequently. (*Id.* at 156-57.) He did not, however, allege that his non-bizarre delusions prevented him from effectively communicating with his counsel or understanding the proceedings, and he did not claim in the Petition that this evidence also suggested Morris was incompetent.

Morris also asserts in the Petition that counsel should have investigated, and presented evidence of, Morris's brain damage in his mitigation presentation. This evidence, Morris states, would have explained the "missing link" between counsel's presentation of Morris as a responsible and caring child and his crimes. (Doc. 21 at 149-152.) But in the Petition Morris does not connect his brain injury with an inability to communicate or understand his legal proceedings. Thus, the mental health mitigation investigation Morris contends trial counsel failed to complete in the Petition is different in type from the present challenge to Morris's competence to stand trial. As Morris states in his motion, "[m]ental illness and competency to stand trial are distinct concepts." (Doc. 38-4 at 8) (citing *Clark v. Arizona*, 548 U.S. 735, 775 (2006)). Additionally, the claims differ in time. The evidence Morris asserts counsel should have presented in

---

[4] The Petition cited the following examples: second chair counsel stating first chair counsel was not aware of the need to reach out to the client and "stuff like that"; communication deteriorated and Morris declined legal visits because lead counsel did not seem to care about anything he said and they were barely on speaking terms, lead counsel visited Morris only twice in 2005 leading up to his trial, and after the guilt-phase verdicts counsel did not meet with Morris in jail even once; new co-counsel visited Morris only once in jail and "didn't really have too much involvement with him"; counsel failed to communicate with Morris and rarely visited Morris in jail; counsel failed to adequately explain allocution and Morris's right to speak to the jury; as part of her strategy playing "good cop, bad cop," PCR counsel wrote a letter accusing Morris of lying to her and stating, "You need to understand you are not a celebrity or a movie star. You are just another black man on death row waiting to be executed."

mitigation focuses on his deteriorating mental health "[l]eading up to the time of the crimes," but not during his state court criminal proceedings. (*See id.* at 77.)

Additionally, Morris's "proposed new claims in the amended petition do not amplify or clarify any of the original claims, are based on different aspects of the criminal process, and involve different theories and analyses than those presented in the original petition." *See Pete v. Henry*, 2:02-CV-02713, 2007 WL 4325504, *6 (E.D. Cal. Dec. 7, 2007). In *Pete*, the petitioner's original claims challenging two jury instructions were "specific, discrete, and limited." *Id.* at *4. The Court found Pete's new claims, alleging (1) juror confusion over legal terms not related to the specific instructions at issue in his petition, (2) IAC for failing to participate in jury instruction selection, and (3) the broad charge of ineffective assistance of appellate counsel for failing to adequately research the record and identify appellate issues, were "broad ranging challenges to conviction based upon separate sets of facts and legal theories," and thus did not relate back. *Id.* Similarly, as discussed above, Morris's new claims and factual allegations do not amplify, clarify, or expand on any of his original claims of IAC. C*f. Torres v. Graham*, CV 06-0785, 2007 WL 1233555, *4 (E.D. NY April 20, 2007) (finding new claim—that defense counsel was ineffective for failing to obtain psychiatric records to use at a competency hearing— related back to the claim defense counsel was ineffective for failing to make a timely motion for a competency hearing). Moreover, it is well understood that the mere assertion of IAC clams in a habeas petition does not support the relation back of other claims of IAC. *Schneider v. McDaniel*, 674 F.3d 1144, 1151 (9th Cir. 2012). Instead, such claims relate back only if they rely on the same concrete facts. *See id.* at 1152 ("Ground 5 does not relate back. Ground 5 is based on trial counsel's failures to prepare [petitioner's] defense whereas Ground 1(3) is based on trial counsel's failure to investigate [a codefendant's] defense. The two claims have no facts in common."). Because there are no facts in Morris's original IAC claim that concern his competency or his ability to understand his trial proceedings and to effectively communicate with his attorneys, the IAC claims in the amended petition do not relate back to the Petition.

Finally, the Petition does not put Respondents on notice that Morris intended to place his competency at issue in these federal habeas proceedings, as he alleges in Claim Fifty. *See United States v. Hernandez*, 436 F.3d 851, 858 (8th Cir. 2006) ("The facts alleged in the original claim were not such that would put the opposition on notice that cross-examination of witnesses was at issue.") (citing *Mandacina v. United States*, 328 F.3d 995, 1000 (8th Cir. 2003)).

