1    **WO**

2

3

4

5

6            **IN THE UNITED STATES DISTRICT COURT**

7            **FOR THE DISTRICT OF ARIZONA**

8

9    Cory Deonn Morris,                    No. CV-17-00926-PHX-DGC

10                  Petitioner,             DEATH-PENALTY CASE

11    v.                                    **ORDER**

12    Ryan Thornell, et al.,

13                  Respondents.

14          Petitioner Cory Deonn Morris, a state prisoner under sentence of death, has filed a

15    Petition for Writ of Habeas Corpus.  (Doc. 21 (Petition).)[1]  Morris alleges, pursuant to 28

16    U.S.C. § 2254, that he is imprisoned and sentenced in violation of the United States

17    Constitution.  He seeks expansion of the record, discovery, and an evidentiary hearing in

18    support of several of the claims he raises in his 400-page Petition.  (Doc. 43.)  Respondents

19    oppose the Petition and the request for evidentiary development.  (Docs. 27, 60.)  Morris

20    has replied with memoranda in support of the Petition and the request for discovery and

21    evidentiary development.  (Docs. 34, 64.)  The Petition and the request for discovery and

22    evidentiary development are denied for the reasons set forth below.

23    **I.    BACKGROUND**

24          In 2005, Morris was convicted of the first-degree murders of Barbara Codman,

25    Shanteria Davis, Jade Velasquez, Sharon Noah, and Julie Castillo.  *State v. Morris*, 215

26    Ariz. 324, 332, 160 P.3d 203, 211 (2007).  The following facts concerning the crimes are

27    _____

28          [1] "Doc." refers to numbered documents in this Court's electronic case docket and
      page citations are to page numbers generated by the Court's electronic filing system.

1    drawn from the Arizona Supreme Court's opinion in *Morris*, 215 Ariz. 324, 160 P.3d 203,

2    and this Court's review of the record.[2]   The state court's factual findings are "presumed

3    correct." *Atwood v. Ryan*, 870 F.3d 1033, 1039 (9th Cir. 2017) (citing 28 U.S.C.

4    § 2254(e)(1)).[3]

5        Morris lived in a camper in the backyard of his aunt and uncle's house in Phoenix

6    and worked at a bar approximately three nights a week.   In April 2003, Morris's boss

7    noticed for the first time that Morris had a body odor problem.   Morris's aunt and uncle

8    also noticed that Morris had a body odor problem that had become progressively worse

9    since he began living with them six months earlier.

10       On April 12, 2003, when Morris's uncle went to the camper to find Morris, he

11   smelled a "rotten odor" in the backyard and saw flies inside the window of the camper.   As

12   he opened the door and stepped inside, he saw flies and maggots "boiling on the floor."

13   He discovered the decomposed body of Julie Castillo under a blanket.

14       Police officers questioned Morris about the body in his camper, as well as four other

15   bodies that had been found nearby.   Morris admitted to knowing the five victims and

16   provided two versions of each victim's death.   In the first version, he claimed that each

17   victim died of a drug overdose while he was away from the camper.   After discussing all

18

19

20       [2] "ROA" refers to the indexed documents from the Maricopa County Superior Court
21   trial and post-conviction proceedings in CR 2003-011506-00. "DA" refers to the indexed
     documents from the Arizona Supreme Court direct review proceedings in CR-05-0267-
22   AP.  "PR" refers to the indexed documents from the Arizona Supreme Court's review of
     post-conviction proceedings in CR-15-0442-PC.  Exhibits to the post-conviction petition
23   are labeled "PCR Pet. Ex." and exhibits from the post-conviction evidentiary hearing are
     labeled "PCR EH Ex."  These exhibits are located at PR 12 and 13, respectively.  Trial
24   exhibits are referred to as "Trial Ex." and these and some select post-conviction exhibits
     were submitted electronically to the Court by Morris.  (*See* Doc. 37.)
25

26       [3] The Court's recitation of facts derived from *Morris* in the Background section is
27   not intended to be an implicit rejection of any of Morris's claim-specific challenges to the
     presumption of correctness.

28                                            2

1   five victims, the detective conducting the interview told Morris that he did not believe him.

2   Morris then stated that each victim asked him to choke her during sex and that each

3   accidentally died as a result of this conduct.

4   <u>Barbara Codman</u>

5        On September 11, 2002, police discovered Barbara Codman's naked, decomposed

6   body in an alley just north of Morris's residence.  Police found drag marks from the

7   sidewalk crossing the alley into the alley itself.  Codman's body exhibited skin slippage[4]

8   on her inner thighs and breast, and her head and neck were more decomposed than the rest

9   of her body.

10       Morris said he met Codman while walking at night and, for twenty dollars, she

11  agreed to come to his camper and have sex with him.  Morris first said he went outside

12  after he and Codman had sex and, when he returned, Codman was sitting naked on the bed

13  using drugs.  Morris told her to leave after she finished, and then he stepped outside.  When

14  he went back into the camper, Codman was sitting on the bed panting, and she soon

15  collapsed.  Morris dragged Codman out of the camper on a sleeping bag.

16       In his second version of events, Morris stated Codman asked him to choke her with

17  a necktie during sex.  He did so, and she collapsed and never regained consciousness.

18       Morris kept some of Codman's belongings.  Analysts found Codman's DNA on

19  some of the items.  When Morris was arrested, he was carrying Codman's social security

20  card, driver's license, and check card in his wallet.

21       Because of the extensive decomposition of Codman's head and neck, Dr. John Hu,

22  who performed her autopsy, was unable to conduct a detailed investigation for trauma in

23  that region.  Dr. Hu originally determined that the cause of death was combined toxicity of

24  morphine and cocaine and listed the manner of death as undetermined because the

26  [4] Skin slippage occurs when, in the postmortem phase, bacteria destroy connections
27  between the skin and the underlying tissue so that, with pressure and movement, the skin
    begins to detach and slip off the body.

28                                    3

circumstances surrounding Codman's death were suspicious.  After the police gave Dr. Hu a transcript of Morris's statements, he determined that "the cause of death is most likely asphyxia due to ligature strangulation" because the autopsy results were not inconsistent with such a determination.

<u>Shanteria Davis</u>

On October 10, 2002, police found Shanteria Davis's naked, decomposed body in the same alley in which Codman's body had been discovered.  Davis had skin slippage on her back, buttocks, and the backs of her legs.  Police found drag marks in the alley.

In his first version of events, Morris stated that, for five dollars, Davis agreed to come back to his camper and have sex with him.  After they had sex, Morris left Davis alone in the camper for about an hour because she wanted to use drugs.  When Morris returned, Davis was unconscious but breathing.  Morris covered her and left for his friend's house.  When he returned the next morning, Davis was dead.  That night, he dragged her into the alley.

In his second version of events, Morris stated that Davis asked him to wrap her hair extensions around her neck while they were having sex.  Davis died as a result of this conduct.

Police found hair extensions in Morris's camper.  DNA under Davis's fingernails matched Morris's DNA.  DNA analysis on panties found in Morris's camper could not exclude Davis as a source of the DNA.

Because of the extent of decomposition, Dr. Kevin Horn, who performed Davis's autopsy, could not determine whether Davis suffered any trauma.  Based on the lack of visible trauma and the presence of cocaine and cocaine breakdown products in her spleen, Horn determined that the cause of death was cocaine intoxication.  After reviewing a transcript of Morris's statements to the police, Dr. Horn stated that nothing in his autopsy was inconsistent with strangulation.

///

4

Jade Velasquez

On February 27, 2003, police discovered the clothed body of Jade Velasquez just outside the locked gate leading to the backyard where Morris's camper was located. Velasquez had ligature marks on the front and sides of her neck and bruising under her left eye. Police noted "some disturbance" in the ground near the gate to the backyard, which was consistent with removing the gate from its hinge and then replacing it. Police also noted grass scuff marks on the sidewalk, indicating that the body had been dragged. A detective spoke with Morris's aunt during the investigation of Velasquez's death.

During his interview with police, Morris first stated that Velasquez, a friend, agreed to come to his camper for sex. He claimed that Velasquez was drunk when she arrived at the camper and passed out before having sex with him. According to Morris, he realized that Velasquez was dead when she did not wake up the next morning. He left for the day and moved her body to the street that night.

In his second version of events, Morris stated that Velasquez asked him to use his hands to choke her while they were having sex. Morris did so, and Velasquez passed out and never regained consciousness. Morris put Velasquez's clothes back on her before he dragged her to the street because he knew her and did not want to leave her in the street unclothed.

DNA from semen on a vaginal swab taken from Velasquez's body matched Morris's DNA profile. Dr. Vladimir Shvarts, who performed Velasquez's autopsy, found petechial hemorrhages in her left eye and focal hemorrhagic areas inside her neck, and determined that the cause of death was strangulation. Velasquez's blood tested positive for alcohol, cocaine metabolites, and benzodiazepines, but the combination of drugs was not sufficient to cause death.

Sharon Noah

On March 29, 2003, police found Sharon Noah's naked body approximately fifteen to twenty feet from the location at which Velasquez's body was discovered. There were

ligature marks on Noah's neck and skin slippage on her inner thighs, breasts, and hips. Maggots were present on her body, and her hand and foot were mummified. Some of Noah's artificial fingernails were broken.

Morris first stated that he met Noah, who had the mental age of a ten- or eleven-year-old, while out walking, and the two then went back to his camper and had sex. Afterwards, Morris left because Noah wanted to use drugs. Noah was dead when he returned. Morris then put a belt around Noah's neck and pulled her body onto his sleeping bag. He dragged her body outside that night. He threw away most of her clothes but kept her shoes.

In his second version of events, Morris said that Noah suggested that he use the nylon strap attached to Morris's gym bag to choke her during sex. Morris did so, but when Noah's eyes closed, he stopped and noticed that she was no longer breathing. Morris left the strap on Noah's neck until he dragged her outside.

DNA on panties found in Morris's camper matched both Morris's and Noah's DNA profiles, and Morris's DNA profile matched DNA on a vaginal swab taken from Noah. Police also found broken fingernails in Morris's camper.

Noah's autopsy indicated that she died of ligature strangulation resulting in asphyxia. Although toxicology reports showed that Noah had used cocaine before her death and that her system contained GHB (gamma hydroxybutyrate), which is often used in date rapes, drug overdose was not the cause of death. When asked how he would explain the extensive skin slippage on Noah's thighs, the medical examiner posited that some item may have contacted her thighs postmortem.

Julie Castillo

The body discovered in Morris's camper on April 12, 2003, was that of Julie Castillo. The badly decomposed body was face down and her buttocks were near the camper's fold-down bed. There was a necktie around her neck.

6

Morris first stated that he brought Castillo back to his camper because it was cold and she needed a place to spend the night. Morris left the camper after Castillo asked if she could smoke crack, and when he returned, Castillo was unconscious on the floor. He took her clothes off because she had urinated on herself. The next day, he went to work, and when he returned, he realized that Castillo was dead. Morris stayed in the camper that night. When the detective conducting the interview asked whether Morris engaged in any sexual activity while Castillo's body was in the camper, Morris stated that he ejaculated in his sleep but was facing away from Castillo's body at the time. Morris originally said that he never had sex with Castillo.

In his second version of events, Morris stated that Castillo asked him to choke her with a necktie during sex. Morris did so, and Castillo collapsed and never regained consciousness. Morris kept Castillo's body in his camper for approximately five days before it was discovered. He claimed that he had not been in the camper during the three days before the body's discovery.

Dr. Horn, who performed Castillo's autopsy, determined that Castillo had been dead "between three and seven" days at the time the body was found. Based on information from the detectives, Dr. Horn determined that the cause of death was "probable ligature strangulation." Because of the extensive decomposition, there was no visible evidence of trauma. Castillo had a blood alcohol content of 0.12, and also had traces of cocaine in her system. Additionally, seven defects measuring up to three-eighths of an inch radiated around Castillo's anus. Dr. Horn could not determine whether the defects resulted from trauma or normal decomposition.

Indictment and Trial

A grand jury indicted Morris on five counts of first degree murder. During the guilt phase of the trial, the prosecution played videotapes of Morris's description of each woman's death. After the prosecution rested, Morris moved for a directed verdict on all

1    counts.  The judge denied the motion.  Morris chose not to testify and presented no defense.

2    The jury found Morris guilty on all five counts.[5]

3        At the aggravation phase, the prosecutor presented evidence in support of the

4    "especially cruel, heinous, or depraved" aggravating factor.  *See* A.R.S. § 13-703(F)(6)

5    (Supp. 2004).[6]   With respect to the especially cruel prong, Dr. Keen testified that

6    strangulation victims are conscious for at least a short period and experience pain before

7    they lose consciousness.  With respect to the heinous and depraved prong, the prosecutor

8    argued that Morris kept the bodies after they began to decompose because he enjoyed the

9    odor of decomposition.  He also argued that Morris had sexual intercourse with all of the

10   corpses except for Davis's.  The prosecutor focused on the selective skin slippage on the

11   bodies and the presence of semen on some of the victims despite Morris's insistence that

12   he used condoms during sex.

13       The jury found that Morris committed all five murders in both an "especially cruel"

14   and "especially heinous or depraved" manner.  For all victims, the jury found that Morris

15   relished the murders and inflicted gratuitous violence on the victims beyond that necessary

16   to kill.  (RT 7/13/05 at 9–15.)  For all victims except Velasquez, the jury found that Morris

17   needlessly mutilated the bodies.  (*Id*.)  The jury also found that Morris had convictions for

18   prior serious offenses, A.R.S. § 13-703(F)(2), based on the five convictions from the guilt

19   phase of the trial.

20

21   ———————————

22       [5] The Maricopa County Public Defender's Office was appointed to represent Morris

23   initially but had to withdraw because of their prior representation of one of the victims.
     (ROA 2.)  James Logan of the Maricopa County Office of the Legal Advocate was then

24   appointed (ROA 4), with Maria Schaffer as his second chair counsel; she was replaced by

25   Randall Craig in 2004.  (RT 03/24/15 at 78–79; *see* ROA 72.)  Linda Thomas was the
     assigned mitigation specialist.  (PCR Pet. Ex. D.)

26

27       [6] A.R.S. § 13-703, *et seq.*, has since been renumbered as A.R.S. § 13-751, *et seq*.
     The Court refers to the statute in effect at the time of the state court decision.

28                                    8

1    In the penalty phase, Morris's mitigation evidence focused on the responsibilities

2    placed on him at a young age; his problems with his appearance and hygiene, particularly

3    his problems with body odor; his desire to improve himself; and his good work record.  He

4    also presented evidence that there was no father figure in his home, that he was not violent

5    and was nicknamed "Teddy Bear" in high school, and that he was very dependable and

6    enthusiastic about the ROTC program in which he was active in high school.  (RT 7/14/05,

7    7/18/05.)  Morris did not present any expert testimony.

8    The jury determined that Morris's mitigation evidence was not sufficiently

9    substantial to call for leniency and that death was the appropriate sentence for each of the

10   five murders.

11   Direct Appeal[7]

12   Appellate counsel raised four case-specific claims: (1) the trial court abused its

13   discretion by denying Morris's motion to dismiss the counts involving Codman and Davis

14   because the State was unable to establish corpus delicti without Morris's statements; (2) the

15   trial court abused its discretion and erred by violating Morris's right to be present at all

16   critical stages when it allowed the jury commissioner to prescreen prospective jurors

17   outside his and his counsel's presence, which also resulted in a jury not representative of a

18   fair cross-section of the community; (3) there was persistent and pervasive prosecutorial

19   misconduct, and the cumulative effect shows it was intentional with specific intent to

20   prejudice Morris; and (4) the trial court abused its discretion by allowing the State to

21   introduce excessively gruesome pictures throughout trial.  (*See* DA 29 (Opening Brief).)

22   Morris also raised fourteen claims called "issues raised to avoid preclusion."  (*Id.*)

23   The Arizona Supreme Court denied relief on all claims and affirmed the convictions

24   and sentences.  *Morris*, 215 Ariz. at 343, 160 P.3d at 222.  Morris then pursued post-

25

26   _____

27   [7] Deputy Legal Advocate Consuelo Ohanesian was assigned to represent Morris in
     his direct appeal.  (DA 21.)

28                                                    9

1    conviction relief ("PCR").[8]  (*See* ROA 307.)  The PCR court denied his claims (*see* ROA

2    354, 438, 491) and, on March 14, 2017, the Arizona Supreme Court summarily denied

3    Morris's petition for review.  (*See* PR 7, 27.)

4         In 2017, Morris filed a notice of intent to pursue habeas relief in this Court.  (Doc.

5    1.)   The Court appointed the Federal Public Defender for the District of Arizona to

6    represent him.  (Doc. 5.)  Morris filed his Petition in February 2018 (Doc. 21), and a notice

7    of request for evidentiary development in December 2018 (Doc. 43).  On April 25, 2019,

8    the Court denied Morris's motion to amend his Petition with several additional claims.

9    (Doc. 63.)  On May 19, 2023, the Court denied Morris's motion to stay and hold the Petition

10   in abeyance and denied Claim 13 of his Petition (Doc. 84), and subsequently denied

11   Morris's motion for reconsideration on June 20, 2024 (Doc. 91).   On March 18, 2024,

12   Morris filed a notice of supplemental authority in support of three claims in his Petition.

13   (Doc. 86.)

14   **II.    APPLICABLE LAW**

15        Federal habeas claims are analyzed under the framework of the Antiterrorism and

16   Effective Death Penalty Act ("AEDPA").[9]   AEDPA defines the substantive and procedural

17   limits on the claims a capital habeas petitioner may bring, and the Rules Governing Section

18   2254 Cases define the types of evidentiary development a petitioner may seek if his claims

19   otherwise meet the requirements of AEDPA.

20

21   _____

22        [8] The Arizona Supreme Court appointed Nicole Farnum to represent Morris in the

23   state proceedings.  (DA 52.)  Later, after a conflict arose, the court appointed Harvey

     Kurlander to replace Farnum.  (ROA 419; DA 57.)

24

25        [9] Morris's challenge to the constitutionality of AEDPA (Doc. 21 at 68–69) is

     meritless.  *See Crater v. Galaza*, 491 F.3d 1119, 1125–26 (9th Cir. 2007) (holding that

26   AEDPA violates neither the Suspension Clause nor the separation of powers doctrine); *cf.*

     *Smith v. Thornell*, No. CV-12-00318-PHX-ROS, 2025 WL 563453, at *6 (D. Ariz. Feb.

27   20, 2025) (citing cases upholding constitutionality of AEDPA).

28

### A.  Principles of Exhaustion and Procedural Default

<u>Exhaustion</u>

A writ of habeas corpus cannot be granted unless the petitioner has exhausted all available state court remedies.  28 U.S.C. § 2254(b)(1); *see also Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Rose v. Lundy*, 455 U.S. 509 (1982).  To exhaust state remedies, the petitioner must "fairly present" his claims to the state's highest court in a procedurally appropriate manner.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).

A claim is fairly presented if the petitioner has described the operative facts and the federal legal theory on which the claim is based.  *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 277–78 (1971).  A petitioner must clearly alert the state court that he is alleging a specific federal constitutional violation.  *See Casey v. Moore*, 386 F.3d 896, 913 (9th Cir. 2004).  A petitioner must make the federal basis of the claim explicit either by citing specific provisions of federal law or federal case law, even if the federal basis of a claim is "self-evident," *Gatlin v. Madding*, 189 F.3d 882, 888 (9th Cir. 1999), or by citing state cases that explicitly analyze the same federal constitutional claim, *Peterson*, 319 F.3d at 1158 (9th Cir. 2003) (en banc).  A general claim raised in state court cannot exhaust a new specific argument raised in federal habeas.  *Atkins v. Bean*, 122 F.4th 760, 782 (9th Cir. 2024).

In Arizona, there are two avenues for petitioners to exhaust federal constitutional claims: direct appeal and PCR proceedings.  Arizona's procedural-default rule precludes any post-conviction claim "waived at trial or on appeal, or in any previous post-conviction proceeding, except when the claim raises a violation of a constitutional right that can only be waived knowingly, voluntarily, and personally by the defendant."  Ariz. R. Crim. P. ("Rule") 32.2(a)(3).  "[A]ll known claims for relief [must be raised] in a single petition to prevent endless trial-court reviews of the same case."  *State v. Anderson*, 257 Ariz. 226, 231, 547 P.3d 345, 350 (2024).  The preclusive effect of Rule 32.2(a) may be avoided only if a claim falls within certain exceptions and the petitioner can justify his omission of the

11

1    claim from a prior petition or his failure to present the claim in a timely manner.  *See* Ariz.

2    R. Crim. P. 32.1(b)–(h), 32.2(b), 32.4(b)(3).

3           Under Arizona law, collateral review proceedings are the first point at which an

4    ineffective assistance of counsel claim may be presented for review.  *State v. Spreitz*, 202

5    Ariz. 1, 3, 39 P.3d 525, 527 (2002).  However, "the ground of ineffective assistance of

6    counsel cannot be raised repeatedly" in state court.  *Anderson*, 257 Ariz. at 231, 547 P.3d

7    at 350 (quoting *Stewart v. Smith*, 202 Ariz. 446, 450, 46 P.3d 1067, 1071 (2002)).

8    Generally, where an ineffective assistance claim was raised or could have been raised in a

9    previous Rule 32 PCR proceeding, "subsequent claims of ineffective assistance will be

10   deemed waived and precluded."  *Id.*  (quoting *Spreitz*, 202 Ariz. at 2, 39 P.3d at 526); *see*

11   Ariz. R. Crim. P. 32.2(a)(3).

12          The Arizona Supreme Court recently explained that whether a defendant must

13   personally waive an ineffective assistance claim to warrant preclusion under Rule

14   32.2(a)(3) depends on the particular right implicated by the allegedly ineffective

15   representation.  *State v. Traverso*, —Ariz. —, 576 P.3d 97, 104–05 (2025).

16          The right to counsel, to a jury trial, and to a twelve-person jury have been identified

17   as belonging to the narrow category of rights that are of sufficient constitutional magnitude

18   to require a defendant's knowing, voluntary, and personal waiver.  *Id.*

19   <u>Procedural Default</u>

20          A habeas petitioner's claims may be precluded from federal review in two ways.

21   First, a claim may be procedurally defaulted in federal court if it was raised in state court

22   but found by that court to be defaulted on state procedural grounds.  *Coleman*, 501 U.S. at

23   729–30.  Such claims will be found procedurally defaulted in federal court so long as the

24   state procedural bar was independent of federal law and adequate to warrant preclusion of

25   federal review.  *See Harris v. Reed*, 489 U.S. 255, 262 (1989).  Contrary to Morris's

26   assertion, it is well established that Arizona's preclusion rule is independent of federal law,

27   *see Stewart v. Smith*, 536 U.S. 856, 860 (2002), and the Ninth Circuit has repeatedly

28                                                    12

determined that Arizona regularly and consistently applies its procedural default rules such that they are an adequate bar to federal review of a claim. *See Hurles v. Ryan*, 752 F.3d 768, 780 (9th Cir. 2014) (Arizona's waiver rules are independent and adequate bases for denying relief); *Ortiz v. Stewart*, 149 F.3d 923, 932 (9th Cir. 1998)*, overruled on other grounds by Martinez v. Ryan*, 566 U.S. 1 (2012) (Rule 32.2(a)(3) regularly followed and adequate); *Poland v. Stewart*, 117 F.3d 1094, 1106 (9th Cir. 1997) (finding Arizona not "irregular" in application of procedural default rules); *Martinez-Villareal v. Lewis*, 80 F.3d 1301, 1306 (9th Cir. 1996) (same).[10]

Second, a claim may be procedurally defaulted if the petitioner failed to present it in state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Coleman*, 501 U.S. at 735 n.1; *see also Ortiz*, 149 F.3d at 931 (explaining district court must consider whether the claim could be pursued by any presently available state remedy). The latter form of preclusion is referred to as "technical exhaustion." *See Coleman*, 501 U.S. at 732 ("A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him."); *Smith v. Baldwin*, 510 F.3d 1127, 1139 (9th Cir. 2007) (observing that if state court where petitioner would be required to present the claims would find the claims procedurally barred, petitioner has technically exhausted the claims through procedural default). Therefore, in the present case, if there are claims that were not raised in state court, the Court must determine whether Morris has state remedies currently

---

[10] Morris asserts throughout his petition that "any procedural bar is not adequate or independent" and "that imposing default would be a miscarriage of justice." (*See e.g.*, Doc. 21 at 107, 177.) In addition to being meritless, these arguments are waived, as they are mentioned in his petition only in passing and unsupported by legal argument. *See United States v. Stoterau*, 524 F.3d 988, 1003 n.7 (9th Cir. 2008) (finding general contentions mentioned only in passing, and unsupported by meaningful argument, were waived).

1   available to him pursuant to Rule 32. *See Ortiz*, 149 F.3d at 931. If he does not, then his

2   claims are "technically" exhausted but procedurally defaulted. *Coleman*, 501 U.S. at 732,

3   735 n.1.

4        Because the doctrine of procedural default is based on comity, not jurisdiction,

5   federal courts retain the power to consider the merits of procedurally defaulted claims.

6   *Reed v. Ross*, 468 U.S. 1, 9 (1984). As a general matter, the Court will not review the

7   merits of a procedurally defaulted claim unless the petitioner demonstrates legitimate cause

8   for his failure to exhaust the claim in state court and prejudice from the alleged

9   constitutional violation, or shows that a fundamental miscarriage of justice would result if

10  the claim were not heard on the merits in federal court. *Coleman*, 501 U.S. at 750.

11       "Cause" for a procedural default exists if a petitioner can demonstrate that "some

12  objective factor external to the defense impeded counsel's efforts to comply with the

13  State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *accord Coleman*,

14  501 U.S. at 753. "Prejudice" is actual harm resulting from the alleged constitutional errors.

15  *Vickers v. Stewart*, 144 F.3d 613, 617 (9th Cir. 1998). "The petitioner can meet the

16  prejudice prong if he demonstrates 'that the errors . . . worked to his actual and substantial

17  disadvantage, infecting his entire [proceeding] with errors of constitutional dimension.'"

18  *Cooper v. Neven*, 641 F.3d 322, 327 (9th Cir. 2011) (quoting *White v. Lewis*, 874 F.2d 599,

19  603 (9th Cir. 1989)). "A petitioner can demonstrate a fundamental miscarriage of justice

20  by 'establish[ing] that under the probative evidence he has a colorable claim of factual

21  innocence.'" *Id.* (quoting *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)).

22       Because the acts of a petitioner's counsel are not external to the defense, they are

23  generally attributable to the petitioner, and negligence, ignorance, or inadvertence on

24  counsel's part does not qualify as "cause." *Coleman*, 501 U.S. at 752–54 (citing *Carrier*,

25  477 U.S. at 488). However, where the ineffective assistance of counsel amounts to an

26  independent constitutional violation, it can establish cause. *Id.* at 753–54; *Ortiz*, 149 F.3d

27  at 932.

28

14

1    Ineffective assistance of appellate counsel may be used as cause to excuse a

2    procedural default only where the particular ineffective assistance allegation was first

3    exhausted in state court as an independent constitutional claim. *See Edwards v. Carpenter*,

4    529 U.S. 446, 453 (2000) ("an ineffective-assistance-of-counsel claim asserted as cause for

5    the procedural default of another claim can itself be procedurally defaulted"); *Carrier*, 477

6    U.S. at 489–90.

7    In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court recognized that

8    ineffective assistance by PCR counsel can establish cause to excuse the procedural default

9    of a claim of ineffective assistance of trial counsel. *Leeds v. Russell*, 75 F.4th 1009, 1016

10   (9th Cir. 2023) (citing *Martinez*, 566 U.S. at 11–12, 14; *Shinn v. Ramirez (Ramirez)*, 596

11   U.S. 366, 380 (2022)). A petitioner may establish cause for the procedural default of an

12   ineffective assistance of trial counsel claim by showing that PCR counsel was ineffective

13   under the standards of *Strickland v. Washington*, 466 U.S. 668 (1984) – that is, "(a) post-

14   conviction counsel's performance was deficient, and (b) there was a reasonable probability

15   that, absent the deficient performance, the result of the post-conviction proceedings would

16   have been different." *Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014), *overruled on

17   other grounds by McKinney v. Ryan*, 813 F.3d 798, 819 (9th Cir. 2015) (en banc)).[11]

---

19   [11] Morris alleges, throughout the petition, that he will demonstrate PCR counsel's
20   ineffectiveness at an evidentiary hearing. (*See e.g.*, Doc. 21 at 106–07, 177.) These
     unsupported allegations, without more, are insufficient to establish cause and prejudice or
21   to warrant an evidentiary hearing. A prisoner bears the burden of pleading and proving
     cause and prejudice to excuse a procedural default. *See Carpenter*, 529 U.S. at 451 ("We
22   therefore require a prisoner to demonstrate cause for his state-court default of any federal
     claim, and prejudice therefrom, before the federal habeas court will consider the merits of
23   that claim."); *Martinez*, 566 U.S. at 14 (in order to excuse a defaulted claim under *Martinez*,
     a petitioner must "demonstrate that the underlying ineffective-assistance-of-trial-counsel
24   claim is a substantial one, which is to say that the prisoner must demonstrate that the claim
     has some merit"); *Cook v. Ryan*, 688 F.3d 598, 610–12 (9th Cir. 2012) ("When faced with
25   the question whether there is cause [under *Martinez*] for an apparent default, a State may
     answer that the ineffective-assistance-of-trial-counsel claim is insubstantial, *i.e.*, it does not
26   have any merit or that it is wholly without factual support . . . .") (quoting *Martinez*, 566

27

28                                                    15

To establish "prejudice" under the second prong of *Martinez*'s "cause and prejudice" analysis, a petitioner must demonstrate that his underlying ineffective assistance of trial counsel claim is "substantial." *Id.* The Supreme Court defines a "substantial" claim as one that "has some merit" – the procedural default of a claim will not be excused if the underlying ineffective assistance of counsel ("IAC") claim "is insubstantial, i.e., it does not have any merit or . . . it is wholly without factual support." *Martinez*, 566 U.S. at 14–16. The standard for finding a claim "substantial" is analogous to the standard for issuing a certificate of appealability. *Id.* at 14; *see Detrich v. Ryan*, 740 F.3d 1237, 1245 (9th Cir. 2013), *overruled in part on other grounds by Ramirez*, 596 U.S. 366. Under that standard, a claim is "substantial" if "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Id.* (quoting *Miller-El v. Cockrell (Miller El-I)*, 537 U.S. 322, 336 (2003)). "[T]he standard for evaluating the underlying trial counsel IAC claim during the *Martinez* prejudice analysis is not as stringent as that required when considering the merits of the underlying claim." *Leeds*, 75 F.4th at 1017 (quoting *Michaels v. Davis*, 51 F.4th 904, 930 (9th Cir. 2022)).

Courts may analyze cause and prejudice in any order. The two factors are distinct, but there is considerable overlap since each "considers the strength and validity of the underlying ineffective assistance claim." *Id.* (citing *Michaels*, 51 F.4th at 931, *Dickenson v. Smith*, 2 F.4th 851, 853 n.3 (9th Cir. 2021)).

The Ninth Circuit has offered guidance for assessing whether "cause" exists under *Martinez*. In *Atwood*, for example, the court explained:

> In evaluating whether the failure to raise a substantial claim of ineffective assistance of trial counsel in state court resulted from ineffective assistance

---

U.S. at 16); *Reed v. Stephens*, 739 F.3d 753, 781 n.20 (5th Cir. 2014) ("We decline [Petitioner]'s suggestion that his procedurally defaulted claims may be considered under *Martinez*. [Petitioner] has insufficiently briefed this issue, and we consider this argument waived.").

16

of state habeas counsel under *Strickland*, we must evaluate the strength of the prisoner's underlying ineffective assistance of trial counsel claim. If the ineffective assistance of trial counsel claim lacks merit, then the state habeas counsel would not have been deficient for failing to raise it. Further, any deficient performance by state habeas counsel would not have been prejudicial, because there would not be a reasonable probability that the result of the post-conviction proceedings would have been different if the meritless claim had been raised.

870 F.3d at 1059–60. Although trial counsel's actions are reviewed under "a more relaxed standard," the *Strickland* standard is applied with "full force when considering [PCR counsel's] actions in the *Martinez* cause analysis." *Leeds*, 75 F.4th at 1022 (citing *Clabourne*, 745 F.3d at 377); *see Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012) (explaining that if the underlying IAC claim were meritless, PCR counsel "would not be ineffective for failure to raise an [IAC] claim with respect to trial counsel who was not constitutionally ineffective").

The *Martinez* exception to procedural default applies only to claims of ineffective assistance of trial counsel. It has not been expanded to other types of claims. *Martinez (Ernesto) v. Ryan*, 926 F.3d 1215, 1225 (9th Cir. 2019) ("[I]neffective assistance of PCR counsel can constitute cause only to overcome procedurally defaulted claims of ineffective assistance of trial counsel."); *Pizzuto v. Ramirez*, 783 F.3d 1171, 1177 (9th Cir. 2015) (explaining that the Ninth Circuit has "not allowed petitioners to substantially expand the scope of *Martinez* beyond the circumstances present in *Martinez*"); *Hunton v. Sinclair*, 732 F.3d 1124, 1126–27 (9th Cir. 2013) (noting that only the Supreme Court can expand the application of *Martinez* to other areas); *see Davila v. Davis*, 582 U.S. 521, 524–25, 529–30 (2017) (holding that the *Martinez* exception does not apply to claims of ineffective assistance of appellate counsel).

Alternatively, a petitioner may be able to overcome a procedural default by establishing that a fundamental miscarriage of justice occurred. A fundamental miscarriage occurs where the petitioner makes a sufficient showing of actual innocence.

17

*See Schlup v. Delo*, 513 U.S. 298, 316 (1995) ("[I]f a petitioner . . . presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims."). "In *Schlup*, the Court . . . held that prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House v. Bell*, 547 U.S. 518, 536–37 (2006) (quoting *Schlup*, 513 U.S. at 327). To revive a claim under *Schlup*, a petitioner's claim of innocence must be "truly extraordinary." *Id*.[12]

Finally, a federal habeas court may reject a claim on the merits without reaching the question of exhaustion. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *Rhines v. Weber*, 544 U.S. 269, 277 (2005) (a stay is inappropriate in federal court to allow claims to be raised in state court if they are subject to dismissal under § 2254(b)(2) as "plainly meritless"); *Cassett v. Stewart*, 406 F.3d 614, 623–24 (9th Cir. 2005) (holding that a federal court may deny an unexhausted petition on the merits when the petition does not raise a colorable federal claim).

## B.  Merits review under AEDPA

AEDPA authorizes federal courts to grant writs of habeas corpus to state prisoners only in cases of "extreme malfunctions in the state criminal justice systems." *Ramirez*, 596

---

[12] Morris alleges throughout this petition that imposing a procedural default on any of his claims would be a miscarriage of justice. (*See*, *e.g.*, Doc. 21 at 177.)  These bare allegations, without more, are insufficient to show a fundamental miscarriage of justice. *See Schlup*, 513 U.S. at 327 (in order to excuse a procedural default through the miscarriage of justice doctrine, a "petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of [his newly proffered] evidence").

18

U.S. at 377.  A petitioner is not entitled to habeas relief on any claim adjudicated on the merits in state court unless the state court's adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly-established federal law, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.  28 U.S.C. § 2254(d).

"Clearly-established federal law" refers to the holdings, as opposed to dicta, of Supreme Court decisions at the time of the relevant state court decision.  *Williams v. Taylor (Terry Williams)*, 529 U.S. 362, 412 (2000).  "'[I]f a habeas court must extend a rationale before it can apply to the facts at hand," then by definition the rationale was not 'clearly established at the time of the state-court decision.'"  *White v. Woodall*, 572 U.S. 415, 426 (2014) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004)).

"[C]ircuit precedent does not constitute 'clearly established Federal law'" and "cannot form the basis for habeas relief under AEDPA."  *Parker v. Matthews*, 567 U.S. 37, 48–49 (2012); *see Carey v. Musladin*, 549 U.S. 70, 76–77 (2006).  A reviewing court may, however, "look to circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established by Supreme Court precedent."  *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

"In determining whether a state court decision is contrary to federal law, we look to the state's last reasoned decision . . . as the basis for its judgment."  *Dickey v. Davis*, 69 F.4th 624, 635 (9th Cir. 2023) (quoting *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)); s*ee Wilson v. Sellers*, 584 U.S. 122, 125 (2018) ("[When the relevant state-court decision on the merits . . . does not come accompanied with . . . reasons . . . the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale . . . and presume that the unexplained decision adopted the same reasoning.").

"When there is no reasoned state-court decision addressing a habeas claim, there is a rebuttable presumption that the state court adjudicated the claim on the merits."  *Id.*

19

1    (citing *Harrington v. Richter*, 562 U.S. 86, 99–100 (2011)).  "In that circumstance, federal
2    courts must consider what arguments could have supported the state court's decision and
3    then ask whether it is possible fairminded jurists could disagree that those arguments or
4    theories are inconsistent with a prior Supreme Court holding."  *Id.*  (citing *Richter*, 562
5    U.S. at 102).

6          If a claim was not adjudicated on the merits in state court and is not otherwise
7    foreclosed, the Court reviews the claim *de novo* without the deference required by
8    § 2254(d).  *See Cone v. Bell*, 556 U.S. 449, 472 (2009).

9    <u>Contrary To/Unreasonable Application of Clearly Established Federal Law</u>

10         A state court decision is "contrary to" clearly established federal law if the decision
11   applies a rule that contradicts the governing law set forth in Supreme Court precedent,
12   thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter
13   of law, or if it confronts a set of facts that is materially indistinguishable from a decision
14   of the Supreme Court but reaches a different result.  *Terry Williams*, 529 U.S. at 405–06;
15   *see, e.g.*, *Hooper*, 985 F.3d at 614.  Under the "unreasonable application" prong of
16   § 2254(d)(1), a federal court may grant habeas relief where a state court "identifies the
17   correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it
18   to the facts of the particular . . . case" or "unreasonably extends a legal principle from
19   [Supreme Court] precedent to a new context where it should not apply."  *Id.* at 407; *see,*
20   *e.g.*, *Murray v. Schriro (Robert Murray)*, 745 F.3d 984, 997 (9th Cir. 2014).  The burden
21   rests with the habeas applicant to show that the state court applied clearly established
22   Supreme Court precedent in an objectively unreasonable manner.  *Woodford v. Visciotti*,
23   537 U.S. 19, 25 (2002).

24         The Supreme Court has emphasized that "an *unreasonable* application of federal
25   law is different from an *incorrect* application of federal law."  *Id.*  To be an unreasonable
26   application, "the ruling must be 'objectively unreasonable, not merely wrong; even clear
27   error will not suffice.'"  *Virginia v. LeBlanc*, 582 U.S. 91, 94 (2017) (quoting *Woods v.*

28                                          20

1    *Donald*, 575 U.S. 312, 316 (2015) (per curiam)); *see Shinn v. Kayer*, 592 U.S. 111, 118

2    (2020); *Bolin v. Davis*, 13 F.4th 797, 805 (9th Cir. 2021).  The burden is on the petitioner

3    to show "there was no reasonable basis for the state court to deny relief."  *Richter*, 562 U.S.

4    at 98.  This standard is "difficult to meet."  *Kayer*, 592 U.S. at 118 (quoting *Richter*, 562

5    U.S. at 102).

6    <u>Unreasonable Determination of the Facts</u>

7         "[A] decision adjudicated on the merits in a state court and based on a factual

8    determination will not be overturned on factual grounds unless objectively unreasonable in

9    light of the evidence presented in the state-court proceeding."  *Miller-El v. Dretke (Miller-*

10   *El II)*, 545 U.S. 231, 340 (2005).  A state court's factual determination is presumed correct

11   and a petitioner bears the burden of overcoming that presumption with clear and convincing

12   evidence.  28 U.S.C. § 2254(e)(1); *see Miller-El I*, 537 U.S. at 340; *Brumfield v. Cain*, 576

13   U.S. 305, 314 (2015) (explaining that § 2254(d)(2) requires federal courts to "accord the

14   state trial court substantial deference").  The Supreme Court has not defined the precise

15   relationship between § 2254(d)(2) and § 2254(e)(1), but has clarified "that a state-court

16   factual determination is not unreasonable merely because the federal habeas court would

17   have reached a different conclusion in the first instance."  *Burt v. Titlow*, 571 U.S. 12, 18

18   (2013) (citing *Wood*, 558 U.S. at 293, 301); *see also Ayala v. Chappell*, 829 F.3d 1081,

19   1094 (9th Cir. 2016) ("factual findings are unreasonable if 'reasonable minds reviewing

20   the record' could not agree with them") (quoting *Brumfield*, 576 U.S. at 314).

21   <u>*Brecht*/Harmless error</u>

22        If "a state court determines that an error at trial did not prejudice a criminal

23   defendant," then a federal court cannot grant relief without first applying both the test the

24   Supreme Court outlined in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), and the one

25   Congress prescribed in AEDPA.  *Brown v. Davenport*, 596 U.S. 118, 122 (2022).  The

26   *Brecht* test requires a petitioner to "show that the error had a 'substantial and injurious

27   effect or influence' on the outcome of his trial."  *Brown*, 596 U.S. at 126 (quoting *Brecht*,

28

21

507 U.S. at 637).  A federal court must apply *Brecht*'s standard even if the state court did not conduct a harmless-error analysis.  *Bains v. Cambra*, 204 F.3d 964, 977–78 (9th Cir. 2000).  And if the state court did conduct a harmless-error analysis, a prisoner can only obtain relief if that determination was unreasonable.  *Davis v. Ayala*, 576 U.S. 257, 268 (2015).

The *Brecht* standard does not apply to constitutional errors that are structural defects, or to claims under *Brady v. Maryland*, 373 U.S. 83 (1963), or *Strickland*.  *See Kyles v. Whitley*, 514 U.S. 419, 436 (1995) (explaining that a showing of prejudice that satisfies *Brady* "cannot subsequently be found harmless under *Brecht*"); *Musladin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009) ("[W]here a habeas petition governed by AEDPA alleges ineffective assistance of counsel . . . , we apply *Strickland*'s prejudice standard and do not engage in a separate analysis applying the *Brecht* standard.").

### C. Evidentiary Development

"Although state prisoners may sometimes submit new evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them from doing so.  Provisions like §§ 2254(d)(1) and (e)(2) ensure that '[f]ederal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.'"  *Cullen v. Pinholster*, 563 U.S. 170, 186 (2011) (quoting *Williams v. Taylor (Michael Williams)*, 529 U.S. 420, 437 (2000)).

Under the Rules Governing Section 2254 Cases, a petitioner may seek to discover and introduce additional evidence in federal court.  The court's discretion to grant such requests, however, is limited.  "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  *Pinholster*, 563 U.S. at 181; *see Robert Murray*, 745 F.3d at 998 ("Along with the significant deference AEDPA requires us to afford state courts' decisions, AEDPA also restricts the scope of the evidence that we can rely on in the normal course of discharging our responsibilities under § 2254(d)(1).").  The Ninth Circuit has observed that "*Pinholster* and the statutory text

22

make clear that this evidentiary limitation is applicable to § 2254(d)(2) claims as well." *Gulbrandson v. Ryan*, 738 F.3d 976, 993 n.6 (9th Cir. 2013) (citing § 2254(d)(2) and *Pinholster*, 563 U.S. at 185 n.7). "AEDPA . . . restricts the ability of a federal habeas court to develop and consider new evidence, limiting review of factual determinations under § 2254(d)(2) to 'the evidence presented in the State court proceeding.' . . . " *Shoop v. Twyford*, 596 U.S. 811, 819 (2022). "This effectively precludes federal evidentiary hearings for such claims because the evidence adduced during habeas proceedings in federal court could not be considered in evaluating whether the claim meets the requirements of § 2254(d)." *Gulbrandson*, 738 F.3d at 993–94; *see also Robert Murray*, 745 F.3d at 1000 ("After *Pinholster*, a federal habeas court may consider new evidence only on de novo review, subject to the limitations of § 2254(e)(2).")

    *Pinholster* does not, however, bar evidentiary development where the court has determined, based solely on the state court record, that the petitioner "has cleared the § 2254(d) hurdle." *Madison v. Comm'r, Ala. Dep't of Corr.*, 761 F.3d 1240, 1249–50 (11th Cir. 2014); *see Pinholster*, 563 U.S. at 185; *Henry v. Ryan*, 720 F.3d 1073, 1093 n.15 (9th Cir. 2013). A petitioner who meets the deferential standards of § 2254(d) may be entitled to evidentiary development if the following standards are also met.

    First, a habeas petitioner is not entitled to discovery "as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997); *see Campbell v. Blodgett*, 982 F.2d 1356, 1358 (9th Cir. 1993). Rule 6 of the Rules Governing Section 2254 Cases provides that "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery." Rule 6(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.

    Second, if a prisoner "has failed to develop the factual basis of [the] claim in State court proceedings," 28 U.S.C. § 2254(e)(2), either through "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel," *Michael Williams*, 529 U.S. at 432, a district court may not conduct an evidentiary hearing or otherwise allow

1    further evidentiary development of a claim unless the prisoner demonstrates that his

2    conviction either rests on a retroactively-applicable new constitutional rule or a newly-

3    discovered factual predicate, *and* that he is actually innocent.  *See* 28 U.S.C. § 2254(e)(2);

4    *Michael Williams*, 529 U.S. at 429–30.  With respect to claims that were not adjudicated

5    on the merits, "a federal habeas court may not conduct an evidentiary hearing or otherwise

6    consider evidence beyond the state-court record based on ineffective assistance of state

7    postconviction counsel" unless the stringent requirements of § 2254(e)(2) are met.

8    *Ramirez*, 596 U.S. at 382.[13]

9            Additionally, an evidentiary hearing is not required if the issues can be resolved by

10   reference to the state court record.  *Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998)

11   ("It is axiomatic that when issues can be resolved with reference to the state court record,

12   an evidentiary hearing becomes nothing more than a futile exercise."); *see also Schriro v.*

13   *Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's factual

14   allegations or otherwise precludes habeas relief, a district court is not required to hold an

15   evidentiary hearing.").  Likewise, "an evidentiary hearing is not required if the claim

16   presents a purely legal question and there are no disputed facts."  *Beardslee v. Woodford*,

17   358 F.3d 560, 585 (9th Cir. 2004); *see Hendricks v. Vasquez*, 974 F.2d 1099, 1103 (9th

18   Cir. 1992).

19           Finally, under Rule 7 of the Rules Governing Section 2254 Cases, a federal habeas

20   court is authorized to expand the record to include additional material relevant to the

21   petition.  The purpose of expansion of the record under Rule 7 "is to enable the judge to

22   dispose of some habeas petitions not dismissed on the pleadings, without the time and

23   _____

24        [13] "Thus, if [§ 2254(e)(2)] applies and the prisoner cannot satisfy its 'stringent

25   requirements,'. . . a federal court may not hold an evidentiary hearing – or otherwise
     consider new evidence – to assess cause and prejudice under *Martinez*."  *Ramirez*, 596 U.S.

26   at 389 (internal citation omitted).  A petitioner must allege facts which, if true, would entitle

27   him to relief, in order to be entitled to an evidentiary hearing on cause and prejudice.  *Id.*
     at 389–90 (citing *Landrigan*, 550 U.S. at 474).

28                                              24

1    expense required for an evidentiary hearing."   Advisory Committee Notes, Rule 7, 28

2    U.S.C. foll. § 2254; *see also Blackledge v. Allison*, 431 U.S. 63, 81–82 (1977); *Downs v.*

3    *Hoyt*, 232 F.3d 1031, 1041 (9th Cir. 2000) (explaining that the need for an evidentiary

4    hearing may be obviated by expansion of record).

5        **D.  Ineffective assistance of counsel**

6        IAC claims are governed by the principles set forth in *Strickland*, 466 U.S. 668.  To

7    prevail under *Strickland*, a petitioner must show that counsel's representation fell below an

8    objective standard of reasonableness and that the deficiency prejudiced the defense.  *Id.* at

9    687–88.  The inquiry under *Strickland* is highly deferential.  "A fair assessment of attorney

10   performance requires that every effort be made to eliminate the distorting effects of

11   hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to

12   evaluate the conduct from counsel's perspective at the time."  *Id.* at 689; *see Padilla v.*

13   *Kentucky*, 559 U.S. 356, 371 (2010) ("Surmounting *Strickland*'s high bar is never an easy

14   task.").  The "standard is necessarily a general one," *Bobby v. Van Hook*, 558 U.S. 4, 7

15   (2009), because "[n]o particular set of detailed rules for counsel's conduct can satisfactorily

16   take account of the variety of circumstances faced by defense counsel or the range of

17   legitimate decisions regarding how best to represent a criminal defendant."  *Strickland*, 466

18   U.S. at 688–89.

19       To satisfy *Strickland*'s first prong, a defendant "must overcome the presumption

20   that, under the circumstances, the challenged action 'might be considered sound trial

21   strategy.'"  *Id.* at 689.  Deficient performance "requires showing that counsel made errors

22   so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by

23   the Sixth Amendment."  *Id*. at 687.  "The question is whether an attorney's representation

24   amounted to incompetence under 'prevailing professional norms,' not whether it deviated

25   from best practices or most common custom."  *Richter*, 562 U.S. at 105 (quoting

26   *Strickland*, 466 U.S. at 690).  "The defendant bears the heavy burden of proving that

27   counsel's assistance was neither reasonable nor the result of sound trial strategy."

28                                      25

1  *Murtishaw v. Woodford*, 255 F.3d 926, 939 (9th Cir. 2001) (citing *Strickland*, 466 U.S. at
2  689).  "[T]he relevant inquiry . . . is not what defense counsel could have pursued, but
3  rather whether the choices made by defense counsel were reasonable."  *Robert Murray*,
4  745 F.3d at 1011 (quoting *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998)).
5  Ultimately, "it is difficult to establish ineffective assistance when counsel's overall
6  performance indicates active and capable advocacy." *Richter*, 562 U.S. at 111.  Even under
7  *de novo* review, the standard for judging counsel's representation is a deferential one.
8  *Richter*, 562 U.S. at 105.

9      Under *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by
10 "show[ing] that there is a reasonable probability that, but for counsel's unprofessional
11 errors, the result of the proceeding would have been different.  A reasonable probability is
12 a probability sufficient to undermine confidence in the outcome." *Id.* at 694.  The petitioner
13 "bears the highly demanding and heavy burden [of] establishing actual prejudice." *Allen*
14 *v. Woodford*, 395 F.3d 979, 1000 (9th Cir. 2005) (quoting *Terry Williams*, 529 U.S. at 394).
15 "The likelihood of a different result must be substantial, not just conceivable." *Richter*,
16 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693); *see Hooper*, 985 F.3d at 628.  The
17 strength of the prosecution's case factors into the determination of prejudice.  *See*
18 *Strickland*, 466 U.S. at 696 ("[A] verdict or conclusion only weakly supported by the record
19 is more likely to have been affected by errors than one with overwhelming record
20 support."); *Riley v. Payne*, 352 F.3d 1313, 1321 n.8 (9th Cir. 2003) ("[O]ur evaluation of
21 *Strickland* prejudice must be considered in light of the strength of the government's case.").

22     A court need not address both *Strickland* prongs. *Id*. at 697.  If it is easier to dispose
23 of a claim on just one of the components, then that course should be taken. *Id.*

24     When the standards created by *Strickland* and § 2254(d) both apply, review is
25 "doubly" deferential. *Richter*, 562 U.S. at 105 (citations and quotations omitted).  "[T]he
26 question is not whether counsel's actions were reasonable . . . [but] whether there is any
27 reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* "[E]ven

28                                      26

1   when a court is presented with an ineffective-assistance claim not subject to § 2254(d)(1)

2   deference, a defendant must overcome the 'presumption that, under the circumstances, the

3   challenged action might be considered sound trial strategy.'"  *Bell v. Cone*, 535 U.S. 685,

4   698 (2002) (quoting *Strickland*, 466 U.S. at 689) (internal quotations omitted).

5   **III.    DISCUSSION**

6       Morris filed his amended petition for writ of habeas corpus on February 20, 2018.

7   (Doc. 21.)  It is nearly 400 pages long and raises 49 claims for relief, some of which are

8   unexhausted and several which are comprised of numerous subclaims.  (*Id.*)  He seeks

9   evidentiary development with respect to many of those claims.  (Doc. 43.)  For the reasons

10  that follow, Morris's petition and request for evidentiary development will be denied.

11      **A. Unexhausted Trial Error Claims**

12      Before addressing individual claims, the Court considers Morris's argument that the

13  procedural default of several trial error claims can be excused by the ineffective assistance

14  of both appellate and PCR counsel.

15      Morris concedes that he has not raised the following claims in state court: 9–10, 17–

16  20, 23–27, 42–43, and 47.  (Doc. 21 at 245, 248, 283, 286, 288, 296, 315, 317, 319, 321,

17  325, 366, 372, 384.)  These claims allege various trial errors.  Because they were not raised

18  in state court and would be precluded if raised in a successive post-conviction petition, they

19  are technically exhausted and procedurally defaulted.  *See* Ariz. R. Crim. P. 32.2(b);

20  32.1(b)–(h).

21      Morris offers a two-step argument for excusing the default of these claims.  First,

22  he contends that appellate counsel rendered ineffective assistance in failing to properly

23  present them.  Second, he argues that PCR counsel's ineffectiveness excuses the default of

24  the ineffective assistance of appellate counsel ("IAAC") claims, allowing this Court to

25  review the merits of the unpreserved trial error claims de novo.  *See e.g.*, (Doc. 34 at 163,

26  165–66.)  Morris acknowledges that the Supreme Court's holding in *Davila* is contrary to

27  his argument, *see e.g.* (Doc. 21 at 245), but asserts in his Reply that *Davila* "does not

28                                          27

automatically impair the ability to show cause and prejudice under *Martinez* to overcome the default of claims of ineffective assistance of appellate counsel." (Doc. 34 at 25.) The Court disagrees. That is precisely what *Davila* held.

*Davila* refused to "extend *Martinez* to allow a federal court to hear a substantial, but procedurally defaulted, claim of ineffective assistance of appellate counsel when a prisoner's state postconviction counsel provides ineffective assistance by failing to raise that claim." 582 U.S. at 525. The Supreme Court explained that *Martinez* provides no support, either on its face or in its underlying rationale, for extending its narrow exception to new categories of procedurally defaulted claims. *Id.* at 529–30. Additionally, *Martinez* was addressing an equitable consideration created by the state's deliberate choice to move trial-ineffectiveness claims outside of the direct-appeal process (where counsel is constitutionally guaranteed) to the PCR process (where counsel is not constitutionally guaranteed), thus significantly diminishing the prisoner's ability to file such claims. *Id.* at 534. Further, *Martinez* was grounded "in part on the belief that its narrow exception was unlikely to impose significant costs," and as *Davila* noted, "[t]he same cannot be said" of a proposal to extend the exception to defaulted claims of appellate ineffectiveness. *Id.* at 535.

Morris argues that the *Davila* decision was narrow, applying only to the Court's consideration of a default by post-conviction counsel of a claim that appellate counsel was ineffective for not challenging a preserved trial error. (Doc. 34 at 24) (citing *Davila*, 582 U.S. at 525–26). Morris argues that *Davila* recognized a primary concern animating *Martinez* – that no court will have considered the claim on its merits. (Doc. 34 at 24) (citing *Davila*, 582 U.S. at 532). He asserts that *Davila* considered unpreserved trial errors and recognized that "it is not categorically true that trial errors will be reviewed by at least one court when appellate counsel fails to raise them and post-conviction counsel fails to then raise appellate counsel's failure." (Doc. 34 at 24–25) (citing *Davila*, 582 U.S. at 532–

33).  Morris contends that this concern is still implicated and *Davila* does not automatically impair his ability to show cause and prejudice under *Martinez* to overcome the default of IAAC claims alleging unpreserved trial error.  (*Id.* at 25.)

The Supreme Court addressed this argument in *Davila*, specifically considering whether an exception for claims of ineffective assistance of counsel for failure to raise unpreserved trial error claims was necessary, and concluded that it was not:

> Claims of ineffective assistance of appellate counsel, however, do not pose the same risk that a trial error – of any kind – will escape review altogether, at least in a way that could be remedied by petitioner's proposed rule.  This is true regardless of whether trial counsel preserved the alleged error at trial.

*Davila*, 582 U.S. at 532.

The Court then explained that if the claim of error was not preserved by trial counsel's objection, then the claim was either not strong enough to make out a case of appellate ineffectiveness or "was so obvious that appellate counsel was constitutionally required to raise it on appeal." *Id.* at 533.  In the latter case, "trial counsel likely provided ineffective assistance by failing to object to [the error] in the first instance," and "the prisoner likely could invoke *Martinez* or *Coleman* to obtain review of trial counsel's failure to object." *Id.*

Additionally, *Davila* addressed and rejected the very proposal Morris asserts:

> An expanded *Martinez* exception, . . . would mean that *any* defaulted trial error could result in a new trial.  In *Carpenter,* this Court held that, when a prisoner can show cause to excuse a defaulted claim of ineffective assistance of appellate counsel, he can, in turn, rely on that claim as cause to litigate an underlying claim of trial error that was defaulted due to appellate counsel's ineffectiveness. 529 U.S., at 453. . . .   Expanding *Martinez* as petitioner suggests would thus produce a domino effect: Prisoners could assert their postconviction counsel's inadequacy as cause to excuse the default of their appellate ineffectiveness claims, and use those newly reviewable appellate ineffectiveness claims as cause to excuse the default of their underlying claims of trial error. Petitioner's rule thus could ultimately knock down the procedural barriers to federal habeas review of nearly any defaulted claim of

1    trial error.  The scope of that review would exceed anything the *Martinez*
2    Court envisioned when it established its narrow exception to *Coleman*.

3    *Davila*, 582 U.S. at 536.

4        Thus, Claims 9–10, 17–20, 23–27, 42–43, and 47 are technically exhausted but
5    procedurally defaulted.  They are barred from federal review and will be denied.

6        The Court should note that Morris raises several IATC claims related to these trial
7    error claims, and the Court applies *Martinez* below in determining whether the defaulted
8    IATC claims could be excused.  (*See* upcoming discussion regarding Claims Three (B)(2),
9    (B)(4); Four (A), (B)(1), (D); Five (D), and Six (B)(1)).  In doing so, the Court necessarily
10   considers to some extent the allegations of trial error underlying the IATC claims.  While
11   this illustrates precisely the point made by the Supreme Court in denying Davila's request
12   to extend *Martinez* to claims other than IATC, *see Davila*, 582 U.S. at 533, *Martinez*
13   remains viable only as a vehicle for excusing IATC claims and no others, including IAAC
14   claims.  *See id.; see also Martinez (Ernesto)*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at 1177;
15   *Hunton*, 732 F.3d at 1126–27.

16       **B.  Claim One**

17       Morris claims that the trial prosecutor engaged in repeated and pervasive
18   misconduct, violating Morris's rights under the Fifth, Sixth, Eighth, and Fourteenth
19   Amendments.[14]    (Doc. 21 at 70–108.)    Specifically, Morris alleges the prosecutor
20   (1) misstated facts, Claim One (A)(1), and engaged in vouching for witnesses, Claim One
21   (A)(2); (2) focused on irrelevant and salacious information, including deviant sexuality,
22   Claim One (B)(1), the victims' decomposition, Claim One (B)(2), and by introducing an
23   unfounded element of sexual deviancy into voir dire, Claim One (B)(3); (3) appealed to
24   the juror's passions and fear by singling out individual jurors and addressing them

---

26   [14] Because the parties do not agree on whether Claim One is divisible and, if it is,
27   how the subclaims should be labeled, the Court applies its own labeling system to the
     allegations of prosecutorial misconduct.

28                                          30

1  personally, Claim One (C)(1), unpackaging Castillo's malodorous jacket in court, Claim

2  One (C)(2), and displaying excluded photographs, Claim One (C)(3); and (4) invoked an

3  unproved and uncharged aggravating factor, Claim One (D).  (*Id.* at 79–100.)  Morris

4  argues that the effect of these alleged errors, considered both individually and

5  cumulatively, entitles him to relief.  (*Id.* at 79.)  Morris also alleges that trial counsel was

6  ineffective for failing to object to the prosecutor's pervasive misconduct, Claim One (E).

7  (*Id.* at 106–108.)

8          Morris did not raise several of these allegations in state court.  He argues their

9  default is excused under *Martinez* by the ineffective assistance of PCR counsel.  (Doc. 34

10  at 33–34.)

11         Morris also alleges the state court's ruling on his prosecutorial misconduct claims,

12  including a claim of improper influence (designated as Claim One (F)),[15] was contrary to

13  and an unreasonable application of clearly established federal law and based on an

14  unreasonable determination of facts.  (*Id.* at 100–106.)

15  <u>Additional Background</u>

16         On direct appeal, Morris alleged five occasions of prosecutorial misconduct:

17  (1) "The prosecutor improperly influenced the medical examiners' opinions

18  on two of the cases by supplying [Morris]'s statements to the police in an
    effort to influence their opinion on the causes of death."

19  (2) "There was no basis in fact for the prosecutor's continuing argument that

20  Appellant had killed the victims in order to have sexual intercourse with their
    corpses."

21

22  (3) "The prosecutor invited the jurors to put themselves in the place of the
    victims, asking for volunteers for a demonstration of his theories of how the

23  victims were killed."

24  (4) "The prosecutor told the jurors that he had introduced into evidence a
    jacket that had been covering one of the victim's bodies for their 'smelling

25  pleasure.'"

26  _____

27  [15] This allegation was not separately argued as a claim in his Petition.

28                                          31

1

2

      (5) "Throughout the testimony of two police officers on June 15, 2005, the prosecutor kept an excluded photograph showing maggot infestation on his desk in full view of the jurors."

3

4

(DA 29 at 51–53.)  Morris also alleged that the "cumulative effect of the misconduct . . .

5

so permeated the entire atmosphere of the trial with unfairness that it denied [him] due

6

process."  (*Id.* at 49.)

7

      The Arizona Supreme Court reviewed these claims to determine if "the prosecutor's

8

misconduct 'so infected the trial with unfairness as to make the resulting conviction a

9

denial of due process.'"  *Morris*, 215 Ariz. at 335, 160 P.3d at 214 (quoting *State v. Hughes*,

10

193 Ariz. 72, 79, 969 P.2d 1184, 1191 (1998)).

11

      The Arizona Supreme Court addressed each allegation individually and found that

12

one incident rose to the level of prosecutorial misconduct – addressing particular jurors

13

individually and playing on their sympathy for the victims and their fears of the defendant.

14

But the Supreme Court found the incident did not deny Morris a fair trial or deprive him

15

of a right essential to his defense.  *Id*. at 337–38, 160 P.3d at 216–17.

16

      The court also rejected Morris's cumulative-effect argument, concluding that

17

because he had identified only one instance of misconduct, there was no "persistent and

18

pervasive" misconduct.  *Id.* at 339, 160 P.3d at 218.  Additionally, the court found that "the

19

challenged remarks by the prosecutor did not prejudice Morris" in light of the

20

"overwhelming evidence of Morris's guilt and of the cruelty of the murders."  *Id.*

21

Clearly Established Federal Law: Prosecutorial Misconduct

22

      The appropriate standard for federal habeas review of a claim of prosecutorial

23

misconduct is "the narrow one of due process, and not the broad exercise of supervisory

24

power."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v.*

25

*DeChristoforo*, 416 U.S. 637, 642 (1974)).  To succeed, a petitioner must prove not only

26

that the prosecutor's remarks and other conduct were improper, but also that they "so

27

infected the trial with unfairness as to make the resulting conviction a denial of due

28

1  process." *Donnelly*, 416 U.S. at 643; *see Parker*, 567 U.S. at 45; *Johnson v. Sublett*, 63

2  F.3d 926, 930 (9th Cir. 1995) (explaining that relief is limited to cases in which the

3  petitioner can establish that prosecutorial misconduct resulted in actual prejudice); *see also*

4  *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process analysis in

5  cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of

6  the prosecutor.").

7         In determining if a petitioner's due process rights were violated, the court "must

8  consider the probable effect [of] the prosecutor's [remarks] . . . on the jury's ability to judge

9  the evidence fairly." *United States v. Young*, 470 U.S. 1, 12 (1985).  To make such an

10  assessment, the prosecutor's remarks must be placed in context.  *See Boyde v. California*,

11  494 U.S. 370, 385 (1990); *United States v. Robinson*, 485 U.S. 25, 33–34 (1988); *Williams*

12  *v. Borg*, 139 F.3d 737, 745 (9th Cir. 1998).  In *Darden*, for example, the Court assessed

13  the fairness of the trial by considering whether the prosecutor's comments manipulated or

14  misstated the evidence, whether the trial court gave a curative instruction, and "[t]he weight

15  of the evidence against petitioner."  477 U.S. at 181–82; *see Trillo v. Biter*, 769 F.3d 995,

16  1001 (9th Cir. 2014).

17         Even if a petitioner establishes a due process violation, habeas relief is not available

18  unless the petitioner also shows the violation resulted in a "substantial and injurious" effect

19  on the verdict under the standard set forth in *Brecht*, 507 U.S. at 638.  *Brown*, 596 U.S. at

20  122.  Courts have substantial latitude when considering prosecutorial misconduct claims

21  because "constitutional line drawing [in such cases] is necessarily imprecise."  *Donnelly*,

22  416 U.S. at 645; *Parker*, 567 U.S. at 48 (explaining that the "*Darden* standard is a very

23  general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case

24  determinations'") (quoting *Yarborough*, 541 U.S. at 664).

25  Analysis

26         Respondents assert that Morris failed to exhaust several of his specific allegations

27  of misconduct in state court.  Morris argues that while his habeas claim includes additional

28                                                      33

1   examples of misconduct, he did assert prosecutorial misconduct in state court and the

2   additional examples are not separate claims.  He argues it is not appropriate to divide the

3   single claim incorporating those examples into separate subclaims.

4       A claim has not been fairly presented in state court if new factual allegations either

5   "fundamentally alter the legal claim already considered by the state courts," *Vasquez v.*

6   *Hillery*, 474 U.S. 254, 260 (1986); *Beaty v. Stewart*, 303 F.3d 975, 989–90 (9th Cir. 2002),

7   or "place the case in a significantly different and stronger evidentiary posture than it was

8   when the state courts considered it." *Aiken v. Spalding*, 841 F.2d 881, 883 (9th Cir. 1988);

9   *accord Nevius v. Sumner*, 852 F.2d 463, 470 (9th Cir. 1988).

10      If, as Morris contends, there is only a single claim of prosecutorial misconduct, and

11  his new allegations are supported by significantly different facts than those presented in

12  state court so that they fundamentally alter the claim already considered by the Arizona

13  courts, he would be precluded from raising this fundamentally altered claim in state court.

14  *See* Ariz. R. Crim. P. 32.1(d)–(h), 32.2(a) & (b); *Stewart*, 536 U.S. at 860–61; *Beaty*, 303

15  F.3d at 987; *Ortiz*, 149 F.3d at 931–32; *Carriger*, 971 F.2d at 333.  Accordingly, the claim

16  as a whole would be technically exhausted but procedurally defaulted in federal court.  *See*

17  *O'Sullivan*, 526 U.S. at 848; *Coleman*, 501 U.S. at 735 n.1; *Hurles*, 752 F.3d at 779–80.

18      The Court, however, rejects this approach.  Individual allegations of prosecutorial

19  misconduct that were not fairly presented to the courts should be dismissed as procedurally

20  defaulted.  *See Wood v. Ryan*, 693 F.3d 1104, 1117 (9th Cir. 2012) (affirming district

21  court's dismissal of unexhausted allegations of prosecutorial misconduct because they

22  were not fairly presented to the states); *Jackson v. Conway*, 763 F.3d 115, 143–44 (2d Cir.

23  2014) (finding that, despite exhaustion of other prosecutorial misconduct allegations,

24  allegations not raised in state court are unexhausted and procedurally defaulted).

25  Moreover, even if a petitioner could allege new facts in the federal habeas proceeding and

26  still satisfy the exhaustion rule, those new facts may not be considered in determining

27  whether the state court's merits adjudication was objectively unreasonable.  *Pinholster*,

28                                              34

563 U.S. 170; *Vasquez*, 474 U.S. at 257–58.  Thus, the Court considers only those prosecutorial misconduct allegations reviewed on the merits by the state court and finds Petitioner's new allegations – Claims One (A)(2), One (B)(1) and (3), One (D), and One (E) – procedurally defaulted.

Morris asserts that any default can be overcome because of the ineffective assistance of PCR counsel.  (Doc. 34 at 33.)  As explained above, however, ineffective assistance of PCR counsel can excuse only claims of ineffective assistance of trial counsel.  *Martinez (Ernesto)*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at 1177; *Hunton*, 732 F.3d at 1126–27.  Therefore, the unexhausted allegations, which concern the conduct of the prosecutor and not the defense attorney at trial – Claims One (A)(2), One (B)(1) and (3), and One (D) – remain defaulted and barred from federal review.  Claim One (E), which alleges ineffective assistance of trial counsel, is addressed below.

Morris contends the state court's rulings on the five exhausted allegations were contrary to or based on an unreasonable application of clearly established Supreme Court precedent, *see* 28 U.S.C. § 2254(d)(1), and also involved unreasonable determinations of the facts, *see id.* § 2254(d)(2).  (Doc. 21 at 100–106.)  He further alleges the Arizona Supreme Court unreasonably applied clearly established Supreme Court precedent by reviewing isolated instances of prosecutorial misconduct alone rather than considering their cumulative effect.  (*Id.* at 101.)

In support of Claim One, Morris first chronicles "the well-documented history" of the prosecutor, Juan Martinez, violating ethical rules and committing misconduct.  (Doc. 21 at 72–78.)  Because this evidence was never presented in state court when adjudicating Morris's prosecutorial misconduct claim on the merits, it "has no bearing on § 2254(d)(1) review."  *See Pinholster*, 563 U.S. at 185.  Additionally, accusations from other cases are not relevant to the issue before the Court, which is "the fairness of the trial, not the culpability of the prosecutor."  *Phillips*, 455 U.S. U.S. at 219; *see Trillo*, 769 F.3d at 1001 (explaining that the court's role in reviewing prosecutorial misconduct claims "is

35

1    not to punish society for the misdeeds of the prosecutor," but "to ensure that the petitioner

2    received a fair trial"). Morris asserts that PCR counsel should have incorporated the

3    prosecutor's "pattern of misconduct, including cases decided after Morris's trial and direct

4    appeal had concluded," in a claim of prosecutorial misconduct. As noted above, however,

5    PCR counsel's ineffectiveness cannot excuse the procedural default of the unexhausted

6    claims, and to the extent Morris also alleges it is relevant to his claim of trial counsel

7    ineffectiveness, allegations of misconduct occurring after trial are irrelevant to whether

8    trial counsel's performance was deficient. Accordingly, the Court addresses only the

9    prosecutor's actions in Morris's case.

10   Exhausted Allegations of Prosecutorial Misconduct

11   *Claim One (A)(1): Misrepresentation of Facts*

12          In both the guilt and aggravation phases of trial, the prosecutor argued that Morris

13   killed the victims in order to have sexual intercourse with their corpses. (RT 7/05/05 at 14,

14   37–39, 43–44, 46, 49–50, 53–55, 124; RT 7/12/05 at 26–27, 32–33, 35–39.) The Arizona

15   Supreme Court rejected Morris's allegation that there was no basis in fact for this argument.

16   The court found that although the evidence "does not compel the conclusion that Morris

17   engaged in intercourse with the corpses of the victims, the record includes sufficient

18   evidence to permit the prosecutor to make such an argument." *Morris*, 215 Ariz. at 336,

19   160 P.3d at 215. Additionally, "the judge instructed the jury that the lawyers' arguments

20   were not evidence to be considered in reaching its conclusions," and the court presumed

21   "the jurors reached their own conclusions regarding the strength of the evidence." So that

22   "even if the prosecutor's statements were improper, the judge's instructions negated their

23   effect." *Id.* at 336–37, 160 P.3d at 215–16. Finally, the Arizona Supreme Court found that

24   the prosecutor's arguments were "directed only toward establishing the 'heinous and

25   depraved' prong" of the (F)(6) aggravator. They were "at worst, harmless error" because

26   the jury found that each murder was committed in an especially cruel manner and a finding

27   of cruelty alone is sufficient to establish the (F)(6) aggravator. *Id.* at 337, 160 P.3d at 216.

28

1          The state court's ruling on this claim was not based on an unreasonable application

2   of clearly established Supreme Court precedent or an unreasonable determination of the

3   facts.

4          Morris first argues the Arizona Supreme Court erred by considering only whether

5   the prosecutor committed misconduct at the aggravation phase, ignoring Morris's

6   "pervasive argument about necrophilia at the guilt phase." (Doc. 21 at 102.)  Morris argued

7   in his Opening Brief that "[t]here was no basis in fact for the prosecutor's continuing

8   argument that [Morris] had killed the victims in order to have sexual intercourse with their

9   corpses."   In support of this allegation, he cited arguments the prosecutor made in the

10  closing arguments of the guilt phase of trial.  (*See* DA 29 at 51) (citing RT 7/5/05 at 37–

11  39, 123–24).  Morris referred to the same portions of the guilt-phase transcript in his reply

12  brief.  (*See* DA 38 at 16.)

13         In rejecting Morris's claim, the Arizona Supreme Court addressed only whether the

14  prosecutor committed misconduct in the aggravation phase.  *See Morris*, 215 Ariz. at 336,

15  160 P.3d at 215.  The court appears to have overlooked Morris's only specific references

16  to the transcript: the prosecutor's closing and rebuttal arguments in the guilt phase of trial

17  regarding victims Codman and Noah.  (*See* DA 29 at 51) (citing RT 7/5/05 at 37–38)

18  (arguing that Morris kept Codman's body "because he wanted to have sex with the body"

19  and that the evidence of skin slippage "indicates that he went in there when she was dead");

20  (RT 7/5/05 at 123–24) (arguing photographs of Codman and Noah at the scene

21  demonstrated skin slippage, an indication of friction, only between the legs as well as

22  sperm matching Morris inside Noah's vagina despite Morris's having said he used a

23  condom when he had sex with her when she was alive).

24         The conclusion reached by the Arizona Supreme Court regarding the prosecutor's

25  arguments during the aggravation phase – that the record contained "sufficient evidence to

26  permit the prosecutor to" argue "that Morris engaged in intercourse with the corpses,"

27  *Morris*, 215 Ariz. at 336, 160 P.3d at 215 – applies equally to Morris's argument that the

28                                                    37

prosecutor distorted the evidence in the guilt phase.  Specifically, in finding that the record

included sufficient evidence to support a necrophilia argument, the Arizona Supreme Court

explained that:

> The prosecutor relied in part on skin slippage on selective parts of the victims' bodies as evidence that Morris engaged in intercourse with the corpses.  Selective skin slippage existed on Codman's inner thighs and breast and on Noah's inner thighs.  The medical examiners testified that skin slippage can result from friction and the general decomposition process. . . .
>
> The prosecutor also relied on the skin defects on Castillo's anus, although the medical examiner was unable to determine whether those defects were caused by trauma or decomposition.  In his statement to police, Morris also mentioned that he either masturbated or ejaculated in his sleep after Castillo died but while she was still in his camper.  Castillo's buttocks were level with Morris's bed.
>
> Additionally, the prosecutor relied on DNA evidence showing Morris's semen was present in Velasquez's and Noah's vaginas, even though Morris insisted that he wore a condom during sex with the women before their deaths.  Thus, the proposition that Morris had intercourse with the corpses of Codman, Velasquez, Noah, and Castillo is a "reasonable inference" to be drawn from the evidence in the record, and the prosecutor did not act improperly in making this argument.

*Id.*

The record supports the state court's conclusion that the prosecutor's arguments

were a reasonable inference to be drawn from the evidence.  *See Young*, 470 U.S. at 8 &

n.5 ("The prosecutor may argue all reasonable inferences from evidence in the record.")

(quoting ABA Standards for Criminal Justice Rule 3–5.8).

For example, Dr. Hu testified that the photo of Codman at the location where her

body was found demonstrated skin slippage on her left breast, inner thigh, and the upper

part of the arm, which could have indicated rubbing, touching, or friction in those areas

after she was dead and her body had started to decompose.  (RT 6/28/05 at 13, 23–24, 26–

27, 48.)

1    Detective Dillian testified that the photo of Noah at the crime scene, as well as her

2 personal observations at the scene, demonstrated skin slippage on both inner thighs and

3 smaller areas near the breast and hip.  (RT 6/20/05 at 41–42.)

4    Morris's semen was found inside Noah's vagina, even though Morris told police

5 that he used a condom while having sex with Noah before she died.  (RT 6/27/05 at 24–

6 25; PCR Pet. Ex. O at Bates No. 525, 572, 583.)  Morris's semen was also found inside

7 Velasquez's vagina, even though Morris told police that he always used a condom.  (RT

8 6/27/05 at 19–20; RT 6/29/05 at 16; PCR Pet. Ex. O at Bates No. 525, 572.)

9    Castillo's naked body was found face down in Morris's camper with her buttocks

10 facing up and within a few inches of the area where Morris slept.  (RT 6/14/05 at 68–75.)

11 Morris stated that he ejaculated in his sleep while Castillo's body was next to him.  (PCR

12 Pet. Ex. O at Bates No. 502–03.)  Castillo had tears or defects in the skin around her anus,

13 which Dr. Horn testified was consistent with trauma, though he could not say whether it

14 happened before, during, or after death.  (RT 6/15/05 at 87–88, 95–96.)

15    Morris further asserts that the Arizona Supreme Court ignored numerous

16 misstatements the prosecutor made about the alleged evidence of necrophilia in an attempt

17 to make it appear to be a reasonable theory.

18    First, Morris alleges that during the guilt phase the prosecutor made statements

19 about the evidence regarding the anal defects on Castillo's body that were contrary to the

20 evidence and highly prejudicial to Morris, as they transformed the defects from a natural

21 phenomenon to evidence of assault.  (Doc. 21 at 80.)  The Court disagrees.

22    Responding to questions posed by the prosecutor, Dr. Horn, the medical examiner,

23 testified as follows:

24    A:  Around the anus there were defects in the skin, and I felt that they could
      represent -- they could be tears in the skin from trauma.

25
      But, again, there was a lot of -- there were a lot of maggots in that area, as
26    well as a lot of maggots around the vagina and around the anus, and lot of
27    insect activity and decomposition there, too.  So I felt I couldn't opine one

28                                    39

way or the other whether that was real trauma before death or just due to the decompositional process.

Q:  Is it consistent with trauma to the anus?

A:  Could be consistent, yes.

Q:  Trauma -- if it is trauma to the anus, is it ante-, peri-, or post-mortem?

A:  Again, I couldn't say.

Q:  So it could be before, during, or after death?

A:  Yes.

(RT 6/15/05 at 88.)

On cross-examination, Dr. Horn further testified:

Q:  Did I understand you correctly that that is the result of either some sort of sexual activity or some sort of insect activity?

A:  Correct.

Q:  And you can't tell us which one it was?

A:  That's correct.

(*Id.* at 96.)

Morris asserts that, contrary to this evidence, the prosecutor repeatedly referred to the defects as "injuries" or "trauma" that were "consistent with sexual activity" during his examination of Dr. Horn.   (Doc. 21 at 80) (citing RT 6/15/05 at 88, 95, 102).   The statements made in questioning Dr. Horn, however, were a reasonable inference taken from the evidence.  Moreover, the prosecutor said the defects indicated "potential trauma," (RT 6/15/05 at 95) "consistent with sexual activity," which could also have been caused by "insect activity."  (*Id.* at 102.)   The prosecutor further clarified that Dr. Horn could not determine "whether it was consensual or nonconsensual *if it was* sexual activity," and whether it was "before or after death."  (*Id.* at 102) (emphasis added).  These questions allowed room for the jurors to draw their own conclusions about what may have caused the defects.  *See Boyde*, 494 U.S. at 385 ("[T]he arguments of counsel . . . must be judged in the context in which they are made.").

40

1   Morris argues that the prosecutor continued to misstate the evidence throughout

2 closing argument. (Doc. 21 at 80) (citing RT 7/05/05 at 53–54). Read in context, the

3 prosecutor continued to clarify that Dr. Horn could not determine whether the defects or

4 "lesions" occurred before, during, or after death, and merely "proposed," based on the way

5 Castillo's body was positioned and Morris's description of ejaculating while he was

6 sleeping next to her, that "his penis went inside her anus when she was dead." (RT

7 07/05/05 at 53–54.) The scenario "proposed" by the prosecutor was not an unreasonable

8 inference based on the evidence.

9   Morris further alleges the prosecutor made false statements about Dr. Horn's

10 testimony during the aggravation phase to support his theory that Morris engaged in

11 postmortem sex with Castillo. (Doc. 21 at 80.) The prosecutor stated that Dr. Horn

12 indicated there "were lacerations or bruising through trauma" around Castillo's anus. (*Id.*)

13 (citing RT 7/12/05 at 37. Later, he again referred to the defects as "trauma" (RT 7/12/05

14 at 109, 133), consisting of "lacerations or contusions or abrasions." (*Id.* at 109.) Although

15 the prosecutor's description of the defects was not fully accurate – the medical examiner

16 did not describe any bruising or contusions – the fact remains that the jury had heard from

17 Dr. Horn that there were defects around Castillo's anus that they may or may not have been

18 caused by postmortem intercourse; they had heard Morris's statement that he ejaculated

19 while sleeping next to her body; and the prosecutor's argument of necrophilia was a

20 reasonable inference from this evidence.

21   Morris argues that no medical examiner testified that the only reason there would

22 be skin slippage on the victims in certain areas of their bodies would be if Morris engaged

23 in postmortem sex with them. But the medical examiner testified that the skin slippage

24 observed in photographs of Codman at the crime scene involving the back of the right arm

25 was consistent with somebody, after her death, grabbing underneath the arm and rubbing.

26 (RT 6/28/05 at 25). Similarly, slippage over one side of the breast indicated "some kind

27 of force" – rubbing or touching – "applied to that area." (*Id.* at 26.) The medical examiner

28

also noted skin slippage "near the pubic area to down by the knee . . . concentrate[d] on the front inner aspect of the thigh." (*Id.* at 27.)  A reasonable inference to be drawn from this evidence is that Morris had postmortem sex with the victim.

The Court concludes that the state court's rejection of the prosecutorial misconduct claim was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *See Matthews*, 567 U.S. at 47 (citing *Richter*, 562 U.S. at 101–02).  Morris has failed to show that the state court's conclusions about reasonable inferences to be drawn from the evidence – that Morris had intercourse with the corpses of Codman, Velasquez, Noah, and Castillo – was contrary to or an unreasonable application of clearly-established federal law, or was based on an unreasonable determination of facts.  Because Morris has not met his burden of showing "there was no reasonable basis for the state court to deny relief," *Richter*, 562 U.S. at 98; *see Parker*, 567 U.S. at 47–48, this claim is denied.

*Claim One (B)(2): Improperly focusing on graphic details of the victims' decomposition*

Morris contends the prosecutor improperly focused on graphic details of the victims' decomposition, particularly evidence of skin slippage and anal defects.  (Doc. 21 at 90–96.)  Although Morris did not specifically allege this claim in his Opening Brief, Respondents do not assert the claim is procedurally defaulted.  The claim is, however, meritless, for the reasons discussed below in Morris's IAC claim, Claim One (E), based on his counsel's failure to object to the prosecutor's alleged misconduct.

*Claim One (C)(1): Appealing to Passion and Fears of Jurors, Improper Remarks to Jurors*

The Arizona Supreme Court found the prosecutor committed misconduct in closing argument by singling out particular jurors and addressing them personally, playing on their sympathy for the victims and fears of the defendant.  *Morris*, 215 Ariz. at 337, 160 P.3d at 216.  The court provided an example of the prosecutor's improper remarks:

[W]hich one of you wants to volunteer?  I want a show of hands on this one.
Which one of you ladies—and we don't need guys on this one, because he
didn't take guys.  He only took women.

Which one of you want [sic] to volunteer to come sit here and have the
defendant sit himself on your chest and say, Oh, that didn't hurt?  Because
the defense attorney is saying throw common sense out of [the] window.
Which one?  I challenge anybody to say, That is something I want to do.  And
anyway, and on top of that, while he's sitting on my chest, which one of you,
since the one lower left-hand side has the longer hair of the jurors, maybe
she wants to have him grab her hair while he's sitting on her chest . . . to grab
it and pull it around her neck.

You think that's not going to hurt?  You think one of you guys is going to
volunteer for that?  You can't leave your common sense aside.  [Defense
counsel] wants you to because he makes these arguments and says, well, we
don't know what is in their heads.  We don't know what is in Juror Number
1's head.  Can you tell me you don't think it's not going to hurt when he sits
on you?

Hey, Juror Number 1 or Juror Number 14, whatever it is, what if we put
Winnie the Pooh tie around your neck?  Are you going to enjoy that?  Are
you going to like it?  Going to feel real good when you can't breathe?

*Id.*; *see also* (RT 7/12/05 at 130–31).

The Arizona Supreme Court concluded, however, that Morris had not shown this
"isolated incident of impropriety" denied him of a fair trial or deprived him of a right
essential to his defense.  *Id.* at 338, 160 P.3d at 217.  Additionally, the court concluded that
Morris could not establish prejudice:

The prosecutor's argument was directed toward proof of cruelty.  To prove
that a murder was "especially cruel" under A.R.S. § 13-703[(F)(6)], the State
must show that the victim was conscious and suffered physical pain or mental
anguish during at least some portion of the crime and that the defendant knew
or should have known that the victim would suffer.  *State v. Trostle,* 191
Ariz. 4, 18, 951 P.2d 869, 883 (1997).  Here, independent of the prosecutor's
improper argument, the State presented overwhelming evidence of cruelty.
The medical examiner testified that all of the victims would have experienced
pain for some period before losing consciousness.  Moreover, the evidence
suggests that at least three of the victims struggled with Morris before losing
consciousness:  Morris's  DNA  was  under  Davis's  fingernails,  Noah's

43

1   fingernails were broken, and the side of Velasquez's face was bruised.
2   Morris has not met his burden of showing that the argument caused prejudice.

3   *Id.*

4   Morris first argues that the state court's determination was unreasonable because
5   "the court ignored the fact that [the prosecutor's] argument was aimed at inflaming the
6   passions in a supremely private context." (Doc. 21 at 102.) The record does not show that
7   the state court ignored this issue. The court specifically acknowledged that the prosecutor
8   "invited jurors to put themselves in the place of the victims and singled out specific jurors
9   based on appearance and gender." *Morris*, 215 Ariz. at 337, 160 P.3d at 216. The court
10  did not ignore the "private context" of the prosecutor's remarks.

11  Morris next asserts that the state court's finding that the evidence of cruelty was
12  "overwhelming" was based on an unreasonable determination of facts because the state
13  court did not acknowledge that the evidence of consciousness was inconclusive. (Doc. 21
14  at 102; *see also id.* at 258) (citing *State v. Fulminante*, 161 Ariz. 237, 254–55, 778 P.2d
15  602, 619–20 (1988)). Morris contends the prosecution presented no evidence of how long
16  any of the victims remained conscious. (*Id.* at 258.) Under Arizona law, "[i]f the evidence
17  is inconclusive as to whether the victim was conscious during the infliction of violence,
18  the court cannot find that the killing was especially cruel." *State v. Schackart*, 190 Ariz.
19  238, 248, 947 P.2d 315, 325 (1997) (citing *State v. Bolton*, 182 Ariz. 290, 311, 896 P.2d
20  830, 851 (1995)).

21  The Court is not aware of any authority, and Morris cites none, that a victim must
22  remain conscious for any predetermined length of time. *See State v. Cropper*, 223 Ariz.
23  522, 526, 225 P.3d 579, 583 (2010) ("No set period of suffering is required) (citation
24  omitted); *State v. Goudeau*, 239 Ariz. 421, 463, 372 P.3d 945, 987 (2016) (commenting
25  that a victim's suffering need not last for any specific length of time to establish cruelty)
26  (citing *Cropper*, 223 Ariz. at 526, 225 P.3d at 583). The state must prove only that a
27  "victim was conscious" and suffered mental or physical anguish at the time of the offense.

28  44

1    *See Bolton*, 182 Ariz. at 311, 896 P.2d at 851 (citing *State v. Jiminez*, 165 Ariz. 444, 453,

2    799 P.2d 785, 794 (1990)).  Though unwilling to say that all stranglings are per se cruel,

3    the Arizona Supreme Court has found that a period of suffering from as little as "eighteen

4    seconds to two or three minutes can be enough to warrant application of the cruelty factor."

5    *Schackart*, 190 Ariz. at 248, 947 P.2d at 325 (citing *State v. Herrera*, 176 Ariz. 21, 34, 859

6    P.2d 131, 144 (1993)).

7         Dr. Horn testified that most strangulation victims will be unconscious within 30

8    seconds to a minute of consistent pressure, assuming that the victim is *not* struggling.  (RT

9    6/15/05, at 85–86.)  Dr. Keen testified that during manual or ligature strangulation or

10   compression asphyxia a person would feel and perceive sensations before they lapse into

11   unconsciousness.  (RT 7/12/05 at 44, 52, 53, 57–58.)  He testified, however, that there was

12   no way to know how long it took for any of the victims in this case to lose consciousness.

13   (*Id.* at 66, 72.)  The length of time would be "variable" and depend on things such as the

14   hold on the ligature and the initial state of consciousness of the victim.  (*Id.* at 57–58, 66.)

15        Morris asserts that because all of the victims had drugs or alcohol in their system,

16   the finding that they were conscious at the time of their deaths is speculative.  (Doc. 21 at

17   259) (citing RT 6/15/05 at 93–95; RT 0/27/05 at 114–118; RT 6/28/05 at 34–37; RT

18   6/29/05 at 19–21, 37–38).  This ignores the evidence that Morris admitted to strangling all

19   five victims at their insistence – in other words, while they were conscious.  *See Morris*,

20   215 Ariz. at 229, 160 P.3d 208.  Further, as the Arizona Supreme Court noted, physical

21   evidence suggested that three of the victims – Davis, Velasquez, and Noah – struggled

22   before their deaths.   Morris does not dispute this evidence, but argues it is mere

23   "speculation" to conclude that the struggle occurred during strangulation.  He suggests that

24   Noah's broken fingernails, Velasquez's bruise, and the DNA under Davis's fingernails

25   could have occurred at some other time or in some other way.  (Doc. 21 at 260.)  But when

26   combined with the fact that all of the victims were conscious during the strangulation

27   according to Morris's own statements, and Dr. Keen's testimony that the victims would

28                                          45

have felt sensation before they lapsed into unconsciousness, these conditions could reasonably be viewed by the jury as suggesting a struggle before the victims died.

The Arizona Supreme Court's evaluation of the evidence and the facts is presumed correct, and Morris has not satisfied his burden of showing by clear and convincing evidence that the evidence demonstrating the victims were conscious was inconclusive.

*Claim One (C)(2): Appealing to Passion and Fears of Jurors – Unpackaging Castillo's Jacket*

Morris alleges the prosecutor inflamed the jury's passions and fears by unpackaging and displaying Castillo's jacket, resulting in a foul odor permeating the courtroom, and then arguing in closing argument that the jacket was opened for the jury's "smelling pleasure." (Doc. 21 at 96–97.)

During closing argument, the prosecutor stated:

> But one of the things that is interesting about [Castillo] is that the smell is absolutely putrid, absolutely one of the worst things that you will ever probably experience. And you got a minimal exposure to it when the jacket was opened up for your, if you will, smelling pleasure, for lack of a better word.
>
> And what ended up happening – you could tell it was a very strong odor about it. So with regard to Julie Castillo, one of the things that happened to her is that she was wearing that jacket, and the reason that we pulled it out to show it to you, because the sleeves were inside out, and what that means is that he killed her.

*Morris*, 215 Ariz. at 338 n.7, 160 P.3d at 217; (*see also* RT 07/05/05 at 51).

Morris argued in his Opening Brief that the prosecutor's statement constituted an admission that the prosecutor offered the jacket solely to inflame the jurors' passions. (DA 29 at 52) (citing RT 7/05/05 at 51). The Arizona Supreme Court rejected this claim, concluding there "was no misconduct in introducing the jacket into evidence." *Morris*, 215 Ariz. at 338, 160 P.3d at 217. The court explained:

> The prosecutor originally introduced the jacket to show that it belonged to Castillo. During the testimony of a police officer who investigated the scene

46

of Castillo's death, the prosecutor introduced a booking photograph of Castillo wearing the jacket and then asked the officer to remove the jacket from its plastic bag and hold it up.  The prosecutor quickly asked the detective to return the jacket to the bag.

*Id.*  Morris asserts this ruling was contrary to and an unreasonable application of clearly established law, as well as an unreasonable determination of the facts.  (Doc. 21 at 104–05.)

The state court found that, "[a]t worst, the offhand 'smelling pleasure' comment was inappropriate," but it did not deprive Morris of a fair trial.  *Morris*, 215 Ariz. at 338, 160 P.3d at 217.  The court concluded that Morris could not establish prejudice because "overwhelming evidence established that the strong odor associated with the jacket resulted from its close proximity to Castillo's badly decomposed body."  *Id.*

Morris asserts the Arizona Supreme Court "ignored the magnitude" of the impact of unsealing the jacket and focused on the prosecutor's "smelling pleasure" remark, improperly characterizing it as a singular, offhand comment, when in fact the prosecutor's "focus on the smell of decomposing bodies was not limited to the comment in reference to the jacket."  (Doc. 21 at 105.)  Morris alleges the prosecutor painted him as a "monster who enjoyed the smell of rotting corpses" throughout his questioning of witnesses and in closing argument, and the introduction of the jacket early in the guilt phase "provided the jurors with a repugnant point of reference for each time he asked a witness about or made statements concerning the smell" of Morris's trailer.  (*Id.*)

Morris, however, did not make this argument in his Opening Brief, nor did he make any reference to the portion of the transcripts he now asserts in support of this argument.  (*See* DA 29 at 52.)  Morris argued only that the prosecutor's "smelling pleasure" comment was evidence of the prosecutor's improper intent in opening the package.  (*Id.*)  The state court clearly identified this claim and rejected it by finding that the package was not opened

1    solely to prejudice the jury – the "prosecutor originally introduced the jacket to show that

2    it belonged to Castillo."  *Morris*, 215 Ariz. at 338, 160 P.3d at 217.

3           Moreover, the contention that the prosecutor opened the jacket to intentionally

4    inflame the jurors is unsupported by the record.  The prosecutor explained in closing

5    arguments that the jacket was brought out of its packaging to demonstrate that the sleeves

6    of the jacket were inside out, evidence that Morris removed the jacket after Castillo's death.

7    (RT 7/5/05 at 51–52; *see also* RT 6/15/05 at 21–24, 30).  The state court's conclusion that

8    the prosecutor's stated reason for opening the package was to show that it belonged to

9    Castillo appears reasonable from the record.

10          Morris also asserts the state court's factual determination – that the odor associated

11   with the jacket resulted from its close proximity to Castillo's badly decomposed body –

12   was unreasonable because, as defense counsel pointed out in closing arguments, the jacket

13   had been sealed for years, causing the odor to increase.  Defense counsel's arguments,

14   however, are not evidence.  *See Leavitt v. Arave (Leavitt I)*, 383 F.3d 809, 834 (9th Cir.

15   2004).  There was ample evidence in the record that the strong odor of the jacket resulted

16   from its proximity to Castillo's body.  Morris's uncle testified that he could smell "a rotten

17   odor like a dead animal" in the backyard of his home (RT 06/13/05 at 105), eventually

18   tracking the smell to the trailer where Morris lived and discovering Castillo's body.  (*Id.* at

19   106–07, 119–21.)  Morris stated during his interview with the police that he laid the jacket

20   on top of Castillo after removing her urine-soaked pants and shirt.  (PCR Pet. Ex. O at

21   Bates No. 496–98.)[16]  And the jacket was discovered in the trailer after Castillo's body was

22

23   _____

24          [16] Sections of the videotape of Morris's interview with Detective Hutson were
     played for the jury and admitted as separate exhibits.  (*See* ROA 180; RT 06/16/05 at 31,
25   34, 39, 40, 41, 43, 44, 46, 47, 53; RT 6/20/05 at 8, 10, 12, 14.)  The complete videotaped
     interview, marked as Trial Exhibit 382, was not admitted during the trial. (*See id.*).  The
26   transcript of the complete interview was attached to Morris's PCR petition. (*See* PCR Pet.
27   Ex. O.)

28                                                48

1    found.  (RT 6/14/05 at 160–61; RT 6/15/05 at 20–21).  It was not unreasonable for the state

2    court to conclude that the odor of the jacket resulted from its proximity to Castillo's body.

3        For all of these reasons, the state court's denial of this claim was not "so obviously

4    wrong as to be 'beyond any possibility for fairminded disagreement.'"  *Kayer*, 592 U.S. at

5    124 (quoting *Richter*, 562 U.S. at 102, 103).

6    *Claim One (C)(3): Appealing to Passion and Fears of Jurors – Display of Excluded*

7    *Photographs*

8        Morris alleges the prosecutor inflamed the jury's passions and fears by keeping an

9    excluded photograph showing maggot infestation on top of a pile of papers on his table, on

10   open display to the jury.  (Doc. 21 at 97) (citing RT 6/15/05 at 58).  Morris raised this claim

11   in his Opening Brief, "asserting the photograph remained in full view throughout the

12   testimony of two witnesses, until [Morris's] counsel objected to its presence and the trial

13   court ordered the prosecutor to cover the photograph or turn it over."  (DA 29 at 52) (citing

14   RT 6/15/05 at 58).

15       The Arizona Supreme Court rejected the claim, finding no misconduct given the

16   circumstances:

17       Nothing in the record indicates that any juror actually saw the challenged
         photograph.  Defense counsel did not ask the trial judge to determine whether
18       any jurors had seen the photograph or to instruct the jurors to disregard it.
         The prosecutor complied with the judge's order to remove the photograph
19       from view, and nothing indicates that he intentionally left it on his desk or
20       that he repeated this conduct at any other point in the trial.

21   *Morris*, 215 Ariz. at 338–39, 160 P.3d at 217–18.

22       Morris asserts the state court's ruling was unreasonable because it ignored the fact

23   that "this incident occurred on the same day that Castillo's jacket was unsealed," indicating

24   a pattern of misconduct by the prosecutor.  (Doc. 21 at 105–06.)

25       The state court's finding was reasonable because there is no evidence that the jury

26   saw the photograph, and Morris does not contend otherwise.  There is also no support in

27

28                                                  49

the record for Morris's contention that the prosecutor left the photograph out intentionally. That this happened on the same day Castillo's jacket was unpackaged does not establish that the state court's denial of this claim was "so obviously wrong as to be 'beyond any possibility for fairminded disagreement.'" *Kayer*, 592 U.S. at 124 (quoting *Richter*, 562 U.S. at 102, 103).

*Claim One (F): Improper Influence*

The Arizona Supreme Court rejected Morris's allegation that the prosecutor improperly influenced the medical examiners investigating the deaths of Codman and Davis by providing them copies of the statements Morris made to the police. *Morris*, 215 Ariz. at 336, 160 P.3d at 215. The court summarized the relevant facts as follows:

> Dr. Hu, who performed Codman's autopsy, and Dr. Horn, who performed Davis's autopsy, originally determined that the cause of death for each woman was drug overdose. After police provided them transcripts of Morris's statements regarding the deaths, the medical examiners testified that they found nothing inconsistent with asphyxiation due to strangulation as the cause of death for both women.

*Id.* at 335–36, 160 P.3d at 214–215.

The state court then noted that under Arizona law a peace officer is required to report the results of an investigation surrounding a suspicious death to the county medical examiner, and the medical examiner is statutorily required to make inquiries regarding the cause and manner of death. *Id.* at 336, 160 P.3d at 215 (citing A.R.S. §§ 11-593(B), 11-594(A)(4), 11-594(A)(2) (2001)). The court held that no misconduct occurred, therefore, when the prosecutor provided the transcripts of Morris's statements to the medical examiners. Additionally:

> [T]he record does not suggest that Morris's statements improperly influenced either of the medical examiners. Both testified simply that they found nothing inconsistent with those statements in their respective autopsies of Codman and Davis, and they acknowledged that, without the statements, they would have believed that drug intoxication caused the deaths.

1    *Id.*

2          Morris alleges the state court's factual determination was unreasonable because the

3    court ignored the fact that the prosecutor did not provide the medical examiners with

4    Morris's statements until after they were interviewed by defense counsel.[17]   (Doc. 21 at

5    106.)

6          "[T]he state-court fact-finding process may be 'undermined where the state court

7    has before it, yet apparently ignores, evidence that supports petitioner's claim.'"   *Kipp v.*

8    *Davis*, 971 F.3d 939, 953 (9th Cir. 2020) (quoting *Taylor v. Maddox*, 366 F.3d 992, 1001

9    (9th Cir. 2004)).   State courts are not required, however, to address "every jot and tittle of

10   proof suggested to them," and "overlooked and ignored evidence" fatally undermines the

11   fact-finding process only when the evidence is "highly probative and central to petitioner's

12   claim."   *Id.* at 954 (quoting *Taylor*, 366 F.3d at 1001).

13         Morris did not assert in state court that the timing of the prosecutor's disclosure of

14   Morris's statements to the medical examiners constituted prosecutorial misconduct.   (*See*

15   DA 29 at 50–51.)   Given this fact, Morris fails to show that the timing of disclosure was

16   "central to his claim" or that he was prejudiced by the state court's failure to address it.

17   *See Donnelly*, 416 U.S. at 643; *see also Parker*, 567 U.S. at 45; *Johnson*, 63 F.3d at 930.

18   Morris's counsel brought to the juror's attention the medical examiners' inability to

19   determine the causes of death until after speaking with detectives.   (RT 7/05/05 at 101–

20   105.)   His counsel also argued that their conclusions – "consistent with strangulation" –

21   was not proof of strangulation beyond a reasonable doubt and that cocaine intoxication was

22   more consistent with the physical findings reported by the medical examiners.   Morris does

23   not state what more he would have done if the reports were disclosed any earlier or how he

24   _____

25         [17] Morris did not assert this as an individual claim in his Petition.   (*See* Doc. 21 at
26   79–100.)   Nonetheless, because he asserts the state court's decision regarding improper
     influence was unreasonable and based on an unreasonable factual determination, the Court
27   treats this as an exhausted allegation of prosecutorial misconduct.

28                                             51

1    was prejudiced by the timing of the disclosure.  Accordingly, the state court's decision was

2    not contrary to or an unreasonable application of clearly established federal law, and was

3    not based on an unreasonable factual determination.

4    *Cumulative Effect*

5        Morris asserts the Arizona Supreme Court erred by individually analyzing each of

6    the five examples of misconduct "in a vacuum" and, after determining that only one

7    qualified as misconduct, concluding that "[b]ecause Morris has described only one incident

8    of misconduct, we cannot conclude that the prosecutor engaged in 'persistent and

9    pervasive' misconduct."  (Doc. 21 at 101) (citing *Morris*, 215 Ariz. at 339, 160 P.3d at

10   218).   Morris contends this was an unreasonable application of "clearly established

11   Supreme Court precedent holding that prosecutorial misconduct is not evaluated from

12   isolated instances alone; rather, the reviewing court must consider the cumulative effect of

13   the harm."  (*Id.*) (citing *Berger v. United States*, 295 U.S. 78, 89 (1935)).  In addition to

14   being procedurally defaulted,[18] this argument is meritless.

15       In *Berger*, the Supreme Court reversed a conviction where the prosecutor had made

16   "improper suggestions, insinuations, and . . . assertions of personal knowledge" about

17   evidence not before the jury.   295 U.S. at 88.   The Court found the prosecutor's

18   "pronounced and persistent" misconduct had "a probable cumulative effect upon the jury"

19   and concluded that Berger was entitled to a new trial.  *Id.* at 89.

20

21   _____

22       [18] In state court, Morris argued only that the court was required under state law to
     assess each incident for error and then assess whether the incident should "count towards
23   the defendant's prosecutorial misconduct claim."  (DA 29 at 48) (citing *State v. Roque*, 213
     Ariz. 193, 228, 141 P.3d 368, 403 (2006).  He further asserted that even if there is no error,
24   or an error is harmless and by itself does not warrant reversal, "an incident may nonetheless
25   contribute to a finding of persistent and pervasive misconduct if the cumulative effect of
     the incidents shows that the prosecutor intentionally engaged in improper conduct and 'did
26   so with indifference, if not a specific intent, to prejudice the defendant.'"  (*Id.*) (citing
27   *Hughes,* 193 Ariz. at 83, 88, 969 P.2d at 1195, 1200).

28                                                52

The *Berger* Court distinguished the multiple instances of misconduct at issue from cases "where the misconduct of the prosecuting attorney was slight or confined to a single instance." *Id*. Here, the state court reasoned, correctly, that because there was only one instance of misconduct, it could not conclude that the prosecutor engaged in "persistent and pervasive" misconduct.[19] Because there was no misconduct to cumulate, the court's conclusion was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. Morris is not entitled to habeas relief on this claim.

*Claim One(E): Ineffective Assistance of Counsel – Failure to Object to Prosecutorial Misconduct*

Morris asserts his trial counsel was ineffective for failing to object to the "prosecutor's pervasive misconduct." (Doc. 21 at 106–08.) Morris concedes this claim is unexhausted, but asserts he can overcome its default by "demonstrating at an evidentiary hearing that post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced him." (*Id.* at 106.)

The Court will assume without deciding that the claims are substantial and have "some merit," thereby satisfying *Martinez*'s prejudice prong. *Martinez*, 566 U.S. at 14. With respect to the cause prong, the Court will assume that PCR counsel's failure to raise the claims constituted deficient performance under *Strickland*. The Court's analysis accordingly will focus on whether PCR counsel's failure to raise the claims was prejudicial – whether there was a reasonable probability of a different outcome during the PCR proceedings if counsel had raised the claims. To make that determination, the Court must evaluate the strength of the underlying claims of ineffective assistance of trial counsel. *See Hooper*, 985 F.3d at 627; *Atwood*, 870 F.3d at 1059–60; *Runningeagle v. Ryan*, 825 F.3d 970, 982 (9th Cir. 2016).

---

[19] This is the analysis Morris invited by arguing that "[o]nce the incidents contributing to a finding of misconduct are identified, the court must evaluate their cumulative effect on the trial." (DA 29 at 48.)

Morris asserts "trial counsel was plainly deficient for failing to object to, or ask for a mistrial on the basis of, the pervasive and prejudicial prosecutorial misconduct that [the prosecutor] committed throughout all phases of trial." (Doc. 21 at 107.)  Morris further asserts that "had trial counsel objected, the prosecutor's arguments would have been curtailed, and with proper admonitions, the jury would have understood properly its role in determining Morris's guilt as well as the need to 'consider and give effect to [mitigating] evidence in imposing sentence,' so that 'the sentence imposed . . . reflect[s] a reasoned moral response to the defendant's background, character, and crime.'" (*Id.* at 108) (citing *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989)).

Claims of ineffective assistance of trial counsel are governed by the principles set forth in *Strickland*, 466 U.S. 668.  To prevail under *Strickland*, a petitioner must show that trial counsel's conduct fell below an objective standard of reasonableness and that the deficiency prejudiced the defense.  *Id.* at 687–88.  Trial counsel is not ineffective for failing to object to a prosecutor's remarks when any such objection would have failed.  *See Juan H. v. Allen,* 408 F.3d 1262, 1273 (9th Cir. 2005) (explaining that the merits of the underlying claim "control the resolution of the *Strickland* claim because trial counsel cannot have been ineffective for failing to raise a meritless objection"); *Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998) ("[F]ailure to make a frivolous objection does not cause counsel's performance to fall below an objective level of reasonableness."); *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994) (holding counsel was not ineffective for failing to move to strike a special circumstance finding where the motion would have been futile).  Additionally, the *Strickland* prejudice standard is not met if counsel's failure to object to a prosecutor's improper statements do not "seriously affect the fairness of the trial."  *Ybarra v. McDaniel*, 656 F.3d 984, 1000 (9th Cir. 2011) (citing *Kyles*, 514 U.S. at 435–36); *see Leavitt v. Arave (Leavitt II)*, 682 F.3d 1138, 1140 (9th Cir. 2010) (even if a prosecutor's actions "deviat[ed] from propriety," if it is "not enough to make any difference in the

54

1    result," no prejudice results from counsel's failure to object) (citing *Leavitt I*, 383 F.3d at

2    835).

3         Applying these principles to the allegations in Claim One which underly Morris's

4    ineffective assistance claim, the court concludes that Morris has failed to demonstrate

5    deficient performance by trial counsel or that he was prejudiced by any failure of that

6    counsel to object to the alleged misconduct.

7         *a.  Misstatement of facts*

8         Morris first alleges the prosecutor misrepresented the facts by arguing Morris

9    engaged in postmortem sex with four of the victims.  (Doc. 21 at 79–85.)  But as discussed

10   above, this was a reasonable inference that could be drawn from the evidence and therefore

11   not improper.  *See Young,* 470 U.S. at 8 & n. 5; *United States v. Younger,* 398 F.3d 1179,

12   1190 (9th Cir. 2005) ("It is not misconduct for the prosecutor to argue reasonable

13   inferences based on the record.") (quotation omitted).  Any objection to the prosecutor's

14   argument would have been futile, and trial counsel was not ineffective for failing to object.

15   *See Juan H.*, 408 F.3d at 1273.

16        Morris alleges the prosecutor also made several misleading statements about the

17   circumstances surrounding Davis's death.  (Doc. 21 at 85–86.)  First, Morris alleges the

18   prosecutor's description of Dr. Horn's testimony was misleading.  In closing arguments,

19   the prosecutor explained Dr. Horn could not say at first whether Davis was strangled

20   because he didn't have all of the evidence and facts before him, recalling the testimony in

21   Dr. Horn's voice for the jurors the prosecutor stated:

22        All I had was a body that had been dumped in an alley.  That was suspicious
         to me, because, you know, a body just doesn't appear in alleys, especially
23        when they're nude, and bodies don't appear in this condition where they're
         bloated, where the skin is slipping off of the body, without raising suspicion.
24

25   (RT 07/05/05 at 74–75.)  The prosecutor's statements were not true, Morris asserts, because

26   Dr. Horn testified that:

27

28                                            55

> The fact that she is nude in an alleyway means that she may be a quote, unquote, drug dump, meaning that somebody may have become intoxicated in someone's house and simply dumped in an alleyway, which does happen.

(RT 6/29/05 at 40.)  The prosecutor's statement was not misleading.  In addition to the testimony described above, Dr. Horn testified that "before the toxicology screening, basically what I had was a decomposed nude body in an alleyway with no visible trauma, so I pended the cause of death, meaning that I was waiting for the outcome of further testing and/or investigation."  (*Id.* at 39.)  Dr. Horn explained he could not rule out a homicide based on the evidence he had; in other words, Dr. Horn considered the death potentially suspicious.  (*Id.* at 40.)  While the prosecutor's recollection of Dr. Horn's testimony was not wholly accurate, it was a reasonable inference based on Dr Horn's testimony.  Any objection to the prosecutor's argument, therefore, would have been futile and counsel was not ineffective for failing to object.  *See Younger*, 398 F.3d at 1190; *Juan H*., 408 F.3d at 1273.

Morris next alleges the prosecutor mischaracterized DNA evidence by arguing to the jury during opening statements that Morris's DNA was found in fingernail scrapings from both of Davis's hands.  (Doc. 21 at 86) (citing RT 6/13/05 at 69).  Though Morris contends the prosecutor mischaracterized the DNA evidence in order to argue that Davis attempted to fight off Morris, the prosecutor did not argue any inference from this evidence during opening statements.  During the trial, the DNA expert testified that only the scrapings from Davis's left hand matched Morris (RT 6/27/05 at 47–49), but Morris could not be ruled out as a contributor to the scrapings from her right hand (*id.* at 53; *see also id.* at 80–81).  After this testimony, the prosecutor stated during closing argument that the "DNA profile under both left and right fingernails are, if you will, matched up to the profile of the defendant.  He could not be excluded."  (RT 7/05/05 at 43.)  The prosecutor therefore asserted that Davis was "fighting him."  (*Id.*)  During rebuttal argument, he reiterated that "the DNA profiles that you have matched and did not exclude the defendant as being the

56

1    contributor of the DNA," suggesting that "she fought him." (*Id.* at 66–67.)  During the

2    aggravation-phase closing argument, the prosecutor stated the "DNA profiles of both

3    [Davis's] left and right hand are consistent with the defendant's DNA profiles."

4    The prosecutor's misstatement during opening statements did not seriously affect

5    the fairness of the trial.  Morris's DNA was found under the fingernails of one of Davis's

6    hands, and he could not be excluded from the other hand, leading to a reasonable inference

7    that she attempted to fight Morris as the prosecutor suggested during guilt and aggravation

8    phase closing arguments.  The prosecutor corrected his misstatement in closing arguments

9    by arguing the defendant could not be excluded from the DNA profile.  No prejudice

10   resulted from counsel's failure to object to the prosecutor's factual misstatement during

11   opening arguments or to move for a mistrial.  *See Ybarra*, 656 F.3d at 1000.  The fact is

12   that Morris's DNA under the fingernails of one of Davis's hands could lead to the

13   reasonable inference that she fought him, and evidence from the other hand could not

14   exclude him.  In light of this evidence, the prosecutor's misstatements did not so infect the

15   trial with unfairness as to make the resulting conviction a denial of due process, *Donnelly*,

16   416 U.S. at 643, or substantially or injuriously affect or influence the verdict.  *Brecht*, 507

17   U.S. at 638.  This is especially true when the jury had just been instructed that "[w]hat is

18   said in opening statements is not evidence, nor is it argument," (RT 6/13/05 at 23) and

19   when Morris admitted to sitting on Davis's chest and strangling her.  No prejudice resulted

20   from counsel's failure to object to the prosecutor's factual misstatement in opening

21   statements or to move for a mistrial.  *See Ybarra*, 656 F.3d at 1000.

22   Morris asserts the prosecutor mischaracterized the evidence during his opening

23   statement at the guilt phase by stating that when the police found Codman's body they

24   noticed that her "tongue was coming out, the eyes were popping out, and the head was

25   darker or blacker than the rest of the body," which he said was "an indication of

26   strangulation." (Doc. 21 at 87) (citing RT 6/13/05 at 64).  The prosecutor also stated that

27

28                                                      57

1    when the police discovered Codman she "appeared to have been strangled," but the

2    "problem was that the fact of decomposition eradicates the cause." (*Id.* at 64.)

3            This mischaracterized the actual evidence, Morris argues, because Dr. Hu testified

4    that in his opinion Codman's protruding tongue and bulging eyes were the result of

5    postmortem decomposition from gas formation. (RT 6/28/05 at 33, 50.) But Dr. Hu also

6    testified that the fact that Codman's head was more decomposed than the rest of her body

7    was consistent with, but not a definitive indication of, strangulation. (*Id.* at 33–34, 50.)

8            Although the post-mortem condition of Codman's tongue, eyes, and head were

9    gruesome, the prosecutor did not misstate them – his description was accurate. And his

10   suggestion that their condition suggested strangulation was not unduly prejudicial because

11   strangulation was not materially in dispute – Morris himself admitted killing Codman by

12   strangulation. Further, the jury was instructed that "[w]hat is said in opening statements is

13   not evidence[.]" (RT 6/13/05 at 23). In short, the prosecutor's misstatement did not so

14   infect the trial with unfairness that the conviction was a denial of due process, nor did it

15   substantially or injuriously affect or influence the verdict. *See Donnelly*, 416 U.S. at 643;

16   *Brecht*, 507 U.S. at 638. As a result, no prejudice resulted from counsel's failure to object.

17   *See Ybarra*, 656 F.3d at 1000.

18           Morris alleges the prosecutor mistakenly attributed the description of Codman as

19   the "pretty one" to Morris instead of the detective. (Doc. 21 at 87–88) (citing RT 6/13/05

20   at 57; 7/05/05 at 33); *see also* (PCR Pet. Ex. O at Bates No. 576) (detective stating to

21   Morris, after showing Morris Codman's picture for identification, that Codman was the

22   "First one. Pretty girl."). The prosecutor argued that this supported a finding that the

23   murder was heinous and depraved because Morris "was relishing" that "she was the pretty

24   one."[20] (RT 7/12/05 at 25.)

25

26   ────────────────

27           [20] As the jury was instructed (*see* RT 07/12/05 at 85), a finding that Morris relished
     the murder was one factor that could establish the state of mind necessary to support a

28                                                    58

1    This misstatement did not infect the trial with unfairness or substantially or

2    injuriously affect the verdict.  *See Donnelly*, 416 U.S. at 643; *Brecht*, 507 U.S. at 638.  The

3    video of Morris's interview with police was played for the jury and showed it was the

4    detective, not Morris, who referred to Codman as the pretty girl.  (PCR Pet. Ex. at 113.)

5    As already noted, the trial judge instructed the jury that the prosecutor's statements were

6    not evidence.  (RT 7/05/05 at 3.)  Additionally, as the Arizona Supreme Court found, there

7    was overwhelming evidence of cruelty, which alone is sufficient to establish the (F)(6)

8    aggravator.  *Morris*, 215 Ariz. at 337, 160 P.3d at 216.  No prejudice resulted from

9    counsel's failure to object to the prosecutor's factual misstatements or to move for a

10    mistrial.  *See Ybarra*, 656 F.3d at 1000.

11    Morris alleges the prosecutor falsely implied that Morris was aware of Noah's

12    intellectual disability, and then relied on that assumption to argue during the guilt phase

13    that, "it just is so unseemly to take a woman who is mentally retarded and bring her over

14    to a camper knowing full well that you're going to kill her[.]" (Doc. 21 at 88) (citing RT

15    07/05 at 48).  Morris also alleges the prosecutor made several factually incorrect statements

16    during the guilt and aggravation phases that Noah was "chronologically" a 12-year-old,

17    (Doc. 21 at 89) (citing RT 07/05/05 at 24–25, 48–49, 104, 106), and then argued during

18    the aggravation phase that he relished the killing of Noah because "[h]e mutilated what

19    was, in essence, I guess, somebody who was chronologically the age of 12," (*id.*) (citing

20    RT 7/12/05 at 106).

21    It is unlikely the prosecutor's statements confused the jury.  Noah's sister testified

22    during trial that Noah was "about 10 to 11 years old mentally."  (RT 6/20/05 at 59.)  The

23    jury saw photos of Noah, a woman,  (*see* RT 6/20/05 at 38) (admitting Trial Exhibit 254, a

24    picture of Noah's body; *see also* RT 7/12/05 at 31 (exhibiting pictures of Noah as a child

25    and "when she's older") and heard that she had been placed in an "adult home" (*see* RT

26    _____

27    finding of heinousness or depravity. *See State v. Moody*, 208 P.3d 424, 472 (2004) (citing
*State v. Gretzler*, 135 Ariz. 42, 52, 650 P.2d 1, 11 (1983)).

28

7/12/05 at 33).  Thus, even if the prosecutor misspoke in the penalty-phase closing that Noah was "chronologically" the age of 12 instead of "mentally" the age of 12, the jury had evidence that Noah was a woman with a 12-year-old mental capacity.  And even if it the jury could have understood the prosecutor to be suggesting that Morris knew of the victim's mental incapacity – something that is not clear from the transcript – the court instructed the jury that the prosecutor's statements were not evidence.  (RT 7/05/05 at 3); *see Johnson*, 63 F.3d at 930 (jury instructions can cure questionable remarks).  This conduct by the prosecutor did not infect the trial with unfairness or substantially or injuriously affect the verdict.  *See Donnelly*, 416 U.S. at 643; *Brecht*, 507 U.S. at 638.  Thus, no prejudice resulted from trial counsel's failure to object to the prosecutor's factual misstatements or to move for a mistrial.  *See Ybarra*, 656 F.3d at 1000.

Morris alleges the prosecutor improperly vouched for his own witness during aggravation-phase arguments by employing objectionable "we know" statements:

> . . . *we also know* there was more than that going on, because the medical examiner, Kevin Horn, told you so.  He indicated in the anal area, if you're looking at it as if the face of a clock, that all the way around her anus were lacerations or bruising through trauma.

(Doc. 21 at 80–81) (quoting RT 7/12/05 at 37) (emphasis added).  Morris asserts the improper vouching was repeated during closing argument:

> And *you also know* that the medical examiner . . . Kevin Horn, told you that in her anus all around the face of the clock, one of the things you see are lacerations or contusions or abrasions, however you want to call it.

(*Id.* at 81) (quoting RT 7/12/05 at 109) (emphasis added)); *see also* (RT 7/12/05 at 93–94, 99–105, 107, 109–14).  Morris contends the Ninth Circuit has criticized this type of "we know" statement because it "blurs the line between improper vouching and legitimate summary."  (*Id.*) (citing *Younger*, 398 F.3d at 1191).

*Younger* did "emphasize that prosecutors should not use 'we know' statements in closing argument."  398 F.3d at 1191.  But *Younger* declined to reverse the appellant's

conviction because "the record in this case confirms that the prosecutors used the phrase 'we know' to marshal evidence actually admitted at trial and reasonable inferences from that evidence, not to vouch for witness veracity or suggest that evidence not produced would support a witness's statements. The prosecutors' statements thus were not improper." *Id.* The same is true here. The prosecutor used "we know" statements to describe evidence actually admitted at trial and reasonable inferences that could be drawn from that evidence, not evidence the jury never received. (*See* RT 7/12/05 at 93–94, 99–101, 103–105, 107, 109–10.) Because this was not improper under *Younger*, any objection to the prosecutor's argument would have been futile.

### b. Inappropriate focus on irrelevant and salacious information

Morris alleges the prosecutor inappropriately and improperly focused on "deviant sexuality . . . despite his inability to provide any evidence in support of these statements." (Doc. 21 at 91.) He contends the prosecutor's intention to sexualize the trial was apparent from opening statements when he argued that Morris:

> killed for his own sexual gratification, and after each kill he wouldn't get rid of the body. What he would do, he would just leave it there. He would keep the body even after the skin would start to slide off. He would keep the body when it would start to bloat up a little because of the bacterial decomposition, and he would keep the body because of the smell of rot, smell of decomposition.

(*Id.*) (quoting RT 06/13/05 at 38–39). Additionally, Morris notes that the prosecutor reiterated in his opening that all the victims "share one thing in common. They were brought over to his camper for the defendant's sexual gratification." (*Id.*) (quoting RT 06/13/05 at 74).

The Court finds no misconduct. There was clear evidence of the sexually deviant nature of the crimes, in particular that Morris killed each victim while having sex with her and then did not dispose of the naked bodies of four of the women until decomposition began. Evidence of motive is generally relevant and admissible. *See United States v. Allen*,

341 F.3d 870, 886 (9th Cir. 2003); *see also State v. Atwood*, 171 Ariz. 576, 638, 832 P.2d 593, 655 (1992), *overruled on other grounds by State v. Nordstrom*, 200 Ariz. 229, 241, 25 P.3d 717, 729 (2001).  Because the prosecutor "was not pursing an invalid theory of the case" but rather was arguing reasonable inferences regarding Morris's motives, the conduct was not improper.  *United States v. Reyes*, 660 F.3d 454, 462–63 (9th Cir. 2011).

Morris next contends that the prosecutor improperly focused on graphic details of the victims' decomposition when questioning witnesses and during closing arguments in each phase of the trial, particularly evidence of skin slippage and anal defects.  (Doc. 21 at 91–94) (citing RT 6/05/05 at 95–96; RT 6/28/05 at 63, RT 7/05 05 at 14–15, 37–39, 46–47, 49–50, 52–55, 68; 7/12/05 at 26–27, 35, 38, 95–97; RT 7/18/05 at 128).  As discussed above, the Arizona Supreme Court found that evidence of skin slippage and anal defects was sufficient to permit the prosecutor to argue the reasonable inference "that Morris engaged in intercourse with the corpses."  *Morris*, 215 Ariz. at 336, 160 P.3d at 215.  This evidence was part of the State's theory of the case.  The prosecutor's arguments were not baseless or improper.  Any objection would have been futile and trial counsel was not ineffective for failing to object.  *See Younger*, 398 F.3d at 1190; *Juan H.*, 408 F.3d at 1273.

Morris next asserts that the prosecutor "improperly introduced an unfounded element of sexual deviancy into the proceedings when, during voir dire, he implied to several prospective jurors – Juror numbers 12, 23, 65 and 73 – that Morris sexually assaulted the victims.  (Doc. 21 at 95) (citing RT 06/07/05 at 61; RT 06/08/05 at 124; RT 06/09/05 a.m. at 4; RT 06/09/05 p.m. at 12).  The Court need not determine if the prosecutor's conduct in voir dire was improper because his questioning took place during individual voir dire (*see* RT 06/06/05 at 2) and none of the jurors identified by Morris were seated on the jury (*see* RT 6/13/05 at 16–17).  Thus, no member of the jury was exposed to the alleged misconduct and Morris cannot demonstrate that counsel's failure to object was prejudicial.  *Cf. Dickey*, 69 F.4th at 647 ("Establishing prejudice 'in the context of juror selection' requires a 'showing that, as a result of trial counsel's failure . . . the jury

1    panel contained at least one juror who was biased.'") (quoting *Davis v. Woodford*, 384 F.3d

2    628, 643 (9th Cir. 2004)).

3          Morris also alleges that throughout the trial the prosecutor focused on evidence that

4    could have been misinterpreted as being relevant to sexual assault.  (Doc. 21 at 95.)  For

5    example, Morris contends the prosecutor referred to the Gamma Hydroxybutyrate (GHB)

6    found in Noah's system as the "date rape drug" (RT 6/27/05 at 116) and referred throughout

7    trial to the use of "rape" or "sexual assault" kits (RT 6/20/05 at 18–19, 42–43; RT 6/29/05

8    at 15–16).

9          The prosecutor did not argue that Morris killed the victims while raping or sexually

10   assaulting them.  His arguments that Morris killed the victims while having sex with them

11   was supported by the evidence introduced at trial, including Morris's own statements to

12   the police.  The discussion of GHB and "sexual assault kits" were a necessary part of the

13   case because they were inextricably intertwined with the story of the murders and the facts

14   of the case.

15         The medical examiner first commented that GHB was known "as the date rape drug"

16   (RT 6/20/05 at 115) before the prosecutor echoed the term back to him, asking if Noah died

17   "from the date rate drug that you also mentioned."  (*Id.* at 116.)  Any question about

18   whether GHB or the "date rape" drug killed Noah was relevant to refute Morris's theory

19   that these women died of drug overdoses, as suggested by Morris's first statement to the

20   detective.  (RT 7/5/05 at 113.)  The prosecutor did not suggest, during questioning or

21   argument, that Morris administered this drug to Noah for purposes of assaulting her.

22         Likewise, it was the detective, not the prosecutor, who first referred to the "rape kit"

23   as a "sexual assault kit."  (RT 6/20/05 at 18.)  Moreover, any mention of a "rape kit" or

24   "sexual assault kit" was relevant to the biological samples taken from Noah's and

25   Velasquez's vaginal areas for DNA testing – samples that were relevant because Morris

26   maintained he always used a condom.  (RT 6/20/05 at 18–19.)  It was relevant to inform

27   the jury how Morris's semen had been obtained from Noah and Velasquez's corpses, and

28                                              63

then matched to Morris's DNA.  *See, e.g.*, *Tejera v. McCollum*, No. 07-20227-CIV-MORENO, 2008 WL 5102881, at *15 (S.D. Fla. Nov. 25, 2008) ("[T]he term "rape kit" is a term of art as used by medical and law enforcement personnel.  It does not necessarily insinuate that a rape actually occurred.")

Morris fails to establish that these allegedly improper statements had a substantial and injurious effect or influence on the jury's verdict.  *See Brecht*, 507 U.S. at 638.  The evidence of his guilt was overwhelming, and the brief references to the "date rape drug" and "sexual assault" kit were harmless, particularly in light of the evidence as a whole. The evidence presented and argued by the prosecutor was that each victim came willingly to Morris's trailer and willingly engaged in sexual intercourse with him.  Even if counsel's failure to object to the use of the terms was error, it did not prejudice Morris in light of the prosecution's theory of the case and the overwhelming evidence against him.  *See Morris*, 215 Ariz. at 339, 160 P.3d at 218.

c.  *Appeal to passions and fear.*

Morris alleges the prosecutor employed several tactics designed to appeal to the passions, fears, and vulnerabilities of the jury, including removing Castillo's jacket from the packaging, leaving an excluded photograph on top of a pile of papers on his table, and singling out female jurors and asking them to place themselves in the place of a victim. (Doc. 21 at 96–99.)

As discussed above, the Arizona Supreme Court rejected these claims on the merits, finding Morris could not establish prejudice from the "isolated instance of impropriety" – the singling out of female jurors – because the argument was directed toward proof of cruelty and the State presented overwhelming evidence of cruelty.  *Morris*, 215 Ariz. at 338, 160 P.3d at 217.  Additionally, the court found no misconduct in introducing the jacket into evidence or in leaving the excluded photograph on his desk.  *Id.* at 338–39, 160 P.3d at 217–18.

"[G]iven the overwhelming evidence of Morris's guilt and of the cruelty of the murders, the challenged remarks by the prosecutor did not prejudice Morris." *Morris*, 215 Ariz. at 339, 160 P.3d at 218.  Thus, even if trial counsel had objected to each instance which Morris believes constituted misconduct, Morris cannot establish that it would likely have changed the outcome of his case.  There was no prosecutorial misconduct that so infected the trial with unfairness as to make the resulting conviction a denial of due process. *See Donnelly*, 416 U.S. at 643.

In summary, the record does not support a finding of prosecutorial misconduct or of prejudice under *Strickland* for purposes of overcoming the procedural default of Morris's ineffective assistance of trial counsel claim for failure to object to the alleged instances of prosecutorial misconduct.  Morris is not entitled to habeas relief on this defaulted claim.

### C.  Claims Two and Six (A)

Morris alleges that trial counsel performed ineffectively at the guilt, aggravation, and penalty phases of his trial (Claims Two (A)–(C) and Claim Six (A)), by failing to investigate and present evidence rebutting the prosecution's theory that Morris engaged in necrophilia (Doc. 21 at 108–35) and failing to challenge the (F)(6) aggravating factor with expert testimony (*id.* at 131–33, 226–31).  He raised these claims in his PCR petition and amended petition (ROA 307 at 6–43; ROA 434), and the PCR court rejected them on the merits.  (ROA 354 at 4–5; ROA 438; ROA 491.)  The Arizona Supreme Court denied review without comment.[21]  (PR 27.)

*Applicable Law*

Section 2254(d) imposes a "highly deferential standard" that "demands that state-court decisions be given the benefit of the doubt."  *Pinholster*, 563 U.S. at 181 (quoting

---

[21] Because the Arizona Supreme Court summarily denied Morris's petition for state post-conviction relief, the Court "looks through" to the "last related state-court decision that does provide a relevant rationale," *Wilson*, 584 U.S. at 125, which is the decision of the PCR court.

1    *Visciotti*, 537 U.S. at 24.  "[F]ederal judges are required to afford state courts due respect

2    by overturning their decisions only when there could be no reasonable dispute that they

3    were wrong." *Donald*, 575 U.S. at 316.

4          The "backward-looking language" of § 2254(d)(1) "focuses on what a state court

5    knew and did," and requires this Court to examine the state-court decision at the time it

6    was made, limited to the record that was before the state court.  *Pinholster*, 563 U.S. at

7    181–82 (2011) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003)); *Twyford*, 596

8    U.S. at 819; *Gulbrandson*, 738 F.3d at 993 n.6.  Under § 2254(d)(2), Morris has the burden

9    of rebutting the state court's factual findings "by clear and convincing evidence." *Titlow*,

10   571 U.S. at 18 (quoting 28 U.S.C. § 2254(e)(1)).  A "state-court factual determination is

11   not unreasonable merely because the federal habeas court would have reached a different

12   conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).

13         Under *Strickland*, "the defendant must show that counsel's representation fell below

14   an objective standard of reasonableness."   466 U.S. at 688.  Evaluation of counsel's

15   performance "must be highly deferential," to "eliminate the distorting effects of hindsight."

16   *Id.* at 689; *see also Cone*, 535 U.S. at 702.  The Court must "indulge a strong presumption

17   that counsel's conduct falls within the wide range of reasonable professional assistance."

18   *Strickland*, 466 U.S. at 689.

19         When the *Strickland* and AEDPA standards "apply in tandem," *Richter*, 562 U.S. at

20   105, the Court's review becomes "doubly deferential," *Knowles v. Mirzayance*, 556 U.S.

21   111, 123 (2009); *see also Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) (per curiam).  In

22   particular, the Court "must guard against the danger of equating unreasonableness under

23   *Strickland* with unreasonableness under § 2254(d)." *Richter*, 562 U.S. at 105.  To evaluate

24   deficiency in a case governed by AEDPA, the Court asks "whether there is any reasonable

25   argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

26   ///

27   ///

28                               66

Claim Two (A): Guilt Phase

Morris alleges trial counsel failed to investigate, develop, and present evidence to rebut the necrophilia theory at the guilt phase of his trial.  (Doc. 21 at 122.)  Specifically, Morris alleges counsel failed to consult with and present a mental health expert to testify that Morris was not a necrophile, and failed to consult with and present a pathologist to rebut the physical bases of the prosecutor's argument.  (*Id.*)

This claim is exhausted.  Morris filed a PCR petition alleging counsel failed to use experts to defend against the necrophilia allegations and to support his claim that the killings were a result of Morris's desire to engage in erotic asphyxiation.  (ROA 307 at 33–43.)  Morris alleged in his PCR petition that there was a reasonable likelihood the jury would have found him guilty only of second-degree murder if counsel had presented an expert regarding necrophilia.  (*Id.* at 42.)  He also alleged the defense team should have hired a pathologist to review the State's evidence from the autopsies.  (*Id.* at 25.)

After the trial court granted an evidentiary hearing on Morris's assertion "that counsel should have presented expert testimony in the penalty phase to disprove the necrophilia theory for the killings" (ROA 354 at 5), Morris requested that the court expand the scope of the hearing to include claims of "ineffectiveness for not using expert witnesses to defend the State's necrophilia theory" during the guilt and aggravation phases of trial.  (ROA 385.)  The court denied the request, explaining that the "PCR ruling was clear that the only colorable claim was trial counsel's alleged failure to present expert testimony in the [penalty] phase."  (ROA 402, *as corrected by* ROA 404.)[22]

---

[22] On March 16-19 and 24, 2015, the PCR court held an evidentiary hearing on whether trial counsel was ineffective for failing to present "expert testimony in the penalty phase to disprove the State's necrophilia theory for the killings."  (ROA 354 at 11.)  Morris presented testimony from pathologist Dr. David Posey; psychologist Dr. Richard Lanyon; psychologist Dr. Judith Becker; expert counsel Richard Bock; trial counsel Randall Craig and James Logan; trial mitigation specialist Linda Thomas; and original counsel Maria Schaffer.  (RTs 3/16/15–3/19/15, and 3/24/15; *see also* (ROA 495–98).)  Additionally, the

Morris was granted leave to file an amended PCR petition urging the court to find trial counsel ineffective for failing to present expert testimony in the guilt and aggravation phases of trial to disprove the State's necrophilia theory for the killings.  (ROA 434; ROA 438.)  The PCR court subsequently dismissed the claims.  (ROA 438.)

The court first noted that the necrophilia assertions during trial were limited to arguments made by the prosecutor, and that the Arizona Supreme Court found on direct appeal that the inferences of necrophilia were permissible.  Given this finding, the PCR court concluded that "[t]rial counsel reasonably assessed the lack of evidence of necrophilia and determined to counter the State's allegations with argument rather than evidence."  (*Id.* at 3.)  The PCR court further explained:

> The trial court instructed the jury that argument of counsel was not evidence. . . . Calling an expert had the potential to highlight, and perhaps legitimize the necrophilia claim and would have opened the door to potentially-damaging cross-examination, such as whether defendant's behaviors were "consistent with" necrophilia, giving the necrophilia claim additional credibility.  Not calling an expert, had one even been available, permitted trial counsel to downplay the allegation as "mere argument" rather than having to dispute evidence offered by him.

(*Id.*)  The PCR court also found Morris failed to establish prejudice in the guilt phase because, as the Arizona Supreme Court found, "the evidence proving defendant's guilt was 'overwhelming.'"  (*Id.*) (citing *Morris*, 215 Ariz. at 339, 160 P.3d at 218).

Morris asserts that the PCR court's prejudice ruling as to the guilt phase was contrary to or an unreasonable application of *Strickland* because the court deferred to the Arizona Supreme Court's determination on direct appeal that the evidence of Morris's guilt was overwhelming without the benefit of the evidence PCR counsel presented to the PCR court that rebutted necrophilia.  (Doc. 21 at 130–31.)

parties proffered, and the court considered, expert reports from psychiatrists Dr. Steven Pitt and Dr. Park Dietz.  (ROA 491 at 7.)  On April 29, 2015, the trial court issued a detailed ruling finding that Morris's trial counsel was not ineffective in the penalty phase for not securing expert testimony regarding necrophilia.  (*Id.*)

68

As discussed above in Claim One, in ruling on Morris's prosecutorial misconduct claim, the Arizona Supreme Court found the evidence of guilt overwhelming. *See Morris*, 215 Ariz. at 335–39, 160 P.3d at 214–18. The court had also determined, however, that the prosecutor's remarks regarding necrophilia "were directed only toward establishing the 'heinous or depraved' prong" of the (F)(6) aggravator. *Id.* at 336, 160 P.3d at 215. It is not clear, therefore, whether the Arizona Supreme Court considered the evidence of necrophilia in support of the element of premeditation when it made its finding. Regardless of whether this was an "error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Richter*, 562 U.S. at 103, the claim is meritless on de novo review.

The PCR court rightly found – after hearing Morris's evidence on the necrophilia issue – that trial counsel was not deficient in failing to call a necrophilia expert in the penalty phase. The prosecution presented no necrophilia expert in either the guilt or the penalty phase of trial, and it would not have been unreasonable for trial counsel to conclude that the safest course was to address the issue through cross-examination of the witnesses who were called and by noting that the necrophilia claim was simply prosecutorial argument. Calling a defense expert on necrophilia risked legitimizing the necrophilia claim through the prosecutor's cross-examination on evidence in this case that comports with necrophilia – five women died while having sex with Defendant, he retained at least some of the corpses for a period of time after their deaths, his semen was found in victims even though he claimed to have used a condom, and there was physical evidence (skin slippage and anal injuries) that could be consistent with acts of necrophilia.

When evaluating the adequacy of trial counsel's action, there is a "presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (citation modified). Deficient performance "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. Even under *de novo*

1   review, the standard for judging counsel's representation is a deferential one.  *Richter* at

2   105.  The Court cannot find trial counsel was deficient in failing to call a necrophilia

3   expert.[23]

4        Nor can Morris satisfy the prejudice prong of *Strickland*.  As noted above, "the

5   question is whether there is a reasonable probability that, absent the errors, the factfinder

6   would have had a reasonable doubt respecting guilt."  *Strickland*, 466 U.S. at 695.  In

7   answering that question, a reviewing court necessarily considers the strength of the state's

8   case.  *See Allen*, 395 F.3d at 999 ("[E]ven if counsel's conduct was arguably deficient, in

9   light of the overwhelming evidence of guilt, [the petitioner] cannot establish  prejudice");

10  *Johnson v. Baldwin (Albert Johnson)*, 114 F.3d 835, 839–40 (9th Cir. 1997) (explaining

11  that the "potential prejudicial effect of counsel's deficient performance must be evaluated

12  in light of" the strength of the State's case); *United States v. Harden*, 846 F.2d 1229, 1232

13  (9th Cir. 1988) (finding no *Strickland* prejudice where there was overwhelming evidence

14  of guilt); *see also Strickland*, 466 U.S. at 696 ("[A] verdict or conclusion only weakly

15  supported by the record is more likely to have been affected by errors than one with

16  overwhelming record support.").

17       Morris asserts that necrophilia was the prosecution's theory of premeditation and,

18  if that theory had been undermined, there is a reasonable probability that one juror would

19  not have voted for first-degree murder.  (Doc. 21 at 126.)  To prove first-degree murder by

20  premeditation, the State had to prove that Morris caused the victim's deaths, that he

21  intended or knew that he would cause their deaths, and that he acted with premeditation.

22  (RT 7/5/05 at 9–10.)  "To prove premeditation, the state must show that a defendant

23  intended to kill another person, and 'after forming that intent . . . reflected on the decision

24  before killing.'"  *State v. VanWinkle*, 230 Ariz. 387, 391–92, 285 P.3d 308, 312–13 (2012)

---

[23] As noted above in footnote 11, Morris requests an evidentiary hearing in this case, but provides only unsupported allegations insufficient to warrant such a hearing.

1   (quoting *State v. Thompson*, 204 Ariz. 471, 479, 65 P.3d 420, 428 (2003)). "Circumstantial

2   evidence may establish that the defendant reflected on the killing." *Id.* at 391–92, 285 P.3d

3   at 312–13 (citing *Thompson*, 204 Ariz. at 480, 65 P.3d at 429).

4        Necrophilia could be reasonably inferred from the evidence as discussed above, but

5   it was not the only evidence of premeditation. The prosecutor argued that once each victim

6   was unconscious, "[Morris] could have either moved his hands away, he could have

7   removed the ligature from their neck. But he chose not to." (RT 07/05/05 at 15.) The

8   evidence clearly supported this assertion. First, Morris admitted that he strangled each

9   victim. Second, the medical examiner testified that after a victim is rendered unconscious

10   by strangulation, brain damage takes another three to six minutes of sustained pressure,

11   with death ensuing a short time thereafter. (RT 6/15/05 at 86; *see also* RT 6/27/05 at 112–

12   13 (testimony of Dr. Keen that irreversible brain damage almost always occurs within a

13   five to eight minute period before death occurs)). This was ample evidence for a jury to

14   conclude that Morris acted with premeditation – that he maintained pressure on the

15   unconscious victims' necks until they were dead. *See State v. Ellison*, 213 Ariz. 116, 134,

16   140 P.3d 899, 917 (2006) (evidence that suffocation takes several minutes indicative of

17   premeditation); *Thompson*, 204 Ariz. at 479, 65 P.3d at 428 (noting the "state may argue

18   that the passage of time *suggests* premeditation"); *VanWinkle*, 230 Ariz. at 392, 285 P.3d

19   313 ("prolonged, brutal attack" including strangulation was evidence of premeditation);

20   *see e.g.*, *State v. Bondy*, 2018 WL 4927923 *1 (Ariz. App. 2018) ("The length of time

21   pressure had to be applied to the victim's neck for death to occur would permit a reasonable

22   jury to conclude [the defendant] had reflected on his decision to murder the victim."); *State*

23   *v. Villa*, 2011 WL 486907 *4 (Ariz. App. 2011) ("The medical examiner concluded [the

24   victim] had been strangled and opined her death could have taken several minutes, a fact

25   the jury could consider as evidence of premeditation."); *see also State v. Scott*, 271 Kan

26   103, 108–09, 21 P.3d 516, 522–23 (2001) ("[C]ontinued application of pressure over a

27   period of time is sufficient for a jury to find that [the decedent's] death was premeditated.").

28

1    Further, as discussed in Claim Four (C) below, the evidence of five similar
2    strangulation deaths strongly negated the defense theory that the killings were accidental,
3    either as a result of drug overdose or erotic asphyxiation. Five comparable strangulation
4    deaths by a single defendant strongly suggest deliberate and premeditated actions by
5    Morris. *See e.g., State v. Lee*, 189 Ariz. 590, 599, 944 P.2d 1204, 1213 (1997) (finding the
6    "unlikeliness" of defendant's claim that he was forced on two separate occasions to shoot
7    his robbery victims because they attacked him "tends to show that neither shooting was
8    accidental"); *State v. Hernandez,* 7 Ariz. App. 200, 203, 437 P.2d 952, 955 (1968)
9    (reasoning that one incident "may have been accidental would be a likely possibility, but
10   that two such instances were coincidental is substantially less likely") *abrogated on other*
11   *grounds by State v. Harvill*, 106 Ariz. 386, 391, 476 P.2d 841, 846 (1970); *cf. People v.*
12   *Steele*, 27 Cal. 4th 1230, 1244–45, 47 P.3d 225, 234 (2002) ("The fact that defendant killed
13   twice under similar circumstances is logically probative of whether the second killing was
14   premeditated even if no independent evidence existed that the first killing was itself
15   premeditated."); *Young v. Gipson*, 163 F.Supp.3d 647, 728 (N.D. Cal. 2015) (finding
16   defendant's multiple killings over a period of time "showed a distinct pattern" from which
17   the jury could infer motive and a "premeditated and deliberate manner of killing").

18   What is more, "the evidence suggests that at least three of the victims struggled with
19   Morris before losing consciousness: Morris's DNA was under Davis's fingernails, Noah's
20   fingernails were broken, and the side of Velasquez's face was bruised," *Morris*, 215 Ariz.
21   at 338, 160 P.3d at 217. This evidence rebuts any suggestion the killings were accidental.

22   But this is not all. Morris's actions after each murder support a finding of
23   premeditation. *See State v. Nelson*, 229 Ariz. 180, 185, 273 P.3d 632, 637 (2012) ("A
24   defendant's actions after a murder can also help establish premeditation."). As the
25   prosecutor argued regarding the death of Codman, if her death had truly been an accident,
26   Morris could have used his aunt's phone to call 911, but did not do so. (RT 07/05/05 at
27   37.) There is no evidence Morris attempted to aid any of the victims. Instead, Morris

28                                                    72

1    concealed the deaths by removing the victims' bodies from his camper and dragging them

2    into the alley, and then providing inconsistent accounts to the police about his role in each

3    death.  *See, e.g., State v. Beard*, 273 Kan. 789, 804, 46 P.3d 1185, 1195 (2002) (noting that

4    providing inconsistent statements to the police is suggestive of premeditation); *Wyatt v.*

5    *Sutton*, 838 F. App'x 266, 267–68 (9th Cir. 2020) (unreported) ("The jury could also have

6    reasonably concluded that Wyatt's additional actions – not immediately seeking aid after

7    he stabbed Nobles, waiting twelve hours with Nobles's corpse before dumping the body at

8    a time least likely to be seen, and lying to others (including the police) – all further evince

9    that Wyatt's conduct was not merely the product of rash impulse.").

10          Morris presents no persuasive argument that this overwhelming evidence was

11   insufficient for the jury to find his offenses premeditated, even without the necrophilia

12   theory.  Morris has not met "the highly demanding and heavy burden [of] establishing

13   actual prejudice," *Allen*, 395 F.3d at 1000, by showing there was a reasonable probability

14   he would not have been convicted if counsel had presented expert testimony to rebut the

15   State's theory of necrophilia.

16          Morris further alleges the PCR court unreasonably applied clearly established law

17   by failing to consider whether the alleged deficiencies of counsel at the guilt phase

18   prejudiced him at the penalty phase.  (Doc. 21 at 131, 134.)  But because Morris fails to

19   establish on de novo review that his counsel's failure to call a necrophilia expert – at any

20   time during the trial – was deficient or prejudicial under *Strickland*, he also fails to show

21   that the state court's decision regarding penalty-phase prejudice – where he relies on the

22   same decision by trial counsel – was unreasonable.

23          As noted above, the PCR court held an evidentiary hearing and took evidence

24   regarding counsel's performance during the penalty phase of trial, specifically considering

25   whether counsel's decision to challenge the State's witnesses through cross-examination

26

27

28                                               73

1    rather than expert testimony prejudiced Morris at the penalty phase.[24]  The PCR court found
2    that trial counsel consulted with several different experts and another experienced trial
3    lawyer before trial, and ultimately decided to use the State's witnesses to discredit their
4    own testimony through cross-examination.  (ROA 491 at 4–6.)[25]  The PCR court also
5    evaluated the testimony of several experts called by Morris during the PCR hearing and
6    found their testimony, if it had been presented at trial, would have been problematic for
7    various reasons.  (ROA 491 at 7) ("Although each of the defense experts concluded that
8    the defendant did not meet the diagnosis for necrophilia, which the defendant claims is
9    mitigating and should have been used at sentencing, each of the expert's testimony presents
10   significant concerns for the defense – testimony that would not be mitigating.").[26]  The
11   PCR court found counsel "conducted an appropriate and focused cross-examination of the
12   State's experts."  (ROA 491 at 12).  The state court's denial of this aspect of the claim was
13   not "so obviously wrong as to be 'beyond any possibility for fairminded disagreement.'"
14   *Kayer*, 592 U.S. at 124 (quoting *Richter*, 562 U.S. at 102, 103).

15       In sum, on de novo review of the claim alleging guilt-phase prejudice, the Court
16   finds that none of Morris's arguments or PCR evidence is sufficient to satisfy *Strickland*'s
17   demanding standards for deficiency and prejudice.  Additionally, he has failed to show the

18   _____

19       [24] This decision is the subject of Claim Two (C), reviewed below.

20       [25] Trial counsel testified at the PCR hearing that this was his strategy.  (ROA 491 at
21   12-14.)

22       [26] For example, Dr. Becker "discounted the defendant's version of events in which
23   he stated that his victims requested that he choke them, because the victims cannot confirm
     that they requested the choking and because it is unlikely that prostitutes would request
24   such an activity."  (ROA 491 at 6.)  Other PCR experts had doubts about Morris's
     truthfulness regarding the murders, and Morris refused to cooperate with some experts.
25   The PCR court found that defense counsel could not have kept the expert's negative
26   opinions out of evidence if he had called them to testify at trial.  (ROA 491 at 7-8.)  After
     reviewing all the evidence, the PCR court found that "trial counsel made a reasonable,
27   strategic decision not to consult with additional experts."  (ROA 491 at 14.)

28                                    74

1    state court's decision denying the portion of the claim alleging penalty-phase prejudice was

2    unreasonable.  Claim Two (A) is denied.

3    Claim Two (B) and Six(A): Aggravation Phase

4          Morris alleges that counsel performed ineffectively by failing to hire a mental health

5    specialist to testify that Morris was not a necrophile or a pathologist to show that the

6    physical evidence did not support necrophilia, despite counsel's awareness that if they did

7    not rebut the necrophilia theory at the aggravation phase the State would easily establish

8    the (F)(6) aggravating factor.  (Doc. 21 at 132, 226); *see* A.R.S. § 13-703(F)(6).  Morris

9    contends that expert testimony would have undermined the prosecutor's necrophilia

10    theory, which was the basis for the finding that the crimes were heinous or depraved.  (*Id.*

11    at 133, 226.)

12          Morris also alleges that counsel performed ineffectively in the aggravation phase by

13    failing to challenge the (F)(6) cruelty factor with expert testimony.  (Doc. 21 at 226.)

14    Specifically, Morris asserts defense counsel called no expert witnesses to undermine the

15    prosecutor's arguments that the victims experienced pain and mental anguish while being

16    strangled.  (*Id.*)  Morris contends that expert testimony could have shown the victims were

17    most likely conscious for mere seconds, if at all, and that if they were conscious, they were

18    under the influence of drugs to the extent that they were not aware of what was occurring.

19    (*Id.* at 228.)

20          Morris contends there is a reasonable probability that if counsel presented expert

21    testimony at the aggravation phase of his trial, at least one juror would have voted against

22    the (F)(6) aggravating factor.  (*Id.* at 133, 226, 229.)

23          Additionally, he claims that even if the (F)(6) factor was found, the testimony of an

24    expert would have held particular sway with the jury and there is a reasonable probability

25    of a different outcome at the penalty phase if counsel had not performed deficiently at the

26    aggravation phase.  (*Id.* at 133.)

27

28

1    These claims are exhausted.  Morris alleged in his PCR petition that if counsel had

2    presented a mental health expert regarding necrophilia it would have significantly

3    improved his defense against the heinous or depraved aggravating factor.  (ROA 307 at

4    42.)  Morris also alleged that a qualified pathologist would have enabled his attorneys to

5    effectively defend him against the (F)(6) aggravator.  (ROA 307 at 25.)

6    During the PCR proceedings in state court, Morris's subsequent request to expand

7    the scope of the evidentiary hearing to include claims of "ineffectiveness for not using

8    expert witnesses to defend the State's necrophilia theory" during the aggravation phase of

9    trial (ROA 385) was denied.  (ROA 402, *as corrected by* ROA 404.)  Morris was granted

10    leave to file an amended PCR petition urging the court to find trial counsel ineffective for

11    failing to present expert testimony in the aggravation phase.  (ROA 434, 438.)  The PCR

12    court dismissed the claim.  (ROA 438.)

13    *Additional Background*

14    The prosecutor relied on the evidence presented during the guilt phase of the trial

15    and the testimony of Dr. Keen during the aggravation phase to argue that the "especially

16    cruel" and "heinous or depraved" prongs of the (F)(6) factor were demonstrated in each of

17    the murders.  (*See* RT 7/12/05 at 21–39, 90–110.)  The prosecutor argued that the murders

18    were cruel because the victims experienced pain and mental anguish while being strangled,

19    and the killings were especially heinous or depraved because Morris relished killing all of

20    the victims and needlessly mutilated four of their bodies through postmortem sexual

21    intercourse.  (*Id.* at 22–39, 91–110.)

22    Defense counsel asserted in his opening statement that there was no evidence of

23    cruelty and the prosecutor's argument was "speculative and based on opinion."  (RT

24    07/12/05 at 40.)  He argued "[t]here was absolutely no evidence presented that [Morris]

25    did any kind of relishment [sic] or that he enjoyed any kind of sex after death.  Again, these

26    are conclusory statements presented by the State."  (*Id.* at 41.)

27

28                                                76

1    Dr. Keen was the only witness presented during the aggravation phase. Regarding

2    the heinous or depraved prong, Dr. Keen testified, reviewing a photograph of Noah, that it

3    "takes friction to cause that skin to slip" and that the picture the prosecutor submitted

4    evidenced skin slippage. (*Id.* at 59–60.)

5    Dr. Keen also testified about the mechanics of strangulation and other hypothetical

6    situations, including opinions based on the prosecutor's submission of photographs of

7    some of the victims. Dr. Keen testified that strangulation victims perceive a feeling of

8    shortness of breath or an inability to breath while they are conscious. (*Id.* at 43–44.) Dr.

9    Keen testified that the sensory functions of a person being strangled from behind by a

10   necktie would remain intact until the central nervous system shuts them down; in other

11   words, a person would have the capacity to think, see, hear, smell, and experience pain for

12   up to two minutes before passing out. (*Id.* at 47–48, 58, 69.) In a situation where a heavy

13   individual is lying on the chest of a person while also strangling that person with a ligature,

14   the time to unconsciousness is variable, but Dr. Keen testified he would expect it to be

15   shorter than in the previous hypothetical. (*Id.* at 51–54.) Dr. Keen further opined that,

16   depending on the placement of a person's hands, manual strangulation can result in a

17   person passing out "rather quickly," but "it's kind of hard to say" and could be as much as

18   two minutes initially. (*Id.* at 57–58.) Use of a strap instead of a necktie would make no

19   difference as far as the mechanism of strangling, and the period of time a person might stay

20   conscious "could be as short as less than a minute up to a couple of minutes or more." (*Id.*

21   at 60–61.) On cross-examination by defense counsel, Dr. Keen testified that he could not

22   tell when any of the victims fell into unconsciousness, and that the introduction of drugs

23   might be a factor which could hasten unconsciousness. (*Id.* at 72–73.)

24   In closing, defense counsel argued that there was no evidence of postmortem sex or

25   that Morris enjoyed having the bodies of the victims near him, and that it was unknown

26   when the skin slippage occurred or if it was from the bodies being dragged. (*Id.* at 117,

27   122, 124.) He also argued, based on Dr. Keen's testimony, that there was no way to know

28                                        77

how long consciousness lasts or when the victims fell into unconsciousness, and that each victim had "toxicity levels" of drugs in her system.  (*Id.* at 118–20.)  He argued there was no trauma at all associated with three of the victims' deaths.  (*Id.* at 119–20.)

The jury found Morris committed all five murders in both an "especially cruel" and "especially heinous or depraved" manner.  (RT 0713/05 at 9–15.)  For all the victims, the jury found that Morris relished the murders and inflicted gratuitous violence on the victims beyond that necessary to kill.  (*Id.*)  For all the victims except Jade Velasquez, the jury found that Morris needlessly mutilated the bodies.  (*Id.*)

In his PCR petition, Morris argued that his "trial attorneys did absolutely no investigation of their own to offer a defense to any of the State's theories and claims that the murders were especially cruel and heinous or depraved."  (ROA 307 at 8.)  Morris alleged that a "qualified pathologist would have enabled [Morris's] lawyers to effectively defend him" against the State's allegations, especially the (F)(6) aggravating factor.  (*Id.* at 25.)  Morris argued that counsel could have used an expert to counter the State's claims that any of the five women suffered prior to their deaths and refute the claims that there was evidence of post-mortem sex or sexual trauma.  (*Id.* at 26.)

Morris relied in the PCR proceeding on a report from pathologist Dr. David Posey to support his allegations that the victims did not suffer physical or mental pain.  (*Id.*)  Dr. Posey reviewed the autopsy reports, photographs, and laboratory and DNA analysis of all five victims, as well as investigative files and trial transcripts.  (PCR Pet. Ex. Q ("Posey Orig. Rpt.") at 1.)  Regarding all of the victims, Dr. Posey opined as follows:

- When carotid arteries are occluded by any mechanism, most forensic pathologists believe it takes approximately 10 seconds to lose consciousness.
- If any of the victims were aware they were being strangled, the maximum they would have suffered would have been approximately 10 seconds.
- In the absence of physical injuries, antemortem sexual activity whether consensual or by assault can never be determined from the autopsy findings.
- Postmortem sexual assault cannot be determined by the autopsy.

- In the absence of "vital reaction," injuries to the genitalia and anus found at autopsy are almost always due to decomposition.
- There is no forensic evidence to suggest Morris had ante- or post-mortem anal sex with any of the decedents.
- Injury may be seen in rough consensual sexual activity.

(*Id.* at 15–17.)  Regarding each victim individually, Dr. Posey opined:

- Codman died from drug intoxication, as there is no evidence of asphyxia or other cause of death.
- Davis and Velasquez's deaths should have been undetermined.
- Noah and Castillo died from asphyxia due to strangulation.
- There were no defense wounds or injuries to suggest any of the victims were in a struggle or altercation at the time of their death.
- Velasquez, Noah, and Castillo were either semiconscious or unconscious, and in the event they were strangled, they were not aware of what was happening to them.

(*Id.* at 8–10, 12, 13–16.)

Morris also relied in the PCR proceeding on the reports of several mental health experts – Dr. Judith Becker, a psychologist, Dr. James Sullivan, a forensic neuropsychologist, Dr. Park Dietz, a forensic psychiatrist, and Dr. Richard Lanyon, a psychologist[27] – to  support his assertion that he was not a necrophiliac and did not commit necrophilic homicide, but rather choked the women to cause "extreme sexual arousal." (ROA 307 at 34–42.)

The PCR court applied the two-prong *Strickland* test in analyzing and denying each component of this claim.  (ROA 354 at 3; ROA 438 at 3–4.)  The court first denied the cruelty allegations, explaining that proper analysis of the claim challenging the cruelty factor "requires an examination of the totality of the circumstances surrounding the murder and not just the final act that killed the victim."  (ROA 354 at 5) (citing *Schackart*, 190 Ariz. 238, 947 P.2d 315).  "Given the evidence presented by the State," the PCR court

---

[27] These opinions are discussed in greater detail in Claim Two (C), below.

determined that Morris had "failed to show his counsel was deficient for failing to obtain and present testimony from his own pathologist in the aggravation phase." (*Id.* at 5.)

Addressing Dr. Posey's report, the court explained:

Although defendant's PCR pathologist states that "none of the victims would have suffered more than 10 seconds if they suffered at all," ([PCR Pet. Ex.] Q, p.17), his opinion ignores evidence of strangulation and struggles by some of the victims.  In addition, even the 10-second time period is sufficient to establish cruelty. *See*, *State v. Herrera*, 176 Ariz. 21, 859 P.2d 131 (1993) (18 seconds sufficient to establish cruelty).

(ROA 354 at 5.)

In a second order, the court addressed and dismissed Morris's claim that trial counsel was ineffective for failing to hire an expert to defend against the prosecutor's necrophilia theory in support of the (F)(6) aggravator (ROA 434 at 5–6), finding trial counsel's strategic decision to meet the prosecutor's allegations of necrophilia with "substantial and focused counter-argument" was entitled to a presumption of reasonableness, and Morris had "failed to overcome the strong presumption that his attorneys' alleged failure to call any experts in the guilt or aggravation phases to explain necrophilia was sound trial strategy."  (ROA 438 at 2–3.)

The court also found Morris failed to establish prejudice:

Regarding the aggravation phase, the jury found that both prongs of the (F)(6) aggravator, "cruel" and "heinous and depraved" had been proven.  Arguably, any necrophilia references supported a conclusion that the "heinous or depraved" prong was established.  However, the "cruelty" prong was also established as to each victim.  The Supreme Court specifically found that the evidence supported this finding. *Morris*, 215 Ariz. at [341, 160 P.3d at 220,] ¶80.  The jury finding of cruelty alone was sufficient to support a finding of the (F)(6) aggravator.

Given the overwhelming evidence of defendant's guilt of five murders, and the cruelty of each of these murders, the Court finds that defendant has not demonstrated a reasonable probability that, but for counsel's allegedly unprofessional error in failing to call a necrophilia expert, the result of the aggravation phase proceeding would have been different.  A reasonable

80

1     probability is a probability sufficient to undermine confidence in the
2     outcome. *Strickland*, 466 U.S. at 694.

3     (*Id.* at 3–4.)

4          Because the Arizona Supreme Court denied Morris's petition for review without
5     comment (*see* PR 7, 27), the last reasoned decision is the PCR court's.

6          The Court addresses the prejudice prong of Morris's claim and the PCR court's
7     ruling. *See Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness
8     claim on the ground of lack of sufficient prejudice, which we expect will often be so, that
9     course should be followed.").

10    *Heinous and Depraved*

11         Morris asserts the PCR court's prejudice ruling regarding necrophilia at the
12    aggravation phase was contrary to or an unreasonable application of *Strickland* because the
13    PCR court's finding that Morris was not prejudiced by counsel's alleged failures did not
14    recognize that deficient performance at the aggravation phase resulted in prejudice at the
15    penalty phase. (Doc. 21 at 130–31.) As discussed in Claim Two (A), above, the PCR court
16    held an evidentiary hearing and specifically considered whether counsel's decision to
17    challenge the State's witnesses through cross-examination rather than expert testimony
18    prejudiced Morris at the penalty phase.

19         The state court found that trial counsel's strategic decision to undercut the state's
20    necrophilia arguments through cross-examination and by noting that it was simply
21    counsel's argument did not result in the prejudice required by *Strickland*. This decision
22    was not "so obviously wrong as to be 'beyond any possibility for fairminded
23    disagreement.'" *Kayer*, 592 U.S. at 124 (quoting *Richter*, 562 U.S. at 102, 103).

24         Morris does not otherwise challenge the PCR court's prejudice ruling. (*See* Doc. 21
25    at 133–34, 230–31.) Because Morris fails to allege, much less demonstrate, that the PCR
26    court's determination in regard to counsel's alleged deficient performance as to the heinous
27    and depraved prong was unreasonable, he is not entitled to habeas relief.

28                                                81

1    Claim Two (B) and Claim Six (A) (necrophilia/heinous or depraved) are denied.

2    *Cruelty*

3    Morris asserts the state court's ruling that counsel was not ineffective for failing to

4    challenge the cruelty prong of the (F)(6) aggravating factor was contrary to or an

5    unreasonable application of clearly established federal law and was based on an

6    unreasonable determination of facts.  (Doc. 21 at 226, 230–31.)

7    Morris first contends that he is entitled to de novo review of the cruelty prong of

8    Claim Six (A) because the PCR court's determination that Dr. Posey's opinion ignored

9    evidence of the strangulation and struggles by some of the victims was unreasonable.

10   (Doc. 21 at 229); *see Maxwell v. Roe*, 628 F.3d 486, 494–95 (9th Cir. 2010) ("[W]hen a

11   state court adjudication is based on an antecedent unreasonable determination of fact, we

12   proceed to consider the petitioner's related claim de novo.").  Morris also asserts the PCR

13   court made a credibility determination about the strength of Dr. Posey's opinion without

14   the benefit of an evidentiary hearing.  (Doc. 229–30.)  Finally, Morris argues the PCR

15   court's finding is an unreasonable application of federal law because aggravating factors

16   are required to narrow the class of defendants who are eligible for the death penalty, and

17   the PCR court's definition of cruelty would not do so.  (Doc. 21 at 230) (citing *Lowenfield*

18   *v. Phelps*, 484 U.S. 231, 244 (1988)).

19   First, even if counsel performed deficiently in failing to present an expert

20   pathologist to refute the allegations that any of the victims suffered prior to their deaths,

21   there is no reasonable probability of a different outcome at the aggravation phase because

22   the (F)(6) aggravator can be satisfied by the heinous or depraved elements alone.  *State v.*

23   *Newell*, 212 Ariz. 389, 405–06, 132 P.3d 833, 849–50 (2006) (citing *State v. Gretzler*, 135

24   Ariz. 42, 51, 659 P.2d 1, 10 (1983)).

25   There is also no reasonable probability of a different outcome at the penalty phase

26   for reasons this Court explains on Claim Two (C) below.  A finding that multiple murders

27   can constitute an aggravating circumstance carries extraordinary weight.  *See State v.*

28

1    *Hampton*, 213 Ariz. 167, 185, 140 P.3d 950, 968 (2006) (giving "extraordinary weight" to

2    (F)(8) multiple murders aggravating circumstance based on the commission of three

3    homicides); *State v. Pandeli*, 215 Ariz 514, 533, 161 P.3d 557, 576 (2007) (finding (F)(2)

4    aggravating circumstance established by evidence of prior conviction for second degree

5    murder especially "substantial"); *State v. Garza*, 216 Ariz. 56, 72, 163 P.3d 1006, 1022

6    (2007) (multiple-homicides aggravator gets "'extraordinary weight'"); *see also Thornell v.*

7    *Jones*, 602 U.S. 154, 170–71 (2024) ("*Jones*") (commenting that the aggravator of multiple

8    homicides is "given great weight in Arizona").

9          The state court's denial of this aspect of the claim was not "so obviously wrong as

10   to be 'beyond any possibility for fairminded disagreement.'"  *Kayer*, 592 U.S. at 124

11   (quoting *Richter*, 562 U.S. at 102, 103).  Claim Six (A) (cruelty) is denied.

12   Claim Two (C)

13         Morris alleges he received ineffective assistance when his trial counsel failed to

14   investigate, develop, and present evidence at the penalty phase that Morris was not a

15   necrophile and had not engaged in necrophilia.  (Doc. 21 at 135–37.)  Morris asserts that,

16   by the time of the penalty phase, "it was inescapable that the prosecution's theory was that

17   Morris engaged in necrophilia. . . . [A]nd a mitigation presentation could not be complete

18   without refuting and correcting that image."  (*Id.* at 135.)

19         Morris raised this claim in his PCR petition (*see* ROA 307 at 33–43) and the PCR

20   court held a six-day evidentiary hearing before denying the claim.  (*See* ROA 491.)  Morris

21   asserts the state court's rejection of the claim involved an unreasonable application of

22   clearly established federal law and was based on an unreasonable determination of the

23   facts.

24   *Additional Background—Penalty Phase*

25         On July 20, 2004, approximately one year before trial started, the defense noticed

26   19 mitigation witnesses.  (ROA 63.)  The defense ultimately called six witnesses during

27

28                                            83

1  the penalty phase and played recorded statements from another four people.  (RT 7/14/05,

2  RT 7/18/05.)  None were expert witnesses.

3         In opening statements of the penalty phase, the defense told jurors that Morris had

4  dreams that were not fulfilled due to circumstances beyond his control; that he had been

5  dealt a "bad hand" in his life.  (RT 7/14/05 at 12.)  Counsel explained that Morris had a

6  body odor problem, was born into significant poverty, never really had a father, and had to

7  take on household responsibilities at a very early age.  (*Id.* at 13–15.)  He said Morris was

8  a "respectful, loving, caring individual," who, despite the criticism and ridicule he endured

9  about his body odor and appearance, maintained a group of friends and got involved in

10  ROTC at school.  (*Id.* at 14, 18–19.)  Nonetheless, as counsel explained, Morris despaired.

11  (*Id.* at 14, 20.)  His despair bred loneliness, and his loneliness "bred behavior."  (*Id.* at 14.)

12         Following opening statements, the jury heard victim impact evidence from three

13  surviving family members—Patina Noah, Jan Velasquez, and G.G. Codman.  (RT 7/14/05

14  at 30–43.)  The jury then heard from Morris's witnesses.

15         Manssa Muhammed, Morris's high school acquaintance, testified that Morris was

16  known as the "fat, ugly, smelly kid" in high school; everyone made fun of Morris because

17  he was "an easy target" but he never "struck back"; he was quiet, shy, and "invisible"

18  outside his friend group; Morris's life was the drill team; and the girls in high school felt

19  sorry for him and called him "Teddy Bear."  (RT 7/14/05 at 46–54.)  Muhammed recalled

20  one incident where "one of the most beautiful girls" at Morris's high school played a cruel

21  joke on Morris by going with him to the Military Ball where she then "ditched" him for

22  another boy.  (*Id.* at 55–57, 74–75.)  Muhammad said, "everyone talked about it" and

23  Morris had a "break down" at school over it.  (*Id.* at 57–58.)

24         Will Cummins, Morris's high school teacher and ROTC instructor, testified that

25  Morris was an "above-average student," that he was a very dependable and enthusiastic

26  participant in the ROTC program, but he was worried about Morris's hygiene, noting that

27  the kids called him "Stinky," and Morris's uniforms had to be thrown away because of his

28                                          84

1  body odor. (*Id.* at 77–85.) Additionally, Cummins testified that Morris gained 50 pounds
2  his senior year and he discussed the impact of his weight on the possibility of a military
3  career. (*Id.* at 79–80.)

4       Donald Boone, Morris's pastor from Oklahoma, testified that Morris was a nice,
5  polite, and respectful member of his congregation. (*Id.* at 90–91, 104–05.) Morris enjoyed
6  ROTC and wore his uniform with pride. (*Id.* at 95.) A couple of times, Morris initiated
7  discussions with Boone about how to better himself as a Christian and as a person. (*Id.* at
8  92–93.) Boone stated that Morris wanted to be "the best that he could." (*Id.* at 93.) Boone
9  noticed that Morris had a body odor problem and spoke with him about that. (*Id.* at 91–
10  100.)

11       Brandon Morris, Morris's younger brother, described growing up with Morris with
12  no adult male figure in the home. (RT 7/18/05 at 2–4.) Brandon testified that his mother
13  raised them, loved all three of her children, was good to them, and provided a nurturing
14  home. (*Id.* at 24.) She worked two jobs, however, and was out of the house from six
15  o'clock in the morning to ten o'clock at night. (*Id.* at 4–5.) As a result, Morris watched
16  his two younger siblings, made all of their meals, and did most of the cooking. (*Id.* at 5–
17  6.) Brandon shared a room with Morris and noticed that he perspired a lot and had an odor
18  problem; despite regular showering and bathing the odor only improved for a couple of
19  hours and got worse when he gained weight. (*Id.* at 7–8.) Brandon recounted hearing
20  students at Morris's high school talking about Morris, saying things like he smelled like
21  "fish" and "waste." (*Id.* at 9–10.) Brandon also recalled one incident where he and Morris
22  got into a fight in the front yard of their home and the police were called. (*Id.* at 11–12.)
23  Brandon observed that Morris held back his feelings "a whole bunch," but described him
24  becoming emotional and visibly upset when discussing the episode at the Military Ball
25  when a young woman he brought to the ball "disappeared." (*Id.* at 13–14.)

26       Candice Morris-Verbal, Morris's younger sister, also described growing up with
27  Morris in much the same way as Brandon. Candice testified that there was no father in

28                                                85

1    their home and when their mother worked, Morris would take care of his younger siblings.

2    (*Id.* at 37–38.)  Candice recalled Morris frequently bathed and showered but had body odor.

3    (*Id.* at 41.)  Candice did not notice an increase in Morris's body odor after he gained weight.

4    (*Id.* at 41–42.)  Candice and Morris both worked at Burger King, and Morris brought the

5    money he earned home to help the family.  (*Id.* at 42–43.)

6         Wilma Morris ("Wilma"), Morris's mother, testified that there was no father figure

7    in the home, but Morris was a dependable son who never shirked his responsibilities; he

8    worked to support the family and she relied on him to watch Brandon and Candice while

9    she was working.  (*Id.* at 57–58.)  Wilma first noticed in junior high that Morris had an

10   odor problem that did not abate with bathing.  (*Id.* at 60–61.)  Wilma did not take Morris

11   to the doctor for the odor problem.  (*Id.* at 74.)  When Morris was a senior in high school,

12   he decided to live with his father, but Wilma testified she was never sure why.  (*Id.* at 66–

13   67.)

14        Fred Tanguma was Morris's manager at Sonic, a fast food restaurant, in Austin,

15   Texas, from 1996 to 1997.  He said Morris was a good young man and a good employee

16   who also became a good friend.  (Trial Ex. 6, July 4, 2005, video submission.)

17        Laila Pribble said she grew up with Morris and they were really good friends.  She

18   said Morris was a good student, very respectful of everyone, and was the underdog.  He

19   had a lot of responsibility and took care of his siblings.  (Trial Ex. 7, undated video

20   submission.)

21        Donald McGlory was one of Morris's and Wilma's employers.  He explained that

22   the Morrises were an economically deprived but happy family, and that Morris was a good

23   happy-go-lucky, nice young man who cared about his family.  He hired Morris to pick up

24   trash and sweep and mop, and Morris worked well with a team of six other employees at a

25   local hospital.  He said Morris's only problem was his body odor, which he discussed with

26   Morris. (Trial Ex. 19, July 13, 2005, video submission.)

27

28                                            86

Lastly, Clareece Masters's video was played.  She was Morris's high school vocational business teacher for two-and-a-half years, although she first met him at a daycare where she worked.  She said Morris was very helpful to her in class.  She considered Morris to be quiet, sensitive and insecure, but also well-mannered and a hard worker.  She said he was teased because of his appearance and odor.  She also recalled that Morris took a girl to the ROTC ball but it was a joke, and how tearful Morris was when he told her about it.  (Trial Ex. 20, July 13, 2005 video submission.)  The defense then rested.  (RT 7/18/05 at 85.)

After the defense rested, the State called Detective Mike Meislish to testify that Morris was convicted for felony theft in 2002 for stealing $600 from his employer, Goodwill Industries.  (*Id.* at 86–87.)

*Additional Background—PCR Evidentiary Hearing*

At the PCR evidentiary hearing, Morris presented testimony from pathologist Dr. David Posey; psychologists Dr. Richard Lanyon and Dr. Judith Becker; expert counsel Richard Bock; trial counsel Randall Craig and James Logan; trial mitigation specialist Linda Thomas; and original trial counsel Maria Schaffer.  (RT 3/16/15 to 3/24/15.)  Additionally, the parties proffered expert reports from psychiatrists Dr. Steven Pitt and Dr. Park Dietz.  (PCR EH Ex. 1; PCR. Ex. Y.)

Dr. Posey testified that he reviewed the autopsy reports, photographs of the bodies and crime scenes, DNA analysis reports, investigative files, and the medical examiners' trial transcripts.  (RT 3/16/15 at 23–24.)  Dr. Posey prepared two reports, the first focusing on the general subjects of cause and manner of death, including whether there was evidence of sexual or bodily mutilation, and the second restricted to the issue of postmortem decomposition, specifically the development of skin slippage and bug infestation.  (*Id.* at 25, 27; *see* Posey Orig. Rpt.; PCR EH Ex. 6 (Posey Supp. Rpt.)

Dr. Posey testified that, in his original report, dated April 6, 2011, he had opined there was no evidence of postmortem or antemortem mutilation on any of the bodies.  (*See*

*id.* at 26.)  In his second report, dated February 14, 2015, he opined that the prosecutor's theory, that Morris had postmortem sex with victims Codman, Noah, and Castillo, was "erroneous" because "skin slippage on all of the victims is what would be expected based on the state of decomposition when found." (Posey Supp. Rpt. at 6.)  Additionally, Dr. Posey concluded that in four of the victims (excluding Velasquez), the autopsy disclosed no trauma of any kind and thus, "with an extremely high degree of medical certainty, anal sex did not occur either postmortem or antemortem." (Posey Supp. Rpt. at 9.)

Dr. Posey explained how skin slippage takes place during ordinary decomposition:

[S]kin slippage and blisters first appear on the lower surfaces of the trunk, thighs, and pendant areas of the body where hypostatic . . . edema has loaded the tissues with fluid.

These blisters may become pendulous and soon burst either due to the internal pressure overcoming the tensile strength of the separated epidermis, from maggot activity, by accidentally touching the blisters during body movement or any combination [of the] foregoing.

(RT 3/16/15 at 39; Posey Supp. Rpt. at 4.)

Dr. Posey reviewed photographs of Noah's body showing skin slippage and opined that it demonstrated "typical skin slippage due to the natural decomposition process" and was not consistent with rubbing or friction.  (*Id.* at 53–56; *see also id.* at 149 (opining that testimony of Drs. Hu and Keen that skin slippage was consistent with rubbing or friction was "misleading.")))  Dr. Posey opined that the photograph of Noah was also inconsistent with sexual activity in the postmortem state because he would expect, in those circumstances, that the fragile skin layers visible in the photograph would be gone and there would be other damage.  (*Id.* at 58–59.)  Dr. Posey testified that he did not see any evidence that there was "any real true disruption that would be commiserate [sic] with somebody who was sitting on [the body] or manually assaulting the breast area."  (*Id.* at 59.)  Dr. Posey did not believe there was any room for reasonable disagreement about the lack of evidence of postmortem trauma.  (*Id.* at 60.)

88

Dr. Posey reviewed photographs of Codman's body and noted that the "tissue paper thin" layers of skin visible in the photograph that had not been "lifted off" demonstrated typical postmortem skin slippage due to natural decomposition. (*Id.* at 63–65; *see also id.* at 74; Posey Supplemental Report at 9.)

Dr. Posey, however, could not rule out the possibility that Morris had postmortem sex with Codman or Noah. (*Id.* at 120.)

Dr. Posey further opined that the anal defects in the photographs of victim Castillo appeared to be caused by natural decomposition, specifically maggot activity. (*Id.* at 89, 94.) Based on the visual characteristics of the wounds, Dr. Posey ruled out both blunt force injury, such as tears or lacerations, or sharp force injury, such as incision or cutting-type wounds. (*Id.* at 88–94, 105.) Dr. Posey opined that characterizing the wounds as trauma caused by tearing is misleading. (*Id.* at 94, 152.) Dr. Posey disagreed with the statements Dr. Horn made during trial attributing the defects to either sexual activity or insect activity, stating "with a very high degree of medical certainty" that the damage was caused by "insect[s] only." (*Id.* at 135.)

Dr. Lanyon testified that he was hired by Morris's defense team before trial as a consultant and was asked to perform a general psychological evaluation of Morris with a focus on his sexual development and characteristics. (RT 3/16/15 at 164–67, 172–73; RT 3/23/15 at 7.) Dr. Lanyon evaluated Morris in April 2003, spoke to family members, received information from Morris's mitigation specialist regarding interviews she had conducted with family members, and reviewed police reports. (RT 3/16/15 at 169–70, 182–83; RT 3/23/15 at 6–8.) As part of the evaluation, Morris was given tests to determine whether he was reporting accurately. (RT 03/23/15 at 37–38.) Dr. Lanyon concluded that Morris "made a significant attempt to present himself in a virtuous light, denying normal faults and exaggerating virtues." (*Id.* at 38.)

Dr. Lanyon conveyed to the defense team that he found no significant psychological or mental-health-related disability that would explain Morris's behavior. (RT 3/16/15 at

1    173–75; *see* PCR EH Ex. 5 at 12–33 (Lanyon Rpt.).)  Additionally, neuropsychological

2    testing did not reveal anything suggesting a brain-related basis for his behavior.  (*Id.* at

3    174.)

4         Although Dr. Lanyon had experience in conducting psychosexual evaluations, he

5    had little experience in the more "extreme" or "unusual" forms of serious sexual deviancy

6    and was puzzled by Morris's behavior and thought process.  (RT 3/16/15 at 175, 177.)  At

7    the request of counsel, Lanyon conducted a review of literature on "serial/sexual murder"

8    (Lanyon Rpt. at 28; RT 3/16/15 at 174; RT 3/23/15 at 45), but found no evidence that

9    definitively demonstrated that Morris had "some sort of sexual deviance" or any underlying

10   mental illness.  (RT 3/16/15 at 174–75; RT 3/23/15 at 8.)  Dr. Lanyon opined that,

11   comparing the literature on necrophilia to the literature on serial sexual murder, it appeared

12   that Morris fit the category of serial sexual murderer rather than necrophiliac.  (Lanyon

13   Rpt. at 33.)

14        In January 2004, Dr. Lanyon recommended that the defense team consult with a

15   serial killer expert or an expert in the field of sexual sadism and provided the names of

16   three potential experts, including Dr. Judith Becker, a leading expert in the area of sexual

17   deviance.  (*Id.* at 176, 180; RT 3/23/15 at 21–22.)  Later, possibly in July 2004, Dr. Lanyon

18   also recommended that the defense team investigate the possibility of brain abnormality

19   through neurological imaging.  (RT 3/16/15 at 177–78.)

20        Dr. Becker, a professor of psychology and a forensic psychologist with an emphasis

21   on psychosexual evaluations related to sexual deviancy, also known as paraphilia, testified

22   at the hearing.  (RT 3/18/15 at 83, 85–86.)  Based on a review of her e-mail communications

23   (*see* PCR EH Ex. 5 at 55), Dr. Becker verified that she was contacted by Morris's

24   mitigation specialist in 2004 about consulting or performing an examination of Morris.

25   (RT 3/18/15 at 93–95.)  In an email communication dated October 25, 2004, Dr. Becker

26   informed the mitigation specialist that she would be able to begin reviewing collateral

27   information at the end of November and meet with Morris for the purpose of conducting a

28                                                    90

psychosexual evaluation by early December 2004. (*Id.* at 97; PCR EH Ex. 5 at 55.) Dr. Becker did not recall ever informing the defense team that she could not be ready for a February 14, 2005, trial date if they had asked her to perform an evaluation of Morris. (RT 03/18/15 at 96.)

Dr. Becker had no further contact with the defense team until 2010, when PCR counsel asked her to perform a psychosexual evaluation of Morris. (*Id.* at 95, 98.) As part of her evaluation, she interviewed Morris five times and administered psychological testing. (*Id.* at 102; PCR Pet. Ex. T (Becker Rpt.).) Dr. Becker characterized Morris as mostly cooperative, but noted he did not want to discuss his crimes and tended to exaggerate and lie to make himself look good. (*Id.* at 103, 107.)

Dr. Becker also reviewed numerous collateral sources of information, including police and medical examiner reports, trial transcripts, interviews, school records, medical history, prison records, photographs of the victims, reports by Dr. Joseph Wu and Dr. James Sullivan,[28] as well as several of Morris's writings and records that were in Morris's possession. (RT 3/18/15 at 102; Becker Rpt., App. A.) She also conducted an interview with Morris's mother. (Becker Rpt. at 14.)

Dr. Becker testified that the Personality Assessment Inventory ("PAI") she administered to Morris did not result in any kind of psychological or psychiatric diagnosis, though Morris did exhibit some traits of a Schizotypal Personality Disorder. (RT 3/18/15

---

[28] Morris submitted the opinions of Drs. Wu and Sullivan as exhibits to his PCR petition. (*See* PCR Pet. Exs. N, V.) Dr. Wu performed brain imaging scans on Morris and concluded that the results of testing, together with Morris's history, are "consistent with a dual diagnosis of brain injury from head traumas and/or schizoaffective disorder." (PCR Pet. Ex. N at 2.) Dr. Sullivan, a forensic neuropsychologist, conducted neuropsychological testing on Morris and determined that defendants with similar profiles to Morris's report relatively few antisocial traits and behaviors and low rates of institutional misconduct. (PCR Pet. Ex. V at 2.) Dr. Sullivan also opined that Morris's profiles were subclinical, suggesting Morris was not experiencing clinically significant psychiatric disturbance or distress. (*Id.*)

at 108; Becker Rpt. at 14–18.)  Morris's scores on the Positive Impression Management Scale suggest he attempted to portray himself as exceptionally free of shortcomings to which most people would admit, in other words, he presented himself as having no problems.  (*Id.* at 109; Becker Rpt. at 14.)  Dr. Becker explained that because this called into question the validity of the PAI clinical scale, additional scales were used to examine the possibility of malingering.  (*Id.*; Becker Rpt. at 14.)  The results of those scales indicated Morris was being "mildly defensive" in his responses.  (*Id.* at 110; Becker Rpt. at 14.)  In Dr. Becker's opinion, however, Morris's evasive answers were not an attempt to hide necrophilia.  (*Id.* at 170.)

Dr. Becker also administered the Multiphasic Sex Inventory II ("MSI II").  (*Id.* at 111; Becker Rpt. at 16.)  The MSI II addresses a person's sexual history, sex education, reported paraphilic behavior, and whether the person admits or denies the acts they have been charged with.  (*Id.* at 112.)

Dr. Becker explained there are several categories of necrophiles, including homicidal necrophilies, or individuals "who will kill to obtain a body to be sexual with." (RT 3/18/15 at 104.)  Dr. Becker opined, however, that Morris did not meet the criteria for a diagnosis of necrophilia, and she would have been comfortable, based on the material she reviewed, offering that same opinion in 2004 to 2005.  (*Id.* at 115–17; Becker Rpt. at 18.)

Dr. Becker proposed an alternative diagnosis of erotophonophilia; in other words, that "Morris is sexually aroused by the act of strangling slash choking . . . lust murder, or causing physical suffering to the victim."  (*Id.* at 118; Becker Rpt. at 18.)  Dr. Becker based her suggested alternative diagnosis on the five murder convictions.  (*Id.* at 123.)  She did not definitively diagnosis Morris with erotophonophilia, however, because there was an absence of evidence that Morris obtained sexual gratification from murdering.  Morris denied having fantasies of erotophonophilia and there was no information from any of his previous sexual partners that would indicate he engaged in similar sexual acts, such as

causing pain or humiliation, or strangling/choking as part of sexual pleasure. (*Id.* at 117–24; Becker Rpt. at 18–20.)

Finally, Dr. Becker explained the limitations to her evaluation:

> The opinions and discussion are based on information this evaluator had available to her at the time of the evaluation. If in fact Mr. Morris had been involved with the number of women he reported being involved with it would have been most helpful to interview them. It also would have been helpful if Mr. Morris had been more forthcoming in discussing his life and the crimes [of which] he has been convicted. Another level of difficulty in coming to firm conclusions in this is Mr. Morris' propensity to embellish.

(Becker Rpt. at 20; *see also* RT 3/18/15 at 125.)

Dr. Dietz opined in his August 22, 2011, report that Morris did not meet the criteria for a diagnosis of necrophilia and that there was insufficient evidence to suggest that he is a homicidal necrophile or that any of the homicides for which he had been convicted were necrophilic homicides. (PCR Pet. Ex. Y.) Dr. Pitt, the State's expert, agreed with Dr. Becker's and Dr. Lanyon's forensic conclusions related to the absence of evidence to support a diagnosis of necrophilia. (PCR EH Ex.1, Report Re: Forensic Psychiatric Evaluation.)

After the evidentiary hearing, the PCR court concluded that Morris failed "to demonstrate that trial counsel's alleged failure to secure expert testimony . . . showed either deficient performance or prejudice sufficient to support a claim of ineffective assistance of counsel; expert testimony about either decomposition or 'not necrophilia' would not have changed the outcome of the penalty phase and confidence in the verdict is not undermined." (ROA 491 at 21.) Regarding performance, the court ruled:

> "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable, and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. . . ." *Strickland*, 466 U.S. at 690–691; *State v.*

93

*Lee*, 142 Ariz. 210, 215, 689 P.2d 153, 158 (1984) ("the decision of what witnesses to call was counsel's to make. . . .").

Trial counsel, however, was unable to locate anyone with the appropriate expertise despite a nationwide search.  Although the defendant claims that "[n]ot a single expert testified for [his] defense," this was not the fault of trial counsel.  In December 2004, counsel stated: "In a last ditch desperate effort to find something to use in mitigation with [defendant], I would like to give Dr. Potts a shot at the mind of Mr. Morris."  This was after the defendant had been evaluated by Dr. Lanyon and Dr. Tamm to no avail.  Dr. Potts concluded that he, too, was "somewhat baffled with our interesting client."  The defense team noted, "[The capital mitigation specialist] is doing a nationwide search to find the right expert…but [defendant] falls between the cracks in terms of experts and expertise."

In addition, the defendant's consulting expert, Dr. Lanyon, opined in his report, disclosed only to trial counsel, that the defendant did not fit the category of necrophilia but rather had characteristics of serial sexual murderer.  The defendant would not be permitted to limit psychological testimony to "not necrophilia."  An attempt by the defense to present only "not necrophilia" testimony would call into question the defendant's mental health and would open the door to the State's evaluation and discovery of the potential for affixing a "serial sexual murderer" diagnosis.  Although necrophilia is repugnant, the latter characterization is significantly more detrimental.  Trial counsel's keeping those damaging words out served defendant's interests better than seeking to secure and admit evidence that the defendant was not a necrophile.

The Court finds that defendant has failed to overcome the strong presumption that his attorneys' alleged failure to call any experts in the penalty phase to explain and refute necrophilia was sound trial strategy.  Trial counsel's decision is based on trial tactics and strategy rather than on deficient performance.

(ROA 491 at 17–18) (footnotes omitted).

The PCR court also rejected Morris's argument that there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different:

The defendant's consulting expert opined in his report, disclosed only to trial counsel, that the defendant was not a necrophile but rather had characteristics

of being a serial, sexual murderer.  Had the defendant secured an expert to dispute a necrophilia argument, it is probable that the expert would have reached a similar conclusion about the serial murder aspect.  Even had the defense expert not done so, it is probable that the State would have either elicited the damaging material from the defense expert or secured its own expert either to refute the defense expert or to opine on the defendant as a serial, sexual deviant.  Such evidence is unlikely to persuade the jury to impose a life sentence rather than a death sentence.

. . .

Given the overwhelming evidence of defendant's guilt of five murders and the cruelty of each of these murders, coupled with the "multiple murders" finding, the indifferent manner in which the naked bodies were discarded (dragged to and dumped in the alley), and consideration of the mitigation presented . . . and that could have been presented ("decomposition/not necrophilia"), the Court finds that the defendant has not demonstrated a reasonable probability that, but for trial counsel's allegedly unprofessional error in failing to consult or call a necrophilia expert and/or a forensic pathologist, the result of the penalty phase proceeding would have been different.

In reaching this conclusion, this Court has compared the evidence that actually was presented to the jury (revealed in the trial transcripts and summarized in the Supreme Court opinion) with the "decomposition/not necrophilia" evidence that could have been presented had counsel acted differently; and has evaluated whether the difference between what was presented and what could have been presented is sufficient to undermine confidence in the outcome of the proceedings.

This Court does not find that at least one juror may have found the additional evidence sufficient to warrant leniency.

(ROA 491 at 19–21) (footnote omitted).

*Analysis*

Morris alleges the PCR court's denial of the claim is based on an unreasonable application of clearly established law and an unreasonable determination of the facts. (Doc. 21 at 137–41.)  The Court will focus on the prejudice prong of Morris's claim and the PCR court's ruling.  *See Strickland*, 466 U.S. at 697.  "When a capital defendant claims that he was prejudiced at sentencing because counsel failed to present available mitigating

95

1   evidence, a court must decide whether it is reasonably likely that the additional evidence

2   would have avoided a death sentence.  This analysis requires an evaluation of the strength

3   of all the evidence and a comparison of the weight of aggravating and mitigating factors."

4   *Jones*, 602 U.S. at 171–72.

5       Morris alleges the post-conviction court based its prejudice finding on unreasonable

6   factual determinations and ignored the pervasive, inflammatory nature of the charge of

7   necrophilia.  (Doc. 21 at 141.)  Specifically, he asserts the PCR court erred by: (1)

8   reasoning, based on Dr. Lanyon's preliminary opinion, that a defense expert would have

9   testified that Morris is a "serial, sexual murderer"; (2) speculating that "[h]ad the defendant

10  secured an expert to dispute a necrophilia argument, it is probable that the expert would

11  have reached a similar conclusion about the serial murder aspect"; and (3) assuming that

12  the State would have "secured its own expert either to refute the defense expert or to opine

13  on the defendant as a serial, sexual deviant."  (*Id.* at 140) (citing ROA 491 at 19).

14      Morris asserts that Dr. Lanyon was not an expert in this field and his preliminary

15  thoughts would not have been presented if an appropriate expert had been retained and

16  called.  (*Id.*) (citing RT 03/18/15 at 74).  Morris's argument misstates the state court's

17  findings.

18      Dr. Lanyon acknowledged Morris's behavior was beyond his area of expertise, and,

19  at the request of counsel and after reviewing literature in the field of "necrophilia" and

20  "serial, sexual sadistic murder" (RT 3/23/15 at 45), concluded that "[c]omparing the

21  literature on serial sexual murder with the sparse literature on necrophilia, it would appear

22  that Mr. Morris fits the former category rather than the latter." (Lanyon Rpt. at 33.)  Dr.

23  Lanyon provided counsel with a brief summary of each article on which he based this

24  opinion and which supported his hypothesis.  (*Id.* at 28–30.)  Based on Lanyon's opinion

25  that Morris was not a necrophile but that he demonstrated "characteristics of being a serial,

26  sexual murderer," the PCR court stated that it was "probable" that either a defense or State

27  expert would have concluded that Morris had characteristics of being a serial, sexual

28                                              96

murderer. (ROA 491 at 19.)  This was not an unreasonable factual determination.  Contrary to the manner in which Morris frames the issue, the PCR court did not state that Dr. Lanyon's opinion would have been presented to the jury, but rather that there was a likelihood, based on the research Lanyon conducted and shared with defense counsel, that any expert retained by counsel or by the State would have also found characteristics suggesting Morris was a serial, sexual murderer.  (*Id.*)

This determination was borne out by Dr. Becker's testimony at the PCR hearing. Dr. Becker specializes in psychosexual evaluations in the area of paraphilias (*see* RT 3/18/15 at 86) and proposed, after concluding Morris did not meet the diagnosis for necrophilia, that "Morris is sexually aroused by the act of strangling slash choking . . . lust murder, or causing physical suffering to the victim."  (*Id.* at 117–18; Becker Rpt. at 18.) Dr. Becker was unable to state definitively that Morris met the diagnostic criteria for erotophonophilia, however, for a number of reasons, including an absence of evidence of mutilation of the bodies, possibly due to decomposition; Morris's denial of fantasizing that he is aroused by strangling, choking, or causing other physical suffering to the victims; Morris's propensity to embellish; and an absence of information from his sexual partners that would indicate he engaged in similar sexual acts.  (*Id.* at 117–19, 122–23; Becker Rpt. at 20.)  Despite Dr. Becker's inability to ultimately diagnose Morris with erotophonophilia, the PCR court concluded that, in addition to the "not necrophilia" determination, the negative aspects of Dr. Becker's report—that "Morris is sexually aroused by the act of strangling slash choking . . . lust murder, or causing physical suffering to the victim" (RT 3/18/15 at 117–18)—would have been admissible in the penalty phase.  (ROA 491 at 7–8.)  It was therefore reasonable for the PCR court to conclude that it was probable that an expert presented by Morris to show he was not a necrophile, or an expert retained by the State to refute Morris's expert, would have opined that the murders demonstrated characteristics of serial, sexual deviance.

1    Further, the PCR court reasonably determined that "[s]uch evidence is unlikely to

2  persuade the jury to impose a life sentence rather than a death sentence."  (ROA 491 at 19;

3  *see also* RT 3/19/15 at 154 (trial counsel's testimony that "making [Morris] a lust murderer

4  could be just as damaging. . . .")).

5    Finally, Morris contends that it was an unreasonable application of clearly

6  established federal law for the PCR court to find that, even if Morris presented evidence

7  that he did not meet the diagnostic criteria for necrophilia and that the skin slippage and

8  anal defects observed in the photographs were attributable to natural decomposition, it

9  would not have fundamentally altered the sentencing profile such that confidence in the

10  outcome of the penalty phase was undermined.  (Doc. 21 at 141.)

11    In support of this assertion, Morris cites *Porter v. McCollum*, 558 U.S. 30, 43

12  (2009), but does not explain how this decision supports his claim.  In *Porter*, "the judge

13  and jury . . . heard almost nothing that would humanize Porter or allow them to accurately

14  gauge his moral culpability."  *Id.* at 41.  Post-conviction review proceedings revealed

15  several facts of the "kind of troubled history" the Supreme Court has "declared relevant to

16  assessing a defendant's moral culpability," *id.* (citing *Wiggins v. Smith*, 539 U.S. 510, 535

17  (2003)), including Porter's "abusive childhood, his heroic military service and the trauma

18  he suffered because of it, his long-term substance abuse, and his impaired mental health

19  and mental capacity," *id.* at 33.  "On the other side of the ledger," the Court found the

20  weight of evidence in aggravation was "not as substantial as the sentencing judge thought."

21  *Id.* at 41.  "Had the judge and jury been able to place Porter's life history 'on the mitigating

22  side of the scale,' and appropriately reduced the ballast on the aggravating side of the scale,

23  there is clearly a reasonable probability that the advisory jury—and the sentencing judge—

24  'would have struck a different balance.'"  *Id.* at 42 (quoting *Wiggins*, 539 U.S. at 537).

25    Unlike the substantial impact of the new evidence in *Porter*, even if Morris

26  established he was not a necrophile and there was no evidence he had postmortem sex with

27  the bodies, this new evidence would not significantly have altered his sentencing profile.

28                                         98

Morris did present mitigation evidence relating to long-standing problems with his appearance and hygiene, the responsibilities placed on him at a young age, his desire to improve himself, and his good work record. *Morris*, 215 Ariz. at 341, 160 P.3d at 220. On the other side of the scale, even in the absence of necrophilia, the jury found the (F)(2) aggravating factor of multiple murders and the (F)(6) factor that each murder was committed in an especially cruel manner. These aggravating circumstances carry great weight at the penalty phase. *See Jones*, 602 U.S. at 170–71 (finding aggravating circumstances of multiple homicides and cruelty are given great weight in Arizona) (citing, among other cases, *Garza*, 216 Ariz. at 72, 163 P.3d at 1022; *State v. Poyson*, 250 Ariz 48, 57, 475 P.3d 293, 302 (2020)).

Indeed, a finding of the multiple-murder aggravating factor carries extraordinary weight, whether the defendant is convicted (as here) of multiple murders committed on separate occasions ((F)(2)) or multiple murders committed during the commission of one or more other homicides ((F)(8)). *See Hampton*, 213 Ariz. at 185, 140 P.3d at 968 (giving "extraordinary weight" to (F)(8) multiple murders aggravating circumstance based on the commission of three homicides); *Pandeli*, 215 Ariz at 533, 161 P.3d at 576 (finding (F)(2) aggravating circumstance established by evidence of prior conviction for second degree murder especially "substantial"). This is because "the murder of two people wreaks twice the horror and sorrow as the murder of one. A triple homicide triples the loss." *Hampton*, 213 Ariz. at 184, 140 P.3d at 967. Here, the horror, loss, and sorrow are magnified by a factor of five. As the United States Supreme Court explained in *Jones*:

> Indeed, in a host of cases, the Arizona Supreme Court has held that one or more of these aggravating circumstances outweighed mitigation evidence—even evidence that was "not insubstantial." *State v. Hampton*, 213 Ariz. 167, 185, 140 P.3d 950, 968 (2006) (concluding that the multiple-homicides aggravator outweighed evidence of a "horrendous childhood"); *see also Poyson*, 250 Ariz. at 57–58, 475 P.3d at 302–303 (listing several cases in which the multiple-homicides aggravator alone outweighed all mitigating circumstances); *State v. McKinney*, 245 Ariz. 225, 227, 426 P.3d 1204, 1206 (2018) (cruelty and pecuniary-motivation aggravators outweighed evidence

99

1    that a defendant had "endured a horrific childhood" and suffered from mental
2    illness).

3    *Jones*, 602 U.S. at 170.

4    In *Jones*, the Supreme Court noted that despite Jones's evidence of mental illness,
5    cognitive impairment caused by a history of head trauma and childhood abuse, counsel's
6    inability to identify any case "in which the Arizona Supreme Court has vacated the
7    judgment of death in a case involving multiple murders . . . strongly suggests that Jones
8    has no reasonable probability of escaping the death penalty." *Id.* at 170–71.

9    The same is true here.  As the PCR court acknowledged, "necrophilia is repugnant"
10    (*see* ROA 491 at 18), but removal of the necrophilia factor would have made little
11    difference when the aggravating factors of multiple and cruel murders remain. These
12    aggravating circumstances, considered together or separately, carry great weight. In
13    contrast, the mitigating profile presented by Morris, while sympathetic, did little to excuse
14    his heinous murders.  Weighing the aggravating circumstances against the totality of the
15    mitigating evidence and applying AEDPA's deferential standard of review, the Court finds
16    that a reasonable jurist could conclude, as the state PCR court did here, that Morris failed
17    to establish prejudice from counsel's failure to present "not necrophilia" evidence at the
18    penalty phase.

19    Morris has not shown that "no 'fairminded juris[t]' could have reached the same
20    judgment as the state court." *Ramirez*, 596 U.S. at 378 (alteration in original) (quoting
21    *Richter*, 562 U.S. at 102).  Accordingly, Morris is not entitled to habeas relief on this claim,
22    and the claim is denied.

23    **D.  Claim Three**

24    Morris alleges counsel performed ineffectively at the penalty phase by failing to
25    investigate and present "available, comprehensive mitigation evidence," Claims Three
26    (A)(1)–(4); object to improper jury instructions, Claim Three (B); object to victim impact

28    100

testimony, Claim Three (C); and investigate and challenge juror misconduct in a motion for a  new trial, Claim Three (D).  (Doc. 21 at 142–188.)

Claim Three (A)

Morris asserts that trial counsel was ineffective for failing to investigate and present several categories of mitigating evidence and otherwise performed ineffectively at the penalty phase of trial.  (Doc. 21 at 143.)  Specifically, Morris alleges counsel "failed to investigate and present broad mitigation evidence as well as experts to explain the mitigation presentation," Claim Three (A)(1) (Doc. 21 at 157–62); "failed to investigate and present evidence of brain damage," Claim Three (A)(2) (*id.* at 162–65); "failed to communicate with Morris," Claim Three (A)(3) (*id.* at 165–166); and "made investigative decisions based on cost," Claim Three (A)(4) (*id.* at 166).

Each of these claims was raised in Morris's PCR petition.  (ROA 307 at 3–6, 34–47.)  The PCR court denied each sub-claim on the merits, granting an evidentiary hearing only on the "not necrophilia" portion of Morris's IAC claim discussed in Claim Two (C) above.  (ROA 354 at 3–8.)  Morris contends the PCR court's rulings were contrary to or involved an unreasonable application of clearly established federal law, and that the PCR court made unreasonable factual determinations in light of the evidence presented.  (Doc. 21 at 157–166.)

*Analysis*

Section 2254(d) imposes a "highly deferential standard" that "demands that state-court decisions be given the benefit of the doubt."  *Pinholster*, 563 U.S. at 181 (quoting *Visciotti*, 537 U.S. at 24).  "[F]ederal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong."  *Donald*, 575 U.S. at 316.

The "backward-looking language" of § 2254(d)(1) "focuses on what a state court knew and did," and requires this Court to examine the state-court decision at the time it was made, limited to the record that was before the state court.  *Pinholster*, 563 U.S. at

101

181–82.  Under § 2254(d)(2), Morris has the burden to rebut the state court's factual findings "by clear and convincing evidence."  *Titlow*, 571 U.S. at 18 (quoting 28 U.S.C. § 2254(e)(1)).  Thus, "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."  *Wood*, 558 U.S. at 301.  Review under § 2254(d)(2) is also limited to the record that was before the state court that adjudicated the claim on the merits.  *Twyford*, 596 U.S. at 819; *Gulbrandson*, 738 F.3d at 993 n.6.  This includes the trial record and the appendices attached to the PCR petition,[29] but not the additional evidence submitted at the PCR evidentiary hearing on a different set of issues because that evidence was not before the PCR court when it denied the claims we are now considering.

*Claim Three (A)(1)*

In his PCR petition, Morris alleged that trial counsel offered no expert testimony to assist the jury with interpreting the significance of the "scant mitigation" that the defense presented.[30]  (PCR Pet. at 34.)  In addition to the "not necrophilia" evidence described above, Morris presented the following evidence to support his assertion that qualified experts were necessary to adequately explain to the jury "how [Morris's] childhood issues drove him to commit the acts for which he could get the death penalty."  (*Id.*)

Dr. Becker reported that, as an adolescent, Morris's "lack of appropriate developmental social experiences," body odor, and weight problem placed him at risk, "both physically and psychologically[,] for teasing, bullying and other negative peer interactions."  (*Id.* at 35) (citing Becker Rpt. at 18.)  Dr. Becker opined that Morris's life "can be seen as bleak and desolate," and that the "numerous fabrications he engaged in" have been an attempt to "bolster his own self-image."  (PCR Pet. at 35) (citing Becker Rpt.

---

[29] Morris proffered Exhibits A–JJ attached to his PCR petition in support of his claim of ineffective assistance of counsel at the penalty phase. (*See* PCR Pet. Exs. A–JJ.)

[30] The mitigating evidence presented at Morris's trial is described in Claim Two.

102

at 18–19).  Dr. Becker also reported that "Morris is generally nonviolent," and "posed little risk for misconduct."  (PCR Pet. at 35) (citing Becker Rpt. at 19–20).

Dr. James Sullivan, a board-certified forensic neuropsychologist, administered neuropsychological testing to Morris and determined that defendants with similar profiles report relatively few antisocial traits and behaviors and low rates of institutional misconduct.  (*Id.* at 35–36) (citing PCR Pet. Ex. U (Sullivan CV); *Id.*, Ex. V at 2 (Sullivan Rpt.).)  Dr. Sullivan administered personality tests, and Morris responded by attempting to minimize his problems and present as well adjusted.  (Sullivan Rpt. at 2.)  Although Morris's "somewhat defensive manner" of responding did not invalidate the testing, Dr. Sullivan determined that Morris's profiles were subclinical, suggesting Morris was not experiencing clinically significant psychiatric disturbance or distress.  (*Id.*)

Prior to trial, Dr. Lanyon conducted a "full neuropsychological evaluation" and informed the defense team that he remained "puzzled by some of [Morris's] behavior and thought processes, since I have not been able to identify sufficient abnormality to account for his extreme deviance."  (PCR Pet. Ex. J (letter dated March 9, 2004).)  During the PCR proceedings, Dr. Lanyon reviewed his file and opined that, in addition to determining that neither necrophilia nor serial murder were the likely motives for the victims' deaths, the most likely explanation for the killings was that Morris was "motivated by the thrill from the women's extreme sexual arousal while choking them," which, "after an awkward life of failures," provided him with "great manly satisfaction"; the fact that the women died was merely "inconvenient."  (PCR Pet. Ex. BB. (undated letter)).  Dr. Lanyon opined that there may well be other sexual partners who had the same interaction with Morris but survived.  (*Id.*)

Morris also alleged that trial counsel failed to interview and present critical lay witnesses.  (PCR Pet. at 43.)  In support, Morris presented an affidavit from capital mitigation specialist Maria De La Rosa.  (PCR Pet. Ex. M, Ex. A (De La Rosa Affidavit.)  Relying on the declarations and affidavits of 31 witnesses, De La Rosa compiled a list of

mitigating evidence that could have been presented if Morris's defense team had conducted a proper investigation, including:  a history of family instability, dysfunction, generational domestic violence, drug and alcohol abuse, and a genetic propensity toward addiction and mental disorders; lack of prenatal care and a history of physical abuse, neglect, and substance abuse; separation from parents and peers; lack of positive role models and exposure to negative role models; insomnia, anecdotal evidence of depression, and a possible brain impairment; a caring and loving character with beautiful artistic ability; good behavior and cooperation with law enforcement; no history of violence and lack of future dangerousness; family love and support; and the negative impact of execution including grief to his family.  (De La Rosa Affidavit at 8–10.)  Morris asserted that the witness affidavits attached to De La Rosa's Affidavit attest to Morris's dysfunctional childhood, and the "consensus from all . . . of the witnesses was that Cory was not violent, and never displayed any sexual deviance or interest in dead people."  (PCR Pet. at 44.)  Additionally, Morris alleged, one witness believed that he was sexually abused and suicidal.  (*Id.*)

Based on her research, De La Rosa also reported that Morris has minimal criminal history and, according to military records, enlisted in the Armed Forces on September 23, 1996, but was discharged because he was overweight.  (De La Rosa Affidavit at 10.)

Finally, Morris alleged that his attorney told the jury that Morris grew up in poverty but did nothing to further develop this factor.  Morris's PCR team obtained a demographical study of the neighborhood where Morris grew up and, according to census data compiled by Amy Nguyen, a Geographic Information Systems Analyst, he "grew up in a community where single mother families were the dominant family type, the median family income was less than half the average income for the county, and more than three times the county's rate of adults had less than a 9th grade education."  (PCR Pet. at 45.) Nguyen explained that Morris's childhood was "marked by patterns of poverty, lack of male role models and under education in his home communities."  (*Id.*) (citing PCR Pet. Ex. T at 2.)

Applying *Strickland* and noting counsel's decisions are entitled to deference, the PCR court denied Morris's claim that counsel should have had expert witnesses testify in the penalty phase to explain Morris's behavior to the jury. (ROA 354 at 7) ((citing *Strickland*, 466 U.S. at 689; *Conklin v. Schofield*, 366 F.3d 1191, 1204 (11th Cir. 2004) ("Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess."). The court explained the decision not to have expert witnesses testify was "not due to trial counsel's lack of effort." (*Id.* at 5.)

> Defendant was evaluated by Dr. Lanyon, Dr. Potts, and Dr. Tamm. Dr. Lanyon told counsel that after doing an "extensive evaluation" of defendant, "including a full neuropsychological evaluation," he remained puzzled by some of his behavior and thought processes, since I have not been able to identify sufficient abnormality to account for his extreme deviance." [(PCR Pet. Ex. J.)] Dr. Lanyon has further explained to PCR counsel, after again reviewing his entire file, that the most plausible explanation for defendant's conduct is that "he was motivated by the thrill from the women's extreme sexual arousal while choking them, which especially gave him great manly satisfaction after an awkward life of failures. The fact that they died was inconvenient." [(PCR Pet. Ex. BB. (undated letter).)] Dr. Potts also told trial counsel that he was "somewhat baffled with our interesting client." [(PCR Pet. Ex. A.)]

(*Id.* at 5–6.)

Further, the PCR court determined that the decision was "more likely . . . a tactical one rather than a deficiency in performance." (*Id.* at 6.) The court explained that the "testimony of Dr. Lanyon and Dr. Potts would not have been mitigating" and even the proffered expert, Dr. Becker, did "not come up with an explanation for his behavior that jurors would find mitigating." (*Id.* at 6.) The PCR cited Dr. Becker's observation that it "should be considered that Mr. Morris is sexually aroused by the act of strangling/choking, or what is termed erotophonophilia/lust murder or causing physical suffering to the victims." Dr. Becker also noted that there was "an absence of information" indicating Morris "has engaged in similar sexual acts . . . as part of sexual pleasure." (*Id.* at 6) (quoting

105

1    Becker Rpt. at 18–19).  Dr. Becker further observed that, although the PET scan conducted

2    by Dr. Joseph C. Wu found Morris "abnormal," there was no data specifying "a special

3    neurological or psychiatric disorder" and it was unclear "how this brain abnormality might

4    be affecting his sexual and overall behavior."  (*Id.*)

5        The PCR court further found that counsel was not ineffective for failing to present

6    expert testimony because the experts believed erotophonophilia or lust fantasies were the

7    "most plausible explanation for the murders," and Morris denied having these fantasies.

8    (*Id.* at 6.)  Moreover, the court found this proffered explanation "not mitigating."  (*Id.* at

9    6.)

10        The PCR court also found that counsel "attempted to identify and secure an expert

11    who could gain insight into defendant's neurological processes and then explain his

12    behavior to the jury, but was unable to locate anyone with the appropriate expertise."  (*Id.*

13    at 6) (citing PCR Pet. Ex. A at 18); (*see also* ROA 354 at 7) (quoting *Landrigan v. Schriro*,

14    441 F.3d 638, 644 (9th Cir. 2006) ("[C]ounsel is not deficient for failing to find mitigating

15    evidence if, after a reasonable investigation, nothing has put counsel on notice of the

16    existence of that evidence.")).

17        The PCR court did not explicitly address the prejudice prong of this claim, although

18    the court remarked on some of the evidence Morris offered to demonstrate the

19    improbability that the presentation of expert testimony would have resulted in a different

20    outcome at sentencing.  (*See* ROA 354.)

21        Regarding the "broad mitigation evidence" Morris claimed counsel could have

22    "easily acquired on their own," the PCR court rejected Morris's contention that trial

23    counsel performed deficiently, quoting the Supreme Court decision in *Rompilla v. Beard*,

24    545 U.S. 374, 383 (2005): "Trial counsel need not 'scour the globe on the off-chance

25    something will turn up; reasonably diligent counsel may draw a line when they have good

26    reason to think further investigation would be a waste.'"  (ROA 354 at 7.)  The court noted

27    that the "defense team identified and interviewed at least 37 people, some on multiple

28                                            106

1    occasions; reduced the list to 19 who would be most helpful to call, and called [6] people."

2    (*Id.*) (citing PCR Pet Exs. F, Y).

3          The PCR court additionally found that much of the evidence proffered by Morris

4    was "cumulative of the mitigation evidence he presented" and, as the PCR court previously

5    pointed out in discussing Morris's proffered experts, counsel's decision not to call certain

6    witnesses was entitled to deference.  (*Id.*)

7          The court denied Morris's allegation that counsel overlooked his military record,

8    because "counsel established his participation in the ROTC program" and there was no

9    record to establish further service "because he was discharged due to obesity after less than

10   90 consecutive days of active duty for training."  (*Id.*)  Thus, the PCR court concluded,

11   "[t]rial counsel's decision not to present military service beyond ROTC time appears to

12   have been well-founded, ensuring that defendant would be presented in the best light

13   possible." (*Id.* at 7–8.)

14         The PCR court's finding that trial counsel was not ineffective in failing to present

15   expert testimony and other mitigating evidence from lay witnesses in the penalty phase was

16   a reasonable application of *Strickland* and a reasonable determination of the facts.

17         Contrary to Morris's allegation (*see* Doc. 21 at 158), the PCR court's finding that

18   "counsel attempted to identify and secure an expert who could gain insight into defendant's

19   neurological processes . . .  but was unable to locate anyone with the appropriate expertise"

20   was not unreasonable.  In support of this finding, the PCR court cited an interview of Maria

21   Schaeffer.  (ROA 354) (quoting PCR Pet. Ex. A at 18).  Schaeffer was second chair counsel

22   until she left the Office of the Legal Advocate ("OLA") in December 2004, approximately

23   six months before trial.  (PCR Pet. Ex. A.)[31]  In her interview, Schafer acknowledged that

24   she wanted to call an expert and stated that their mitigation specialist was "doing a nation-

26       [31] Morris provided no affidavit or interview from trial counsel Randall Craig, who

27   became second chair after Schaeffer resigned, or trial counsel James Logan, in support of
     his PCR claims.

28                                                 107

1    wide search to find that right expert," but felt that Morris fell "between the cracks in terms

2    of experts and expertise," and didn't know "if there's an expert out there" that is "able to

3    explain him adequately. (PCR Pet Ex. A at 2, 11–12, 16.) The PCR court's finding, based

4    on Schaeffer's interview, was reasonable. The finding is also supported by other evidence

5    in the record before the PCR court.

6    The PCR court noted that Morris was evaluated by three experts—Dr. Lanyon, Dr.

7    Potts, and Dr. Tamm. (ROA 354 at 5.) After a full neuropsychological evaluation, Dr.

8    Lanyon reported to counsel on March 9, 2004 that he remained "puzzled by some of

9    [Morris's] behavior and thought processes" and was not able "to identify sufficient

10   abnormality to account for his extreme deviance." (PCR Pet. Ex. J.)

11   On June 15, 2004, Dr. Harry Tamm, a neurologist, conducted a neurological

12   examination of Morris. (PCR Pet. Exs. C and J.) The results of this examination were not

13   included as an exhibit to Morris's PCR petition and thus were not before the PCR court

14   when the decision in question was made and will not be considered here.[32]

15   In a December 2004 email, lead counsel Logan wrote: "In a last ditch desperate

16   effort to find something to use in mitigation with Mr. Morris, I would like to give Dr. Potts

17   a shot at the mind of Mr. Morris." (PCR Pet. Ex. E.) Logan anticipated that Dr. Potts

18   could review "the work of Dr. Lanyon and Dr. Tamm" and talk to Morris. (PCR Pet. Ex.

19   E.) Dr. Potts, a forensic psychiatrist, then evaluated Morris, and like Dr. Lanyon, told the

20   defense team that he was "somewhat baffled" by Morris. (PCR Pet. Ex. A at 18, Exs. F–

21   H, J.)

22   Morris argues that Dr. Lanyon's referral of the team to Dr. Becker, and her apparent

23   availability and interest in the case, contradicts the PCR court's determination that the team

24   could find no appropriate expert. (Doc. 21 at 158.) The Court disagrees. In an email dated

---

[32] The Tamm results were later submitted as an exhibit in the PCR evidentiary hearing. (*See* PCR EH Ex. 5 at 45–46.)

108

October 21, 2004, from the mitigation specialist, Linda Thomas, to lead counsel Logan, Thomas reported that Dr. Lanyon referred the defense team to Dr. Becker. (ROA 307 at 34–35, 45; PCR Pet. Ex. R at 1.) Though Thomas subsequently investigated the possibility of retaining Dr. Becker (*see* PCR Pet. Ex. R at 2), she conveyed to counsel that she and Dr. Lanyon were in agreement "that bringing in either a serial killer expert or a necrophilia expert . . . would be highly entertaining for the jury and for the press but that it would not serve our client at all." (*Id.* at 1.) In other words, while Dr. Becker may have been available, it was reasonable for the PCR court to determine, based on Thomas's email, that the defense team did not consider Dr. Becker to be an "appropriate" expert.

Next, Morris alleges that by "completely ignoring" the opinions offered by Dr. Sullivan and Amy Nguyen, attached as exhibits to his petition (*see* PCR Pet. Exs. V, CC), the PCR court did not "consider key aspects of the record." (Doc. 21 at 158–59.) Morris fails to explain how these opinions are relevant to the PCR court's determination that counsel did not perform deficiently. Dr. Sullivan's opinion, that Morris has a low risk for misconduct in prison compared to other institutionalized individuals, and relatively few antisocial traits and behaviors compared to other defendants with similar personality profiles, was offered by Morris in his PCR petition to demonstrate the expert evidence counsel could have offered in mitigation had they decided to do so. Additionally, Dr. Sullivan opined that Morris's profiles were subclinical, suggesting Morris was not experiencing clinically significant psychiatric disturbance or distress. This evidence does not explain and mitigate Morris's conduct. If anything, it goes to the prejudice component of the *Strickland* analysis and is not relevant to the PCR court's performance analysis.

Nguyen's report, a demographic study of the neighborhood in Oklahoma City where Morris grew up, was not even offered by Morris in his PCR claim regarding the alleged failure to secure experts. Rather, it was offered as evidence of counsel's failure to obtain evidence the defense team "could have easily acquired on their own" to show that Morris's childhood "was marked by patterns of poverty, lack of role models and under

109

1    education in home communities."  (PCR Petition at 45) (citing PCR Pet. Ex. CC).  It was

2    not unreasonable for the PCR court to ignore this evidence in determining that counsel

3    attempted to identify and secure an expert who could gain insight into defendant's

4    neurological processes and then explain his behavior to the jury, but was unable to locate

5    anyone with the appropriate expertise.

6        Finally, Morris argues that in addressing and discounting Dr. Becker's opinion, the

7    PCR court made an unreasonable factual determination and unreasonably applied clearly

8    established federal law.  (Doc. 21 at 159.)  Morris asserts that the PCR court pointed to

9    perceived negative information in Dr. Becker's report as a reason counsel was not deficient

10   in failing to retain her, but this was error because counsel could not have known what Dr.

11   Becker would say when they failed to consult with her.  (*Id.*) (citing ROA 354 at 6–7).

12       Reviewing the PCR court's ruling, the Court finds that it is likely that the PCR court

13   discussed the negative implications of Dr. Becker's report as evidence of a lack of

14   prejudice.  (ROA 354 at 6) (explaining that the testimony of the experts that counsel

15   proffered in PCR proceedings, including Dr. Becker, would not have been mitigating); (*see*

16   *also id.* at 7) (finding the "erotophonophilia/lust fantasies that his experts believe is the

17   most plausible explanation for the murders . . . not mitigating).

18       Nonetheless, even if the PCR court erroneously considered the proffered evidence

19   to support its finding that counsel did not perform deficiently, the court's ultimate

20   conclusion – that counsel's decision not to pursue Dr. Becker as an expert was a tactical

21   one – based solely on the evidence in the record discussed above and disregarding the

22   negative implications of Dr. Becker's report, is not unreasonable because the decision was

23   a strategic one based on the defense team's conclusion that such testimony might be

24   "highly entertaining" but would serve no purpose.

25       Finally, Morris asserts that the PCR court erroneously reasoned that the experts did

26   not give a mitigating explanation for the murders, and thus counsel did not perform

27   deficiently in failing to present them, contrary to the Supreme Court's holding in *Eddings*

28                                    110

1   *v. Oklahoma*, 455 U.S. 104, 114 (1982). (Doc. 21 at 160.)  The Supreme Court has "held

2   that a State cannot preclude the sentencer from considering 'any relevant mitigating

3   evidence' that the defendant proffers in support of a sentence less than death." *Payne v.*

4   *Tennessee*, 501 U.S. 808, 822 (1991) (citing *Eddings*, 455 U.S. at 114).  The sentencer

5   may, however, consider "causal nexus . . . as a factor in determining the weight or

6   significance of mitigating evidence." *Lopez v. Ryan*, 630 F.3d 1198, 1204 (9th Cir. 2011),

7   *overruled on other grounds by McKinney*, 813 F.3d 798 at 819; *see Styers v. Ryan*, 811

8   F.3d 292, 298–99 (9th Cir. 2015) (holding that the Arizona Supreme Court did not

9   violate *Eddings* in assigning little weight to the petitioner's PTSD when it lacked a causal

10  connection to the crime).

11      Morris's argument fails for the same reason his argument regarding Dr. Becker fails.

12  The PCR court's determination that counsel did not perform deficiently is fully supported

13  by the evidence in the record without consideration of the evidence Morris proffered to

14  demonstrate prejudice.  Additionally, it was not improper for the PCR court to consider the

15  strength and significance of Morris's proffered evidence.  *See Lopez*, 630 F.3d at 1204.

16  Read in context (*see* PCR Pet. at 7) (citing *Strickland*, 466 U.S. at 699 (counsel could

17  "reasonably surmise … that character and psychological evidence would be of little

18  help")), the PCR court's finding that the evidence was "not mitigating" was permissible

19  commentary on the strength of the evidence, not its admissibility.  Finally, Morris invited

20  causal nexus scrutiny by arguing trial counsel failed to present expert testimony to explain

21  what "drove [Morris] to commit" the murders.  (PCR Pet. at 34.)  The PCR court did not

22  err in countering this argument by explaining the proffered mitigation did not explain

23  Morris's conduct.

24      "This is not a case in which the defendant's attorneys failed to act while potentially

25  powerful mitigating evidence stared them in the face." *Van Hook*, 558 U.S. at 11.  Instead,

26  "there comes a point" at which the search for more evidence distracts "from more important

27  duties." *Id.*  "'[C]ounsel has a duty to make reasonable investigations *or* to make a

28                                          111

reasonable decision that makes particular investigations unnecessary' during the penalty phase of a trial." *Bolin*, 13 F.4th at 804 (emphasis in original) (quoting *Carter v. Davis*, 946 F.3d 489, 513 (9th Cir. 2019) (per curiam)).

The highly qualified experts trial counsel retained to assist them in developing mitigating evidence remained puzzled by Morris, and offered very little information that would explain "how [Morris's] childhood issues drove him to commit the acts for which he could get the death penalty" or otherwise "interpret[] the scant mitigation that the defense presented." (PCR Pet. at 34.) There is no reason to believe that the opinions offered by Drs. Lanyon or Potts, that Morris's behavior was puzzling and essentially unexplainable, were unreliable. Counsel had no reason to believe that additional evaluations would yield different results unless an expert in necrophilia or paraphilia was consulted, and Drs. Lanyon and Thomas both had serious questions about the benefit of hiring such an expert because of the impact such evidence would have on a jury. There was no evidence that gave counsel reason to believe additional searches for experts to explain the murders would have been productive.

The PCR court's finding that trial counsel did not perform ineffectively by failing to offer a broader mitigation presentation from lay witnesses at the penalty phase was also a reasonable application of *Strickland* and a reasonable determination of the facts.

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Id.* at 689. The burden rests with the habeas applicant to show that the state court applied clearly established Supreme Court precedent in an objectively unreasonable manner. *Visciotti*, 537 U.S. at 25. Morris has not "overcome the presumption that, under the circumstances," counsel's decision not to present all of the witnesses or evidence that Morris proffered in

his PCR proceedings "might be considered sound trial strategy" developed after a thorough investigation. *Strickland*, 466 U.S. at 689–91.

Morris first asserts that because the majority of the witnesses whom the trial team interviewed were the same as those proffered by Morris in his PCR Petition, it was "not the case that counsel would have had to 'scour the globe'" to find this information, "but that counsel failed to utilize the resources available to them and effectively prepare for the penalty phase of trial." (Doc. 21 at 160.)

The record supports the conclusion that the defense team did not fail to conduct a thorough investigation. Trial counsel's mitigation specialist interviewed 37 witnesses, many of the same witnesses that Morris presented in his PCR Petition. (PCR Pet. Ex. Y at 3–4; *see also* PCR Pet. Ex. M at Ex. D (Thomas Affidavit) ("As the Capital Mitigation Specialist on Mr. Morris' case, I interviewed many people (often on several repeat occasions) who knew Mr. Morris including numerous family members, neighbors, his pastor, friends current and past, former employers, former girlfriends, former teachers, his ROTC instructors, etc."). On July 20, 2004, approximately one year before trial started, the defense noticed 19 mitigation witnesses, most of whom were from Oklahoma. (ROA 63.) On April 5, 2005, approximately two months before trial started, Thomas compiled a "scaled-down list of the most helpful witnesses to call." (PCR Pet. Ex. F.) Of the 19 mitigation witnesses noticed, the defense called six to testify at trial. (RT 7/14/05, RT 7/18/05.) Having interviewed a majority of the same witnesses Morris presented in his PCR proceedings, counsel's decision not to present them at the penalty phase is a strategic choice after thorough investigation that is "virtually unchallengeable." *Strickland*, 466 U.S. at 690. The PCR court's conclusion that counsel acted reasonably because "counsel may draw a line when they have good reason to think further investigation would be a waste" (ROA 354 at 7) (quoting *Rompilla*, 545 U.S at 383), was not contrary to or an unreasonable application of Supreme Court precedent.

1    Morris takes issue with the PCR court's determination that "[m]uch of the evidence

2    defendant now proffers is cumulative of the mitigation he presented." (Doc. 21 at 160.)

3    As an example, Morris asserts that no evidence was presented of his familial history of

4    mental illness and substance abuse, the physical abuse he experienced as a child, or the

5    volatility of his life in Austin and Phoenix. Morris contends the PCR court's failure to

6    consider this evidence is an unreasonable determination of the facts under § 2254(d)(2).

7    The Court disagrees. The PCR court found that "much" of the PCR evidence was

8    cumulative of evidence presented at trial. (ROA 354 at 7.) The PCR court also concluded

9    that "counsel's decision not to call certain witnesses is entitled to deference." (*Id.*) This

10   conclusion must be considered in light of the court's finding in the previous paragraph of

11   the same section that "[t]he defense identified and interviewed at least 37 people, some on

12   multiple occasions; reduced the list to 19 who would be most helpful to call, and called six

13   people." (*Id.*) The PCR court's conclusion was not an unreasonable determination of fact.

14   Trial counsel identified and interviewed more than three dozen fact witnesses. "Attorneys

15   are expected to formulate reasonable strategies that 'balance limited resources in accord

16   with effective trial tactics and strategies.'" *Carter*, 946 F.3d at 524 (quoting *Richter*, 562

17   U.S. at 107.)

18   Finally, Morris asserts the PCR court unreasonably found that there "was no record

19   to support" Morris's military service beyond his participation in ROTC, which was

20   presented at trial. (Doc. 21 at 161–62) (citing ROA 354 at 7). Morris alleges the court

21   ignored the records indicating Morris enlisted in the Army Reserves while in Austin. (*Id.*)

22   (citing De La Rosa Affidavit, Ex. C (Military Records)). This is not accurate. The PCR

23   court specifically cited Morris's Army Reserve record and noted that Morris "had no active

24   service because he was discharged due to obesity after less than 90 consecutive days of

25   active duty for training." (ROA 354 at 7.) This accurately portrayed Morris's record. (*See*

26   De La Rosa Affidavit, Ex. C at 1) ("[T]he veteran had no active service or less than 90

27   consecutive days of active duty for training.").

28                                          114

Further, the PCR court determined that "counsel's decision not to present military service beyond ROTC time appears to have been well-founded, ensuring that defendant would be presented in the best light possible." (ROA 354 at 7.) This conclusion is supported by the record. Morris's Army Reserve record included a memorandum from Sergeant David K. Lindquist, explaining why Morris would not be shipping out for training:

> Pvt Morris has been gaining weight steadily since he enlisted. He has been counseled repeatedly by his recruiter, station commander, his unit NCOIC, and by his parents. His parents have attempted to provide him a diet regimen, which he refused to follow. He was encouraged to attend station level weight control training, and declined. He was informed repeatedly that if he did not reduce his weight, he would be discharged from the Army Reserve.

(De La Rosa Affidavit, Ex. C (Memorandum dated May 31, 1997).) Additionally, Sergeant Lindquist's memorandum mentions that Morris's father said "Morris had a disagreement with his stepmother, involving law enforcement officials," left town, and "does not intend to ship." (*Id.*) Morris's military records would not have shown him in a favorable light.

The PCR court's finding that trial counsel was not ineffective was both a reasonable application of *Strickland* and a reasonable determination of the facts. Morris is not entitled to habeas relief on Claim Three (A)(1).

*Claim Three (A)(2)*

In his PCR petition, Morris alleged trial counsel was ineffective for failing to follow their own experts' recommendations to obtain critical neurological evidence. (PCR Pet. at 4–6.) In support, Morris offered his own affidavit and a report from Dr. Joseph Wu.

Morris stated in his affidavit that he hit his head and blacked out once when he was 13 or 14 years old, and passed out in his junior year of high school (1995–96) and was taken to the hospital. (*Id.*) He also described passing out "for about a minute" in 2000 and reported that the left side of his face and part of his body were numb when he gained consciousness. (*Id.*) He further reported that he only sleeps for about two hours a night,

1    waking up every thirty minutes, and as an adult he suffers from daily migraine headaches

2    which last for two to three hours.  (*Id.*)

3    After reviewing Morris's medical, psychological, military, and academic records,

4    and conducting brain scans, Dr. Wu concluded that the testing results and Morris's history

5    were "consistent with a dual diagnosis of brain injury from head traumas and/or

6    schizoaffective disorder."  (PCR Pet. Ex. N at 2.)  Dr. Wu explained that the PET scan

7    demonstrated a finding of "asymmetrical left temporal decrease relative to the right," and

8    that a key function of the frontal and temporal lobes is the regulation of aggression.  (*Id.* at

9    2, 5.)

10    The PCR court considered the proffered neurological evidence and, assuming

11    without deciding that trial counsel performed deficiently in not presenting it, found Morris

12    had failed to show prejudice.  (ROA 354 at 3.)  The court first noted that, "[w]ith respect

13    to each victim, the defendant [had] not indicated that he lost control and became aggressive;

14    rather, he claimed that the victims asked to be strangled during sex" and claimed their

15    deaths were accidental.  (*Id.*)  The PCR court also found there was no evidence Morris had

16    been violent or unable to control his aggressive impulses in the past, and evidence that

17    Morris was unable to control aggressive impulses would have conflicted with the

18    mitigation evidence that Morris was "consistently described as quiet, mild-mannered, and

19    a 'teddy bear.'"  (*Id.*)  Finally, the court considered the strength of the aggravating factors

20    and concluded that "there is no reasonable probability that even with the neurological

21    evidence, the jury would have concluded that the balance of aggravating and mitigating

22    circumstances did not warrant death." (*Id.*)

23    The PCR court's finding that Morris could not prove prejudice from any failure to

24    fully investigate his brain damage was not an unreasonable application of *Strickland* or an

25    unreasonable determination of fact.  The Court must review this claim based on the record

26    before the PCR court at the time it made its decision.  *See Pinholster*, 563 U.S. at 181–82.

27    Based on the trial record and transcripts, and the exhibits Morris attached to his PCR

28                                          116

1    petition, the Court finds that the PCR court's determination that neurological evidence

2    would not have changed the outcome of Morris's case is a reasonable application of

3    *Strickland* and a reasonable determination of the facts.

4        Morris did not indicate that he lost control and became aggressive with respect to

5    each victim.  (ROA 354 at 4.)  Contrary to Morris's assertion, the PCR court did not

6    unreasonably rely on Morris's second statement to the police in reaching this conclusion.

7    (*See* Doc. 21 at 162.)  Morris asserts it was unreasonable to rely on the statement that

8    Morris claimed that the victims asked to be strangled during sex because Morris did not

9    testify at any stage of the trial and the defense's theory rested on the first version of the

10   account Morris gave as to each victim's death—that the victims died of drug overdoses.

11   (*Id.*); (*See* RT 7/05/05 ("There's been no proof of anything but drug overdose . . . .")).

12   Although Morris did not testify, the videotape of his interview with police was played for

13   the jury and provided the only eyewitness account of each murder.  (*See* RT 6/16/05,

14   *passim*; RT 6/20/05, *passim.*)  Based on this evidence, the PCR court reasonably

15   determined that Morris did not indicate he had lost control and become aggressive, rather,

16   he claimed that the "deaths were accidental and not his fault."  (ROA 354 at 4.)

17       Morris next asserts that by finding him guilty of premeditated murder, the jury had

18   already rejected both of Morris's statements to the police and found Morris acted

19   aggressively.  Thus, he claims, the PCR court acted unreasonably in determining Morris's

20   aggression was "not at issue" in the penalty phase.  (Doc. 21 at 149–50.)  The Court

21   disagrees with Morris's characterization of the court's determination.  The PCR court

22   found there was no evidence Morris had been violent or unable to control his aggressive

23   impulses in the past—in other words, there was no evidence to corroborate Dr. Wu's

24   opinion about his brain injury—and that evidence Morris was unable to control aggressive

25   impulses would have conflicted with the mitigation evidence that Morris was "consistently

26   described as quiet, mild-mannered, and a 'teddy bear.'"  (ROA 354 at 3.)

27

28                                          117

Additionally, the jury found before the penalty phase that each killing was premeditated, indicating the crimes were planned and controlled, not impulsive and reactive. Dr. Wu's explanation—that individuals with brain injuries similar to Morris's demonstrate an inability to control aggressive impulses and may be overreactive and have disproportionate responses—would not have been helpful in explaining the type of aggression demonstrated by the facts of the crimes themselves. (*See* PCR Pet. Ex. N at 4–5.) There is no evidence suggesting any of the killings were predominantly reactive in nature, or the result of impulsive aggression.

Even if Dr. Wu's report supported a finding that Morris had difficulty controlling violent and aggressive impulses, other evidence in the record did not support such a finding, as was noted by the PCR court. The neurological evidence would have conflicted with the witnesses' testimony in mitigation. Morris was described by friends and family as someone who was not violent, never got angry, and was nicknamed "Teddy Bear," (RT 7/14/05, at 53–54, 63, 97–98; RT 7/18/05, at 11–14, 20–20, 33, 55–58), and counsel painted a mitigation picture that Morris was a sad person, with a sad upbringing—a "very pathetic soul"—and because of his sad life the jury should take pity on him. (RT 3/19/15 at 126–28; RT 3/24/15 at 68–70.) No lay or expert witness proffered during the PCR proceedings found Morris to have a lack of impulse control.

Likewise, Morris's reliance on *Sears* is unavailing because in that case, unlike here, the state court unreasonably concluded "that counsel's effort to present some mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant." *Sears v. Upton*, 561 U.S. 945, 954 (2010). The Supreme Court held this was not a "correct conceptualization" of the proper prejudice standard. *Id.* at 952. The correct standard, and the one employed by the PCR court in this case, is to "consider the totality of the available mitigation evidence—the evidence presented at trial and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation." *Sears*, 561 U.S. at 955–56 (quoting *Porter*,

558 U.S. at 41) (cleaned up)).  Regardless of "how much or how little mitigation evidence was presented during the initial penalty phase," this standard requires the state court to "speculate" as to the effect of the new evidence.  *Sears*, 561 U.S. at 956.  This is exactly what the PCR court did.

Unlike the state court in *Sears*, the PCR court here "correctly conceptualize[d]" and applied the proper standard, first correctly determining that the evidence would have conflicted with the mitigation evidence presented at the penalty phase of Morris's trial and then determining that, "[g]iven the fact that five women were murdered, the facts of each murder, and the nature and strength of the aggravating factors for each murder, there is no reasonable probability that even with the neurological evidence, the jury would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." (ROA 354 at 4.)  The PCR court's consideration of whether the mitigating evidence conflicted with the mitigation evidence presented at trial was not unreasonable, as this impacts the overall reweighing of the mitigating and aggravating factors.  In other words, new mitigating evidence that was consistent, or potentially synergistic, with the mitigating evidence or theory propounded at trial would weigh more heavily on the mitigating side of the scale.  But new mitigating evidence that supports a theory in conflict with the evidence produced at trial would diminish the impact of the new mitigating evidence.  It therefore was not unreasonable for the PCR court to consider whether the new evidence conflicted with the evidence presented at trial.

Ultimately, the PCR court reasoned that because of the "nature and strength of the aggravating factors," Morris could not show prejudice even with the new neurological evidence.  (ROA 354 at 5.)  This was not an unreasonable conclusion.  *See Bonin v. Calderon,* 59 F.3d 815, 836 (9th Cir. 1995) (because of overwhelming aggravation, Bonin had not shown the use of expert psychiatrists would likely have changed the outcome).  "'[W]here the aggravating factors greatly outweigh the mitigating evidence, there may be no 'reasonable probability' of a different result,' even if the petitioner presents 'substantial

1    evidence of the kind that a reasonable sentencer might deem relevant to the defendant's

2    moral culpability.'" *Lee v. Thornell*, 118 F.4th 969, 989 (9th Cir. 2024), cert. denied, No.

3    24-6668, 2025 WL 1549805 (U.S. June 2, 2025) (quoting *Jones*, 602 U.S. at 165).  The

4    Supreme Court has recognized that a defendant having committed *another* murder is "the

5    most powerful imaginable aggravating evidence."  *Belmontes,* 558 U.S. at 28.    As

6    discussed in Claim Two, an aggravating circumstance based on multiple murders carries

7    extraordinary weight.  *See Jones*, 602 U.S. at 170–71; *Hampton*, 213 Ariz. at 185, 140 P.3d

8    at 968; *Pandeli*, 215 Ariz at 533, 161 P.3d at 576; *see also Bonin,* 59 F.3d at 836.

9        "*Strickland* places the burden on the defendant, not the State, to show a "reasonable

10    probability" that the result would have been different."  *Belmontes*, 558 U.S. at 27 (citing

11    *Strickland*, 466 U.S. at 694.)  Under a proper application of the *Strickland* standard, the

12    PCR court reasonably determined that Morris did not carry this burden.  Morris is not

13    entitled to habeas relief.  Claim Three (A)(2) is denied.

14    *Claim Three (A)(3)*

15        Morris alleged in his PCR petition that communication with his trial counsel

16    "rapidly deteriorated while the case was pending, and by the time of trial, [Morris] barely

17    had any contact with his lawyers."  (ROA 307 at 45.)  Had counsel properly maintained

18    communication and "explained the procedure of a death penalty trial, and the important

19    opportunity of an allocution," Morris maintains he would have told the jury the following:

20    that he had no interest in having sex with a dead person; had never had sex with a dead

21    person, including with any of the victims; the police told him to say the victims died from

22    choking while they were having sex; he knows who the real killer is but revealing that

23    information will put people's lives at risk; and he was in the military.  (*Id.* at 46) (citing

24    PCR Pet. Ex. L, Morris Affidavit).

25        The PCR court rejected Morris's allegation that trial counsel failed to communicate

26    with him:

27

28                                               120

Defendant claims that communication with counsel deteriorated while his case was awaiting trial. (Pet. at 45). This complaint is belied by the jail visitation logs showing that members of the defense team met with defendant regularly. (Pet. at App. XV, ex. DD). Defendant also was present every day of the trial and able to consult with counsel at that time, even absent additional consultation. In any event, he fails to show how his attorneys' failure to meet with him regularly constituted deficient performance or prejudiced him.

(ROA 354 at 8.)

The PCR court's finding that Morris failed to demonstrate that trial counsel's alleged lack of communication constituted deficient performance or prejudice was a reasonable application of *Strickland* and a reasonable determination of the facts.

As noted by the PCR court, visitation logs demonstrated regular visitation by Morris's defense team before the trial. (*See* PCR Pet. Ex. DD) (indicating that in the four months before jury selection began members of the defense team met with Morris at the jail seven times). (*See id.*) The record also supports the PCR court's finding that counsel would have been able to consult with Morris every day of the trial. (*See* RT 6/01/05 through 7/19/05) (noting Morris's presence in court every day but for the first three days of jury selection).

Additional records before the PCR court also support the performance finding. *See Miller–El v. Cockrell*, 537 U.S. 322, 348 (2003) (habeas petitioner must show unreasonability "in light of the record before the [state] court"); *see also Miller-El v. Dretke*, 545 U.S. 231, 241 n.2 (2005) (considering evidence that was unquestionably before the state courts in addressing unreasonability). The trial transcript shows that trial counsel discussed with Morris his right to testify during the guilt, aggravation, and penalty phases of trial. (*See* RT 6/29/05 at 113) (trial counsel stating on the record that he had advised Morris of his right to testify); (*see* RT 7/12/05 at 116) (trial court affirming that Morris had advised his attorney that he did not want to testify); (*see* RT 7/18/05 at 81–82) (trial court and trial counsel affirming that Morris had discussed his right to allocute with counsel).

121

1    Additionally, trial counsel was aware that Morris wanted to speak to the jury and was going

2    to "say bad things during his allocution," specifically "there wasn't going to be expression

3    of remorse." (*See* PCR Pet. Ex. A at 12–13.) Morris stated in his affidavit that this

4    discussion took place during a break in the trial. (PCR Pet. Ex. L at 2.) Counsel asked

5    Maria Schaefer, who was no longer on the defense team but who had a good relationship

6    with Morris, to speak with him; Schaefer explained to Morris that speaking to the jury as

7    he intended—"effectively thumb[ing] his nose at the jurors"—wasn't going to help him

8    and "would be a bad thing to do." (*Id.* at 14–15.) Based on this evidence, the PCR court

9    reasonably determined that the record contradicted Morris's contention that trial counsel

10   performed deficiently by failing to communicate with him.

11   Additionally, the PCR court reasonably determined Morris failed to demonstrate

12   prejudice from his counsel's alleged failure to communicate. (Doc. 354 at 8.) Because the

13   state court did not articulate its reasoning supporting this conclusion, the Court "'must

14   determine what arguments or theories . . . could have supported the state court's'

15   determination that [Morris] failed to show prejudice." *Kayer*, 592 U.S. at 120 (citing

16   *Richter*, 562 U.S. at 102. The Court must then "assess whether 'fairminded jurists could

17   disagree on the correctness of the state court's decision' if based on one of those arguments

18   or theories." *Id.* (quoting *Richter*, 562 U.S. at 101) (cleaned up).

19   The most likely reason for the PCR court's prejudice determination is that Morris's

20   self-serving statements in his affidavit—that he had not had sex with any of the victims'

21   bodies or any other dead bodies—created even less likelihood of a different sentencing

22   outcome than the expert testimony that was presented regarding the "decomposition/not

23   necrophilia" theory, as discussed above in Claim Two. In determining that Morris had "not

24   demonstrated a reasonable probability that, but for trial counsel's allegedly unprofessional

25   error in failing to consult or call a necrophilia expert and/or a forensic pathologist, the result

26   of the penalty phase proceeding would have been different," the PCR court emphasized the

27   "overwhelming evidence of defendant's guilt of five murders and the cruelty of each of

28   122

these murders, coupled with the 'multiple murders' finding, [and] the indifferent manner in which the naked bodies were discarded (dragged to and dumped in the alley)." (ROA 491 at 20–21) (footnote omitted).  Given the strength of the aggravating factors, Morris's proposed allocution would have fallen short of the type of mitigation information that would have influenced the sentencing decision.  Furthermore, several of the statements Morris intended to convey to the jury could have harmed him in the penalty phase.  Morris intended to tell the jury that the police told him to say that the women died from choking while they were having sex, an allegation that is contradicted by the videotaped statements Morris made to the police.  Additionally, Morris did not intend to express remorse; he intended to tell the jury he knew "who the real killer is," which, as Schaeffer described, would effectively be the same as thumbing his nose at the jury who had already determined that Morris was the "real killer."

Morris has failed to demonstrate that no reasonable jurist considering the statements in his affidavit could conclude that Morris was not prejudiced by his counsel's alleged failure to communicate with him.  The state court decision "was not so obviously wrong as to be 'beyond any possibility for fairminded disagreement.'"  *Kayer*, 592 U.S. at 124 (quoting *Richter*, 562 U.S. at 103).  Claim Three (A)(3) is denied.

*Claim Three (A)(4)*

Morris alleged in his PCR petition that his defense was "underfunded" and that trial counsel failed to pursue neurological evidence for "budgetary reasons." (ROA 307 at 2–4.)  The PCR court rejected this claim, concluding that Morris "failed to show his counsel lacked funds to adequately prepare his case and that this caused deficient performance and prejudice." (ROA 354 at 4.)  The court also noted that the defense paid $6,537.50 to retain two experts, Dr. Lanyon and Phoenix Neurological Associates, and Morris did not calculate the defense expense for attorneys, paralegals, and investigators.  (*Id.*)

The PCR court's determination was not an unreasonable application of clearly established federal law.  Morris failed to allege, much less demonstrate in his PCR petition,

123

1    that any of the decisions counsel made regarding experts was based on a lack of funding.

2    To the extent Morris claims he was prejudiced because counsel failed to obtain

3    neurological testing, this claim was reasonably denied by the PCR court as discussed in

4    claim Three (A)(2).[33]  Morris is not entitled to habeas relief.  Claim Three (A)(4) is denied.

5    *Cumulative Prejudice Claim*

6           Morris contends the PCR court's decision was contrary to or an unreasonable

7    application of Supreme Court precedent because it treated Morris's claim of ineffective

8    assistance of counsel at the penalty stage as multiple, distinct claims and did not examine

9    the cumulative effect of the various instances of counsel's deficient performance.  (*Id.* at

10   156.)  The Court disagrees.

11          As noted by Respondents in the Answer, Morris did not raise a claim in his PCR

12   proceedings that the cumulative effect of trial counsels' errors prejudiced him.  (*See*

13   Doc. 27 at 71.)  The claim is also meritless.

14          The United States Supreme Court has not specifically recognized the doctrine of

15   cumulative error as an independent basis for habeas relief.  *See Lorraine v. Coyle*, 291 F.3d

16   416, 447 (6th Cir. 2002) ("The Supreme Court has not held that distinct constitutional

17   claims can be cumulated to grant habeas relief."); *cf. Morris v. Sec'y Dep't of Corr.*, 677

18   F.3d 1117, 1132 n.3 (11th Cir. 2012) (refusing to decide whether "under the current state

19   of Supreme Court precedent, cumulative error claims reviewed through the lens of AEDPA

20   can ever succeed in showing that the state court's decision on the merits was contrary to or

21   an unreasonable application of clearly established law").

22          The Ninth Circuit has held in some cases that although no single trial error is

23   sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may

24   prejudice a defendant to such a degree that his conviction must be overturned.  *See*

25   _____

26   [33] Morris explains in his petition for review that the "proof of prejudice" for his IAC
     claim alleging a failure to obtain adequate funding was "joined" to prejudice with his claim
27   for failing to conduct nuerological testing.  (PR 7 at 12.)

28                                        124

1    *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002), *overruled on other grounds by*

2    *Slack v. McDaniel*, 529 U.S. 473 (2000).  Here, however, the Court has not identified any

3    constitutional errors arising during Morris's trial.[34]  "If there are no errors, there is no need

4    to consider their cumulative effect."  *McGill v. Shinn*, 16 F.4th 666, 685 (9th Cir. 2021).

5    Morris's claim of cumulative prejudice is therefore meritless.

6            Morris is not entitled to habeas relief.  Claim Three (A) is denied.

7    <u>Claim Three (B)</u>

8            Morris asserts that trial counsel was ineffective for failing to object to several

9    instructional errors in the penalty phase of his trial.  (Doc. 21 at 177.)  Morris raises four

10   subclaims of ineffectiveness.  He did not raise these claims in state court.  (*See id.* at 177.)

11   *Claim Three (B)(1)*

12           In *Simmons v. South Carolina*, 512 U.S. 154 (1994), the United States Supreme

13   Court held that when "a capital defendant's future dangerousness is at issue, and the only

14   sentencing alternative to death available to the jury is life imprisonment without possibility

15   of parole, due process entitles the defendant 'to inform the jury of [his] parole ineligibility,

16   either by a jury instruction or in arguments by counsel.'"  *Cruz v. Arizona*, 598 U.S. 17, 21

17   (2023) (quoting *Shafer v. South Carolina*, 532 U.S. 36, 39 (2001); *Kelly v. South Carolina*,

18   534 U.S. 246, 248 (2002)).

19           Until 2012, Arizona's sentencing statute expressly provided for a release-eligible

20   life sentence for defendants convicted of first-degree murder.[35]  *See* A.R.S. § 13-703(A),

21

22   _____

23       [34] Though the PCR court assumed counsel performed deficiently by failing to obtain

24   neurological evidence, the PCR court found no other deficient performance, and therefore
     no other prejudice to consider cumulatively to this assumed error.

25

26       [35] At the time of Morris's trial, the relevant sentencing statute read:

27       If the defendant is sentenced to life, the defendant shall not be released on
         any basis until the completion of the service of twenty-five calendar years if

28                                              125

1    renumbered as A.R.S. § 13-751(A).  In 1994, however, "the legislature had obliquely

2    abolished parole through Title 41 rather than Title 13" for all felonies committed after

3    1993.  *Anderson*, 257 Ariz. at 235, 547 P.3d at 354 (Beene, J., dissenting) (citing A.R.S §

4    41–1604.09(I)(1)).  As a result, defendants facing death sentences between 1994 and 2012

5    were statutorily eligible to receive life-with-parole sentences but, as a practical matter,

6    could not be paroled.

7        At the time of Morris's trial, the Arizona Supreme Court had not considered

8    *Simmons*' applicability to Arizona's capital jury-sentencing process in light of § 13-703(A)

9    and § 41-1604.09(I).  In 2008, the court rejected an argument that *Simmons* required a trial

10   court to "presentence" a defendant by deciding before trial whether it would impose a

11   parole-eligible life sentence and instruct the jury accordingly.  *State v. Cruz*, 218 Ariz. 149,

12   160, 181 P.3d 196, 207 (2008).  The court reasoned that *Simmons* did not require reversal

13   because "[n]o state law would have prohibited [the defendant's] release on parole after

14   serving twenty-five years, had he been given a life sentence."  *Id.*  (citing A.R.S. § 13-

15   703(A)).  Finally, in 2015, the Arizona Supreme Court acknowledged that, under A.R.S.

16   § 41-1604.09(I), "parole is available only to individuals who committed a felony before

17   January 1, 1994, and juveniles," but nonetheless reaffirmed its holding that *Simmons* did

18   not apply in Arizona because a defendant facing a death sentence was eligible to receive a

19   life sentence with the possibility of release under A.R.S. § 13-751(A).  *See State v. Lynch*,

20   238 Ariz. 84, 103–04, 357 P.3d 119, 138–39 (2015), *reversed by Lynch v. Arizona*, 578

21   U.S. 613, 614–16 (2016).  This "systemic failure to recognize the effect of the change in

22   the law regarding parole" by "defendants, attorneys, and courts" created "pervasive

23   confusion about parole eligibility in Arizona."  *Anderson*, 257 Ariz. at 232, 547 P.3d at

24   351.

---

25
26       the murdered person was fifteen or more years of age and thirty-five years if
         the murdered person was under fifteen years of age.

27   A.R.S. § 13-703(A).

28                                      126

1    In this case, where the trial occurred during this period of "pervasive confusion,"

2    the trial court instructed the jury at the aggravation and penalty phases of Morris's trial that

3    if their verdict was that he should not be sentenced to death, then the court would sentence

4    him to either natural life or life with the possibility of release or parole after 25 years.

5    (ROA 153 at 5; ROA 163 at 9; ROA 169 at 7; RT 7/12/05 at 18; RT 7/14/05 at 10; RT

6    7/18/05 at 96–97.) Morris alleges that counsel performed ineffectively by failing to inform

7    the court that Morris was parole ineligible and by failing to object to an instruction that

8    incorrectly informed the jury that Morris could be sentenced to life with the possibility of

9    parole. (Doc. 21 at 178–82.)

10    As discussed in a separate order, the claim is technically exhausted and

11    procedurally defaulted. (*See* Doc. 84 at 12, 19; *see also* Doc. 91 at 8.) Morris argues the

12    default of this claim is excused under *Martinez* by the ineffective assistance of PCR

13    counsel. (Doc. 34 at 89.) *Martinez* does not provide cause to excuse the procedural default

14    because, as set forth below, the claim is plainly meritless.

15    Constitutionally deficient performance "is necessarily linked to the practice and

16    expectations of the legal community. . . ." *Hinton v. Alabama*, 571 U.S. 263, 273 (2014)

17    (quoting *Padilla*, 559 U.S. at 366). "An attorney's ignorance of a point of law that is

18    fundamental to his case combined with his failure to perform basic research on that point

19    is a quintessential example of unreasonable performance under *Strickland*." *Id.* at 274.

20    Counsel's failure to object to the instruction or inform the court of Morris's parole

21    ineligibility is not evidence that counsel failed to perform basic research. Basic research

22    would have established that, under A.R.S. § 13-703(A), Morris could be sentenced to a

23    parole eligible sentence. For over 15 years, the Arizona Supreme Court failed to recognize

24    the legislature's abolition of parole in Arizona. In 1999, the Arizona Supreme Court held

25    that "Arizona's statute . . . states with clarity that the punishment for committing first

26    degree murder is either death, natural life, or life in prison with the possibility of parole."

27    *State v. Wagner*, 194 Ariz. 310, 312, 982 P.2d 270, 272 (1999). Just before Morris's

28

1    sentencing, the Arizona Supreme Court confirmed that "[t]he range of punishment allowed

2    by law on the basis of [a first degree murder guilty] verdict alone is life imprisonment with

3    the possibility of parole or imprisonment for 'natural life' without the possibility of

4    release." *State v. Fell*, 210 Ariz. 554, 558, 115 P.3d 594, 598 (2005) (quoting *State v. Ring*,

5    200 Ariz. 267, 279, 25 P.3d 1139, 1151 (2001)).

6        Given this background, the Court disagrees with the majority opinion in *Anderson*

7    that "basic research would ordinarily have included reading A.R.S. § 41-1604.09(I)."

8    *Anderson*, 257 Ariz. at 234, 547 P.3d at 353 n.1.  The parole ineligibility provision was

9    buried in a section of statute setting forth provisions for the Arizona Department of

10    Correction's parole eligibility classification system, separate from the criminal statutes

11    codified in Title 13.  And as Justice Beene explained in dissent in *Anderson*, "[t]he Arizona

12    Legislature conveyed its 1993 parole restrictions via a negative inference, not an

13    affirmative statement."  *Id.* at 235, 547 P.3d at 354 (citing A.R.S. § 41-1604.09(I) (1993)

14    ("This section [describing parole eligibility and classifications] applies only to persons who

15    commit felonies before January 1, 1994.").)  For many years after the enactment of § 41-

16    1604.09, trial courts continued to sentence defendants to "illegally lenient" sentences of

17    life without the possibility of parole for 25 years.  *See, e.g.*, *Chaparro v. Shinn*, 248 Ariz.

18    138, 459 P.3d 50 (2020); *Anderson*, 257 Ariz. at 229, 547 P.3d at 348.

19        Although intermediate appellate courts occasionally remarked that the possibility

20    for parole for crimes committed after 1993 had been eliminated, *see*, *e.g.*, *State v. Rosario*,

21    195 Ariz. 264, 268, 987 P.2d 226, 230 (App. 1999); *State v. Jensen*, 193 Ariz. 105, 108,

22    970 P.2d 937, 940 (App. 1998), given the controlling Arizona Supreme Court opinions in

23    *Wagner* and *Fell*, affirmatively explaining that "the legislature has concluded that the trial

24    court can appropriately exercise its discretion to determine whether future release is

25    possible (although not assured) or whether the defendant must instead spend the rest of his

26    or her life in prison," *Fell*, 210 Ariz. at 558, 115 P.3d at 598, together with the sentencing

27    statute on which those determinations were based, A.R.S. § 13-703(A), reasonable counsel

28                                                    128

performing basic research could have concluded, as the Arizona Supreme Court did in *Wagner* and *Fell*, that Morris was in fact parole or release eligible and there were no grounds for an objection.

Because the underlying claim of trial counsel ineffectiveness lacks merit, cause does not exist for the claim's default. *Runningeagle*, 825 F.3d at 982; *Atwood*, 870 F.3d at 1060. The claim therefore remains barred from federal review.

*Claim Three (B)(2)*

In the penalty phase of Morris's trial, the jurors were instructed as follows:

> You must individually determine if the totality of the mitigating circumstances is sufficiently substantial to call for leniency and a life sentence.

> The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale or the arbitrary assignment of weights to any of them. You are free to assign whatever value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances, you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstance with the totality of the mitigating circumstances.

> In reaching a reasoned, moral judgment about which penalty is justified and appropriate, you must decide how compelling or persuasive the totality of the mitigating factors is when compared against the totality of the aggravating factors.

(RT 7/18/05 at 94–95.)

Morris argues that trial counsel was ineffective for failing "to request that the jury be instructed that the cumulative effect of mitigation can be considered as a separate mitigating circumstance." (Doc. 21 at 182.)

Because the claim would be precluded if raised in a successive post-conviction petition, it is procedurally defaulted. *See* Ariz. R. Crim. P. 32.2(b); 32.1(b)–(h); *see also Spreitz*, 202 Ariz. at 2, 39 P.3d at 526 ("Our basic rule is that where ineffective assistance of counsel claims are raised, or could have been raised, in a Rule 32 post-conviction relief

1    proceeding, subsequent claims of ineffective assistance will be deemed waived and

2    precluded.").  Morris argues the default is excused under *Martinez* by the ineffective

3    assistance of PCR counsel.  (Doc. 34 at 89.)  He argues that, had PCR counsel researched

4    the law related to a jury's obligation and authority to consider mitigating evidence, she

5    would have discovered that defense counsel in Arizona had requested that jurors be

6    instructed that they could consider the cumulative effect of mitigation as an independent

7    mitigating factor.  (Doc. 34 at 92) (citing *e.g.*, *State v. Chappell*, 225 Ariz. 229, 241, 236

8    P.3d 1176, 1188 (2010)).  *Martinez* does not provide cause to excuse the procedural default

9    because, as set forth below, the claim is plainly meritless.  Additionally, Morris fails to

10   demonstrate PCR counsel performed deficiently by failing to raise this IAC claim.

11       As Morris notes, had PCR counsel researched the issue she would have discovered

12   that defense counsel in Arizona often request that the sentencer be instructed to consider

13   the cumulative effect of mitigating circumstances.  *See e.g.*, *Chappell*, 225 Ariz. at 241,

14   236 P.3d at 1188.  Morris fails to include, however, that had PCR counsel researched the

15   issue, she would also have discovered that the Arizona Supreme Court had consistently

16   rejected arguments that failure to instruct the jury to consider multiple mitigating factors

17   cumulatively is unconstitutional.  *See, e.g.*, *id.* (finding totality of mitigating circumstances

18   instruction fulfilled the purpose of Chappell's proffered cumulative mitigating instruction

19   by informing jurors that they should consider his mitigation evidence in its "totality"); *State

20   v. McCray*, 218 Ariz. 252, 262, 183 P.3d 503, 513 (2008) (rejecting argument that

21   "Arizona's death penalty statute violates the Eighth and Fourteenth Amendments . . .

22   because it does not require multiple mitigating factors to be considered cumulatively

23   . . . ."); *State v. Van Adams*, 194 Ariz. 408, 423, 984 P.2d 16, 31 (1999) (rejecting

24   defendant's argument that Arizona's sentencing statute unconstitutionally fails to require

25   cumulative consideration of multiple mitigating factors); *State v. Spreitz*, 190 Ariz. 129,

26   151, 945 P.2d 1260, 1282 (1997); (rejecting defendant's claim that "Arizona's death

27   penalty statute violates the Eighth and Fourteenth Amendments . . . because it does not

28                                           130

require multiple mitigating factors to be considered cumulatively. . . ."); *State v. Apelt*, 176 Ariz. 349, 368, 861 P.2d 634, 653 (1993) (rejecting defendant's claim that the court failed to weigh the mitigating factors as a whole).

Reasonable counsel researching this issue would have concluded there were no grounds for raising this claim in a PCR petition. Morris fails to establish that PCR counsel performed deficiently. Furthermore, as discussed below, the underlying trial counsel IAC claim is meritless.

The United States Supreme Court has never held that the "cumulative effect" of mitigation must be considered as a separate mitigating circumstance. The Supreme Court has specifically held that "[t]he absence of an instruction on the concept of mitigation and of instructions on particular statutorily defined mitigating factors did not violate the Eighth and Fourteenth Amendments to the United States Constitution." *Buchanan v. Angelone*, 522 U.S. 269, 275−77 (1998) (footnote omitted). Because Morris was not entitled to a cumulative mitigation instruction, counsel was not ineffective for failing to request one. *See James*, 24 F.3d at 27 ("Counsel's failure to make a futile motion does not constitute ineffective assistance of counsel."). PCR counsel would not be ineffective for failing to raise an ineffective assistance of counsel claim where trial counsel was not constitutionally ineffective. *Sexton*, 679 F.3d at 1157.

The Court finds plainly meritless the claim that trial counsel performed ineffectively by failing to object to the jury instruction at issue. Because the underlying claim of trial counsel ineffectiveness lacks merit, cause does not exist for the claim's default. *Runningeagle*, 825 F.3d at 982; *Atwood*, 870 F.3d at 1060. The claim therefore remains barred from federal review.

*Claim Three (B)(3)*

Morris alleges trial counsel "failed to request that the jury be instructed that mercy can be an independent mitigating circumstance," and that, as "a result, the jury was

131

1  prevented from considering all evidence relevant to the determination of whether Morris
2  should be sentenced to death." (Doc. 21 at 183.)

3          Because the claim would be precluded if raised in a successive post-conviction
4  petition, it is procedurally defaulted. *See* Ariz. R. Crim. P. 32.2(b); 32.1(b)–(h); *see also*
5  *Spreitz*, 202 Ariz. at 2, 39 P.3d at 526. Morris argues the default is excused under *Martinez*
6  by the ineffective assistance of PCR counsel. (Doc. 34 at 89.) *Martinez* does not provide
7  cause to excuse the procedural default because, as set forth below, the claim lacks merit.
8  Additionally, Morris fails to demonstrate PCR counsel performed deficiently by failing to
9  raise this IAC claim.

10          Once a determination is made that a person is eligible for the death penalty, the
11  sentencer must consider relevant mitigating evidence, allowing for "an individualized
12  determination on the basis of the character of the individual and the circumstances of the
13  crime." *Tuilaepa v. California*, 512 U.S. 967, 972 (1994). The sentencer in a capital case
14  may "not be precluded from considering, as a mitigating factor, any aspect of a defendant's
15  character or record and any of the circumstances of the offense that the defendant proffers
16  as a basis for a sentence less than death." *Eddings*, 455 U.S. at 110 (quoting *Lockett v.
17  Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion)); *see also Penry*, 492 U.S. at 328
18  ("[T]he jury must be able to consider and give effect to any mitigating evidence relevant
19  to a defendant's background and character or the circumstances of the crime."), *abrogated
20  on other grounds by Atkins v. Virginia*, 536 U.S. 304, 320 (2002))).

21          The Supreme Court has explained that "the jury must be given an effective vehicle
22  with which to weigh mitigating evidence so long as the defendant has met a 'low threshold
23  for relevance,' which is satisfied by 'evidence which tends logically to prove or disprove
24  some fact or circumstance which a fact-finder could reasonably deem to have mitigating
25  value.'" *Smith v. Texas*, 543 U.S. 37, 44 (2004) (quoting *Tennard v. Dretke*, 542 U.S. 274,
26  284–85 (2004)).

27

28                                         132

The legal standard for reviewing jury instructions that are claimed to restrict a jury's consideration of relevant mitigating evidence is "whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that prevented the consideration of constitutionally relevant evidence." *Boyde*, 494 U.S. at 380.

Morris argues that "mercy was not included in the jury instructions as a separate mitigating circumstance the jury should consider, as opposed to the lens through which the jury could consider other mitigating circumstances." (Doc. 34 at 102.) Although a "capital defendant generally must be allowed to introduce any relevant mitigating evidence regarding his character or record and any of the circumstances of the offense," *California v. Brown*, 479 U.S. 538, 541 (1987) (quotations omitted), the Supreme Court has never held that a sentencer must consider emotional or spiritual concepts such as "mercy" as independent mitigating factors.

To be sure, courts have mentioned mercy as a possible juror response to mitigating evidence. "The imperative to cast a wide net for all relevant mitigating evidence is heightened at a capital sentencing because the Constitution prohibits imposition of the death penalty without adequate consideration of factors which might evoke mercy." *Doe v. Ayers*, 782 F.3d 425, 435 (9th Cir. 2015) (citing *Frierson v. Woodford,* 463 F.3d 982, 989 (9th Cir. 2006)); *see also Kansas v. Carr*, 577 U.S. 108 (2016) ("[T]he ultimate question whether mitigating circumstances outweigh aggravating circumstances is mostly a question of 'mercy.'"). And although, as Morris contends, the Supreme Court has found that counsel's reliance "on a simple plea for mercy" under certain circumstances may constitute a reasonable strategic choice, *see Darden*, 477 U.S. at 185–87, this does not transform mercy into a constitutionally relevant mitigating fact. Mercy is not evidence that "tends to logically prove or disprove some fact or circumstance." *See Smith*, 543 U.S. at 44. "[M]ercy" cannot be proven "by any standard, nor does it relate to the character or propensities of the defendant or the circumstances of the crime. Therefore, mercy is not a mitigating circumstance. Mercy is a concept jurors may apply in evaluating the existence

133

1   of mitigating circumstances and in deciding whether the death penalty is appropriate in a

2   particular case."  *State v. Andriano*, 215 Ariz. 497, 507, 161 P.3d 540, 550 (2007),

3   *abrogated on other grounds by State v. Ferrero*, 229 Ariz. 239, 274 P.3d 509 (2012).

4        Even if mercy is properly construed as a mitigating factor, trial counsel's failure to

5   request an instruction about it did not prevent the jury's consideration of mercy.  To the

6   contrary, the court specifically instructed the jury that it was allowed to consider all

7   mitigating circumstances "which in *fairness and mercy* may be considered as extenuating

8   or reducing the degree of the defendant's culpability and the punishment to be imposed."

9   (RT 7/14/05 at 3) (emphasis added).  The jurors were further instructed that "the

10  determination of what circumstances are mitigating" is for each juror "to resolve

11  individually, based on all the evidence that has been and will be presented . . . including

12  any aspect of the defendant's character, propensities, . . . or record and any of the

13  circumstances of the offense."  (*Id.* at 3–4.)  The court instructed the jurors that their

14  weighing of aggravation and mitigation was not a "mere mechanical counting of factors,"

15  that they were required to reach "a reasoned, moral judgment about which penalty is

16  justified and appropriate," and that although they could not be "governed or influenced by

17  "mere sentiment, passion or prejudice," they could "consider grounds for leniency."  (*Id.*

18  at 8–9.)

19        The Supreme Court has also rejected the argument that the failure to include a

20  specific mitigating factor in a list of mitigating factors provided by the court necessarily

21  precludes consideration of the unenumerated factors.  In *Blystone v. Pennsylvania*, 494

22  U.S. 299, 307–08 (1990), the Court determined that the trial court's instruction that the

23  jury was allowed to consider "extreme" mental or emotional disturbance, "substantial"

24  impairment, or "extreme" duress, did not impermissibly preclude the jury's consideration

25  of lesser degrees of disturbance, impairment, or duress.  The trial court made clear that the

26  examples were merely items it could consider, and that the jury was also entitled to consider

27  "any other mitigating matter concerning the character or record of the defendant, or the

28                                              134

1    circumstances of his offense." *Id.* at 308.  This instruction, the Supreme Court held, fully

2    complied with the requirements of *Lockett and Penry*.  *Id.* at 308.

3         The jury instructions in this case permitted jurors to "accord mercy if they deem it

4    appropriate, and withhold mercy if they do not, which is what [the Supreme Court's] case

5    law is designed to achieve."  *Carr*, 577 U.S. at 119.

6         Because Morris has not shown that mercy is constitutionally relevant mitigating

7    evidence or that the penalty-phase jury instructions prevented his jury from exercising its

8    reasoned moral judgment to show him mercy, the Court finds plainly meritless the claim

9    that trial counsel performed ineffectively by failing to request a jury instruction that mercy

10   be considered as an independent mitigating circumstance.  Because the underlying claim

11   of trial counsel ineffectiveness lacks merit, cause does not exist for the claim's default.

12   *Runningeagle*, 825 F.3d at 982; *Atwood*, 870 F.3d at 1060.  The claim therefore remains

13   barred from federal review.

14   *Claim Three (B)(4)*

15        Morris alleges trial counsel failed to request that the court use special verdict forms

16   at the penalty phase that would have clarified what mitigating circumstances the jury found

17   proven.  (Doc. 21 at 184.)  As a result, he claims, the Arizona Supreme Court had no

18   findings of fact or reasoning from the jury to review in determining whether the jury abused

19   its discretion by imposing the death penalty.

20        Morris did not raise this claim in state court.  (*See id.* at 177.)  Because the claim

21   would be precluded if raised in a successive post-conviction petition, it is procedurally

22   defaulted.  *See* Ariz. R. Crim. P. 32.2(b); 32.1(b)–(h); *see also Spreitz*, 202 Ariz. at 2, 39

23   P.3d at 526.  Morris argues the default of this claim is excused under *Martinez* by the

24   ineffective assistance of PCR counsel.  (Doc. 34 at 89.)  *Martinez* does not provide cause

25   to excuse the procedural default because, as set forth below, the claim is plainly meritless.

26   Additionally, Morris fails to demonstrate PCR counsel performed deficiently by failing to

27   raise this IAC claim.

28

The Constitution does not require a capital sentencer to document its analysis of mitigating circumstances, as long as the sentencer considers all of the evidence. *See Jeffries v. Blodgett*, 5 F.3d 1180, 1197 (9th Cir. 1993) ("[D]ue process does not require that the sentencer exhaustively document its analysis of each mitigating factor as long as a reviewing federal court can discern from the record that the state court did indeed consider all mitigating evidence offered by the defendant") (citing *Parker v. Dugger*, 498 U.S. 308, 314–19 (1991)); *see also Jeffers v. Lewis*, 38 F.3d 411, 418 (9th Cir. 1994) (explaining that a defendant is not "entitled to a specific listing and discussion of each piece of mitigating evidence under federal constitutional law").

Contrary to Morris's assertion, the Arizona Supreme Court does not review the jury's findings of fact or reasoning. Rather, it reviews the jury's decision to impose the death sentence for reasonableness based on the evidence presented. *Morris*, 215 Ariz. at 341, 160 P.3d at 220. The Arizona Supreme Court has repeatedly rejected the argument that jurors should be provided with mitigation verdict forms, finding use of such a form inappropriate. *See, e.g.*, *State v. Carlson*, 237 Ariz. 381, 351 P.3d 1079, 1096 (2015) (citing *State v. Forde*, 233 Ariz. 543, 573–74, 315 P.3d 1200, 1230–31 (2014) (a special verdict form of this type would be inappropriate "because jurors 'do not have to agree unanimously that a mitigating circumstance has been proven to exist,' and '[e]ach juror may consider any mitigating circumstance found by that juror in determining the appropriate penalty.'") (quoting A.R.S. § 13-751(C)); *see also State v. Tucker*, 215 Ariz. 298, 319, 160 P.3d 177, 198 (2007); *State v. Roseberry*, 210 Ariz. 360, 373, 111 P.3d 402, 415 (2005). Therefore, counsel's failure to request such a form did not fall below prevailing professional norms.

The Arizona Supreme Court had the entire record that was before the jury when it determined that the jury did not abuse its discretion in imposing death sentences for each of the murders. *Morris*, 215 Ariz. at 341, 160 P.3d at 220. Thus, counsel was not ineffective in failing to request a form, and Morris was not prejudiced on appeal because

136

1   the reviewing court had the same record the jury considered in imposing the five death

2   sentences.

3       Because the underlying claim of trial counsel ineffectiveness is without merit, cause

4   does not exist for the claim's default. *Runningeagle*, 825 F.3d at 982; *Atwood*, 870 F.3d at

5   1060. The claim is barred from federal review.

6   Claim Three (C)

7       Morris alleges trial counsel was ineffective for failing to object to improper victim-

8   impact testimony consisting of unduly prejudicial victim statements and sentencing

9   recommendations in violation of the Eighth Amendment as held by the Supreme Court in

10  *Payne*, 501 U.S. at 830, and *Booth v. Maryland*, 482 U.S. 496, 508–09 (1987). (Doc. 21

11  at 184–86.) He asserts there is a reasonable probability that without the inflammatory

12  statements and sentencing recommendations at least one juror would have weighed the

13  aggravating and mitigating evidence differently.

14      Morris did not raise this claim in state court. (*See id.* at 184.) Because the claim

15  would be precluded if raised in a successive post-conviction petition, it is procedurally

16  defaulted. *See* Ariz. R. Crim. P. 32.2(b); 32.1(b)–(h); *see also Spreitz*, 202 Ariz. at 2, 39

17  P.3d at 526. Morris argues the default is excused under *Martinez* by the ineffective

18  assistance of PCR counsel. (Doc. 34 at 89.) *Martinez* does not provide cause to excuse

19  the procedural default because, as set forth below, the claim is plainly meritless.

20      Morris asserts that the statements made by three family members of the murder

21  victims during the penalty phase of the trial were unduly prejudicial and were "effectively

22  sentencing recommendations." (Doc. 21 at 186.) Morris cites three examples. Patina

23  Noah, Sharon Noah's mother, said:

24          . . . I haven't been to court every day, and it hasn't been because I don't care.
            . . . It's been very hard for me to sit here and . . . hear what he's done to my
25          daughter . . . . I can't bear to hear all the grisly details about how he made
            Sherri suffer. She didn't deserve this. Sherri did not deserve this.
26

27  (RT 7/14/05 at 31.) Jan Velasquez, sister of Jade Velasquez, commented:

28                                        137

I'm the oldest of three children, and I do know what Mr. Morris went through, but I haven't taken that life that he took. I took care of my little sister, and I took care of my little brother, too, and I'm also getting a bachelor's of science in nursing and bachelor's of science in social work.

Even though we grew up poor, we didn't choose the life that Mr. Morris chose. My little sister had three associate's degrees, and she was also a member of the armed forces. She didn't let anything stop her.

. . .

We went through a lot, my sister and I. We grew up without a father, too, but that didn't stop us from achieving our goals. I'm still dealing with a lot of loneliness and depression because of what you took away from me.

(*Id.* at 35–36.) G.G. Codman, Barbara Codman's sister, described the impact of receiving the news of her sister's death and having to share that news with Barbara's daughter:

I felt so completely alone that day. Our parents had both passed away. Barbara is my only sibling. I was horrified. I was -- I could not imagine what her last moments could have been like. And now I know the gory details, the disgusting details but I had no idea at that time what could have possibly happened to her, what she could have been thinking at her very last moments.

. . . [S]o the worst day by far was the day I had to tell Shawna that her mom was murdered, and there was others. I think that I've just been so concerned that she would hear these details or see any of these pictures. I have a fear that, you know, this is going to haunt her for the rest of her life. . . .

Just no human being, no sister, no child needs to ever hear what I've heard in this courtroom or seen what Cory Morris has done to my sister and what he did to her after death. It's just horrifying, and nobody should ever have to see that.

. . . I have heard what Cory Morris has done to my sister, how he preyed upon her weakness and her vulnerabilities and performed some unimaginable acts and vile acts upon her. These pictures are now in my head, and I can't erase them. I have to live with them every day of my life.

And Cory Morris, he's the one who said my sister was the pretty one. Well, what you did to my sister was not pretty, but I've brought you pictures of my sister so you could see the real Barbara. These are the pictures that I choose to look at now daily so I can remember her the way she was.

138

1    (*Id.* at 40–42.)

2        The court instructed the jury that:

3        The [murder victims' survivors] have made statements relating to the
         personal characteristics of the victims and the impact of their murders on
4        their family.  You may consider this information to the extent it may rebut
         the mitigation presented by the defendant.  You are to consider this
5        information only for this limited purpose.  You may not consider the
6        information as a new aggravating circumstance.

7    (RT 7/18/05 at 95.)  The court also instructed the jurors that they "cannot be governed or

8    influenced by mere sentiment, passion, or prejudice."  (*Id.*)

9        In *Booth*, 482 U.S. at 509, the Supreme Court held that the introduction of a victim-

10   impact statement to a capital sentencing jury violated the Eighth Amendment.  In *Payne*,

11   the Court overruled *Booth* in relevant part and held that in a penalty-phase capital trial, "if

12   the State chooses to permit the admission of victim impact evidence and prosecutorial

13   argument on that subject, the Eighth Amendment erects no per se bar."  501 U.S. at 827.

14   The Court explained that the "State has a legitimate interest in counteracting the mitigating

15   evidence which the defendant is entitled to put in, by reminding the sentencer that just as

16   the murderer should be considered as an individual, so too the victim is an individual whose

17   death represents a unique loss to society and in particular to this family."  501 U.S. at 825

18   (citation and internal quotation marks omitted).  The Court left intact *Booth*'s prohibition

19   on the admission of characterizations and opinions about the crime, the defendant, or the

20   appropriate sentence.  *Id.* at 830 n.2.  "In the event that evidence is introduced that is so

21   unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of

22   the Fourteenth Amendment provides a mechanism for relief."  *Id.* at 825 (citing *Darden*,

23   477 U.S. at 179–83).

24       Although the victims did not offer recommendations as to the appropriate sentence,

25   *Payne*, 501 U.S. at 830 n.2, the Court finds that the statements offered opinions and

26   characterizations of the crime, and, implicitly, of the defendant.  The Court further finds

27

28                                            139

1    that these comments likely fall into one of the categories that remain prohibited under

2    *Payne* and *Booth*. *See, e.g.*, *Lockett v. Trammell*, 711 F.3d 1218, 1238 (10th Cir. 2013)

3    (admission of statement describing details of the crime and speculating about the victim's

4    thoughts and feelings during the crime violated the Eighth Amendment). *But see Simmons*

5    *v. Bowersox*, 235 F.3d 1124, 1134 & n.4 (8th Cir. 2001) (penalty-phase testimony by

6    victim's family members describing in detail her thoughts and feelings during the crime

7    was "not meaningfully distinguishable from that approved by the Supreme Court in

8    *Payne*"). But even if trial counsel should have objected to the statement on the grounds

9    they were improper characterizations and opinions of the crime and of Morris, counsel's

10    performance did not prejudice Morris.

11         Given the extraordinary weight of the prosecution's aggravating case against Morris

12    and the weakness of Morris's mitigating case, as described in Claim Two (C) above, the

13    family member characterizations of the crime or Morris were unlikely to sway the jury.

14    The jury received full evidence regarding Morris's murders of five women during sexual

15    acts, that some of the victims struggled, that the victims suffered, and the grisly manner in

16    which Morris treated and discarded the victims' bodies. This graphic evidence far

17    outweighed the statements of family members quoted above. There simply is no

18    reasonable probability of a different outcome if counsel had objected to the family member

19    statements. *See Payne*, 501 U.S. at 825.

20         Any error in failing to object was also harmless because there is no evidence that

21    the testimony had "substantial and injurious effect or influence in determining the jury's

22    verdict." *Brecht*, 507 U.S. at 638 (quotation marks omitted); *see Floyd v. Filson*, 949 F.3d

23    1128, 1149 (9th Cir. 2020) (applying harmless error standard to admission of mother's

24    victim-impact statement); *Short v. Sirmons*, 472 F.3d 1177, 1193 (10th Cir. 2006) ("[T]he

25    alleged prejudicial effect of the victim-impact testimony [must be assessed] by examining

26    the aggravating and mitigating factors and the overall strength of the State's case.");

27    *Hooper v. Mullin*, 314 F.3d 1162, 1174 (10th Cir. 2002) (applying harmless error standard

28                                          140

to admission of improper victim-impact statement).  The statements by the victims were not inconsistent with, and certainly not more graphic or disturbing than, the evidence already before the jury.  *See United States v. Mitchell*, 502 F.3d 931, 990 (9th Cir. 2007) (finding no prejudice where victim's statement was "an inadmissible opinion about [the defendant's crime]," but denying relief because the comment was "brief, isolated, and could not have had more than a marginal impact on the jury.")

Further, given the trial court's instructions, the failure to object was harmless.  *See Lockett*, 711 F.3d at 1239–40 (finding error harmless where jury was correctly instructed that its sentencing decision was "limited to a moral inquiry into the culpability of the defendant, not an emotional response to the evidence"); *Welch v. Workman*, 639 F.3d 980, 997, 999 (10th Cir. 2011) (admission of unconstitutional victim-impact statements "vividly and emotionally" describing the crimes was harmless error where jury was properly instructed); *United States v. Bernard*, 299 F.3d 467, 481 (5th Cir. 2002) ("[A]ny prejudice that did result from the statements was mitigated by the district court's instructions to the jurors not to be swayed by passion, prejudice or sympathy.").

Because this claim of trial counsel ineffectiveness lacks merit, PCR counsel did not perform ineffectively in failing to raise it.  *See Atwood*, 870 F.3d at 1060; *Sexton*, 679 F.3d at 1157.  Morris cannot show "cause" under *Martinez* for the claim's default.  Claim Three (C) is procedurally defaulted and barred from federal review.

Claim Three (D)

In his Reply, Morris withdraws Claim Three (D) of the Petition, alleging trial counsel was ineffective for failing to investigate and challenge juror misconduct in a motion for new trial contending that alternate jurors improperly participated in deliberations.  (*See* Doc. 21 at 187–88; Doc. 34 at 108.)

**E.  Claim Four**

Morris alleges that counsel performed ineffectively in the pretrial stage by failing to file a motion in limine objecting to evidence purporting to demonstrate necrophilia,

141

1    Claim Four (A); by failing to investigate and challenge Morris's statements to the police

2    and by failing to explain or place the statements in context, Claims Four (B)(1)–(2); by

3    failing to seek a severance of the multiple counts of first-degree murder, Claim Four (C);

4    and by failing to make appropriate objections during voir dire, Claim Four (D). (Doc. 21

5    at 190–215.)

6         Claims Four (A), (B)(1)–(2), and (D) were not raised in state court. (*See id.* at 190,

7    195, 212.)   Because these claims would be precluded if raised in a successive post-

8    conviction petition, they are procedurally defaulted.  *See* Ariz. R. Crim. P. 32.2(b); 32.1(b)–

9    (h); *see also Spreitz*, 202 Ariz. at 2, 39 P.3d at 526.  Morris argues the default is excused

10   under *Martinez* by the ineffective assistance of PCR counsel.  (*See* Doc. 21. at 190, 195,

11   212; Doc. 34 at 108, 113, 129.)

12        *Martinez* does not provide cause to excuse the procedural default because, as set

13   forth below, the claims are plainly meritless. *See Hooper*, 985 F.3d at 627; *Atwood*, 870

14   F.3d at 1059–60; *Runningeagle*, 825 F.3d at 982.  Additionally, Morris fails to demonstrate

15   PCR counsel performed deficiently by failing to raise these IAC claims.

16   Claim Four (A)

17        Morris alleges counsel knew before trial that the prosecution would argue that

18   Morris engaged in necrophilia but failed to file a motion in limine under Arizona Rules of

19   Evidence 404(b) and 403 to preclude the evidence and argument.  (Doc. 21 at 191.)

20        Under Rule 404(b) of the Arizona Rules of Evidence,

21        A defendant's prior bad acts are not admissible "to show action in conformity
          therewith," but can be used to prove "motive, opportunity, intent,
22        preparation, plan, knowledge, identity, or absence of mistake or accident."
          Ariz. R. Evid. 404(b).  Although the jury must ultimately determine whether
23        the other act is proved, "before admitting evidence of prior bad acts, trial
          judges must find that there is clear and convincing proof both as to the
24        commission of the other bad act and that the defendant committed the act."
25        *State v. Terrazas,* 189 Ariz. 580, 582, 944 P.2d 1194, 1196 (1997).  Even if
          the trial judge concludes that the prior act is shown by clear and convincing
26        evidence, the judge must also (1) find that the act is offered for a proper
27

28                                              142

purpose under Rule 404(b); (2) find that the prior act is relevant to prove that purpose; (3) find that any probative value is not substantially outweighed by unfair prejudice; and (4) give upon request an appropriate limiting instruction. *Id.* at 583, 944 P.2d at 1197.

*State v. Anthony*, 218 Ariz. 439, 444, 189 P.3d 366, 371 (2008).

Morris asserts counsel should have argued that there was not clear and convincing evidence to support the allegation that necrophilia had occurred and that the evidence to support the theory—Morris's semen in the vaginas of victims Velasquez and Noah, skin slippage on victims Codman, Davis, and Noah, and anal defects on victim Castillo (the "necrophilia evidence")—therefore could not be admitted under Rule 404(b). (Doc. 21 at 193) (citing *Anthony*, 218 Ariz. at 444–45, 189 P.3d at 371–72).

It was apparent that the prosecutor intended to introduce the necrophilia evidence to support the State's theory that Morris killed the women for the purpose of having sex with their bodies. During opening statements in the guilt phase, the prosecutor argued that Morris killed for his own sexual gratification and kept the bodies because of the smell of rot and decomposition and for the purpose of sexually gratifying himself. (RT 6/13/05 at 38–39.) During the trial, out of the jury's presence, the prosecutor maintained that it was the State's theory that "the defendant killed these women so that . . . once they were dead, he could have sex with them," and supported this assertion by describing the "necrophilia evidence." (RT 6/20/05 at 78–80.) During closing arguments, the prosecutor argued more specifically that Morris kept the bodies because he wanted to and did have sex with them, claiming "[t]hat's the whole reason why he's killing. . . ." (RT 7/05/05 at 39; *see also* RT 07/5/05 at 37–39; RT 7/5/05 at 123–24.)

In determining whether "other act" evidence can be admitted for a purpose other than propensity under Rule 404(b), the "appropriate question . . . is whether there was clear and convincing evidence," not merely a possible inference, that Morris committed necrophilia. *Anthony*, 218 Ariz. at 445, 189 P.3d at 372. Although the Arizona Supreme

143

Court found the evidence established a "reasonable inference" that Morris "engaged in intercourse with the corpses of the victims," the court also concluded that "the evidence in this case does not compel the conclusion that Morris engaged in intercourse with the corpses of the victims." It is likely, therefore, that a Rule 404(b) objection, based on the lack of clear and convincing evidence, would have been sustained at the guilt phase.

Even if counsel performed deficiently by failing to argue that there was no clear and convincing evidence of necrophilia, there is no reasonable probability of a different outcome. *See Allen*, 395 F.3d at 999 ("[E]ven if counsel's conduct was arguably deficient, in light of the overwhelming evidence of guilt, [the petitioner] cannot establish prejudice"); *Albert Johnson*, 114 F.3d at 839–40 (explaining that the "potential prejudicial effect of counsel's deficient performance must be evaluated in light of" the strength of the State's case); *Harden*, 846 F.2d at 1232 (finding no *Strickland* prejudice where there was overwhelming evidence of guilt); *see also Strickland*, 466 U.S. at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.").

Even without evidence of necrophilia, the evidence of Morris's guilt was still overwhelming. The conclusion that he killed the victims while having sex with them was supported by the evidence introduced at trial, including his own statements to the police. (*See* ROA 491 at 4) (finding overwhelming evidence of defendant's guilt of five murders); *Morris*, 215 Ariz. at 339, 160 P.3d at 218 (finding evidence of Morris's guilt overwhelming).

The same is true during the aggravation phase of trial—there is no reasonable probability of a different outcome. *See Harden*, 846 F.2d at 1232 (finding no *Strickland* prejudice where there was overwhelming evidence of guilt). Absent the evidence of necrophilia, the evidence establishing the "especially cruel" aggravating factor was still overwhelming. (*See* ROA 491 at 4) (finding overwhelming evidence of the cruelty of each of these murders). As recounted by the Arizona Supreme Court, "the State presented

144

1    overwhelming evidence of cruelty.  The medical examiner testified that all of the victims

2    would have experienced pain for some period before losing consciousness.  Moreover, the

3    evidence suggests that at least three of the victims struggled with Morris before losing

4    consciousness: Morris's DNA was under Davis's fingernails, Noah's fingernails were

5    broken, and the side of Velasquez's face was bruised." *Morris*, 215 Ariz. at 338, 160 P.3d

6    at 217.

7        During the penalty phase, "[t]he Rules of Evidence do not apply[.]" *State v. Burns*,

8    237 Ariz. 1, 28, 344 P.3d 303, 330 (2015).  This means Rule 404(b) does not apply.  *State*

9    *v. Sanders*, 245 Ariz. 113, 133, 425 P.3d 1056, 1076 (2018).  In *State v. Martinez*, 218

10   Ariz. 421, 431, 189 P.3d 348, 358 (2008), the Arizona Supreme Court rejected the

11   argument that evidence of a prior bad act should be excluded from the penalty phase under

12   Rule 404(b).  The court cited A.R.S. § 13-703(C), which provides that "the prosecution . . .

13   may present any information that is relevant to any of the mitigating circumstances . . .

14   regardless of its admissibility under the rules governing admission of evidence at criminal

15   trials." *Id.* at 431, 189 P.3d at 358 n.11.  Because the evidence was admissible during the

16   penalty phase, counsel's failure to object did not constitute ineffective assistance.  *See Rupe*

17   *v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) ("[T]he failure to take a futile action can never

18   be deficient performance."); *James*, 24 F.3d at 27 ("[F]ailure to make a futile motion does

19   not constitute ineffective assistance of counsel.").

20       Moreover, as discussed above in Claim Two (C), even if counsel had managed to

21   suppress the allegations of necrophilia, this would do very little to diminish the strength of

22   the aggravating factors, especially the multiple murders.  The mitigating circumstances

23   presented by Morris would have remained relatively weak.

24        In conclusion, counsel did not perform deficiently by failing to object to the

25   necrophilia evidence during trial.  And because trial counsel did not perform ineffectively,

26   PCR counsel did not perform ineffectively by failing to raise this claim.  *See Atwood*, 870

27

28                                                    145

1    F.3d at 1060; *Sexton*, 679 F.3d at 1157.   Morris therefore cannot show "cause" under

2    *Martinez* for the claim's default.  Claim Four (A) is therefore denied.

3    Claim Four (B)

4          Morris alleges counsel was ineffective for failing to challenge the admissibility and

5    reliability of Morris's statement to police.  (Doc. 21 at 195–207.)  Morris asserts he was

6    prejudiced by counsel's performance at all stages of trial because the statement was used

7    to show both that he had committed the murders and that he engaged in necrophilia.  (*Id.*

8    at 202, 206–07.)

9    *Additional Background*

10         Phoenix Police Detectives Hutson and Barnes contacted Morris at his place of

11   employment, a local bar, on April 12, 2003, at approximately 4:15 p.m.  (RT 6/15/05 at

12   65–66.)  Morris agreed to speak with the detectives and was taken to the police station.

13   (*Id.* at 68; RT 6/16/05 at 26.)  At the police station, Hutson placed Morris in an interview

14   room and advised him of his *Miranda* rights by reading to him from a card.  (RT 6/16/05

15   at 27, 29–31; *see also* Trial Ex. 385; PCR Pet. Ex. O at Bates No. 470.)[36]  Morris indicated

16   he understood his rights and proceeded to answer questions.  (PCR Pet. Ex. O at Bates No.

17   470.)

18   _____

19         [36] The videotape was broken up into sections that were played for the jury and
admitted as separate exhibits.  (*See* ROA 180; RT 6/16/05 at 31 (Trial Ex. 366), 33–34
20   (Trial Ex. 367), 38 (Trial Ex. 369), 39 (Trial Ex. 368), 40 (Trial Ex. 370), 41 (Trial Ex.
380), 43 (Trial Ex. 381), 44 (Trial Ex. 371), 46 (Trial Ex. 372), 47 (Trial Ex. 373), 53 (Trial
21   Ex. 374); RT 06/20/05 at 8 (Trial Ex. 375), 10 (Trial Ex. 376, 378), 12 (Trial Ex. 379), 14
22   (Trial Ex. 377).  After the first few sections were played, counsel lodged an objection to
skipping around and viewing "bits and pieces," and requested that the entire tape be played
23   except for the sections that had been previously ruled irrelevant and prejudicial.  (RT
24   6/16/05 at 35.)  The court indicated that, during the recess, counsel could identify any
additional portions that he believed needed to be played.  (*Id.* at 37.)  During the recess,
25   the court observed that counsel had been tracking the tape as it went along, and asked
26   counsel if he felt anything had been left out that should have been included.  (*Id.* at 42.)
Counsel indicated it was difficult to track, but he would "get it through cross-examination
27   and if I have to play the whole tape in one sequence."  (*Id.*)

28                                          146

The interrogation, which was audio and video taped, started around 5:20 p.m. and lasted about three and one-half hours.  (*See* RT 06/16/05 at 28–29, 31; RT 6/20/05 at 12; *see also* Trial Ex. 382 (lodged at Doc. 35-1).)  Hutson testified that he had no gun or weapon drawn, and never threatened physical violence against Morris, promised him anything if he would speak, or indicated that some sort of benefit would come to him if he spoke to the detective.  (RT 6/16/05 at 32.)  Morris never indicated he was uncomfortable or in personal distress, never requested food or to use the restroom, and never expressed a desire to stop the interview.  (RT 6/16/05 at 33; RT 6/20/05 at 22–23; RT 6/29/05 at 90– 92.)  Hutson provided Morris with water, a slice of pizza, and took "probably three breaks during that period."  (RT 6/20/05 at 12–13.)

During the interview, Morris described each of his encounters with the victims.

> Morris admitted to knowing the five victims and provided two versions of each victim's death.  In the first version, he claimed that each victim died of a drug overdose while he was away from the camper.  After discussing all five victims, the detective conducting the interview told Morris that he did not believe him.[37]  Morris then stated that each victim asked him to choke her during sex and that each accidentally died as a result of this conduct.

*Morris*, 215 Ariz. at 329, 160 P.3d at 208; (*see also* PCR Pet. Ex. O at Bates No. 489–545, 555–59, 561–86).  Morris was arrested at the end of the interview.  (PCR Pet. Ex. O at Bates No. 617.)

At a case management conference on January 21, 2005, the prosecutor informed the trial court that it was going to ask for a voluntariness hearing on Morris's statement.  (RT 1/21/05 at 8.)  The trial court indicated that if the parties stipulated, it would rule on the motion based on the court's review of the videotape.  (*Id.* at 9.)  The parties agreed and the hearing was calendared.  (*Id.*)  On the date set for the hearing, the prosecutor told the trial

---

[37] The entire conversation "that took place between the time that [Morris] first told [Hutson] about what happened and then the second version" of events was read into the trial transcript during the state's redirect examination of Hutson.  (RT 6/29/05 at 111; *see also id.* at 92–111.)

1    court that there was a voluntariness hearing issue, but it would "go quick" and the parties

2    "can even submit it on the transcript." (RT 05/20/05 at 4.) Defense counsel agreed and

3    said, "We won't need an evidentiary hearing on that, I don't believe, Judge." (*Id.*)

4          After the jurors were sworn in and prior to opening statements, the prosecutor

5    informed the trial court that he was "going to attempt to use the defendant's statement."

6    (RT 6/13/05 at 37–38.) The trial court indicated that it had reviewed the statement and

7    didn't "see any issues." (*Id.* at 38.) Defense counsel indicated there was "one minor issue"

8    he wanted to put on the record. (*Id.*) Counsel stated that before Morris gave his second

9    version of events, he was asked if he wanted something to eat and he responded, "no, I'll

10   wait until I get back to the bar." (*Id.*) Counsel argued that when the police said "Okay,

11   that's fine," they effectively gave Morris an inducement, when in fact they knew Morris

12   was not going to be leaving. (*Id.*) The trial judge indicated that he had reviewed the

13   statement and did not see any voluntariness issues. (*Id.*)

14   *Claim Four (B)(1)*

15         Morris claims that counsel performed deficiently by agreeing the trial court could

16   determine, without an evidentiary hearing, whether Morris's statement was voluntary

17   (Doc. 21 at 200), and by failing to unambiguously object to the statement's admission or

18   argue for its suppression (*id.* at 201). Morris asserts that had defense counsel developed

19   and presented expert testimony regarding the effects that Morris's mental and physical

20   condition had on his suggestibility, it was reasonably likely that his statement would have

21   been suppressed. (*Id.* at 201.)

22         Morris claims that he had not slept much the night before the interview, that he had

23   donated plasma that day, and that he suffered brain damage that affected his processing

24   speed and verbal comprehension. (*Id.* at 198–202.) He further alleges that Hutson "put

25   extreme pressure on Morris to adopt certain responses, used suggestive questioning and

26   subtle coercion, and made implied promises to Morris." (*Id.* at 199.)

27

28                                              148

1    Morris's claim fails, first, because counsel did unambiguously challenge Morris's

2    statement on the grounds that it was induced by a promise. (*See* RT 6/13/05 at 38.)  More

3    significantly, as determined by the trial court, the statement was voluntary.  Counsel,

4    therefore, did not perform deficiently by failing to "unambiguously" object to the statement

5    or argue for its suppression.

6    "The admission of an involuntary or coerced confession violates a defendant's right

7    to due process under the Fourteenth Amendment." *Reno v. Davis*, 46 F.4th 821, 836 (9th

8    Cir. 2022) (citing *Jackson v. Denno*, 378 U.S. 368, 385–86 (1964)).  "A confession is

9    involuntary if a defendant's 'will was overborne' or if the confession was not 'the product

10   of a rational intellect and a free will.'"  *Id.*  (quoting *Townsend v. Sain*, 372 U.S. 293, 307

11   (1963)).  "In determining whether a statement is voluntary, the court looks at the

12   surrounding circumstances and the combined effect of the entire course of the officer's

13   conduct upon the defendant." *Pollard v. Galaza*, 290 F.3d 1030, 1033 (9th Cir. 2002)

14   (citing *United States v. Polanco,* 93 F.3d 555, 560 (9th Cir. 1996)).  "[E]vidence of

15   'coercive police activity is a necessary predicate to the finding that a confession is not

16   'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment.'"

17   *Reno*, 46 F.4th at 836 (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)).

18   To determine whether a confession was voluntary, courts consider the totality of

19   circumstances, including but not limited to, length, location, and continuity of the

20   interrogation; the suspect's age and maturity, education, and physical conditions such as

21   deprivation of sleep or food; mental conditions, such as intelligence; and whether the

22   suspect was advised of his *Miranda* rights. *See Schneckloth v. Bustamonte*, 412 U.S. 218,

23   226 (1973); *Withrow v. Williams*, 507 U.S. 680, 693–94 (1993).

24   Morris asserts there were "numerous indicators" that his statement to Hutson was

25   involuntary, including his physical condition, susceptibility to suggestion, and Hutson's

26

27

28                                                    149

use of deceptive tactics.  (Doc. 21 at 198, 288–96.)[38]  Morris also asserts it was evident from the circumstances of the interview that he did not understand his *Miranda* rights or was relinquishing those rights.  (*Id.* at 199.)  The Court disagrees.  Looking "at the surrounding circumstances and the combined effect of the entire course of the officer's conduct upon the defendant," *Pollard*, 290 F.3d at 1033, the Court finds Morris's statement was voluntary.

The record does not demonstrate any error in advising Morris of his *Miranda* rights or that Morris did not understand them.  Morris asserts that he was sleep deprived and dehydrated from donating plasma, and that his fragile condition rendered him unable to understand the "quick recitation" of his *Miranda* rights or that he was relinquishing those rights. (Doc. 21 at 290–91.) Contrary to Morris's assertion, however, there was nothing "quick" about the *Miranda* recitation.  Before advising Morris, Hutson placed the *Miranda* warnings in the context of the television show "Cops," which Morris indicated he had just watched the day before, explaining to him that it is "just like on tv" and then proceeded to read the *Miranda* rights from a card.  (*Id.* at 470; RT 6/16/05 at 29–30.)  When asked if he understood the *Miranda* rights, Morris indicated "yes, sir."  (PCR Pet. Ex. O at Bates No. 470.)

The totality of circumstances evident from the record also do not suggest that Morris's will was overborne by his "fragile physical condition."  Morris, a twenty-four-year-old high school graduate, was not handcuffed or restrained.  He was given food and water.  He never asked to use the restroom or take a break.  His answers were composed and responsive.  While Hutson "pressed him hard to tell a different story" (Doc. 21 at 196), pointing out that "there's no chance" five women just overdosed in Morris's camper (PCR

---

[38] Morris references the allegations set forth in Claim Nineteen to support this assertion. (*See* Doc. 21 at 288–96.)

Pet. O at Bates No. 558–59), he did not physically or psychologically intimidate, threaten, badger, or otherwise undermine Morris's ability to exercise his free will.

There is no reasonable probability of a different outcome if the defense team researched and presented evidence that Morris suffered from brain damage. A suspect's age or low IQ does not render a confession involuntary absent the predicate of coercive police conduct. *Connelly*, 479 U.S. at 164; *see, e.g.*, *Thompson v. Runnels*, 705 F.3d 1089, 1097 (9th Cir. 2013) ("Although Thompson argues that he was more susceptible to the officers' tactics because he was only eighteen and had a learning disability, the state court reasonably concluded that the record does not reveal such youthfulness and low intelligence that Thompson would have been unusually vulnerable to the inspectors' tactics.") (internal quotations omitted); *see also Clark v. Mitchell*, 425 F.3d 270, 283–84 (6th Cir. 2005) (collecting cases where courts have found that defendants, despite their mental retardation or low IQ, voluntarily waived their *Miranda* rights). There was no coercive police conduct in Morris's case.

Even assuming Morris was brain damaged, the record belies Morris's argument that his mental and physical conditions rendered him highly suggestible. Before agreeing with Hutson's suggestion that the victims "wanted to do something strange" (PCR Pet. O at Bates No. 561), Morris rejected the first story Hutson offered to explain the murders by suggesting the women might "piss [Morris] off" because they smoked drugs in his camper (*id.* at Bates No. 559), something Morris explained was a show of "disrespect" (*Id.* at Bates No. 554). Morris also remained adamant that he was not responsible for the choking or strangling deaths of two additional women despite Hutson's suggestion they died under similar circumstances:

Hutson: You said you didn't recognize her. I, I think you do.

Morris: Actually I don't. Because . . .

Hutson: Well I think you do.

. . .

1    Morris: Truthfully sir, I do not know her.

2    (*Id.* at Bates No. 549–50; *see also id.* at 591–97, 613–14.)

3    Nor was the discussion about food misleading.  When Hutson first offered to bring
4    Morris food, Morris said "I'll eat when I get back to the bar," and Hutson replied "All
5    right."  (PCR Pet. Ex. O at Bates No. 548.)  Later, when Hutson commented that he was
6    hungry and would like to think his boss would order some pizza, Morris agreed he was also
7    "a little hungry," but "I can eat when I get back to the bar." (*Id.* at Bates No. 549.)  Hutson
8    responded, "Uhm, you know, I appreciate you talking to me and ah, I, and, I'm sure you
9    feel a little better about it. The fact that you're talking . . . ." (*Id.* at Bates No. 549.)
10   Although Hutson did not correct Morris's belief that he would be returning to the bar, his
11   responses were not an implied or express promise of a tangible benefit.  *See e.g.*, *United*
12   *States v. Leon Guerrero*, 847 F.2d 1363, 1367 (9th Cir. 1988) (statement that defendant's
13   cooperation would be taken into consideration did not render statement involuntary where
14   no promise was made of a tangible benefit, for example, no promise of "no prosecution,
15   reduced charges, or a recommendation of a lenient sentence."); *United States v. McCowan*,
16   (Report and Recommendation) CR 17-00839-TUC-CKJ (EJM), 2018 WL 1026784, * 17
17   (D. Ariz. Feb. 02, 2018) (finding no tangible benefit promised where agent did not tell
18   defendant she would go home or would not be charged with a crime if she cooperated with
19   law enforcement, despite agent telling defendant she definitely would not get to go home
20   today if she did not talk with him), *adopted by* (Order) 2019 WL 993756 (D. Ariz. Feb. 21,
21   2018).

22   Nor has Morris alleged any police misconduct amounting to coercion.  Morris
23   asserts Hutson constrained Morris's response to his questioning to two alternatives,
24   knowing Morris would be less likely to reject both scenarios.  (Doc. 21 at 292–93) (citing
25   PCR Pet. O at Bates No. 560) (stating Morris could choose door number one, that he
26   provided the victims with drugs, or door number two, that the victims wanted Morris to
27   restrict their airways because they enjoyed it)  Even if the detective's suggestion could be

152

considered a "strategic deception," "[p]loys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns." *Illinois v. Perkins*, 496 U.S. 292, 297 (1990); *see also Pollard*, 290 F.3d at 1034 ("[M]isrepresentations made by law enforcement in obtaining a statement, while reprehensible, does not necessarily constitute coercive conduct.") Because Morris has failed to offer any evidence of "coercion, undue influence, or overreaching by the police at the time he made the statements," the Court concludes that the statements were not "involuntary" within the meaning of the Due Process Clause. *See Connelly*, 479 U.S. at 157, 163–67.

The circumstances of Morris's interview contrast sharply with cases where coercion has been found. *See*, *e.g.*, *Arizona v. Fulminante*, 499 U.S. 279, 287–88 (1991) (finding that government informant's promise to protect defendant from a credible threat of violence rendered confession involuntary); *Mincey v. Arizona*, 437 U.S. 385, 398–99 (1978) (finding confession involuntary where defendant had been seriously wounded a few hours earlier, was "depressed almost to the point of a coma," was in an intensive care unit, complained of "unbearable" pain, gave incoherent answers, declined to answer questions without a lawyer, and was questioned while lying in a hospital bed); *Rodriguez v. McDonald*, 872 F.3d 908, 924 (9th Cir. 2017) (finding police coercion where police officers suggested to defendant that he would be imminently charged with murder but that cooperation would result in more lenient treatment from the court).

Because there is no evidence that the statements were in fact involuntary, counsel's decision not to request a voluntariness hearing, present expert testimony regarding Morris's suggestibility, or "unambiguously" object to the use of the statements did not prejudice Morris. *See Clabourne v. Lewis*, 64 F.3d 1373, 1379 (9th Cir. 1995) (finding no ineffective assistance in failing to present evidence of effects of medication on voluntariness where defendant could point to no coercive police activity).

1   *Claim Four (B)(2)*

2      Morris alleges defense counsel was ineffective for failing to investigate and present

3   grounds on which to challenge the reliability of his statement to the police.  (Doc. 21 at

4   202–07.)  Morris claims that trial counsel should have done more to discount his second

5   story to police by educating the jury in the opening statement about the pressures of

6   custodial police interrogations, objecting to the prosecutor's use of only discrete sections

7   of the videotaped interview, playing the entire tape for the jury, and presenting expert

8   testimony regarding police interrogations to show that Morris was particularly suggestible

9   and gave his second version of events as a result of Hutson's deceptive tactics.  (*Id.* at 205–

10  06.)  Morris asserts that because the second version of events was the key piece of evidence

11  against him, there is a reasonable likelihood that the outcome of every stage of Morris's

12  trial would have been different if counsel had explained the evidence and undermined its

13  reliability.  (*Id.* at 207.)

14     Contrary to Morris's assertion, trial counsel did attempt to "discount Morris's

15  second story to police" during his cross-examination of the medical examiners and Hutson,

16  as the following testimony demonstrates.  Dr. Horn testified on cross-examination that

17  Castillo's autopsy revealed no evidence of trauma and no cause of death and that

18  toxicology results demonstrated evidence of cocaine and alcohol use.  (RT 6/15/05 at 98–

19  101.)  Dr. Horn further testified that a person's susceptibility to cocaine can't be predicted,

20  as it "can be fatal by having a cardiovascular reaction."  (*Id.* at 100.)  Dr. Hu testified on

21  cross-examination that the petechial hemorrhaging observed in his examination of

22  Codman's body, which was consistent with strangulation, could also be caused by

23  decomposition.  (RT 6/28/05 at 49–50.)  Additionally, Dr. Hu testified that the bulging of

24  eyes and tongue he observed can be caused by postmortem gas formation and

25  decompositional change.  (*Id.* at 50.)

26     Counsel also elicited from Dr. Hu that there was no evidence of significant trauma

27  or strangulation on Codman's body, but there was evidence of toxic levels of drugs.

28                                          154

1    Counsel further focused on how Dr. Hu amended his report to change Codman's cause of

2    death from combined drug toxicity to ligature strangulation only after hearing Morris's

3    statement to police.    (*Id.* at 51–60.)    Dr. Shvarts testified that although petechial

4    hemorrhages, like those in Velasquez's right eye, were consistent with strangulation, they

5    were not "exclusive to strangulation," and his autopsy report indicated that a contributing

6    cause of death was drug intoxication.  (RT 6/29/05 at 24–29.)

7         Although Dr. Keen had testified that Noah died from a ligature strangulation

8    resulting in asphyxia, during cross examination defense counsel directed the juror's

9    attention to the drugs that were found in Noah's system. (RT 6/27/05 at 108, 116–19.)  Dr.

10   Horn testified that, based on Davis's autopsy, he could not conclude that a homicide had

11   occurred, and the only cause of death supported by his examination, standing alone, was

12   cocaine intoxication.  (RT 6/26/05 at 47–48.)

13        In closing argument, consistent with his cross-examination of the medical

14   examiners, trial counsel argued that the victims died of accidental drug overdoses.  (RT

15   7/5/05 at 99–113; *see id.* at 104–05 ("[T]he strangulation theory is contrary to the physical

16   findings in those bodies, and cocaine intoxication is absolutely consistent with the physical

17   findings in those bodies.")).

18        Defense counsel also objected to the prosecutor's piecemeal presentation of the

19   videotaped interview, arguing he should be allowed to play the entire tape at once, in

20   context. (RT 6/16/05 at 35.)  The court disagreed, stating it was "not going to make [the

21   prosecutor] play the entire tape if he doesn't intend to," but would let defense counsel play

22   any additional portions that he thought needed to be played.  (*Id.* at 36–37.)

23        On cross-examination, defense counsel placed Morris's statement in context by

24   questioning Hutson about portions of the videotape that weren't played for the jury.  (RT

25   6/29/05 at 66–75, 79–87.)  Defense counsel clarified, through questioning of Hutson, that

26   the discussion did not occur in the same order in which the jury heard the videotape.  (*See*

27   RT 06/29/05 at 72) ("[Defense counsel]:  Now, when you had your discussion with

28                                          155

[Morris], you didn't have it in the same order as the videotapes that were played, did you?
. . . [Hutson]:  Correct.").  Defense counsel confirmed that Morris first described the death
of each of the five victims by overdose before describing how he strangled or choked them.
(*Id.* at 80.)  Counsel also confirmed there was additional conversation in the intervening
period between Morris's first and second description of events and that, during that time,
Hutson suggested to Morris that something other than drug ingestion had happened,
specifically, that something was placed over the victim's faces.  (*Id.* at 81–83.)  On redirect,
the entire conversation that occurred between each version of events was read to the jury.
(*Id.* at 92–110.)

During closing argument, defense counsel questioned Hutson's interrogation
technique, describing Morris as "rather naïve," providing the example of Morris stating he
would eat when he got back to the bar.  (RT 7/05/05 at 100.)  Counsel highlighted the way
Hutson questioned Morris—disagreeing with Morris's denial that he placed something
over their heads, and giving him only two options for what happened:

> [D]oor number one and door number two, . . . and door number two was
> something had to be placed around their neck.

> People - - some people like that. Don't make a face. Remember that portion
> of the reading? Don't make a face. People do like that. They like to be
> strangled.  It gets them high while they're doing drugs.  All of that was what
> was said to Cory.

> [Morris] then tells the detectives that he strangled them, and if you listen
> carefully to the tapes, and if you put it together with what the medical
> examiner says, his story about strangulation is more inconsistent with what
> the medical examiner said than the cocaine, which is what he told them first.
> But he was told, That can't be it. We're not going to accept that one. No, no,
> no, no, no.

(*Id.* at 100-01.)  Counsel argued that when Morris's version of events was not accepted by
Hutson, Morris gave them "another statement consistent with what he had been told, and
what he had been told, there was damage to the neck.  They were choked.  People like to
do this sort of thing."  (*Id.* at 112.)

156

Thus, contrary to Morris' assertion, counsel did attempt to undermine the reliability of Morris's second statement to the police through questioning of the medical examiners and in his argument to the jury. Additionally, because there is no significant evidence that the statements were the result of the pressures of custodial police interrogation or deception or that Morris was particularly suggestible, trial counsel did not perform deficiently by failing to show that Morris's second story was unreliable.

As discussed in Claim Four (B)(1), and as evident from viewing the videotape and reading the transcript in its entirety, Hutson did not compel, coerce, or deceive Morris to obtain the second story. Rather, after Morris gave his first version of events of how each woman died, Hutson expressed his disbelief that five women died of an overdose in Morris's camper and opined that, if Morris picked up five women who all died of drug overdoses in his camper, he was the "unluckiest guy in the world" because there was just "no chance." (PCR Pet. Ex. O at Bates No. 558.) Hutson also stated that the women did "not have enough dope to overdose," and that the medical examiner would be looking at the victims' appearance, especially their necks and skin tissue, and that Morris needed to tell him what really happened. (*Id.* at Bates No. 560.) Hutson then offered Morris two scenarios of what might have happened, that Morris gave the women drugs to go with him to his camper or that they brought their own drugs but wanted Morris to do "something really weird" because it enhanced their sexual pleasure. After this, Morris, not Hutson, provided the details of each killing.

For example, Morris stated that Castillo initially told him to put a blanket over her head and then told him to wrap his necktie around her neck and ride her like a horse. (*Id.* at 561–62.) Morris's second story regarding the necktie—a fact that was not suggested by Hutson—matched the evidence. Castillo was found severely decomposed on the floor of Morris's camper with a necktie around her neck. (RT 6/15/05 at 97.) Morris provided additional details regarding each strangulation that had not been suggested by Hutson, and some of which were contrary to what Hutson suggested. (*See* PCR Pet. O at Bates No.

157

1   520, 568–70) (disagreeing with Hutson that Noah was strangled with a rope); (*id.* at Bates

2   No. 581) (explaining he used his hands to choke Velasquez, contradicting Hutson that

3   something similar to Noah had happened with Velasquez).  Morris has not shown that any

4   further attempt by trial counsel to discount his second story would have changed the

5   outcome, and has not shown ineffective assistance.  *See Rupe*, 93 F.3d at 1445 ("[T]he

6   failure to take a futile action can never be deficient performance").

7           *Conclusion*

8           Because the underlying claims of trial counsel ineffectiveness are without merit,

9   PCR counsel did not perform ineffectively in failing to raise these claims.  *See Atwood*,

10  870 F.3d at 1060; *Sexton*, 679 F.3d at 1157.  Claims Four (B)(1) and (2) are barred from

11  federal review.

12  Claim Four (C)

13          Morris alleges trial counsel was ineffective for failing to seek a severance of the five

14  counts of first-degree murder.  (Doc 21 at 207–12.)  Morris raised this claim in his PCR

15  petition, asserting trial counsel was ineffective for failing to move to sever the murder

16  counts under Rule 404(b) of the Arizona Rules of Evidence and in violation of Morris's

17  constitutional right to a fair trial and due process.  (ROA 307 at 47–54.)

18          The PCR court denied Morris's IAC claim, finding the offenses properly joined

19  under Rule 13.3(a)(1) of the Arizona Rules of Criminal Procedure because the offenses

20  were "of the same or similar character."  (ROA 354 at 8.)  The court further found

21  severance unavailable under Rule 13.4(b) because "evidence of the other offenses would

22  be admissible under applicable rules of evidence if the offenses were tried separately."

23  (*Id.*)  The court explained:

24          All five offenses involved a female prostitute or transient who was strangled
            while having sex with defendant, and whose body was found in the vicinity
25          of defendant's yard over a period of a few months.  Defendant claimed in his
            statements to police that the deaths were either a mistake or accidental.  Thus,
26          the other offenses would have been admissible at separate trials as proof of

27

28                                              158

mistake or accident. Defendant has not shown that counsel was deficient for failing to move for severance or that he was prejudiced by all five counts being tried together.

(*Id.*) The Arizona Supreme Court denied review without comment. (PR 27.)

Morris asserts the state court's rejection of this claim was contrary to or involved an unreasonable application of clearly established federal law, and constituted an unreasonable determination of the facts in light of the evidence presented. (Doc. 21 at 207.)

To be entitled to relief from counsel's failure to move for severance, Morris must show both that the motion would have been granted and that he was prejudiced by the unsevered trial. *See United States v. Rodriguez–Ramirez,* 777 F.2d 454, 458 (9th Cir. 1985) (no ineffective assistance of counsel when defendant failed to show severance motion "could have been granted" and he "suffered prejudice as a result of the unsevered trial").

Under Arizona law, two or more offenses may be joined in an indictment if they "[a]re of the same or similar character." Ariz. R. Crim. P. 13.3(a)(1). But a defendant is entitled to severance if, as here, the offenses are joined only because they are of the same or similar character, "unless evidence of the other offense[s] . . . would be admissible under applicable rules of evidence if the offenses were tried separately." Ariz. R. Crim. P. 13.4(b); *see also State v. Ives,* 187 Ariz. 102, 106, 927 P.2d 762, 766 (1996) ("[A]nalysis of Rule 13.3(a)(1) is related in part to Rule 404(b), Ariz. R. Evid.; if a defendant's motion to sever is denied and joinder was based only on the similarity between the offenses, defendant only has a remedy if the prior act evidence would not have been admissible under Rule 404(b).")

Morris argues that the PCR court, in finding the offenses similar under Rule 13.3(a)(1), "painted the offenses in broad strokes and overlooked and ignored evidence of the offenses' dissimilarity to one another," and made an unreasonable determination of facts based on the evidence before the court. (Doc. 21 at 210.) Morris points to the fact

159

that, unlike the other four victims, Velasquez was found clothed; only two victims had Morris's semen in their vaginas; the autopsy report for Codman and Davis originally listed their causes of death as drug overdoses; and two other persons had previously been suspected of Codman's murder.  (*Id.*) (citations omitted).  While these facts demonstrate differences in some of the details surrounding the offenses, reasonable minds could agree with the state court's determination that the offenses were sufficiently similar for purposes of joinder under Rule 13.3(a)(1): similarity in victims (prostitutes or transients), where the victim's bodies were found (in or near Morris's camper), the cause of death (strangling or asphyxiation), and the relatively short seven-month period in which the five killings occurred (September 2002 to April 2003).  The state court factual finding that the offenses were the similar is not unreasonable.  *See State v. Stuard*, 176 Ariz. 589, 596, 863 P.2d 881, 888 (1993) ("The facts make it quite apparent that the charges were 'of the same or similar character.'  Each involved an attack and beating of an elderly woman living alone; each involved infliction of similar injuries."); *see also Ayala*, 829 F.3d at 1094 ("A state court's factual findings are unreasonable if 'reasonable minds reviewing the record' could not agree with them.").

Morris clams that it was unreasonable for the state court, with no basis, to conclude that he would claim the second version of events to be true at trial – that the women asked him to strangle them and they died by accident.  (Doc. 21 at 211.)  Because the first version of events was "ultimately the defense's theory of the case," Morris argues, the evidence of the other offenses should not have been admitted because the defense did not argue mistake or accident at trial.  (*Id.*) (citing RT 7/05/05 at 99–113).  Morris relies on the Arizona Supreme Court's decision in *State v. Ives*, 187 Ariz. 102, 927 P.2d 762 (1996), to support this position.

In *Ives*, the court held that, "[u]nless there is some discernible issue as to defendant's intent (beyond the fact that the crime charged requires specific intent), the state may not introduce evidence of prior bad acts as part of some generalized need to prove intent in

160

1    every case." *Ives*, 187 at 110, 927 P.2d at 770.  In *Ives*, the defendant was charged with

2    multiple counts of child molestation and "denied ever having touched any of the girls in a

3    sexual manner." *Id.* at 109, 927 P.2d at 769.  The court explained that, even "a cursory

4    reading of the record . . . indicates that the issue in this case was whether the defendant

5    committed the acts at all, not what his state of mind was when he committed them."[39]  *Id.*

6    at 110, 927 P.2d at 770.  If intent is not at issue, and no other valid 404(b) grounds exist,"

7    the court explained, it failed "to see why propensity evidence is permissible in specific

8    intent cases but not those involving general intent crimes." *Ives*, 187 Ariz. at 110, 927 P.2d

9    at 770.

10        In this case, however, Morris did not make an opening statement or articulate his

11    theory of defense until closing arguments.  Unlike Ives, who "steadfastly maintain[ed] that

12    he simply did not commit any of the criminal acts in question," leaving "no issue as to

13    intent and no danger of shifting defense theories to justify the admission of the prior bad

14    acts," *Ives*, 187 Ariz. at 110, 927 P.2d at 771, Morris did not take a clear position on his

15    defense before or even at the start of trial.  As Morris himself asserts, he "ultimately"

16    adopted the first version of events during closing arguments.  (*See* Doc. 21 at 198.)  *See*,

17    *e.g.*, *State v. Harmon*, No. 1 CA-CR 12-0091, 2013 WL 4080760, at *5 (Ariz. Ct. App.

─────────────────────────

19    [39] In *Ives*, the Arizona Supreme Court noted that while courts are split on the issue

20    of whether a defendant may remove intent as an issue by a blanket denial of participation

21    in a criminal act, it was adopting the approach taken by the Second Circuit Court of Appeals

      in *United States v. Colon*, 880 F.2d 650, 657 (2nd Cir. 1989).  In *Colon*, the Second Circuit

22    "recognized a distinction between defense theories that claim that the defendant did not do

      the charged act at all, and those that claim that the defendant did the act innocently or

23    mistakenly, with only the latter truly raising a disputed issue of intent." *Id.* (quoting *Colon*,

24    880 F.2d at 657).  The Arizona Supreme Court emphasized that in *Colon*, the court held

      that "to take [the intent issue] out of a case, a defendant must make some statement to the

25    court of sufficient clarity to indicate that the issue will not be disputed," noting that the

      circumstances in *Colon* were sufficient to show that the defendant's theory of the case was

26    "an offer to stipulate intent out of the case." *Id.* (quoting *Colon*, 880 F.2d at 659).  Here,

27    there was no such offer by Morris to stipulate intent out of the case, nor does the record

      demonstrate circumstances equivalent to such an offer.

28                                         161

1   Aug. 13, 2013) (distinguishing *Ives* and finding the potential for "shifting defense theories"
2   due to the defendant's disclosure of "a variety of defenses," including lack of intent, and
3   the failure to disclose a defense of complete denial.").  Because Morris's defense was not
4   clear, admitting evidence of the five murders to rebut any claim of mistake or accident
5   would not have been error.

6          Furthermore, Morris's first version of events also involved mistake or accident.  He
7   claimed each of the victims died in his trailer from an accidental drug overdose after he
8   had sex with them.  The occurrence of five similar deaths, in his trailer, in a seven-month
9   period would certainly be relevant to rebut this claim of mistake or accident.  The chances
10  that five separate women died from accidental drug overdoses after sex with Morris in his
11  trailer are vanishingly small.  *See e.g., Lee*, 189 Ariz. at 599, 944 P.2d at 1213 (finding
12  defendant's statements describing the details of each of two murders relevant to the other
13  because the "unlikeliness" of defendant's claim that he was forced on two separate
14  occasions to shoot his robbery victims because they attacked him "tends to show that
15  neither shooting was accidental."); *see also Hernandez,* 7 Ariz. App. at 203, 437 P.2d at
16  955 (reasoning that one incident "may have been accidental would be a likely possibility,
17  but that two such instances were coincidental is substantially less likely") *abrogated on*
18  *other grounds by State v. Harvill*, 106 Ariz. 386, 391, 476 P.2d 841, 846 (1970).

19         Finally, Morris alleges the PCR court did not address his argument that defense
20  counsel should have moved for severance under Rule 13.4(a), which provides for severance
21  when it is "necessary to promote a fair determination of the guilt or innocence of any
22  defendant of any offense."  (Doc. 21 at 198) (citing ROA 307 at 48).  The PCR court's
23  cross-admissibility holding, however, forecloses any argument that joinder would render
24  Morris's trial fundamentally unfair.  *See Walden v. Shinn*, 990 F.3d 1183, 1197 (9th Cir.
25  2021) (holding petitioner's argument that joinder of counts rendered his trial fundamentally
26  unfair foreclosed by Arizona Supreme Court's holding that each of the counts would have
27  been admissible in separate trials); *Sandoval v. Calderon*, 241 F.3d 765, 772 (9th Cir. 2000)

28                                          162

1    (holding evidence of separate killings, which would have been cross-admissible in separate

2    trials to establish the State's allegations of multiple murder special circumstances, "dispels

3    the prejudicial impact of joining all counts in the same trial.").

4         Morris has not established a violation of *Strickland* based on counsel's failure to

5    move for severance.  He has failed to show the request would have been granted.  The PCR

6    court's finding that trial counsel was not ineffective was both a reasonable application of

7    *Strickland* and a reasonable determination of the facts, and Morris is not entitled to habeas

8    relief.  Claim Four (C) is denied.

9    <u>Claim Four (D)</u>

10        Morris claims trial counsel was ineffective for failing to make appropriate

11   objections during voir dire.  (Doc. 21 at 212–15.)  He alleges four biased jurors were seated,

12   thereby demonstrating prejudice as a result of defense counsel's failure to challenge them

13   for cause.  (*Id.* at 213; Doc. 34 at 131–32.)  Morris also claims that counsel was ineffective

14   for failing to object to the *Batson*[40] violation he alleges in Claim Seventeen.  (*Id.* at 214.)

15        Under *Strickland*, "the defendant must show that counsel's representation fell below

16   an objective standard of reasonableness."  466 U.S. at 688.  "The conduct of voir dire 'will

17   in most instances involve the exercise of a judgment which should be left to competent

18   defense counsel.'"  *Hovey v. Ayers*, 458 F.3d 892, 909–10 (9th Cir. 2006) (finding no

19   deficient performance in counsel's failure to question jurors about their reactions to pretrial

20   publicity) (quoting *Gustave v. United States*, 627 F.2d 901, 906 (9th Cir. 1980)); *see also*

21   *Wilson v. Henry*, 185 F.3d 986, 991 (9th Cir. 1999) (holding there was no ineffective

22   assistance where counsel relied on jurors' statements that they would be fair and follow the

23   law without asking about their views on criminal history).  The Court "need not decide

24   whether counsel's performance was deficient before determining whether any prejudice

25

26   ────────────────

27        [40] *Batson v. Kentucky*, 476 U.S. 79 (1986).

28                                          163

1    was suffered by the defendant because of the alleged errors." *Wilson*, 185 F.3d at 988

2    (citing *Strickland*, 466 U.S. at 697).

3          Establishing *Strickland* prejudice in the context of juror selection requires a

4    showing that, as a result of trial counsel's failure to challenge the seating of the jurors, "the

5    jury panel contained at least one juror who was biased." *Davis v. Woodford*, 384 F.3d 628,

6    643 (9th Cir. 2004) (citing *United States v. Quintero–Barraza*, 78 F.3d 1344, 1349 (9th

7    Cir.1995)).  "A juror is biased if he or she has 'such fixed opinions that [he or she] could

8    not judge impartially the guilt of the defendant.'"  *Dickey*, 69 F.4th at 647 (quoting

9    *Quintero-Barraza*, 78 F.3d at 1349).

10         In *Witherspoon v. Illinois*, 391 U.S. 510 (1968), the Supreme Court "set forth the

11   rule for juror disqualification in capital cases." *White v. Wheeler*, 577 U.S. 73, 77 (2015).

12   Capital defendants are entitled to a jury not "uncommonly willing to condemn a man to

13   die." *Witherspoon*, 391 U.S. at 521.   The Supreme Court "with equal clarity has

14   acknowledged the State's 'strong interest in having jurors who are able to apply capital

15   punishment within the framework state law prescribes.'" *Wheeler*, 577 U.S. at 77 (quoting

16   *Uttech v. Brown*, 551 U.S. 1, 9 (2007)).  A juror may be excused for cause only if he or she

17   is "substantially impaired in his or her ability to impose the death penalty under the state-

18   law framework." *Uttecht*, 551 U.S. at 9 (citing *Wainwright v. Witt*, 469 U.S. 412, 424

19   (1985)).  A juror may be excused for cause "where the trial judge is left with the definite

20   impression that a prospective juror would be unable to faithfully and impartially apply the

21   law." *Witt*, 469 U.S. at 425–26.  "A juror who will automatically vote for the death penalty

22   in every case will fail in good faith to consider the evidence of aggravating and mitigating

23   circumstances as the instructions require him to do." *Morgan v. Illinois*, 504 U.S. 719, 729

24   (1992).

25         Morris contends that counsel should have moved to strike five jurors for cause:

26   Panelist 27, who was not seated on the jury, and K.N., C.J., A.L., and A.M., who were

27   seated  (*Id.* at 213.)  The Court need not address Panelist 27.  *See Ross v. Oklahoma*, 487

28                                              164

U.S. 81, 88 (1988) ("So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated.).

Each of the seated jurors stated they "would be willing to follow the law as instructed by the judge, whether or not [they] personally agree[d] with [it]." (ROA 107, Jury Questionnaire, Panelist 19 at 20 (A.M.); ROA 108, Jury Questionnaire, Panelist 22 at 20 (K.N.); ROA 110, Jury Questionnaire, Panelist 41 at 20 (A.L.); ROA 110, Jury Questionnaire, Panelist 49 at 20 (C.J.)). Trial counsel's reliance on these statements "merits deference as a tactical decision." *Wilson*, 185 F.3d at 991 (citing *Strickland*, 466 U.S. at 689).

Moreover, Morris has also not established that the seated jurors were predisposed to convict or impose death, or that they were otherwise impartial or biased. Morris alleges counsel should have moved to strike two jurors for cause, K.N. and C.J., because they indicated disagreement with the law that limits aggravating circumstances to a specified set of factors. (Doc. 21 at 214) (citing RT 6/06/05 at 147; RT 6/08/05 at 16–17).

K.N and C.J. noted they disagreed with the law as described by the following statement in the jury questionnaire:

> The law allows only a very few and very specific aggravating factors to be used, if proven beyond a reasonable doubt and not overcome by mitigation, to support the state's request for a death sentence. No other fact or detail about the case or the person accused may be considered as [an] aggravating factor.

(ROA 108, Jury Questionnaire, Panelist 22 at 17; ROA 110, Jury Questionnaire, Panelist 49 at 17.) K.N. and C.J. both indicated they could follow this law even if they disagreed with it. (ROA 108, Jury Questionnaire, Panelist 22 at 17; ROA 110, Jury Questionnaire, Panelist 49 at 17.)

In discussing her disagreement with the statement during voir dire, K.N. stated:

165

> I think every case is probably different from each one. Every one is unique, and I don't think that we have come across everything that can possibly be mitigating or aggravating factor. And so until I would see all the evidence, I don't agree with that law.

(RT 6/6/05 at 147.) After defense counsel informed K.N. that she was correct regarding mitigating evidence, but that the law requires consideration of only specific aggravating factors, K.N. confirmed that she could follow the law. (*Id.* at 147–48.) K.N. also agreed that she could "keep an open mind throughout the proceedings, listen to the evidence . . . and then consider everything that is presented . . . without going in with a preconceived notion that this is appropriate or that is appropriate." (*Id.* at 145–46.)

Juror C.J. explained her negative response to the statement regarding aggravating factors in the jury questionnaire, stating that "[i]t would be nice to know if defendant has a past of violence or other factors." (*See* ROA 110, Jury Questionnaire, Panelist 49 at 18.) Defense counsel explored this topic with her during voir dire, explaining that "there are only very few and very specific things that the State can allege and must prove before a case can be considered a capital case and must prove it to the jury beyond a reasonable doubt." (RT 6/08/05 at 16.) C.J. explained her answer to the question:

> I'm not really sure when I filled that out I really understood the difference of aggravating and mitigating, but my interpretation was . . . often you hear the jury doesn't find out until after the fact that there have been previous crimes . . . and it would be nice if, as a juror, you knew previous crimes that the defendant . . . had committed.

(*Id.* at 16–17.) C.J. confirmed that if she were told that "only certain things can make a particular murder qualify as a capital case for the very reason that a jury is not to consider some things that it might think is important because the law says they are not," she would follow the law and would have no "nagging concern in the back of [her] mind there must be something else [she] could consider here because they're not telling us everything[.]" (*Id.* at 17.)

1      Morris has not established that Jurors K.N. or C.J. held fixed views on the death

2  penalty or on Morris's guilt.  *See Davis*, 384 F.3d at 643 (finding no actual or implied bias

3  where jurors answers to voir dire questions demonstrate they did not hold fixed views on

4  the death penalty or on defendant's guilt).  Neither of the juror's explanations regarding

5  their disagreement with the law limiting the use of aggravating circumstances to a "very

6  few and very specific aggravating factors" leaves the impression that they "would be

7  unable to faithfully and impartially apply the law."  *Witt*, 469 U.S. at 425–26.  Both jurors

8  indicated in their responses to the jury questionnaire and during voir dire that they could

9  "lay aside [their] impression[s] or opinion[s] and render a verdict based on the evidence

10  presented in court."  *Irvin v. Dowd*, 366 U.S. 717, 722–23 (1961).

11      Morris alleges Juror A.L. (Panelist 41) should have been struck for cause because

12  she knew Dr. Keen on a professional basis.  (Doc. 21 at 214) (citing RT 06/07/05 at 138,

13  140).  A.L. noted in her questionnaire that she recognized the names of Dr. Phillip Keen

14  and Dr. Mark Fischione, with the Maricopa County Medical Examiner's Office ("OME"),

15  because she "worked indirectly" with the OME while "processing donations for Science

16  Care Anatomical," where she was a customer service manager for their research donor

17  program.  (ROA 110, Jury Questionnaire, Panelist 41 at 5, 13.)  A.L. explained that the

18  "OME had to determine or sign off [cause of death] on death certificates."  (*Id.* at 13.)

19  During voir dire, Juror A.L. further explained that she did not have contact with Dr. Keen

20  personally, only on a professional basis while working with the donor program "to use their

21  services for finalizing cause of death."  (RT 06/07/05 at 140.)

22      In *Tinsley v. Borg*, the Ninth Circuit cautioned against "formulating categories of

23  relationships which bar jurors from serving in certain types of trials," but nonetheless found

24  instructive an examination of the types of relationships where other courts had "grappled

25  with the issue of implied bias."  895 F.2d 520, 527–28 (9th Cir. 1990).  The court noted

26  that implied bias has been found (1) "where the juror is apprised of such prejudicial

27  information about the defendant that the court deems it highly unlikely that he can exercise

28                                                      167

1    independent judgment even if the juror states he will," *id.* at 528; (2) "where a juror or his

2    close relatives have been personally involved in a situation involving a similar fact

3    pattern," *id.* (citations omitted); and (3) "where it is revealed 'that the juror is an actual

4    employee of the prosecuting agency, that the juror is a close relative of one of the

5    participants in the trial or the criminal transaction, or that the juror was a witness or

6    somehow involved in the criminal transaction,'" *id.* (citing *Phillips*, 455 U.S. at 222 (J.

7    O'Connor, concurring)).  Implied bias may also be found when "the relationship between

8    a prospective juror and some aspect of the litigation is such that it is highly unlikely that

9    the average person could remain impartial in his deliberations under the circumstances,"

10   *Fields*, 503 F.3d at 770 (internal quotation marks omitted), or when the juror has

11   "materially and repeatedly" lied to stay on the panel for any reason, even if not done

12   vindictively, *Dyer v. Calderon*, 151 F.3d 970, 983 (9th Cir. 1998) (en banc).

13           With these kinds of disqualifying relationships in mind,  Morris has not shown A.L.

14   was actually or impliedly biased based on her familiarity with Dr. Keen.  A.L's professional

15   knowledge of Dr. Keen does not establish such a close relationship with the litigation that

16   it is highly unlikely she could remain impartial.

17           Morris also suggests that A.L. was biased because she opined that the death penalty

18   is imposed "too seldom" and "should be enforced more often."  (ROA 110, Jury

19   Questionnaire, Panelist 41 at 16.)  A.L. also noted, however, that a life sentence without

20   possibility of parole was "somewhat appropriate—depending on the circumstances," and

21   that if she believed life was the appropriate sentence, she would be able to enter such a

22   verdict, and was willing to accept and follow the law as instructed by the judge.  (ROA

23   110, Jury Questionnaire, Panelist 41 at 17, 20.)  During voir dire, A.L. confirmed she would

24   be willing to follow the judge's instructions and impose the death penalty based only on

25   the facts and circumstance of the case and could put aside her belief that the death penalty

26   is imposed too seldom.  (RT 06/07/05 at 138.)  These affirmations clarified any ambiguity

27   in the questionnaire answers and dispelled any notion that A.L. was biased.  *See Bible v.*

28                                              168

1   *Schriro*, 497 F. Supp. 2d 991, 1018 (D. Ariz. 2007) ("To the extent that the answers on a
2   juror's questionnaire were ambiguous or inconsistent, such difficulties were resolved or
3   offset by the juror's unequivocal, affirmative responses to direct inquiries into his . . .
4   ability to serve fairly and impartially.").

5       These circumstances are not so "extraordinary" that a finding of implied bias is
6   warranted. *Dyer*, 151 F.3d at 981; *see also Tinsley*, 895 F.2d at 527–28; *United States v.*
7   *Mitchell*, 568 F.3d 1147, 1151 (9th Cir. 2009) (cautioning that courts should presume juror
8   bias only in "extreme" situations).

9       Finally, Morris alleges that juror A.M. heard about the case on the news and knew
10  the names of two of the officers involved in the case and explained there were more people
11  on the list he might know, although not by name.  (Doc. 21 at 214) (citing RT 6/06/05 at
12  127, 133–34).  A.M. indicated he knew two officers from the Phoenix Police Department,
13  Officer Steven Butler and Sergeant Michael Smallman.  (ROA 107, Jury Questionnaire,
14  Panelist 19 at 11.)  A.M. recognized Sergeant Smallman's name from a television show,
15  but did not know him, and Officer Butler's name was "familiar," and he believed he met
16  him once doing a repair on his patrol car, but did not remember what he looked like.  (*Id.*
17  at 13.)  A.M. worked as a mechanic at the precinct where the police officers brought their
18  cars for service.  (RT 06/06/05 at 130.)  As with juror A.L., A.M's relationships with the
19  two named officers, and possibly others, is not  so "extraordinary" that a finding of implied
20  bias is warranted.  *Dyer*, 151 F.3d at 981; *see also Tinsley*, 895 F.2d at 527–28; *Mitchell*,
21  568 F.3d at 1151.

22      Nor is A.M.'s exposure to news of the case indicative of bias.  During voir dire,
23  A.M. related that he had heard that "some guy," a "DJ somewhere nearby at a club," "had
24  been suspected of killing some women in a camper," and was "maybe even suspected of
25  dropping off bodies" in the area.  (RT 6/06/05 at 127.)  "[J]uror *impartiality*," the Supreme
26  Court has explained, "does not require *ignorance*."  *Skilling v. United States*, 561 U.S. 358,
27  380–81 (2010); *see also Irvin,* 366 U.S. at 722 (jurors are not required to be "totally

28                                    169

1    ignorant of the facts and issues involved"; "scarcely any of those best qualified to serve as

2    jurors will not have formed some impression or opinion as to the merits of the case.");

3    *Reynolds v. United States,* 98 U.S. 145, 155–156 (1879) ("[E]very case of public interest

4    is almost, as a matter of necessity, brought to the attention of all the intelligent people in

5    the vicinity, and scarcely any one can be found among those best fitted for jurors who has

6    not read or heard of it, and who has not some impression or some opinion in respect to its

7    merits.")).

8        "A presumption of prejudice . . . attends only the extreme case." *Skilling*, 561 U.S.

9    at 381.  "Even where a prospective juror displays some prior knowledge of the facts and

10   issues involved in a case, it is his [or her] ability to 'lay aside his [or her] impression or

11   opinion and render a verdict based on the evidence presented in court' that is crucial."

12   *Hayes v. Ayers*, 632 F.3d 500, 511 (9th Cir. 2011) (quoting *Irvin*, 366 U.S. at 723).  It is

13   sufficient if the juror can lay aside his impression or opinion and render a verdict based on

14   the evidence.

15       Counsel's decision not to move to strike A.M. based on his exposure to news of

16   Morris's case was not ineffective.  A.M. avowed that he could follow the law, that he would

17   base his decision on the facts and circumstances of the case, that he would consider and

18   give weight to mitigating circumstances, that he could vote for life if he felt it was the

19   appropriate verdict, that he could put aside everything he had heard and decide the case

20   only on what was presented, and that there was nothing about his involvement in fixing the

21   police officer's cars or in talking to the officers that would sway him for or against the

22   officers when they testified.  (ROA 107, Jury Questionnaire, Panelist 19 at 17–18; RT

23   6/06/05 at 128, 131.)

24       In conclusion, Morris has not established that counsel was ineffective for failing to

25   move to strike jurors K.N., C.J., A.L., or A.M. for cause.  *See Wilson*, 185 F.3d at 991 ("At

26   voir dire, all jurors stated that they would be fair and would follow the law as instructed.

27   Counsel's choice to rely on such a commitment, . . .  merits deference as a tactical

28                                               170

decision." (citing *Strickland*, 466 U.S. at 689). Additionally, Morris has not established that K.N., C.J., A.L., or A.M. were predisposed to convict or impose death, or were otherwise not impartial. Accordingly, trial counsel was not ineffective in failing to strike these jurors for cause. Because trial counsel did not perform ineffectively, PCR counsel did not perform ineffectively in failing to raise this claim. *See Atwood*, 870 F.3d at 1060; *Sexton*, 679 F.3d at 1157. Morris therefore cannot show "cause" under *Martinez* for the claim's default. Claim Four (D) alleging juror bias is denied.

Morris alleges counsel performed deficiently by failing to object to the *Batson* violation he outlines in Claim Seventeen. (*See* Doc. 21 at 214.) Claim Seventeen alleges that the prosecutor's use of a peremptory strike to remove a blind juror was a violation of *Batson*, which held that the discriminatory use of peremptory challenges based on a prospective juror's race violated the Equal Protection Clause of the Fourteenth Amendment. (Doc. 21 at 184) (citing *Batson*, 476 U.S. at 96–98).

Morris alleged this IAC claim only in passing, relying exclusively on his arguments in Claim Seventeen to support his allegation that a *Batson* violation occurred. Morris's failure to allege trial counsel's deficient performance or prejudice with any specificity at all is fatal to the claim. *See Murtishaw*, 255 F.3d at 939 ("The defendant bears the heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy."); *Allen*, 395 F.3d at 1000 ("[The petitioner] bears the highly demanding and heavy burden [of] establishing actual prejudice.") In any event, the claim is meritless.

Classifications based on race and gender receive heightened review or scrutiny. *In City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440–41 (1985). "A member of a class entitled to heightened scrutiny . . . receives protection under the rule established in *Batson*." *United States v. Watson*, 483 F.3d 828, 831 (2007). The Supreme Court held that the Equal Protection Clause forbids a prosecutor from challenging potential jurors based solely on their race. *Batson*, 476 U.S. at 89. The Court extended its holding to strikes based on gender in *J.E.B. v. Alabama ex. rel. T.B.*, 511 U.S. 127, 131 (1994).

This heightened scrutiny has not been applied to the disabled. *See id* ("[W]hat differentiates sex from such non-suspect statuses as intelligence or physical disability, and aligns it with the recognized suspect criteria, is that the sex characteristic frequently bears no relation to ability to perform or contribute to society."); *see also United States v. Watson*, 483 F.3d 828, 831 (D.C. Cir. 2007) ("Disability . . . has been accorded no heightened scrutiny by the Supreme Court.") (citing *Cleburne Living Ctr., Inc.*, 473 U.S.at 442–46) (declining to treat intellectual disability as a suspect class because, unlike race and gender, "mental retardation is a characteristic that the government may legitimately take into account in a wide range of decisions.").

Morris acknowledges that the Supreme Court has not explicitly extended its holding to jurors excluded on the basis of disability, but he asserts that the holding in *Tennessee v. Lane*, 541 U.S. 509, 522–23 (2004) – that "classifications based on disability violate" the Fourteenth Amendment if "they lack a rational relationship to a legitimate governmental purpose" – forms the basis for extending *Batson* to claims that jurors were excluded on the basis of disability.  (Doc. 21 at 284.)  Morris claims the Seventh Circuit entertained such a challenge to a peremptory challenge against a disabled juror, reviewing the challenge under rational basis review.   (Doc. 21 at 284) (citing *United States v. Harris*, 197 F.3d 870, 876 (7th Cir. 1999)).  But this Court is aware of no other federal court that has extended *Batson* to a prospective juror's disability.  *See United States v. Watson* 483 F.3d 828, 829 (D.C. Cir. 2007).  Moreover, such an expansion is not likely to be forthcoming.  The Supreme Court has stated that "[p]arties may . . . exercise their peremptory challenges to remove from the venire any group or class of individuals normally subject to 'rational basis' review."  511 U.S. at 143; *accord United States v. Santiago–Martinez,* 58 F.3d 422, 423 (9th Cir. 1995) (holding *Batson* challenge does not apply to prohibit peremptory strikes on the basis of obesity, even though obese persons are recognized as a class under the Americans with Disabilities Act); *see also Dixon v. Rackley*, No. 114CV01149AWIMJSHC, 2017 WL 1380547, at *89 (E.D. Cal. Apr. 17, 2017) (We have

172

1    been unable to find any case directly holding that the physically disabled are a cognizable

2    class for *Batson* . . . purposes.")  While the Seventh Circuit's decision in *Harris* may

3    support an argument for the extension of *Batson*, "the reasonableness standard does not

4    require counsel to predict changes in the law." *Leeds*, 75 F.4th at 1018–19; *see also*

5    *Sophanthavong v. Palmateer*, 378 F.3d 859, 870 (9th Cir. 2004) ("*Strickland* does not

6    mandate prescience, only objectively reasonable advice under prevailing professional

7    norms.").  Therefore, trial counsel was not ineffective for failing to argue the novel legal

8    theory that *Batson* should be extended to claims that jurors were excluded on the basis of

9    disability.

10    Additionally, establishing *Strickland* prejudice requires Morris to demonstrate "a

11    reasonable probability he would have prevailed on a [*Batson*] claim." *Carrera v. Ayers*,

12    699 F.3d 1104, 1108 (9th Cir. 2012) (assessing prisoner's habeas claim for ineffective

13    assistance of counsel for an alleged failure to make a *Wheeler* objection, the California

14    equivalent of a *Batson* challenge).  Morris has not made such a showing here.

15    Lastly, even applying "cumulative error principles" as Morris advocates (*see*

16    Doc. 21 at 215), Morris is not entitled to habeas relief because where, as here, "there are

17    no errors, there is no need to consider their cumulative effect." *McGill*, 16 F.4th at 685

18    (9th Cir. 2021).  Claims Four (A) through (D) are denied.

19    **F.  Claim Five**

20    Morris alleges that counsel performed ineffectively in the guilt phase of trial by

21    failing to hire a pathologist to rebut the prosecution's theory of the cause of death for

22    Codman, Davis, and Velasquez, Claim Five (A); by failing to object to Confrontation

23    Clause violations, Claim Five (B); by failing to move for acquittal on the ground that the

24    State failed to establish the corpus delicti of Codman and Davis, Claim Five (C); and by

25    failing to object to the standard of proof at both the guilt and aggravation phases, Claim

26    Five (D).  (Doc. 21 at 215–224.)

27

28                                           173

Morris asserts Claim Five (A) was raised in his postconviction petition, but the PCR court did not rule on the claim. (*Id.* at 216) (citing ROA 307 at 25–33). Respondents disagree, asserting the pathologist's report on cause of death was offered in the PCR petition only on whether the victims suffered, in support of the State's allegation of the (F)(6) aggravating factor, and whether Morris had post-mortem intercourse with the victims. (Doc. 27 at 121–22.) Morris counters that he fairly presented the claim to the PCR court by arguing, under the heading "Defense Lawyer's Failure to Investigate and Develop a Defense Regarding the Victims' Deaths," that "[u]pon review of Dr. [David] Posey's report, it is clear that the defense could have refuted critical aspects of the State's case during both the *guilt phase*, and the penalty phase, which would have affected the verdict." (ROA 307 at 25–26 (emphasis added).)[41]

_____

[41] Morris also alleged in his PCR petition that:

[W]ith "a high degree of medical certainty," Ms. Codman's cause of death was "combined toxicity of morphine and cocaine," not asphyxia.

(ROA 307 at 27) (citing Posey Orig. Rpt. at 3, 13).

[Morris's] trial team's failure to present a qualified expert [to explain Davis could have died from drug intoxication and there was no physical evidence of any asphyxia or strangulation] to the jury clearly harmed his defense against the State's unchallenged claims concerning Ms. Davis's cause of death.

(*Id.* at 29) (citing Posey Orig. Rpt. at 14).

In [Dr. Posey's] report, he explains that, in determining the cause of death [with respect to Velasquez], no consideration should have been given to the other decedents, and any amendment to the initial opinion should only be based on solid evidence as to the cause of death. . . [and that Velasquez] could have either died from asphyxia or drug intoxication.

(*Id.* at 29–30) (citing Posey Orig. Rpt. at 4, 15).

174

Even if these allegations were sufficient to fairly present the claim to the PCR court, Morris failed to fully exhaust the claim by alerting the Arizona Supreme Court of it in his petition for review. (*See* PR 7 at 3–5, Issues for Review). In Arizona, fair presentation of a federal habeas claim in state court requires capital petitioners to present their allegations not only to the PCR court but also to the Arizona Supreme Court. *See O'Sullivan*, 526 U.S. at 848; *Swoopes v. Sublett*, 196 F.3d 1008 (9th Cir. 1999) (per curiam) (explaining that capital petitioners must seek review in Arizona Supreme Court to exhaust claims). "[T]he mere submission of a relevant affidavit to a state court is not sufficient to place that court on notice of all potential constitutional challenges stemming from that affidavit." *Gulbrandson*, 738 F.3d at 993. Additionally, in the context of IAC claims, each unrelated allegation of counsel's ineffectiveness is generally considered a separate claim for purposes of exhaustion. *Id.*, 738 F.3d at 992 (citing *Moormann v. Schriro*, 426 F.3d 1044, 1056 (9th Cir. 2005)). Thus, Morris's presentation of Dr. Posey's report to the Arizona Supreme Court in the context of unrelated IAC claims does not render this claim exhausted. *See id.*

The Court finds Claim Five (A) unexhausted and Morris concedes that Claims Five (B)–(D) were not raised in state court. (*See id.* at 219, 221, 223.) Because these claims would be precluded if raised in a successive post-conviction petition, they are procedurally defaulted. *See* Ariz. R. Crim. P. 32.2(b); 32.1(b)–(h); *see also Spreitz*, 202 Ariz. at 2, 39 P.3d at 526. Morris argues the default of these claims is excused under *Martinez* by the ineffective assistance of PCR counsel. (*See* Doc. 21 at 219–21, 223; Doc. 34 at 134–35, 137–38, 140–41.)

The Court's analysis will focus on whether PCR counsel's failure to raise the claims was prejudicial; that is, whether there was a reasonable probability of a different outcome during the PCR proceedings if counsel had raised the claims. To make that determination, the court evaluates the strength of the underlying claims of ineffective assistance of trial counsel. *See Hooper*, 985 F.3d at 627; *Atwood*, 870 F.3d at 1059–60; *Runningeagle*, 825 F.3d at 982.

175

1    <u>Claim Five (A)</u>

2          Morris alleges trial counsel was ineffective at the guilt phase for failing to hire a

3    pathologist to rebut evidence that the cause of death for Codman, Davis, and Velasquez

4    was strangulation or asphyxiation.  (Doc. 21 at 216–19.)  Morris asserts that the defense's

5    theory was that the victims died from drug overdoses, but trial counsel put on no evidence

6    to support that theory.  (Doc. 21 at 219.)  He further asserts that counsel recognized the

7    case turned on medical expertise, and there was no reasonable strategy that would have

8    supported the decision not to hire a pathologist.  (*Id.*)  Morris alleges that expert testimony

9    would have undermined the case that these three victims were in fact murdered.  (*Id.* at

10   217.)

11         Upon reviewing the expert testimony offered by Morris during his PCR

12   proceedings, the Court concludes that Claim Five (A) is plainly meritless because even if

13   counsel performed deficiently by failing to present an expert opinion regarding the cause

14   of death of these three victims, there is not a reasonable probability that it would have

15   changed the guilty verdicts.

16   *Codman and Davis*

17         Dr. Hu testified at trial that the state of decomposition of Codman's body prevented

18   him from being able to fully examine the neck area.  (RT 06/28/05 at 29.)  The examination

19   he was able to conduct revealed no trauma that could assist him in determining the cause

20   of death, but toxicology screening showed the presence of alcohol, morphine, and cocaine.

21   (RT 6/28/05 at 29, 34.)

22         Prior to being provided with Morris's statement to the police, Dr. Hu's opinion was

23   that Codman's death was caused by the combined toxicity of morphine and cocaine and

24   the manner of death was undetermined.  (*Id*. at 41.)  Dr. Hu explained that there were

25   suspicious circumstances surrounding the death, and thus he reported the manner of death

26   as undetermined.  (*Id.* at 41–42.)  Because he was nonetheless required to report what he

27

28                                              176

thought caused Codman's death, he reported drug overdose as the most likely cause. (*Id.* at 41–42.)

After reviewing a transcript of Morris's statement to the police, Dr. Hu determined Codman's cause of death was most likely asphyxia due to ligature strangulation. *Morris*, 215 Ariz. at 330, 160 P.3d at 209. Dr. Hu stated that Codman's head, which was more decomposed than the rest of her body, was not an indication of, but was consistent with, strangulation. (RT 6/28/05 at 33–34.) On cross-examination, Dr. Hu agreed that although there was no physical evidence of strangulation, there was "good circumstantial" evidence, and his autopsy findings were not inconsistent with strangulation. (*Id.* at 60.)

Dr. Horn testified similarly regarding Davis; his examination was limited by decompositional changes, but there was "no gross evidence of trauma on the body." (RT 6/29/05 at 36–37.) Prior to toxicological screening, Dr. Horn stated he "pended" the cause of Davis's death while waiting for the outcome of further testing or investigation. (*Id.* at 39.) The screening revealed cocaine in Davis's spleen, indicating that "some time before her death, she used cocaine." (*Id.* at 37–38.) Dr. Horn certified Davis's death as "drug intoxication with an undetermined manner . . . because [he] could not determine, because of the decomposition, whether she had also been traumatized or not." (*Id.* at 40.) Dr. Horn explained that she might have been a "drug dump," but that he couldn't rule out a homicide. (*Id.*)

Dr. Horn testified that he later reviewed Morris's statement and believed that the "investigative information . . . was consistent with someone who had been strangled." (*Id.* at 41.) "[I]n other words, nothing that [he] found was inconsistent with that conclusion." (*Id.*) Dr. Horn, however, stated that cocaine was "still a potentially fatal intoxication that may or may not have contributed to death." (*Id.* at 45.)

Based on a report from his own expert pathologist, Dr. Posey, Morris asserts that "an expert for the defense could have opined that 'with a high degree of medical certainty,' Codman and Davis died from drug overdoses" and there was "no evidence of asphyxia."

177

1   (Doc. 21 at 217) (citing Posey Orig. Rpt. at 13).  Based on his review of the forensic

2   literature, Dr. Posey opined in his report that Dr. Hu's opinion regarding the decomposition

3   of Codman's head was "a disingenuous, incorrect assessment," and that her facial

4   decomposition was "in line with the decomposition of the remainder of her body."  (Posey

5   Orig. Rpt. at 14.)  Dr. Posey further noted that the autopsy report showed no evidence of

6   trauma to the neck.  (*Id.*)

7          Dr. Posey stated that Davis's toxicology results indicated that she had lethal ranges

8   of cocaine metabolites in her system.  (*Id.* at 3.)  Addressing Dr. Horn's[42] testimony that

9   the investigative information was consistent with strangulation, Dr. Posey opined that "in

10  the absence of factual evidence of asphyxia due to manual or ligature strangulation, this

11  diagnostic conclusion cannot be made on circumstantial evidence."  (*Id.* at 13)

12         The likelihood of a different result necessary to establish prejudice must be

13  substantial, not just conceivable.  *Strickland*, 466 U.S. at 693.  Dr. Posey's opinion,

14  however, establishes "nothing more than a theoretical possibility" that Codman and Davis

15  died as a result of a drug overdose and not asphyxia.  *Richter*, 562 U.S. at 112.  Although

16  he concluded there was no evidence of asphyxia, this conclusion, based on the autopsy

17  reports of Drs. Hu and Horn, is consistent with their testimony that there was no physical

18  evidence of strangulation.  Moreover, Dr. Posey's assessment that "with a high degree of

19  medical certainty [Codman and Davis] died from drug intoxication" (Posey Orig. Rpt. at

20  13) is inconsistent with his later equivocal statements that "undetermined is appropriate

21  when considering the suspicious circumstances of how the bodies were found," and "it is

22  *just as likely* they both died from drug intoxication."  (*Id.* at 14) (emphasis added).

23         The only evidence offered by Dr. Posey that was not already before the jury was his

24  disagreement with Dr. Hu's explanation that the marked decomposition of Codman's head

25  _____

26
27  [42] Dr. Posey mistakenly attributed to Dr. Shvarts the autopsy report and testimony
    regarding Davis. (*Compare* Posey Orig. Rpt. at 14 *with* RT 6/29/05 at 34–49.)

28                                       178

1    was consistent with strangulation.  Dr. Posey offered no other conclusions "directly
2    challenging" the conclusions reached by Dr. Hu.  *See Richter*, 562 U.S. at 112 (finding
3    reasonable the state court's determination that petitioner had "not established prejudice
4    given that he offered no evidence directly challenging other conclusions reached by the
5    prosecution's experts").

6        Moreover, there is "ample basis" to think any real possibility of . . . [acquittal is]
7    eclipsed by the remaining evidence pointing to guilt."  *See id.* at 113 (finding no prejudice
8    where "sufficient conventional circumstantial evidence" pointed to petitioner's guilt).  As
9    Dr. Hu testified, Morris described a ligature strangulation of Codman in his statement to
10   police, and Dr. Hu stated that this was consistent with his autopsy finding.  (RT 6/28/05 at
11   71.)  And Dr. Horn testified there was nothing about his examination related to Davis that
12   was inconsistent with strangulation as described by Morris.  (RT 6/29/05 at 41.)

13       Additionally, there were other suspicious circumstances surrounding both victims'
14   deaths  – Codman and Davis were found naked and decomposing in an alleyway.  *Morris*,
15   215 Ariz. at 330, 160 P.3d at 209.  Morris kept some of Codman's belongings, including
16   her overalls, panties, and purse, and analysts found Codman's DNA on some of the items.
17   *Id.*  When Morris was arrested, he was carrying Codman's social security card, driver's
18   license, and check card in his wallet.  *Id.*  Morris also admitted that he used Davis's hair
19   extensions to strangle her and "[p]olice found hair extensions in Morris's camper.  DNA
20   under Davis's fingernails matched Morris's DNA.  DNA analysis on panties found in
21   Morris's camper could not exclude Davis as a source of the DNA."  *Morris*, 215 Ariz. at
22   330, 160 P.3d at 209.

23       Dr. Posey also agreed that the circumstances of how Codman and Davis were found
24   was "somewhat suspicious," and further stated that "[t]he DNA and circumstantial
25   evidence ties the five decedents to Mr. Morris."  (ROA 307, Posey Orig. Rpt. at 15–16.)

26
27
28                                              179

1    *Velasquez*

2        Dr. Shvarts, who performed Velasquez's autopsy, testified that he found bruising

3    around her left eye, petechial hemorrhages in her right eye, and focal hemorrhagic areas

4    inside her neck.  (RT 6/29/05, at 9–12, 18–19.)  Dr. Shvarts testified that petechial

5    hemorrhages are usually related to increased intravascular pressure, which is consistent

6    with strangulation, and the focal hemorrhaging was the result of blunt force trauma,

7    including external pressure.  (*Id*. at 12, 18–19.)  Dr. Shvarts testified that Velasquez, who

8    was not in a state of decomposition, had a curved, half-moon shaped abrasion on the front

9    of her neck, consistent with someone putting their fingernails on her neck, and a linear type

10   of abrasion, consistent with a ligature.  (*Id*. 8–9, 17–18.)  Dr. Shvarts testified that although

11   Velasquez's blood tested positive for alcohol, cocaine metabolites, and benzodiazepines,

12   the level of substances either individually or in combination was not sufficient to cause

13   death.  (*Id*. at 19–22.)  Dr. Shvarts determined that Velasquez's cause of death was

14   strangulation, but that a contributing cause of death was drug intoxication.  (*Id*. at 22, 28–

15   29.)

16       Based on Dr. Posey's report, Morris asserts that a "defense expert could have

17   testified that the cause of death should have been 'undetermined' because the injuries to

18   her neck 'could have been agonal or around the time of death in a setting where the

19   decedent was dying from multidrug intoxication.'"  (Doc. 21 at 217) (citing Posey Orig.

20   Rpt. at 10).  "Without consideration of the fact that there were other victims," Morris

21   concludes, "the medical examiner could not have determined whether she died from

22   asphyxia or drug intoxication."  (*Id.*) (Posey Orig. Rpt. at 15.)

23       Although Dr. Posey's assertion that drug intoxication may have caused Velasquez's

24   death does "directly challenge" the conclusion reached by Dr. Shvarts, there is sufficient

25   other evidence pointing to Morris's guilt and establishing that he was not prejudiced by

26   counsel's alleged failure to present the opinions of Dr. Posey.  As with Codman and Davis,

27   Dr. Posey noted that there were suspicious circumstances in how Velasquez's body was

28                                                    180

"dumped" on the street.  (Posey Orig. Rpt. at 10.)  Additionally, Dr. Posey's opinion – that Velasquez's neck injuries could have been "agonal or around the time of death in a setting where the decedent was dying from multidrug intoxication" – does not relieve Morris of guilt if, as Morris stated to police, "Velasquez asked him to use his hands to choke her while they were having sex" and, when he did so, "Velasquez passed out and never regained consciousness."  *Morris*, 215 Ariz. at 331, 160 P.3d at 210.  Moreover, Dr. Posey's assessment – that without consideration of the fact that there were other victims Dr. Shvarts could not have determined whether she died from asphyxia or drug intoxication – is inconsistent with the record.  Dr. Shvarts did not rely on the strangling deaths of the four other victims to establish Morris strangled Velasquez, but rather on his examination of Velasquez's body.  This conclusion is supported by, but was not informed by, both Morris's statement to the police and the strangling deaths of the other four victims.

There was not a reasonable probability of a different outcome in the PCR proceedings if PCR counsel had raised the Dr. Posey claim.  Because PCR counsel did not perform ineffectively, Morris cannot establish cause for the claim's default.  *See Atwood*, 870 F.3d at 1060; *Sexton*, 679 F.3d at 1157.  Claim Five (A) is therefore denied.

Claim Five (B)

At trial, all the medical examiners testified to drugs and alcohol found in the victims' systems despite not having conducted the toxicology testing themselves.  (RT 6/15/05 at 93–95; RT 6/27/05 at 114–16; RT 6/28/05 at 34–37; RT 6/29/05 at 19–22, 37–38; *see* PCR EH Exs. 7–11.)  Morris alleges that trial counsel should have objected because this was impermissible hearsay and violated the Confrontation Clause.  Failure to do, he contends, prevented trial counsel from being able to cross-examine the toxicologist on the methods he used as well as his credentials and credibility.  (Doc. 21 at 220–21.)

Morris contends the testimony was inadmissible under *Crawford v. Washington*, 541 U.S. 36 (2004), and its progeny, including *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), and *Bullcoming v. New Mexico*, 564 U.S. 647 (2011).  (*See* Doc. 21 at 220,

181

277; Doc. 34 at 138.)  In *Crawford*, a decision handed down just months before Morris's trial, the Supreme Court held that the Sixth Amendment's Confrontation Clause "bars the admission at trial of 'testimonial statements' of an absent witness unless she is 'unavailable to testify, and the defendant ha[s] had a prior opportunity' to cross-examine her."  *Smith v. Arizona (Jason Smith)*, 602 U.S. 779, 783 (2024) (quoting *Crawford*, 541 U.S. at 53–54).  This prohibition "applies only to testimonial hearsay."  *Davis v. Washington*, 547 U.S. 813, 823 (2006).

At the time of Morris's trial, and up until the Supreme Court's recent decision in *Jason Smith*, the Arizona Supreme Court had held that the Confrontation Clause did not apply "when an expert recites another analyst's statements as the basis for his opinion" because the prosecution was not using the out-of-court statements for the truth of the matter asserted.  602 U.S. at 784 (citing *Crawford*, 541 U.S. at 60, n.9*); see, e.g.*, *State v. Dixon*, 226 Ariz. 545, 553, 250 P.3d 1174, 1182 (2011) ("Our cases teach that a testifying medical examiner may, consistent with the Confrontation Clause, rely on information in autopsy reports prepared by others as long as he forms his own conclusions.").  The Supreme Court did not reject the Arizona court's rationale until it decided *Jason Smith* in 2024, almost 20 years after Morris's trial.  *Id.*

At the time of Morris's trial, reasonable counsel performing basic research could have concluded that:

> Facts or data underlying [a] testifying expert's opinion are admissible for the limited purpose of showing the basis of that opinion, not to prove the truth of the matter asserted. . . . Testimony not admitted to prove the truth of the matter asserted by an out-of-court declarant is not hearsay and does not violate the confrontation clause.

*State v. Rogovich*, 188 Ariz. 38, 42, 932 P.2d 794, 798 (1997) (citing *State v. Lundstrom*, 161 Ariz. 141, 148, 776 P.2d 1067, 1074 (1989))).  Subsequently, in *State v. Smith (Joe Smith)*, 215 Ariz. 221, 159 P.3d 531 (2007), the Arizona Supreme Court confirmed that the *Crawford* decision did not alter this analysis.  In *Joe Smith*, the Arizona Supreme Court

held that testimony by medical experts that does not act as a "conduit for another non-testifying expert's opinion," *id.* at 229, 159 P.3d at 539 (quoting *State v. Lundstrom*, 161 Ariz. 141, 148, 776 P.2d 1067, 1074 (1989)), but instead discusses the reports and opinions of another expert and reasonably relies on those reports and opinions in reaching their own opinion is not hearsay "because it is offered not to prove the truth of the prior reports or opinions, but rather is offered only to show the basis of the testifying expert's opinion." *Id.* at 228–30, 159 P.3d at 538–40 (citing *Rogovich,* 188 Ariz. at 41–42, 932 P.2d at 797–98; *State v. Villafuerte,* 142 Ariz. 323, 327, 690 P.2d 42, 46 (1984); *State v. Noleen,* 142 Ariz. 101, 104, 688 P.2d 993, 996 (1984)).  Thus, reasonable counsel at the time of Morris's trial could have concluded that the medical examiners' opinions were not hearsay and did not violate Morris's confrontation right.  *See id.* at 229, 159 P.3d at 539.

Additionally, *Bullcoming* and *Melendez-Diaz* do not support Morris's claim.  First, they were not decided before Morris's trial and thus Morris's counsel could not have been aware of them.  Morris's counsel cannot be ineffective for failing to argue a theory that had not been developed.  In the evaluation of an attorney's performance, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland,* 466 U.S. at 689.

Second, although the Supreme Court "made clear that the Confrontation Clause applies to forensic reports" in *Bullcoming* and *Melendez-Diaz*, *Jason Smith*, 602 U.S. at 785, those cases are distinguishable from the circumstances in Morris.  "[F]orensic reports were introduced into evidence, and there is no question that this was done for the purpose of proving the truth of what they asserted: in *Bullcoming* that the defendant's blood alcohol level exceeded the legal limit and in *Melendez–Diaz* that the substance in question contained cocaine." *Williams v. Illinois*, 567 U.S. 50, 79 (2012) *abrogated by Smith*, 602 U.S. 779.  "[T]he Court held that the particular forensic reports at issue qualified as testimonial statements, but the Court did not hold that all forensic reports fall into the same

183

1  category.  Introduction of the reports in those cases ran afoul of the Confrontation Clause

2  because they were the equivalent of affidavits made for the purpose of proving the guilt of

3  a particular criminal defendant at trial."  *Id.* at 84.

4      After *Bullcoming* and *Melendez-Diaz*, the Court remained "fractured" on whether

5  the Confrontation Clause was implicated by testimony from a lab analyst's statements that

6  "were not introduced for their truth, but to explain the basis for the testifying expert's

7  opinion" until that question was presented in *Jason Smith*.  *Jason Smith*, 602 U.S. at 779

8  (citing *Williams*, 567 U.S. at 79; *see also State v. Medina*, 232 Ariz. 391, 406, 306 P.3d 48,

9  63 (2013) ("[T]here is no binding rule for determining when reports are testimonial.");

10  *United States v. Alcan Aluminum Corp.*, 315 F.3d 179, 189 (2d Cir. 2003) (holding that

11  when no "single standard . . . legitimately constitutes the narrowest ground for a decision

12  on that issue, there is then no law of the land").

13      Thus, reasonable counsel in 2005 could have concluded, as the Arizona Supreme

14  Court had at the time, that forensic testing results relied on by medical examiners to form

15  their opinion, but not for the truth of the matter asserted, were non-hearsay and not

16  precluded by the Confrontation Clause.  Trial counsel was not ineffective for failing to

17  predict *Jason Smith*.  *See Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994) (finding counsel

18  was not ineffective because a "lawyer cannot be required to anticipate our decision" in a

19  later case); *Bullock v. Carver*, 297 F.3d 1036, 1052 (10th Cir. 2002) (rejecting ineffective

20  assistance claim based upon counsel's failure to predict future changes in the law, as

21  "clairvoyance is not a required attribute of effective representation.").

22      Further, the trial court's denial of counsel's objection to Dr. Keen's testimony about

23  Noah's autopsy, conducted by a medical examiner who no longer worked in the medical

24  examiner's office, demonstrates that an objection to the medical examiners' testimony

25  about the toxicology results would also have been futile.  *See Matylinsky v. Budge*, 577

26  F.3d 1083, 1094 (9th Cir. 2009) (explaining that failure to object to testimony on hearsay

27  grounds is not ineffective where the objection would have been properly overruled).  In

28                    184

1    rejecting Morris's claim alleging Dr. Keen's testimony violated the Confrontation Clause,

2    the PCR court reasoned:

3        The [Arizona Supreme] Court has repeatedly held that a testifying medical
         examiner may, consistent with the Confrontation Clause, rely on information
4        in autopsy reports prepared by others as long as he forms his own
         conclusions. *State v. Joseph*, 230 Ariz. 296, ¶8, 283 P.3d 27 (2012) (Dr.
5        Keen); *State v. Dixon*, 226 Ariz. 545, 553, ¶¶36-37, 250 P.3d 1174, 1182
         (2011) (Dr. Keen); *State v. Snelling*, 225 Ariz. 182, 187 ¶ 21, 236 P.3d 409,
6        414 (2010); *State v. Smith*, 215 Ariz. 221, 229 ¶26, 159 P.3d 531, 539 (2007)
7        (Dr. Keen). *See also Williams v. Illinois*, [567] U.S. [50], 132 S. Ct. 2221,
         2228 (2012) ("Out-of-court statements that are related by the expert solely
8        for the purpose of explaining the assumptions on which that opinion rests are
         not offered for their truth and thus fall outside the scope of the Confrontation
9        Clause.") (plurality opinion); *State v. Gomez*, 226 Ariz. 165, 169-70 ¶22, 244
10       P.3d 1163, 1167-68 (2010) ("[A] medical examiner may offer an expert
         opinion based on review of reports and test results prepared by others, as long
11       as the testifying expert does not simply act as a conduit for another non-
         testifying expert's opinion." (internal quotation marks omitted)); *cf.* Ariz. R.
12       Evid. 703 (allowing testifying expert to rely on data not admitted into
13       evidence).

14

15   (ROA 354 at 10–11.)  For the same reasons, it would have been futile for counsel to object

16   to the medical examiners' testimony regarding the toxicology reports.

17        Finally, although Morris argues that as a result of counsel's deficient performance

18   he could not challenge the credibility of the toxicologist who prepared the toxicology

19   results, he fails to establish how this would have impacted the outcome of his trial.

20   (Doc. 21 at 280–81.)

21        The allegation that trial counsel performed ineffectively in failing to object to the

22   medical examiners' testimony regarding the toxicology results lacks merit.  Because

23   Morris's claim of ineffectiveness is meritless, there was not a reasonable probability of a

24   different outcome in the PCR proceedings if PCR counsel had raised the claim.  Because

25   PCR counsel did not perform ineffectively, Morris cannot establish cause for the claim's

26

27

28                                          185

default.  *See Atwood*, 870 F.3d at 1060; *Sexton*, 679 F.3d at 1157.  Claim Five (B) is therefore denied.

Claim Five (C)

In his Reply, Morris withdraws Claim Five (C), which alleges trial counsel was ineffective for failing to move to acquit on the grounds that the State failed to present sufficient evidence to establish the corpus delicti of Codman and Davis.  (*See* Doc. 21 at 221–23; Doc. 34 at 140.)

Claim Five (D)

Morris alleges that trial counsel was ineffective for failing to object to the trial court's reasonable-doubt standard at both the guilt and aggravation phases of his trial.  (Doc. 21 at 223–24, 296–98.)

During the guilt phase of trial, the court provided the following instruction:

> The State has the burden of proving the defendant guilty beyond a reasonable doubt.  The State must prove each element of the charge beyond a reasonable doubt.  In civil cases, it is only necessary to prove that a fact is more likely true than not or that its truth is highly probable.  In criminal cases such as this, the State's proof must be more powerful than that.  It must be beyond a reasonable doubt.

> Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt.  There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every doubt.  If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty.  If, on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty.

(RT 7/05/05 at 4.)  The court provided a nearly identical instruction during the aggravation phase.  (RT 7/12/05 at 81.)

The phrase "firmly convinced," Morris asserts, reduced the State's standard of proof to something less than reasonable doubt, akin to "clear and convincing." (Doc. 21 at 297) (citing *State v. Perez*, 976 P.2d 427, 442 (Haw. Ct. App. 1998), *aff'd in part*, *rev'd in part*

186

1    *on other grounds*, 976 P.2d 379 (Haw. 1999)).  "The beyond a reasonable doubt standard

2    is a requirement of due process, but the Constitution neither prohibits trial courts from

3    defining reasonable doubt nor requires them to do so as a matter of course."  *Victor v.*

4    *Nebraska*, 511 U.S. 1, 5 (1994).  As long as the jury is instructed that the defendant must

5    be found guilty beyond a reasonable doubt, "the Constitution does not require that any

6    particular form of words be used in advising the jury of the government's burden of proof.

7    Rather, taken as a whole, the instructions must correctly convey the concept of reasonable

8    doubt to the jury."  *Id.*

9         The instruction provided by the trial court, which was consistent with Arizona law,

10   *see State v. Portillo*, 182 Ariz. 592, 596, 898 P.2d 970, 974 (1995), is based on the pattern

11   instruction adopted by the Federal Judicial Center.  *See State v. Van Adams*, 194 Ariz. 408,

12   417–18, 984 P.2d 16, 25–26 (1999).  Morris cites no controlling authority holding that it

13   impermissibly lowers the burden of proof, and Justice Ginsburg praised the instruction as

14   "clear, straightforward, and accurate."  *Victor*, 511 U.S. at 26 (Ginsburg, J., concurring).

15   The Ninth Circuit has upheld identical or substantially similar instructions.  *See, e.g.*,

16   *United States v. Velasquez*, 980 F.2d 1275 (9th Cir. 1992) (finding no error in trial court's

17   instruction defining proof beyond a reasonable doubt as proof "that leaves you firmly

18   convinced" of the defendant's guilt); *United States v. Bustillo*, 789 F.2d 1364, 1368 (9th

19   Cir. 1986) (no error where trial court instructed jurors that they must find defendant not

20   guilty if there is a "real possibility" that he was innocent).  Because the instruction is not

21   unconstitutional, trial counsel was not ineffective for failing to challenge it.

22        Because Morris's claim of ineffectiveness is meritless, there was not a reasonable

23   probability of a different outcome in the PCR proceedings if PCR counsel had raised the

24   claim.  Because PCR counsel did not perform ineffectively, Morris cannot establish cause

25   for the claim's default.  *See Atwood*, 870 F.3d at 1060; *Sexton*, 679 F.3d at 1157.  Claim

26   Five (D) is therefore denied.

27   / / /

28                                          187

1    Claim Five: Cumulative Error

2          Morris asserts that, even if this Court finds that no single error amounts to prejudice,

3    it nonetheless should apply cumulative error principles to grant relief.  (Doc. 21 at 216,

4    224) (citing *Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005).  This claim, which

5    Morris did not raise in state court, is procedurally defaulted and barred from federal review.

6    *See Carpenter*, 529 U.S. at 453; *Martinez (Ernesto)*, 926 F.3d at 1225.  It is also meritless.

7          As previously discussed, the Supreme Court has not specifically recognized the

8    doctrine of cumulative error as an independent basis for habeas relief.  *See Lorraine*, 291

9    F.3d at 447; *cf. Morris v. Sec'y Dep't of Corr.*, 677 F.3d at 1132 n.3. The Ninth Circuit

10   has held that in some cases, although no single trial error is sufficiently prejudicial to

11   warrant reversal, the cumulative effect of several errors may nonetheless prejudice a

12   defendant to such a degree that his conviction must be overturned.  *See Mancuso*, 292 F.3d

13   at 957.  In assessing whether the aggregate effect of counsel's performance at the guilt

14   phase prejudiced a defendant, the Court does not consider the prejudicial effect of

15   nonexistent errors.  *Waidla v. Davis*, No. 18-99001, 2024 WL 5196398, at *16 (9th Cir.

16   Dec. 23, 2024) (citing *United States v. Jeremiah*, 493 F.3d 1042, 1047 (9th Cir. 2007)).

17         Because Supreme Court precedent does not recognize the doctrine of cumulative

18   error, and because this Court has determined that Morris's claims of ineffectiveness are

19   meritless, the claim of cumulative prejudice is meritless.  Claim 5, including all subclaims,

20   is denied as procedurally defaulted.

21         **G.  Claim Six (B)**

22         Morris alleges that counsel performed ineffectively in the aggravation phase of his

23   trial by failing to challenge the (F)(2) aggravating factor as a violation of Morris's rights

24   under the Double Jeopardy Clause, Claim Six (B)(1), and by failing to challenge the jury

25   instructions on the (F)(6) aggravating factor, Claim Six (B)(2).  (Doc. 21 at 225, 231–33.)

26         Morris did not exhaust Claim Six (B) and Respondents assert it is procedurally

27   defaulted.  (Doc. 27 at 135–36.)  Morris concedes the claim is unexhausted and alleges any

28                                                188

1    default is excused under *Martinez*, by the ineffective assistance of PCR counsel.  (Doc. 21
2    at 231.)

3    *Claim Six (B)(1)*

4           The State alleged as an aggravating factor that Morris was previously convicted of
5    a serious offense, relying for each count on the other four.  (ROA 19; RT 7/12/05 at 19–
6    21); *see* A.R.S. § 13-703 (F)(2) ("The defendant has been or was previously convicted of
7    a serious offense, whether preparatory or completed," including "[c]onvictions for serious
8    offenses committed on the same occasion as the homicide, or not committed on the same
9    occasion but consolidated for trial with the homicide . . . .").  Morris asserts that because
10   "the same facts are required to prove the elements of murder and the (F)(2) factor" he "has
11   been exposed to multiple proceedings and punishments on the same offense" in violation
12   of the Double Jeopardy Clause.  (Doc. 21 at 326.)  The Court disagrees.

13          The Double Jeopardy Clause of the Fifth Amendment protects against a second
14   prosecution for the same offense after acquittal or conviction, and against multiple
15   punishments for the same offense.  *Schiro v. Farley*, 510 U.S. 222, 229 (1994).  None of
16   the protections afforded by the Double Jeopardy Clause are implicated by application of
17   the (F)(2) aggravating factor to each of Morris's murder convictions. *See id.* ("Where . . .
18   there is 'no threat of either multiple punishment or successive prosecutions, the Double
19   Jeopardy Clause is not offended.'") (quoting *United States v. Wilson*, 420 U.S. 332, 344
20   (1969)).

21          Morris was not being punished twice for the same crime.  His sentences were based
22   on the murders of five different victims; there were five convictions and five sentences.
23   Aggravating circumstances, such as those set forth in (F)(2), only determine whether the
24   crime of murder will carry the death penalty.  As the Supreme Court has explained,
25   "[a]ggravating circumstances are not separate penalties or offenses, but are 'standards to
26   guide the making of [the] choice' between alternative verdicts of death and life
27   imprisonment."  *Poland v. Arizona*, 476 U.S. 147, 156 (1986) (quoting *Bullington v.*

28

*Missouri*, 451 U.S. 430, 438 (1981)); *see Lowenfield*, 484 U.S. at 244–46; *Green v. Zant*, 738 F.2d 1529, 1541 (11th Cir. 1984) (statutory aggravating circumstances are not offenses for double-jeopardy purposes, but rather are procedural standards designed to control a jury's discretion in capital cases in order to ensure against capricious and arbitrary enforcement of the death penalty).

"The (F)(2) aggravating factor is a recidivist provision," *Pandeli*, 215 Ariz. at 522–23, 161 P.3d at 565–66, and "a charge under a recidivism statute does not state a separate offense, but goes to punishment only." *Parke v. Raley*, 506 U.S. 20, 27 (1992) (citations omitted). The Supreme Court has "repeatedly upheld recidivism statutes 'against contentions that they violate constitutional strictures dealing with double jeopardy. . . .'" *Id.* (quoting *Spencer v. Texas,* 385 U.S. 554, 560 (1967)) (additional citations omitted).

Because the underlying objection is meritless, trial counsel was not ineffective for failing to raise it. *See Juan H.,* 408 F.3d at 1273; *Green*, 160 F.3d at 1037; *James*, 24 F.3d at 27. Because the underlying claim of trial counsel ineffectiveness is without merit, cause does not exist for the claim's default. *Runningeagle*, 825 F.3d at 982; *Atwood*, 870 F.3d at 1060. The claim remains barred from federal review.

*Claim Six (B)(2)*

Morris alleges that after the trial court failed to rule on his motion to strike the (F)(6) aggravating factor on the basis that it was unconstitutionally vague (*see* Doc. 21 at 232) (citing ROA 54), trial counsel was ineffective for subsequently failing to object to the jury instructions that were similarly vague and failed to narrow the aggravating factor. (Doc. 21 at 232–33.) Morris asserts that the instructions failed to provide jurors with a "meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." (Doc. 21 at 232) (quoting *Godfrey v. Georgia*, 446 U.S. 420, 427 (1980), *holding modified by Brown v. Sanders*, 546 U.S. 212 (2006)). Morris alleges that the trial court instructed the jury that for a murder to be "especially heinous, cruel, or depraved," it must be "above the norm of other first degree murders," (*see* RT

190

07/12/05 at 84–85), but "without any point of reference or comparison as to what first-degree murders were 'the norm,' the jury could not differentiate the case before it." (Doc. 21 at 233.)  Morris further alleges the ineffective assistance of PCR counsel excuses the procedural default of this claim under *Martinez*. (*Id.* at 231.)

The trial counsel IAC claim is meritless.  First, Morris is incorrect that the trial court failed to rule on his challenge to the (F)(6) factor as unconstitutionally vague.  The court first ordered the State to respond and then denied the motion.  (ROA 56, 62.)

Appellate counsel raised the issue on direct appeal, acknowledging that the Arizona Supreme Court had rejected the same argument in *State v. Cromwell*, 211 Ariz. 181, 119 P.3d 448 (2005), and *State v. Anderson*, 210 Ariz. 327, 352–53, 111 P.3d 369, 394–95 (2005). (DA 29 at 60–61.)  Relying on the same cases, the court denied the claim.  *Morris*, 215 Ariz. at 342, 160 P.3d at 221.  Trial counsel was therefore not ineffective for failing to raise the same objection to the jury instructions – it would have been futile to do so.

Second, the jury instructions were not unconstitutionally vague.  A statutory aggravating factor is unconstitutionally vague if it fails to furnish principled guidance for the choice between death and a lesser penalty.  *Richmond v. Lewis*, 506 U.S. 40, 46 (1992) (citing *Maynard v. Cartwright*, 486 U.S. 356, 361-364 (1988); *Godfrey*, 446 U.S. at 427–433).  Both the Ninth Circuit and the United States Supreme Court have upheld Arizona's death penalty statute against allegations that particular aggravating factors, including the (F)(6) factor, do not adequately narrow the sentencer's discretion.  *See Lewis v. Jeffers*, 497 U.S. 764, 774–77 (1990); *Walton v. Arizona*, 497 U.S. 639, 652–56 (1990) *overruled on other grounds by Ring v. Arizona (Ring II)*, 536 U.S. 584 (2002).  In *Walton*, the Supreme Court held that the "especially heinous, cruel or depraved" aggravating circumstance was facially vague but the vagueness was remedied by the Arizona Supreme Court's clarification of the factor's meaning.  497 U.S. at 654; *see also Smith v. Ryan*, 823 F.3d 1270, 1294–95 (9th Cir. 2016).

191

1
2
3
4

> *Walton* . . . squarely forecloses any argument that Arizona's subsection (F)(6) aggravating circumstance, as construed by the Arizona Supreme Court, fails to "channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.'"

5
6
7

*Jeffers*, 497 U.S. at 777–78 (quoting *Godfrey,* 446 U.S. at 428). Morris cites no caselaw, and this court is aware of none, finding the Arizona Supreme Court's construction constitutionally inadequate when applied by a jury instead of a judge.

8
9
10
11
12
13
14
15
16
17
18
19
20

Morris criticizes Respondents for resting their opposition on the argument that there is no clearly established federal law establishing that the phrase "above the norm of other first degree murders" must be separately defined. Morris asserts there is no requirement that he point to clearly established federal law – that the only applicable standard for review is that found in *Strickland*. Even so, Morris has failed to allege trial counsel performed deficiently under *Strickland*. Reasonably competent counsel conducting research at the time of Morris's trial would have discovered, in addition to the absence of clearly established federal law finding the (F)(6) factor unconstitutionally vague when clarified by the application of a narrowing construction, that the Arizona Supreme Court had addressed and rejected the argument that "the rule announced in *Walton* can no longer justify use of the facially vague (F)(6) aggravator in Arizona because juries, not judges, now find aggravating circumstances." *Anderson*, 210 Ariz. at 352, 111 P.3d at 394, *supplemented,* 211 Ariz. 59, 116 P.3d 1219.

21
22
23
24
25
26
27

Finally, Morris claims that "if counsel had sought to clarify the instructions and the jury had been properly instructed, there is a reasonable probability that at least one juror would not have found the aggravating factor proven." (Doc. 21 at 233.) But Morris fails to explain what clarification or proper instruction should have been given and why it might have changed the outcome. (*See id.*) The jury was instructed in detail as to what would support a finding that the murders were "especially heinous, cruel or depraved" and gave substance to the terms "cruel" and "heinous or depraved" in accordance with Arizona case

28

law narrowing and defining those terms.[43]  *See Cromwell*, 211 Ariz. at 189, 119 P.3d at 456; *Anderson*, 210 Ariz. at 352, 111 P.3d at 394.

---

[43] The jury was instructed:

All First Degree Murders are to some extent heinous, cruel, or depraved. However, this aggravating circumstance cannot be found to exist unless the murder is especially heinous, cruel, or depraved; that is, where the circumstances of the murder raise it above the norm of other first degree murders.

The terms cruel, heinous, or depraved are to be considered separately, but proof of any of these factors is sufficient to establish this aggravating circumstance.

Cruelty may be found if you find that the victim consciously experienced physical pain and/or mental anguish prior to death and the defendant knew or should have known that suffering would occur.  The victim must be conscious for at least some portion of the time when the pain and/or anguish was inflicted.

. . .

A murder is especially heinous if it is hatefully or shockingly evil; grossly bad.  A murder is depraved if marked by debasement, corruption, perversion, or deterioration.  The terms heinous and depraved focus upon a defendant's state of mind at the time of the offense, as reflected by his words and acts.

In order to find heinousness or depravity, you must find that the defendant has such a mental State [sic] as exhibited by engaging in at least one of the following actions:

One.  Relishing the murder;

Two.  Infliction of gratuitous violence on the victim beyond that necessary to kill;

Three.  Needless mutilation of the victim's body.

In this context, relishing refers to words or actions that demonstrate debasement or perversion.  In order to support a finding of relishing the defendant must say or do something other than the murder itself which indicates he savored or enjoyed the killing.

In this context, needless mutilation means that the defendant, apart from the killing, committed distinct acts with the intent to mutilate the victim's body.

Because the underlying objection is meritless, trial counsel was not ineffective for failing to raise it. *See Juan H.,* 408 F.3d at 1273; *Green,* 160 F.3d at 1037; *James,* 24 F.3d at 27. Because the underlying claim of trial counsel ineffectiveness is without merit, cause does not exist for the claim's default. *Runningeagle,* 825 F.3d at 982; *Atwood,* 870 F.3d at 1060. The claim therefore remains barred from federal review.

## H. Claim Seven

Morris alleges the state court violated his constitutional rights by erroneously denying his motions to preclude the introduction of his statements on the ground that the State could not establish the corpus delicti of either Codman or Davis's murder (Claim Seven (A)), and for judgment of acquittal despite insufficient evidence that Morris murdered these two victims (Claim Seven (B)). (Doc. 21 at 234–40.) Respondents contest Morris's allegation that these two claims were exhausted in state court; alternatively, they assert the claims are meritless. (*Id.* at 137–40.)

---

In order to return a finding that the murder was especially heinous or depraved you must be unanimous as to at least one of the three factors above.

A finding of relishing, infliction of gratuitous violence, or mutilation alone will support findings of heinousness and/or depravity.

To assist you in determining whether a crime is heinous or depraved you may also consider whether:

One. The murder was senseless; or.

Two. Helplessness of the victim.

All murders are senseless because of their brutality and finality. Yet, not all are senseless as the term is used to distinguish those first degree murders that warrant a death sentence and those that do not. Rather, a senseless murder is one that is unnecessary to achieve the defendant's criminal purpose.

Helplessness is proven when the victim is unable to resist.

A finding of senselessness or helplessness alone or together will not be sufficient to prove heinousness or depravity unless the State also proves at least one of the three circumstances listed above.

(RT 7/12/05 at 84–87.)

194

<u>Claim Seven (A)</u>

Morris alleges the admission of his statement relating to Codman and Davis (Counts 1 and 2, respectively), rendered his trial fundamentally unfair in violation of his due process rights under the Fourteenth Amendment.  (Doc. 21 at 234–37) (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991)).

Prior to trial, Morris moved to preclude his confession that he strangled Codman and Davis, asserting that, under Arizona law,[44] the State had failed to establish the corpus delicti of either crime. (ROA 65.)   The trial court, considering the totality of the circumstances, found independent proof in their deaths that "raise reasonable inferences that their deaths were caused by criminal conduct":

> [A]lthough the cause of death of the victims of Counts 1 and 2 are undetermined, the circumstances surrounding the discovery of the bodies establish reasonable inferences that the deaths were caused by criminal conduct.  Barbara Codman's nude decomposing body was found in an alley in a residential area.  Drag marks were found near her body.  Her driver's license, social security card and Bank of America check cashing card were found in the possession of Defendant.

> The body of Shanteria Davis, like that of Barbara Codman's was found nude and decomposing in the same alley in the early morning hours.  There were drag and scuff marks next to her body leading to the back gate of the yard of the Defendant's trailer.  Fingernail scrapings from Shanteria Davis' left hand matched Defendant's DNA profile.  Pink panties found in Defendant's trailer closet matched the DNA profile of Shanteria Davis.

(ROA 70 at 1–2.)

Morris appealed this decision, arguing the trial court abused its discretion by denying his motion to dismiss the counts involving Codman and Davis and by admitting Morris's statements to the police concerning those deaths because the State was unable to

---

[44] Specifically, Morris cited *Atwood*, 171 Ariz. 576, 832 P.2d 593; *State v. Washington*, 204 Ariz. 166, 61 P.3d 460 (App. 2003); *State v. Hall*, 204 Ariz. 442, 65 P.3d 90 (App. 2003); *State v. Nieves*, 207 Ariz. 438, 87 P.3d 851 (App. 2004); and *State v. Janise*, 116 Ariz. 557, 570 P.2d 499 (1997), in support of this claim. (ROA 65 at 3–4.)

195

1    establish corpus delicti without his statements. (DA 29 at 16, 18–32.) The Arizona

2    Supreme Court affirmed, finding "sufficient evidence independent of Morris's

3    incriminating statements establishes corpus delicti for the deaths of both Codman and

4    Davis." *Morris*, 215 Ariz. at 333, 160 P.3d at 212. Morris alleges the Arizona Supreme

5    Court's finding was both an unreasonable application of the law and an unreasonable

6    determination of the facts. (Doc. 21 at 237.) Respondents assert Claim Seven (A) is

7    unexhausted and procedurally defaulted. (Doc. 27 at 137.)

8        To fairly present a federal claim, a state prisoner must present to the state courts

9    both the operative facts and the federal legal theories that animate the claim. *See Gray v.*

10   *Netherland,* 518 U.S. 152, 162–63 (1996); *Castillo v. McFadden*, 399 F.3d 993, 999 (9th

11   Cir. 2005). Morris asserts that the substance of his federal claim was preserved because he

12   argued on direct appeal "that the arbitrary denial of his motion to exclude his statement

13   with respect to Codman and Davis rendered his convictions for their murders

14   fundamentally unfair, and he cited cases recognizing the due process implications of the

15   corpus delicti rule." (Doc. 21 at 152) (citing DA 29 at 18–32); *see Peterson*, 319 F.3d at

16   1158 ("[F]or purposes of exhaustion, a citation to a state case analyzing a federal

17   constitutional issue serves the same purpose as a citation to a federal case analyzing such

18   an issue."). Morris's characterization of the claim he raised in state court as a federal due

19   process claim is misleading. Morris's Opening Brief focused exclusively on state law; he

20   failed to present his corpus delicti claim as a federal claim. *See Arrendondo v. Neven*, 763

21   F.3d 1122, 1138 (9th Cir. 2014) ("Because Arrendondo's brief before the Nevada Supreme

22   Court focused exclusively on state law, he failed to present his compulsory-process claim

23   as a federal claim.").

24        Corpus delicti is a common law doctrine. *State v. Allen*, 253 Ariz. 306, 334, 513

25   P.3d 282, 310 (2022). "[T]o establish corpus delicti there must appear some proof of a

26   certain result, and that someone is criminally responsible therefor." *State v. Weis,* 92 Ariz.

27   254, 260, 375 P.2d 735, 739 (1962). As Morris explained in his Opening Brief, the purpose

28                                              196

of the rule is "to prevent a conviction based on an individual's uncorroborated confession, the concern being that such a confession could be false and the conviction thereby lack fundamental fairness." (DA 29 at 19) (quoting *State v. Flores*, 202 Ariz. 221, 222, 42 P.3d 1186, 1187 (App. 2002)).

Focusing on two state court cases, *State v. Nieves*, 207 Ariz. 438, 87 P.3d 851 (App. 2004), and *State v. Morgan,* 204 Ariz. 166, 61 P.3d 460 (App. 2002), Morris argued in his Opening Brief that the court should look to *Nieves*, and not *Morgan*, in finding that the trial court had abused its discretion in not dismissing the Codman and Davis counts. (DA 29 at 30.) He further argued that the factors the trial court relied on in denying his motion did not support a reasonable inference that the crimes charged were committed in light of the evidence presented. (*Id.* at 31.) Finally, Morris asserted that the trial court's conclusion otherwise "rendered the corpus delicti rule without any practical effect." (*Id.* at 32.) Morris cited no law, state or federal, in support of the latter assertion. (*See id.*) None of these arguments invoked a federal claim.

Contrary to Morris's argument in his federal petition, neither did the additional citations to three cases that he asserts "recognize the due process implications of the corpus delicti rule." (*see* Doc. 34 at 152.) A review of these cases reveal they also did not sufficiently alert the state court that he was raising a federal claim in his direct appeal. *See Peterson*, 319 F.3d at 1158.

Morris cited two cases, *Smith v. United States*, 348 U.S. 147, 153 (1954), and *State v. Jones ex rel. Cnty. of Maricopa*, 198 Ariz. 18, 21, 6 P.3d 323, 326 (App. 2000), in support of his legal assertion that the "corpus delicti rule requires that, before a defendant's statements are admissible as evidence of a crime, the State must show both proof of a crime and that someone is responsible for that crime." (DA 29 at 19.) Although *Jones* and *Smith* both "touch[ed] upon the due process implications of the rule," *Jones*, 198 Ariz. at 21, 6 P.3d at 326, this was confined to preliminary discourse over the provenance of the rule, and neither court held that a conviction based on an uncorroborated confession is a

197

violation of due process or applied a constitutional analysis to the claims before them. *See Jones*, 198 Ariz. at 21, 6 P.3d at 326 ("Although courts have seldom articulated a precise rationale, they usually cite the regrettable historical experience with false confessions and the concern that convictions lacking in fundamental fairness could too-readily result from these statements."). In fact, concerns over fundamental fairness were not, as the *Jones* court noted, the only factor that has been offered to support the common-law rule. *See id.*, 198 Ariz. at 21 n.3, 6 P.3d at 326 n.3. "Citation of irrelevant federal cases does not provide a state court with a fair opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim." *Castillo,* 399 F.3d at 1000 (citation and internal quotation marks omitted).

Morris also quoted *State v. Flores*, 202 Ariz. 221, 222, 42 P.3d 1186, 1187 (App. 2002), in his Opening Brief, to support his assertion that the "purpose of the rule is 'to prevent a conviction based solely on an individual's uncorroborated confession, the concern being that such a confession could be false and the conviction thereby lack fundamental fairness.'" (DA 29 at 19.) Morris's citation to *Flores*, however, did not alert the state court that Morris was raising a federal due process claim; aside from the brief mention of "fundamental fairness," *Flores* was argued and decided purely as a matter of state law. *See Casey*, 386 F.3d at 912 n. 13 ("For a federal issue to be presented by the citation of a state decision dealing with both state and federal issues relevant to the claim, the citation must be accompanied by some clear indication that the case involves federal issues. Where . . .the citation to the state case has no signal in the text of the brief that the petitioner raises federal claims or relies on state law cases that resolve federal issues, the federal claim is not fairly presented."). Moreover, "[g]eneral appeals to broad constitutional principles, such as due process, equal protection, and the right to a fair trial, do not establish fair presentation of a federal constitutional claim." *Castillo*, 399 F.3d at 1002 ("Exhaustion requires more than drive-by citation, detached from any articulation of an underlying federal legal theory."); *Fields v. Waddington*, 401 F.3d 1018, 1021 (9th Cir.

1    2005); *Shumway v. Payne*, 223 F.3d 982, 987 (9th Cir. 2000) (finding it insufficient for

2    prisoner to make "a general appeal to a constitutional guarantee," such as a naked reference

3    to "due process," or to a "constitutional error" or a "fair trial").

4         Because the claim is unexhausted and would be precluded if raised in a successive

5    post-conviction petition, it is procedurally defaulted. *See* Ariz. R. Crim. P. 32.2(b);

6    32.1(b)–(h). Morris argues the default of this claim is excused by appellate counsel's

7    ineffectiveness coupled with PCR counsel's subsequent failure to raise an IAAC claim

8    under *Martinez*. (Doc. 34 at 152–53; *see also id.* at 24–25.)

9         Ineffective assistance of appellate counsel may be used as cause to excuse a

10    procedural default only where the particular ineffective assistance allegation was first

11    exhausted in state court as an independent constitutional claim. *See Carpenter*, 529 U.S.

12    at 453 ("an ineffective-assistance-of-counsel claim asserted as cause for the procedural

13    default of another claim can itself be procedurally defaulted"); *Carrier*, 477 U.S. at 489–

14    90. Because Morris did not first exhaust this IAAC claim in his PCR petition, he may not

15    rely on an allegation of IAAC as cause to excuse the procedural default of this alleged trial

16    error. Additionally, *Martinez* does not provide cause to excuse the procedural default

17    because Claim Seven (A) alleges trial-court error, not trial counsel's ineffectiveness. *See*

18    *Martinez (Ernesto)*, 926 F.3d at 1225 ("[I]neffective assistance of PCR counsel can

19    constitute cause only to overcome procedurally defaulted claims of ineffective assistance

20    of trial counsel.").

21         The Court rejects Morris's argument that *Martinez* and *Davila*, read together,

22    provide cause to overcome the default of unpreserved trial error claims (*see* Doc. 34 at

23    152–53) because this unauthorized expansion of the *Martinez* exception would surely

24    swallow the whole. Moreover, the premise of Morris's argument, that *Davila* does not

25    preclude the use of ineffective assistance of post-conviction counsel to excuse the default

26    of IAAC claims (*see* Doc. 34 at 25), is patently incorrect, as the Court in *Davila* did

27    precisely that. *See Davila*, 582 U.S. at 529 (declining to extend *Martinez* to allow a federal

28                                        199

1    court to hear a substantial, but procedurally defaulted, IAAC claim when a prisoner's state

2    postconviction counsel provides ineffective assistance by failing to raise that claim.)  Only

3    the Supreme Court can expand the application of *Martinez* to other areas, and "further

4    substantive expansion of *Martinez* is not . . . forthcoming."  *Hurles v. Ryan*, 914 F.3d 1236,

5    1238 n.3 (9th Cir. 2019) (quoting *Pizzuto v. Ramirez*, 783 F.3d at 1176–77).

6        Claim Seven (A), which Morris did not raise in state court, is therefore procedurally

7    defaulted and barred from federal review.

8    Claim Seven (B)

9        Morris alleges the trial court erroneously denied his motion for judgment of

10   acquittal despite insufficient evidence that Morris murdered Codman and Davis, in

11   violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.  (Doc. 21 at 237–40.)

12   Respondents assert the claim is unexhausted and procedurally defaulted.  (Doc. 27 at 139.)

13       At the conclusion of the guilt phase of trial, Morris moved for a judgment of

14   acquittal as to all five counts of first-degree murder under Arizona Rule of Criminal

15   Procedure 20.  (RT 06/29/05 at 112–13.)  The trial court denied the motion (*see id.* at 113),

16   and Morris did not appeal this decision, nor did he argue that the trial court's denial violated

17   his Fifth, Sixth, Eighth, or Fourteenth Amendment rights.  (*See* DA 29.)  Morris asserts he

18   nonetheless fairly presented the substance of his federal claim by arguing in his Opening

19   Brief that the State failed to establish the corpus delicti for the deaths of Codman and Davis.

20   (Doc. 34 at 155–56) (citing DA 29 at 20, 23–29, 30–32).  The fair presentation requirement

21   for claim Seven (B) is satisfied, Morris contends, because the state-law analysis on the

22   issue is "fundamentally identical" to the federal-law analysis applied to constitutional

23   challenges to the sufficiency of the evidence.  (*Id.* at 156.) (citing *Scarpa v. Dubois*, 38

24   F.3d 1, 7 (1st Cir. 1994)).

25       The Supreme Court has left open the question whether raising a state claim that is

26   "identical" to a federal claim suffices to fairly present the federal claim, *see Baldwin v.*

27   *Reese*, 541 U.S. 27 (2004); *see also Peterson*, 319 F.3d at 1160 (noting that the Court has

28   200

1    not decided whether "citation of an identical or functionally identical state-law claim is

2    sufficient to present a federal claim").  "But raising a state claim that is merely *similar* to

3    a federal claim does not exhaust state remedies."  *Fields*, 401 F.3d at 1022–23 (citing

4    *Johnson v. Zenon,* 88 F.3d 828, 830 (9th Cir. 1996)).

5              Even if raising identical or "functionally identical" state and federal claims may

6    satisfy the exhaustion requirement, Morris fails to establish that the state courts treat "his

7    particular claimed due process violation" identically under both state and federal law.  *See*

8    *Fields*, 401 F.3d at 1022–23 ("Petitioner must show that the Washington state courts treat

9    his particular claimed due process violations identically. . . .").  "In the absence of an

10   affirmative statement by the [state supreme court] that it considers a particular state and

11   federal constitutional claim to be identical, rather than analogous . . . Petitioner was

12   required to raise his federal claims affirmatively; we will not infer that federal claims have

13   been exhausted."  *Fields*, 401 F.3d at 1024.  Morris proffers nothing to show an identity

14   between a state of Arizona corpus delicti claim and a federal insufficiency of the evidence

15   claim, let alone an affirmative statement by the Arizona Supreme Court.

16             The corpus delicti rule demands that before a defendant's statements are admissible

17   as evidence of a crime, the State must show "proof of a crime and that someone is

18   responsible for that crime."  *Jones*, 198 Ariz. at 22, 6 P.3d at 327 (citations omitted).  Such

19   evidence "need not be of the quantum of proof beyond a reasonable doubt."  *Id.*  In contrast,

20   federal insufficiency of the evidence claims require the defendant to show that "upon the

21   record evidence adduced at the trial no rational trier of fact could have found proof of guilt

22   beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 324 (1979).  The claims

23   are not coextensive and Morris therefore has failed to establish exhaustion.

24             Because the claim is unexhausted and would be precluded if raised in a successive

25   post-conviction petition, it is procedurally defaulted.  *See* Ariz. R. Crim. P. 32.2(b);

26   32.1(b)–(h).  Morris argues the default is excused by the ineffective assistance of appellate

27   counsel coupled with PCR counsel's subsequent failure to raise an IAAC claim under

28                                                    201

1    *Martinez.* (Doc. 34 at 152–53; *see also id.* at 24–25.) As discussed in Claim Seven (A),

2    above, because Morris did not exhaust this IAAC claim in his PCR petition, he may not

3    use an IAAC claim as cause to excuse the procedural default, and *Martinez* does not

4    provide cause to excuse the default because Claim Seven (B) alleges trial-court error, not

5    trial counsel's ineffectiveness. *See Martinez (Ernesto)*, 926 F.3d at 1225.

6    Claim Seven (B), which Morris did not raise in state court, is therefore procedurally

7    defaulted and barred from federal review.

8    **I.  Claims Eight and Twenty-Two (C)**

9    Morris alleges the introduction of unreliable scientific evidence rendered his trial

10   fundamentally unfair in violation of his due process rights under the Fourteenth

11   Amendment (Claim Eight). (Doc. 21 at 240–45.) He asserts that the State presented

12   "scientifically unreliable" evidence through the testimony of the medical examiners related

13   to skin slippage, anal defects, a vaginal bruise, and cause of death[45]  (Doc. 21 at 241.)

14

---

15   [45]    Morris asserts that testimony from Dr. Horn and Dr. Hu regarding friction or

16   rubbing as a cause of skin slippage in victims Noah and Codman (*see* RT 06/27/05 at 85–
     86; 06/28/05 at 22, 26) was incorrect and misleading regarding the origins and causes of

17   skin slippage, as explained by Dr. Posey in Morris's PCR proceedings. (Doc. 21 at 242)

18   (citing PCR EH. Ex. 6 at 6, 7, 9). He also asserts that Dr. Horn's testimony regarding
     defects around Castillo's anus as due to sexual activity or insect activity (*see* RT 06/15/05

19   at 96) was "scientifically incorrect," as explained by Dr. Posey in Morris's PCR
     proceedings. (Doc. 21 at 243) (citing Posey Orig. Rpt. at 11). Morris

20   further asserts that Dr. Keen's testimony that there was a bruise or contusion found on the
     right lateral wall of Noah's vagina, "a fact that was then used by the prosecutor to argue

21   that the murder was cruel at the aggravation phase," was in fact "an autopsy artifice

22   misinterpreted as a contusion," and the medical examiner's conclusion that it was a
     contusion was "disingenuous and inappropriate," as Dr. Posey opined in his report. (Doc.

23   21 at 243) (citing Posey Orig. Rpt. at 11). Finally, Morris asserts that the medical

24   examiners' testimony as to the cause of death for victims Codman, Davis, Velasquez, and
     Castillo (*see* RT 06/15/05 at 98, 101; RT 06/28/05 at 41, 55–58, 71; RT 06/29/05 at 40–

25   41, 47; PCR EH Ex. 11 at 914, 916; Posey Orig. Rpt. at 10, 15) "was not based in science."

26   (Doc. 21 at 243.)

27

28                                                    202

1    Morris concedes this claim is unexhausted but asserts the procedural default of the claim

2    is excused by the ineffective assistance of appellate and PCR counsel. (*Id.* at 240–41.)

3        Because this claim alleges trial-court error, not ineffective assistance of trial

4    counsel, the ineffective assistance of PCR counsel does not provide cause to excuse the

5    procedural default of the claim. *See Martinez (Ernesto)*, 926 F.3d at 1225.

6        Morris also asserts the ineffective assistance of appellate counsel excuses the default

7    of this claim and that he exhausted a claim of ineffective assistance of appellate counsel

8    for failing to challenge the admission of unreliable evidence during PCR proceedings.

9    (Doc. 34 at 158) (citing *Coleman*, 501 U.S. at 753–54; *Carrier*, 477 U.S. at 488).  But

10   before Morris can rely on the ineffective assistance of appellate counsel to excuse the

11   default of Claim Eight, he must establish that he exhausted an ineffective assistance of

12   appellate counsel claim based specifically on appellate counsel's failure to assert that the

13   trial court admitted medically unreliable testimony. *See Carrier*, 477 U.S. at 489 ("[A]

14   claim of ineffective assistance" generally must "be presented to the state courts as an

15   independent claim before it may be used to establish cause for a procedural default.");

16   *Carpenter*, 529 U.S. at 453 ("[A]n ineffective-assistance-of-counsel claim asserted as

17   cause for the procedural default of another claim can itself be procedurally defaulted").

18   With two exceptions, as discussed below, Morris failed to do so.

19       The IAAC claim Morris raised in his PCR petition was more circumscribed than the

20   IAC claim he argues as cause here.  Embedded in the PCR petition claim alleging "NEW

21   LAW" and citing an intermediary appellate court's decision addressing the admissibility

22   of expert testimony, Morris alleged appellate counsel was ineffective for failing to argue

23   that the trial court erred by denying defense counsel's objection to Dr. Horn's testimony

24   regarding the information he received from Detective Dillian that led him to conclude that

25   Castillo died from ligature strangulation.  (ROA 307 at 57–58.)  Similarly, he alleged

26   appellate counsel was ineffective for failing to make the same argument regarding Dr. Hu's

27   testimony about Codman's cause of death.  (*Id.* at 59.)

28

1    In petitioning the Arizona Supreme Court for review, Morris dropped this claim
2    altogether, asking the court to review only the PCR court's determination regarding a claim
3    that he was denied his right to confront Dr. Zhang when Dr. Keen testified as to the contents
4    of Dr. Zhang's autopsy report.  (PR 7 at 41).  The Arizona Supreme Court denied the claim
5    without comment.  (PR 27.)

6    Morris sufficiently exhausted the IAAC claim alleging appellate counsel failed to
7    argue the trial court erred by permitting Drs. Hu and Horn to testify regarding Castillo's
8    and Codman's cause of death because Morris raised this claim in the PCR petition and then
9    argued generally in his request for review that the PCR court denied him due process by
10   failing to grant a hearing on all of the claims raised in his PCR petition (*see* PR 7 at 1–2,
11   81), and by not explicitly waiving consideration of this IAAC claim.  *See Sandgathe v.*
12   *Maass*, 314 F.3d 371, 378 (9th Cir. 2002) (instructing that the *Ylst* presumption of
13   exhaustion applies when the petitioner argues in his petition for review, generally, that the
14   trial court decision was in error and does not indicate a waiver of the federal claim
15   previously decided).  Although *Sandgathe* was called into question in *Castillo*, 399 F.3d at
16   1001, it remains the law in this circuit.  *Ybarra,* 656 F.3d at 991 (citing *Sandgathe* with
17   approval).  Because Morris raised the IAAC claim in his PCR proceedings and the PCR
18   court ruled on it, he satisfies the threshold inquiry.  *See Carpenter*, 529 U.S. at 452–53.  To
19   establish cause for the claim's federal default, he must next establish that his appellate
20   counsel's performance was ineffective under *Strickland v. Washington*, 466 U.S. 668
21   (1984).  *See Visciotti v. Martel*, 862 F.3d 749, 769 (9th Cir. 2016).

22   Here, as the Court explains below in addressing Claim Twenty-Two (C), the IAAC
23   claim is meritless because appellate counsel did not perform ineffectively.  Accordingly,
24   Morris has not shown cause to overcome the default of this portion of Claim Eight.

25   As to the remainder of Claim Eight, the related allegations of ineffective assistance
26   of counsel were neither raised in Morris's PCR petition nor ruled on by the state courts.
27   "[T]he exhaustion doctrine . . . generally requires that a claim of ineffective assistance be

28                                                    204

1   presented to the state courts as an independent claim before it may be used to establish

2   cause for a procedural default." *Carrier*, 477 U.S. at 488–89.  In Arizona, fair presentation

3   of a federal habeas claim in state court requires capital petitioners to present their

4   allegations not only to the PCR court but also to the Arizona Supreme Court upon denial

5   of relief.  *See O'Sullivan*, 526 U.S. at 848; *Swoopes*, 196 F.3d 1008 (explaining that capital

6   petitioners must seek review in Arizona Supreme Court to exhaust claims).  A general

7   claim raised in state court cannot exhaust a new specific argument raised in federal habeas.

8   *Atkins*, 122 F.4th at 782.  With the exception of the two claims discussed above, Morris

9   did not "fairly present" an IAAC claim alleging appellate counsel was ineffective for

10  failing to argue that the introduction of unreliable scientific evidence rendered his trial

11  fundamentally unfair in violation of his due process rights.  Appellate counsel's alleged

12  ineffectiveness, therefore, is itself unexhausted and may not serve as cause to excuse the

13  procedural default of the remainder of Claim 8.  *See Carrier*, 477 U.S. at 489.  Claim Eight

14  is therefore procedurally defaulted and barred from federal review.

15       In Claim Twenty-Two (C), Morris alleges appellate counsel failed to challenge the

16  introduction of unreliable scientific testimony from the medical examiners.  (Doc. 21 at

17  309–11.)  Morris alleged in his PCR petition that Drs. Hu and Horn's testimony was

18  improperly admitted at trial.  (ROA 307 at 58.)  Specifically, Morris asserted that "[w]hen

19  a medical examiner's opinion as to the cause of death 'is based largely on the testimony of

20  lay witnesses, whose credibility the jury can determine without the aid of expert testimony,'

21  the expert's opinion is inadmissible . . . ."  (*Id.*) (quoting *State v. Sosnowicz*, 229 Ariz. 90,

22  97–98, 270 P.3d 917, 924–25 (App. 2012) (footnote omitted)).

23       The PCR court found Morris failed to show counsel was ineffective:

24   At trial, Dr. Horn testified that it is generally accepted practice in his field to
     rely not just on the body, but also on anecdotal information from
25   investigating detectives attending the autopsy when determining cause of
     death.  (RT 6/15/05, at 90-91).  Due to the decomposition of the bodies, Dr.
26   Horn and Dr. Hu also relied on defendant's statements, anecdotal
27

28                                    205

1
2
3
4

information from detectives, and the circumstances and available evidence surrounding the other victims' deaths to opine as to the causes of death of victims Castillo and Codman, respectively. A medical examiner's opinion as to cause of death is clearly within his/her expertise and admissible. The Supreme Court would not have found error in allowing these medical examiners to so testify.

5
6
7

(ROA 354 at 10.) The Arizona Supreme Court denied the claim without comment. (PR 27.)

8
9
10
11
12
13

The state court's decision was neither contrary to nor an unreasonable application of clearly established federal law. To prevail on a claim of ineffective assistance of appellate counsel, a petitioner must show that counsel's appellate advocacy fell below an objective standard of reasonableness and a reasonable probability that, but for counsel's deficient performance, the petitioner would have prevailed on appeal. *Smith v. Robbins*, 528 U.S. 259, 285–86 (2000). "[F]ailure to raise untenable issues on appeal does not fall below the *Strickland* standard." *Turner v. Calderon*, 281 F.3d 851, 872 (9th Cir. 2002).

14
15
16
17
18
19
20
21
22
23
24

Morris has not shown the PCR court's decision is so obviously wrong that its error lies "beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. As discussed in Claim One, the Arizona Supreme Court rejected Morris's related claim that the prosecutor improperly influenced the medical examiners by providing them with statements Morris made to the police. *Morris*, 215 Ariz. at 336, 160 P.3d at 215. The Supreme Court noted that, under Arizona law, a peace officer is required to report the results of an investigation surrounding a suspicious death to the county medical examiner and the medical examiner is statutorily required to make inquiries regarding the cause and manner of death. *Id.* (citing A.R.S. §§ 11-593(B), 11-594(A)(4), 11-594(A)(2) (2001)). The court explained:

25
26
27

[T]he record does not suggest that Morris's statements improperly influenced either of the medical examiners. Both testified simply that they found nothing inconsistent with those statements in their respective autopsies of Codman and Davis, and they acknowledged that, without the statements, they would have believed that drug intoxication caused the deaths.

28

1    *Id.* Based on this conclusion, the PCR court's determination was not unreasonable when

2    it found that the Arizona Supreme Court would have found no error in allowing these

3    medical examiners to testify about cause of death.

4         Additionally, Morris's argument that appellate counsel was ineffective for failing to

5    argue the medical examiners' testimony was inadmissible rested on a single case decided

6    after the Arizona Supreme Court denied Morris's direct appeal.  (ROA 307 at 58) (citing

7    *Sosnowicz*, 229 Ariz. at 97–98, 270 P.3d at 924–25).  Morris categorized this as one of

8    several claims based on "New Law."  (ROA 307 at 58.)  In evaluating an attorney's

9    performance, "every effort [must] be made . . . to evaluate the conduct from counsel's

10   perspective *at the time*."  *Strickland,* 466 U.S. at 689 (emphasis added).  Morris's appellate

11   counsel cannot be ineffective for failing to argue a theory that had not been developed at

12   the time of the appeal.

13        Nor do circumstances in this case, considered in light of the decision in *Sosnowicz*,

14   "come close to showing the sort of 'extreme malfunctio[n] in the state criminal justice

15   syste[m]' that would permit federal court intervention."  *Kayer*, 592 U.S. at 123–24

16   (quoting *Richter*, 562 U.S. at 102).  In *Sosnowicz*, the court held that the medical examiner

17   impermissibly testified under Ariz. R. Evid. 702 that the victim died from a "homicide"

18   rather than an accident, where the medical examiner did not rely on any specialized

19   knowledge, rendered the opinion based largely on the testimony of interested lay witnesses,

20   and was not in any better position to determine the manner of death than was the jury.  229

21   Ariz. at 95–96, 270 P.3d at 922–23.

22        In *Sosnowicz*, there was no dispute as to cause of death; the victim died from blunt

23   force trauma after being run over by the defendant.[46]  229 Ariz. at 94, 270 P.3d at 921. The

24   medical examiner, however, went further by determining "that the manner of death was

25   ───────────────

26   [46] The court clarified that "cause of death" is "the disease or injury responsible for

27   the lethal sequence of events," and "manner of death" "explains how the cause of death
     arose."  *Sancowicz*, 229 Ariz. at 94, 270 P.3d at 921.

28                                              207

homicide based on his findings from the autopsy and the information he received from the police." *Id.*  Unlike a cause of death determination, manner of death goes to the ultimate question of criminal liability and invades the province of the jury.  "[A]n expert is not permitted to tell a jury how to decide a case." *Id.* at 97, 270 P.3d at 924; *see also id.* at 97 n.10 (recognizing the distinction between legal causation and medical causation).

The Court of Appeals in *Sancowicz* determined that the medical examiner's testimony as to manner of death was impermissible, but declined "to formulate a bright-line rule that will govern every scenario in which a medical examiner may be asked to testify regarding the victim's manner of death in a criminal case over the defendant's objection." 229 Ariz. at 97, 270 P.3d at 925.  The court contrasted the facts in *Sancowicz* with an out-of-state case which involved a victim whose body revealed no evident violence or trauma and an "indefinite" toxicology report.  *State v. Commander*, 396 S.C. 254, 721 S.E.2d 413, 415 (2011).  The medical examiner relied "on anecdotal history relayed by officers at the scene, together with the lack of normal indicators of physical violence," and opined that the cause of death was asphyxiation and that the manner of death was homicide due to the suspicious nature of the victim's death.  *Id.* at 258, 721 S.E.2d at 415.  The court found the testimony admissible, first noting that state law requires medical examiners to make an initial inquiry and form the basis of a medical conclusion as to the cause and manner of death in certain instances, including if a person dies in a suspicious or unusual manner.  *Id.* at 264, 721 S.E. 2d at 418.  To aid in the determination of cause and manner of death, a medical examiner routinely conducts an autopsy.  *Id.* at 264–65, 721 S.E. 2d at 419.  "Because the anecdotal history is an essential component of any autopsy," the court held that "testimony concerning findings based on this information falls within the umbrella of the expert's specialized knowledge." *Id.* at 267, 721 S.E.2d at 420.  The court noted that the medical examiner "testified extensively concerning his methodology, stating he arrived at the cause and manner of death through a process of elimination, in which the lack of physical injury figured prominently into his opinion that Victim died from

asphyxiation as a result of homicide. The information gleaned from the police investigation formed merely one aspect of his examination." *Id.* Such testimony is admissible, the court held, "so long as the expert does not opine on the criminal defendant's state of mind or guilt or testify on matters of law in such a way that the jury is not permitted to reach its own conclusion concerning the criminal defendant's guilt or innocence." *Id.* at 269, 721 S.E.2d at 421.

The Arizona Court of Appeals did not disagree with the result or find it inconsistent with the result reached in *Sosnowicz*:

> The history relied on by the pathologist in *Commander,* which consisted of objectively verifiable data, was, as the court noted, "of a type reasonably relied upon by experts" in determining the cause and manner of death. *See* Rule 703. Insofar as the record suggests here, however, the history relied on by [the medical examiner] was comprised of the statements by, for the most part, interested witnesses whose accuracy and credibility were necessarily subject to question. Indeed, had the court in *Commander* been faced with circumstances similar to those in this case, it may well have reached a different result.

*Sosnowicz*, 229 Ariz. at 97, 270 P.3d at 924. Thus, even if *Sosnowicz* applied to the question of appellate counsel's ineffectiveness, the PCR court's prejudice determination was not unreasonable. Unlike *Sosnowicz*, the medical examiners here did not testify as to the "ultimate question" of criminal liability. And as the Arizona Supreme Court determined on direct appeal, Arizona statutes permit medical examiners to receive information about the circumstances surrounding a suspicious death and there was nothing in the record to suggest that the medical examiners were improperly influenced by the statements in providing their expert opinions. *Morris*, 215 Ariz. at 336, 160 P.3d at 215.

The Court concludes that the state court's rejection of the IAAC claim was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *See Matthews*, 567 U.S. at 47 (*citing Richter*, 562 U.S. at 101–02). Claim Twenty-Two (C) is denied.

1

**J.  Claim Eleven**

2      Morris alleges the trial court's admission of excessively gruesome photographs

3  during the guilt and aggravation phases of trial resulted in the denial of a fair trial as

4  guaranteed by the Sixth and Fourteenth Amendments, violated due process under the Fifth

5  and Fourteenth Amendments, and rendered Morris's death sentence unreliable under the

6  Eighth Amendment.  (Doc. 21 at 251–55.)

7      In his Opening Brief, Morris argued the trial court abused its discretion by allowing

8  the prosecutor to show the jurors gruesome photographs of the victims' decaying corpses

9  solely for the purpose of upsetting and inflaming the jurors.  (DA 29 at 54–58.)  The

10  Arizona Supreme Court affirmed, finding none of the photographs which Morris

11  specifically objected to on appeal were gruesome and that the trial judge had carefully

12  analyzed each photograph for purposes of Arizona Rule of Evidence 403 and determined

13  any prejudicial effect did not substantially outweigh the probative value.  *Morris*, 215 Ariz.

14  at 339–40, 160 P.3d at 218–19.  On that record, the court "could not conclude that the trial

15  judge abused his discretion in admitting the photographs."  *Id.* at 340, 160 P.3d at 218–19.

16  Morris alleges the Arizona Supreme Court's finding was contrary to or an unreasonable

17  application of the law and an unreasonable determination of the facts.  (Doc. 21 at 251–

18  52.)  Respondents assert Claim Eleven is unexhausted and procedurally defaulted.  (Doc.

19  27 at 150–51.)

20      To fairly present a federal claim, a state prisoner must present to the state courts

21  both the operative facts and the federal legal theories that animate the claim.  *See Gray*,

22  518 U.S. at 162–63; *Castillo*, 399 F.3d at 999.  Morris asserts that the substance of his

23  federal claim was preserved because he cited *Brecht*, 507 U.S. at 623, on direct appeal,

24  making it "clear" that he "was raising a constitutional challenge because he relied on the

25  harmlessness inquiry applicable to such constitutional violations."  (Doc. 34 at 171.)  The

26  Court disagrees.

27

28                                                210

1     Morris's Opening Brief focused exclusively on state law.  (*See* DA 29 at 55) ("This

2     Court assesses the admissibility of photographs under a three-part test, examining 1)

3     relevance, 2) tendency to incite or inflame, and 3) the probative value versus the potential

4     to cause unfair prejudice.") (citing *State v. Davolt*, 207 Ariz. 191, 208, 84 P.3d 456, 473

5     (2004)); *see also Arrendondo v. Neven*, 763 F.3d 1122, 1138 (9th Cir. 2014) ("Because

6     Arrendondo's brief before the Nevada Supreme Court focused exclusively on state law, he

7     failed to present his compulsory-process claim as a federal claim.").

8     Moreover, Morris's citation to *Brecht's* harmlessness standard along with a stated

9     conclusion that he did not receive a "fair trial" was insufficient to preserve the

10    constitutional claim.  "General appeals to broad constitutional principles, such as due

11    process, equal protection, and the right to a fair trial, do not establish fair presentation of a

12    federal constitutional claim."  *Castillo*, 399 F.3d at 1002 ("Exhaustion requires more than

13    drive-by citation, detached from any articulation of an underlying federal legal theory.");

14    *Fields*, 401 F.3d at 1021; *Shumway*, 223 F.3d at 987 (finding it insufficient for prisoner to

15    make "a general appeal to a constitutional guarantee," such as a naked reference to "due

16    process," or to a "constitutional error" or a "fair trial").

17    Because the claim is unexhausted and would be precluded if raised in a successive

18    post-conviction petition, it is procedurally defaulted.  *See* Ariz. R. Crim. P. 32.2(b);

19    32.1(b)–(h).  Morris argues the default of this claim is excused by appellate counsel's

20    ineffectiveness coupled with PCR counsel's subsequent failure to raise an IAAC claim

21    under *Martinez*.  (Doc. 34 at 152–53; *see also id.* at 24–25.)  As previously discussed,

22    because Morris did not first exhaust this IAAC claim in his PCR petition, he may not use

23    an IAAC claim as cause to excuse the procedural default of this alleged trial error, and

24    *Martinez* does not provide cause to excuse the procedural default because Claim Eleven

25    alleges trial-court error, not trial counsel's ineffectiveness.  *See Martinez (Ernesto)*, 926

26    F.3d at 1225.  Claim Eleven is denied.

27

28    211

**K. Claim Twelve**

Morris alleges the State failed to present sufficient evidence supporting the (F)(6) aggravating factor and that this error was compounded by the Arizona Supreme Court on direct appeal in violation of Morris's rights under the Fifth, Eighth, and Fourteenth Amendments.  (Doc. 21 at 256–64.)  Morris concedes the claim was not presented in state court, but asserts the claim was exhausted by the Arizona Supreme Court's abuse of discretion review.  (*Id.* at 256.)

The Arizona Supreme Court reviewed Morris's death sentence pursuant to A.R.S. § 13-703.05[47] and concluded that the jury did not abuse its discretion in finding that the State proved the (F)(6) factor beyond a reasonable doubt because the State presented expert evidence that strangulation victims remain conscious and experience pain for some period of time and presented additional evidence that three of the victims struggled with Morris. *Morris*, 215 Ariz. at 340–41, 160 P.3d at 219–20.  Because the finding of cruelty alone was sufficient to establish the (F)(6) factor, the court did not address whether the jury abused its discretion in finding that the murders were also heinous or depraved.  *Id.* at 341, 160 P.3d at 220.

Although exhaustion ordinarily requires a petitioner to present both the legal basis of his federal claim to the state courts and include a thorough description of the operative facts entitling the petitioner to relief, there are, as potentially relevant here, two additional mechanisms which may serve to exhaust a claim for purposes of federal habeas review.

First, when a state court is required to review the record for federal constitutional error, the state court's determination that there was no such error constitutes exhaustion of

---

[47] For offenses committed after August 1, 2002, the Arizona Supreme Court is required to review all death sentences to determine "whether the trier of fact abused its discretion in finding aggravating circumstances and imposing a sentence of death."  A.R.S. § 13-703.05(A); *see* also 2002 Ariz. Sess. Laws 5th Spec. Sess. CH.1 (S.B. 1001) (stating that A.R.S. § 13-703.05 applies to offenses committed on or after August 1, 2002). *Morris* was the first case to be reviewed under this statute.  215 Ariz. at 340, 160 P.3d at 219.

1   constitutional claims that are within the scope of the court's mandatory review. *Beam v.*

2   *Paskett*, 3 F.3d 1301, 1306–07 (9th Cir. 1993), *overruled on other grounds by Lambright*

3   *v. Stewart,* 191 F.3d 1181 (9th Cir. 1999) (en banc); *but see Martinez-Villareal*, 80 F.3d at

4   1306 ("Under Arizona law, fundamental error review does not prevent subsequent

5   procedural preclusion.").  In this case, however, contrary to Morris's assertion, the review

6   provision in A.R.S. § 13-703.05 mandates only that the court "review death sentences to

7   determine whether the trier of fact abused its discretion in finding aggravating

8   circumstances and imposing a sentence of death."  It does not mandate constitutional

9   review of the jury's findings.  Thus, the state court's application of this mandatory

10  provision, without more, did not exhaust Morris's claim. *Cf. Moormann*, 426 F.3d at 1057–

11  58 (finding unexhausted issues that are not included in the scope of the Arizona Supreme

12  Court's independent review of the death sentence as defined by that court).

13       Second, a claim may be exhausted if the State's highest court expressly rules on the

14  federal constitutional issue even when a petitioner fails to fairly present the claim because

15  in that case "there is no possibility of 'friction between the state and federal court

16  systems.'" *Sandgathe v. Maass*, 314 F.3d 371, 377 (9th Cir. 2002) (quoting *O'Sullivan*,

17  526 U.S. at 845).  "[T]here is no point asking whether a state court had a 'full and fair

18  opportunity to resolve federal constitutional claims,' . . . when the state court in fact did

19  so." *Id.*  (quoting *O'Sullivan*, 526 U.S. at 845).

20       Morris contends the standard of review articulated by the Arizona Supreme Court's

21  abuse of discretion review – whether there is "any reasonable evidence in the record to

22  sustain" the jury's finding – *id.* at 341, 160 P.3d at 220 (citing *State v. Veatch*, 132 Ariz.

23  394, 396, 646 P.2d 279, 281 (1982)), necessarily encompasses the constitutional standard

24  expressed in *Jackson*, 443 U.S. at 319: whether "after viewing the evidence in the light

25  most favorable to the prosecution, any rational trier of fact could have found the essential

26  elements of the crime beyond a reasonable doubt."  (Doc. 34 at 176.)  But "[t]he mere

27  similarity between a claim of state and federal error is insufficient to establish exhaustion."

28                                            213

*Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999). A petitioner must make the federal basis of a claim explicit either by citing specific provisions of federal law or case law, *Lyons*, 232 F.3d at 670, or by citing state cases that plainly analyze the federal constitutional claim, *Peterson*, 319 F.3d at 1158.

By analogy, therefore, before Morris can rely on the Arizona Supreme Court's ruling as a means of exhaustion, it must be clear that the court ruled on the federal claim. The Arizona Supreme Court conducted its mandatory review by analyzing the jury's finding of the cruelty prong of the (F)(6) aggravating factor. *Morris*, 215 Ariz. at 340–41, 160 P.3d at 219–20. The court made no reference to the federal constitution, *Jackson*, or any other federal case, and its analysis referenced only a single state case, *Veatch*, 132 Ariz. at 396, 646 P.2d at 281. *Veatch*, in turn, established that "an appellate court must view the evidence on appeal in a light most favorable to support the judgment," and the judgment is presumed correct "if there is any reasonable evidence in the record to sustain it." *Id.* This standard is not identical to the standard in *Jackson*. *See Jackson*, 443 U.S. at 320 (explicitly rejecting the call for a "no evidence" standard that would be satisfied by a "mere modicum" of evidence and holding instead that the due process standard is "record evidence [that] could reasonably support a finding of guilt beyond a reasonable doubt"). In neither *Veatch* nor *Morris* did the court explicitly analyze the sufficiency of the evidence under federal due process standards or cite any federal case or law applying the constitutional standard. Accordingly, not only did Morris not fairly present a *Jackson* claim to the Arizona Supreme Court, that court did not decide such a claim.[48]

---

[48] Subsequently, in another case in which the defendant challenged the sufficiency of the evidence to support an aggravating factor, the Arizona Supreme Court clarified that a jury abuses its discretion if, reviewing the facts in the light most favorable to sustaining the verdict, it finds an aggravating circumstance when the record reflects insufficient evidence to support that finding beyond a reasonable doubt. *State v. Roque*, 213 Ariz 193, 141 P.3d 368 (2006). Thereafter, this standard, which is similar to the *Jackson* standard, was utilized by the Supreme Court in its abuse of discretion review under 13-703.05, *see*

214

1    Morris's claim, therefore, remains unexhausted and procedurally defaulted.

2    Morris asserts the ineffective assistance of appellate counsel excuses the default of

3    this claim, and that he exhausted this IAAC claim.  (Doc. 34 at 177) (citing Doc. 21 at 303,

4    305–07 (Claim Twenty-Two (A))).   In his postconviction petition, Morris asserted that

5    appellate counsel was ineffective for failing to argue that there was insufficient evidence

6    of cruelty.  (Doc. 307 at 7.)  He alleged he was prejudiced because, in the absence of an

7    appellate challenge, the PCR court reviewed only whether the jury had abused its discretion

8    in deciding that each murder was especially cruel, not whether there was sufficient

9    evidence of cruelty under *State v. Snelling*, 225 Ariz. 182, 236 P.3d 409 (2010).  (*Id.*)

10    While Morris did argue in his PCR petition that appellate counsel was ineffective

11    for failing to challenge the sufficiency of the evidence (*see* ROA 307 at 7), he did not argue

12    that appellate counsel was ineffective for failing to raise a constitutional due process claim.

13    Thus, this claim, asserted as cause to excuse the default of Morris's *Jackson* claim, is itself

14    defaulted.  Moreover, the claim is meritless.

15    "*Jackson* leaves juries broad discretion in deciding what inferences to draw from

16    the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from

17    basic facts to ultimate facts.'" *Lucero v. Holland*, 902 F.3d 979, 994 (9th Cir. 2018) (citing

18    *Coleman v. Johnson*, 566 U.S. 650, 655 (2012) (per curium)).  Importantly, "this inquiry

19    does not require a court to ask itself whether *it* believes that the evidence at the trial

20    established guilt beyond a reasonable doubt." *Jackson,* 443 U.S. at 318–19 (internal

21    quotations omitted).  Instead, "[t]his familiar standard gives full play to the responsibility

22    of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to

23    draw reasonable inferences from basic facts to ultimate facts." *Id.* at 319.

24

25

26    *e.g., State v. Gunches*, 225 Ariz. 22, 25, 234 P.3d 590, 593 (2010), *State v. Robinson*, 253
Ariz. 121, 134, 509 P.3d 1023, 1036 (2022).  To the extent the application of this standard
27    of review may exhaust a *Jackson* claim, it was not the standard the court applied in *Morris.*

28    215

1    The juries' determination that the murders were especially cruel was not "so

2 arbitrary or capricious as to constitute an independent due process or Eighth Amendment

3 violation." *Jeffers*, 497 U.S. at 780; *see Styers v. Schriro*, 547 F.3d 1026, 1033 (9th Cir.

4 2008). "A state court's finding of an aggravating circumstance in a particular case . . . is

5 arbitrary or capricious if and only if no reasonable sentencer could have so concluded."

6 *Jeffers*, 497 U.S. at 783 (quoting *Jackson*, 443 U.S. 307).

7    Arizona courts have defined cruelty to exist "if the victim consciously experienced

8 physical or mental pain prior to death, and the defendant knew or should have known that

9 suffering would occur.  Mental anguish includes a victim's uncertainty about her ultimate

10 fate." *State v. Trostle*, 191 Ariz. 4, 951 P.2d 869, 883 (1997) (internal quotation marks and

11 citations omitted).  The victim must have been conscious "during at least some portion of

12 the crime." *State v. Jones*, 205 Ariz. 445, 449, 72 P.3d 1264, 1268 (2003) (citing *Trostle*,

13 191 Ariz. at 18, 951 P.2d at 883).

14    Here, a rational factfinder could have found that the victims were conscious before

15 Morris killed them by strangulation because the "medical examiner testified that all of the

16 victims would have experienced pain for some period before losing consciousness."[49]  *Id.*

17 at 338, 160 P.3d at 217.  Morris asserts that this evidence is insufficient under the court's

18 decision in *Snelling*, 225 Ariz. at 188–89, 236 P.3d at 415–16 (refusing to find all

19 strangulations are "per se physically cruel absent specific evidence that the victim

20 consciously suffered physical pain.").  In *Snelling*, however, "the medical examiner did not

21 testify that victims in general always experience, or [the victim] in particular experienced

22 pain during strangulation." *Id.* at 189, 236 P.3d at 416.  Specifically contrasting the facts

23 in *Snelling*, where the evidence of the victim's conscious experience of physical pain was

------

24    [49] Additionally, the Arizona Supreme Court noted that there was evidence from

25 which a reasonable juror could infer that three of the victim's struggled.  *Morris*, 215 Ariz.

26 at 338, 160 P.3d at 217.  Morris asserts this determination was no more than speculation.

27 The Court need not address this assertion, however, because the evidence of consciousness
and suffering as to all five victims is sufficient to support the (F)(6) finding.

28                                            216

1    inconclusive, with the facts in *Morris*, where the State presented evidence that

2    strangulation victims remain conscious and experience pain for some time, the court

3    explained that "[a]lthough one might reasonably suspect that any strangulation victim must

4    experience physical pain, speculation cannot support a finding of especial cruelty when . . .

5    the record contains no evidence of the physical pain required for an (F)(6) finding of

6    physical pain." *Id.* at 190, 236 P.3d at 417.  A reasonable inference to be drawn from the

7    evidence, especially when resolving conflicts in favor of the prosecution, is that conscious

8    suffering was established, which, under Arizona law, is sufficient evidence of cruelty.  *See*

9    *Bolton*, 182 Ariz. at 311, 896 P.2d at 851 (citing *State v. Jimenez,* 165 Ariz. 444, 453, 799

10   P.2d 785, 794 (1990)).  Claim Twelve is procedurally defaulted and barred from federal

11   review.  It is also meritless.

12       **L.   Claim Thirteen**

13       In Claim 13 of his petition, Morris seeks relief for a violation of his due process

14   right to be sentenced by a jury correctly informed of his ineligibility for parole under *Lynch*,

15   578 U.S. 613, and *Simmons*, 512 U.S. 154. (Doc. 21 at 264–69.)  This claim was denied by

16   separate order on June 28, 2023.  (Doc. 84.)

17       **M. Claim Fourteen**

18       Morris argues that his absence during the jury commissioner's prescreening of the

19   jury for hardship regarding the length of the trial deprived him of due process (Claim

20   Fourteen (A)), and that the jury commissioner's prescreening process violated his right to

21   a jury drawn from a representative cross-section of the community (Claim Fourteen (B)).

22   (Doc. 21 at 269–76.)

23       The Arizona Supreme Court summarized the facts comprising this claim:

24       Because the trial was expected to last six to eight weeks, the judge ordered
         the jury commissioner to poll the jurors to identify those who claimed that
25       they could not serve for such a long trial.  The jury commissioner gave those
         jurors one-page questionnaires on which they could state the reasons for their
26

27

28                                                  217

inability to serve.[50]   The lawyers then reviewed the questionnaires for potentially invalid excuses and submitted those questionnaires to the judge for further review.

After reviewing the questionnaires, the judge determined that approximately twenty prospective jurors had provided questionable excuses.  When he asked the jury commissioner to send those twenty individuals to the courtroom for further questioning, the jury commissioner informed him that only four of the twenty were available.[51]   The jury commissioner had released the remaining sixteen to other panels.

Defense counsel admitted that he could not identify any group excluded from service or show that the jury did not represent a cross-section of the community, but objected to the prescreening procedure because it left only "volunteers" as prospective jurors.  The trial judge rejected this challenge.

*Morris*, 215 Ariz. at 334, 160 P.3d at 213.

Claim Fourteen (A)

Morris alleges the jury commissioner's reassignment to other trials of the prospective jurors who indicated they had a hardship, without making those jurors available for questioning in Morris's presence, violated his rights under the Sixth and Fourteenth Amendments to be present during a critical stage of his trial.  (Doc. 21 at 269, 272–73.)

On direct appeal, Morris argued that the trial court's overruling of his objection to the jury commissioner's prescreening of potential jurors outside the presence of Morris and his counsel was inconsistent with Sixth Amendment guarantees for an accused to be present

---

[50] Approximately 330 to 350 potential jurors were called for the purpose of seating seven or eight juries in total that day; they were not designated specifically for Morris's trial.  (RT 6/01/05 at 3, 11.)  Of those potential jurors, 87 indicated they did not have a hardship that would prevent them from serving.  (*Id.* at 3–4.)  The trial court subsequently rejected the excuses offered by two potential jurors, resulting in a venire of 89 jurors for Morris's trial.

[51] Morris alleged in his Opening Brief that all but four of the questionnaires from the twenty "suspect" venire persons were missing.  (DA 29 at 38) (citing RT 06/01/05 at 18).  The jury commissioner was ultimately unable to locate these forms.  (*Id.*)

218

1    at all critical stages of the proceeding and his due process right to be present during jury

2    selection.  (DA 29 at 40–41.)  The Arizona Supreme Court denied the claim, finding:

3        [E]ven assuming that he was entitled to attend the prescreening process, an
         issue we do not reach, any error is harmless because no basis exists on which
4        we could conclude that Morris's exclusion from that process affected the
         verdict.
5

6    *Morris*, 215 Ariz. at 335, 160 P.3d at 214.

7        The Arizona Supreme Court's decision was neither contrary to nor an unreasonable

8    application of clearly established federal law.  There is no clearly established federal law

9    entitling a criminal defendant to be present during a prescreening process for hardship

10   regarding the length of trial.  A criminal defendant's "constitutional right to presence is

11   rooted to a large extent in the Confrontation Clause of the Sixth Amendment," but "in some

12   situations where the defendant is not actually confronting witnesses or evidence against

13   him" the Supreme Court has "recognized that this right is protected by the Due Process

14   Clause."  *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (citation omitted).  "The

15   presence of a defendant is a condition of due process to the extent that a fair and just hearing

16   would be thwarted by his absence, and to that extent only."  *Id.*  (quoting *Snyder v.*

17   *Massachusetts*, 291 U.S. 97, 105–06 (1934)).  "Among the proceedings at which a

18   defendant has such a due process right to be present are 'the voir dire and empanelling of

19   the jury.'"  *United States v. Ehmer*, 87 F.4th 1073, 1097 (9th Cir. 2023) (citing *Campbell*

20   *v. Wood*, 18 F.3d 662, 671 (9th Cir. 1994)).  "[P]re-screening and excusing potential jurors

21   'for hardship'," however, "is an administrative task that 'cannot reasonably be considered

22   a part of the criminal trial' and that therefore may be conducted by the court or its staff . . .

23   without the participation of the parties or their lawyers."  *Id.* at 1098; *see also United States*

24   *v. Greer*, 285 F.3d 158, 168 (2d Cir. 2002) ("[H]ardship questioning is not a part of voir

25   dire—and thus not a critical stage of the trial during which the parties and counsel must be

26   present."); *United States v. Moreland*, 703 F.3d 976, 982–83 (7th Cir. 2012) (commenting

27

28                                    219

1    that "it is difficult to see" what the defendant's presence could have added to the jury

2    administrator's consideration of hardship excuses outside the defendant's presence).

3        Additionally, even if Morris was entitled to be present during the pre-screening

4    process, violation of the right to be present is subject to harmless error analysis,

5    notwithstanding Morris's claim to the contrary.  *Campbell v. Rice*, 408 F.3d 1166, 1172

6    (9th Cir. 2005) ("The Supreme Court has never held that the exclusion of a defendant from

7    a critical stage of his criminal proceedings constitutes a structural error.") (citing *Rushen

8    v. Spain*, 464 U.S. 114, 117 (1983) (per curiam)).  Morris fails to cite any clearly established

9    Supreme Court law holding that a defendant's absence from portions of the jury-selection

10   process is structural error and therefore per se prejudicial.

11       In *United States v. Gonzalez-Lopez,* cited by Morris in support of his claim (*see*

12   Doc. 21 at 274), the Court held that the erroneous deprivation of the right to counsel of

13   choice qualifies as structural error because it "bears directly on the 'framework within

14   which the trial proceeds' . . . ." 548 U.S. 140, 150 (2006) (citing *Fulminante*, 499 U.S. at

15   310).  But *Gonzalez-Lopez* did not hold that violation of the right to be present is structural

16   error, and appellate courts, including the Ninth Circuit, continue to subject such claims to

17   harmless error review.  *See United States v. Reyes*, 764 F.3d 1184, 1197 n.4 (9th Cir. 2014)

18   ("[T]he erroneous deprivation of the defendant's right to be present is subject to harmless

19   error review.  We have continued to apply these precedents after the Supreme Court issued

20   its opinion in *Gonzalez–Lopez*."); *see also Hovey*, 458 F.3d at 902–03 ("Even if Hovey had

21   a right to be present at the competency hearing, his exclusion from the hearing was

22   harmless.").  Thus, it was not contrary to or an unreasonable application of clearly

23   established federal law for the state court to apply harmless-error review.

24       Nor did the state court unreasonably apply clearly established federal law in

25   determining that the denial of Morris's rights was harmless.  Morris argues that it "cannot

26   be said that Morris's presence during the jury commissioner's prescreening of prospective

27   jurors would have 'been useless, or the benefit but a shadow,'" because had Morris been

28                                              220

1    present "either he or his counsel would have been able to identify other invalid excuses

2    that went undetected by the jury commissioner."  (Doc. 21 at 274.)  This argument,

3    however, does not go to harmlessness.  It goes to Morris's assertion that he was entitled to

4    participate in the administrative prescreening of the jurors, an allegation the state court

5    assumed correct in finding any error "harmless because no basis exists on which we could

6    conclude that Morris's exclusion from that process affected the verdict." *Morris*, 215 Ariz.

7    at 335, 160 P.3d at 214.  Even assuming Morris was entitled to be present, the state court

8    conducted a harmless-error analysis and Morris can obtain relief only if that determination

9    was unreasonable.  *See Ayala*, 576 U.S. at 268.  Morris does not challenge the state court's

10   ultimate harmlessness conclusion—that no basis exists from which it could be concluded

11   that Morris's exclusion from the prescreening process affected the verdict.  *See Reyes*, 764

12   F.3d at 1193 (finding defendant's absence from voir dire harmless in light of overwhelming

13   evidence of guilt).  The Arizona Supreme Court's decision denying relief on this claim was

14   not contrary to nor an unreasonable application of clearly established federal law.  Claim

15   Fourteen (A) is denied.

16   Claim Fourteen (B)

17       Morris alleges "the jury commissioner's willingness to excuse jurors who might

18   suffer hardship because of the length of the trial without inquiring into the reasons for the

19   alleged hardship resulted in a jury comprised essentially of 'volunteers'" and likely

20   "disproportionately excluded low-income persons from Morris's jury because those who

21   would not opt out would be those with the financial means to be absent from work for two

22   months."  (Doc. 21 at 275.)  Morris alleges the jury selection process violated his right to

23   a jury drawn from a representative cross-section of the community in violation of the Sixth

24   Amendment.  (*Id.*) (citing *Taylor v. Louisiana*, 419 U.S. 522, 537 (1975)).

25       In his direct appeal, Morris asserted his right to the selection of a jury from a

26   representative cross-section of the community was violated when the jury commissioner

27   was allowed to prescreen prospective jurors for hardship based on the expected length of

28                                      221

1  the trial.  (DA 29 at 44.)  He further alleged he was unable to establish "a prima facie

2  violation of the fair cross-section requirement . . .  because the State misplaced the

3  documents he needed to prove his claim."  (DA 29 at 45.)

4      The Arizona Supreme Court first identified the three-part test established by the

5  Supreme Court in *Duren v. Missouri*, 439 U.S. 357 (1979), for evaluating whether Morris

6  had made a prima facie showing that the jury did not represent a fair cross-section of the

7  community:

8      (1) that the group alleged to be excluded is a "distinctive" group in the
   community; (2) that the representation of this group in venires from which
9      juries are selected is not fair and reasonable in relation to the number of such
   persons in the community; and (3) that this underrepresentation is due to
10     systematic exclusion of the group in the jury-selection process.

11

12  *Morris*, 215 Ariz. at 334, 160 P.3d at 213 (quoting *Duren*, 439 U.S. at 364).

13     Addressing the first prong, the court determined Morris had failed to identify a

14  distinctive group that was excluded from his jury panel.  *Id.*  The court also determined

15  Morris had failed to demonstrate that the jurors who actually served were not fair and

16  impartial and thus failed to show any actual prejudice resulting from the commissioner's

17  prescreening of prospective jurors.  *Id.*  (citations omitted).

18     State criminal defendants have the right to an "impartial jury."  U.S. Const. amend.

19  VI; *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 379 (1979).  To assure this right, the

20  jury must be selected from a "fair cross section of the community."  *Taylor v. Louisiana*,

21  419 U.S. at 529–33; *Berghuis v. Smith*, 559 U.S. 314 (2010).  The Arizona Supreme Court

22  correctly identified *Duren* as the controlling test for an alleged lack of a fair cross-section

23  of the community.  *Berghuis*, 559 U.S. at 319; *Roger Murray*, 882 F.3d at 808.

24     Morris alleges the state court's decision was an unreasonable application of clearly

25  established federal law.  (Doc. 21 at 276.)  This bare allegation, however, is insufficient to

26  carry his burden of demonstrating that the state court applied clearly established Supreme

27  Court precedent in an objectively unreasonable manner.  *See Visciotti*, 537 U.S. at 25;

28

222

1    *Richter*, 562 U.S. at 98 (burden is on the petitioner to show "there was no reasonable basis

2    for the state court to deny relief.").

3         Morris also contends the state court's finding that he had not identified a distinctive

4    group that was excluded from the jury pool was an unreasonable determination of the facts

5    because the jury commissioner lost the forms that disclosed the identities of the prospective

6    jurors who were excused for hardship.  (Doc. 21 at 276.)  But even assuming Morris's

7    factual allegations are correct and that the missing questionnaires would have supported

8    his claim that the screening disproportionately excluded low-income persons, his claim

9    lacks merit.

10        Morris has not alleged any facts, either in his direct appeal or in this petition, from

11   which it could be concluded that individuals who face financial hardship are a "distinctive

12   group" in the community.  *See Coleman v. McCormick*, 874 F.2d 1280, 1284 (9th Cir.

13   1989) (*Duren* test not met when petitioner failed to allege any facts from which it could be

14   concluded that persons from the lower socioeconomic areas of the community formed a

15   distinctive group, or that if such a group existed it consisted of a sufficient number of

16   persons so that its systematic exclusion from jury panels would support a fair cross-section

17   challenge under the Sixth Amendment).  Nor is there any clearly established federal law

18   establishing economic status as a "distinctive group" for purposes of selecting a jury.  *See*

19   *Atwood v. Schriro*, 489 F. Supp. 2d 982, 1046 (D. Ariz. 2007) ("[I]ndividuals who face

20   financial hardship do not constitute a distinctive group, and underrepresentation of poor

21   people in Petitioner's particular jury panel does not amount to systemic exclusion.").  *See*

22   *also Berghuis*, 559 U.S. at 333, n.35 ("We have also never 'clearly' decided, and have no

23   need to consider here, whether the impact of social and economic factors can support a

24   fair-cross-section claim."); *Duren*, 439 U.S. at 370, quoting *Taylor*, 419 U.S. at 534 ("[I]t

25   is unlikely that reasonable exemptions, such as those based on special hardship, incapacity,

26   or community needs, 'would pose substantial threats that the remaining pool of jurors

27   would not be representative of the community.'").

28                                          223

Furthermore, to the extent Morris alleges the missing questionnaires prevented him from showing the hardship exemption resulted in exclusion of a distinctive socioeconomic group, "proof of underrepresentation in a single jury" alone does not violate the cross-section requisite. *United States v. Miller*, 771 F.2d 1219, 1228 (9th Cir. 1985). Morris offered no statistical evidence to show systematic underrepresentation of a distinctive group in the venires from which his jury was selected.

Moreover, the juror forms from sixteen of the potential jurors that were lost consisted of a single page on which the potential juror's wrote down the reasons they had an impediment to serving for the scheduled length of trial. (RT 6/01/05 at 12); *see e.g.*, Jury Selection Exhibit 3. Morris offers no evidence that information from the remainder of the excluded jurors—the large majority of potential jurors exempted for hardship (approximately 225–245 potential jurors)—was missing. Morris could have attempted to show that exclusion of these jurors resulted in the exclusion of a distinct group. It is unlikely the 16 missing questionnaires would have significantly impacted the statistical analysis of such a claim, and, to the extent they did, the court would have been in a better position to consider the impact of the missing evidence in any event. Morris's complete failure to provide any evidence is fatal to his claim.

The Arizona Supreme Court's decision denying relief on this claim was not contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts. Claim Fourteen (B) is denied.

## N. Claims Fifteen and Twenty-Two (B)

Morris alleges the trial court violated his Sixth and Fourteenth Amendment rights when it admitted hearsay testimony in violation of the Confrontation Clause. (Doc. 21 at 276–81.) Specifically, Morris alleges Dr. Keen's testimony about Noah's autopsy results, based not on his own observations but rather on Dr. Zhang's autopsy report (Claim Fifteen (A)), and the testimony of all the medical examiners regarding toxicology results from testing they did not conduct (Claim Fifteen (B)), violated the Confrontation Clause. Morris

concedes the claims were not raised in state court, and Respondents contend the claims are procedurally defaulted. (Doc. 27 at 169.) Morris first asserts that the default is excused by the ineffective assistance of appellate counsel coupled with PCR counsel's subsequent failure to raise an IAAC claim under *Martinez*. (Doc. 21 at 276.) He abandons his reliance on *Martinez* in his reply, and asserts that the ineffective assistance of appellate counsel excuses the default and that he exhausted this IAAC claim. (Doc. 34 at 196) (citing Doc. 21 at 303, 307–09 (Claim Twenty-Two (B))).

Ineffective assistance of appellate counsel may be used as cause to excuse a procedural default only where the particular ineffective assistance allegation was first exhausted in state court as an independent constitutional claim. *See Carpenter*, 529 U.S. at 453 (2000) ("an ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted"); *Carrier*, 477 U.S. at 489–90. Although Morris did not clearly assert a claim of appellate counsel ineffectiveness in his PCR petition (*see* ROA 307 at 59–64) (alleging significant change in the law pursuant to Rule 32.1(g)), the PCR court ruled there was no colorable claim of ineffective assistance of appellate counsel:

> The Supreme Court also would not have found error in allowing Dr. Keen to opine as to the cause of death of victim Noah even though he did not conduct the autopsy. The Court has repeatedly held that a testifying medical examiner may, consistent with the Confrontation Clause, rely on information in autopsy reports prepared by others as long as he forms his own conclusions. *State v. Joseph*, 230 Ariz. 296, ¶8, 283 P.3d 27 (2012) (Dr. Keen); *State v. Dixon*, 226 Ariz. 545, 553, ¶¶36-37, 250 P.3d 1174, 1182 (2011) (Dr. Keen); *State v. Snelling*, 225 Ariz. 182, 187 ¶ 21, 236 P.3d 409, 414 (2010); *State v. Smith*, 215 Ariz. 221, 229 ¶26, 159 P.3d 531, 539 (2007) (Dr. Keen). *See also Williams v. Illinois*, __ U.S.__, 132 S. Ct. 2221, 2228 (2012) ("Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause.") (plurality opinion); *State v. Gomez*, 226 Ariz. 165, 169–70 ¶22, 244 P.3d 1163, 1167–68 (2010) ("[A] medical examiner may offer an expert opinion based on review of reports and test results prepared by others, as long

as the testifying expert does not simply act as a conduit for another non-testifying expert's opinion." (internal quotation marks omitted)); *cf.* Ariz. R. Evid. 703 (allowing testifying expert to rely on data not admitted into evidence).

Here, Dr. Keen stated his opinion based on his review of Dr. Zhang's report, the photographs and other matters. Dr. Zhang's report was not admitted into evidence. Defense counsel cross-examined Dr. Keen about his opinion. In *Joseph*, the Supreme Court also rejected the arguments defendant makes here regarding *Bullcoming v. New Mexico*, __ U.S. __, 131 S. Ct. 2705 (2011), and *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009). [*State v. Joseph*, 230 Ariz. 296,] ¶¶9–11 [283 P.3d 27 (2012).] As in *Joseph*, and the earlier cases, had appellate counsel raised this issue on appeal, the [Arizona] Supreme Court would have found no error. The defendant has failed to show a colorable claim of ineffective assistance of appellate counsel.

(ROA 354 at 10–11.)

In his petition for review, Morris again argued he was entitled to relief under Rule 32.1(g), asserting *Bullcoming* and *Melendez-Diaz* were significant changes in the law. (PR 7 at 42.) The Arizona Supreme Court denied the claim without comment. (PR 27.) The Court finds that this is sufficient to exhaust his IAAC claim alleging appellate counsel failed to argue Claim Fifteen (A) because Morris argued generally that the PCR court's ruling was error, and did not waive consideration of the IAAC claim. *See Sandgathe*, 314 F.3d at 378 (instructing that the *Ylst* presumption of exhaustion applies when the petitioner argues in his petition for review, generally, that the trial court decision was in error and does not indicate a waiver of the federal claim previously decided).

Because he raised the IAAC claim in his PCR proceedings, he satisfies the threshold inquiry. *See Carpenter*, 529 U.S. at 452–53. He next must show that his appellate counsel's performance was ineffective under *Strickland*, 466 U.S. 668. *See Visciotti*, 862 F.3d at 769. To prevail on a claim of ineffective assistance of appellate counsel, a petitioner must show that counsel's appellate advocacy fell below an objective standard of reasonableness and a reasonable probability that, but for counsel's deficient performance, the petitioner would have prevailed on appeal. *Smith v. Robbins*, 528 U.S. at 285–86.

226

1    "[F]ailure to raise untenable issues on appeal does not fall below the *Strickland* standard."
2    *Turner*, 281 F.3d at 872.  Nor does appellate counsel have a constitutional duty to raise
3    every nonfrivolous issue requested by a petitioner.  *Miller v. Keeney*, 882 F.2d 1428, 1434
4    n.10 (9th Cir. 1989) (citing *Jones v. Barnes*, 463 U.S. 745, 751–54 (1983)); *see also Davila*,
5    582 U.S. at 533 ("Declining to raise a claim on appeal . . . is not deficient performance
6    unless that claim was plainly stronger than those actually presented to the appellate
7    court.").  Here, as the Court explains below in addressing Claim Twenty-Two (B), the
8    underlying IAAC claim is meritless because appellate counsel did not perform
9    ineffectively.  Accordingly, Morris has not shown cause to overcome the procedural default
10   of Claim Fifteen (A).

11          Morris did not raise an ineffective assistance of appellate counsel claim related to
12   claim Fifteen (B) in his PCR petition, nor did the PCR court *sua sponte* rule on the merits
13   of such a claim.  (*See* ROA 307, 354.)  Because the claim is unexhausted and would be
14   precluded if raised in a successive post-conviction petition, it is procedurally defaulted.
15   *See* Ariz. R. Crim. P. 32.2(b); 32.1(b)–(h).  Morris argues the default is excused by
16   appellate counsel's ineffectiveness.  (Doc. 34 at 196–97.)  Because Morris did not first
17   exhaust this IAAC claim in his PCR petition, however, he may not allege the ineffective
18   assistance of appellate counsel as cause to excuse the procedural default of this alleged trial
19   error claim. Accordingly, Morris has not shown cause to overcome the procedural default
20   of Claim Fifteen (B).

21          Claims Fifteen (A) and (B) are procedurally defaulted and barred from federal
22   review.

23          In Claim Twenty-Two (B), Morris contends that appellate counsel was ineffective
24   for failing to challenge alleged Confrontation Clause violations at the guilt phase of his
25   trial. (Doc. 21 at 307–309). As discussed above, this claim is comprised of two sub-claims:
26   Morris's contention that appellate counsel failed to argue that his Confrontation Clause
27   rights were violated by: (1) Dr. Keen's testimony based on Dr. Zhang's autopsy report

28                                          227

1      (Claim Twenty-Two (B)(1)), a claim exhausted by the PCR court's ruling; and (2) the

2      testimony by all the medical examiners based on toxicology tests they did not personally

3      perform (Claim Twenty-Two (B)(2)), an unexhausted claim.  Morris asserts that parsing

4      these allegations into two claims is inappropriately hyper-technical.  (Doc. 34 at 220.)

5            Morris bases Claim Twenty-Two (B) on the two separate claims of Confrontation

6      Clause violations alleged in Claims Fifteen (A) and (B).  (*See* Doc. 21 at 278–81.)  In the

7      context of IAC claims, each unrelated allegation of counsel's ineffectiveness is generally

8      considered a separate claim for purposes of exhaustion.  *Gulbrandson*, 738 F.3d at 992

9      (citing *Moormann*, 426 F.3d at 1056).  Because Morris failed to raise an IAAC claim based

10     on the medical examiner's reliance on the toxicology reports in his PCR petition, that claim

11     is unexhausted and procedurally defaulted.  Contrary to Morris's assertion (Doc. 34 at 220),

12     the claim cannot be excused by PCR counsel's ineffectiveness.  *See Davila*, 582 U.S. at

13     525.

14           Both claims, moreover, are meritless for the reasons explained in Claim Five (B).

15     Until the Supreme Court's recent decision in *Jason Smith*, the Arizona Supreme Court had

16     held that the Confrontation Clause did not apply "when an expert recites another analyst's

17     statements as the basis for his opinion" because the prosecution was not using the out-of-

18     court statements for the truth of the matter asserted.  602 U.S. at 784 (citing *Crawford*, 541

19     U.S. at 60 n.9*); see, e.g.*, *Dixon*, 226 Ariz. at 553, 250 P.3d at 1182.  Appellate counsel did

20     not perform deficiently by failing to raise either of these claims – reasonable counsel

21     performing basic research at the time of Morris's appeal could have concluded that forensic

22     testing results and autopsy results relied upon by medical examiners to form their opinion

23     were non-hearsay and the Confrontation Clause did not preclude such testimony.  Claims

24     Twenty-Two (B)(1) and (2) are denied as procedurally defaulted.  Alternatively, the claims,

25     considered separately (or as one instance of ineffectiveness) are meritless.

26

27

28                                          228

**O. Claim Sixteen**

In his Reply, Morris withdraws Claim Sixteen, which alleged alternate jurors improperly participated in deliberations during his trial, in violation of his Sixth and Fourteenth Amendment rights. (*See* Doc. 21 at 281–83; Doc. 34 at 200.)

**P. Claim Twenty-Two**

Morris alleges his Sixth Amendment right to the effective assistance of counsel was violated by his appellate counsel's failure to raise meritorious claims on direct appeal. (Doc. 21 at 303–14.) Morris concedes that several subclaims, Claims E through J, were not exhausted in state court and asserts he can overcome the procedural default of these claims by demonstrating the ineffective assistance of counsel under *Martinez*. (*Id.* at 303; Doc. 34 at 218.) As explained in Section III.B above, however, Morris's attempt to invoke *Martinez* to excuse the default fails because these claims do not allege trial counsel's ineffectiveness. *See Davila*, 582 U.S. at 525, *Martinez (Ernesto)*, 926 F.3d at 1225. Therefore, the unexhausted allegations in Claim 22 (E) through (J) remain defaulted and barred from federal review.

Claim Twenty-Two (A)

Morris alleges appellate counsel was ineffective for failing to challenge the sufficiency of the evidence supporting the (F)(6) aggravating factor or that the jury abused its discretion in sentencing him to death, as alleged in Claim Twelve of the habeas petition.[52] (Doc. 21 at 305–07.)

The Arizona Supreme Court reviewed Morris's death sentence pursuant to A.R.S. § 13-703.05 and concluded that the jury did not abuse its discretion in finding that the State proved the (F)(6) factor beyond a reasonable doubt because the State presented expert

---

[52] To the extent Morris also argues that appellate counsel performed deficiently by failing to challenge the constitutionality of Arizona's abuse of discretion review, this claim is procedurally defaulted and Morris has not demonstrated cause and prejudice to excuse the default.

229

1    evidence that strangulation victims remain conscious and experience pain for some period

2    of time and presented additional evidence that three of the victims struggled with Morris.

3    *Morris*, 215 Ariz. at 340–41, 160 P.3d at 219–20.  Because the finding of cruelty alone was

4    sufficient to establish the (F)(6) factor, the court did not address whether the jury abused

5    its discretion in finding that the murders were also heinous or depraved.  *Id.* at 341, 160

6    P.3d at 220.

7         In his postconviction petition, Morris asserted that appellate counsel was ineffective

8    for failing to argue that there was insufficient evidence of cruelty.  (Doc. 307 at 7.)  He

9    alleged he was prejudiced as a result, because in the absence of an appellate challenge the

10   court reviewed only whether the jury had abused its discretion in deciding that each murder

11   was especially cruel, not whether there was sufficient evidence of cruelty under *Snelling*,

12   225 Ariz. 182, 236 P.3d 409.  (*Id.*)

13        The PCR court rejected this claim, finding:

14        Appellate counsel has no constitutional duty to raise every non-frivolous
          issue requested by appellant.  *Jones v. Barnes*, 463 U.S. 745, 751 (1983).
15        The Court finds that such a challenge would not have changed the outcome
          of the appeal.  First, as noted above, the Supreme Court specifically found
16        that the evidence in the record supported the jury's finding of cruelty.
          *Morris,* 215 Ariz. at ¶79.  Second, the decision in *State v. Snelling*, 225 Ariz.
17        182, 188, 36 P.3d 409, 415 (2010), would not have changed this conclusion.
          In *Snelling*, the Court found the record contained no evidence to support a
18        finding of cruelty.  In so holding, the Court also compared the facts in this
          case with *Snelling*:
19
20
21             *Cf. State v. Morris*, 215 Ariz. 324, 341 ¶79, 160 P.3d 203, 220
               (2007) (finding cruelty when the state presented evidence of a
22             struggle in addition to expert testimony that strangulation
               victims remain conscious and experience pain for some time).
23

24        *Snelling*, 225 Ariz. at ¶36.

25   (ROA 354 at 5.)  Morris thereafter presented his IAAC claim to the Arizona Supreme

26   Court, which denied it without comment.  (PR 7 at 21–22, PR 27.)

27

28                                      230

1    Morris alleges the decision on direct appeal was an unreasonable determination of

2    clearly established federal law and based on an unreasonable determination of the facts, as

3    discussed *supra* in Claim Twelve, and that the PCR court's deference to this decision was

4    therefore unreasonable.  As discussed in Claim Twelve, however, any claim asserting

5    insufficiency of the evidence of the (F)(6) aggravating factor would have failed on the

6    merits.  Because the underlying claim lacks merit, trial counsel was not ineffective for

7    failing to raise it.  *See Juan H.,* 408 F.3d at 1273; *Green*, 160 F.3d at 1037; *James*, 24 F.3d

8    at 27.

9    The Arizona Supreme Court's decision denying relief on this claim was not contrary

10   to nor an unreasonable application of clearly established federal law, nor was it based on

11   an unreasonable determination of the facts.  Claim Twenty-Two (A) is denied.

12   Claim Twenty-Two (D)

13   Morris alleges counsel failed to challenge the trial court's instruction that incorrectly

14   informed the jury that Morris could be sentenced to life with the possibility of parole.

15   (Doc. 21 at 311.)  This IAAC claim is unexhausted.  (*See* ROA 307 at 3–56.)

16   In denying Morris's request for a stay, the Court found Claims 3(B)(1) and 22(D)

17   technically exhausted through procedural default.  (*See* Doc. 84 at 12, 18.)  Specifically,

18   the Court found that "[i]f Morris were to return to state court and attempt to exhaust these

19   ineffective assistance claims, the claims would be found waived under Rule 32.2(a)

20   because they do not fall within an exception to preclusion."  (Doc. 84 at 12.)  The Court

21   incorporates that decision here.  Morris argues, however, that he is excused from the

22   exhaustion requirement because there is an absence of effective state corrective process.

23   (Doc. 34 at 222.)  Raising this IAAC claim before the Supreme Court decided *Lynch*, he

24   alleges, would have been futile.  (*Id.*)

25   The Court need not determine the procedural status of this claim because, for

26   reasons expressed in addressing the merits of Claim Three (B)(1), it is plainly meritless.

27   *Cf.* 28 U.S.C. § 2254(b)(2) (" An application for a writ of habeas corpus may be denied on

28                                                    231

1    the merits, notwithstanding the failure of the applicant to exhaust the remedies available in

2    the courts of the State."); *see Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("We do not

3    mean to suggest that the procedural-bar issue must invariably be resolved first; only that it

4    ordinarily should be.").  "Procedural bar issues are not infrequently more complex than the

5    merits issues . . . , so it may well make sense in some instances to proceed to the merits if

6    the result will be the same."  *Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002).

7        Given the controlling Arizona law at the time of Morris's appeal (*see* discussion in

8    Claim Three (B)(1)), reasonable appellate counsel could have concluded that Morris was

9    in fact parole or release eligible and there were no grounds for an appeal.  *See Turner*, 281

10   F.3d at 872 ("A failure to raise untenable issues on appeal does not fall below the *Strickland*

11   standard."); *Wildman v. Johnson*, 261 F.3d 832, 840 (9th Cir. 2001) ("[A]ppellate counsel's

12   failure to raise issues on direct appeal does not constitute ineffective assistance when

13   appeal would not have provided grounds for reversal."); *cf. Pollard v. White*, 119 F.3d

14   1430, 1435 (9th Cir. 1997) ("A hallmark of effective appellate counsel is the ability to

15   weed out claims that have no likelihood of success, instead of throwing in a kitchen sink

16   full of arguments with the hope that some argument will persuade the court.").  Claim

17   Twenty-Two (D) is denied.

18       **Q. Constitutional Challenges to Arizona's Death Penalty Scheme**

19       Morris raises a number of challenges to his death sentence, Arizona's death penalty

20   scheme, and capital punishment in general.  Morris exhausted these claims in his Opening

21   Brief.  (*See* DA at 59–66).  The Arizona Supreme Court's rejection of the claims, *see*

22   *Morris*, 215 Ariz. at 341–43, 160 P.3d at 220–22, was neither contrary to nor an

23   unreasonable application of clearly established federal law.[53]  Additionally, these claims

24   are all meritless.

25   _____

26       [53] Morris alleges several of these claims were raised in his direct appeal but not

27   adjudicated by the Arizona Supreme Court because they were summarily dismissed, and
     that the limitations imposed on relief imposed by 28 U.S.C. § 2254(d) therefore do not

28                                    232

Claim Twenty-One

Morris alleges Arizona's capital sentencing scheme is unconstitutional because it does not require the jury to find that the aggravating factors outweighed mitigating circumstances beyond a reasonable doubt, and the trial court's flawed instruction violated Morris's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Doc. 21 at 285.) Respondents assert that the claim Morris raised on direct appeal (that Arizona's statute is unconstitutional) differs from the claim he is now raising in his habeas petition (that instructional error occurred in his trial), and that this latter claim is unexhausted and procedurally defaulted. While technically correct, this argument puts too fine a point on Morris's general assertion that the trial court instructed the jury in accordance with A.R.S. § 13-703(E) and that the jury instructions, like the statute, relieved the prosecutor of his burden of proving beyond a reasonable doubt that the mitigation was not sufficiently substantial to call for leniency, and relieved the jury of having to determine beyond a reasonable doubt that death was the appropriate punishment.

Procedural status notwithstanding, the claim is meritless. The Supreme Court has held that a capital sentencer "need not be instructed how to weigh any particular fact in the capital sentencing decision." *Tuilaepa*, 512 U.S. at 979–80; *see Kansas v. Marsh*, 548 U.S. at 175 ("In aggregate, our precedents confer upon defendants the right to present sentencers with information relevant to the sentencing decision and oblige sentencers to consider that information in determining the appropriate sentence. The thrust of our mitigation jurisprudence ends here."); *Franklin v. Lynaugh*, 487 U.S. 164, 179 (1988) ("[W]e have

_____

apply to the Court's review of the claim. This is factually and legally incorrect. The court addressed each claim, noted Morris conceded that the Court had previously rejected the arguments, noted the cases in which it had previously denied each claim, and then affirmed Morris's conviction and sentences. *See Morris*, 215 Ariz. at 341–43, 160 P.3d at 220–22. Additionally, a state court is presumed to have adjudicated a federal claim on the merits, even if it gives no explanation for its decision. *See Richter*, 562 U.S. at 98–99; *Johnson*, 568 U.S. at 293.

233

1   never held that a specific method for balancing mitigating and aggravating factors in a

2   capital sentencing proceeding is constitutionally required.").

3       The cases cited by Morris, *Ring*, 536 U.S. 584, *Apprendi v. New Jersey*, 530 U.S.

4   466 (2000), and *Hurst v. Florida*, 577 U.S. 92 (2016), do not alter this analysis.  First,

5   contrary to Morris's argument (Doc. 21 at 301), *Hurst* does "not apply retroactively on

6   collateral review."  *McKinney v. Arizona*, 589 U.S. 139, 145 (2020); *see Ybarra v. Filson*,

7   869 F.3d 1016, 1032–33 (9th Cir. 2017).[54]   And even if *Hurst* did apply retroactively,

8   Morris would not be entitled to relief.

9       In *Hurst* the Court held that Florida's capital sentencing scheme, in which a jury

10  rendered an advisory verdict while the judge made the ultimate factual determinations

11  necessary to sentence a defendant to death, violated *Ring*, 536 U.S. 584.  *Hurst*, 577 U.S.

12  at 98, 102–03.  The Court held that this procedure was invalid because it "does not require

13  the jury to make the critical findings necessary to impose the death penalty."  *Id.*  The Court

14  did not hold that a jury is required to find beyond a reasonable doubt that the aggravating

15  factors outweigh the mitigating circumstances.  *See United States v. Tsarnaev*, 968 F.3d

16  24, 88–89 (1st Cir. 2020) (*Hurst* "made no holding regarding [the] determination . . . that

17  the mitigators do not outweigh the aggravators"), *reversed on other grounds*, 595 U.S. 302

18  (2022).

19      In *McKinney*, 589 U.S. at 144, the Court reiterated that while "a jury must find the

20  aggravating circumstance that makes the defendant death eligible . . . , in a capital

21  sentencing proceeding just as in an ordinary sentencing proceeding, a jury (as opposed to

---

23  [54] Morris cited *Ybarra* in his petition as a "*but see*" citation, without an explanatory
24  parenthetical, after the bald assertion that *Hurst* "applies retroactively on collateral
    review."  (Doc. 21 at 288.)  He failed to acknowledge that *Ybarra* directly held that "*Hurst*
25  does not apply retroactively to cases on collateral review."  869 F.3d at 1032.  Morris is
    permitted to argue the case is wrong, or perhaps not binding, but it was disingenuous not
26  to acknowledge through use of a *contra* signal or an explanatory parenthetical that the
27  holding in *Ybarra* directly contradicted his position.

28                                                      234

1  a judge) is not constitutionally required to weigh the aggravating and mitigating

2  circumstances or to make the ultimate sentencing decision within the relevant sentencing

3  range." Thus, "*Ring* and *Hurst* did not require jury weighing of aggravating and mitigating

4  circumstances." *Id.* at 708. If jury weighing is not constitutionally required, there cannot

5  be a constitutionally-required standard for that weighing. Claim Twenty-One is denied.

6  Claim Twenty-Eight

7  Morris alleges Arizona's capital-sentencing scheme limits the jury's full

8  consideration of mitigation evidence by requiring that mitigating circumstances be proved

9  by a preponderance of the evidence, in violation of the Eighth and Fourteenth Amendments

10  to the United States Constitution. (Doc. 21 at 326–28.) This claim also lacks merit. In

11  *Walton,* the Supreme Court rejected the argument that "Arizona's allocation of the burdens

12  of proof in a capital sentencing proceeding violates the Constitution." 497 U.S. at 651.

13  Claim Twenty-Eight is denied.

14  Claim Twenty-Nine

15  Morris alleges that, because he was not indicted for a capital crime, and the

16  aggravating circumstances were not included in the indictment, he was not provided

17  sufficient notice of the alleged aggravating circumstances, nor was there a finding of

18  probable cause as required by the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Doc.

19  21 at 328–30.) Morris raised this claim on direct appeal (DA 29 at 59–60), and the Arizona

20  Supreme Court rejected it on the merits, citing *McKaney v. Foreman*, 209 Ariz. 268, 273,

21  100 P.3d 18, 23 (2004). The Arizona Supreme Court's decision was not contrary to nor an

22  unreasonable application of clearly established federal law, nor was it based on an

23  unreasonable determination of the facts.

24  The Supreme Court has held that facts constituting the elements of an offense must

25  be charged in a federal indictment. *See Jones v. United States*, 526 U.S. 227, 251–52

26  (1999). But the Fifth Amendment Due Process Clause does not incorporate the same

27  requirement into state criminal prosecutions. *See Branzburg v. Hayes*, 408 U.S. 665, 688

28

1   n.25 (1972) ("[I]ndictment by grand jury is not part of the due process of law guaranteed

2   to state criminal defendants by the Fourteenth Amendment.") (citing *Hurtado v. California*,

3   110 U.S. 516, 538 (1884)); *see also Gautt v. Lewis*, 489 F.3d 993, 1003 n.10 (9th Cir.

4   2007).   Because states are not required by the Constitution to empanel grand juries for

5   purposes of indictment, they are not required to specify aggravating factors in a grand jury

6   indictment.

7         Morris contends that *Ring II*, 536 U.S. at 609, and *Apprendi*, 530 U.S. at 477,

8   support his position.  (Doc. 21 at 329–30.)  But the Supreme Court did not address the issue

9   in either case, let alone hold that aggravating factors must be included in an indictment and

10  subjected to a probable cause determination.  *See Ring II*, 536 U.S. at 597 n.4 ("[The

11  Fourteenth Amendment] has not been construed to include the Fifth Amendment right to

12  'presentment or indictment of a Grand Jury.'") (quoting *Apprendi*, 530 U.S. at 477 n.3);

13  *see e.g.*, *Goff v. State*, 14 So.3d 625, 665 (Miss. 2009) ("We have held that *Apprendi* and

14  *Ring* address issues wholly distinct from the present one, and in fact do not address

15  indictments at all.).

16        The Arizona Supreme Court has expressly rejected the argument that *Ring* requires

17  that aggravating factors be alleged in an indictment and supported by probable cause.

18  *McKaney*, 209 Ariz. at 270, 100 P.3d at 20.  Morris cites no clearly-established federal law

19  to the contrary, or otherwise calling *McKaney*'s reasoning into question.  Claim Twenty-

20  Nine is denied.

21  Claim Thirty

22        Morris asserts the (F)(6) aggravating factor of "especially cruel, heinous, or

23  depraved," as well as the jury instructions on the factor, are unconstitutionally vague and

24  violate the Eighth and Fourteenth Amendments.  (Doc. 21 at 330–34.)  Respondents

25  contend that Morris exhausted only the statutory challenge in his direct appeal, and never

26  argued that the jury instructions were unconstitutionally vague.   (Doc. 27 at 209.)

27  Notwithstanding this claim's procedural status, it is meritless.

28                                         236

The United States Supreme Court and the Ninth Circuit have upheld Arizona's death penalty statute against allegations that particular aggravating factors, including the (F)(6) factor, do not adequately narrow the sentencer's discretion. *See Jeffers*, 497 U.S. at 774–77; *Walton*, 497 U.S. at 652–56. In *Walton* the Supreme Court held that the "especially heinous, cruel or depraved" aggravating circumstance was facially vague but the vagueness was remedied by the Arizona Supreme Court's clarification of the factor's meaning. 497 U.S. at 654; *see also Smith*, 823 F.3d at 1294–95.

Morris argues that *Walton* no longer controls after Arizona switched to jury sentencing in capital cases. (Doc. 21 at 332.) This is unpersuasive. "There is no clearly established federal law holding that jury instructions based on the Arizona Supreme Court's narrowing construction are inadequate." *Dixon*, 2016 WL 1045355, at *45.

As discussed in Claim Six (B)(2) above, the jury was specifically instructed on the factors that could be used to establish the (F)(6) circumstance. (*See* RT 7/12/05 at 84–87.) The trial court instructed the jury in detail as to what would support a finding that the murders were "especially heinous, cruel or depraved" and gave substance to the terms "cruel" and "heinous or depraved," including instructing the jury that for a murder to be "especially heinous, cruel, or depraved," it must be "above the norm of other first degree murders" (*see id.*), in accordance with Arizona case law narrowing and defining those terms. *See Cromwell*, 211 Ariz. at 189, 119 P.3d at 456; *Anderson*, 210 Ariz. at 352, 111 P.3d at 394. Morris cites no clearly-established federal law holding that the phrase "above the norm of other first degree murders" must be separately defined, and that phrase is not facially vague. (*See* Doc. 21 at 333–34.) The instruction was therefore sufficient to narrow and define the factor for the jurors. *See Donald*, 575 U.S. at 317 ("Because none of our cases confront 'the specific question presented by this case,' the state court's decision could not be 'contrary to' any holding from this Court.").

Additionally, "irrespective of whether invalidation of the jury instructions in *Walton*, *Jeffers*, and *Richmond* is 'the logical next step' after *Ring*, the Court 'ha[s] not yet

237

1   taken that step and there are reasonable arguments on both sides—which is all [Arizona]

2   needs to prevail in this AEDPA case.'" *Smith*, 823 F.3d at 1295 (quoting *White*, 572 U.S.

3   at 426). Claim Thirty is denied.

4   <u>Claim Thirty-One</u>

5          Morris alleges that admission of inflammatory and irrelevant victim-impact

6   evidence resulted in a fundamental violation of his Eighth and Fourteenth Amendment

7   rights, and to the extent A.R.S. §§ 13-752(R) and 13-4426(A) authorized such statements,

8   they are unconstitutional. (Doc. 21 at 335–39.) Morris raised this claim, in part, on direct

9   appeal.

10         In his Opening Brief, Morris alleged the admission of victim-impact evidence at the

11  penalty phase of the trial violated his Fifth, Sixth, Eighth, and Fourteenth Amendment

12  rights. (DA 29 at 61.) The Arizona Supreme Court's decision denying relief on this claim,

13  *see Morris*, 215 Ariz. at 342, 160 P.3d at 221, was not contrary to nor an unreasonable

14  application of clearly established federal law, nor was it based on an unreasonable

15  determination of the facts. As discussed in Claim Three (C) above, the Eighth Amendment

16  erects no per se bar to the admission of victim impact evidence in the penalty phase of a

17  capital trial. *See Payne*, 501 U.S. at 827 ("[I]f the State chooses to permit the admission

18  of victim impact evidence and prosecutorial argument on that subject, the Eighth

19  Amendment erects no per se bar.").

20         Morris's allegation that A.R.S. §§ 13-752(R) and 13-4426(A), either on their face

21  or as applied, are "unconstitutionally broad" and inject irrelevant emotional sympathies

22  into the trial, thereby undermining the jury's ability to fairly listen to and consider

23  mitigation evidence in violation of the Eighth Amendment (*see* Doc. 21 at 335–39), is

24  unexhausted and procedurally defaulted. Morris's contention that the default is excused

25  by the ineffective assistance of appellate counsel combined with the ineffective assistance

26  of PCR counsel (Doc. 34 at 238) is unavailing. *See Davila*, 582 U.S. at 536.

27

28                                              238

1    Moreover, for the reasons discussed in Claim Three (C), given the trial court's
2    instructions, which jurors are presumed to have followed, *Greer v. Miller*, 483 U.S. 756,
3    766 n.8 (1987), even if the victim-impact evidence had been erroneously admitted, the error
4    was harmless. *See Lockett*, 711 F.3d at 1239–40 (finding error harmless where jury was
5    correctly instructed that its sentencing decision was "limited to a moral inquiry into the
6    culpability of the defendant, not an emotional response to the evidence"); *Welch*, 639 F.3d
7    at 997, 999 (admission of unconstitutional victim-impact statements "vividly and
8    emotionally" describing the crimes was harmless error where jury was properly
9    instructed); *Bernard*, 299 F.3d at 481 ("[A]ny prejudice that did result from the statements
10   was mitigated by the district court's instructions to the jurors not to be swayed by passion,
11   prejudice or sympathy."). Claim Thirty-One is denied.

12   Claim Thirty-Two

13   Morris alleges his jury was not instructed to consider mercy or sympathy as a
14   mitigating circumstance in violation of his Sixth, Eighth, and Fourteenth Amendment
15   rights. The trial court instructed the jury that mitigating circumstances are circumstances
16   "which in fairness and mercy may be considered as extenuating or reducing the degree of
17   the defendant's culpability and the punishment to be imposed" (RT 07/14/05 at 3), and that
18   the jurors "are free to assign whatever value you deem appropriate to each and all of the
19   various factors you are permitted to consider." (*Id.* at 8.) The court also instructed the
20   jurors that they were not to be governed or influenced by "mere sentiment, passion, or
21   prejudice." (*Id.* at 9.)

22   Morris asserts that by failing to include mercy or sympathy as a mitigating factor
23   the jury should consider, the instructions violated *Lockett* and *Eddings* by preventing the
24   jury from considering all relevant mitigating evidence. (Doc. 27 at 232.) The Arizona
25   Supreme Court rejected the claim on the merits, citing its prior decision in *State v. Carreon*,
26   210 Ariz. 54, 70–71, 107 P.3d 900, 916–17 (2005). *Morris*, 215 Ariz. at 342, 160 P.3d at
27   221. In *Carreon*, the court found that "[t]he Constitution does not require . . . that a jury

28                                                      239

1    'be able to dispense mercy on the basis of a sympathetic response to the defendant.'" 210

2    Ariz. at 70, 107 P.3d at 916 (quoting *Johnson v. Texas*, 509 U.S. 350, 371 (1993) and citing

3    *Brown*, 479 U.S. at 541–43).    The court's decision was neither contrary to nor an

4    unreasonable application of clearly established federal law.

5            In *Saffle v. Parks,* the Supreme Court held that an instruction directing the jury to

6    avoid any influence of sympathy when imposing a sentence did not violate *Lockett* and

7    *Eddings* by barring relevant mitigating evidence from being presented and considered

8    during a capital proceeding.  494 U.S. 484, 492–93 (1990).  The Court explained that "[i]t

9    is no doubt constitutionally permissible, if not constitutionally required . . . for the State to

10   insist that 'the individualized assessment of the appropriateness of the death penalty [be] a

11   moral inquiry into the culpability of the defendant, and not an emotional response to the

12   mitigating evidence.'"  *Id.*  (quoting *Brown*, 479 U.S. at 545).  In *Brown*, 479 U.S. at 540,

13   and *Victor*, 511 U.S. at 13, the Court upheld instructions directing jurors "not to be swayed

14   by mere sentiment, sympathy, passion, prejudice, public opinion or [public] feeling."

15   These instructions are similar to those given in Morris's case.

16           The trial court properly defined mitigating circumstances, without placing any limits

17   on the jury's assessment of the evidence.  *See Kansas v. Marsh*, 548 U.S. 163, 175 (2006)

18   ("[O]ur precedents confer upon defendants the right to present sentencers with information

19   relevant to the sentencing decision and oblige sentencers to consider that information in

20   determining the appropriate sentence.  The thrust of our mitigation jurisprudence ends

21   here.").    As this Court explained in Claim Three (B)(3) above, the jury instructions

22   permitted jurors to "accord mercy if they deem it appropriate, and withhold mercy if they

23   do not, which is what [the Supreme Court's] case law is designed to achieve."  *Carr*, 577

24   U.S. at 119.  Claim Thirty-Two is denied.

25   Claim Thirty-Three

26           Morris alleges capital punishment is categorically cruel and unusual, in violation of

27   the Eighth and Fourteenth Amendments.  (Doc. 21 at 341–44.)  The Arizona Supreme

28                                                  240

1    Court's decision denying relief on this claim, *see Morris*, 215 Ariz. at 342, 160 P.3d at 221,

2    was not contrary to nor an unreasonable application of clearly established federal law, nor

3    was it based on an unreasonable determination of the facts.

4          Although Morris asserts, based on statistical research, that the death penalty is cruel

5    because it is unreliable and arbitrarily imposed, as well as unusual in the nationwide

6    scarcity of its application, (Doc. 21 at 342–43), there is no clearly established federal law

7    supporting this claim. *See Gregg v. Georgia*, 428 U.S. 153, 187 (1976). Claim Thirty-

8    Three is denied.

9    Claim Thirty-Four

10         Morris alleges the death penalty violates his rights under the Eighth and Fourteenth

11   Amendments because it is irrationally and arbitrarily imposed and serves no penological

12   purpose that is not adequately addressed by life imprisonment. (Doc. 21 at 344–46.) The

13   Arizona Supreme Court's decision denying relief on this claim, *see Morris*, 215 Ariz. at

14   342, 160 P.3d at 221, was not contrary to nor an unreasonable application of clearly

15   established federal law, nor was it based on an unreasonable determination of the facts.

16   *See Walton*, 497 U.S. at 655–56; *Smith v. Stewart*, 140 F.3d 1263, 1272 (9th Cir. 1998); *see*

17   *also Andriano v. Shinn*, No. CV-16-01159-PHX-SRB, 2021 WL 184546, at *81 (D. Ariz.

18   Jan. 19, 2021); *Roseberry v. Ryan*, No. 15-CV-1507-PHX-NVW, 2019 WL 3556932 at

19   *37 (D. Ariz. August 5, 2019). Morris "simply fails to provide any clearly established

20   authority in support of his contention." *Roybal v. Davis*, 148 F.Supp.3d 958, 1111 (S.D.

21   Cal. 2015). Claim Thirty-Four is denied.

22   Claim Thirty-Five

23         Morris alleges Arizona's capital-sentencing scheme violates the Eighth and

24   Fourteenth Amendments because it affords the prosecutor unbridled discretion to seek the

25   death penalty. (Doc. 21 at 217–18.) The Arizona Supreme Court's decision denying relief

26   on this claim, *see Morris*, 215 Ariz. at 342–43, 160 P.3d at 221–22, was not contrary to nor

27

28                                         241

1    an unreasonable application of clearly established federal law, nor was it based on an

2    unreasonable determination of the facts.

3        The Supreme Court has held that prosecutors have wide discretion in making the

4    decision whether to seek the death penalty.  *See McCleskey*, 481 U.S. at 296– 97; *Gregg*,

5    428 U.S. at 199 (holding that pre-sentencing decisions by actors in the criminal justice

6    system that may remove an accused from consideration for the death penalty are not

7    unconstitutional).  In *Smith*, 140 F.3d at 1272, the Ninth Circuit rejected the argument that

8    Arizona's death penalty statute is constitutionally infirm because "the prosecutor can

9    decide whether to seek the death penalty."  Although Morris attempts to distinguish *Smith*,

10   arguing the Arizona death-penalty statute in effect at the time *Smith* was decided has since

11   been expanded, he does not explain how this alters the court's decision.  Claim Thirty-Five

12   is denied.

13   Claim Thirty-Six

14       Morris alleges Arizona's capital-sentencing scheme discriminates against indigent

15   young male defendants in violation of the Eighth and Fourteenth Amendments.  (Doc. 21

16   at 347–48.)   The Arizona Supreme Court's decision denying relief on this claim, *see*

17   *Morris*, 215 Ariz. at 343, 160 P.3d at 222, was not contrary to nor an unreasonable

18   application of clearly established federal law, nor was it based on an unreasonable

19   determination of the facts.

20       Clearly established federal law holds that "a defendant who alleges an equal

21   protection violation has the burden of proving 'the existence of purposeful discrimination'"

22   and must demonstrate that the purposeful discrimination "had a discriminatory effect" on

23   him.  *McCleskey*, 481 U.S. at 292 (quoting *Whitus v. Georgia*, 385 U.S. 545, 550 (1967)).

24   Morris "must prove that the decisionmakers in *his* case acted with discriminatory purpose."

25   *Id.*

26       Morris does not attempt to meet this burden.  He offers no evidence specific to his

27   case that would support an inference that his sex, age, or economic status played a part in

28                                      242

1   his prosecution or sentence.  *See Richmond v. Lewis*, 948 F.2d 1473, 1490–91 (1990),

2   *vacated on other grounds*, 986 F.2d 1583 (9th Cir. 1993) (holding statistical evidence that

3   Arizona's death penalty is discriminatorily imposed based on race, sex, and socioeconomic

4   background is insufficient to prove that decision-makers in petitioner's case acted with

5   discriminatory purpose); *see also McCleskey*, 481 U.S. at 292–93 (use of statistics, without

6   regard to the facts of the particular case, insufficient to prove purposeful discrimination in

7   imposition of death penalty).  Claim Thirty-Six is denied.

8   Claim Thirty-Seven

9        Morris alleges Arizona's capital sentencing scheme violates the Fifth, Eighth, and

10  Fourteenth Amendments because it denies capital defendants the benefit of proportionality

11  review of their sentences.  (Doc. 21 at 348–49.)  The Arizona Supreme Court's decision

12  denying relief on this claim, *see Morris*, 215 Ariz. at 343, 160 P.3d at 222, was not contrary

13  to nor an unreasonable application of clearly established federal law, nor was it based on

14  an unreasonable determination of the facts.

15       There is no federal constitutional right to proportionality review of a death sentence.

16  *McCleskey v. Kemp*, 481 U.S. 279, 306 (1987) (citing *Pulley v. Harris*, 465 U.S. 37, 43

17  (1984)); *see Allen*, 395 F.3d at 1018–19.  The "substantive right to be free from a

18  disproportionate sentence" is protected by the application of "adequately narrowed

19  aggravating circumstance[s]."  *Ceja v. Stewart*, 97 F.3d 1246, 1252 (9th Cir. 1996).  Claim

20  Thirty-Seven is denied.

21  Claim Thirty-Eight

22       Morris alleges Arizona's death penalty scheme is unconstitutional because it does

23  not sufficiently channel the sentencing jury's discretion to impose death, in violation of the

24  Eighth and Fourteenth Amendments.  (Doc. 21 at 350–54.)  Specifically, he argues that the

25  scheme includes so many aggravating circumstances that virtually every defendant

26  convicted of first-degree murder is eligible for death and fails to set forth objective

27  standards to guide the jury in weighing the aggravating circumstances against the

28  243

1    mitigating circumstances.  (*Id.*)  The Arizona Supreme Court's decision denying relief on

2    this claim, *see Morris*, 215 Ariz. at 343, 160 P.3d at 222, was not contrary to or an

3    unreasonable application of clearly established federal law, nor was it based on an

4    unreasonable determination of the facts.

5         Arizona's death penalty scheme allows only certain statutorily-defined aggravating

6    factors to be considered in determining eligibility for the death penalty.  "The presence of

7    aggravating circumstances serves the purpose of limiting the class of death-eligible

8    defendants, and the Eighth Amendment does not require that these aggravating

9    circumstances be further refined or weighed by [the sentencer]."  *Blystone*, 494 U.S. at

10   306–07.  The Supreme Court and the Ninth Circuit have upheld Arizona's death penalty

11   statute against allegations that its aggravating factors do not adequately narrow the

12   sentencer's discretion.  *See Jeffers*, 497 U.S. at 774–77; *Walton*, 497 U.S. at 649–56;

13   *Woratzeck v. Stewart*, 97 F.3d 329, 335 (9th Cir. 1996).  Claim Thirty-Eight is denied.

14   Claim Thirty-Nine

15        Morris asserts that execution by lethal injection is cruel and unusual punishment

16   under the Eighth and Fourteenth Amendments.  (Doc. 21 at 354–61.)  The Arizona

17   Supreme Court's decision denying relief on this claim, *see Morris*, 215 Ariz. at 343, 160

18   P.3d at 222, was not contrary to or an unreasonable application of clearly established

19   federal law, nor was it based on an unreasonable determination of the facts.  The Supreme

20   Court "has never invalidated a State's chosen procedure for carrying out a sentence of death

21   as the infliction of cruel and unusual punishment."  *Baze v. Rees*, 553 U.S. 35 (2008).  Nor

22   has the Supreme Court or the Ninth Circuit held that Arizona's lethal injection protocols

23   violate the Eighth Amendment.  *See Dickens v. Brewer*, 631 F.3d 1139 (9th Cir. 2011).

24        Morris's allegations in his habeas petition focus on Arizona's lethal injection

25   protocols and history of executions.  (Doc. 21 at 355–61.)  Those protocols are no longer

26   in place.  (*Id.* at 361) (citing Stipulated Settlement Agreement at 1, *Wood v. Ryan*, No.

27   2:14-cv-01447-NVW (D. Ariz. filed Dec. 19, 2016), ECF No. 152; Stipulated Settlement

28                                              244

1    Agreement at 4, *Wood v. Ryan*, No. 2:14-cv-01447-NVW (D. Ariz. filed June 21, 2017);

2    *Cf. Guardian News & Media LLC v. Ryan*, No. CV-14-02363-PHX-GMS, 2017 WL

3    4180324, at *2 (D. Ariz. Sept. 21, 2017) (noting current execution protocol, set forth in

4    Department Order 710, provides that ADC will use either pentobarbital or sodium

5    pentothal as the execution drug). Morris may challenge the relevant protocol in a separate

6    civil rights action under 42 U.S.C. § 1983. *See Hill v. McDonough*, 547 U.S. 573, 579–80

7    (2006) (recognizing that a challenge to the State's execution method may be brought in a

8    § 1983 action); *Nance v. Ward*, 597 U.S. 159, 169 (2022). Claim Thirty-Nine is denied.

9    <u>Claim Forty</u>

10        Morris asserts that Arizona's capital sentencing scheme violates the Eighth and

11   Fourteenth Amendments because it requires a death sentence whenever one aggravating

12   circumstance and no mitigating circumstances are found with respect to an eligible

13   defendant. (Doc. 362–63.) The Arizona Supreme Court's denial of this claim, *see Morris*,

14   215 Ariz. at 343, 160 P.3d at 222, was not contrary to or an unreasonable application of

15   clearly established federal law, nor was it based on an unreasonable determination of the

16   facts. The Supreme Court has rejected the contention that Arizona's death penalty statute

17   is impermissibly mandatory. *See Walton*, 497 U.S. at 651–52; *Marsh*, 548 U.S. at 173–74.

18   Claim Forty is denied.

19        **R. Miscellaneous Claims**

20        Morris's remaining claims were not presented in state court.

21   <u>Claim Forty-One</u>

22        Morris alleges that Due Process requires this Court to re-evaluate his death sentence

23   in light of the significant changes to his person and circumstances in the twelve and a half

24   years since he was sentenced. (Doc. 21 at 363–66.) Morris contends this claim was not

25   ripe for review until now. Notwithstanding the procedural status of the claim, Morris is

26   not entitled to habeas relief on this claim.

27

28                                              245

1    Morris cites *State v. Watson*, 129 Ariz. 60, 62, 628 P.2d 943, 945 (1981), and *State*

2    *v. Richmond*, 180 Ariz. 573, 580–81, 886 P.2d 1329, 1336–37 (1994), in support.  (Doc. 25

3    at 199.)  In these cases, the Arizona Supreme Court, in its independent review of death

4    sentences, found the defendants' changed character to be significantly mitigating by

5    looking to evidence in the trial court record.  Unlike the state supreme court on direct

6    appeal, a federal habeas court does not perform an independent review of a state

7    petitioner's death sentence.

8    Morris fails to identify any Supreme Court case supporting his contention that due

9    process requires this Court to "re-evaluate" his death sentence based on his alleged

10   "successful[] incarcerat[ion]" or "low risk of violence" in prison.  (Doc. 21 at 363–66.)

11   "[H]abeas review is available to check violations of federal laws when the error qualifies

12   as a 'fundamental defect which inherently results in a complete miscarriage of justice [or]

13   an omission inconsistent with the rudimentary demands of fair procedure.'"  *Reed v.*

14   *Farley*, 512 U.S. 339, 348 (1994) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962))

15   "Undoing a final state-court judgment" through habeas "is an extraordinary remedy,

16   reserved for only extreme malfunctions in the state criminal justice system."  *Brown*, 596

17   U.S. at 133 (quoting *Chapman*, 386 U.S. at 633–634) (cleaned up).  Habeas relief can only

18   be granted on claims that a prisoner "is in custody in violation of the Constitution or laws

19   or treaties of the United States."  28 U.S.C. § 2254(a).  Morris does not allege in Claim

20   Forty-One that his sentence was obtained in violation of the United States Constitution or

21   "on the basis of some transgression of federal law binding on the state courts."  *Middleton*

22   *v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456, U.S. 107, 119

23   (1982)).  Claim Forty-One is denied.

24   Claim Forty-Four

25   Morris alleges he will be denied a fair clemency process in violation of the Eighth

26   and Fourteenth Amendments.  (Doc. 21 at 254–56.)  This claim is not cognizable on federal

27   habeas review.  *See* 28 U.S.C. § 2254(a).  Morris's challenge to state clemency procedures

28

1 and proceedings is not an attack on his detention and thus does not constitute a proper

2 ground for relief.  *See Franzen v. Brinkman*, 877 F.2d 26, 26 (9th Cir. 1989) (per curiam);

3 *see also Woratzeck v. Stewart*, 118 F.3d 648, 653 (9th Cir. 1997) (per curiam) (explaining

4 that clemency claims are not cognizable under federal habeas law).  Contrary to Morris's

5 assertion (Doc. 34 at 255–56), the Supreme Court's decision in *Ohio Adult Parole*

6 *Authority v. Woodard*, 523 U.S. 272 (1998), does not establish this clemency claim is

7 cognizable in habeas proceedings.  Claim Forty-Four is denied.

8 Claim Forty-Five

9      Morris alleges it would violate his right to be free from cruel and unusual

10 punishment for the State of Arizona to execute him after he has spent over twelve years on

11 its death row.  (Doc. 21 at 375–79.)  This claim is meritless.  "The Supreme Court has

12 never held that execution after a long tenure on death row is cruel and unusual punishment."

13 *Allen v. Ornoski*, 435 F.3d 946, 958 (9th Cir. 2006); *see Lackey v. Texas*, 514 U.S. 1045

14 (1995) (mem.) (Stevens, J. & Breyer, J., discussing denial of certiorari and noting the claim

15 has not been addressed); *Thompson v. McNeil* , 556 U.S. 1114 (2009) (mem.) (Stevens, J.

16 & Breyer, J., dissenting from denial of certiorari; Thomas, J., concurring, discussing

17 *Lackey* issue); *see also Knight v. Florida*, 528 U.S. 990 (1999) (Thomas, J., concurring in

18 denial of certiorari); *Smith v. Mahoney*, 611 F.3d 978, 998 (9th Cir. 2010) (rejecting *Lackey*

19 claim as *Teague*-barred).  Circuit courts have consistently held that prolonged incarceration

20 under a sentence of death does not violate the Eighth Amendment.  *See, e.g.*, *Roger Murray*,

21 882 F.3d at 798 (citing *McKenzie v. Day*, 57 F.3d 1493, 1493– 94 (9th Cir. 1995) (en

22 banc)).

23 Claim Forty-Six

24      Morris alleges the imposition of the death penalty on a person with organic brain

25 damage violates the Eighth and Fourteenth Amendments.  (Doc. 21 at 379–84.)  He

26 concedes this claim is unexhausted.  His attempt to invoke *Martinez* to excuse the default

27 (*see* Doc. 34 at 20–22, 258) fails because this claim does not allege trial counsel's

28                                          247

1    ineffectiveness. *Martinez (Ernesto)*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at 1177; *Hunton*,

2    732 F.3d at 1126–27. Claim Forty-Six is procedurally defaulted and barred from federal

3    review.

4    <u>Claim Forty-Eight</u>

5        Morris alleges that, pursuant to the Fifth, Sixth, Eighth, and Fourteenth

6    Amendments, he was entitled to the constitutionally effective assistance of counsel during

7    his state post-conviction proceedings. (Doc. 21 at 386–96.) He asserts this claim was not

8    raised in state court because there is no available state court corrective process. (*Id.* at

9    386.)

10        To the extent Morris alleges PCR counsel's ineffectiveness as a freestanding claim,

11    the claim is not cognizable in federal habeas. *See* 28 U.S.C. § 2254(i) ("The ineffectiveness

12    or incompetence of counsel during Federal or State collateral postconviction proceedings

13    shall not be a ground for relief in a proceeding arising under section 2254.") Additionally,

14    the Supreme Court "has repeatedly reaffirmed that there is no constitutional right to counsel

15    in state postconviction proceedings," so there can be no cause of action for ineffective

16    assistance of post-conviction counsel. *Ramirez*, 596 U.S. at 386; *Coleman*, 501 U.S. at

17    752; *Pennsylvania v. Finley*, 481 U.S. 551, 553 (1987).

18        To the extent Morris alleges PCR counsel's ineffectiveness as grounds for excusing

19    the procedural default of his unexhausted claims, the Court has addressed these allegations

20    directly in each of the claims where he specifically made this argument.

21    <u>Claim Forty-Nine</u>

22        Morris alleges his conviction and sentence must be vacated due to the cumulative

23    prejudicial effect of the errors in this case. (Doc. 21 at 396–98.) He did not raise this claim

24    in state court and, as discussed in Section III.B., the combined effect of PCR and appellate

25    counsel's alleged ineffectiveness cannot excuse this claim. The claim is also meritless.

26        The United States Supreme Court has not specifically recognized the doctrine of

27    cumulative error as an independent basis for habeas relief. *See Lorraine*, 291 F.3d at 447

28    

("The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief."); *cf. Morris v. Sec'y Dep't of Corr.*, 677 F.3d at 1132 n.3 (refusing to decide whether "under the current state of Supreme Court precedent, cumulative error claims reviewed through the lens of AEDPA can ever succeed in showing that the state court's decision on the merits was contrary to or an unreasonable application of clearly established law"); *Hooks v. Workman*, 689 F.3d 1148, 1194 n.24 (10th Cir. 2012) ("We note that there is a split in the circuits on whether the need to conduct a cumulative-error analysis is clearly established federal law under § 2254(d)(1).").

The Ninth Circuit has held that in some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may nonetheless prejudice a defendant to such a degree that his conviction must be overturned. *See Mancuso*, 292 F.3d at 957. Cumulative prejudice exists only where the aggregation of errors undermines confidence in the verdict. *Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007).

The Court has not identified any constitutional errors arising during Morris's trial. "If there are no errors, there is no need to consider their cumulative effect." *McGill*, 16 F.4th at 685; *see Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005); *Morris v. Sec'y Dep't of Corr.*, 677 F.3d at 1132 & n.3. Claim Forty-Nine is denied.

## IV.    EVIDENTIARY DEVELOPMENT

Morris requests evidentiary development with respect to Claims One (A)–(C), One (E), Two, Three (A)–(B), Four (A)–(B), Four (D), Five (B), Six (A), Nine, Thirteen, Fifteen (B), Forty-One and Forty-Eight. (Doc. 43.) He also seeks discovery to support a showing of cause and prejudice under *Martinez* to excuse the default of Claims One (D), Three (B), Three (C), Four (A), Four (B), Four (D), Five (B), Five (D), Six (B), Nine, Ten, Thirteen, Seventeen, Eighteen, Nineteen, Twenty, Twenty-Two (D)–(J), Twenty-Three, Twenty-Four, Twenty-Five, Twenty-Six, Twenty-Seven, Forty-Two, Forty-Three, Forty-Six, Forty-Seven, and Forty-Nine. (*See* Doc. 21, *passim*.) He seeks discovery, an evidentiary

249

1  hearing, and an expansion of the record.  *See* Rules 6, 7, and 8 of the Rules Governing
2  § 2254 Cases, 28 U.S.C. foll. § 2254.

3  **A.  Claims Adjudicated on the Merits in State Court**

4  Claims One (in part), Two, Three (A), and Six (A) were raised and denied on the
5  merits in state court.  This Court's review under § 2254(d) is confined to the record that
6  was before the state court that adjudicated the claim.  *Twyford*, 596 U.S. at 819; *Pinholster*,
7  563 U.S. at 181; *see also Gulbrandson*, 738 F.3d at 993 & n.6.  Having determined that the
8  state courts' denials of these claims did not satisfy AEDPA's deferential standard of
9  review, 28 U.S.C. § 2254(d), the Court is precluded from considering new evidence in
10 support of them.  *Stokley v. Ryan*, 659 F.3d 802, 809 (9th Cir. 2011) (citing *Pinholster*, 563
11 U.S. at. 185); *see Ellison v. Thornell*, 721 F.Supp.3d 820, 895 (D. Ariz. 2024).  Relying on
12 his unsuccessful efforts to seek an evidentiary hearing on several claims in state court,
13 Morris asserts "it is impossible to conclude that [he] was not diligent in developing his
14 claims in the state courts."  (Doc. 43 at 18.)  But Morris's diligence is irrelevant to the
15 request for evidentiary development unless, as discussed above, he first overcomes the
16 limitations of § 2254(d).  *See generally*, *Pinholster*, 563 U.S. at 181.  Because Marris has
17 not done so, there is no reason to hold an evidentiary hearing or expand the record and no
18 good cause exists to authorize discovery.  *See Sully v. Ayers*, 725 F.3d 1057, 1075 (9th Cir.
19 2013) ("[A]n evidentiary hearing is pointless once the district court has determined that §
20 2254(d) precludes habeas relief.").

21 **B.  Procedurally Defaulted Claims**

22 The remaining claims for which Morris seeks evidentiary development were not
23 presented in state court.  Relying on *Martinez*, 566 U.S. at 14, Morris argues that
24 postconviction counsel's failure to develop the record is not attributable to the petitioner.
25 (Doc. 43 at 23.)  He also asserts that "the diligence requirement in § 2254(e)(2) does not
26 apply to *Martinez* issues" and therefore evidentiary development is available "to help
27
28                                                          250

1    demonstrate cause and prejudice to overcome the default of several claims."  (*Id.* at 23.)

2    As discussed above, however, *Ramirez* forecloses these arguments.

3    In *Ramirez*, the Supreme Court "considered two specific issues concerning the

4    proper construction of § 2254(e)(2)." *McLaughlin v. Oliver*, 95 F.4th 1239, 1248 (9th Cir.),

5    *cert. denied*, 145 S. Ct. 598 (2024).  First, the Court "addressed what counts as a 'fail[ure]

6    to develop the factual basis of a claim in State court,' so as to trigger the application of

7    § 2254(e)(2)'s restrictions." *Id.*  The Court held that a petitioner "fails" to develop the state

8    court record within the meaning of § 2254(e)(2) when he or his state post-conviction

9    counsel is "at fault for the undeveloped record in state court." 5 96 U.S. at 382 (cleaned

10   up).  The Court explained that:

11       [A] prisoner bears the risk in federal habeas for all attorney errors made in
         the course of the representation, unless counsel provides constitutionally
12       ineffective assistance.  And, because there is no constitutional right to
         counsel in state postconviction proceedings, a prisoner ordinarily must bear
13       responsibility for all attorney errors during those proceedings.  Among those
14       errors, a state prisoner is responsible for counsel's negligent failure to
15       develop the state postconviction record.

16   *Id*. 382–83 (cleaned up).

17   The Court also "reaffirmed that the [§ 2254(d)(2)'s] restrictions also apply 'when a

18   prisoner seeks relief based on new evidence without an evidentiary hearing.'" *McLaughlin*,

19   95 F.4th at 1248 (quoting *Ramirez*, 596 U.S. at 389).  Therefore, even if a federal habeas

20   court "admits or reviews new evidence" for some other purpose, such as determining

21   whether the *Martinez* exception applies, the court "may not consider that evidence on the

22   merits of a negligent prisoner's defaulted claim unless the exceptions in § 2254(e)(2) are

23   satisfied." *Id.* (quoting *Ramirez*, 596 U.S. at 389).

24   Morris has not satisfied the requirements of 2254(e)(2).  He has not shown that the

25   claims for which he seeks evidentiary development rely on (1) a new and previously

26   unavailable rule of constitutional law made retroactively applicable by the Supreme Court,

27   or (2) "a factual predicate that could not have been previously discovered through the

28                                        251

1   exercise of due diligence."  28 U.S.C. §§ 2254(e)(2)(A)(i), (ii).  With the exception of the

2   new evidence supporting Claims One (as it relates to the prosecutor's "pattern and practice

3   of misconduct"), and Forty-One,[55] the evidence Morris seeks to develop existed at the time

4   of the state court proceedings, so there is no new factual predicate under § 2254(e)(2).  *See*

5   *Lee*, 108 F.4th at 1161–62; *Speer*, 2023 WL 2503733, at *88 ("The claims for which he

6   seeks evidentiary development do not . . . rely on a factual predicate that could not have

7   been discovered previously through due diligence.").  The evidence Morris seeks to

8   develop, consisting largely of additional information from his defense team and from

9   family members, existed at the time of the state court proceedings, so there is no new

10  factual predicate under § 2254(e)(2).  Morris is not entitled to evidentiary development.[56]

11                        **CERTIFICATE OF APPEALABILITY**

12          Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, a petitioner

13  cannot take an appeal unless a certificate of appealability ("COA") has been issued by an

14  appropriate judicial officer. Rule 11(a) of the Rules Governing Section 2254 Cases

15  provides that the district judge must either issue or deny a certificate of appealability when

16  _____

17  [55] As discussed above, evidence of prosecutorial misconduct occurring after
18  Morris's trial or in other cases is irrelevant to the Court's resolution of Claim One.
    Additionally, the Court resolved Claim Forty-One as a purely legal question, requiring no
19  further evidentiary development.  *See Beardslee*, 358 F.3d at 585; *see Hendricks*, 974 F.2d
20  at 1103.

21  [56] The Court notes that Morris, in his request for evidentiary development, seeks a
    subpoena duces tecum to his first PCR counsel, Nicole Farnum, for her complete attorney
22  file.  (Doc. 43 at 55.)  For the reasons explained above, the Court denies Morris's request
    for further evidentiary development of his claims, including the requested subpoena.  To
23  the extent Morris contends the Arizona Rules of Criminal Procedure and the ABA
24  Guidelines mandate Farnum release her complete file, this Court previously ordered
    counsel, prior to the case management conference, to obtain and complete review of
25  Morris's prior counsel's files, and noted that the Court would not assist directly in obtaining
26  these materials "[a]bsent a motion detailing significant delays, problems or obstacles
    encountered in obtaining" these files.  (Doc. 5 at 2.)  At no time during habeas counsel's
27  representation of Morris did his counsel file a separate motion requesting these files.

28                                        252

1    it enters a final order adverse to the applicant.  If a certificate is issued, the court must state

2    the specific issue or issues that satisfy 28 U.S.C. § 2253(c)(2).

3           Under § 2253(c)(2), a certificate of appealability may issue only when the petitioner

4    "has made a substantial showing of the denial of a constitutional right."  This showing can

5    be established by demonstrating that "reasonable jurists could debate whether (or, for that

6    matter, agree that) the petition should have been resolved in a different manner" or that the

7    issues were "adequate to deserve encouragement to proceed further."  *Slack*, 529 U.S. at

8    484 (quoting *Barefoot*, 463 U.S. at 893 & n.4).  For procedural rulings, a certificate of

9    appealability will issue only if reasonable jurists could debate whether the petition states a

10   valid claim of the denial of a constitutional right and whether the court's procedural ruling

11   was correct.  *Id.*  The Court finds that reasonable jurists could debate its resolution of Claim

12   13, alleging Morris's right to due process was violated when the jury was incorrectly

13   instructed that if given a life sentence, he could be eligible for parole.  (See Doc. 84)

14   (denying Claim 13).

15                                    **CONCLUSION**

16          The Court has considered Morris's claims and determined that none establish that

17   he is entitled to habeas relief.

18          **IT IS ORDERED:**

19          1.  Morris's Petition for Writ of Habeas Corpus (Doc. 21) is **denied**. The Clerk of

20              Court shall enter judgment accordingly.

21          2.  Morris's request for evidentiary development (Doc. 43) is **denied**.

22          3.  A certificate of appealability with respect to Claim 13 is **granted**.

23          4.  The Clerk of Court shall forward a courtesy copy of this Order to the Clerk of

24              the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-3329.

25          Dated this 8th day of December, 2025.

26          *David G. Campbell*

27          _____
                        David G. Campbell
28                Senior United States District Judge

253