Further, the claims and operative facts alleged in the Petition do not indicate that "the essential features of delusional disorder and their impact on Morris rendered him incompetent to stand trial," as alleged in Claim Fifty-One. Allegations of mental illness, even "paranoid delusions," do not necessarily equate to allegations of incompetence. *See Boyde v. Brown*, 404 F.3d 1159, 1166 (9th Cir. 2005) (stating paranoid delusions unrelated to petitioner's counsel or his trial do not obviously limit petitioner's ability to interact with his counsel or understand the proceedings against him). No facts alleged in the Petition suggest that the impact of his delusional disorder rendered Morris incompetent or unable to communicate with his counsel or understand the proceedings. The Petition describes Morris's behavior as "erratic and strange" (Doc. 21 at 42), but does not paint a picture of Morris's behavior that was so irrational or erratic as to raise a doubt regarding his understanding of the proceedings or ability to consult with his counsel. *See Hernandez v. Ylst*, 930 F.2d 714, 718 (9th Cir. 1991) ("[A] defendant's bizarre actions or statements, or counsel's statement that the defendant is incapable of cooperating in his own defense, or even psychiatric testimony *need not alone* raise sufficient doubt."). A defendant suffering from mental illness may still be able to understand the proceedings against him and assist in his defense. *See United States v. Garza*, 751 F.3d 1130, 1135-36 (9th Cir. 2014) (stressing the need for clear connection between defendant's mental illness, even if severe, and "some failure by the defendant to understand the proceedings or assist in his own defense").

For the same reasons, the amended ineffective assistance of appellate counsel claim (Amended Claim Twenty-Two (K)) and ineffective assistance of PCR counsel claim

(Amended Claim Forty-Eight) do not relate back to the claims in the Petition.[5] The operative facts supporting the claims in the Petition and the proposed amended petition are distinct, as are the underlying legal theories. Finally, Morris's assertion that he is being denied his due process rights by having to litigate his federal habeas proceedings when he is currently incompetent (Claim Fifty-Two) does not relate back to the Petition.[6]

The Court has carefully compared the proposed amendments with the Petition and concludes that the Petition does not provide adequate notice of the amended claims. Further, the amended claims do not arise out of the same conduct, transactions, or occurrences alleged in the Petition, do not rely on the same evidence, and thus do not share a common core of operative facts. Finally, the proposed amendments do more than merely clarify or amplify the claims or theories in the Petition. For these reasons, the proposed claims do not relate back to the original Petition. It would therefore be futile to allow amendment. Because leave to amend may be denied based upon futility alone, Morris's motion to amend will be denied. *See Bonin*, 59 F.3d at 845.

III. <u>MOTION TO STRIKE</u>

On June 22, 2017, the Court granted Respondents' request to limit juror contact. (Doc. 11.) The Court's order prohibited Morris from questioning jurors on the course of their deliberations or other matters not admissible in evidence absent further authorization

---

[5] Additionally, Claim Forty-Eight is meritless because "there is no constitutional right to counsel in state PCR proceedings." *Detrich v. Ryan*, 740 F.3d 1237, 1243–44 (9th Cir. 2013) (en banc) (plurality opinion) (citing *Coleman v. Thompson*, 501 U.S. 722, 753–54 (1991)); *see also Clabourne v. Ryan*, 745 F.3d 362, 375 (9th Cir. 2014) (stating that *Martinez v. Ryan*, 566 U.S. 1 (2012), did not change the premise "that an individual does not have a constitutional right to counsel in post-conviction proceedings"), *overruled on other grounds by McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015); 28 U.S.C. § 2254(i).

[6] Additionally, because Claim Fifty-Two does not attack the constitutionality of Morris's detention, it is not cognizable in a habeas corpus proceeding under 28 U.S.C. § 2254. To the extent Morris asserts that his incompetency renders him unable to aid counsel in developing his claims in this habeas proceeding, the Court takes notes that this claim was not raised until after full briefing of the petition and that Morris specifically states that he does not seek a competency-based stay of his petition. Cf. *Ryan v. Gonzales*, 568 U.S. 57 (2013) (incompetent prisoner has no right to an indefinite stay of habeas proceedings, but a district court may exercise its discretion to issue a competency-based stay).

of the Court, but permitted him to question jurors concerning extraneous influences on, or racial animus of, the jury.  (*Id.* at 2.)  On December 11, 2018, Morris filed a request for evidentiary development including a request to expand the record to include six juror declarations attached as Exhibits 109 through 114.  (Doc. 43-8 at 57-69.)  Respondents move to strike the declarations and the request for evidentiary development because the declarations violate the Court's order and are prohibited by federal law, and the evidentiary request relies on, and references, the challenged declarations.  (Doc. 45.)

A. Applicable Law

Juror testimony cannot be used to impeach a verdict unless "extrinsic influence or relationships have tainted the deliberations." *Tanner v. United States*, 483 U.S. 107, 120 (1987).  Similarly, Rule 606(b)(1) prohibits juror testimony "about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." Fed. R. Evid. 606(b)(1).  Rule 606(b)(1) also states that "[t]he court may not receive a juror's affidavit or evidence of a juror's statement on these matters." *Id.*  The only exceptions concern questions of whether "extraneous prejudicial information was improperly brought to the jury's attention"; "outside influence was improperly brought to bear upon any juror"; or "a mistake was made in entering the verdict on the verdict form." Fed. R. Evid. 606(b)(2).  Additionally, the Supreme Court has recognized that the Sixth Amendment requires that the prohibition in Rule 606(b)(1) give way where "a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant." *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 869 (2017).

B. Analysis

The Court rejects Morris's contention that it should not consider the admissibility of the declarations because objections to the admissibility of his proffered evidence should only be made in a responsive filing to his request for evidentiary development and not in a motion to strike. *See* LRCiv 7.2(m)(2).  The Court's order limiting juror contact prohibited Morris from questioning jurors "on the course of their deliberations or *other matters not*

*admissible in evidence*" and authorized him only to question jurors regarding extraneous influences on, or racial animus of, the jury. (Doc. 11 at 2) (emphasis added). Respondents' motion asserts that the exhibits are both prohibited by, and lack authorization under, this Court's order and Rule 606(b). A party may file a motion to strike "if it seeks to strike any part of a filing or submission on the ground that it is prohibited (or not authorized) by a statute, rule, or court order." LRCiv 7.2(m)(1). Thus, Respondents motion is properly filed.

Morris contends Respondents have failed to identify the objectionable statements in the challenged declarations. (Doc. 52 at 2.) While Respondents' did not identify the objectionable statements by paragraph or line number, their request to strike the juror declarations which specifically "talk about evidence at trial, the jurors' reactions to evidence at trial, and the jurors' deliberations" (Doc. 45 at 2) sufficiently identifies the statements at issue before the Court.

Juror D.A. stated in his declaration that "[d]uring the trial, a sealed package that contained foul-smelling evidence was opened. It was clothing that had been found near a decomposed body." (*Id.* at 57, Ex. 109.) All five of the other jurors also recalled this incident in their declarations. (*Id.* at 58-69, Exs. 110-14.) Jurors E.R. and C.J. stated they thought that the prosecutor's conduct in exposing the evidence was intentional, (*id.* at 62, 69, Exs. 111, 114), and Juror D.A. recalled that, after the trial, the prosecutor told the jury "he wanted [them] to experience what [Morris's] camper smelled like" (*id.* at 57, Ex. 109). Jurors D.G. and J.P stated in their declarations that, based on the State's evidence, they believed Morris had postmortem sex with the victims. (Doc. 43-8. at 60, 67, Exs. 110, 113.) Juror E.R. declared the images presented at trial were shocking and recalled seeing photos of skin slippage. (*Id.* at 69, Ex. 114.) Juror C.J. was "surprised at the lack of defense Morris's attorneys provided." (*Id.* at 62, Ex. 111.) Morris argues that these declarations show that the prosecutor's misconduct rendered Morris's trial fundamentally unfair and counsel ineffective for not objecting to the misconduct, and that the introduction of evidence of necrophilia was prejudicial. (*Id.* at 21, 51.)

Juror A.M. stated he was surprised to be on the jury because of his line of work as a mechanic repairing the Phoenix Police Department's vehicles in addition to recognizing the names of two of the officer witnesses in the juror questionnaire. (*Id.* at 64, Ex. 112.) Morris cites this declaration in support of his claim that trial counsel was ineffective for failing to make appropriate objections during voir dire. (Doc. 43 at 49.)

Jurors A.M. and J.P. both recalled one juror "having a hard time" and "wrestling with the decision" to vote for the death penalty. (*Id.* at 64, 67, Ex. 112-13.) Juror A.M. told her that he did not "want to make a bad decision that would allow a guilty man to go free." (*Id.* at 64.) Morris argues that A.M.'s declaration shows the jury contemplated the possibility that Morris could be released from prison because of an erroneous jury instruction and counsel's failure to correct it. (Doc. 43 at 44.)

Morris argues that these jurors' statements are permissible because they do not go to the jurors' deliberative process. Rather, he asserts, the statements can be categorized as observations of, and reactions to, the evidence at trial, the prosecutor's actions, and defense counsel's performance. This attempt by Morris to carve out a Rule 606(b) exception for intrinsic trial evidence observed by jurors during the course of trial and the jurors' "reactions" to that evidence is not supported by the law he cites. Morris relies on *United States v. Farmer*, 717 F.3d 559 (7th Cir. 2013), and *United States v. Kimberlin*, 805 F.2d 210 (7th Cir. 1986), to assert that a court may consider potentially prejudicial communications that occur before the jury begins deliberations. In *Farmer*, the court explained that, "when a district court receives information after a verdict is returned that jurors engaged in premature deliberation or made pre-deliberation statements indicating they had already made up their minds, Rule 606(b) does not prevent consideration of evidence of the statements or conduct." 717 F.3d at 565; *see also Kimberlin*, 805 F.2d at 244-45 (recognizing that communications between jurors that were allegedly made during the course of trial are not literally included in the prohibition of Rule 606(b) against testimony by a juror as to a statement made during the course of the jury's deliberations).

Thus, Morris asserts, the jurors' observations of the prosecutor's in-court actions are admissible as evidence of a non-deliberative trial proceeding.

The Court disagrees for several reasons. First, even if these cases were binding precedent, the statements at issue here do not involve allegations of communications between jurors—a type of extrinsic evidence—in support of a juror misconduct claim. Second, contrary to the Seventh Circuit's recognition of an exception to Rule 606(b) for matters involving premature deliberations, the Ninth Circuit has declined to "delve into the internal affairs of the jury simply because the discussions took place before deliberations commenced." *See United States v. Leung*, 796 F.3d 1032, 1034, 1038 (2015) (holding that "juror testimony that other jurors engaged in premature deliberations or made up their minds about the case before deliberations began is inadmissible"). Third, citing *Warger v. Shauers*, 135 S. Ct. 521, 527 (2014), for support, Morris defines the term "deliberations" to mean only "what the jurors discussed when reaching a verdict and why individual jurors voted as they did." (Doc. 52 at 3.) But the Court in *Warger* did not define the term this way and rejected an interpretation that Rule 606(b) applies only to claims of error for which a court must examine the manner in which the jury reached its verdict. *Warger*, 135 S. Ct. at 528. Moreover, after the *Warger* decision, the Ninth Circuit observed that "parsing how jurors considered the evidence or their mental states while hearing testimony is exactly what . . . the plain text of Rule 606(b) seek[s] to prevent." *Leung*, 796 F.3d at 1036.

Additionally, the Court prohibited all questioning of jurors with the exception of permitting Morris to question jurors on matters concerning extraneous influences on, or racial animus of, the jury. (*See* Doc. 11.) Evidence that has not been introduced into the trial record is deemed "extrinsic." *See Marino v. Vasquez,* 812 F.2d 499, 504 (9th Cir. 1987). What happens in the courtroom is a part of the trial, not extrinsic to it. *Raley v. Ylst*, 470 F.3d 792, 803 (9th Cir. 2006). Only juror D.A.'s statement, in which he recalls that the prosecutor told the jury "he wanted [them] to experience what [Morris's] camper smelled like" (*id.* at 57, Ex. 109, ¶ 3), is not prohibited because it concerns matter occurring after deliberations. The rest of the substantive declarations made by these six jurors involve

matters intrinsic to the trial, do not constitute an exception to Rule 606(b)'s prohibition of juror testimony, and show noncompliance with this Court's order. Specifically, the Court finds the following paragraphs from the jurors' declarations exceed the bounds of the Court's order and what federal law permits by delving impermissibly into subjects that do not involve the extraneous influences on, or racial animus of, the jury:

- Juror D.A.'s Declaration (Doc. 43-8, Ex. 109), Paragraph 2.
- Juror D.G.'s Declaration (*Id.*, Ex. 110), Paragraphs 2-5.
- Juror C.J.'s Declaration (*Id.*, Ex. 111), Paragraphs 2-7.
- Juror A.M.'s Declaration (*Id.*, Ex. 112), Paragraphs 2-6.
- Juror J.P.'s Declaration (*Id.*, Ex. 113), Paragraphs 2-6.
- Juror E.R.'s Declaration (*Id.*, Ex. 114), Paragraphs 2-4.

Morris contends that the jurors are no different than any other witness in the courtroom regarding their ability to substantiate claims of prosecutorial misconduct observed during the trial. In support, Morris cites *Smith v. Winters*, 337 F.3d 935 (7th Cir. 2003), in which the court suggests that the petitioner in that case could have sought supporting affidavits from the jurors to substantiate his "improbable" and unsupported claims of prosecutorial misconduct. *Id.* at 937. Even if the decision in *Smith* was binding on this Court, the submission or admissibility of juror affidavits was not at issue in *Smith*. Additionally, unlike the petitioner in *Smith*, Morris's claim of prosecutorial misconduct is not unsupported. He has attached the declarations of several non-jurors as witnesses to the bag-opening incident, rendering these jurors' declarations cumulative. (*See e.g.*, Doc. 43 at 21–22) (citing Exs. 91-93, 105 and 108)).

Morris also argues that Rule 606(b) does not prohibit E.R.'s recollection of certain photographs as "shocking" and D.G. and J.P.'s statements that, based on the State's evidence, they "believed" Morris had committed necrophilia because these statements do not go to the deliberative process since the jurors did not state what effect these facts had on their votes. (Doc. 52 at 4-5.) But if a court may not consider a juror's testimony about the subjective impact of improperly admitted evidence, *see Sassounian v. Roe*, 230 F.3d

1097, 1109 (9th Cir. 2000), *as amended on denial of reh'g* (Dec. 6, 2000), it follows that the subjective impact on a juror of properly admitted evidence is also off-limits. Morris cites *United States v. Henley*, 238 F.3d 1111 (9th Cir. 2001), for the proposition that courts distinguish between testimony that an incident has occurred, which is not precluded by Rule 606(b), and testimony about the effect of the incident on the jury's deliberations, which is precluded by Rule 606(b), and asserts that the statements at issue here fall into the former category of testimony. Neither *Henley* nor *United States v. Cheek*, 238 F.3d 1111 (9th Cir. 2001), cited in *Henley*, support his assertion. The "incident" at issue in both *Henley* and *Cheek* involved extrajudicial juror contact in the form of a bribery attempt. *Henley*, 238 F.3d at 1114; *Cheek*, 94 F.3d at 138. Nothing similar is alleged to have occurred here.

Further, in *Cheek*, the appellate court found that by asking a juror "whether he had listened to and considered all the evidence" during trial the government was in fact "delving into [the juror's] mental processes about the sufficiency of the evidence in reaching his personal verdict," thus exceeding the strict limits imposed by Rule 606(b). 94 F.3d at 143. Here, consideration of the jurors' thoughts and beliefs about what they observed during the trial and what impact it made on them impermissibly "delve[s] into the mental processes" of the jurors and is precisely what Rule 606(b) and this Court's order are designed to prohibit. *See Sassounian*, 230 F.3d at 1108-09 ("A long line of precedent distinguishes between juror testimony about the consideration of extrinsic evidence, which may be considered by a reviewing court, and juror testimony about the subjective effect of evidence on the particular juror, which may not."). Additionally, to the extent Morris is arguing that the statements are necessary to establish that an incident has occurred, juror testimony is unnecessary to establish "incidents" that are a part of the record, such as the introduction of evidence.

Morris contends that C.J.'s statement that she was shocked that Morris's counsel put on no defense is admissible evidence of counsel's alleged ineffective performance under *Strickland v. Washington*, 466 U.S. 668 (1984). Morris argues the statement is not

prohibited because it does not go to the prejudice prong of his ineffective assistance of counsel claim because C.J. makes no statement as to how counsel's performance impacted deliberations. Morris also alleges A.M.'s statement that he was surprised he made it on the jury supports his claim that trial counsel was ineffective for failing to move to strike A.M. for cause because "the fact that A.M. should have been removed from the jury was so apparent that even he recognized it." (Doc. 52 at 6.) Morris's arguments miss their mark. Whether counsel put on a defense or failed to strike a juror for cause is a historical fact, evident from the record. Whether counsel's failure to put on a defense demonstrates deficient performance is an objective finding of fact and law made by the court, not by the trial jurors. Whether a juror was shocked by counsel's chosen defense or lack thereof is completely irrelevant to this determination and, as discussed above, involves the impermissible consideration of the subjective impact of evidence, or lack thereof, on a juror. Juror C.J.'s statement is also irrelevant, cumulative to other evidence that could be obtained from non-jurors, and involves intrinsic observations of the trial. Similarly, a juror's subjective expectations, in this case A.M.'s surprise at being selected for the jury, is irrelevant to the Court's assessment of counsel's performance in the context of "prevailing professional norms." *See Strickland*, 466 U.S. at 688.

Morris alleges A.M.'s statement that he did not want a guilty man to go free, made to another juror during deliberations, confirms that the trial court incorrectly instructed the jury and that counsel was ineffective for failing to object to the instructions. Morris argues that juror statements are admissible to demonstrate that a trial court's error and counsel's deficient performance was harmful. (Doc. 52 at 7) (citing *Lawlor v. Zook*, 909 F.3d 614 (4th Cir. 2018)). Reading *Lawlor* closely, however, reveals it does not support Morris's position. The Fourth Circuit explained that a juror affidavit could not properly be considered to impeach a jury's verdict. *Lawlor*, 909 F.3d at 634. Although the Court then remarked that one juror's affidavit was evidence of confusion that resulted from the trial court's failure to fully and correctly answer the jury's questions during deliberations, the Court relied solely on record-based evidence to find the error was not harmless. *Id.* at 635.

This is consistent with the law in this Circuit. *See e.g., Sassounian,* 230 F.3d at 1108–09; *see also Hanna v. Riveland*, 87 F.3d 1034, 1039 (9th Cir. 1996) (stating that a judge conducts a proper harmless error inquiry in habeas proceedings "based on the record's facts"); *Dickson v. G.E. Sullivan*, 849 F.2d 403, 406 (1988) ("[T]he question of prejudice is an objective, rather than a subjective, one.").

Juror affidavits are generally not pertinent to undermine a verdict or jury instructions. *See Walker v. United States*, 298 F.2d 217, 226 (9th Cir. 1962) ("[W]hen objection rests upon the juror's testimony as to what were the reasons that in fact induced them to find their verdict, the court will not hear them."). Harmless error review in a habeas proceeding is a record-based inquiry. *See Sassounian*, 230 F.3d at 1108-09. Even under Morris's narrow definition of the meaning of deliberations—what jurors discussed when reaching a verdict and why individual jurors voted as they did—A.M.'s statement is precluded by Rule 606(b).

IV.     <u>CONCLUSION</u>

The Court finds that Morris's proposed amendments do not relate back to the claims, or operative facts and legal theories, in his Petition. Thus, the Court will deny his motion to amend on the grounds that the proposed amendments would be futile. *See Bonin*, 59 F.3d at 845.

The Court further finds that the juror declarations attached to Morris's notice of request for evidentiary development (Doc. 43, Exs. 109-114), apart from juror D.A.'s statement concerning matters occurring after deliberations, contain statements on matters prohibited by Rule 606(b)(1), and to which the exceptions of Rule 606(b)(2) and this Court's order allowing statements concerning the extraneous influences on, or racial animus of, the jury, do not apply. The Court will disregard the improper portions of the juror declarations, as identified above, and all references to them, when considering Morris's request for evidentiary development. Fed. R. Evid. 606(b)(1).

**IT IS ORDERED** that Petitioner's Motion to Amend (Doc. 38) is **denied**.

- 23 -

**IT IS FURTHER ORDERED** that Respondents' Motion to Strike (Doc. 45) is **denied**, but the Court will disregard the improper portions of the juror declarations, as identified above, and all references to them, when considering Morris's request for evidentiary development.

Dated this 25th day of April, 2019.

David G. Campbell
Senior United States District Judge